Judah D. Greenblatt
GREENBLATT LESSER LLP
The Chanin Building
122 East 42nd Street, 31st Floor
New York, NY 10168
(212) 682-9832
jgreenblatt@greenblattlesser.com

Howard Kleinhendler
Jocelyn M. Weinstein
WACHTEL MISSRY LLP
885 Second Avenue
New York, NY 10017
(212) 909-9500
hkleinhendler@wmllp.com

*Attorneys for Plaintiff*
*Monadnock Construction, Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONADNOCK CONSTRUCTION, INC., <br><br> Plaintiff, <br><br> v. <br><br> WESTCHESTER FIRE INSURANCE COMPANY, <br><br> Defendant. | Case No. 1:16-cv-420 (JW) <br><br> **COMPLAINT** |

Plaintiff Monadnock Construction, Inc. ("Monadnock") by its attorneys, Wachtel Missry LLP and Greenblatt Lesser LLP, in furtherance of its action against Westchester Fire Insurance Company ("WFIC"), states as follows:

047842-002/00020538-2

## NATURE OF THE CASE

1. WFIC, as surety, refused to honor performance bonds it issued in favor of its obligee, Monadnock. Glasswall, LLC ("Glasswall"), as principal on the bonds and manufacturer for Monadnock, breached its contractual obligations to Monadnock by repeatedly failing to timely deliver window assemblies ("Windows") and other materials (Materials") to the two large mixed use (commercial and affordable housing) buildings Monadnock constructed in Long Island City, New York. In addition, Glasswall failed to deliver certain Materials and ones it did deliver were defective. Glasswall also failed to pay suppliers for work in connection with the projects. These breaches delayed the projects' completions by close to a year, resulting in more than $9 million in damages.

2. Glasswall's delays and other breaches were further exacerbated by WFIC's refusal to honor its policy commitments to timely step in and take over Glasswall's responsibilities under the construction contracts.

3. Monadnock seeks damages against WFIC for breaches of contract.

## JURISDICTION AND VENUE

4. Monadnock is a New York corporation, with its principal place of business located at 155 3rd Street, Brooklyn, New York.

5. WFIC, upon information and belief, is a Pennsylvania corporation, with its principal place of business in Philadelphia, Pennsylvania.

6. The Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1332(a), because the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

7. Venue lies in this district, pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district. The construction projects at the heart of this dispute are located in Queens County, New York.

**FACTS**

8. On or about January 3, 2013, Monadnock, as Contractor, entered into two (2) AIA A401-2007 contracts (hereinafter collectively referred to as the "Contracts") with Glasswall, as Manufacturer, located at 3550 NW 49th Street, Miami, Florida, for the design and supply of a curtainwall system including Windows, doors, storefronts and other Materials for each of two (2) mixed use (commercial/affordable housing) projects in the Hunters Point South section of Long Island City, New York.

9. The Windows specified under the Contracts were long lead items that required many months to design, engineer and produce. The Windows were also unique and were to be specifically manufactured for the projects.

10. The first project, referred to as "HPS Parcel A", is a thirty-seven (37) story building located at 1-50 50th Avenue, and is owned by HPS 50th Avenue Associates LLC. The second project, referred to as "HPS Parcel B", is a thirty-two (32) story building located at 1-55 Borden Avenue, is owned by HPS Borden Avenue Associates LLC. The two (2) HPS entities are hereinafter collectively referred to as "HPS". The HPS Parcels A and B projects are hereinafter collectively referred to as the "Projects".

11. The Monadnock/Glasswall HPS Parcel A Contract was in the amount of Eight Million, Four Hundred and Twelve Thousand, Five Hundred and Two Dollars ($8,412,502) and required Glasswall to deliver Five Thousand, Eight Hundred and Thirty-Six (5,836)

Windows and other Materials to HPS Parcel A. The Monadnock/Glasswall HPS Parcel B Contract was in the amount of Four Million, Five Hundred and Eighty-Seven Thousand, Four Hundred and Ninety-Eight Dollars ($4,587,498) and required Glasswall to deliver Three Thousand, One Hundred and Twenty (3,120) Windows and other Materials to HPS Parcel B.

