Howard Kleinhendler
Evan Weintraub
Jocelyn M. Weinstein
WACHTEL MISSRY LLP
885 Second Avenue
New York, NY 10017
(212) 909-9500
hkleinhendler@wmllp.com
weintraub@wmllp.com
jweinstein@wmllp.com

*Attorneys for Plaintiff*
*Monadnock Construction, Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MONADNOCK CONSTRUCTION, INC.,                    Case No.: 16 CIV 00420 (JBW)(VMS)
                                  Plaintiff,     ECF Case
                 -against-


WESTCHESTER FIRE INSURANCE              **AMENDED COMPLAINT**
COMPANY,
                                  Defendant.
-------------------------------------------------------------X
WESTCHESTER FIRE INSURANCE
COMPANY,
                          Third-Party Plaintiff,
                 -against-


GLASSWALL, LLC, UGO COLOMBO, and
SARA JAYNE KENNEDY COLOMBO,
                          Third-Party Defendants.
-------------------------------------------------------------X

Plaintiff Monadnock Construction, Inc. ("Monadnock") by its attorneys, Wachtel Missry

LLP, states as follows:

## NATURE OF THE CASE

1.     Westchester Fire Insurance Company ("WFIC"), as surety, refused to honor two

performance bonds (the "Bonds") it issued in favor of its obligee, Monadnock.  Glasswall,

LLC ("Glasswall"), as principal on the Bonds and manufacturer for Monadnock, breached its

contractual obligations to Monadnock by repeatedly failing to timely deliver window assemblies ("Windows") and other materials ("Materials") to the two large mixed use (commercial and affordable housing) buildings Monadnock constructed in Long Island City, New York.  In addition, Glasswall failed to deliver certain Materials, and ones it did deliver were defective. Glasswall also failed to pay suppliers for work in connection with the projects. These breaches delayed the projects' completions by close to a year, resulting in more than $10 million in damages.

2.      Glasswall's delays and other breaches were further exacerbated by WFIC's refusal to honor its policy commitments to timely step in and take over Glasswall's responsibilities under the construction contracts.

3.      Monadnock seeks damages against WFIC for its breaches of contract.

4.      Monadnock further seeks confirmation of the arbitration award it secured against Glasswall for its delays and breaches.

5.      Monadnock also seeks to collect from Glasswall's owner, Ugo Colombo, the damages it was awarded in the arbitration.

<u>**JURISDICTION AND VENUE**</u>

6.      Monadnock is a New York corporation, with its principal place of business located at 155 3rd Street, Brooklyn, New York.

7.      WFIC, upon information and belief, is a Pennsylvania corporation, with its principal place of business in Philadelphia, Pennsylvania.

8.      Third-Party Defendant, Glasswall, is a Florida limited liability company whose members are citizens of the State of Florida.

9.      Third-Party Defendant, Ugo Colombo, is an individual and a citizen of the State of Florida, residing at 5020 North Bay Road, Miami, Florida 33140.

10.     Third-Party Defendant, Sara Jayne Kennedy Colombo, is an individual and a citizen of the State of Florida, residing at 5020 North Bay Road, Miami, Florida 33140.

11.     The Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1332(a), because the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

12.     The Court also has supplemental jurisdiction over the claims against third-party defendants pursuant to 28 U.S.C. § 1367 because the claims are related to and arise out of the same controversy as the federal claims.

13.     Venue lies in this district, pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district. The construction projects at the heart of this dispute are located in Queens County, New York.

## FACTS

### The Project

14.     The Hunter's Point development was a New York City affordable housing initiative for the construction of high-rise residential towers in Long Island City. This included: Parcel A, a 37-floor 619-unit residential unit building on 1-50 50th Avenue; and Parcel B, a 32-story 306-unit residential unit building at 1-55 Borden Avenue. Monadnock was part of the team that won the bid to construct the towers. A member of the project's architectural team recommended Glasswall as a potential curtain wall manufacturer and after

checking with references, Glasswall was invited to bid the job in 2012. Glasswall submitted the winning bid.

15.     A curtain or window wall unit is a slab-to-slab structure that makes up the skin or envelope of the building and is comprised of metal frames, louvers, hardware, glass and gaskets. Between the two buildings, Glasswall committed to provide over 9,000 window wall units consisting of several hundred different designs and multiple colors of glass. Window wall is a long lead time item and is critical to the timely completion of the project. The value of the two construction contracts was $13 million. Glasswall bonded its performance under the contracts with Westchester Fire Insurance Company.

**The Contracts**

16.     Glasswall's obligations were set forth in a modified AIA Standard Form Agreement Between Contractor and Subcontractor (collectively the "Contracts"), executed in February 2013.  Indeed, the form contract was Exhibit F to the Construction Agreement between the property owner and Monadnock, the construction manager (the "CM Agreement"). Parcel A and Parcel B had separate CM and subcontractor agreements, which were virtually identical.  The ownership entities for both parcels were represented by the Related Companies, which was also an owner.  The Contracts had a standard flow-down provision that permitted Monadnock to pursue claims against Glasswall on behalf of the owners.  Under the CM Agreement baseline schedules, Parcel A was to have obtained its first temporary certificate of occupancy ("TCO") by August 2014, and Parcel B by July 2014.

