# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

In the Matter of the Arbitration of Certain
Controversies Between

Glasswall, LLC,

                                    Petitioner,

        -and-

Monadnock Construction, Inc.,

                                    Respondent

-----------------------------------------------------------------X

Index #: 656000/17

NOTICE OF PETITION
TO CONFIRM
ARBITRATION AWARD

PLEASE TAKE NOTICE, that upon the annexed petition of Glasswall, LLC, verified on

September 22, 2017, the award of the arbitrators in the arbitration proceedings between the

petitioner Glasswall, LLC, and the respondent Monadnock Construction, Inc., signed and

acknowledged on August 29, 2017, and delivered to the petitioner on August 30, 2017, the

agreements for arbitration dated January 3, 2013, and upon all the papers and proceedings

heretofore had herein, an application will be made to an IAS Part of this Court, to be held at the

courthouse thereof, located at 60 Centre Street, New York, New York 10007 on November 17,

2017 at 9:30 a.m., or as soon thereafter as counsel can be heard, for a judgment pursuant to

CPLR 7510 confirming the award of the arbitrators and directing that judgment be entered

thereon, and for such other and further relief as may be just, proper and equitable, together with

the costs and disbursements of this proceeding.

        PLEASE TAKE FURTHER NOTICE, that a demand is hereby made for the service of an

answer and supporting affidavits, if any, at least seven days before the aforesaid date of hearing,

since this notice is served at least 12 days before such time.

The Petitioner designates New York County as place of trial.  The basis of venue is the

county in which the arbitration was conducted and the award made.

DATED: NEW YORK, NEW YORK
        SEPTEMBER 22, 2017

                                    CINQUE & CINQUE, P. C.

                                    By: _____
                                        James P. Cinque
                                    Attorneys for Petitioner
                                    845 Third Avenue, Suite 1400
                                    New York, New York 10022
                                    Telephone: (212) 759-5515
                                    Telefax:    (212) 759-7737
                                    E-mail:    CINQUE845@aol.com

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

In the Matter of the Arbitration of Certain      Index #:
Controversies Between

Glasswall, LLC,

                 Petitioner,       PETITION TO CONFIRM
                                   ARBITRATION AWARD

    -and-

Monadnock Construction, Inc.,

                 Respondent

------------------------------------------------------------X

      The petition of Glasswall, LLC respectfully shows:

      1.  That at all times hereinafter mentioned, the petitioner was, and still is, a limited

liability company formed under the laws of the State of Florida, with its principal place of

business in the State of Florida.

      2.  That at all times hereinafter mentioned the respondent, Monadnock Construction, Inc.,

was and still is a domestic corporation, duly organized and existing under the Laws of the State

of New York, with its principal place of business in the State of New York.

      3.  That on or about January 3, 2013, two contracts were entered into between the

petitioner and respondent, copies of which are collectively annexed hereto as Exhibit A.

      4.  That §6.36 of the contracts (Exhibit A annexed hereto) provided, among other things,

as follows:

> This agreement to arbitrate and any other written agreement to
> arbitrate with an additional person or persons referred to herein
> shall be specifically enforceable under applicable law in any court

having jurisdiction thereof. The award rendered by the arbitrator
or arbitrators shall be final, and judgment may be entered upon it in
accordance with applicable law in any court having jurisdiction
thereof.

5. That a dispute arose between the parties to the contracts, and the respondent demanded

that an arbitration be had pursuant to the terms of the contracts and in accordance with the

Construction Industry Arbitration Rules of the American Arbitration Association. A copy of

respondent's demand for arbitration is annexed hereto as Exhibit B (with exhibits omitted).

6. That thereafter the American Arbitration Association, in accordance with its

Construction Industry Arbitration Rules, designated as Arbitrators Thomas J. Rossi, Susanna S.

Fodor and Michael Oscar Renta, and notice of designation of those arbitrators was duly given to

both parties.

7. That thereafter, on nine days beginning on November 14, 2016 and ending on

February 28, 2017 the three arbitrators subscribed to their oath of office and proceeded to hear

the proofs of both parties.

8. After the arbitrators had completed their study of all the facts, circumstances,

elements, and proofs entering into the controversy, so submitted to them as aforesaid, and after

they had considered all of the evidence and arguments submitted by the parties, the arbitrators

came to a decision and made an award, in writing, dated and duly affirmed on August 29, 2017.

9. That annexed hereto as Exhibit C is a true copy of that award.

10. That a copy of the aforesaid award was delivered to the petitioner and to the

respondent by the American Arbitration Association on August 30, 2017.

11. That this petition is brought within one year after the aforesaid delivery of the award

2

to the parties, and that the award has not been vacated or modified upon any ground specified in

CPLR 7511.

WHEREFORE, petitioner respectfully prays that an Order be made herein confirming the

award and granting petitioner such other and further relief as to the Court may deem proper.

DATED: NEW YORK, NEW YORK
        SEPTEMBER 22, 2017

CINQUE & CINQUE, P. C.

By: _____
        James P. Cinque
Attorneys for Petitioner
845 Third Avenue, Suite 1400
New York, New York 10022
Telephone: (212) 759-5515
Telefax:    (212) 759-7737
E-mail:     CINQUE845@aol.com

3

## ATTORNEY'S VERIFICATION

STATE OF NEW YORK

COUNTY OF NEW YORK

I, the undersigned, an attorney admitted to practice in the courts of the State of New York, state that I am the attorney of record for Petitioner Glasswall, LLC in the within action; I have read the foregoing Petition and know the contents thereof; the same is true to my own knowledge, except as to the matters therein alleged to be on information and belief, and as to those matters I believe it to be true. The reason this verification is made by me and not by the Petitioner is because the Petitioner is not located in the county wherein your affiant maintains his office.

The grounds of my belief as to all matters not stated upon my own knowledge are as follows: Records contained in my file and conversations had with the Petitioner.

I affirm that the foregoing statements are true, under the penalties of perjury.

DATED: NEW YORK, NEW YORK
SEPTEMBER 22, 2017

_____
JAMES P. CINQUE

4

**EXHIBIT "A"**

# ▓AIA® Document A401™ – 2007

## *Standard Form of Agreement Between Contractor and Subcontractor*

**AGREEMENT** made as of the ___Third___ day of ___January___ in the year ___Two Thousand Thirteen___
*(In words, indicate day, month and ~~year.)~~year)*

**BETWEEN** the Contractor:
*(Name, ~~legal status,~~ address and other information)*

Monadnock Construction, Inc.
155-3rd Street
Brooklyn, New York 11231

and the ~~Subcontractor:~~Manufacturer:
*(Name, ~~legal status,~~ address and other information)*

Glasswall
3550 NW 49ᵗʰ Street
Miami, Florida 33142

The Contractor has made a contract for construction (hereinafter, the Prime Contract) dated:
January 3, 2013

with the Owner:
*(Name, ~~legal status,~~ address and other information)*

HPS 50ᵗʰ Avenue Associates, LLC
60 Columbus Circle
New York, New York 10023

for the following Project:
*(Name, location and detailed description)*

HPS "Parcel A"
1-50 – 50ᵗʰ Avenue
Long Island City, New York 11101

The Prime Contract provides for the furnishing of labor, materials, equipment and services in connection with the construction of the Project. ~~A copy of the Prime Contract, consisting of the Agreement Between Owner and Contractor (from which compensation amounts may be deleted)~~ and the other Contract Documents enumerated therein, has been made available to the ~~Subcontractor.~~Manufacturer.

The Architect for the Project:
*(Name, ~~legal status,~~ address and other information)*

Ismael Leyva Architects, P.C.
48 West 37ᵗʰ Street, #13
New York, New York 10018

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201™–2007, General Conditions of the Contract for Construction, is adopted in this document by reference.

This document has been approved and endorsed by the Associated Specialty Contractors, Inc.

Init.



PB /

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                               (861359192)

1

The Contractor and the ~~Subcontractor~~ Manufacturer agree as follows.

Init.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                    (861359192)

2

TABLE OF ARTICLES

1      THE SUBCONTRACT DOCUMENTS

2      MUTUAL RIGHTS AND RESPONSIBILITIES

3      CONTRACTOR

4      ~~SUBCONTRACTOR~~MANUFACTURER

5      CHANGES IN THE WORK

6      MEDIATION AND BINDING DISPUTE RESOLUTION

7      TERMINATION, SUSPENSION OR ASSIGNMENT OF THE SUBCONTRACT

8      THE WORK OF THIS SUBCONTRACT

9      DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

10     SUBCONTRACT SUM

11     PROGRESS PAYMENTS

12     FINAL PAYMENT

13     INSURANCE AND BONDS

14     TEMPORARY FACILITIES AND WORKING CONDITIONS

15     MISCELLANEOUS PROVISIONS

16     ENUMERATION OF SUBCONTRACT DOCUMENTS

## ARTICLE 1   THE SUBCONTRACT DOCUMENTS

§ **1.1** The Subcontract Documents consist of (1) this Agreement; ~~(2) the Prime Contract, consisting of the Agreement between the Owner and Contractor and the other Contract Documents enumerated therein; (3) Modifications issued subsequent to the execution of the Agreement between the Owner and Contractor, whether before or after the execution of this Agreement; (4)~~ other documents listed in Article 16 of this Agreement; and (5) Modifications to this Subcontract issued after execution of this Agreement. These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein. The Subcontract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Subcontract Documents, other than Modifications issued subsequent to the execution of this Agreement, appears in Article 16.

§ **1.2** Except to the extent of a conflict with a specific term or condition contained in the Subcontract Documents, the General Conditions governing this Subcontract shall be the AIA Document ~~A201™  2007,~~ A201, General Conditions of the Contract for Construction.

§ **1.3** The Subcontract may be amended or modified only by a Modification. The Subcontract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and the ~~Subcontractor,~~ Manufacturer, (2) between the Owner and the ~~Subcontractor,~~ Manufacturer, or (3) between any persons or entities other than the Contractor and ~~Subcontractor.~~ Manufacturer.



Init.

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                                (861359192)

3

**§ 1.4** The Contractor shall make available the Subcontract Documents to the ~~Subcontractor prior to execution of this Agreement,~~ Manufacturer and thereafter, upon request, but the Contractor may charge the ~~Subcontractor~~ Manufacturer for the reasonable cost of reproduction.

## ARTICLE 2   MUTUAL RIGHTS AND RESPONSIBILITIES

The Contractor and ~~Subcontractor~~ Manufacturer shall be mutually bound by the terms of this Agreement and, to the extent that the provisions of AIA Document ~~A201-2007~~ A201, apply to this Agreement pursuant to Section 1.2 and provisions of the Prime Contract apply to the Work of the ~~Subcontractor,~~ Manufacturer, the Contractor shall assume toward the ~~Subcontractor~~ Manufacturer all obligations and responsibilities that the Owner, under such documents, assumes toward the Contractor, and the ~~Subcontractor~~ Manufacturer shall assume toward the Contractor all obligations and responsibilities which the Contractor, under such documents, assumes toward the Owner and the Architect. The Contractor shall have the benefit of all rights, remedies and redress against the ~~Subcontractor~~ Manufacturer that the Owner, under such documents, has against the Contractor, and the ~~Subcontractor~~ Manufacturer shall have the benefit of all rights, remedies and redress against the Contractor that the Contractor, under such documents, has against the Owner, insofar as applicable to this Subcontract. Where a provision of such documents is inconsistent with a provision of this Agreement, this Agreement shall govern.

## ARTICLE 3   CONTRACTOR
### § 3.1 SERVICES PROVIDED BY THE CONTRACTOR

**§ 3.1.1** The Contractor shall cooperate with the ~~Subcontractor~~ Manufacturer in scheduling and performing the Contractor's Work to avoid conflicts or interference in the ~~Subcontractor's~~ Manufacturer's Work and shall expedite written responses to submittals made by the ~~Subcontractor~~ Manufacturer in accordance with Section 4.1 and Article 5. Promptly after execution of this Agreement, the Contractor shall provide the ~~Subcontractor~~ Manufacturer copies of the Contractor's construction schedule and schedule of submittals, together with such additional scheduling details as will enable the ~~Subcontractor~~ Manufacturer to plan and perform the ~~Subcontractor's~~ Manufacturer's Work properly. The Contractor shall promptly notify the ~~Subcontractor~~ Manufacturer of subsequent changes in the construction and submittal schedules and additional scheduling details.

**§ 3.1.2** The Contractor shall provide suitable areas for storage of the ~~Subcontractor's materials and equipment during the course of the Work. Additional costs to the Subcontractor resulting from relocation of such storage areas at the direction of the Contractor, except as previously agreed upon, shall be reimbursed by the Contractor.~~ Manufacturer's materials

**§ 3.1.3** ~~Except as provided in Article 14, the Contractor's equipment will be available to the Subcontractor only at the Contractor's discretion and on mutually satisfactory terms.~~

### § 3.2 COMMUNICATIONS

**§ 3.2.1** The Contractor shall promptly make available to the ~~Subcontractor~~ Manufacturer information, including information received from the Owner, that affects this Subcontract and that becomes available to the Contractor subsequent to execution of this Subcontract.

**§ 3.2.2** The Contractor shall not give instructions or orders directly to the ~~Subcontractor's~~ Manufacturer's employees or to the ~~Subcontractor's Sub-subcontractors~~ Manufacturer's Sub-Manufacturers or material suppliers unless such persons are designated as authorized representatives of the ~~Subcontractor.~~ Manufacturer.

**§ 3.2.3** The Contractor shall permit the ~~Subcontractor~~ Manufacturer to request directly from the Architect information regarding the percentages of completion and the amount certified on account of Work done by the ~~Subcontractor.~~ Manufacturer.

**§ 3.2.4** If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the Contractor, a ~~subcontractor~~ Manufacturer or anyone directly or indirectly employed by them (other than the ~~Subcontractor),~~ Manufacturer), the Contractor shall, prior to harmful exposure of the ~~Subcontractor's~~ Manufacturer's employees to such substance, give written notice of the chemical composition thereof to the ~~Subcontractor~~ Manufacturer in sufficient detail and time to permit the ~~Subcontractor's~~ Manufacturer's compliance with such laws.

Init.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                    (861359192)

**§ 3.2.5** The Contractor shall furnish to the ~~Subcontractor~~ Manufacturer within 30 days after receipt of a written request, or earlier if so required by law, information necessary and relevant for the ~~Subcontractor~~ Manufacturer to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property, usually referred to as the site, on which the Project is located and the Owner's interest therein.

**§ 3.2.6** If the Contractor asserts or defends a claim against the Owner that relates to the Work of the ~~Subcontractor,~~ Manufacturer, the Contractor shall promptly make available to the ~~Subcontractor~~ Manufacturer all information relating to the portion of the claim that relates to the Work of the ~~Subcontractor.~~ Manufacturer.

### § 3.3 CLAIMS BY THE CONTRACTOR
**§ 3.3.1** Liquidated damages for delay, if provided for in Section 9.3 of this Agreement, shall be assessed against the ~~Subcontractor~~ Manufacturer only to the extent caused by the ~~Subcontractor~~ Manufacturer or any person or entity for whose acts the ~~Subcontractor~~ Manufacturer may be liable, and in no case for delays or causes arising outside the scope of this Subcontract. *LIQUIDATED DAMAGES WILL BE CAPPED AT $200,000 - /K*   *≠B*

**§ 3.3.2** The Contractor's claims for the costs of services or materials provided due to the ~~Subcontractor's~~ Manufacturer's failure to execute the Work shall require
   **.1**   seven days' written notice prior to the Contractor's providing services or materials, except in an emergency; and
   **.2**   written compilations to the ~~Subcontractor~~ Manufacturer of services and materials provided by the Contractor and charges for such services and materials no later than the fifteenth day of the month following the Contractor's providing such services or materials.

### § 3.4 CONTRACTOR'S REMEDIES
If the ~~Subcontractor~~ Manufacturer defaults or neglects to carry out the Work in accordance with this Agreement and fails within ~~five~~ three working days after receipt of written notice from the Contractor to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, ~~by appropriate Modification,~~ **-, after three days following receipt by the Manufacturer of an additional written notice** and without prejudice to any other remedy the Contractor may have, make good such deficiencies and may deduct the reasonable cost thereof from the payments then or thereafter due the ~~Subcontractor.~~ Manufacturer.

~~**ARTICLE 4   SUBCONTRACTOR**~~
**ARTICLE 4   MANUFACTURER**
### § 4.1 EXECUTION AND PROGRESS OF THE WORK
**§ 4.1.1** For all Work the ~~Subcontractor~~ Manufacturer intends to subcontract, the ~~Subcontractor~~ Manufacturer shall enter into written agreements with ~~Sub-subcontractors~~ Sub-Manufacturers performing portions of the Work of this Subcontract by which the ~~Subcontractor~~ Manufacturer and the ~~Sub-subcontractor~~ Sub-Manufacturer are mutually bound, to the extent of the Work to be performed by the ~~Sub-subcontractor,~~ Sub-Manufacturer, assuming toward each other all obligations and responsibilities that the Contractor and ~~Subcontractor~~ Manufacturer assume toward each other and having the benefit of all rights, remedies and redress each against the other that the Contractor and ~~Subcontractor~~ Manufacturer have by virtue of the provisions of this Agreement.

**§ 4.1.2** The ~~Subcontractor~~ Manufacturer shall supervise and direct the ~~Subcontractor's~~ Manufacturer's Work, and shall cooperate with the Contractor in scheduling and performing the ~~Subcontractor's~~ Manufacturer's Work to avoid conflict, delay in or interference with the Work of the Contractor, other ~~subcontractors,~~ Manufacturers, the Owner, or separate contractors.

**§ 4.1.3** The ~~Subcontractor~~ Manufacturer shall promptly submit Shop Drawings, Product Data, ~~Samples~~ Samples, and similar submittals required by the Subcontract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Contractor or other ~~subcontractors.~~ Manufacturers.

**§ 4.1.4** The ~~Subcontractor~~ Manufacturer shall furnish to the Contractor periodic progress reports on the Work of this Subcontract as ~~mutually agreed,~~ required by the Contractor, including information on the status of materials and equipment that may be in the course of preparation, manufacture, or transit.

Init.

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                                                        (881359192)

5

§ **4.1.5** The ~~Subcontractor~~ Manufacturer agrees that the Contractor and the Architect each have the authority to reject Work of the ~~Subcontractor~~ Manufacturer that does not conform to the Prime Contract. The Architect's decisions on matters relating to aesthetic effect shall be final and binding on the ~~Subcontractor~~ Manufacturer if consistent with the intent expressed in the Prime Contract.

§ **4.1.6** The ~~Subcontractor~~ Manufacturer shall pay for all materials, equipment and labor used in connection with the performance of this Subcontract through the period covered by previous payments received from the Contractor, and shall furnish satisfactory evidence, when requested by the Contractor, to verify compliance with the above requirements.