12. The Contracts required Glasswall to obtain payment and performance bonds for each Contract. Pursuant thereto, Glasswall obtained from WFIC Payment and Performance Bonds No. K08840295 dated February 12, 2013 for HPS Parcel A and Payment and Performance Bonds. No. K08840258 dated February 11, 2013 for HPS Parcel B in the amounts of the Contracts (collectively, the "Bonds") (attached hereto as Exhibit A).

13. The Contracts had a "time of the essence" clause (AIA A401-2007, section 9.4). They required Glasswall to ship completed Windows to HPS Parcel B starting on July 1, 2013 and to HPS Parcel A starting on September 1, 2013. Glasswall did not meet those dates.

14. On March 15, 2013, the project schedule was updated and reflected Window delivery start dates of August 7, 2013 for Parcel B and of August 29, 2013 for Parcel A. Glasswall did not meet those delivery start dates either.

15. On August 16, 2013, Glasswall's attorney at the time, Clinton D. Flagg, sent Monadnock a letter representing that "completed window assemblies" would be ready to ship by Glasswall to the Projects on September 1, 2013. That representation proved false.

16. On November 20, 2013, Glasswall issued a production schedule representing that Release 1 for Parcel A (i.e. Windows for floors 2-6) would be complete by December 6, 2013 and Release 1 for Parcel B (i.e. Windows for floors 2-9) would be complete by December 12, 2013. Those representations proved to be false as well.

17. The Contracts also required Glasswall to fabricate, and store off-site, Windows as necessary to allow for their timely and continuous installation (Rider 5, ¶17.d.2) at a rate of 2 floors per week (Rider 5, ¶37) while keeping pace 6 floors below the superstructure contractor (Rider 5, ¶4.3.b.).

18. On or about November 21, 2013, Monadnock's subcontractor completed the concrete superstructure on HPS Parcel B, and on or about January 15, 2014, it completed the concrete superstructure on HPS Parcel A.

19. Glasswall was also required to: "diligently perform the work, and maintain men in sufficient numbers and materials in sufficient quantities to accomplish the rapid completion of the job." (AIA A401-2007, section 9.3.)

20. Significant work by the other trades on the Projects was delayed due to the lack of Windows since the Windows were necessary to protect the interior of the buildings from the outside elements. Glasswall's furnishing of Windows to be installed by others was a necessary construction pre-condition to the various other interior construction trades progression of their work.

21. Although Monadnock asked Glasswall several times for a recovery schedule that would show how Glasswall intended to accelerate its production to make up for lost time, Glasswall refused to provide a recovery schedule. Instead, Glasswall issued production schedules on September 17, 25, 27, October 28, and November 20, 2013, none of which Glasswall followed and all of which failed to show the recovery of lost time.

22. On November 27, 2013, Glasswall emailed Monadnock that Parcel A Release 1 would be complete by December 6, 2013 and Parcel B Release 1 would be complete by December 12, 2013. Those Releases were not completed as represented.

23. On January 7, 2014, Glasswall issued another production schedule, which failed to provide for critical storefront Windows, and once again failed to recover all of the lost time. Moreover, it guaranteed that Glasswall would be late in its "time of the essence" deliveries.

24. Given Glasswall's prior history of broken production and delivery promises and its continued problems with its suppliers, Monadnock had doubts that Glasswall would maintain the January 7, 2014 production schedule.

25. Moreover, quality assurance/quality control ("QA/QC") issues pervaded Glasswall's production. Israel Berger & Associates, LLC ("IBA"), acting as HPS's representative, conducted limited inspections of Glasswall's production in its Miami facilities. It issued weekly deficiency reports demonstrating Glasswall's QA/QC problems. Those deficiencies continued to plague Glasswall's production.

26. In late December, 2013, Glasswall, at IBA's request, opened up 3-5 crates of "completed window assemblies" that Glasswall had represented were defect-free and ready for shipment to the HPS Projects. IBA discovered that numerous previously known defects in several of those "completed window assemblies" had not been remedied.

27. Lastly, Glasswall anticipatorily breached the Contracts by demanding payment before it was due and declaring its refusal to ship Windows if ordered to do so by Monadnock. The Contracts did not require Monadnock to pay Glasswall for stored materials not delivered to the Projects. In addition, Glasswall's certified requisition amounts for its production were false and were never resubmitted with accurate quantities.