17.     Under the Contract the window wall units were to be completed and ready to ship by July 1, 2013 for Parcel B and September 1, 2013 for Parcel A. These dates were "time is of the essence."  Glasswall was required to have enough window units completed to

accommodate installation as the concrete infrastructure of the two buildings was being erected. In fact, the Contracts required the "Manufacturer to be 6 floors below the Superstructure Contractor." Window units were to be shipped floor by floor with completed assemblies in correct position to allow for seamless installation. The pace of window deliveries was required to accommodate the installation of "two floors per week."

18.     This was a design build contract. Glasswall's obligation involved procuring materials and developing all engineering designs to construct a window wall unit that conformed to the shop drawings and plans provided by the Projects' architect, Ismael Levya Architects, P.C. Specifically, to permit the metal fabricator to make the correct cuts and holes for each window wall unit, Glasswall was required to engineer "cut sheets" that conformed to the shop drawings. The cut sheets took time to prepare because of the intricate detail required for every window wall panel. This task was exacerbated by the hundreds of different window wall unit designs required for the Project.

**Glasswall's Delays Begin**

19.     Construction of the two buildings began in February 2013. By April 2013, the window wall visual mockups had been approved; the glass and paint colors had been selected; and Glasswall's glass supplier, AGC, was told to manufacture the glass for the performance mock up. On May 31, 2013, Monadnock sent Glasswall a weekly floor-by-floor concrete erection schedule showing exactly when each floor of each building was to be poured to ensure that Glasswall would deliver a steady and interrupted supply of Halfen anchors that were required to be embedded in the concrete.

20.     During a June conversation between Mr. Colapinto, Monadnock's Senior Vice President and project manager, and Frederico Balestrazzi, Glasswall's president, Mr.

Balestrazzi stated that Glasswall was going to have problems meeting the Contracts' delivery dates. As a result, by email dated June 12, 2013, Monadnock agreed to take delivery of the Parcel B windows on September 16, and Parcel A windows on October 1. Although Monadnock gave Glasswall extra time to deliver the windows, Monadnock was ready to receive the windows under the original time frames set in the Contracts and to store them on site until they were ready for installation.

21.     Mr. Colapinto stressed that the projects could not suffer additional delays, and Mr. Balestrazzi assured him there would not be any.  But the delays continued. In early summer 2013, Monadnock visited Glasswall's factory in Florida and repeatedly asked about progress on the window fabrication. By July, there was still no progress with window fabrication and Glasswall informed Monadnock that windows would not be ready even for the new pushed out delivery dates.  As explained by Mr. Colapinto, this continued delay alarmed Monadnock management: "[B]ecause scheduling was of utmost importance when it came to curtain walls. If we didn't know where the windows were, we couldn't build the project correctly."[1]

**Glasswall Fails to Timely Provide Engineering Releases**

22.     The problems in window fabrication were originally driven by delays in Glasswall's engineering and release dates.  As Mr. Bauso, Monadnock's president, explained:

> The curtain wall guys have to – their engineering department has to produce very specific cut sheets as to how they want the metal, how they want the glass sized and fabricated. They can't just send the approved shop drawings from the architect to the metal factory. They have to give very, very specific engineered cut sheets to their fabricators. And, you know, it's one of the things we typically ask about, because, if that isn't done, we have good reason to believe that they are not

---

[1] Witness quotations are to the transcript of the Arbitration hearings.  See infra.

going to be able to get us the windows when they are promising. So just as a matter of business, this is – this is one of the things we always focus on. And it was becoming apparent that their engineering department wasn't getting these materials released when they should have been.  (Tr. 1015-16.)

23.     In early summer 2013, Mr. Bauso contacted Glasswall's metal extruder, Keymark, to determine whether it had received Glasswall's cut sheets and was working on the project.  Keymark confirmed they had a purchase order from Glasswall, but did not yet have the cut sheets and engineering releases from Glasswall.  Monadnock continued to question Mr. Balestrazzi about the delays in releasing engineering to Keymark, "and the answers he was giving made it obvious he wasn't going to make the dates he had previously committed to, even the revised dates he had previously committed to." This prompted Monadnock, on August 12, 2013, to write WFIC and alert it to a potential default by Glasswall.

**Glasswall Chose to Work on Four Other Large Projects Instead of Hunter's Point**

24.     On August 13, 2013, Mr. Bauso and Michael Trovini, a senior Related executive, met with Glasswall officials at Glasswall's Miami facility.  During the visit, Mr. Trovini observed that Glasswall was not working on the Hunter's Point project and instead was devoting its staff and resources to other projects:

> And we discussed the status of the project, and we toured the factory and I recall breaking – and they were manufacturing not our product, meaning the window wall. I discovered because I went over to the engineering department as – as opposed to walking the factory and watching somebody else's window wall being manufactured, which is a complete waste of time, to see if the engineers had done anything as it relates to designing and getting the window wall parts and pieces designed so that they could go and manufacture it. And the engineers were not working on it – and there was only like a few of them – who were not working on our project.  (Tr. 1505-06.)