§ **4.1.7** ~~The Subcontractor shall take necessary precautions to protect properly the work of other subcontractors from damage caused by operations under this Subcontract.~~

§ **4.1.8** The ~~Subcontractor~~ Manufacturer shall cooperate with the Contractor, other ~~subcontractors,~~ Manufacturers, the Owner, and separate contractors whose work might interfere with the ~~Subcontractor~~ Manufacturer's Work. The ~~Subcontractor~~ Manufacturer shall participate in the preparation of coordinated drawings in areas of congestion, if required by the Prime Contract, or the Contractor, specifically noting and advising the Contractor of potential conflicts between the Work of the ~~Subcontractor~~ Manufacturer and that of the Contractor, other ~~subcontractors,~~ Manufacturers, the Owner, or separate contractors.

## § 4.2 PERMITS, FEES, NOTICES, AND COMPLIANCE WITH LAWS
§ **4.2.1** The ~~Subcontractor~~ Manufacturer shall give notices and comply with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities bearing on performance of the Work of this Subcontract. The ~~Subcontractor~~ Manufacturer shall secure and pay for permits, fees, licenses and inspections by government agencies necessary for proper execution and completion of the ~~Subcontractor's~~ Manufacturer's Work, the furnishing of which is required of the Contractor by the Prime Contract.

§ **4.2.2** The ~~Subcontractor~~ Manufacturer shall comply with Federal, state and local tax laws, social security acts, unemployment compensation acts and workers' compensation acts insofar as applicable to the performance of this Subcontract.

## § 4.3 SAFETY PRECAUTIONS AND PROCEDURES
§ **4.3.1** The ~~Subcontractor~~ Manufacturer shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by the Contractor and with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities for the safety of persons and property in accordance with the requirements of the Prime Contract. The ~~Subcontractor~~ Manufacturer shall report to the Contractor within three days one day an injury to an employee or agent of the ~~Subcontractor~~ Manufacturer which occurred at the site.

§ **4.3.2** If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the ~~Subcontractor, the Subcontractor's Sub-subcontractors~~ Manufacturer, the Manufacturer's Sub-Manufacturers or anyone directly or indirectly employed by them, the ~~Subcontractor~~ Manufacturer shall, prior to harmful exposure of any employees on the site to such substance, give written notice of the chemical composition thereof to the Contractor in sufficient detail and time to permit compliance with such laws by the Contractor, other ~~subcontractors~~ Manufacturers and other employers on the site.

§ **4.3.3** If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a hazardous material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the ~~Subcontractor, the Subcontractor~~ Manufacturer, the Manufacturer shall, upon recognizing the condition, immediately stop Work in the affected area and promptly report the condition to the Contractor in writing. When the material or substance has been rendered harmless, the ~~Subcontractor's~~ Manufacturer's Work in the affected area shall resume upon written agreement of the Contractor and ~~Subcontractor.~~ Manufacturer. The Subcontract Time shall be extended appropriately and the Subcontract Sum shall be increased in the amount of the ~~Subcontractor's~~ Manufacturer's reasonable additional costs of demobilization, delay and remobilization, which adjustments shall be accomplished as provided in Article 5 of this Agreement.

Init.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732626170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                              (861358192)

6

**§ 4.3.4** ~~To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Subcontractor, the Subcontractor's Sub-subcontractors, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 4.3.3 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) except to the extent that such damage, loss or expense is due to the fault or negligence of the party seeking indemnity.~~

**§**

**§ 4.3.5** The ~~Subcontractor~~ Manufacturer shall indemnify the Contractor for the cost and expense the Contractor incurs ~~(1)~~ 1) for remediation of a material or substance brought to the site and negligently handled by the ~~Subcontractor or (2)~~ Manufacturer or 2) where the ~~Subcontractor~~ Manufacturer fails to perform its obligations under Section 4.3.3, except to the extent that the cost and expense are due to the Contractor's fault or negligence.

**§ 4.4 CLEANING UP**
**§ 4.4.1** The ~~Subcontractor~~ Manufacturer shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations performed under this Subcontract. The ~~Subcontractor~~ Manufacturer shall not be held responsible for conditions caused by other contractors or ~~subcontractors~~ Manufacturers.

**§ 4.4.2** As provided under Section 3.3.2, if the ~~Subcontractor~~ Manufacturer fails to clean up as provided in the Subcontract Documents, the Contractor may charge the ~~Subcontractor~~ Manufacturer for the ~~Subcontractor's~~ Manufacturer's appropriate share of cleanup costs.

**§ 4.5 WARRANTY**
The ~~Subcontractor~~ Manufacturer warrants to the Owner, Architect, and Contractor that materials and equipment furnished under this Subcontract will be of good quality and new unless the Subcontract Documents require or permit otherwise. The ~~Subcontractor~~ Manufacturer further warrants that the Work will conform to the requirements of the Subcontract Documents and will be free from defects, except for those inherent in the quality of the Work the Subcontract Documents require or permit. Work, materials, or equipment not conforming to these ~~requirements~~ requirements, including substitutions not properly approved and authorized, may be considered defective. The ~~Subcontractor's~~ Manufacturer's warranty excludes remedy for damage or defect caused by abuse, alterations to the Work not executed by the ~~Subcontractor,~~ Manufacturer, improper or insufficient maintenance, improper operation, or normal wear and tear under normal usage. If required by the Architect and Contractor, the ~~Subcontractor~~ Manufacturer shall furnish satisfactory evidence as to the kind and quality of materials and equipment. **This warranty shall be in addition to and not in limitation of any other warranty or remedy required by law or by the Subcontract Document.**

**§ 4.6 INDEMNIFICATION**
**§ 4.6.1** To the fullest extent permitted by law, the ~~Subcontractor~~ Manufacturer shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the ~~Subcontractor's~~ Manufacturer's Work under this Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the ~~Subcontractor, the Subcontractor's Sub-subcontractors,~~ Manufacturer, the Manufacturer's Sub-Manufacturers, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 4.6.

**§ 4.6.2** In claims against any person or entity indemnified under this Section 4.6 by an employee of the ~~Subcontractor, the Subcontractor's Sub-subcontractors,~~ Manufacturer, the Manufacturer's Sub-Manufacturers, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 4.6.1 shall not be limited by a limitation on the amount or type of damages, compensation or benefits payable

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                  (661359192)



by or for the ~~Subcontractor~~ Manufacturer or the ~~Subcontractor's Sub-subcontractors~~ Manufacturer's Sub-Manufacturers under workers' compensation acts, disability benefit acts or other employee benefit acts.

**§ 4.7 REMEDIES FOR NONPAYMENT**
If the Contractor does not pay the ~~Subcontractor~~ Manufacturer through no fault of the ~~Subcontractor,~~ Manufacturer, within seven days from the time payment should be made as provided in this Agreement, the ~~Subcontractor~~ Manufacturer may, without prejudice to any other available remedies, upon seven additional days' written notice to the Contractor, stop the Work of this Subcontract until payment of the amount owing has been received. The Subcontract Sum shall, by appropriate Modification, be increased by the amount of the ~~Subcontractor's~~ Manufacturer's reasonable costs of demobilization, delay and remobilization.

**ARTICLE 5    CHANGES IN THE WORK**
**§ 5.1** The Owner may make changes in the Work by issuing Modifications to the Prime Contract. Upon receipt of such a Modification issued subsequent to the execution of the Subcontract Agreement, the Contractor shall promptly notify the ~~Subcontractor~~ Manufacturer of the Modification. Unless otherwise directed by the Contractor, the ~~Subcontractor~~ Manufacturer shall not thereafter order materials or perform Work that would be inconsistent with the changes made by the Modification to the Prime Contract.

**§ 5.2** The ~~Subcontractor~~ Manufacturer may be ordered in writing by the Contractor, without invalidating this Subcontract, to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions, including those required by Modifications to the Prime Contract issued subsequent to the execution of this Agreement, the Subcontract Sum and the Subcontract Time being adjusted accordingly. The ~~Subcontractor,~~ Manufacturer, prior to the commencement of such changed or revised Work, shall submit promptly to the Contractor written copies of a claim for adjustment to the Subcontract Sum and Subcontract Time for such revised Work in a manner consistent with requirements of the Subcontract Documents.

**§ 5.3** The ~~Subcontractor~~ Manufacturer shall make all claims promptly to the Contractor for additional cost, extensions of time and damages for delays or other causes in accordance with the Subcontract Documents. A claim which will affect or become part of a claim which the Contractor is required to make under the Prime Contract within a specified time period or in a specified manner shall be made in sufficient time to permit the Contractor to satisfy the requirements of the Prime Contract. Such claims shall be received by the Contractor not less than two working days preceding the time by which the Contractor's claim must be made. Failure of the ~~Subcontractor~~ Manufacturer to make such a timely claim shall bind the ~~Subcontractor~~ Manufacturer to the same consequences as those to which the Contractor is bound.

**ARTICLE 6    MEDIATION AND BINDING DISPUTE RESOLUTION**
**§ 6.1 MEDIATION**
**§ 6.1.1** Any claim arising out of or related to this Subcontract, except <u>claims as otherwise provided in Section 4.1.5 and except</u> those waived in this Subcontract, shall be subject to mediation as a condition precedent to binding dispute resolution.

**§ 6.1.2** The parties shall endeavor to resolve their claims by mediation which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Mediation Procedures in effect on the date of the Agreement. A request for mediation shall be made in writing, delivered to the other party to this Subcontract and filed with the person or entity administering the mediation. The request may be made concurrently with the filing of binding dispute resolution proceedings but, in such event, mediation shall proceed in advance of binding dispute resolution proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order. If an arbitration is stayed pursuant to this Section, the parties may nonetheless proceed to the selection of the arbitrators(s) and agree upon a schedule for later proceedings.

**§ 6.1.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                            (861359192)

**§ 6.2 BINDING DISPUTE RESOLUTION**
For any claim subject to, but not resolved by mediation pursuant to Section 6.1, the method of binding dispute resolution shall be as follows:

*(Check the appropriate box. If the Contractor and ~~Subcontractor~~ Manufacturer do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, claims will be resolved by litigation in a court of competent jurisdiction.)*

[ **X** ] Arbitration pursuant to Section 6.3 of this Agreement

[   ] Litigation in a court of competent jurisdiction

[   ] ~~Other:~~ Other *(Specify)*

**§ 6.3 ARBITRATION**
**§ 6.3.1** If the Contractor and ~~Subcontractor~~ Manufacturer have selected arbitration as the method of binding dispute resolution in Section 6.2, any claim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of the Agreement. A demand for arbitration shall be made in writing, delivered to the other party to the Subcontract, and filed with the person or entity administering the arbitration. The party filing a notice of demand for arbitration must assert in the demand all claims then known to that party on which arbitration is permitted to be demanded.

**§ 6.3.2** A demand for arbitration shall be made no earlier than concurrently with the filing of a request for meditation but in no event shall it be made after the date when the institution of legal or equitable proceedings based on the claim would be barred by the applicable statute of limitations. For statute of limitations purposes, receipt of a written demand for arbitration by the person or entity administering the arbitration shall constitute the institution of legal or equitable proceedings based on the claim.

**§ 6.3.3** Either party, at its sole discretion, may consolidate an arbitration conducted under this Agreement with any other arbitration to which it is a party provided that (1) the arbitration agreement governing the other arbitration permits consolidation; (2) the arbitrations to be consolidated substantially involve common questions of law or fact; and (3) the arbitrations employ materially similar procedural rules and methods for selecting arbitrator(s).

**§ 6.3.4** Either party, at its sole discretion, may include by joinder persons or entities substantially involved in a common question of law or fact whose presence is required if complete relief is to be accorded in arbitration, provided that the party sought to be joined consents in writing to such joinder. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a claim not described in the written consent.

**§ 6.3.5** The Contractor and ~~Subcontractor~~ Manufacturer grant to any person or entity made a party to an arbitration conducted under this Section 6.3, whether by joinder or consolidation, the same rights of joinder and consolidation as the Contractor and ~~Subcontractor~~ Manufacturer under this Agreement.

**§ 6.3.6** This agreement to arbitrate and any other written agreement to arbitrate with an additional person or persons referred to herein shall be specifically enforceable under applicable law in any court having jurisdiction thereof. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

**ARTICLE 7   TERMINATION, SUSPENSION OR ASSIGNMENT OF THE SUBCONTRACT**
**§ 7.1** ~~TERMINATION BY THE SUBCONTRACTOR~~ TERMINATION BY THE MANUFACTURER
The ~~Subcontractor~~ Manufacturer may terminate the Subcontract for the same reasons and under the same circumstances and procedures with respect to the Contractor as the Contractor may terminate with respect to the Owner ~~under the Prime Contract,~~ or for nonpayment of amounts due under this Subcontract for 60 days or longer. In the event of such termination by the ~~Subcontractor~~ Manufacturer for any reason which is not the fault of the ~~Subcontractor, Sub-subcontractors~~ Manufacturer, Sub-Manufacturers or their agents or employees or other persons performing portions of the Work under contract with the ~~Subcontractor, the Subcontractor~~ Manufacturer, the



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                                              (861359192)

Manufacturer shall be entitled to recover from the Contractor payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

### § 7.2 TERMINATION BY THE CONTRACTOR
§ 7.2.1 If the ~~Subcontractor~~ Manufacturer repeatedly fails or neglects to carry out the Work in accordance with the Subcontract Documents or otherwise to perform in accordance with this Subcontract and fails within a ~~ten-day~~ seven  working day period after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, by written notice to the ~~Subcontractor~~ Manufacturer and without prejudice to any other remedy the Contractor may have, terminate the Subcontract and finish the ~~Subcontractor's~~ Manufacturer's Work by whatever method the Contractor may deem expedient. If the unpaid balance of the Subcontract Sum exceeds the expense of finishing the ~~Subcontractor's~~ Manufacturer's Work and other damages incurred by the Contractor and not expressly waived, such excess shall be paid to the ~~Subcontractor~~ Manufacturer. If such expense and damages exceed such unpaid balance, the ~~Subcontractor~~ Manufacturer shall pay the difference to the Contractor.

§ 7.2.2 If the Owner terminates the ~~Prime~~ Contract for the Owner's convenience, the Contractor shall promptly deliver written notice to the ~~Subcontractor~~ Manufacturer.

§ 7.2.3 Upon receipt of written notice of termination, the ~~Subcontractor~~ Manufacturer shall
.1    cease operations as directed by the Contractor in the notice;
.2    take actions necessary, or that the Contractor may direct, for the protection and preservation of the Work; and
.3    except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing Sub-subcontracts and purchase orders and enter into no further Sub-subcontracts and purchase orders.

§ 7.2.4 In case of such termination for the Owner's convenience, the ~~Subcontractor~~ Manufacturer shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

### § 7.3 SUSPENSION BY THE CONTRACTOR FOR CONVENIENCE
§ 7.3.1 The Contractor may, without cause, order the ~~Subcontractor~~ Manufacturer in writing to suspend, delay or interrupt the Work of this Subcontract in whole or in part for such period of time as the Contractor may determine. In the event of suspension ordered by the Contractor, the ~~Subcontractor~~ Manufacturer shall be entitled to an equitable adjustment of the Subcontract Time and Subcontract Sum.

§ 7.3.2 An adjustment shall be made for increases in the Subcontract Time and Subcontract Sum, including profit on the increased cost of performance, caused by suspension, delay or interruption. No adjustment shall be made to the extent that
.1    performance is, was or would have been so suspended, delayed or interrupted by another cause for which the ~~Subcontractor~~ Manufacturer is responsible; or
.2    an equitable adjustment is made or denied under another provision of this Subcontract.

### § 7.4 ASSIGNMENT OF THE SUBCONTRACT
§ 7.4.1 In the event the Owner terminates the Prime Contract for cause, this Subcontract is assigned to the Owner pursuant to Section 5.4 of ~~AIA Document A201–2007 provided the Owner accepts the assignment.~~ A201  and to the prior rights of the surety, if any, obligated under bonds relating to the Prime Contract. In such event, the Owner shall assume the Contractor's rights and obligations under the Subcontract Documents. If the Work of  the Prime Contract has been suspended for more than 30 days, the Manufacturer's compensation shall be equitably adjusted.

§ 7.4.2 Without the Contractor's written consent, the ~~Subcontractor shall~~ Manufacturer may not assign the Work of this Subcontract, subcontract the whole of this Subcontract, or subcontract portions of this Subcontract. Any requests  for assignment must be made by written notification to the Contractor.


AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                          (861359192)

**ARTICLE 8   THE WORK OF THIS SUBCONTRACT**

The ~~Subcontractor~~ Manufacturer shall execute the following portion of the Work described in the Subcontract Documents, including all labor, materials, equipment, services and other items required to complete such portion of the Work, except to the extent specifically indicated in the Subcontract Documents to be the responsibility of others.
*(Insert a precise description of the Work of this Subcontract, referring where appropriate to numbers of Drawings, sections of Specifications and pages of Addenda, Modifications and accepted alternates.)*


**ARTICLE 9   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION**

**§ 9.1** Subcontract Time is the period of time, including authorized adjustments, allotted in the Subcontract Documents for Substantial Completion of the Work described in the Subcontract documents. The ~~Subcontractor's~~ Manufacturer's date of commencement is the date from which the Subcontract Time of Section 9.3 is measured; it shall be the date of this Agreement, as first written above, unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Contractor.
*(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*


**§ 9.2** Unless the date of commencement is established by a notice to proceed issued by the Contractor, or the Contractor has commenced visible Work at the site under the Prime Contract, the ~~Subcontractor~~ Manufacturer shall notify the Contractor in writing not less than five days before commencing the ~~Subcontractor's~~ Manufacturer's Work to permit the timely filing of mortgages, mechanic's liens and other security interests.


**§ 9.3** The Work of this Subcontract shall be substantially completed not later than ~~.~~ **Production start date to be on or about April 15, 2013 and Windows ready to ship to New York on September 1, 2013**
*(Insert the calendar date or number of calendar days after the ~~Subcontractor's~~ Manufacturer's date of commencement. Also insert any requirements for earlier substantial completion of certain portions of the ~~Subcontractor's~~ Manufacturer's Work, if not stated elsewhere in the Subcontract Documents.)*
**With all possible speed, Manufacturer will diligently perform the work, and maintain men in sufficient numbers and materials and equipment in sufficient quantities to accomplish the rapid completion of the job.**


       **Portion of Work**                **Substantial Completion Date**


, subject to adjustments of this Subcontract Time as provided in the Subcontract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time.)*


**§ 9.4** With respect to the obligations of both the Contractor and the ~~Subcontractor,~~ Manufacturer, time is of the essence of this Subcontract.


**§ 9.5** No extension of time will be valid without the Contractor's written consent after claim made by the ~~Subcontractor~~ Manufacturer in accordance with Section 5.3.