28. In any event, delivery of those Windows was held up due to QA/QC concerns and, moreover, the respective Release 1's for Parcels A and B were not complete.

29. Because Window delivery was critical to the progress of the Projects, delays in their delivery delayed the completion of the Projects and pushed out the temporary certificate of occupancy ("TCO") dates. This exposed Monadnock to substantial damages including, but not limited to, extended general conditions, extended field costs, extended overhead costs, trade delay claims, extended financing costs, loss of rents and other damages.

30. In consequence of all the foregoing, Monadnock sent Glasswall a Notice of Default on September 16, 2013, a Notice of Continuing Default on October 23, 2013 and a Notice of Continuing Default on December 31, 2013. The aforesaid Notices were also sent to WFIC.

31. Nevertheless, Glasswall remained in default of its production obligations, delivery obligations, scheduling obligations, and QA/QC obligations and it submitted falsified requisitions that it demanded to be paid for, despite having never delivered a single Window to the Projects.

32. On January 13, 2014, upon certification of sufficient cause from the architect, Monadnock terminated Glasswall's Contracts.

33. Also on January 13, 2014, Monadnock provided WFIC with the required Section 3.2 notice under the Bonds and demanded that WFIC take action pursuant to Section 5 of the Bonds which required WFIC to, inter alia, "promptly": takeover the Contracts (with Monadnock's consent) and arrange for Glasswall to complete them (Section 5.1); takeover the Contracts (without Monadnock's consent) and complete them itself or through other independent contractors (Section 5.2); arrange for a bonded completion contractor to contract with Monadnock to complete the work and pay for it, along with Section 7 damages (Section 5.3); or, pay Monadnock the amount owed under the Bonds or deny liability (Section 5.4).

34. WFIC refused to take any Section 5 action whatsoever and thereby breached its contracts (i.e. the Bonds).

35. On March 6, 2014, Monadnock sent WFIC a 7 day notice under Section 6 of the Bonds demanding that WFIC "perform its obligations" under the Bonds and chose a Section 5 course of action.

36. Again, WFIC refused to take any Section 5 action whatsoever and thereby breached its contracts (i.e. the Bonds).

37. Ultimately, on April 4, 2014, in an effort to mitigate damages, and without any waiver of its rights, Monadnock entered into an Agreement to Amend Contracts ("Amendment Agreement") with Glasswall, WFIC, HPS and the indemnitors on the Bonds, Ugo Colombo and his wife Sara Jayne Colombo Kennedy (the "Indemnitors") that provided for the completion of the Contracts by Glasswall. In addition, unbeknownst to Monadnock at the time, WFIC entered into a side agreement ("Side Agreement") with Glasswall to increase its Contracts price by 7.5%.

38. The Amendment Agreement permitted Glasswall to complete the Contracts but preserved all parties' claims that had accrued to date, including Monadnock's claims against Glasswall and Monadnock's claims against WFIC, and deferred them until the earlier of the completion of the Contracts or termination thereof.

39. The Amendment Agreement provided, inter alia, that Monadnock would withdraw Glasswall's termination without prejudice and without waiver of any rights and Glasswall would complete its Contracts work for the Projects according to an April 4, 2014 Production Schedule and "deliver Competed Windows Units on a continuous basis to the

Project as expeditiously as possible consistent with the Production Schedules". The Production Schedules required production to be completed by October 28, 2014.

40. The original Contracts required Glasswall to complete its Work so that the Projects could be completed by "4th quarter of 2014 to 1st quarter of 2015" for Parcel A (Rider 5, ¶44c) and "3rd quarter of 2014" for Parcel B (Rider 5, ¶43c). The Amendment Agreement further required Glasswall to deliver completed windows "on a continuous basis to the Project as expeditiously as possible consistent with the Production Schedules" (Amendment Agreement, ¶6).

41. The Amendment Agreement also provided that WFIC would pay Glasswall for all Materials it produced at its Miami facilities and Monadnock would pay WFIC for all Materials it received at the Projects. All claims among the parties that had accrued through the date of the Amendment Agreement were preserved and deferred pending the completion of the Contracts or the earlier termination thereof.