25.     Indeed, between January and September 2013 when Glasswall was supposed to be working on the Hunter's Point project, it was working on at least four other Florida curtain

wall projects: 1) the Monte Carlo Hotel, a 20-story high rise; 2) Edition Hotel, a hotel and residential condominium; 3) Perry Rooney Hotel a hotel condo project; and 4) Oceana, a condo residence. These projects were all approximately 80-90 percent complete by September 2013 and were staffed by 80 Glasswall employees.

26.     As Mr. Bauso recalls, by the time of the August 13th meeting, Ugo Colombo, Glasswall's owner, had fired Mr. Balestrazzi.  Mr. Balestrazzi's departure spurred the departure of many other Glasswall engineers, leaving the company disorganized and even less able to meet its already compromised contractual commitments to Monadnock. Nevertheless, Monadnock agreed to attempt to continue to work with Glasswall to get the project back on track.

27.     By letter dated August 16, 2013, Glasswall's attorney, Clinton Flagg, wrote to Monadnock confirming that "Glasswall will expedite production and delivery of the completed window assemblies forthwith such that Glasswall can comply with its contractual obligations with Monadnock."  But by early September, matters had not improved. Glasswall had no windows ready to ship. (Tr. 2013.) Yet at this point, as Mr. Bauso explained:

> [B]y September we had already paid them several million dollars for engineering, for performance mockups, the material deposits they requested – and we paid deposits to their material suppliers, which we paid to Glasswall, not directly to suppliers. So just keep in mind at this point we were out of pocket several million dollars, and things were not moving along very well. And it was a growing concern as to where this was all going. (Tr. 1033-34.)

**Glasswall Defaults**

28.     By letter dated September 16, 2013, Monadnock issued a default notice to Glasswall.  Notice was also provided to WFIC. The parties met in New York on September 18, 2013 to try to resolve the situation. Glasswall had just hired John Anderson to replace Mr. Balestrazzi and promised to expedite its manufacture of windows.

29.     However, Glasswall could not satisfy Monadnock's ongoing concerns about its ability to timely manufacture the window wall units. Specifically, in October 2013, Monadnock had sent its own consultant, Steve Barber, down to Glasswall's facilities to monitor the window production progress. Barber's reports were disturbing.

30.     Barber sent back detailed reports showing that Glasswall did not have sufficient staff manning the construction lines and that they were not in a position to meet their own revised recovery schedules. Barber further confirmed that Glasswall was struggling to complete the engineering releases necessary for Keymark and Glasswall's glass supplier, AGC, to produce the glass and metal frames. Indeed, Barber further observed that even the work Glasswall reported to Monadnock as completed was in fact unfinished.

31.     Mr. Bauso further explained that Glasswall's continued delays in manufacturing the window wall units prompted Monadnock to send another default notice on October 23, 2013. WFIC was again noticed.

32.     The parties met again in mid-November in New York.  By then, Glasswall claimed to have window wall units for five floors ready to ship and was demanding payment before shipment. The units that Glasswall was purportedly ready to ship were not complete floors, but instead were merely incomplete sections of each floor. Additionally, the units had deficiencies identified by IBA in a 10-page report. As Mr. Bauso explained:

> John had some quantity of widows that he was purporting were ready for shipment.  But there were still a number of open issues. There was still quality control issues that had not been addressed ... There was still an issue in my mind of what is really our ongoing schedule here, about all the material that they needed to continue assembly was in their shop.  There was some concern. "Okay. We are going to take a couple of trucks of windows, mobilize all iron workers. And then what happens?  You know, are they going to really have material to continue working?"  (Tr. 1047.)

This was a critical question.

33.     Mr. Bauso further explained that Monadnock could not take and install a handful

of floors of windows and then look elsewhere should Glasswall fail to complete the Contract:

> [I]f we started installing two or three floors of windows, and their factory was not
> able to complete this we – you would not be able to find another factory that
> could manufacture that exact window.  So essentially, you'd have to tear out and
> start all over again whatever you installed.  (Tr. 1053.)

34.     Accordingly, on November 27, 2013, the project architect, Ismael Levya, stated

that sufficient cause existed to terminate the Glasswall Contract.  Monadnock sent another

default letter on December 31, 2013.  WFIC was notified.  By now the concrete infrastructure

of both towers was complete and not a single window wall unit had been delivered to the site.

35.     The parties continued to talk, but to no avail. Glasswall did not deliver any units.

On January 13, 2014, Monadnock terminated Glasswall's Contract. Monadnock kept a

skeleton crew on the job site to avoid a shutdown by the NYC Department of Buildings but

very little work could be accomplished without the weatherproofing provided by the window

wall units.

36.     On February 24, 2014, WFIC sued Glasswall, its owner Ugo Colombo, and Ugo's

wife, Sara Jayne Kennedy Colombo in the Southern District of New York, seeking the

immediate payment of $13 million under their indemnity of the Bonds.