**ARTICLE 10   SUBCONTRACT SUM**

**§ 10.1** The Contractor shall pay the ~~Subcontractor~~ Manufacturer in current funds for performance of the Subcontract the Subcontract Sum of  ~~($    ),~~ Eight Million Four Hundred and Twelve Thousand Five Hundred and Two Dollars  ($8,412,502.00), subject to additions and deductions as provided in the Subcontract Documents.


**§ 10.2** The Subcontract Sum is based upon the following alternates, if any, which are described in the Subcontract Documents and have been accepted by the Owner and the Contractor:
*(Insert the numbers or other identification of accepted alternates.)*

See Rider 5, Scope of Work

**AIA Document A401™ – 2007.** Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                      (861359192)

Init.



**11**

**§ 10.3** Unit prices, if any:
*(Identify and state the unit price, and state the quantity limitations, if any, to which the unit price will be applicable.)*
See Rider 5, Scope of Work

| Item | Units and Limitations | Price Per Unit($0.00) |
|------|----------------------|----------------------|

**§ 10.4** Allowances included in the Subcontract Sum, if any:
*(Identify allowance and state exclusions, if any, from the allowance price.)*
See Rider 5, Scope of Work

| Item | Price |
|------|-------|

## ARTICLE 11   PROGRESS PAYMENTS

**§ 11.1** Based upon applications for payment submitted to the Contractor by the ~~Subcontractor,~~ Manufacturer, corresponding to applications for payment submitted by the Contractor to the Architect, and certificates for payment issued by the Architect, the Contractor shall make progress payments on account of the Subcontract Sum to the ~~Subcontractor~~ Manufacturer as provided below and elsewhere in the Subcontract Documents. Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor and ~~Subcontractor~~ Manufacturer for Work properly performed by their contractors and suppliers shall be held by the Contractor and ~~Subcontractor~~ Manufacturer for those contractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor or ~~Subcontractor~~ Manufacturer for which payment was made to the Contractor by the Owner or to the ~~Subcontractor~~ Manufacturer by the Contractor, as applicable. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor or ~~Subcontractor,~~ Manufacturer, shall create any fiduciary liability or tort liability on the part of the Contractor or ~~Subcontractor~~ Manufacturer for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor or ~~Subcontractor~~ Manufacturer for breach of the requirements of this provision.

**§ 11.2** The period covered by each application for payment shall be one calendar month ending on the last day of the month, or as follows:

Monthly cycle covered by each application shall be determined by Owner and Owner's lender. Contractor shall notify Manufacturer of applicable dates. Manufacturer's approved requisition submitted by the 20th day of the cycle for work completed through the end of the prior cycle, , will be paid within 3 working days of receipt of payment of payment from Owner by Contractor.

**§ 11.3** Provided an application for payment is received by the Contractor not later than the  TBA   day of a month, the Contractor shall include the ~~Subcontractor's~~ Manufacturer's Work covered by that application in the next application for payment which the Contractor is entitled to submit to the Architect. The Contractor shall pay the ~~Subcontractor~~ Manufacturer each progress payment no later than seven working days after the Contractor receives payment from the Owner. If the Architect does not issue a certificate for payment or the Contractor does not receive payment for any cause which is not the fault of the ~~Subcontractor,~~ Manufacturer, the Contractor shall pay the ~~Subcontractor,~~ Manufacturer, on demand, a progress payment computed as provided in Sections 11.7, 11.8 and 11.9.

**§ 11.4** If the ~~Subcontractor's~~ Manufacturer's application for payment is received by the Contractor after the application date fixed above, the ~~Subcontractor's~~ Manufacturer's Work covered by it shall be included by the Contractor in the next application for payment submitted to the Architect.

**§ 11.5** The ~~Subcontractor~~ Manufacturer shall submit to the Contractor a schedule of values prior to submitting the ~~Subcontractor's first Application for Payment.~~ Manufacturer's first Application for Payment made out in such detail as the Contractor and Manufacturer may agree upon or as required by the Contractor and supported by such evidence as the Contractor may require. Each subsequent application for payment shall be based upon the most recent schedule of values submitted by the ~~Subcontractor~~ Manufacturer in accordance with the Subcontract Documents. The schedule of values shall allocate the entire Subcontract Sum among the various portions of the ~~Subcontractor's~~ Manufacturer's Work and be prepared in such form and supported by such data to substantiate its

Init.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:38 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                                          (861359192)

accuracy as the Contractor may require. This schedule, unless objected to by the Contractor, shall be used as a basis for reviewing the ~~Subcontractor's~~ Manufacturer's applications for payment.

**§ 11.6** Applications for payment submitted by the ~~Subcontractor~~ Manufacturer shall indicate the percentage of completion of each portion of the ~~Subcontractor's~~ Manufacturer's Work as of the end of the period covered by the application for payment.

**§ 11.7** Subject to the provisions of the Subcontract Documents, the amount of each progress payment shall be computed as set forth in the sections below.

**§ 11.7.1** Take that portion of the Subcontract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the ~~Subcontractor's~~ Manufacturer's Work by the share of the total Subcontract Sum allocated to that portion of the ~~Subcontractor's~~ Manufacturer's Work in the schedule of values, less that percentage actually retained, if any, from payments to the Contractor on account of the Work of the ~~Subcontractor.~~ Manufacturer. Pending final determination of cost to the Contractor of changes in the Work that have been properly authorized by the Contractor, amounts not in dispute shall be included to the same extent provided in the Prime Contract, even though the Subcontract Sum has not yet been adjusted;

**§ 11.7.2** ~~Add that portion of the Subcontract Sum properly allocable to materials and equipment delivered and suitably stored at the site by the Subcontractor for subsequent incorporation in the Subcontractor's Work or, if approved by the Contractor, suitably stored off the site at a location agreed upon in writing, less the same percentage retainage required by the Prime Contract to be applied to such materials and equipment in the Contractor's application for payment;~~

**§ 11.7.3** Subtract the aggregate of previous payments made by the Contractor; and

**§ 11.7.4** Subtract amounts, if any, calculated under Section 11.7.1 or 11.7.2 that are related to Work of the ~~Subcontractor~~ Manufacturer for which the Architect has withheld or nullified, in whole or in part, a certificate of payment for a cause that is the fault of the ~~Subcontractor.~~ Manufacturer.

**§ 11.8** Upon the partial or entire disapproval by the Contractor of the ~~Subcontractor's~~ Manufacturer's application for payment, the Contractor shall provide written notice to the ~~Subcontractor.~~ Manufacturer. When the basis for the disapproval has been remedied, the ~~Subcontractor~~ Manufacturer shall be paid the amounts withheld.

**§ 11.9 SUBSTANTIAL COMPLETION**
When the ~~Subcontractor's~~ Manufacturer's Work or a designated portion thereof is substantially complete and in accordance with the requirements of the Prime Contract, the Contractor shall, upon application by the ~~Subcontractor,~~ Manufacturer, make prompt application for payment for such Work. Within 30 days following issuance by the Architect of the certificate for payment covering such substantially completed Work, the Contractor shall, to the full extent allowed in the Prime Contract, make payment to the ~~Subcontractor,~~ Manufacturer, deducting any portion of the funds for the ~~Subcontractor's~~ Manufacturer's Work withheld in accordance with the certificate to cover costs of items to be completed or corrected by the ~~Subcontractor.~~ Manufacturer. Such payment to the ~~Subcontractor~~ Manufacturer shall be the entire unpaid balance of the Subcontract Sum if a full release of retainage is allowed under the Prime Contract for the ~~Subcontractor's~~ Manufacturer's Work prior to the completion of the entire Project. If the Prime Contract does not allow for a full release of retainage, then such payment shall be an amount which, when added to previous payments to the ~~Subcontractor,~~ Manufacturer, will reduce the retainage on the ~~Subcontractor's~~ Manufacturer's substantially completed Work to the same percentage of retainage as that on the Contractor's Work covered by the certificate.

**ARTICLE 12   FINAL PAYMENT**
**§ 12.1** Final payment, constituting the entire unpaid balance of the Subcontract Sum, shall be made by the Contractor to the ~~Subcontractor~~ Manufacturer when the ~~Subcontractor's~~ Manufacturer's Work is fully performed in accordance with the requirements of the Subcontract Documents, the Architect has issued a certificate for payment covering the ~~Subcontractor's~~ Manufacturer's completed Work and the Contractor has received payment from the Owner. ~~If, for any cause which is not the fault of the Subcontractor, a certificate for payment is not issued or the Contractor does not receive timely payment or does not pay the Subcontractor within seven days after receipt of payment from the Owner, final payment to the Subcontractor shall be made upon demand.~~


**Init.**

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                                          (861359192)

**13**

*(Insert provisions for earlier final payment to the ~~Subcontractor,~~ Manufacturer, if applicable.)*

**§ 12.2** Before issuance of the final payment, the ~~Subcontractor,~~ Manufacturer, if required, shall submit evidence satisfactory to the Contractor that all payrolls, bills for materials and equipment, and all known indebtedness connected with the ~~Subcontractor's~~ Manufacturer's Work have been satisfied. Acceptance of final payment by the ~~Subcontractor~~ Manufacturer shall constitute a waiver of claims by the ~~Subcontractor,~~ Manufacturer, except those previously made in writing and identified by the ~~Subcontractor~~ Manufacturer as unsettled at the time of final application for payment.

**ARTICLE 13   INSURANCE AND BONDS**
**§ 13.1** The ~~Subcontractor~~ Manufacturer shall purchase and maintain insurance of the following types of coverage and limits of liability as will protect the ~~Subcontractor~~ Manufacturer, **Contractor, and other additional insureds** from claims that may arise out of, or result from, the ~~Subcontractor's~~ Manufacturer's operations and completed operations under the ~~Subcontract.~~ Subcontract.
**See Rider 3, Insurance and Indemnification**

| Type of insurance or bond | Limit of liability or bond amount (~~$0.00~~)($ 0.00) |
|---|---|

**§ 13.2** ~~Coverages, whether~~

Coverage shall be written on an occurrence ~~or claims-made basis,~~ basis and shall be maintained without interruption from the date of commencement of ~~the Subcontractor's Work~~ Manufacturer's work until the date of final ~~payment and termination of any coverage~~ payment. Coverage required to be maintained after final payment to the ~~Subcontractor, and, with respect to the Subcontractor's completed operations coverage, until the expiration of the period for correction of Work or for such other period for maintenance of completed operations coverage~~ Manufacturer shall include completed operations as specified in the Prime Contract. All insurance except Completed Operations must be on an occurrence basis.

**§ 13.3** Certificates of insurance acceptable to the Contractor shall be filed with the Contractor prior to commencement of the ~~Subcontractor's~~ Manufacturer's Work. These certificates and the insurance policies required by this Article 13 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Contractor. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final application for payment as required in Article 12. If any information concerning reduction of coverage is not furnished by the insurer, it shall be furnished by the ~~Subcontractor~~ Manufacturer with reasonable promptness according to the ~~Subcontractor's~~ Manufacturer's information and belief.

**§ 13.4** The ~~Subcontractor~~ Manufacturer shall cause the commercial liability coverage required by the Subcontract Documents to include: (1) the Contractor, the Owner, ~~the Architect and the Architect's consultants~~ as additional insureds for claims caused in whole or in part by the ~~Subcontractor's~~ Manufacturer's negligent acts or omissions during the ~~Subcontractor's~~ Manufacturer's operations; and (2) the Contractor as an additional insured for claims caused in whole or in part by the ~~Subcontractor's~~ Manufacturer's negligent acts or omissions during the ~~Subcontractor's~~ Manufacturer's completed operations.

**§ 13.5** The Contractor shall furnish to the ~~Subcontractor~~ Manufacturer satisfactory evidence of insurance required of the Contractor under the Prime Contract.

**§ 13.6** The Contractor shall promptly, upon request of the ~~Subcontractor,~~ Manufacturer, furnish a copy or permit a copy to be made of any bond covering payment of obligations arising under the Subcontract.

**§ 13.7** Performance Bond and Payment Bond:
*(If the ~~Subcontractor~~ Manufacturer is to furnish bonds, insert the specific requirements here.)*

Init.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                    (881359192)

14

| Bond type | Bond amount ($0.00)($ 0.00) | Bond delivery date | Bond form |
|---|---|---|---|
| Supply Bond | 8,412,502 | January 3, 2013 | A312 |

### § 13.8 PROPERTY INSURANCE

§ 13.8.1 When requested in writing, the Contractor shall provide the ~~Subcontractor~~ Manufacturer with copies of the property and equipment policies in effect for the Project. The Contractor shall notify the ~~Subcontractor~~ Manufacturer _if the required property insurance policies are not in effect.

§ 13.8.2 If the required property insurance is not in effect for the full value of the ~~Subcontractor's~~ Manufacturer's Work, then the ~~Subcontractor~~ Manufacturer shall purchase insurance for the value of the ~~Subcontractor's~~ Manufacturer's Work, and the ~~Subcontractor~~ Manufacturer shall be reimbursed for the cost of the insurance by an adjustment in the Subcontract Sum.

§ 13.8.3 Property insurance for the ~~Subcontractor's~~ Manufacturer's materials and equipment required for the ~~Subcontractor's~~ Manufacturer's Work, stored off site or in transit and not covered by the Project property insurance, shall be paid for through the application for payment process.

### § 13.9 WAIVERS OF SUBROGATION

The Contractor and ~~Subcontractor~~ Manufacturer waive all rights against (1) each other and any of their ~~subcontractors, sub-subcontractors,~~ Manufacturers, sub-Manufacturers, agents and employees, each of the other, and (2) the Owner, the Architect, the Architect's consultants, separate contractors, and any of their ~~subcontractors, sub-subcontractors,~~ Manufacturers, sub-Manufacturers, agents and employees for damages caused by fire or other causes of loss to the extent covered by property insurance provided under the Prime Contract or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner as a fiduciary. The ~~Subcontractor~~ Manufacturer shall require of the ~~Subcontractor's Sub-subcontractors,~~ Manufacturer's Sub-Manufacturers, agents and employees, by appropriate agreements, written where legally required for validity, similar waivers in favor of the parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

### ARTICLE 14   TEMPORARY FACILITIES AND WORKING CONDITIONS

§ 14.1 The Contractor shall furnish and make available at no cost to the ~~Subcontractor~~ Manufacturer the Contractor's temporary facilities, equipment and services, except as noted below:

| Temporary Facility, Equipment or Service | Cost, if any ($0.00)($ 0.00) |
|---|---|

See Rider 1, Conditions

§ 14.2 Specific working conditions:
_(Insert any applicable arrangements concerning working conditions and labor matters for the Project.)_

### ARTICLE 15   MISCELLANEOUS PROVISIONS

§ 15.1 Where reference is made in this Subcontract to a provision of another Subcontract Document, the reference refers to that provision as amended or supplemented by other provisions of the Subcontract Documents.

§ 15.2 Payments due and unpaid under this Subcontract shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
_(Insert rate of interest agreed upon, if any.)_

% ~~NONE~~

§ 15.3 Retainage and any reduction thereto ~~are~~ is as follows: 0%



Init.

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                      (861359192)

15

§ 15.4 The Contractor and ~~Subcontractor~~ Manufacturer waive claims against each other for consequential damages arising out of or relating to this Subcontract, including without limitation, any consequential damages due to either party's termination in accordance with Article 7.

**ARTICLE 16   ENUMERATION OF SUBCONTRACT DOCUMENTS**
§ 16.1 The Subcontract Documents, except for Modifications issued after execution of this Subcontract, are enumerated in the sections below.

§ 16.1.1 This executed AIA Document A401–2007, Standard Form of Agreement Between Contractor and ~~Subcontractor~~ Manufacturer.

§ 16.1.2 ~~The Prime Contract, consisting of the Agreement between the Owner and Contractor dated as first entered above and the other Contract Documents enumerated in the Owner-Contractor Agreement.~~

§ 16.1.3 The following Modifications to the Prime Contract, if any, issued subsequent to the execution of the Owner-Contractor Agreement but prior to the execution of this Agreement:
**See Rider 4, Contract Documents**

| Modification | Date |
| --- | --- |

§ 16.1.4 Additional Documents, if any, forming part of the Subcontract Documents:
  .1  ~~AIA Document E201™ –2007, Digital Data Protocol Exhibit, if completed by the parties, or the following:~~

  .2  Other documents:
    *(List here any additional documents that are intended to form part of the Subcontract Documents. Requests for proposal and the ~~Subcontractor's~~ Manufacturer's bid or proposal should be listed here only if intended to be made part of the Subcontract Documents.)*

    1. Rider 1, Conditions
    2. Rider 2, Project Safety Manual
    3. Rider 3, Insurance and Indemnification
    4. Rider 4, Contract Documents, Current Drawing Log
    5. Rider 5, Scope of Work
    6. Rider 6, Compliance

This Agreement entered into as of the day and year first written above.

CONTRACTOR *(Signature)*
PAUL COLASUTO
*(Printed name and title)*
Project Executive
2/1/13

~~SUBCONTRACTOR~~ MANUFACTURER *(Signature)*
FEDERICO BALESTRAZZI, PRESIDENT
*(Printed name and title)*

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:30:39 on 01/23/2013 under Order No.6737R28170_1 which expires on 05/20/2013, and is not for resale.
User Notes: (861359162)

Init.
TB

16

## *Certification of Document's Authenticity*
*AIA® Document D401™ – 2003*

I, , hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with this certification at 15:30:39 on 01/29/2013 under Order No. 6732828170_1 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document A401™ – 2007, Standard Form of Agreement Between Contractor and Subcontractor, as published by the AIA in its software, other than changes shown in the attached final document by underscoring added text and striking over deleted text.

_____
(Signed)

PRESIDENT
_____
(Title)

01.31.2013
_____
(Dated)

AIA Document D401™ – 2003. Copyright © 1992 and 2003 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:39 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                               (861359192)

1

# ▓AIA® Document A401™ – 2007

## Standard Form of Agreement Between Contractor and Subcontractor

**AGREEMENT** made as of the   Third  day of   January        in the year  Two Thousand
 Thirteen
*(In words, indicate day, month and ~~year,)~~year)*

**BETWEEN** the Contractor:
*(Name, ~~legal status,~~ address and other information)*

Monadnock Construction, Inc.
155-3rd Street
Brooklyn, New York 11231

and the ~~Subcontractor:~~Manufacturer:
*(Name, ~~legal status,~~ address and other information)*

Glasswall
3550 NW 49th Street
Miami, Florida 33142

The Contractor has made a contract for construction (hereinafter, the Prime Contract) dated:
 January 3, 2013

with the Owner:
*(Name, ~~legal status,~~ address and other information)*

HPS Borden Avenue Associates, LLC
60 Columbus Circle
New York, New York 10023

for the following Project:
*(Name, location and detailed description)*

HPS "Parcel B"
1-55 Borden Avenue
Long Island City, New York 11101

The Prime Contract provides for the furnishing of labor, materials, equipment and services
in connection with the construction of the Project. ~~A copy of the Prime Contract, consisting
of the Agreement Between Owner and Contractor (from which compensation amounts may
be deleted) and~~ the other Contract Documents enumerated therein, has been made available
to the ~~Subcontractor.~~Manufacturer.