42. Neither the Amendment Agreement nor the Side Agreement were permitted Section 5 choices under the Bonds and did not satisfy WFIC's obligations to undertake a Section 5 choice; thus WFIC's default under the Bonds continued.

43. In any event, the Amendment Agreement explicitly preserved and reserved Monadnock's Bond claims that had accrued to the date of the Amendment Agreement.

44. For the next few months, Glasswall continued to refuse to ship any Windows to the Project. Moreover, WFIC continued to refuse to take action under Section 5 of the Bonds.

45. By October 28, 2014, Glasswall had neither completed production of the Materials nor delivered all the Materials it had produced. Instead, Glasswall first slowed

down its shipment of Materials to the Projects and then stopped the deliveries completely, even though it had many truckloads of Windows at its facilities ready for shipment. Glasswall explained that it would not continue shipment of completed Materials or production of new Materials until it was paid in advance by WFIC its entire contracts balance.

46. Glasswall also demanded that Monadnock pay WFIC in advance for Glasswall's remaining Materials, even though the Materials had neither been produced nor delivered to the Projects.

47. WFIC recognized that Glasswall's position that it would not ship completed Materials to the Projects unless Monadnock pre-paid WFIC for delivery was contrary to the Amendment Agreement. In fact, WFIC's attorneys prepared litigation papers[1] acknowledging and confirming that Glasswall's demand was contrary to the Amendment Agreement and created a potentially "disastrous condition".

48. Nevertheless, on November 11, 2014, WFIC pre-paid Glasswall for its entire Contracts balance and an extra 7.5% pursuant to the Side Agreement.

49. At WFIC's urging, on November 25, 2014, Monadnock sent WFIC checks totaling $1,979,309 representing the entire contracts balance for the undelivered Materials but specifically reserved all of its rights to assert any "backcharge, change order or similar reduction" for a later date.

50. Thereafter, Glasswall re-commenced delivery of Windows and other Materials to Parcels A and B but never completed its Work. The reason became apparent to all concerned

---

[1] Ultimately, WFIC never filed the litigation papers because Monadnock, at WFIC's urging, paid WFIC in full for Glasswall's production. The payment was made with a complete reservation of rights.

when Monadnock discovered that Glasswall had sold its assets, including its Miami manufacturing facility, to one of its competitors, Tecnoglass, Inc.

51. In addition, Monadnock has discovered and is continuing to discover and uncover QA/QC issues on a continuous basis, including leaking window units. With the sale of Glasswall and its Miami manufacturing facility to Tecnoglass, Glasswall was unresponsive to any of Monadnock's requests to complete the Work or correct defects.

52. Monadnock also discovered that Glasswall had not paid several of its suppliers, one of which liened Parcel A.

53. Finally, on March 4, 2015, four months after Glasswall was required to complete its Work as per the Amendment, Monadnock served a Notice of Default on Glasswall detailing 30 different defaults and affording Glasswall a seven (7) day cure period. Monadnock also served a copy of the Notice on WFIC.

54. Glasswall failed to cure any of the listed defaults and continued to breach the Contracts for reasons including but not limited to the following:

> (a) Glasswall did not complete its Work;
> (b) Glasswall did not correct defective Work;
> (c) Glasswall did not provide documentation required under the Agreements including but not limited to warranties, LEED documentation, material certifications, and final lien waivers by Glasswall and its suppliers;
> (d) Glasswall delayed in performance of its Work thereby causing delays and increased costs to other contractors whom Monadnock has reimbursed;
> (e) Glasswall delayed in performance of its Work thereby causing delays and increased costs to Monadnock;
> (e) Glasswall failed to pay all its suppliers for materials used to fabricate the Work and for shipment of same to the Projects; and
> (f) Glasswall ceased operations and was not able to fulfill its warranty obligations.

55. After the expiration of the cure period, and upon certification of sufficient cause from the architect, Monadnock terminated Glasswall on March 16, 2015.

56. Also on March 16, 2015, Monadnock provided WFIC with the required Section 3.2 notice under the Bonds and demanded that WFIC take action pursuant to Section 5 of the Bonds.

57. On April 20, 2015, Monadnock sent WFIC a 7-day notice under Section 6 of the Bonds demanding that WFIC "perform its obligations" under the Bonds and chose a Section 5 course of action.