37.     Also on January 13, 2014, Monadnock provided WFIC with the required Section

3.2 notice under the Bonds and demanded that WFIC take action pursuant to Section 5 of the

Bonds which required WFIC to, inter alia, "promptly": takeover the Contracts (with

Monadnock's consent) and arrange for Glasswall to complete them (Section 5.1); takeover

the Contracts (without Monadnock's consent) and complete them itself or through other

independent contractors (Section 5.2); arrange for a bonded completion contractor to contract

with Monadnock to complete the work and pay for it, along with Section 7 damages (Section

5.3); or, choose between paying Monadnock the amount owed under the Bonds or denying liability (Section 5.4).

38.     WFIC refused to take any Section 5 action whatsoever and thereby breached the contractual terms of the Bonds.

39.     WFIC's denial of Monadnock's Bond claim constituted an act of bad faith. All of the reasons given by WFIC for denial of Monadnock's Bond claim were patently false and WFIC knew them to be false.

40.     Rather than conduct an independent investigation of Monadnock's Bond claim, as it was required to do under the terms of the Bonds, WFIC simply parroted the position of Glasswall's attorneys.

41.     On March 6, 2014, Monadnock sent WFIC a 7-day notice under Section 6 of the Bonds demanding that WFIC "perform its obligations" under the Bonds and chose a Section 5 course of action.

42.     Again, WFIC refused to take any Section 5 action whatsoever and thereby breached the contractual terms of the Bonds.

43.     Ultimately, on April 4, 2014, in an effort to mitigate damages, and without any waiver of its rights, Monadnock entered into an Agreement to Amend Contracts ("Amendment Agreement") with Glasswall, WFIC, HPS and the indemnitors on the Bonds, Ugo Colombo and his wife Sara Jayne Colombo Kennedy (the "Indemnitors") that provided for the completion of the Contracts by Glasswall.  In addition, unbeknownst to Monadnock at the time, WFIC entered into a side agreement ("Side Agreement") with Glasswall to increase its Contracts' prices by 7.5%.

44.     The Amendment Agreement permitted Glasswall to complete the Contracts but preserved all parties' claims that had accrued to date, including Monadnock's claims against Glasswall and Monadnock's claims against WFIC, and deferred them until the earlier of the completion of the Contracts or termination thereof.

45.     The Amendment Agreement provided, inter alia, that Monadnock would withdraw Glasswall's termination without prejudice and without waiver of any rights and Glasswall would complete the Contracts' work for the Projects according to an April 4, 2014 Production Schedule and "deliver Competed Windows Units on a continuous basis to the Project as expeditiously as possible consistent with the Production Schedules".  The Production Schedules required production to be completed by October 28, 2014.

46.     The original Contracts required Glasswall to complete its Work so that the Projects could be completed by "4th quarter of 2014 to 1st quarter of 2015" for Parcel A (Rider 5, ¶44c) and "3rd quarter of 2014" for Parcel B (Rider 5, ¶43c).  The Amendment Agreement further required Glasswall to deliver completed windows "on a continuous basis to the Project as expeditiously as possible consistent with the Production Schedules" (Amendment Agreement, ¶6).

47.     The Amendment Agreement also provided that WFIC would pay Glasswall for all Materials it produced at its Miami facilities and Monadnock would pay WFIC for all Materials it received at the Projects.  All claims among the parties that had accrued through the date of the Amendment Agreement were preserved and deferred pending the completion of the Contracts or the earlier termination thereof.

48.     Neither the Amendment Agreement nor the Side Agreement were permitted Section 5 choices under the Bonds and did not satisfy WFIC's obligations to undertake a Section 5 choice; thus WFIC's default under the Bonds continued.

49.     In any event, the Amendment Agreement explicitly preserved and reserved Monadnock's Bond claims that had accrued to the date of the Amendment Agreement.

50.     For the next few months, Glasswall continued to refuse to ship any Windows to the Project.  Moreover, WFIC continued to refuse to take action under Section 5 of the Bonds.

51.     By October 28, 2014, Glasswall had neither completed production of the Materials nor delivered all the Materials it had produced.  Instead, Glasswall first slowed down its shipment of Materials to the Projects and then stopped the deliveries completely, even though it had many truckloads of Windows at its facilities ready for shipment. Glasswall explained that it would not continue shipment of completed Materials or production of new Materials until it was paid in advance by WFIC the entire balance of each of the contracts.

52.     Glasswall also demanded that Monadnock pay WFIC in advance for Glasswall's remaining Materials, even though the Materials had neither been produced nor delivered to the Projects.

53.     WFIC recognized that Glasswall's position that it would not ship completed Materials to the Projects unless Monadnock pre-paid WFIC for delivery was contrary to the Amendment Agreement. In fact, WFIC's attorneys prepared litigation papers[2]

---

[2] Ultimately, WFIC never filed the litigation papers because Monadnock, at WFIC's urging, paid WFIC in full for Glasswall's production. The payment was made with a complete reservation of rights.

acknowledging and confirming that Glasswall's demand was contrary to the Amendment Agreement and created a potentially "disastrous condition".

54.      Nevertheless, on November 11, 2014, WFIC pre-paid Glasswall the entire balances on each of the Contracts and an extra 7.5% pursuant to the Side Agreement.