The Architect for the Project:
*(Name, ~~legal status,~~ address and other information)*

Ismael Leyva Architects, P.C.
48 West 37th Street, #13
New York, New York 10018

This document has important
legal consequences. Consultation
with an attorney
is encouraged with respect to
its completion or modification.

AIA Document A201™–2007,
General Conditions of the
Contract for Construction, is
adopted in this document by
reference.

This document has been
approved and endorsed by the
Associated Specialty Contractors,
Inc.

**Init.**

**FB**

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute
of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the
maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires
on 05/20/2013, and is not for resale.
User Notes:                                                                                          (1515465554)

1

The Contractor and the ~~Subcontractor~~ Manufacturer agree as follows.

Init.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                                          (1515465554)

TABLE OF ARTICLES

1    THE SUBCONTRACT DOCUMENTS

2    MUTUAL RIGHTS AND RESPONSIBILITIES

3    CONTRACTOR

4    ~~SUBCONTRACTOR~~MANUFACTURER

5    CHANGES IN THE WORK

6    MEDIATION AND BINDING DISPUTE RESOLUTION

7    TERMINATION, SUSPENSION OR ASSIGNMENT OF THE SUBCONTRACT

8    THE WORK OF THIS SUBCONTRACT

9    DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

10    SUBCONTRACT SUM

11    PROGRESS PAYMENTS

12    FINAL PAYMENT

13    INSURANCE AND BONDS

14    TEMPORARY FACILITIES AND WORKING CONDITIONS

15    MISCELLANEOUS PROVISIONS

16    ENUMERATION OF SUBCONTRACT DOCUMENTS

### ARTICLE 1   THE SUBCONTRACT DOCUMENTS

§ 1.1 The Subcontract Documents consist of (1) this Agreement; ~~(2) the Prime Contract, consisting of the Agreement between the Owner and Contractor and the other Contract Documents enumerated therein; (3) Modifications issued subsequent to the execution of the Agreement between the Owner and Contractor, whether before or after the execution of this Agreement;~~ (4) other documents listed in Article 16 of this Agreement; and (5) Modifications to this Subcontract issued after execution of this Agreement. These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein. The Subcontract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Subcontract Documents, other than Modifications issued subsequent to the execution of this Agreement, appears in Article 16.

§ 1.2 Except to the extent of a conflict with a specific term or condition contained in the Subcontract Documents, the General Conditions governing this Subcontract shall be the AIA Document ~~A201™  2007,~~ A201, General Conditions of the Contract for Construction.

§ 1.3 The Subcontract may be amended or modified only by a Modification. The Subcontract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and the ~~Subcontractor,~~ Manufacturer, (2) between the Owner and the ~~Subcontractor,~~ Manufacturer, or (3) between any persons or entities other than the Contractor and ~~Subcontractor.~~ Manufacturer.



Init.

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                                    (1515465554)

3

**§ 1.4** The Contractor shall make available the Subcontract Documents to the ~~Subcontractor prior to execution of this Agreement,~~ Manufacturer and thereafter, upon request, but the Contractor may charge the ~~Subcontractor~~ Manufacturer for the reasonable cost of reproduction.

## ARTICLE 2   MUTUAL RIGHTS AND RESPONSIBILITIES
The Contractor and ~~Subcontractor~~ Manufacturer shall be mutually bound by the terms of this Agreement and, to the extent that the provisions of AIA Document ~~A201 2007~~ A201, apply to this Agreement pursuant to Section 1.2 and provisions of the Prime Contract apply to the Work of the ~~Subcontractor,~~ Manufacturer, the Contractor shall assume toward the ~~Subcontractor~~ Manufacturer all obligations and responsibilities that the Owner, under such documents, assumes toward the Contractor, and the ~~Subcontractor~~ Manufacturer shall assume toward the Contractor all obligations and responsibilities which the Contractor, under such documents, assumes toward the Owner and the Architect. The Contractor shall have the benefit of all rights, remedies and redress against the ~~Subcontractor~~ Manufacturer that the Owner, under such documents, has against the Contractor, and the ~~Subcontractor~~ Manufacturer shall have the benefit of all rights, remedies and redress against the Contractor that the Contractor, under such documents, has against the Owner, insofar as applicable to this Subcontract. Where a provision of such documents is inconsistent with a provision of this Agreement, this Agreement shall govern.

## ARTICLE 3   CONTRACTOR
## § 3.1 SERVICES PROVIDED BY THE CONTRACTOR
**§ 3.1.1** The Contractor shall cooperate with the ~~Subcontractor~~ Manufacturer in scheduling and performing the Contractor's Work to avoid conflicts or interference in the ~~Subcontractor's~~ Manufacturer's Work and shall expedite written responses to submittals made by the ~~Subcontractor~~ Manufacturer in accordance with Section 4.1 and Article 5. Promptly after execution of this Agreement, the Contractor shall provide the ~~Subcontractor~~ Manufacturer copies of the Contractor's construction schedule and schedule of submittals, together with such additional scheduling details as will enable the ~~Subcontractor~~ Manufacturer to plan and perform the ~~Subcontractor's~~ Manufacturer's Work properly. The Contractor shall promptly notify the ~~Subcontractor~~ Manufacturer of subsequent changes in the construction and submittal schedules and additional scheduling details.

**§ 3.1.2** The Contractor shall provide suitable areas for storage of the ~~Subcontractor's materials and equipment during the course of the Work. Additional costs to the Subcontractor resulting from relocation of such storage areas at the direction of the Contractor, except as previously agreed upon, shall be reimbursed by the Contractor.~~ Manufacturer's materials

**§ 3.1.3** ~~Except as provided in Article 14, the Contractor's equipment will be available to the Subcontractor only at the Contractor's discretion and on mutually satisfactory terms.~~

## § 3.2 COMMUNICATIONS
**§ 3.2.1** The Contractor shall promptly make available to the ~~Subcontractor~~ Manufacturer information, including information received from the Owner, that affects this Subcontract and that becomes available to the Contractor subsequent to execution of this Subcontract.

**§ 3.2.2** The Contractor shall not give instructions or orders directly to the ~~Subcontractor's~~ Manufacturer's employees or to the ~~Subcontractor's Sub-subcontractors~~ Manufacturer's Sub-Manufacturers or material suppliers unless such persons are designated as authorized representatives of the ~~Subcontractor.~~ Manufacturer.

**§ 3.2.3** The Contractor shall permit the ~~Subcontractor~~ Manufacturer to request directly from the Architect information regarding the percentages of completion and the amount certified on account of Work done by the ~~Subcontractor.~~ Manufacturer.

**§ 3.2.4** If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the Contractor, a ~~subcontractor~~ Manufacturer or anyone directly or indirectly employed by them (other than the ~~Subcontractor),~~ Manufacturer), the Contractor shall, prior to harmful exposure of the ~~Subcontractor's~~ Manufacturer's employees to such substance, give written notice of the chemical composition thereof to the ~~Subcontractor~~ Manufacturer in sufficient detail and time to permit the ~~Subcontractor's~~ Manufacturer's compliance with such laws.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                           (1515465554)

**§ 3.2.5** The Contractor shall furnish to the ~~Subcontractor~~ Manufacturer within 30 days after receipt of a written request, or earlier if so required by law, information necessary and relevant for the ~~Subcontractor~~ Manufacturer to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property, usually referred to as the site, on which the Project is located and the Owner's interest therein.

**§ 3.2.6** If the Contractor asserts or defends a claim against the Owner that relates to the Work of the ~~Subcontractor,~~ Manufacturer, the Contractor shall promptly make available to the ~~Subcontractor~~ Manufacturer all information relating to the portion of the claim that relates to the Work of the ~~Subcontractor.~~ Manufacturer,

### § 3.3 CLAIMS BY THE CONTRACTOR
**§ 3.3.1** Liquidated damages for delay, if provided for in Section 9.3 of this Agreement, shall be assessed against the ~~Subcontractor~~ Manufacturer only to the extent caused by the ~~Subcontractor~~ Manufacturer or any person or entity for whose acts the ~~Subcontractor~~ Manufacturer may be liable, and in no case for delays or causes arising outside the scope of this Subcontract. *LIQUIDATED DAMAGES WILL BE CAPPED AT $100 000. N #B*

**§ 3.3.2** The Contractor's claims for the costs of services or materials provided due to the **~~Subcontractor's~~ Manufacturer's** failure to execute the Work shall require
 .1  seven days' written notice prior to the Contractor's providing services or materials, except in an emergency; and
 .2  written compilations to the ~~Subcontractor~~ Manufacturer of services and materials provided by the Contractor and charges for such services and materials no later than the fifteenth day of the month following the Contractor's providing such services or materials.

### § 3.4 CONTRACTOR'S REMEDIES
If the ~~Subcontractor~~ Manufacturer defaults or neglects to carry out the Work in accordance with this Agreement and fails within ~~five~~ three working days after receipt of ~~written notice~~ from the Contractor to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, ~~by appropriate Modification,~~ **_, after three days following receipt by the Manufacturer of an additional written notice_** and without prejudice to any other remedy the Contractor may have, make good such deficiencies and may deduct the reasonable cost thereof from the payments then or thereafter due the ~~Subcontractor.~~ Manufacturer.

### ~~ARTICLE 4   SUBCONTRACTOR~~
### ARTICLE 4   MANUFACTURER
### § 4.1 EXECUTION AND PROGRESS OF THE WORK
**§ 4.1.1** For all Work the ~~Subcontractor~~ Manufacturer intends to subcontract, the ~~Subcontractor~~ Manufacturer shall enter into written agreements with ~~Sub-subcontractors~~ Sub-Manufacturers performing portions of the Work of this Subcontract by which the ~~Subcontractor~~ Manufacturer and the ~~Sub-subcontractor~~ Sub-Manufacturer are mutually bound, to the extent of the Work to be performed by the ~~Sub-subcontractor,~~ Sub-Manufacturer, assuming toward each other all obligations and responsibilities that the Contractor and ~~Subcontractor~~ Manufacturer assume toward each other and having the benefit of all rights, remedies and redress each against the other that the Contractor and ~~Subcontractor~~ Manufacturer have by virtue of the provisions of this Agreement.

**§ 4.1.2** The ~~Subcontractor~~ Manufacturer shall supervise and direct the ~~Subcontractor's~~ Manufacturer's Work, and shall cooperate with the Contractor in scheduling and performing the ~~Subcontractor's~~ Manufacturer's Work to avoid conflict, delay in or interference with the Work of the Contractor, other ~~subcontractors,~~ Manufacturers, the Owner, or separate contractors.

**§ 4.1.3** The ~~Subcontractor~~ Manufacturer shall promptly submit Shop Drawings, Product Data, ~~Samples~~ Samples, and similar submittals required by the Subcontract Documents  with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Contractor or other ~~subcontractors.~~ Manufacturers.

**§ 4.1.4** The ~~Subcontractor~~ Manufacturer shall furnish to the Contractor periodic progress reports on the Work of this Subcontract as ~~mutually agreed,~~ **required by the Contractor,** including information on the status of materials and equipment that may be in the course of preparation, manufacture, or transit.

Init.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                       (1515465554)

**§ 4.1.5** The ~~Subcontractor~~ Manufacturer agrees that the Contractor and the Architect each have the authority to reject Work of the ~~Subcontractor~~ Manufacturer that does not conform to the Prime Contract. The Architect's decisions on matters relating to aesthetic effect shall be final and binding on the ~~Subcontractor~~ Manufacturer if consistent with the intent expressed in the Prime Contract.

**§ 4.1.6** The ~~Subcontractor~~ Manufacturer shall pay for all materials, equipment and labor used in connection with the performance of this Subcontract through the period covered by previous payments received from the Contractor, and shall furnish satisfactory evidence, when requested by the Contractor, to verify compliance with the above requirements.

**§ 4.1.7** ~~The Subcontractor shall take necessary precautions to protect properly the work of other subcontractors from damage caused by operations under this Subcontract.~~

**§ 4.1.8** The ~~Subcontractor~~ Manufacturer shall cooperate with the Contractor, other ~~subcontractors,~~ Manufacturers, the Owner, and separate contractors whose work might interfere with the ~~Subcontractor's~~ Manufacturer's Work. The ~~Subcontractor~~ Manufacturer shall participate in the preparation of coordinated drawings in areas of congestion, if required by the Prime Contract, or the Contractor, specifically noting and advising the Contractor of potential conflicts between the Work of the ~~Subcontractor~~ Manufacturer and that of the Contractor, other ~~subcontractors,~~ Manufacturers, the Owner, or separate contractors.

### § 4.2 PERMITS, FEES, NOTICES, AND COMPLIANCE WITH LAWS
**§ 4.2.1** The ~~Subcontractor~~ Manufacturer shall give notices and comply with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities bearing on performance of the Work of this Subcontract. The ~~Subcontractor~~ Manufacturer shall secure and pay for permits, fees, licenses and inspections by government agencies necessary for proper execution and completion of the ~~Subcontractor's~~ Manufacturer's Work, the furnishing of which is required of the Contractor by the Prime Contract.

**§ 4.2.2** The ~~Subcontractor~~ Manufacturer shall comply with Federal, state and local tax laws, social security acts, unemployment compensation acts and workers' compensation acts insofar as applicable to the performance of this Subcontract.

### § 4.3 SAFETY PRECAUTIONS AND PROCEDURES
**§ 4.3.1** The ~~Subcontractor~~ Manufacturer shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by the Contractor and with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities for the safety of persons and property in accordance with the requirements of the Prime Contract. The ~~Subcontractor~~ Manufacturer shall report to the Contractor within three days one day an injury to an employee or agent of the ~~Subcontractor~~ Manufacturer which occurred at the site.

**§ 4.3.2** If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the ~~Subcontractor, the Subcontractor's Sub-subcontractors~~ Manufacturer, the Manufacturer's Sub-Manufacturers or anyone directly or indirectly employed by them, the ~~Subcontractor~~ Manufacturer shall, prior to harmful exposure of any employees on the site to such substance, give written notice of the chemical composition thereof to the Contractor in sufficient detail and time to permit compliance with such laws by the Contractor, other ~~subcontractors~~ Manufacturers and other employers on the site.

**§ 4.3.3** If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a hazardous material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the ~~Subcontractor, the Subcontractor~~ Manufacturer, the Manufacturer shall, upon recognizing the condition, immediately stop Work in the affected area and promptly report the condition to the Contractor in writing. When the material or substance has been rendered harmless, the ~~Subcontractor's~~ Manufacturer's Work in the affected area shall resume upon written agreement of the Contractor and ~~Subcontractor.~~ Manufacturer. The Subcontract Time shall be extended appropriately and the Subcontract Sum shall be increased in the amount of the ~~Subcontractor's~~ Manufacturer's reasonable additional costs of demobilization, delay and remobilization, which adjustments shall be accomplished as provided in Article 5 of this Agreement.


Init.

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.5732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                (1515465554)

6

§ 4.3.4 To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Subcontractor, the Subcontractor's Sub-subcontractors, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 4.3.3 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) except to the extent that such damage, loss or expense is due to the fault or negligence of the party seeking indemnity.

§

§ 4.3.5 The ~~Subcontractor~~ Manufacturer shall indemnify the Contractor for the cost and expense the Contractor incurs ~~(1)~~ 1) for remediation of a material or substance brought to the site and negligently handled by the ~~Subcontractor or (2)~~ Manufacturer or 2) where the ~~Subcontractor~~ Manufacturer fails to perform its obligations under Section 4.3.3, except to the extent that the cost and expense are due to the Contractor's fault or negligence.

### § 4.4 CLEANING UP
§ 4.4.1 The ~~Subcontractor~~ Manufacturer shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations performed under this Subcontract. The ~~Subcontractor~~ Manufacturer shall not be held responsible for conditions caused by other contractors or ~~subcontractors~~ Manufacturers.

§ 4.4.2 As provided under Section 3.3.2, if the ~~Subcontractor~~ Manufacturer fails to clean up as provided in the Subcontract Documents, the Contractor may charge the ~~Subcontractor~~ Manufacturer for the ~~Subcontractor's~~ Manufacturer's appropriate share of cleanup costs.

### § 4.5 WARRANTY
The ~~Subcontractor~~ Manufacturer warrants to the Owner, Architect, and Contractor that materials and equipment furnished under this Subcontract will be of good quality and new unless the Subcontract Documents require or permit otherwise. The ~~Subcontractor~~ Manufacturer further warrants that the Work will conform to the requirements of the Subcontract Documents and will be free from defects, except for those inherent in the quality of the Work the Subcontract Documents require or permit. Work, materials, or equipment not conforming to these ~~requirements~~ **requirements, including substitutions not properly approved and authorized,** may be considered defective. The ~~Subcontractor's~~ Manufacturer's warranty excludes remedy for damage or defect caused by abuse, alterations to the Work not executed by the ~~Subcontractor,~~ Manufacturer, improper or insufficient maintenance, improper operation, or normal wear and tear under normal usage. If required by the Architect and Contractor, the ~~Subcontractor~~ Manufacturer shall furnish satisfactory evidence as to the kind and quality of materials and equipment. **This warranty shall be in addition to and not in limitation of any other warranty or remedy required by law or by the Subcontract Document.**

### § 4.6 INDEMNIFICATION
§ 4.6.1 To the fullest extent permitted by law, the ~~Subcontractor~~ Manufacturer shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the ~~Subcontractor's~~ Manufacturer's Work under this Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the ~~Subcontractor, the Subcontractor's Sub-subcontractors,~~ Manufacturer, the Manufacturer's Sub-Manufacturers, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 4.6.

§ 4.6.2 In claims against any person or entity indemnified under this Section 4.6 by an employee of the ~~Subcontractor, the Subcontractor's Sub-subcontractors,~~ Manufacturer, the Manufacturer's Sub-Manufacturers, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 4.6.1 shall not be limited by a limitation on the amount or type of damages, compensation or benefits payable


Init.

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes: (1515465554)

7

by or for the ~~Subcontractor~~ Manufacturer or the ~~Subcontractor's Sub-subcontractors~~ Manufacturer's Sub-Manufacturers under workers' compensation acts, disability benefit acts or other employee benefit acts.