58. On April 25, 2015, WFIC, through its counsel, denied Monadnock's Bond claim stating, inter alia, that: (a) Monadnock's payment in full of the entire Contracts price to WFIC constituted a waiver of its right to assert claims; (b) Monadnock's termination of Glasswall was based, in part, on events occurring prior to the Amendment Agreement and the parties had agreed that those claims could not constitute the basis of a later termination; and (c) Glasswall had substantially completed the Contracts and thus could not be terminated.

59. WFIC's denial of Monadnock's Bond claim constituted an act of bad faith. All of the reasons given by WFIC for denial of Monadnock's Bond claim were patently false and WFIC knew them to be false.

60. Rather than conduct an independent investigation of Monadnock's Bond claim, as it was required to do under the terms of the Bonds, WFIC simply parroted the position of Glasswall's attorneys.

61. Particularly egregious was WFIC's reliance on Glasswall's attorney's argument that Monadnock had waived its right to assert claims against Glasswall by virtue of Monadnock's full payment of the entire Contracts price to WFIC. In point of fact, in

November 2014, WFIC did not believe that Glasswall had the right to demand full payment from Monadnock to WFIC.  Nevertheless, in order to mitigate damages WFIC urged Monadnock to make full payment with a reservation of rights.  It was thus an act of bad faith for WFIC to deny Monadnock's Bond claims in reliance, in part, on a waiver argument.

## FIRST CLAIM FOR RELIEF
(Breach of Contract)

62. Monadnock repeats and realleges each and every one of the prior paragraphs as if more fully stated at length herein.

63. Under the terms of the Bonds, WFIC was required to take action pursuant to Section 5 of the Contracts after Glasswall's default and Monadnock's January 13, 2014 Section 3.2 notice thereof, and March 6, 2014 7-day notice.

64. Monadnock fulfilled its obligations under the Bonds and all other conditions precedent, if any, to WFIC's liability under the Bonds have been met or waived.

65. WFIC, however, has failed and refused to perform, and breached its obligations under the Bonds.

66. As a result of Glasswall's default and WFIC's breach of the Bonds, Monadnock has suffered, and is entitled to recover from WFIC, damages in an amount to be determined at trial, but not less than $9 million, plus interest and attorneys' fees.

## SECOND CLAIM FOR RELIEF
(Breach of Contract)

67. Monadnock repeats and realleges each and every one of the prior paragraphs as if more fully stated at length herein.

68. Under the terms of the Bonds, WFIC was required to take action pursuant to Section 5 of the Contracts after Glasswall's default and Monadnock's March 16, 2015 Section 3.2 notice thereof, and April 20, 2014 7-day notice.

69. Monadnock fulfilled its obligations under the Bonds and all other conditions precedent, if any, to WFIC's liability under the Bonds have been met or waived.

70. WFIC's April 25, 2015 denial of Monadnock's claims was in bad faith, as all of the reasons WFIC provided for denying Monadnock's Bond claims were patently false and WFIC knew them to be false.

71. As a result of Glasswall's default and WFIC's breach of the Bonds, Monadnock has suffered, and is entitled to recover from WFIC, damages in an amount to be determined at trial, but not less than $9 million, plus interest and attorneys' fees.

WHEREFORE, Monadnock demands judgment against WFIC:

a. On its FIRST CLAIM FOR RELIEF, awarding damages for WFIC's breach of contract in an amount to be determined at trial, but not less than $9,000,000, plus interest, costs and attorneys' fees;

b. On its SECOND CLAIM FOR RELIEF, awarding damages for WFIC's bad faith breach of contract in an amount to be determined at trial, but not less than $9,000,000, plus interest, costs and attorneys' fees; and

c. For such other and further relief that this court deems just, necessary and proper.

Dated: March 1, 2016

WACHTEL MISSRY LLP

By: /s/ Howard Kleinhendler
Howard Kleinhendler
885 Second Avenue
New York, NY 10017
(212) 909-9500
hkleinhendler@wmllp.com

-and-

GREENBLATT LESSER LLP
Judah D. Greenblatt
The Chanin Building
122 East 42nd Street, 31st Floor
New York, NY 10168
(212) 682-9832
jgreenblatt@greenblattlesser.com