55.      At WFIC's urging, on November 25, 2014, Monadnock sent WFIC checks totaling $1,979,309 representing the entire Contracts' balances for the undelivered Materials but specifically reserved all of its rights to assert any "backcharge, change order or similar reduction" for a later date.

56.      Thereafter, Glasswall re-commenced delivery of Windows and other Materials to Parcels A and B but never completed its Work.  The reason became apparent to all concerned when Monadnock discovered that, on or about January 13, 2015, Glasswall had sold all of its assets, including its Miami manufacturing facility, to one of its competitors, Tecnoglass, Inc. ("Tecnoglass").

57.      In addition, Monadnock has discovered and is continuing to discover and uncover QA/QC issues on a continuous basis, including leaking window units.  With the sale of Glasswall and its Miami manufacturing facility to Tecnoglass, Glasswall was unresponsive to any of Monadnock's requests to complete the Work or correct defects.

58.      Monadnock also discovered that Glasswall had not paid several of its suppliers, one of which liened Parcel A.

59.      Finally, on March 4, 2015, four months after Glasswall was required to complete its Work as per the Amendment Agreement, Monadnock served a Notice of Default on Glasswall detailing 30 different defaults and affording Glasswall a seven (7) day cure period. Monadnock also served a copy of the Notice on WFIC.

60.     Glasswall failed to cure any of the listed defaults and continued to breach the

Contracts for reasons including but not limited to the following:

> (a) Glasswall did not complete its Work;
> (b) Glasswall did not correct defective Work;
> (c) Glasswall did not provide documentation required under the Agreements including but not limited to warranties, LEED documentation, material certifications, and final lien waivers by Glasswall and its suppliers;
> (d) Glasswall delayed in performance of its Work thereby causing delays and increased costs to other contractors whom Monadnock has reimbursed;
> (e) Glasswall delayed in performance of its Work thereby causing delays and increased costs to Monadnock;
> (e) Glasswall failed to pay all its suppliers for materials used to fabricate the Work and for shipment of same to the Projects; and
> (f) Glasswall ceased operations and was not able to fulfill its warranty obligations.

61.     After the expiration of the cure period, and upon certification of sufficient cause

from the architect, Monadnock terminated Glasswall on March 16, 2015.

62.     Also on March 16, 2015, Monadnock provided WFIC with the required Section

3.2 notice under the Bonds and demanded that WFIC take action pursuant to Section 5 of the

Bonds.

63.     On April 20, 2015, Monadnock sent WFIC a 7-day notice under Section 6 of the

Bonds demanding that WFIC "perform its obligations" under the Bonds and chose a Section

5 course of action.

64.     On April 25, 2015, WFIC, through its counsel, denied Monadnock's Bond claim

stating, inter alia, that: (a) Monadnock's payment in full of the entire Contracts price to

WFIC constituted a waiver of its right to assert claims; (b) Monadnock's termination of

Glasswall was based, in part, on events occurring prior to the Amendment Agreement and the

parties had agreed that those claims could not constitute the basis of a later termination; and (c) Glasswall had substantially completed the Contracts and thus could not be terminated.

**Monadnock Obtains TCOs**

65.     Monadnock obtained the first TCO for groups of floors in Parcel A on July 8, 2015, 11 months later than the original baseline schedule.  The first TCO for Parcel B was obtained on July 22, 2015, 12 months later than the baseline schedule.  Subsequent TCOs were obtained for the upper floors of each building.  The project architect certified both Parcels as substantially completed on November 30, 2015.  The owners accepted the completed buildings from Monadnock on December 3, 2015 with the exception for any disputes or claims related to Glasswall.

**Arbitration**

66.     Section 6.3 of the Contracts provided for, among other things, arbitration of disputes between the parties.  Section 6.3.6 provides:

> This agreement to arbitrate. . . shall be specifically enforceable under applicable law in any court having jurisdiction thereof.  The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

67.     Because of Glasswall's late and defective performance of the Contracts, on March 4, 2015, Monadnock commenced an arbitration (the "Arbitration") under the auspices of the American Arbitration Association (the "AAA") in New York, New York, by filing a demand (the "Demand") seeking, among other things an award of its delay damages and damages because of Glasswall's defective performance.

68.     Following Monadnock's Demand, pursuant to the American Arbitration Association's Construction Industry Arbitration Rules, the AAA appointed arbitrators Thomas J. Rossi, Michael O. Renda and Susanna S. Fodor to preside over the Arbitration.

69.     Following nine days of hearings, beginning November 14, 2016 and ending February 28, 2017, and Monadnock's and Glasswall's submissions of post-hearing briefs, the Panel issued an award (the "Award").

70.     The Award ordered Glasswall to pay Monadnock $1,499,255.18 plus 5% interest per annum.

71.     The AAA provided a copy of the Award to the parties on August 30, 2017.

72.     On September 12, 2017, WFIC filed a third-party summons and complaint (the "Third-Party Complaint") in the instant action against Glasswall, Ugo Colombo and Sara Jayne Kennedy Colombo (collectively, "Third-Party Defendants"), seeking, among other things, a declaration that Third-Party Defendants are required to indemnify WFIC for any liability it may incur as a result of having executed the Bonds.