## § 4.7 REMEDIES FOR NONPAYMENT

If the Contractor does not pay the ~~Subcontractor~~ Manufacturer through no fault of the ~~Subcontractor,~~ Manufacturer, within seven days from the time payment should be made as provided in this Agreement, the ~~Subcontractor~~ Manufacturer may, without prejudice to any other available remedies, upon seven additional days' written notice to the Contractor, stop the Work of this Subcontract until payment of the amount owing has been received. The Subcontract Sum shall, by appropriate Modification, be increased by the amount of the ~~Subcontractor's~~ Manufacturer's reasonable costs of demobilization, delay and remobilization.

## ARTICLE 5   CHANGES IN THE WORK

§ 5.1 The Owner may make changes in the Work by issuing Modifications to the Prime Contract. Upon receipt of such a Modification issued subsequent to the execution of the Subcontract Agreement, the Contractor shall promptly notify the ~~Subcontractor~~ Manufacturer of the Modification. Unless otherwise directed by the Contractor, the ~~Subcontractor~~ Manufacturer shall not thereafter order materials or perform Work that would be inconsistent with the changes made by the Modification to the Prime Contract.

§ 5.2 The ~~Subcontractor~~ Manufacturer may be ordered in writing by the Contractor, without invalidating this Subcontract, to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions, including those required by Modifications to the Prime Contract issued subsequent to the execution of this Agreement, the Subcontract Sum and the Subcontract Time being adjusted accordingly. The ~~Subcontractor,~~ Manufacturer, prior to the commencement of such changed or revised Work, shall submit promptly to the Contractor written copies of a claim for adjustment to the Subcontract Sum and Subcontract Time for such revised Work in a manner consistent with requirements of the Subcontract Documents.

§ 5.3 The ~~Subcontractor~~ Manufacturer shall make all claims promptly to the Contractor for additional cost, extensions of time and damages for delays or other causes in accordance with the Subcontract Documents. A claim which will affect or become part of a claim which the Contractor is required to make under the Prime Contract within a specified time period or in a specified manner shall be made in sufficient time to permit the Contractor to satisfy the requirements of the Prime Contract. Such claims shall be received by the Contractor not less than two working days preceding the time by which the Contractor's claim must be made. Failure of the ~~Subcontractor~~ Manufacturer to make such a timely claim shall bind the ~~Subcontractor~~ Manufacturer to the same consequences as those to which the Contractor is bound.

## ARTICLE 6   MEDIATION AND BINDING DISPUTE RESOLUTION
## § 6.1 MEDIATION

§ 6.1.1 Any claim arising out of or related to this Subcontract, except claims as otherwise provided in Section 4.1.5 and except those waived in this Subcontract, shall be subject to mediation as a condition precedent to binding dispute resolution.

§ 6.1.2 The parties shall endeavor to resolve their claims by mediation which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Mediation Procedures in effect on the date of the Agreement. A request for mediation shall be made in writing, delivered to the other party to this Subcontract and filed with the person or entity administering the mediation. The request may be made concurrently with the filing of binding dispute resolution proceedings but, in such event, mediation shall proceed in advance of binding dispute resolution proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order. If an arbitration is stayed pursuant to this Section, the parties may nonetheless proceed to the selection of the arbitrators(s) and agree upon a schedule for later proceedings.

§ 6.1.3 The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

Init.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                    (1515465554)

8

**§ 6.2 BINDING DISPUTE RESOLUTION**
For any claim subject to, but not resolved by mediation pursuant to Section 6.1, the method of binding dispute resolution shall be as follows:
*(Check the appropriate box. If the Contractor and ~~Subcontractor~~ Manufacturer do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, claims will be resolved by litigation in a court of competent jurisdiction.)*

> [ X ] Arbitration pursuant to Section 6.3 of this Agreement

> [  ] Litigation in a court of competent jurisdiction

> [  ] ~~Other:~~ Other *(Specify)*

**§ 6.3 ARBITRATION**
**§ 6.3.1** If the Contractor and ~~Subcontractor~~ Manufacturer have selected arbitration as the method of binding dispute resolution in Section 6.2, any claim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of the Agreement. A demand for arbitration shall be made in writing, delivered to the other party to the Subcontract, and filed with the person or entity administering the arbitration. The party filing a notice of demand for arbitration must assert in the demand all claims then known to that party on which arbitration is permitted to be demanded.

**§ 6.3.2** A demand for arbitration shall be made no earlier than concurrently with the filing of a request for meditation but in no event shall it be made after the date when the institution of legal or equitable proceedings based on the claim would be barred by the applicable statute of limitations. For statute of limitations purposes, receipt of a written demand for arbitration by the person or entity administering the arbitration shall constitute the institution of legal or equitable proceedings based on the claim.

**§ 6.3.3** Either party, at its sole discretion, may consolidate an arbitration conducted under this Agreement with any other arbitration to which it is a party provided that (1) the arbitration agreement governing the other arbitration permits consolidation; (2) the arbitrations to be consolidated substantially involve common questions of law or fact; and (3) the arbitrations employ materially similar procedural rules and methods for selecting arbitrator(s).

**§ 6.3.4** Either party, at its sole discretion, may include by joinder persons or entities substantially involved in a common question of law or fact whose presence is required if complete relief is to be accorded in arbitration, provided that the party sought to be joined consents in writing to such joinder. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a claim not described in the written consent.

**§ 6.3.5** The Contractor and ~~Subcontractor~~ Manufacturer grant to any person or entity made a party to an arbitration conducted under this Section 6.3, whether by joinder or consolidation, the same rights of joinder and consolidation as the Contractor and ~~Subcontractor~~ Manufacturer under this Agreement.

**§ 6.3.6** This agreement to arbitrate and any other written agreement to arbitrate with an additional person or persons referred to herein shall be specifically enforceable under applicable law in any court having jurisdiction thereof. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

**ARTICLE 7   TERMINATION, SUSPENSION OR ASSIGNMENT OF THE SUBCONTRACT**
**§ 7.1** ~~TERMINATION BY THE SUBCONTRACTOR~~ TERMINATION BY THE MANUFACTURER
The ~~Subcontractor~~ Manufacturer may terminate the Subcontract for the same reasons and under the same circumstances and procedures with respect to the Contractor as the Contractor may terminate with respect to the Owner ~~under the Prime Contract,~~ or for nonpayment of amounts due under this Subcontract for 60 days or longer. In the event of such termination by the ~~Subcontractor~~ Manufacturer for any reason which is not the fault of the ~~Subcontractor, Sub-subcontractors~~ Manufacturer, Sub-Manufacturers or their agents or employees or other persons performing portions of the Work under contract with the ~~Subcontractor, the Subcontractor~~ Manufacturer, the



**Init.**

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                    (1515465554)

Manufacturer shall be entitled to recover from the Contractor payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

### § 7.2 TERMINATION BY THE CONTRACTOR

§ 7.2.1 If the ~~Subcontractor~~ Manufacturer repeatedly fails or neglects to carry out the Work in accordance with the Subcontract Documents or otherwise to perform in accordance with this Subcontract and fails within a ~~ten-day~~ seven working day period after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, by written notice to the ~~Subcontractor~~ Manufacturer and without prejudice to any other remedy the Contractor may have, terminate the Subcontract and finish the ~~Subcontractor's~~ Manufacturer's Work by whatever method the Contractor may deem expedient. If the unpaid balance of the Subcontract Sum exceeds the expense of finishing the ~~Subcontractor's~~ Manufacturer's Work and other damages incurred by the Contractor and not expressly waived, such excess shall be paid to the ~~Subcontractor.~~ Manufacturer. If such expense and damages exceed such unpaid balance, the ~~Subcontractor~~ Manufacturer shall pay the difference to the Contractor.

§ 7.2.2 If the Owner terminates the ~~Prime~~ Contract for the Owner's convenience, the Contractor shall promptly deliver written notice to the ~~Subcontractor.~~ Manufacturer.

§ 7.2.3 Upon receipt of written notice of termination, the ~~Subcontractor~~ Manufacturer shall
    .1    cease operations as directed by the Contractor in the notice;
    .2    take actions necessary, or that the Contractor may direct, for the protection and preservation of the Work; and
    .3    except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing Sub-subcontracts and purchase orders and enter into no further Sub-subcontracts and purchase orders.

§ 7.2.4 In case of such termination for the Owner's convenience, the ~~Subcontractor~~ Manufacturer shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

### § 7.3 SUSPENSION BY THE CONTRACTOR FOR CONVENIENCE

§ 7.3.1 The Contractor may, without cause, order the ~~Subcontractor~~ Manufacturer in writing to suspend, delay or interrupt the Work of this Subcontract in whole or in part for such period of time as the Contractor may determine. In the event of suspension ordered by the Contractor, the ~~Subcontractor~~ Manufacturer shall be entitled to an equitable adjustment of the Subcontract Time and Subcontract Sum.

§ 7.3.2 An adjustment shall be made for increases in the Subcontract Time and Subcontract Sum, including profit on the increased cost of performance, caused by suspension, delay or interruption. No adjustment shall be made to the extent that
    .1    performance is, was or would have been so suspended, delayed or interrupted by another cause for which the ~~Subcontractor~~ Manufacturer is responsible; or
    .2    an equitable adjustment is made or denied under another provision of this Subcontract.

### § 7.4 ASSIGNMENT OF THE SUBCONTRACT

§ 7.4.1 In the event the Owner terminates the Prime Contract for cause, this Subcontract is assigned to the Owner pursuant to Section 5.4 of ~~AIA Document A201-2007 provided the Owner accepts the assignment.A201 and to the prior rights of the surety, if any, obligated under bonds relating to the Prime Contract.~~ In such event, the Owner shall assume the Contractor's rights and obligations under the Subcontract Documents. If the Work of the Prime Contract has been suspended for more than 30 days, the Manufacturer's compensation shall be equitably adjusted. *Manufacture to provide material Supply Bond* /t

§ 7.4.2 Without the Contractor's written consent, the ~~Subcontractor shall~~ Manufacturer may not assign the Work of this Subcontract, subcontract the whole of this Subcontract, or subcontract portions of this Subcontract. **Any requests for assignment must be made by written notification to the Contractor.**

**Init.**



**AIA Document A401™ – 2007.** Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 06/20/2013, and is not for resale.
User Notes:

**10**

(1515485554)

**ARTICLE 8   THE WORK OF THIS SUBCONTRACT**
The ~~Subcontractor~~ Manufacturer shall execute the following portion of the Work described in the Subcontract
Documents, including all labor, materials, equipment, services and other items required to complete such portion of
the Work, except to the extent specifically indicated in the Subcontract Documents to be the responsibility of others.
*(Insert a precise description of the Work of this Subcontract, referring where appropriate to numbers of Drawings,
sections of Specifications and pages of Addenda, Modifications and accepted alternates.)*

**ARTICLE 9   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION**
**§ 9.1** Subcontract Time is the period of time, including authorized adjustments, allotted in the Subcontract Documents
for Substantial Completion of the Work described in the Subcontract Documents. The ~~Subcontractor's~~
Manufacturer's date of commencement is the date from which the Subcontract Time of Section 9.3 is measured; it
shall be the date of this Agreement, as first written above, unless a different date is stated below or provision is made
for the date to be fixed in a notice to proceed issued by the Contractor.
*(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will
be fixed in a notice to proceed.)*

**§ 9.2** Unless the date of commencement is established by a notice to proceed issued by the Contractor, or the
Contractor has commenced visible Work at the site under the Prime Contract, the ~~Subcontractor~~ Manufacturer shall
notify the Contractor in writing not less than five days before commencing the ~~Subcontractor's~~ Manufacturer's Work
to permit the timely filing of mortgages, mechanic's liens and other security interests.

**§ 9.3** The Work of this Subcontract shall be substantially completed not later than .**Production start date to be on or
about April 15, 2013 and Windows ready to ship to New York on July 1, 2013**
*(Insert the calendar date or number of calendar days after the ~~Subcontractor's~~ Manufacturer's date of
commencement. Also insert any requirements for earlier substantial completion of certain portions of the
~~Subcontractor's~~ Manufacturer's Work, if not stated elsewhere in the Subcontract Documents.)*
**With all possible speed, Manufacturer will diligently perform the work, and maintain men in sufficient
numbers and materials ~~and equipment~~ in sufficient quantities to accomplish the rapid completion of the job.**

**Portion of Work**                    **Substantial Completion Date**

, subject to adjustments of this Subcontract Time as provided in the Subcontract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time.)*

**§ 9.4** With respect to the obligations of both the Contractor and the ~~Subcontractor,~~ Manufacturer, time is of the
essence of this Subcontract.

**§ 9.5** No extension of time will be valid without the Contractor's written consent after claim made by the
~~Subcontractor~~ Manufacturer in accordance with Section 5.3.

**ARTICLE 10   SUBCONTRACT SUM**
**§ 10.1** The Contractor shall pay the ~~Subcontractor~~ Manufacturer in current funds for performance of the Subcontract
the Subcontract Sum of  ~~($     )~~, **Four Million Five Hundred Eighty Seven Thousand Four Hundred and Ninety Eight
Dollars
($4,587,498.00)**, subject to additions and deductions as provided in the Subcontract Documents.

**§ 10.2** The Subcontract Sum is based upon the following alternates, if any, which are described in the Subcontract
Documents and have been accepted by the Owner and the Contractor:
*(Insert the numbers or other identification of accepted alternates.)*

**Init.**

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute
of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the
maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires
on 05/20/2013, and is not for resale.
User Notes:                                                                                (1515485554)

See Rider 5, Scope of Work

**§ 10.3** Unit prices, if any:
*(Identify and state the unit price, and state the quantity limitations, if any, to which the unit price will be applicable.)*
See Rider 5, Scope of Work

| Item | Units and Limitations | Price Per Unit($0.00) |

**§ 10.4** Allowances included in the Subcontract Sum, if any:
*(Identify allowance and state exclusions, if any, from the allowance price.)*
See Rider 5, Scope of Work

| Item | Price |

## ARTICLE 11   PROGRESS PAYMENTS

**§ 11.1** Based upon applications for payment submitted to the Contractor by the ~~Subcontractor,~~ Manufacturer, corresponding to applications for payment submitted by the Contractor to the Architect, and certificates for payment issued by the Architect, the Contractor shall make progress payments on account of the Subcontract Sum to the ~~Subcontractor~~ Manufacturer as provided below and elsewhere in the Subcontract Documents. Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor and ~~Subcontractor~~ Manufacturer for Work properly performed by their contractors and suppliers shall be held by the Contractor and ~~Subcontractor~~ Manufacturer for those contractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor or ~~Subcontractor~~ Manufacturer for which payment was made to the Contractor by the Owner or to the ~~Subcontractor~~ Manufacturer by the Contractor, as applicable. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor or ~~Subcontractor,~~ Manufacturer, shall create any fiduciary liability or tort liability on the part of the Contractor or ~~Subcontractor~~ Manufacturer for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor or ~~Subcontractor~~ Manufacturer for breach of the requirements of this provision.

**§ 11.2** The period covered by each application for payment shall be one calendar month ending on the last day of the month, or as follows:

Monthly cycle covered by each application shall be determined by Owner and Owner's lender. Contractor shall notify Manufacturer of applicable dates. Manufacturer's approved requisition submitted by the 20th day of the cycle for work completed through the end of the prior cycle, , will be paid within 3 working days of receipt of payment of payment from Owner by Contractor.

**§ 11.3** Provided an application for payment is received by the Contractor not later than the TBA day of a month, the Contractor shall include the ~~Subcontractor's~~ Manufacturer's Work covered by that application in the next application for payment which the Contractor is entitled to submit to the Architect. The Contractor shall pay the ~~Subcontractor~~ Manufacturer each progress payment no later than seven working days after the Contractor receives payment from the Owner. If the Architect does not issue a certificate for payment or the Contractor does not receive payment for any cause which is not the fault of the ~~Subcontractor,~~ Manufacturer, the Contractor shall pay the ~~Subcontractor,~~ Manufacturer, on demand, a progress payment computed as provided in Sections 11.7, 11.8 and 11.9.

**§ 11.4** If the ~~Subcontractor's~~ Manufacturer's application for payment is received by the Contractor after the application date fixed above, the ~~Subcontractor's~~ Manufacturer's Work covered by it shall be included by the Contractor in the next application for payment submitted to the Architect.

**§ 11.5** The ~~Subcontractor~~ Manufacturer shall submit to the Contractor a schedule of values prior to submitting the ~~Subcontractor's first Application for Payment.~~ Manufacturer's first Application for Payment made out in such detail as the Contractor and Manufacturer may agree upon or as required by the Contractor and supported by such evidence as the Contractor may require. Each subsequent application for payment shall be based upon the most recent schedule of values submitted by the ~~Subcontractor~~ Manufacturer in accordance with the Subcontract Documents. The schedule of values shall allocate the entire Subcontract Sum among the various portions of the ~~Subcontractor's~~ Manufacturer's Work and be prepared in such form and supported by such data to substantiate its

**AIA Document A401™ – 2007.** Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                    (1515465554)



accuracy as the Contractor may require. This schedule, unless objected to by the Contractor, shall be used as a basis for reviewing the ~~Subcontractor's~~ Manufacturer's applications for payment.

§ 11.6 Applications for payment submitted by the ~~Subcontractor~~ Manufacturer shall indicate the percentage of completion of each portion of the ~~Subcontractor's~~ Manufacturer's Work as of the end of the period covered by the application for payment.

§ 11.7 Subject to the provisions of the Subcontract Documents, the amount of each progress payment shall be computed as set forth in the sections below.

§ 11.7.1 Take that portion of the Subcontract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the ~~Subcontractor's~~ Manufacturer's Work by the share of the total Subcontract Sum allocated to that portion of the ~~Subcontractor's~~ Manufacturer's Work in the schedule of values, less that percentage actually retained, if any, from payments to the Contractor on account of the Work of the ~~Subcontractor.~~ Manufacturer. Pending final determination of cost to the Contractor of changes in the Work that have been properly authorized by the Contractor, amounts not in dispute shall be included to the same extent provided in the Prime Contract, even though the Subcontract Sum has not yet been adjusted;

§ 11.7.2 ~~Add that portion of the Subcontract Sum properly allocable to materials and equipment delivered and suitably stored at the site by the Subcontractor for subsequent incorporation in the Subcontractor's Work or, if approved by the Contractor, suitably stored off the site at a location agreed upon in writing, less the same percentage retainage required by the Prime Contract to be applied to such materials and equipment in the Contractor's application for payment;~~

§ 11.7.3 Subtract the aggregate of previous payments made by the Contractor; and

§ 11.7.4 Subtract amounts, if any, calculated under Section 11.7.1 or 11.7.2 that are related to Work of the ~~Subcontractor~~ Manufacturer for which the Architect has withheld or nullified, in whole or in part, a certificate of payment for a cause that is the fault of the ~~Subcontractor.~~ Manufacturer.

§ 11.8 Upon the partial or entire disapproval by the Contractor of the ~~Subcontractor's~~ Manufacturer's application for payment, the Contractor shall provide written notice to the ~~Subcontractor.~~ Manufacturer. When the basis for the disapproval has been remedied, the ~~Subcontractor~~ Manufacturer shall be paid the amounts withheld.