73.     On September 19, 2017, the Court issued an order requiring Monadnock to amend its complaint in this action and file its application to confirm the Award by October 3, 2017.

74.     On September 22, 2017, Glasswall filed a petition to confirm the Award in New York State Supreme Court, New York County, thereby conceding liability under the Award.

## FIRST CLAIM FOR RELIEF
(Breach of Contract)

75.     Monadnock repeats and realleges each and every one of the prior paragraphs as if more fully stated at length herein.

76.     Under the terms of the Bonds, WFIC was required to take action pursuant to Section 5 of the Contracts after Glasswall's default and Monadnock's January 13, 2014 Section 3.2 notice thereof, and March 6, 2014 7-day notice.

77.     Monadnock fulfilled its obligations under the Bonds and all other conditions precedent, if any, to WFIC's liability under the Bonds have been met or waived.

78.      WFIC, however, has failed and refused to perform, and breached its obligations under the Bonds.

79.      As a result of Glasswall's default and WFIC's breach of the Bonds, Monadnock has suffered, and is entitled to recover from WFIC, damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
(Breach of Contract)

80.      Monadnock repeats and realleges each and every one of the prior paragraphs as if more fully stated at length herein.

81.      Under the terms of the Bonds, WFIC was required to take action pursuant to Section 5 of the Contracts after Glasswall's default and Monadnock's January 13, 2014 notice thereof.

82.      Monadnock fulfilled its obligations under the Bonds and all other conditions precedent, if any, to WFIC's liability under the Bonds have been met or waived.

83.      WFIC's denial of Monadnock's claims was in bad faith, as all of the reasons WFIC provided for denying Monadnock's Bond claims were patently false and WFIC knew them to be false.

84.      As a result of Glasswall's default and WFIC's breach of the Bonds, Monadnock has suffered, and is entitled to recover from WFIC, damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**
(Fraudulent Conveyance (NY Debtor and Creditor Law §§ 276, 276-a and 279)
against Glasswall and Ugo Colombo)

85.      Monadnock repeats and realleges each and every one of the prior paragraphs as if more fully stated at length herein.

86.     Monadnock is a creditor of Glasswall whose claim has matured.

87.     Ugo Colombo is the principal and alter ego of Glasswall.

88.     On or about, January 13, 2015, Glasswall liquidated and sold all of its assets to Tecnoglass, thereby leaving Glasswall insolvent.

89.     Prior to the transfer, Ugo Colombo was aware that Monadnock was preparing to commence litigation against Glasswall, thereby rendering Glasswall vulnerable to liability to Monadnock.

90.     Upon information and belief, Glasswall transferred the proceeds of the sale to Ugo Colombo.

91.     Glasswall did not execute the transfer in good faith.

92.     The transfer of assets was not executed in the ordinary course of Glasswall's businesses.

93.     Ugo Colombo knew and actually intended that the transfer would hinder, delay and/or defraud Monadnock by making unavailable Glasswall's assets with which Glasswall could satisfy an eventual money judgment debt.  This transfer is therefore fraudulent under New York Debtor & Creditor Law § 276.

94.     Glasswall's fraudulent transfer has harmed Monadnock by frustrating Monadnock's ability to obtain the relief sought in its action against Glasswall.

95.     The transfer should be set aside as a fraudulent conveyance under Debtor & Creditor Law §§ 276 and 279(c).

96.     In the alternative, the Court should appoint a receiver to take charge of Glasswall's assets pursuant to Debtor & Creditor Law §§ 276 and 279(b).

97.     Monadnock should also be awarded its reasonable attorneys' fees and costs in connection with this action under Debtor & Creditor Law § 276-a.

### FOURTH CLAIM FOR RELIEF
(Fraudulent Conveyance (NY Debtor and Creditor Law §§ 273-a, 276, 276-a and 278(1)) against Ugo Colombo as Glasswall's Alter Ego)

98.     Monadnock repeats and realleges each and every one of the prior paragraphs as if more fully stated at length herein.

99.     Monadnock is a creditor of Glasswall whose claim has matured.

100.    Ugo Colombo is the principal and alter ego of Glasswall.

101.    Ugo Colombo was at all relevant times the principal of Glasswall.

102.    Ugo Colombo exercised complete domination and control over Glasswall, including in connection with Glasswall's Contracts with Monadnock and its transfer of assets to Tecnoglass.

103.    Glasswall did not have a separate identity from Ugo Colombo.

104.    Through his domination and control of Glasswall, Ugo Colombo intermingled his own personal funds with Glasswall's.

105.    Through his domination and control of Glasswall, Ugo Colombo caused Glasswall to breach its contractual obligations to Monadnock and to fraudulently convey funds to Ugo Colombo for the inequitable purpose of shielding Glasswall's assets and defrauding Monadnock out of money owed.

106.    Glasswall was never a bona fide entity separate from Ugo Colombo.

107.    As Glasswall's sole beneficial owner, Ugo Colombo stood to benefit from any positive outcome Glasswall would have from retaining the proceeds of the sale of Glasswall's assets to avoid paying its debts to Monadnock.