§ 11.9 SUBSTANTIAL COMPLETION
When the ~~Subcontractor's~~ Manufacturer's Work or a designated portion thereof is substantially complete and in accordance with the requirements of the Prime Contract, the Contractor shall, upon application by the ~~Subcontractor,~~ Manufacturer, make prompt application for payment for such Work. Within 30 days following issuance by the Architect of the certificate for payment covering such substantially completed Work, the Contractor shall, to the full extent allowed in the Prime Contract, make payment to the ~~Subcontractor,~~ Manufacturer, deducting any portion of the funds for the ~~Subcontractor's~~ Manufacturer's Work withheld in accordance with the certificate to cover costs of items to be completed or corrected by the ~~Subcontractor.~~ Manufacturer. Such payment to the ~~Subcontractor~~ Manufacturer shall be the entire unpaid balance of the Subcontract Sum if a full release of retainage is allowed under the Prime Contract for the ~~Subcontractor's~~ Manufacturer's Work prior to the completion of the entire Project. If the Prime Contract does not allow for a full release of retainage, then such payment shall be an amount which, when added to previous payments to the ~~Subcontractor,~~ Manufacturer, will reduce the retainage on the ~~Subcontractor's~~ Manufacturer's substantially completed Work to the same percentage of retainage as that on the Contractor's Work covered by the certificate.

ARTICLE 12   FINAL PAYMENT
§ 12.1 Final payment, constituting the entire unpaid balance of the Subcontract Sum, shall be made by the Contractor to the ~~Subcontractor~~ Manufacturer when the ~~Subcontractor's~~ Manufacturer's Work is fully performed in accordance with the requirements of the Subcontract Documents, the Architect has issued a certificate for payment covering the ~~Subcontractor's~~ Manufacturer's completed Work and the Contractor has received payment from the Owner. ~~If, for any cause which is not the fault of the Subcontractor, a certificate for payment is not issued or the Contractor does not receive timely payment or does not pay the Subcontractor within seven days after receipt of payment from the Owner, final payment to the Subcontractor shall be made upon demand.~~


Init.

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732628170_1 which expires on 06/20/2013, and is not for resale.
User Notes:                                                                                                          (1515465554)

13

*(Insert provisions for earlier final payment to the ~~Subcontractor,~~ Manufacturer, if applicable.)*

§ 12.2 Before issuance of the final payment, the ~~Subcontractor,~~ Manufacturer, if required, shall submit evidence satisfactory to the Contractor that all payrolls, bills for materials and equipment, and all known indebtedness connected with the ~~Subcontractor's~~ Manufacturer's Work have been satisfied. Acceptance of final payment by the ~~Subcontractor~~ Manufacturer shall constitute a waiver of claims by the ~~Subcontractor,~~ Manufacturer, except those previously made in writing and identified by the ~~Subcontractor~~ Manufacturer as unsettled at the time of final application for payment.

**ARTICLE 13   INSURANCE AND BONDS**
§ 13.1 The ~~Subcontractor~~ Manufacturer shall purchase and maintain insurance of the following types of coverage and limits of liability as will protect the ~~Subcontractor~~ **Manufacturer, Contractor, and other additional insureds** from claims that may arise out of, or result from, the ~~Subcontractor's~~ Manufacturer's operations and completed operations under the ~~Subcontract.~~ Subcontract.
**See Rider 3, Insurance and Indemnification**

| Type of insurance or bond | Limit of liability or bond amount ~~($0.00)~~ ($ 0.00) |
|---|---|

§ 13.2 ~~Coverages, whether~~

**Coverage shall be** written on an occurrence ~~or claims-made basis,~~ **basis and shall be maintained without interruption from the date of commencement of the** ~~Subcontractor's Work~~ **Manufacturer's work until the date of final** ~~payment and termination of any coverage~~ **payment. Coverage required to be maintained after final payment to the** ~~Subcontractor, and, with respect to the Subcontractor's completed operations coverage, until the expiration of the period for correction of Work or for such other period for maintenance of completed operations coverage~~ **Manufacturer shall include completed operations as specified in the Prime Contract. All insurance except Completed Operations must be on an occurrence basis.**

§ 13.3 Certificates of insurance acceptable to the Contractor shall be filed with the Contractor prior to commencement of the ~~Subcontractor's~~ Manufacturer's Work. These certificates and the insurance policies required by this Article 13 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Contractor. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final application for payment as required in Article 12. If any information concerning reduction of coverage is not furnished by the insurer, it shall be furnished by the ~~Subcontractor~~ Manufacturer with reasonable promptness according to the ~~Subcontractor's~~ Manufacturer's information and belief.

§ 13.4 The ~~Subcontractor~~ Manufacturer shall cause the commercial liability coverage required by the Subcontract Documents to include: (1) the Contractor, the Owner, ~~the Architect and the Architect's consultants~~ as additional insureds for claims caused in whole or in part by the ~~Subcontractor's~~ Manufacturer's negligent acts or omissions during the ~~Subcontractor's~~ Manufacturer's operations; and (2) the Contractor as an additional insured for claims caused in whole or in part by the ~~Subcontractor's~~ Manufacturer's negligent acts or omissions during the ~~Subcontractor's~~ Manufacturer's completed operations.

§ 13.5 The Contractor shall furnish to the ~~Subcontractor~~ Manufacturer satisfactory evidence of insurance required of the Contractor under the Prime Contract.

§ 13.6 The Contractor shall promptly, upon request of the ~~Subcontractor,~~ Manufacturer, furnish a copy or permit a copy to be made of any bond covering payment of obligations arising under the Subcontract.

§ 13.7 Performance Bond and Payment Bond:
*(If the ~~Subcontractor~~ Manufacturer is to furnish bonds, insert the specific requirements here.)*



**Init.**

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                      (1515465554)

**14**

| Bond type | Bond amount (~~$0.00~~)($ 0.00) | Bond delivery date | Bond form |
|---|---|---|---|
| Supply Bond | 4,587,498 | January 3, 2013 | A312 |

### § 13.8 PROPERTY INSURANCE

§ 13.8.1 When requested in writing, the Contractor shall provide the ~~Subcontractor~~ Manufacturer with copies of the property and equipment policies in effect for the Project. The Contractor shall notify the ~~Subcontractor~~ Manufacturer if the required property insurance policies are not in effect.

§ 13.8.2 If the required property insurance is not in effect for the full value of the ~~Subcontractor's~~ Manufacturer's Work, then the ~~Subcontractor~~ Manufacturer shall purchase insurance for the value of the ~~Subcontractor's~~ Manufacturer's Work, and the ~~Subcontractor~~ Manufacturer shall be reimbursed for the cost of the insurance by an adjustment in the Subcontract Sum.

§ 13.8.3 Property insurance for the ~~Subcontractor's~~ Manufacturer's materials and equipment required for the ~~Subcontractor's~~ Manufacturer's Work, stored off site or in transit and not covered by the Project property insurance, shall be paid for through the application for payment process.

### § 13.9 WAIVERS OF SUBROGATION

The Contractor and ~~Subcontractor~~ Manufacturer waive all rights against (1) each other and any of their ~~subcontractors, sub-subcontractors,~~ Manufacturers, sub-Manufacturers, agents and employees, each of the other, and (2) the Owner, the Architect, the Architect's consultants, separate contractors, and any of their ~~subcontractors, sub-subcontractors,~~ Manufacturers, sub-Manufacturers, agents and employees for damages caused by fire or other causes of loss to the extent covered by property insurance provided under the Prime Contract or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner as a fiduciary. The ~~Subcontractor~~ Manufacturer shall require of the ~~Subcontractor's Sub-subcontractors,~~ Manufacturer's Sub-Manufacturers, agents and employees, by appropriate agreements, written where legally required for validity, similar waivers in favor of the parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

### ARTICLE 14   TEMPORARY FACILITIES AND WORKING CONDITIONS

§ 14.1 The Contractor shall furnish and make available at no cost to the ~~Subcontractor~~ Manufacturer the Contractor's temporary facilities, equipment and services, except as noted below:

**Temporary Facility, Equipment or Service      Cost, if any (~~$0.00~~)($ 0.00)**

See Rider 1, Conditions

§ 14.2 Specific working conditions:
*(Insert any applicable arrangements concerning working conditions and labor matters for the Project.)*

### ARTICLE 15   MISCELLANEOUS PROVISIONS

§ 15.1 Where reference is made in this Subcontract to a provision of another Subcontract Document, the reference refers to that provision as amended or supplemented by other provisions of the Subcontract Documents.

§ 15.2 Payments due and unpaid under this Subcontract shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

~~%~~ NONE

§ 15.3 Retainage and any reduction thereto ~~are~~ is as follows: 0%



**Init.**

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                                              (1515465554)

**15**

**§ 15.4** The Contractor and ~~Subcontractor~~ Manufacturer waive claims against each other for consequential damages arising out of or relating to this Subcontract, including without limitation, any consequential damages due to either party's termination in accordance with Article 7.

**ARTICLE 16   ENUMERATION OF SUBCONTRACT DOCUMENTS**
**§ 16.1** The Subcontract Documents, except for Modifications issued after execution of this Subcontract, are enumerated in the sections below.

**§ 16.1.1** This executed AIA Document A401–2007, Standard Form of Agreement Between Contractor and ~~Subcontractor~~ Manufacturer.

**§ 16.1.2** ~~The Prime Contract, consisting of the Agreement between the Owner and Contractor dated as first entered above and the other Contract Documents enumerated in the Owner-Contractor Agreement.~~

**§ 16.1.3** The following Modifications to the Prime Contract, if any, issued subsequent to the execution of the Owner-Contractor Agreement but prior to the execution of this Agreement:
**See Rider 4, Contract Documents**

| Modification | Date |
|---|---|
|  |  |

**§ 16.1.4** Additional Documents, if any, forming part of the Subcontract Documents:
   .1   ~~AIA Document E201™-2007, Digital Data Protocol Exhibit, if completed by the parties, or the following:~~

   .2   Other documents:
      *(List here any additional documents that are intended to form part of the Subcontract Documents. Requests for proposal and the* ~~Subcontractor's~~ *Manufacturer's bid or proposal should be listed here only if intended to be made part of the Subcontract Documents.)*

      1. Rider 1, Conditions
      2. Rider 2, Project Safety Manual
      3. Rider 3, Insurance and Indemnification
      4. Rider 4, Contract Documents, Current Drawing Log
      5. Rider 5, Scope of Work
      6. Rider 6, Compliance

This Agreement entered into as of the day and year first written above.

CONTRACTOR *(Signature)*

PAUL COLAJinto
*(Printed name and title)*
Project Executive
1/31/13

~~SUBCONTRACTOR~~ MANUFACTURER *(Signature)*

FEDERICO DALE STRAZZI , PRESIDENT
*(Printed name and title)*

Init.

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:57:03 on 01/28/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                               **16**

(1515465554)

### Certification of Document's Authenticity
*AIA® Document D401™ – 2003*

I, , hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with this certification at 15:57:03 on 01/29/2013 under Order No. 6732828170_1 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document A401™ – 2007, Standard Form of Agreement Between Contractor and Subcontractor, as published by the AIA in its software, other than changes shown in the attached final document by underscoring added text and striking over deleted text.

_____
(Signed)

PRESIDENT
_____
(Title)

1.30.13
_____
(Dated)

AIA Document D401™ – 2003. Copyright © 1992 and 2003 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                                    (1515465554)

1

**EXHIBIT "B"**

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

### CONSTRUCTION INDUSTRY ARBITRATION RULES
### Demand for Arbitration

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box* ☒
*There is no additional administrative fee for this service*

| Name of Respondent | | | Name of Representative (if known) | | |
|---|---|---|---|---|---|
| Glasswall, LLC | | | James E. Frankel, Esq. | | |
| Address: | | | Name of Firm (if applicable) | | |
| 3550 NW 49th Street | | | Schiff Hardin LLP | | |
| | | | Representative's Address: | | |
| | | | 666 Fifth Avenue, Suite 1700 | | |
| City | State | Zip Code | City | State | Zip Code |
| Miami | FL | 33142 | New York | NY | 10103 |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| (305) 683-5151 | | (305) 638-5158 | (212) 745-0837 | | (212) 753-5044 |
| Email Address: | | | Email Address: | | |
| janderson@glasswall.com | | | jfrankel@schiffhardin.com | | |

The named claimant, a party to an arbitration agreement dated January 3, 2013 _____, which provides for arbitration under the Construction Industry Rules of the American Arbitration Association, hereby demands arbitration.

ARBITRATION CLAUSE: Please indicate whether the contract containing the dispute resolution clause governing this dispute is a standard industry form contract (such as AIA, ConsensusDOCS or AGC) or a customized contract for the specific project.

Contract Form: AIA A201-2007

**THE NATURE OF THE DISPUTE**

BREACH OF CONTRACT

| Dollar Amount of Claim $ TBD | Other Relief Sought: ☒ Attorneys Fees   ☒ Interest |
|---|---|
| | ☒ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other _____ |

Amount Enclosed $ 7,000.00 _____   In accordance with Fee Schedule:  ☐Flexible Fee Schedule   ☒Standard Fee Schedule

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:

Owner/Contractor/Construction Attorney

Hearing locale requested 150 E. 42nd St., NY, NY _____   Project site 1-55 Borden Avenue/1-50 50th Avenue, L.I.C., NY

| Estimated time needed for hearings overall: | Specify type of business: Claimant Contractor _____ |
|---|---|
| _____ hours or   10.00   days | Respondent Manufacturer _____ |

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| Signature (may be signed by a representative)   Date: 3/4/15 | Name of Representative | | |
|---|---|---|---|
| | Judah D. Greenblatt, Esq. | | |
| Name of Claimant | Name of Firm (if applicable) | | |
| Monadnock Construction, Inc. | Greenblatt Lesser LLP | | |
| Address (to be used in connection with this case) | Representative's Address | | |
| 155 3rd Street | 122 E. 42nd Street, 31st Floor | | |
| City | State | Zip Code | City | State | Zip Code |
| Brooklyn | NY | 11231 | New York | NY | 10168 |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| (718) 875-8160 | | (718) 802-1109 | (212) 682-9832 | | (212) 867-9319 |
| Email Address: | | | Email Address: | | |
| gbauso@moncon.com | | | jgreenblatt@greenblattlesser.com | | |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Case Filing Services can be reached at 877-495-4185.

**AMERICAN ARBITRATION ASSOCIATION**
**CASE NO.:**

-------------------------------------------------------------X

Monadnock Construction, Inc.,

                           Claimant,

        and

Glasswall, LLC,

                           Respondent.

-------------------------------------------------------------X

                                  **SUMMARY OF DISPUTE**

        Claimant, Monadnock Construction, Inc. ("Monadnock") by its attorneys, Greenblatt Lesser LLP, as and for its Summary of Dispute pursuant to its Demand for Arbitration against Glasswall, LLC ("Glasswall"), states as follows:

        1.      On or about January 3, 2013, Monadnock, as Contractor, located at 155 3rd Street, Brooklyn, New York, entered into two (2) AIA A401-2007 contracts (hereinafter collectively referred to as the "Contracts") with Glasswall, as Manufacturer, located at 3550 NW 49th Street, Miami, Florida, for the supply of windows and other materials (collectively, "Windows") to two (2) mixed use (commercial/affordable housing) projects in the Hunters Point South section of Long Island City.  The Contracts are annexed hereto as Exhibit "A".

2.     The Windows required under the Contracts are long lead items that require many months to design, engineer and produce.   The Windows are also unique and were to be specifically manufactured for the projects.

3.     The first project, referred to as "HPS Parcel A", is a thirty-seven (37) story building located at 1-50 50th Avenue, and is owned by HPS 50th Avenue Associates LLC. The second project, referred to as "HPS Parcel B", is a thirty-two (32) story building located at 1-55 Borden Avenue, is owned by HPS Borden Avenue Associates LLC. The two (2) HPS entities are hereinafter collectively referred to as "HPS". The HPS Parcels A and B projects are hereinafter collectively referred to as the "Projects".

4.     The Monadnock/Glasswall HPS Parcel A Contract was in the amount of Eight Million, Four Hundred and Twelve Thousand, Five Hundred and Two Dollars ($8,412,502) and required Glasswall to deliver Five Thousand, Eight Hundred and Thirty-Six (5,836) Windows to HPS Parcel A. The Monadnock/Glasswall HPS Parcel B Contract was in the amount of Four Million, Five Hundred and Eighty-Seven Thousand, Four Hundred and Ninety-Eight Dollars ($4,587,498) and required Glasswall to deliver Three Thousand, One Hundred and Twenty (3,120) Windows to HPS Parcel B.

5.     The Contracts required Glasswall to obtain payment and performance bonds for each Contract. Pursuant thereto, Glasswall obtained from WFIC Payment and Performance Bonds No. K08840295 dated February 12, 2013 for HPS Parcel A and Payment and Performance Bonds. No. K08840258 dated February 11, 2013 for HPS Parcel B in the amounts of the Contracts.

2

6.     The Contracts have a "time of the essence" clause (AIA A401-2007, section 9.4). They required Glasswall to ship completed Windows to HPS Parcel B starting on July 1, 2013 and to HPS Parcel A starting on September 1, 2013.  Glasswall did not meet those dates.

7.     On March 15, 2013, the project schedule was updated and reflected Window delivery start dates of August 7, 2013 for Parcel B and of August 29, 2013 for Parcel A. Glasswall did not meet those delivery start dates either.   On August 16, 2013, Glasswall's attorney at the time, Clinton D. Flagg, sent Monadnock a letter representing that "completed window assemblies" would be ready to ship by Glasswall to the Projects on September 1, 2013. That representation proved false. On November 20, 2013, Glasswall issued a production schedule representing that Release 1 for Parcel A (i.e. Windows for floors 2-6) would be complete by December 6, 2013 and Release 1 for Parcel B (i.e. Windows for floors 2-9) would be complete by December 12, 2013. Those representations proved to be false as well.

8.     The Contracts also required Glasswall to fabricate, and store off-site, Windows as necessary to allow for their  timely and continuous installation (Rider 5, ¶17.d.2) at a rate of 2 floors per week (Rider 5, ¶37) while keeping pace 6 floors below the superstructure contractor (Rider 5, ¶4.3.b).   On or about January 15, 2014, Monadnock's subcontractor completed the concrete superstructure on HPS Parcel A and on or about November 21, 2013, it completed the concrete superstructure on HPS Parcel B.  Glasswall was also required to: "diligently perform the work, and maintain men in sufficient numbers and materials in sufficient quantities to accomplish the rapid completion of the job." (AIA A401-2007, section 9.3).  Significant work on the Projects ground to a halt as the Windows were necessary to protect the interior of the buildings from the outside elements and were a necessary construction pre-condition to the various interior construction trades progressing their work.