108.     Glasswall has not satisfied its indebtedness to Monadnock.

109.     Glasswall transferred its assets to Tecnoglass in or around January 2015.

110.     Upon information and belief, Glasswall transferred the proceeds of the sale to Ugo Colombo.

111.     Ugo Colombo did not execute the transfer in good faith.

112.     Prior to the transfer, Ugo Colombo knew that Glasswall would become obligated to pay Monadnock damages for its defective and delayed performance of the Contracts.

113.     At all relevant times, Ugo Colombo treated and considered Glasswall's debts as his own.

114.     At the time of the transfer, Ugo Colombo was aware that Monadnock was commencing litigation against Glasswall.

115.     Monadnock has obtained a monetary award against Glasswall.

116.     Glasswall has failed to satisfy the award.

117.     Therefore, Glasswall's asset transfer to Ugo Colombo is fraudulent under New York Debtor & Creditor Law § 273-a.

118.     Ugo Colombo knew and intended that the transfer would hinder, delay, and/or defraud Monadnock by preventing it from reaching the assets Glasswall sold to Tecnoglass, the proceeds of which Ugo Colombo retained, which Ugo Colombo could have used to satisfy debts Glasswall owed to Monadnock, and therefore the transfer is fraudulent under New York Debtor & Creditor Law § 276.

119.     The transfer has harmed Monadnock because Ugo Colombo and Glasswall have failed and/or are unable and unwilling to pay the money that they owe to Monadnock.

120.    The transfer should be set aside as a fraudulent conveyance under New York Debtor & Creditor Law §§ 273-a, 276 and 278(1).

121.    Monadnock should also be awarded its reasonable attorneys' fees and costs in connection with this action under Debtor & Creditor Law § 276-a.

## FIFTH CLAIM FOR RELIEF
(Fraudulent Conveyance (NY Debtor and Creditor Law §§ 273, 273-a, 275, 276, 276-a, 278(1) and 279) against Ugo Colombo and Glasswall)

122.    Monadnock repeats and realleges each and every one of the prior paragraphs as if more fully stated at length herein.

123.    Monadnock is a creditor of Glasswall whose claim has matured.

124.    Ugo Colombo is the principal and alter ego of Glasswall.

125.    Ugo Colombo was at all relevant times the principal of Glasswall.

126.    Glasswall purported to transfer its interests in all of its assets to Tecnoglass in or around January 2015.

127.    Ugo Colombo wholly owned and controlled Glasswall at all relevant times.

128.    The agreement by which Glasswall transferred its assets to Tecnogass was not a bona fide agreement.

129.    Ugo Colombo received and retained possession of Glasswall's assets, and/or all of the consideration Tecnoglass provided for Glasswall's assets.

130.    Glasswall did not execute the purported transfer in good faith.

131.    The transfer was not executed in the ordinary course of Glasswall's business.

132.    At the time of the transfer, Monadnock was about to commence litigation against Glasswall for money damages.  Glasswall has not satisfied the resulting award.

133.    Prior to the transfer, Ugo Colombo was aware of the damages Monadnock incurred as a result of Glasswall's defective and late performance, and, as a result, the sums Monadnock would claim against Glasswall in litigation.

134.    The fraudulent transfer rendered Glasswall insolvent under New York Debtor and Creditor Law § 271, and therefore the transfers are constructively fraudulent under New York Debtor and Creditor Law § 273.

135.    At the time of the transfer, Ugo Colombo knew that Monadnock was going to commence litigation against Glasswall for money damages, and therefore the transfer is constructively fraudulent under New York Debtor and Creditor Law § 273-a.

136.    Prior to the transfer, Ugo Colombo and/or Glasswall intended or believed that Glasswall would incur debts beyond Glasswall's ability to pay as the obligations matured, and therefor the transfer is constructively fraudulent under New York Debtor and Creditor Law § 275.

137.    Ugo Colombo and/or Glasswall knew and actually intended that the transfer would hinder, delay, and/or defraud Monadnock by making unavailable the assets with which Glasswall could have paid its debts, and therefore the transfer is fraudulent under New York Debtor and Creditor Law § 276.

138.    The fraudulent transfer harmed Monadnock because Glasswall has failed to and/or is unable and unwilling to pay the money it owes to Monadnock pursuant to the award of money damages monadnock obtained against Glasswall.

139.    The transfer should be set aside as a fraudulent conveyance under New York Debtor & Creditor Law §§ 273, 273-a, 275, 276 and 278(1).

140.    Monadnock should also be awarded its reasonable attorneys' fees and costs in connection with this action under New York Debtor & Creditor Law § 279.

### SIXTH CLAIM FOR RELIEF
(Fraudulent Conveyance (NY Debtor and Creditor Law §§ 273, 273-a, 274, 275, 276, 276-a, 278(1) and 279) against Ugo Colombo and Glasswall)

141.    Monadnock repeats and realleges each and every one of the prior paragraphs as if more fully stated at length herein.