3

9.      Although Monadnock asked Glasswall several times for a recovery schedule that would show how Glasswall intended to accelerate its production to make up for lost time, Glasswall refused to provide same.   Instead, Glasswall issued production schedules on September 17, 25, 27, October 28, and November 20, 2013, none of which Glasswall followed and all of which failed to show the recovery of lost time.

10.     On November 27, 2013, Glasswall emailed Monadnock that Parcel A Release 1 would be complete by December 6, 2013 and Parcel B Release 1 would be complete by December 12, 2013. Those Releases were not completed as represented. On January 7, 2014, Glasswall issued another production schedule, which failed to provide for critical storefront Windows, and once again failed to recover all of the lost time.   Moreover, it guaranteed that Glasswall would be late in its "time of the essence" deliveries.   Given Glasswall's prior history of broken production and delivery promises and its continued problems with its suppliers, Monadnock had doubts that Glasswall would maintain the January 7, 2014 production schedule.

11.     Moreover, quality assurance/quality control ("QA/QC") issues pervaded Glasswall's production. Israel Berger & Associates, LLC ("IBA"), acting as HPS's representative, conducted limited inspections of Glasswall's production in its Miami facilities. It issued weekly deficiency reports demonstrating Glasswall's QA/QC problems.   Those deficiencies continued to plague Glasswall's production. In late December, 2013, Glasswall, at IBA's request, opened up 3-5 crates of "completed window assemblies" that Glasswall had represented were defect-free and ready for shipment to the HPS Project. IBA discovered that numerous previously known defects in several of those "completed window assemblies" had not been remedied.

4

12.   Last, Glasswall anticipatorily breached the Contracts by demanding payment before it was due and declaring its refusal to ship Windows if ordered to do so by Monadnock. The Contracts did not require Monadnock to pay Glasswall for stored materials not delivered to the Projects. In any event, delivery of those Windows was held up due to QA/QC concerns and, moreover, the respective Release 1's for Parcels A and B were not complete. In addition, Glasswall's certified requisition amounts for its production were false and were never resubmitted with accurate quantities.

13.   Since Window delivery is critical to the progress of the Projects, delays in their delivery delayed the completion of the Projects and pushed out the temporary certificate of occupancy ("TCO") dates. This exposed Monadnock to substantial damages including, but not limited to, extended general conditions, extended field costs, extended overhead costs, trade delay claims, extended financing costs, loss of rents and other damages. The full financial impact of the delays is ongoing.

14.   In consequence of all the foregoing, Monadnock sent Glasswall a Notice of Default on September 16, 2013, a Notice of Continuing Default on October 23, 2013 and a Notice of Continuing Default on December 31, 2013. Nevertheless, Glasswall remained in default of its production obligations, delivery obligations, scheduling obligations, and QA/QC obligations and it submitted falsified requisitions that it demanded to be paid for, despite having never delivered a single Window to the Projects.  On January 13, 2014, Monadnock terminated Glasswall's Contracts.

15.   For the next few months, Glasswall continued to refuse to ship any Windows to the Project.  Ultimately, on April 4, 2014, in an effort to mitigate damages, and without any waiver of its rights, Monadnock entered into an Agreement to Amend Contracts ("Amendment

5

Agreement") with Glasswall, WFIC, HPS and the indemnitors on the Bonds, Ugo Colombo and his wife Sara Jayne Colombo Kennedy (the "Indemnitors"). The Amendment Agreement is annexed hereto as Exhibit "B". The Amendment Agreement provided, *inter alia* that Glasswall would produce Windows for the Projects according to an April 4, 2014 Production Schedule and "deliver Competed Windows Units on a continuous basis to the Project as expeditiously as possible consistent with the Production Schedules" (Amendment Agreement, paragraph 6). The Production Schedules required production to be completed by October 28, 2014.

16.   The Agreements required Glasswall to complete its Work so that the Projects could be completed by "4th quarter of 2014 to 1st quarter of 2015" for Parcel A (Rider 5, ¶44c) and "3rd quarter of 2014" for Parcel B (Rider 5, ¶43c). The Amendment Agreement further required Glasswall to deliver completed windows "on a continuous basis to the Project as expeditiously as possible consistent with the Production Schedules" (Amendment Agreement, ¶6).

17.   The Amendment Agreement also provided that WFIC would pay Glasswall for all windows it produced at its Miami facilities and Monadnock would pay WFIC for all Windows it received at the Projects. Monadnock withdrew its termination of Glasswall without prejudice. All claims among the parties that had accrued thru the date of the Amendment Agreement were deferred pending the final delivery of Windows or the earlier termination of the Contracts.

18.   By October 28, 2014, Glasswall had neither completed production of the windows nor delivered all the windows it had produced. Instead, Glasswall first slowed down its shipment of completed windows and then stopped the deliveries completely, even though it had many truckloads of windows at its facilities ready for shipment. Glasswall also slowed its production of the remaining windows and other fabricated materials. Glasswall explained that it would not

6

continue shipment of completed windows or production of new windows until it was paid in advance by WFIC its entire contract balance. Glasswall also demanded that Monadnock pay WFIC in advance for Glasswall's remaining Work, even though it had neither been produced nor delivered to the Projects.

19.     On November 14, 2014, WFIC acceded to Glasswall's duress and paid Glasswall its entire contract balance on both Agreements.  On November 24, 2014, Monadnock likewise acceded to Glasswall's duress and paid WFIC the entire remaining contract balance on the Agreements without deduction. The Monadnock payment was made with a full reservation of rights and in order to mitigate the damages resulting from Glasswall's breaches of the Agreements that were delaying completion of the Projects.

20.     Despite being paid in advance and in full for all the Work required under the Agreements, Glasswall continued to breach same for reasons including but not limited to the following:

(a) Glasswall has not completed its Work;
(b) Glasswall has not corrected defective Work;
(c) Glasswall has not provided documentation required under the Agreements including but not limited to warranties, LEED documentation, material certifications, and final lien waivers by Glasswall and its suppliers;
(d) Glasswall delayed in performance of its Work thereby causing delays and increased costs to other contractors whom Monadnock has and/or will reimburse;
(e)  Glasswall delayed in performance of its Work thereby causing delays and increased costs to Monadnock;
(e) Glasswall has failed to pay all its suppliers for materials used to fabricate the Work and for shipment of same to the Projects; and
(f) Glasswall has ceased operations and it will not be able to fulfill its warranty obligations;

21.     For all the foregoing, Monadnock demands that a duly constituted Arbitration Panel determine the amount of damages suffered by Monadnock and fashion an Arbitration Award accordingly, inclusive of attorney fees, interest, costs and disbursements.

Dated: March 4, 2015
       New York, New York

                              Greenblatt Lesser LLP
                              Attorneys for Claimant
                              Monadnock Construction, Inc.

                              By: _____
                                  Judah D. Greenblatt, Esq.
                              The Chanin Building
                              122 East 42nd Street, 31st Floor
                              New York, NY 10168
                              (212) 867-9319

**EXHIBIT "C"**

<u>AMERICAN ARBITRATION ASSOCIATION</u>
<u>Construction Arbitration Tribunal</u>

In the Matter of the Arbitration between:

MONADNOCK CONSTRUCTION, INC.,

Claimant,

-and-

GLASSWALL, LLC,

Respondent.

AAA Case No. 02-15-0002-8160

## **AWARD OF ARBITRATOR**

We, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreements contained in the subcontracts entered into between the parties, dated as of January 3, 2013 (collectively, "Subcontracts"), and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby AWARD as follows:

## <u>**PROCEEDINGS**</u>

The panel conducted nine, non-consecutive evidentiary hearings in this matter beginning on November 14, 2016 and ending on February 28, 2017. By agreement, the parties submitted lengthy briefs and reply briefs, the last of which were submitted on June 5, 2017. Thereafter, the panel held a telephone conference with counsel for the parties to hear further arguments on several specific points raised by the post hearing submissions.

1

## THE PARTIES

Monadnock Construction, Inc. ("Monadnock") is a general contractor/construction manager.  Glasswall, LLC ("Glasswall") is a fabricator of curtain walls and windows based in the State of Florida.

## THE BUILDINGS, THE PRIME CONTRACTS & THE SUBCONTRACTS

### The Buildings

The dispute concerns the development of two high rise residential buildings in Long Island City, Queens County (collectively, "Buildings"), together with the work related to the design, fabrication and delivery of window wall units to enclose the Buildings (collectively, "Window Work").  The development was known as Hunters Point South ("HPS") and the Buildings were designated as Parcel A, a 31-story 619 residential building located at 1-50 50th Avenue, and Parcel B, a 32-story 306-unit residential building located at 1-55 Borden Avenue. The development was being constructed under an affordable housing plan through the City of New York.  Parcel A and Parcel B had different owners, HPS 50th Avenue Associates, LLC for Parcel A; and HPS Borden Avenue Associates, LLC for Parcel B (collectively, "Owners").  The Owners each had several members, but an affiliate of The Related Companies ("Related") and Monadnock were principals of both of the Owners.  Related served, in effect, as the managing owner in connection with the development of the Buildings.

### The Prime Contracts

In February, 2013, Monadnock and the Owners entered into separate, but identical agreements (except for address and scope of work) for the design and construction of the Buildings

2

(inclusive of the Window Work) at Parcel A and Parcel B (collectively, "Prime Contracts"), with Monadnock serving as the construction manager for the Owners.  The Prime Contracts did not contain guaranteed maximum prices, and Monadnock served in a no-risk position concerning the costs and timing of construction of the Buildings (inclusive of the Window Work), absent breach of its duties to cause the Buildings to be constructed on time and free of defects and otherwise in strict accordance with the subcontracts (inclusive of the Subcontracts for the Window Work.) The Prime Contracts also provided that the trade contractors/subcontractors (collectively, "Subcontractors") would contract directly with Monadnock.  The Owners were to pay Monadnock for the work performed by the Subcontractors, and Monadnock would pass payment onto the Subcontractors in accordance with the terms of their respective subcontracts.  The form of the subcontract to be used with the Subcontractors was annexed as an exhibit to the Prime Contracts, providing for a direct contractual relationship between Monadnock and the Subcontractors and expressly negating any contractual relationship between the Subcontractors and the Owners.

The Subcontracts

Both Subcontracts for Parcel A and Parcel B provided that Glasswall, among other things, was to assist with the design and to fabricate the complex, custom made, glass window wall system comprising the Window Work.  There was to be a shop drawing process governing the Window Work, and Glasswall was to commence production "on or about" April 15, 2013, and be ready to ship the windows portion of the Window Work for Parcel B on July 1, 2013 and for Parcel A on September 1, 2013.  The dates for shipment were pushed back on consent of the parties until September 16, 2013 (Parcel B) and October 1, 2013 (Parcel A).  The Subcontracts also provided that the pace of delivery of the windows portion of the Window Work was to be such so

as to allow for the windows to be installed six floors below the rising superstructure of the Buildings. The "Subcontract Sum" under the Subcontracts for the Window Work at Parcel A was $8,412,502 and for the Window Work at Parcel B was $4,587,498, respectively.

The Subcontracts each contained handwritten language inserted after Article 3.3.1 for Parcel A and for Parcel B, respectively, reading as follows:

"Liquidated damages will be capped at $300,000", and "Liquidated damages will be capped at $200,000."

Article 3.3.1 of the Subcontracts, which was not substantively amended by the parties, reads as follows:

> "Liquidated damages for delay, if provided for in Section 9.3 of the Agreement, shall be assessed against the Manufacturer (Glasswall) only to the extent caused by the Manufacturer or any person or entity for whose conduct the Manufacturer may be liable, and in no case for delays or causes arising outside the scope of the Subcontract."

Despite this apparent handwritten limit on "liquidated damages," Article 9.3 does not provide for liquidated damages.

Article 2 of the Subcontracts provide, in essence, that Glasswall had the same duties, responsibilities and rights toward Monadnock as Monadnock had toward the Owners.

Amendment of Subcontracts

In January, 2014 the parties were engaged in a continuing dispute concerning timing of delivery, costs, delays, payment and other issues related to the Window Work. Actions were commenced in Florida and New York between Glasswall's surety, Westchester Fire Insurance Company ("Westchester"), indemnitors of Westchester, Monadnock, Glasswall and the Owners.

4

In April, 2014 Glasswall, Westchester, Monadnock, the Owners and indemnitors of Westchester entered into an agreement entitled "Agreement to Amend Contracts" ("Amended Agreement").

Under the Amended Agreement, (i) Monadnock agreed to withdraw its notice of default of the Subcontracts and its bond claims without prejudice, (ii) Westchester agreed to advance moneys to Glasswall and its suppliers for windows fabricated and to be fabricated, (iii) Glasswall agreed to deliver, and Monadnock agreed to accept, Window Work that had been fabricated, (iv) Glasswall agreed to commit to complete its Window Work under the Subcontracts, and (v) Monadnock agreed to pay the amounts due under the Subcontracts as the Window Work progressed and as windows were delivered. The progress payments would be paid to Westchester in escrow for the benefit of Glasswall. Glasswall and Monadnock also agreed to waive their respective rights to terminate the Subcontracts based upon events of default occurring prior to the Amended Agreement. All other rights were reserved.

## SUMMARY OF CLAIMS & DEFENSES

### Monadnock's Claims

Summarily, Monadnock asserts that Glasswall delayed completion of the Buildings by failing to timely perform the Window Work. Monadnock also claims that many of the windows delivered as part of the Window Work had significant defects which required field remediation work paid for by Monadnock. Monadnock refers to damages related to defects in the windows portion of the Window Work as "performance damages." Monadnock also seeks a category of damages it refers to as "Soft Costs" which are akin to delay damages and consist of increase in insurance costs, added inspection costs, increased bond and subsidy costs and legal fees to various

law firms (but not the litigation fees charged by counsel that represented Monadnock in this arbitration proceeding).   In all Monadnock seeks damages as follows:

| | |
|---|---|
| Delay Damages: | $7,648,302.77 |
| Performance Damages: | $2,446,535.98 |
| Soft Costs: | $7,261,919.16 |
| Grand Total: | $17,356,757.91, plus interest |

Monadnock has been paid in full by the Owners, and Glasswall has been paid in full by Monadnock, for the Window Work.

## Glasswall's Claims

There are no affirmative claims from Glasswall before the panel.

## Glasswall's Defenses to Monadnock's Claims

In addition to challenging certain specific damage claims for, among other things, contractual defenses or for being too speculative, Glasswall has asserted a number of fundamental defenses that warrant separate mentioning.

### 1.    Defense of Lack of Standing

It is undisputed that Monadnock was reimbursed by the Owners for all costs incurred for the performance of the Window Work. This include, without limitation, all additional construction costs, escalations, extended general conditions and additional insurance and bond interest costs. Because of this, Glasswall argues, in essence, that Monadnock suffered no damages

6

and, therefore, cannot recover damages from Glasswall. Glasswall goes on to argue that if there were damages caused by Glasswall, a point it does not concede, it is the Owners that sustained the damages because they reimbursed Monadnock for all increased costs. Since there is no privity between the Glasswall and the Owners, Glasswall argues there can be no recovery by Monadnock from Glasswall.

To counter this lack of standing argument, Monadnock principally relies on the application of the collateral source rule and reference to the pass-through clause found at Article 2 of the Subcontracts.

2.    Allegation that the Subcontracts Capped Delay Damages at $300,000 and $200,000

Glasswall argues that even if it were responsible for delays relating to the completion of the Buildings, the damages that could be assessed by Monadnock against Glasswall were capped at $300,000 for Parcel A and $200,000 for Parcel B. Glasswall argues that this was clearly the intention of the parties when they added the handwritten language to Article 3.3.1 of the Subcontracts capping the amount of "liquidated damages." In essence, Glasswall argues that "liquidated damages" should read "delay damages."

Monadnock argues in opposition to this cap that the handwritten clause referred specifically to "liquidated damages," and that the entire clause to which the handwriting was added (Article 3.3.1) is applicable only if liquidated damages are "provided for in Section 9.3," and it is undisputed that no liquidated damages are provided for in Article 9.3 of the Subcontracts. Accordingly, Monadnock argues that the cap has no application to the claims asserted.

## GENERAL FINDINGS

1.____The Issue of Standing

We find the collateral source rule to be inapplicable to this contract dispute. However, we do find that the pass-through clause found in Article 2 of the Subcontracts is controlling and permits Monadnock to seek the damages sought in this proceeding. While the evidence established that the Owners have no intention of pursuing Monadnock for the increased costs incurred, we find that under the Prime Contracts the Owners could seek reimbursement if Monadnock breached the Prime Contract by failing to perform its duties, including failing to cause its Subcontractors to perform their work in strict accordance with the requirements of their respective subcontracts. For instance, at Article 6 of the Prime Contracts, Monadnock warrants that the work will be "free from improper workmanship and defective materials and in strict conformance with the applicable Trade Contract.......". Furthermore, in Article 9(d) of the Prime Contracts, Monadnock is in default if it fails to cause its Subcontractors to complete their work on time, as required under Article 13. To the extent that the Subcontractors' work did not comply with this standard, Monadnock could be held liable to the Owners. Therefore, if, as alleged by Monadnock, the Window Work exhibited poor workmanship, was defective or not in compliance with the plans and specifications, or was delayed and not on schedule, Glasswall would be liable to Monadnock, as Monadnock would be liable to the Owners.

Accordingly, because Article 2 of the Subcontracts binds Glasswall to the same extent that Monadnock is bound to the Owners under the Prime Contracts, we find that Monadnock is permitted to pursue the claims asserted here. Again, the fact that the Owners do not intend to pursue the claims does not diminish their ability to do so, and that is an obligation which Glasswall undertook.

8

2.     The Limits on "Liquidated Damages"

We find that the limits on "liquidated damages" of $300,000 and $200,000 for Parcel A and Parcel B, respectively, are not applicable to the claims asserted by Monadnock in this proceeding.  The Subcontracts clearly state that the clause will apply only if liquidated damages are provided in Article 9.3, and the simple fact is that there are no liquidated damages provided for in that Article.  As such, we find that the language has no application.  We sympathize with Glasswall's speculative argument that the parties must have meant for the cap to apply to all delay damages, whether liquidated or not, and we are troubled by the possibility of an unfair overreach by Monadnock at the time of negotiations.  However, Glasswall did not provide testimony or documentary evidence to show what was discussed during the negotiations and why the language was inserted in Article 3.3.1 and no liquidated damages inserted in Article 9.  Therefore, we are left with the language of the Subcontracts themselves, which we find does not support the defense.  In essence, Glasswall asks the Panel to change the handwritten phrase from "Liquidated Damages" will be capped at $200,000 ($300,000) to "Delay Damages" will be capped at $200,000 ($300,000), and we respectfully decline to do so.