142.    Monadnock is a creditor of Glasswall whose claim has matured.

143.    Ugo Colombo is the principal and alter ego of Glasswall.

144.    Ugo Colombo was at all relevant times the principal of Glasswall.

145.    Glasswall purported to transfer its interests in all of its assets to Tecnoglass in or around January 2015.

146.    Ugo Colombo wholly owned and controlled Glasswall at all relevant times.

147.    The agreement by which Glasswall transferred its assets to Tecnoglass was not a bona fide agreement.

148.    Ugo Colombo received and retained possession of Glasswall's assets, and/or all of the consideration Tecnoglass provided for Glasswall's assets.

149.    Glasswall did not execute the purported transfer in good faith.

150.    The transfer was not executed in the ordinary course of Glasswall's business.

151.    At the time of the transfer, Monadnock was about to commence litigation against Glasswall for money damages.  Glasswall has not satisfied the resulting award.

152.    Prior to the transfer, Ugo Colombo was aware of the damages Monadnock incurred as a result of Glasswall's defective and late performance, and, as a result, the sums Monadnock would claim against Glasswall in litigation.

153.     The fraudulent transfer left Glasswall with unreasonably small capital, and therefore the transfer was constructively fraudulent as to Monadnock, its creditor.

154.     The fraudulent transfer rendered Glasswall insolvent under New York Debtor and Creditor Law § 271, and therefore the transfers are constructively fraudulent under New York Debtor and Creditor Law § 273.

155.     At the time of the transfer, Ugo Colombo knew that Monadnock was preparing to commence litigation against Glasswall for money damages, and therefore the transfer is constructively fraudulent under New York Debtor and Creditor Law § 273-a.

156.     Prior to the transfer, Ugo Colombo and/or Glasswall intended or believed that Glasswall would incur debts beyond Glasswall's ability to pay as the obligations matured, and therefor the transfer is constructively fraudulent under New York Debtor and Creditor Law § 275.

157.     Ugo Colombo and/or Glasswall knew and actually intended that the transfer would hinder, delay, and/or defraud Monadnock by making unavailable the assets with which Glasswall could have paid its debts, and therefore the transfer is fraudulent under New York Debtor and Creditor Law § 276.

158.     The fraudulent transfer harmed Monadnock because Glasswall has failed to and/or is unable and unwilling to pay the money it owes to Monadnock pursuant to the award of money damages monadnock obtained against Glasswall.

159.     The transfer should be set aside as a fraudulent conveyance under New York Debtor & Creditor Law §§ 273, 273-a, 274, 275, 276 and 278(1).

160.     Monadnock should also be awarded its reasonable attorneys' fees and costs in connection with this action under New York Debtor & Creditor Law § 279.

## SEVENTH CLAIM FOR RELIEF
(Confirmation of the Award)

161.    Monadnock repeats and realleges each and every one of the prior paragraphs as if more fully stated at length herein.

162.    Pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and N.Y. C.P.L.R. § 7501, Monadnock is entitled to an order and judgment confirming the Award, as the Award satisfies all of the requirements for confirmation pursuant to Section 9 of the FAA and/or § N.Y. C.P.L.R. 7510.

WHEREFORE, Monadnock demands judgment against WFIC:

a.   On its FIRST CLAIM FOR RELIEF, awarding damages for WFIC's breach of contract in an amount to be determined at trial, but not less than $1,500,000, plus interest, costs and attorneys' fees;

b.   On its SECOND CLAIM FOR RELIEF, awarding damages for WFIC's bad faith breach of contract in an amount to be determined at trial, but not less than $5,000,000, plus interest, costs and attorneys' fees;

c.   On its THIRD CLAIM FOR RELIEF, awarding damages for Glasswall's and Ugo Colombo's fraudulent conveyance in an amount to be determined at trial, but not less than $1,500,000, plus interest, costs and attorneys' fees;

d.   On its FOURTH CLAIM FOR RELIEF, awarding damages for Ugo Colombo's fraudulent conveyance in an amount to be determined at trial, but not less than $1,500,000, plus interest, costs and attorneys' fees;

e.   On its FIFTH CLAIM FOR RELIEF, awarding damages for Glasswall's and Ugo Colombo's fraudulent conveyance in an amount to be determined at trial, but not less than $1,500,000, plus interest, costs and attorneys' fees;

f.   On its SIXTH CLAIM FOR RELIEF, awarding damages for Glasswall's and

Ugo Colombo's fraudulent conveyance in an amount to be determined at trial,

but not less than $1,500,000, plus interest, costs and attorneys' fees;

g.   On its SEVENTH CLAIM FOR RELIEF, confirming the Award in all

respects pursuant to 9 U.S.C. § 9, or alternatively N.Y. CPLR § 7510, and

entering judgment thereon; and

h.   For such other and further relief that this court deems just, necessary and

proper.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff Monadnock Construction, Inc. hereby

respectfully demands a trial by jury in this action of all issues so triable.


Dated:  October 3, 2017


WACHTEL MISSRY LLP

By: _____

Howard Kleinhendler, Esq.
Evan Weintraub, Esq.
Jocelyn Weinstein, Esq.
885 Second Avenue
New York, NY 10017
(212) 909-9500
hkleinhendler@wmllp.com
weintraub@wmllp.com
jweinstein@wmllp.com