## SPECIFIC FINDINGS ON THE CLAIMS


### Delays To The Window Work

1.     The Issue of Responsibility for Delay

Glasswall argues that in October-November, 2013 it had approximately 1,000 additional windows completed along with other Window Work all of which were available for delivery, but that Monadnock refused delivery.  Glasswall introduced evidence to suggest that the actual reason Monadnock would not accept delivery of the completed windows was because it

demanded $3,000,000 in delay damages from Glasswall before it would continue with the Subcontracts and/or that Monadnock wished to hire an affiliated company to supply the windows. Around this time meetings were held, default notices were issued, and no new windows were delivered until after the Amended Agreement was executed in April, 2014. This delay, Glasswall argues, was not its responsibility but rather is attributed to Monadnock's conduct.

Monadnock did not materially dispute its refusal to accept the completed windows and ancillary Window Work, but countered it by arguing that at that time it had paid Glasswall more than $3,000,000, it had not obtained any windows, and had serious doubts as to whether Glasswall could complete the Window Work. If Glasswall could not complete, Monadnock would need to retain a substitute window manufacturer and any windows paid for and received from Glasswall would be useless and would need to be replaced.

We find that Monadnock wrongfully refused to accept delivery of the windows, including ancillary materials needed for their installation in the Fall and Winter of 2013-2014, in breach of the Subcontracts. While it is true that Glasswall was struggling to meet its contractual obligations, and there were quality control issues, when faced with those obstacles Monadnock did not exercise its right to terminate the Subcontracts as it could have done for failure to meet the agreed to delivery schedule. Rather it issued a series of Notices of Defaults and Notices of Continuing Defaults, all the while Glasswall continued to manufacture windows, trying to satisfy its contractual obligations. We do not conclude that there was a nefarious reason behind Monadnock's action, such as a desire to oust Glasswall to pursue use of an affiliated company, but we do find that Monadnock could not, whatever the reason, properly hold Glasswall in proverbial limbo while it decided whether to terminate the Subcontracts and hire a new subcontractor or exacted some damages before completion of the Window Work by Glasswall. We were

10

significantly persuaded by the ample documentary evidence showing that Monadnock would not accept Window Work without a signed agreement resolving the disputes that had arisen.

Lack of a Baseline Schedule or Critical Path Schedule

It was not possible to accurately assess damages for delay without a baseline schedule containing a critical path schedule to compare it to the as built schedule. Monadnock admitted that there was no baseline schedule (including a critical path) prepared by it because, in essence, it did not need one. Without a baseline schedule with a critical path presented to Glasswall, there is nothing upon which we can determine how Glasswall impacted that baseline schedule, nor would Glasswall know how its delays would impact the baseline schedule. It is clear that Glasswall did cause delays and breached its Subcontracts by failing to deliver in accordance with the time requirements set forth in its Subcontracts, but without a baseline schedule against which an as-built schedule is compared, we are unable to determine which delays became the controlling delays and who was responsible for those controlling delays.

Delay Damages

In addition to the issues we found assessing blame to Glasswall for delays as outlined above, we also find that certain categories of delay damages, even if Glasswall were responsible for the associated delays, could not be properly assessed against it.

The significant amount paid to Subcontractors for escalations, we find cannot be properly assessed. The executed subcontracts (Eckert and Glasswall) submitted into evidence provide that escalations were to be borne by the Subcontractors and not Monadnock. Additionally, the executed subcontracts and the form subcontract annexed to the Prime Contracts provide at Article 4.1 (C) that the Subcontractors may be required, at no additional charge to Monadnock, to

do work out of sequence and perform "comeback work." We were not persuaded by Monadnock's argument that these clauses applied only to the initial work period and not for any extended period. These types of subcontractor clauses are specifically included in subcontracts to avoid delay damages claims and escalation charges against the general contractor or construction manager.

In addition, the claims for "bond interest" and "subsidy interest" were never adequately explained or established by Monadnock or its expert. The same is true of the claim for reimbursement of legal fees, with Monadnock's witness, at one point, being unaware of which entity a particular law firm was representing or why the fees should be chargeable to Glasswall. Under such circumstances we would have declined to award these damages even if entitlement were to be found.

### Performance Damages

The evidence established that Glasswall was paid for some materials it did not supply or some which required extensive field remediation. In fact, Glasswall has conceded that a credit of $308,739.16 is due to Monadnock for such matters. We have carefully reviewed the category of damages referred to by Monadnock as "Performance Damages" and have awarded such damages as indicated in the attached Schedule A.

### Schedule A

Schedule A to this Award is a list of all damages sought by Monadnock and the amount awarded, if any, for each item. Schedule A is hereby made part of this Award.

### MONETARY AWARD

Based upon our findings outlined above and the amount awarded for each item of damages sought by Monadnock as indicated at Schedule A, Monadnock Construction, Inc. is

hereby Awarded the sum of $1,280,003.25 against Glasswall, LLC with interest at the rate of 5% per annum commencing on March 5, 2015 which calculated to August 31, 2017 totals $159,289.61 for a grand total of $1,439,292.86

The administrative fees and expenses of the American Arbitration Association totaling $29,986.30 shall be borne as incurred, and the compensation and expenses of the arbitrators $137,174.65 shall be shared equally by the parties so that Respondent shall pay to Claimant the sum of $59,962.32.

Therefore, within 30 days of the date that this Award is transmitted to counsel for the parties Respondent shall pay the Claimant the total sum of $1,499,255.18.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

8/29/17
Date

Thomas J. Rossi

Date

Susanna S. Fodor

Date

Michael Oscar Renda

13

Schedule A to this Award is a list of all damages sought by Monadnock and the amount awarded, if any, for each item. Schedule A is hereby made part of this Award.

## MONETARY AWARD

Based upon our findings outlined above and the amount awarded for each item of damages sought by Monadnock as indicated at Schedule A, Monadnock Construction, Inc. is hereby Awarded the sum of $1,280,003.25 against Glasswall, LLC with interest at the rate of 5% per annum commencing on March 5, 2015 which calculated to August 31, 2017 totals $159,289.61 for a grand total of $1,439,292.86

The administrative fees and expenses of the American Arbitration Association totaling $29,986.30 shall be borne as incurred, and the compensation and expenses of the arbitrators $137,174.65 shall be shared equally by the parties so that Respondent shall pay to Claimant the sum of $59,962.32.

Therefore, within 30 days of the date that this Award is transmitted to counsel for the parties Respondent shall pay the Claimant the total sum of $1,499,255.18.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

---
Date

Thomas J. Rossi

8/29/17

---
Date

Susanna S. Fodor

---
Date

Michael Oscar Renda

13

Schedule A to this Award is a list of all damages sought by Monadnock and the amount awarded, if any, for each item. Schedule A is hereby made part of this Award.

## MONETARY AWARD

Based upon our findings outlined above and the amount awarded for each item of damages sought by Monadnock as indicated at Schedule A, Monadnock Construction, Inc. is hereby Awarded the sum of $1,280,003.25 against Glasswall, LLC with interest at the rate of 5% per annum commencing on March 5, 2015 which calculated to August 31, 2017 totals $159,289.61 for a grand total of $1,439,292.86

The administrative fees and expenses of the American Arbitration Association totaling $29,986.30 shall be borne as incurred, and the compensation and expenses of the arbitrators $137,174.65 shall be shared equally by the parties so that Respondent shall pay to Claimant the sum of $59,962.32.

Therefore, within 30 days of the date that this Award is transmitted to counsel for the parties Respondent shall pay the Claimant the total sum of $1,499,255.18.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

Date _____          _____
                                      Thomas J. Rossi

Date _____          _____
                                      Susanna S. Fodor

8/29/17
Date                                  Michael Oscar Renda

13

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument which is our Final Award.

_8/29/17_                             _____
Date                                      Thomas J. Rossi

I, Susanna S. Fodor, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument which is our Final Award.

_____            _____
Date                                     Susanna S. Fodor

I, Michael Oscar Renda, do hereby affirm upon my oath as Arbitrator that I am the
individual described in and who executed this instrument which is our Final Award.

_____            _____
Date                                     Michael Oscar Renda

14

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.


_____                  _____

Date                                                      Thomas J. Rossi


I, Susanna S. Fodor, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.


*8/29/17*                                           _____

Date                                                      Susanna S. Fodor


I, Michael Oscar Renda, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.


_____                  _____

Date                                                      Michael Oscar Renda


14

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

_____

Date                                               Thomas J. Rossi

I, Susanna S. Fodor, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

_____

Date                                               Susanna S. Fodor

I, Michael Oscar Renda, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

_8/29/17_

Date                                               Michael Oscar Renda

14

# Schedule A

*Monadnock v. Glasswall*

| # | Subcontractor | Category | Amount of Damages |
|---|---|---|---|
| 1 | All Fasteners (Coping Fasteners) | Performance Damage | $305.68 |
| 2 | All Fasteners (Coping Fasteners) | Performance Damage | $379.12 |
| 3 | RSG Caulking & Waterproofing CRSG Scaffold) | Performance Damage | $1,678.70 |
| 4 | RSG Caulking & Wateroroofing (RSG Rigging) | Performance Damage | $462,131.00 |
| 5 | Ornamental Erectors (Union Workers to Reglaze Windows) | Performance Damage | $242,547.00 |
| 6 | Digital Buyer (Casement Window Reversal Equipment) | Performance Damage | $975.25 |
| 7 | Leed Himmel Industries (Tree Bracket Engineering) | Performance Damage | $0.00 |
| 8 | Ornamental Erectors (Fix Tree Brackets and Re-Install Trees) | Performance Damage | $0.00 |
| 9 | Hadco Metal Trading (Metal Closure Pieces) | Performance Damage | $0.00 |
| 10 | Pride Equipment (Boom Lift) | Performance Damage | $0.00 |
| 11 | Pride Equipment (Included in Previous Line Item) | Performance Damage | $0.00 |
| 12 | Hadco Metal Trading (Paraoet Anchor Plates) | Performance Damage | $705.51 |
| 13 | Kenseal Construction Products (Dow Coming Sealant and etc.) | Performance Damage | $15,629.77 |
| 14 | Metropolitan Lumber and Hardware (Harnesses) | Performance Damage | $1,468.21 |
| 15 | Stanley Supply & Tool (Tools) | Performance Damage | $0.00 |
| 16 | AGC Glass Company North America (Reolacement Glass) | Performance Damage | $22,000.00 |
| 17 | Woodworks Construction Company (Carpentry Protection) | Performance Damage | $22,555.00 |
| 18 | Kings County Waterproofing (Bulkhead Windows) | Performance Damage | $12,600.00 |
| 19 | Various Vendors for Miscellaneous Supplies | Performance Damage | $0.00 |
| 20 | Ecker Window (Casement Reversal) | Performance Damage | $146,124.06 |
| 21 | Ecker Window (Structural Glazing) | Performance Damage | $13,979.00 |
| 22 | Spieler & Ricca Electrical (Casement Edge Insoection/Repair) | Performance Damage | $0.00 |
| 23 | Spieler & Ricca Electrical (Weather Damaged Equipment) | Performance Damage | $0.00 |
| 24 | Intercoastal Erectors (Storefront Support Steel) | Pertixmance Damage | $0.00 |
| 25 | Trulite Glass & Aluminum Solutions (Replacement Glass) | Performance Damage | $51,209.71 |

| 26 | S&J Sheet Metal Supply (Window Install Clips) | Performance Damage | $5,879.25 |
| 27 | Pinquist Tool & Die Company (Coping Fasteners) | Performance Damage | $12,860.00 |
| 28 | D. LaMontana Transport (Trucking) | Performance Damage | $12,250.00 |
| 29 | Pioneer Window Manufactor. (Fist Brackets) | Performance Damage | $15,528.16 |
| 30 | Pinquist Tool & Die Company (Parapet Hook Anchor Fabrication) | Performance Damage | $0.00 |
| 31 | Air Performance (Picture Frame Material) | Performance Damage · | $28,278.00 |
| 32 | All Fasteners (Fasteners for Coping and etc.) | Performance Damage | $18,732.46 |
| 33 | Kenseal Construction Products and Garvin Brown | Performance Damage | $24,802.18 |
| 34 | Eagle One Roofing Contractors (Roofing Repairs) | Performance Damage | $0.00 |
| 35 | Crown Partition (Additional Carpentry Wall Framing) | Performance Damage | $0.00 |
| 36 | Kings County Waterproofing (ACM Panel Work) | Performance Damage | $0.00 |
| 37 | WAIVED | | |

$1,112,618.06

## Monadnock v. Glasswall
### Summary of Claimant's Damages

| # | Subcontractor | Category | Amount of Damages |
|---|---|---|---|
| 38 | Ecker Window (Additional S1orefront Installation) | Performance Damage | $0.00 |
| 39 | All-Safe (Damaged Overhead Pro1ection) | Performance Damage | $0.00 |
| 40 | Eagle One Roofing Contractors (Parapet Coping Installation) | Perrormance Damage | $0.00 |
| 41 | Iron Horse Transport (Trailer Storage) | Performance Damage | $0.00 |
| 42 | Ecker Window (Moving & Handling) | Performance Damage | $0.00 |
| 43 | L & L Painting (Parapet Panels) | Performance Damage | $0.00 |
| 44 | Ecker Window (Premium Time Hoist Window Installation) | Performance Damage | $0.00 |
| 45 | Navillus Contracting (Engineer and Lull to Load/Unload Hoist Run) | Performance Damage | $0.00 |
| 46 | Ecker Window (Window Unit Modifications) | Performance Damage | $0.00 |
| 47 | Ecker Window (Window Unit Modifications) | Performance Damage | $0.00 |
| 48 | Ecker Window (Field Window Modifications) | Performance Damage | $0.00 |
| 49 | Ecker Window (Misc. Glasswall Problems) | Performance Damage | $0.00 |
| 50 | Ecker Window (Glasswall Open Items) | Performance Damage | $103,523.19 |
| 51 | Jerome Aluminum Products (Interior Storefront Metal Trim) | Performance Damage | $9,200.00 |
| 52 | Woodworks Constructiun Company (Carpenter) | Delav Damage | $0.00 |
| 53 | B.W.B. Crown Partition (Carpenter) | Delav Damage | $0.00 |

| 54 | S.J. Electric (Electrical Contractor) | Delay Damaee | $0.00 |
| 55 | Spieler & Ricca Electrical (Electrical Contractor) | Delay Damage | $0.00 |
| 56 | Paramount Plumbing Company (Plumbing Comractor) | Delav Damage | $0.00 |
| 57 | Parkview Plumbing (Plumbing Contraclor) | Delav Damage | $0.00 |
| 58 | Federated Fire Protection (Fire ProtectionContractor) | Delav Damage | $0.00 |
| 59 | Federated Fire Protection (Fire Protection Contractor) | Delay Damage | $0.00 |
| 60 | Ecker Window (Labor Installational Escalation) | Delay Damage | $0.00 |
| 61 | Ecker Window (Labor Installational Escalation) | Delay Damage | $0.00 |
| 62 | City Elevator (Elevator Cab Storage) | Delay Damage | $0.00 |
| 63 | Islandaire (PTAC Sleeve Storage) | Delay Damaee | $0.00 |
| 64 | Various Emities (Additional General Conditions) | Delay Damage | $0.00 |
| 65 | Various Entities (Additional General Conditions) | Delay Damage | $0.00 |
| 66 | AON/Alliant (Additional Insurance Costs) | Delay Damage | $0.00 |
| 67 | AON/Alliant (Additional Insurance Costs) | Delay Damage | $0.00 |
| 68 | City Elevator (Elevator Shaft Rust Remediation) | Delay Damage | $0.00 |
| 69 | City Elevator (Elevator Shaft Rust Remediation) | Delay Damage | $0.00 |

**$112,723.19**

*Monadnock v. Glasswall*
Summary of Claimant's Damages

| # | Subcontractor | Category | Amount of Damages |
| --- | --- | --- | --- |
| 70 | Ecker Window (Overtime for Interior Job Catch Up) | Delay Damage | $0.00 |
| 71 | Ecker Window (Overtime for Interior Job Catch Up) | Delav Damage | $0.00 |
| 72 | Ecker Window (Overtime for Glasswall Late Deliveries) | Delay Damage | $0.00 |
| 73 | L & L Painting (KADEX Repair) | Delav Damage | $0.00 |
| 74 | S.J. Electric (Electric Heating) | Delay Damage | $0.00 |
| 75 | L & L Painting (Coping Paint Cost) | Performance Damage | $0.00 |
| 76 | Air Performance (Hoist Run Window) | Performance Damage | $0.00 |
| 77 | M Cohen and Sons (Missine Windows) | Performance Damaee | $29,010.00 |
| 78 | Summit HVAC Mechanical (North Curtain Wall PTAC Grills) | Performance Damage | $7,000.00 |
| 79 | City Elevator (Additional Rust Rcmcdial ion) | Delay Damage | $0.00 |
| 80 | City Elevator (Labor and Material Escalation) | Delay Damage | $0.00 |
| 81 | M Cohen and Sons (Terrace Door) | Performance Damage | $18,652.00 |

**$54,662.00**

*Monadnock v. Glasswall*
Summary of Claimant's Damages

| # | Subcontractor | Category | Amount of Damages |
|---|---|---|---|
| 82 | AGS Ventures II. LLC (Builders Risk Extension) | Soft Cost | $0.00 |
| 83 | AGS Ventures II, LLC (Builders Risk Extension) | Soft Cost | $0.00 |
| 84 | Steven D. Barber (Glasswall Inspections) | Soft Cost | $0.00 |
| 85 | Steven D. Barber (Glasswall Insoections) | Soft Cost | $0.00 |
| 86 | Vidaris (Exterior Wall Inspections) | Soft Cost | $0.00 |
| 87 | Vidaris (Exlerior Wall Inspections) | Soft Cost | $0.00 |
| 88 | Various Entities (Bond Interest Costs) | Soft Cost | $0.00 |
| 89 | Various Entities (Bond Interest Costs) | Soft Cost | $0.00 |
| 90 | Various Entities (HPD Subsidy Interest Cost) | Soft Cost | $0.00 |
| 91 | Varies Entities (HPD Subsidy Interest Costs) | Soft Cost | $0.00 |
| 92 | Greenblatt Lesser (Legal Fees) | Soft Cost | $0.00 |
| 93 | Greenblatt Lesser (Legal Fees) | Soft Cost | $0.00 |
| 94 | Duane Morris (Legal Fees) | Soft Cost | $0.00 |
| 95 | Duane Morris (Legal Fees) | Soft Cost | $0.00 |
| 96 | Pathman Lewis (Legal Fees) | Soft Cost | $0.00 |
| 97 | Pathman Lewis (Legal Fees) | Soft Cost | $0.00 |

**$0.00**

**TOTAL        $1,280,003.25**