accuracy as the Contractor may require. This schedule, unless objected to by the Contractor, shall be used as a basis for reviewing the ~~Subcontractor's~~ Manufacturer's applications for payment.

§ 11.6 Applications for payment submitted by the ~~Subcontractor~~ Manufacturer shall indicate the percentage of completion of each portion of the ~~Subcontractor's~~ Manufacturer's Work as of the end of the period covered by the application for payment.

§ 11.7 Subject to the provisions of the Subcontract Documents, the amount of each progress payment shall be computed as set forth in the sections below.

§ 11.7.1 Take that portion of the Subcontract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the ~~Subcontractor's~~ Manufacturer's Work by the share of the total Subcontract Sum allocated to that portion of the ~~Subcontractor's~~ Manufacturer's Work in the schedule of values, less that percentage actually retained, if any, from payments to the Contractor on account of the Work of the ~~Subcontractor.~~ Manufacturer. Pending final determination of cost to the Contractor of changes in the Work that have been properly authorized by the Contractor, amounts not in dispute shall be included to the same extent provided in the Prime Contract, even though the Subcontract Sum has not yet been adjusted;

§ 11.7.2 ~~Add that portion of the Subcontract Sum properly allocable to materials and equipment delivered and suitably stored at the site by the Subcontractor for subsequent incorporation in the Subcontractor's Work or, if approved by the Contractor, suitably stored off the site at a location agreed upon in writing, less the same percentage retainage required by the Prime Contract to be applied to such materials and equipment in the Contractor's application for payment;~~

§ 11.7.3 Subtract the aggregate of previous payments made by the Contractor; and

§ 11.7.4 Subtract amounts, if any, calculated under Section 11.7.1 or 11.7.2 that are related to Work of the ~~Subcontractor~~ Manufacturer for which the Architect has withheld or nullified, in whole or in part, a certificate of payment for a cause that is the fault of the ~~Subcontractor.~~ Manufacturer.

§ 11.8 Upon the partial or entire disapproval by the Contractor of the ~~Subcontractor's~~ Manufacturer's application for payment, the Contractor shall provide written notice to the ~~Subcontractor.~~ Manufacturer. When the basis for the disapproval has been remedied, the ~~Subcontractor~~ Manufacturer shall be paid the amounts withheld.

§ 11.9 SUBSTANTIAL COMPLETION
When the ~~Subcontractor's~~ Manufacturer's Work or a designated portion thereof is substantially complete and in accordance with the requirements of the Prime Contract, the Contractor shall, upon application by the ~~Subcontractor,~~ Manufacturer, make prompt application for payment for such Work. Within 30 days following issuance by the Architect of the certificate for payment covering such substantially completed Work, the Contractor shall, to the full extent allowed in the Prime Contract, make payment to the ~~Subcontractor,~~ Manufacturer, deducting any portion of the funds for the ~~Subcontractor's~~ Manufacturer's Work withheld in accordance with the certificate to cover costs of items to be completed or corrected by the ~~Subcontractor.~~ Manufacturer. Such payment to the ~~Subcontractor~~ Manufacturer shall be the entire unpaid balance of the Subcontract Sum if a full release of retainage is allowed under the Prime Contract for the ~~Subcontractor's~~ Manufacturer's Work prior to the completion of the entire Project. If the Prime Contract does not allow for a full release of retainage, then such payment shall be an amount which, when added to previous payments to the ~~Subcontractor,~~ Manufacturer, will reduce the retainage on the ~~Subcontractor's~~ Manufacturer's substantially completed Work to the same percentage of retainage as that on the Contractor's Work covered by the certificate.

ARTICLE 12   FINAL PAYMENT
§ 12.1 Final payment, constituting the entire unpaid balance of the Subcontract Sum, shall be made by the Contractor to the ~~Subcontractor~~ Manufacturer when the ~~Subcontractor's~~ Manufacturer's Work is fully performed in accordance with the requirements of the Subcontract Documents, the Architect has issued a certificate for payment covering the ~~Subcontractor's~~ Manufacturer's completed Work and the Contractor has received payment from the Owner. ~~If, for any cause which is not the fault of the Subcontractor, a certificate for payment is not issued or the Contractor does not receive timely payment or does not pay the Subcontractor within seven days after receipt of payment from the Owner, final payment to the Subcontractor shall be made upon demand.~~

Init.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732826170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                    (1815465554)

*(Insert provisions for earlier final payment to the ~~Subcontractor,~~ Manufacturer, if applicable.)*

§ 12.2 Before issuance of the final payment, the ~~Subcontractor,~~ Manufacturer, if required, shall submit evidence satisfactory to the Contractor that all payrolls, bills for materials and equipment, and all known indebtedness connected with the ~~Subcontractor's~~ Manufacturer's Work have been satisfied. Acceptance of final payment by the ~~Subcontractor~~ Manufacturer shall constitute a waiver of claims by the ~~Subcontractor,~~ Manufacturer, except those previously made in writing and identified by the ~~Subcontractor~~ Manufacturer as unsettled at the time of final application for payment.

## ARTICLE 13   INSURANCE AND BONDS

§ 13.1 The ~~Subcontractor~~ Manufacturer shall purchase and maintain insurance of the following types of coverage and limits of liability as will protect the ~~Subcontractor~~ Manufacturer, Contractor, and other additional insureds from claims that may arise out of, or result from, the ~~Subcontractor's~~ Manufacturer's operations and completed operations under the ~~Subcontract.~~ Subcontract.
**See Rider 3, Insurance and Indemnification**

| Type of insurance or bond | Limit of liability or bond amount ~~($0.00)~~($ 0.00) |
| --- | --- |

§ 13.2 ~~Coverages, whether~~

**Coverage shall be** written on an occurrence ~~or claims-made basis,~~ **basis and** shall be maintained without interruption from the date of commencement of the ~~Subcontractor's Work~~ **Manufacturer's work** until the date of final ~~payment and termination of any coverage~~ **payment. Coverage** required to be maintained after final payment to the ~~Subcontractor, and, with respect to the Subcontractor's completed operations coverage, until the expiration of the period for correction of Work or for such other period for maintenance of completed operations coverage~~ **Manufacturer shall include completed operations** as specified in the Prime Contract. **All insurance except Completed Operations must be on an occurrence basis.**

§ 13.3 Certificates of insurance acceptable to the Contractor shall be filed with the Contractor prior to commencement of the ~~Subcontractor's~~ Manufacturer's Work. These certificates and the insurance policies required by this Article 13 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Contractor. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final application for payment as required in Article 12. If any information concerning reduction of coverage is not furnished by the insurer, it shall be furnished by the ~~Subcontractor~~ Manufacturer with reasonable promptness according to the ~~Subcontractor's~~ Manufacturer's information and belief.

§ 13.4 The ~~Subcontractor~~ Manufacturer shall cause the commercial liability coverage required by the Subcontract Documents to include: (1) the Contractor, the Owner, ~~the Architect and the Architect's consultants~~ as additional insureds for claims caused in whole or in part by the ~~Subcontractor's~~ Manufacturer's negligent acts or omissions during the ~~Subcontractor's~~ Manufacturer's operations; and (2) the Contractor as an additional insured for claims caused in whole or in part by the ~~Subcontractor's~~ Manufacturer's negligent acts or omissions during the ~~Subcontractor's~~ Manufacturer's completed operations.

§ 13.5 The Contractor shall furnish to the ~~Subcontractor~~ Manufacturer satisfactory evidence of insurance required of the Contractor under the Prime Contract.

§ 13.6 The Contractor shall promptly, upon request of the ~~Subcontractor,~~ Manufacturer, furnish a copy or permit a copy to be made of any bond covering payment of obligations arising under the Subcontract.

§ 13.7 Performance Bond and Payment Bond:
*(If the ~~Subcontractor~~ Manufacturer is to furnish bonds, insert the specific requirements here.)*


**Init.**

AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                      (1515465554)

**14**

| Bond type | Bond amount (~~$0.00~~)($ 0.00) | Bond delivery date | Bond form |
|---|---|---|---|
| Supply Bond | 4,587,498 | January 3, 2013 | A312 |

## § 13.8 PROPERTY INSURANCE
**§ 13.8.1** When requested in writing, the Contractor shall provide the ~~Subcontractor~~ Manufacturer with copies of the property and equipment policies in effect for the Project. The Contractor shall notify the ~~Subcontractor~~ Manufacturer if the required property insurance policies are not in effect.

**§ 13.8.2** If the required property insurance is not in effect for the full value of the ~~Subcontractor's~~ Manufacturer's Work, then the ~~Subcontractor~~ Manufacturer shall purchase insurance for the value of the ~~Subcontractor's~~ Manufacturer's Work, and the ~~Subcontractor~~ Manufacturer shall be reimbursed for the cost of the insurance by an adjustment in the Subcontract Sum.

**§ 13.8.3** Property insurance for the ~~Subcontractor's~~ Manufacturer's materials and equipment required for the ~~Subcontractor's~~ Manufacturer's Work, stored off site or in transit and not covered by the Project property insurance, shall be paid for through the application for payment process.

## § 13.9 WAIVERS OF SUBROGATION
The Contractor and ~~Subcontractor~~ Manufacturer waive all rights against (1) each other and any of their ~~subcontractors, sub-subcontractors,~~ Manufacturers, sub-Manufacturers, agents and employees, each of the other, and (2) the Owner, the Architect, the Architect's consultants, separate contractors, and any of their ~~subcontractors, sub-subcontractors,~~ Manufacturers, sub-Manufacturers, agents and employees for damages caused by fire or other causes of loss to the extent covered by property insurance provided under the Prime Contract or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner as a fiduciary. The ~~Subcontractor~~ Manufacturer shall require of the ~~Subcontractor's Sub-subcontractors,~~ Manufacturer's Sub-Manufacturers, agents and employees, by appropriate agreements, written where legally required for validity, similar waivers in favor of the parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

## ARTICLE 14   TEMPORARY FACILITIES AND WORKING CONDITIONS
**§ 14.1** The Contractor shall furnish and make available at no cost to the ~~Subcontractor~~ Manufacturer the Contractor's temporary facilities, equipment and services, except as noted below:

**Temporary Facility, Equipment or Service**     **Cost, if any (~~$0.00~~)($ 0.00)**

See Rider 1, Conditions

**§ 14.2** Specific working conditions:
*(Insert any applicable arrangements concerning working conditions and labor matters for the Project.)*

## ARTICLE 15   MISCELLANEOUS PROVISIONS
**§ 15.1** Where reference is made in this Subcontract to a provision of another Subcontract Document, the reference refers to that provision as amended or supplemented by other provisions of the Subcontract Documents.

**§ 15.2** Payments due and unpaid under this Subcontract shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

~~%~~ NONE

**§ 15.3** Retainage and any reduction thereto ~~are~~ is as follows: 0%

Init.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                                                      (1515465554)

**§ 15.4** The Contractor and ~~Subcontractor~~ Manufacturer waive claims against each other for consequential damages arising out of or relating to this Subcontract, including without limitation, any consequential damages due to either party's termination in accordance with Article 7.

**ARTICLE 16    ENUMERATION OF SUBCONTRACT DOCUMENTS**
**§ 16.1** The Subcontract Documents, except for Modifications issued after execution of this Subcontract, are enumerated in the sections below.

**§ 16.1.1** This executed AIA Document A401–2007, Standard Form of Agreement Between Contractor and ~~Subcontractor~~ Manufacturer.

**§ 16.1.2** ~~The Prime Contract, consisting of the Agreement between the Owner and Contractor dated as first entered above and the other Contract Documents enumerated in the Owner-Contractor Agreement.~~

**§ 16.1.3** The following Modifications to the Prime Contract, if any, issued subsequent to the execution of the Owner-Contractor Agreement but prior to the execution of this Agreement:
**See Rider 4, Contract Documents**

| Modification | Date |
|---|---|

**§ 16.1.4** Additional Documents, if any, forming part of the Subcontract Documents:
   .1    ~~AIA Document E201™  2007, Digital Data Protocol Exhibit, if completed by the parties, or the following:~~


   .2    Other documents:
        *(List here any additional documents that are intended to form part of the Subcontract Documents. Requests for proposal and the ~~Subcontractor's~~ Manufacturer's bid or proposal should be listed here only if intended to be made part of the Subcontract Documents.)*

        1.  Rider 1, Conditions
        2.  Rider 2, Project Safety Manual
        3.  Rider 3, Insurance and Indemnification
        4.  Rider 4, Contract Documents, Current Drawing Log
        5.  Rider 5, Scope of Work
        6.  Rider 6, Compliance


This Agreement entered into as of the day and year first written above.

CONTRACTOR *(Signature)*
PAUL COLAPINTO
*(Printed name and title)*
Project Executive
1/31/13

SUBCONTRACTOR MANUFACTURER *(Signature)*
FEDERICO DALESTRAZZI, PRESIDENT
*(Printed name and title)*

Init.



AIA Document A401™ – 2007. Copyright © 1915, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1972, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:57:03 on 01/28/2013 under Order No.6732826170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                          (1515465554)

**16**

## Certification of Document's Authenticity
*AIA® Document D401™ – 2003*

I, , hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with this certification at 15:57:03 on 01/29/2013 under Order No. 6732828170_1 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document A401™ – 2007, Standard Form of Agreement Between Contractor and Subcontractor, as published by the AIA in its software, other than changes shown in the attached final document by underscoring added text and striking over deleted text.

(Signed)

PRESIDENT

(Title)

1.30.13

(Dated)

AIA Document D401™ – 2003. Copyright © 1992 and 2003 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:57:03 on 01/29/2013 under Order No.6732828170_1 which expires on 05/20/2013, and is not for resale.
User Notes:                                                                                                              (1515465554)

1

**EXHIBIT "B"**

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

## CONSTRUCTION INDUSTRY ARBITRATION RULES
### Demand for Arbitration

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box* ☒
*There is no additional administrative fee for this service*

| Name of Respondent | | | Name of Representative (if known) | | |
|---|---|---|---|---|---|
| Glasswall, LLC | | | James E. Frankel, Esq. | | |
| Address: | | | Name of Firm (if applicable) | | |
| 3550 NW 49th Street | | | Schiff Hardin LLP | | |
| | | | Representative's Address: | | |
| | | | 666 Fifth Avenue, Suite 1700 | | |
| City | State | Zip Code | City | State | Zip Code |
| Miami | FL | 33142 | New York | NY | 10103 |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| (305) 683-5151 | | (305) 638-5158 | (212) 745-0837 | | (212) 753-5044 |
| Email Address: | | | Email Address: | | |
| janderson@glasswall.com | | | jfrankel@schiffhardin.com | | |

The named claimant, a party to an arbitration agreement dated January 3, 2013 , which provides for arbitration under the Construction Industry Rules of the American Arbitration Association, hereby demands arbitration.

ARBITRATION CLAUSE: Please indicate whether the contract containing the dispute resolution clause governing this dispute is a standard industry form contract (such as AIA, ConsensusDOCS or AGC) or a customized contract for the specific project.

Contract Form: AIA A201-2007

THE NATURE OF THE DISPUTE

BREACH OF CONTRACT

| Dollar Amount of Claim $ TBD | Other Relief Sought: ☒ Attorneys Fees   ☒ Interest |
|---|---|
| | ☒ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other |

Amount Enclosed $ 7,000.00   In accordance with Fee Schedule:   ☐Flexible Fee Schedule   ☒Standard Fee Schedule

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:

Owner/Contractor/Construction Attorney

| Hearing locale requested 150 E. 42nd St., NY, NY | Project site 1-55 Borden Avenue/1-50 50th Avenue, L.I.C., NY |
|---|---|
| Estimated time needed for hearings overall: | Specify type of business: Claimant Contractor |
| _____ hours or 10.00 days | Respondent Manufacturer |

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| Signature (may be signed by a representative)   Date: 3/4/15 | Name of Representative |
|---|---|
| | Judah D. Greenblatt, Esq. |
| Name of Claimant | Name of Firm (if applicable) |
| Monadnock Construction, Inc. | Greenblatt Lesser LLP |
| Address (to be used in connection with this case) | Representative's Address |
| 155 3rd Street | 122 E. 42nd Street, 31st Floor |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Brooklyn | NY | 11231 | New York | NY | 10168 |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| (718) 875-8160 | | (718) 802-1109 | (212) 682-9832 | | (212) 867-9319 |
| Email Address: | | | Email Address: | | |
| gbauso@moncon.com | | | jgreenblatt@greenblattlesser.com | | |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Case Filing Services can be reached at 877-495-4185.

**AMERICAN ARBITRATION ASSOCIATION**
**CASE NO.:**

-------------------------------------------------------------X

Monadnock Construction, Inc.,

                      Claimant,

      and

Glasswall, LLC,

                    Respondent.

-------------------------------------------------------------X

                                          **SUMMARY OF DISPUTE**

      Claimant, Monadnock Construction, Inc. ("Monadnock") by its attorneys, Greenblatt Lesser LLP, as and for its Summary of Dispute pursuant to its Demand for Arbitration against Glasswall, LLC ("Glasswall"), states as follows:

      1.      On or about January 3, 2013, Monadnock, as Contractor, located at 155 3rd Street, Brooklyn, New York, entered into two (2) AIA A401-2007 contracts (hereinafter collectively referred to as the "Contracts") with Glasswall, as Manufacturer, located at 3550 NW 49th Street, Miami, Florida, for the supply of windows and other materials (collectively, "Windows") to two (2) mixed use (commercial/affordable housing) projects in the Hunters Point South section of Long Island City. The Contracts are annexed hereto as Exhibit "A".

1

2.     The Windows required under the Contracts are long lead items that require many months to design, engineer and produce.  The Windows are also unique and were to be specifically manufactured for the projects.

3.     The first project, referred to as "HPS Parcel A", is a thirty-seven (37) story building located at 1-50 50th Avenue, and is owned by HPS 50th Avenue Associates LLC. The second project, referred to as "HPS Parcel B", is a thirty-two (32) story building located at 1-55 Borden Avenue, is owned by HPS Borden Avenue Associates LLC. The two (2) HPS entities are hereinafter collectively referred to as "HPS".  The HPS Parcels A and B projects are hereinafter collectively referred to as the "Projects".

4.     The Monadnock/Glasswall HPS Parcel A Contract was in the amount of Eight Million, Four Hundred and Twelve Thousand, Five Hundred and Two Dollars ($8,412,502) and required Glasswall to deliver Five Thousand, Eight Hundred and Thirty-Six (5,836) Windows to HPS Parcel A. The Monadnock/Glasswall HPS Parcel B Contract was in the amount of Four Million, Five Hundred and Eighty-Seven Thousand, Four Hundred and Ninety-Eight Dollars ($4,587,498) and required Glasswall to deliver Three Thousand, One Hundred and Twenty (3,120) Windows to HPS Parcel B.

5.     The Contracts required Glasswall to obtain payment and performance bonds for each Contract. Pursuant thereto, Glasswall obtained from WFIC Payment and Performance Bonds No. K08840295 dated February 12, 2013 for HPS Parcel A and Payment and Performance Bonds. No. K08840258 dated February 11, 2013 for HPS Parcel B in the amounts of the Contracts.

6.    The Contracts have a "time of the essence" clause (AIA A401-2007, section 9.4). They required Glasswall to ship completed Windows to HPS Parcel B starting on July 1, 2013 and to HPS Parcel A starting on September 1, 2013. Glasswall did not meet those dates.

7.    On March 15, 2013, the project schedule was updated and reflected Window delivery start dates of August 7, 2013 for Parcel B and of August 29, 2013 for Parcel A. Glasswall did not meet those delivery start dates either.  On August 16, 2013, Glasswall's attorney at the time, Clinton D. Flagg, sent Monadnock a letter representing that "completed window assemblies" would be ready to ship by Glasswall to the Projects on September 1, 2013. That representation proved false. On November 20, 2013, Glasswall issued a production schedule representing that Release 1 for Parcel A (i.e. Windows for floors 2-6) would be complete by December 6, 2013 and Release 1 for Parcel B (i.e. Windows for floors 2-9) would be complete by December 12, 2013. Those representations proved to be false as well.

8.    The Contracts also required Glasswall to fabricate, and store off-site, Windows as necessary to allow for their  timely and continuous installation (Rider 5, ¶17.d.2) at a rate of 2 floors per week (Rider 5, ¶37) while keeping pace 6 floors below the superstructure contractor (Rider 5, ¶4.3.b).  On or about January 15, 2014, Monadnock's subcontractor completed the concrete superstructure on HPS Parcel A and on or about November 21, 2013, it completed the concrete superstructure on HPS Parcel B.  Glasswall was also required to: "diligently perform the work, and maintain men in sufficient numbers and materials in sufficient quantities to accomplish the rapid completion of the job." (AIA A401-2007, section 9.3).  Significant work on the Projects ground to a halt as the Windows were necessary to protect the interior of the buildings from the outside elements and were a necessary construction pre-condition to the various interior construction trades progressing their work.

9.      Although Monadnock asked Glasswall several times for a recovery schedule that would show how Glasswall intended to accelerate its production to make up for lost time, Glasswall refused to provide same.    Instead, Glasswall issued production schedules on September 17, 25, 27, October 28, and November 20, 2013, none of which Glasswall followed and all of which failed to show the recovery of lost time.

10.     On November 27, 2013, Glasswall emailed Monadnock that Parcel A Release 1 would be complete by December 6, 2013 and Parcel B Release 1 would be complete by December 12, 2013. Those Releases were not completed as represented. On January 7, 2014, Glasswall issued another production schedule, which failed to provide for critical storefront Windows, and once again failed to recover all of the lost time.   Moreover, it guaranteed that Glasswall would be late in its "time of the essence" deliveries.  Given Glasswall's prior history of broken production and delivery promises and its continued problems with its suppliers, Monadnock had doubts that Glasswall would maintain the January 7, 2014 production schedule.

11.     Moreover, quality assurance/quality control ("QA/QC") issues pervaded Glasswall's production. Israel Berger & Associates, LLC ("IBA"), acting as HPS's representative, conducted limited inspections of Glasswall's production in its Miami facilities. It issued weekly deficiency reports demonstrating Glasswall's QA/QC problems.   Those deficiencies continued to plague Glasswall's production. In late December, 2013, Glasswall, at IBA's request, opened up 3-5 crates of "completed window assemblies" that Glasswall had represented were defect-free and ready for shipment to the HPS Project. IBA discovered that numerous previously known defects in several of those "completed window assemblies" had not been remedied.

4

12.     Last, Glasswall anticipatorily breached the Contracts by demanding payment before it was due and declaring its refusal to ship Windows if ordered to do so by Monadnock. The Contracts did not require Monadnock to pay Glasswall for stored materials not delivered to the Projects. In any event, delivery of those Windows was held up due to QA/QC concerns and, moreover, the respective Release 1's for Parcels A and B were not complete. In addition, Glasswall's certified requisition amounts for its production were false and were never resubmitted with accurate quantities.

13.     Since Window delivery is critical to the progress of the Projects, delays in their delivery delayed the completion of the Projects and pushed out the temporary certificate of occupancy ("TCO") dates. This exposed Monadnock to substantial damages including, but not limited to, extended general conditions, extended field costs, extended overhead costs, trade delay claims, extended financing costs, loss of rents and other damages. The full financial impact of the delays is ongoing.

14.     In consequence of all the foregoing, Monadnock sent Glasswall a Notice of Default on September 16, 2013, a Notice of Continuing Default on October 23, 2013 and a Notice of Continuing Default on December 31, 2013. Nevertheless, Glasswall remained in default of its production obligations, delivery obligations, scheduling obligations, and QA/QC obligations and it submitted falsified requisitions that it demanded to be paid for, despite having never delivered a single Window to the Projects. On January 13, 2014, Monadnock terminated Glasswall's Contracts.

15.     For the next few months, Glasswall continued to refuse to ship any Windows to the Project. Ultimately, on April 4, 2014, in an effort to mitigate damages, and without any waiver of its rights, Monadnock entered into an Agreement to Amend Contracts ("Amendment

5

Agreement") with Glasswall, WFIC, HPS and the indemnitors on the Bonds, Ugo Colombo and his wife Sara Jayne Colombo Kennedy (the "Indemnitors"). The Amendment Agreement is annexed hereto as Exhibit "B". The Amendment Agreement provided, *inter alia* that Glasswall would produce Windows for the Projects according to an April 4, 2014 Production Schedule and "deliver Competed Windows Units on a continuous basis to the Project as expeditiously as possible consistent with the Production Schedules" (Amendment Agreement, paragraph 6). The Production Schedules required production to be completed by October 28, 2014.

16.     The Agreements required Glasswall to complete its Work so that the Projects could be completed by "4th quarter of 2014 to 1st quarter of 2015" for Parcel A (Rider 5, ¶44c) and "3rd quarter of 2014" for Parcel B (Rider 5, ¶43c). The Amendment Agreement further required Glasswall to deliver completed windows "on a continuous basis to the Project as expeditiously as possible consistent with the Production Schedules" (Amendment Agreement, ¶6).

17.     The Amendment Agreement also provided that WFIC would pay Glasswall for all windows it produced at its Miami facilities and Monadnock would pay WFIC for all Windows it received at the Projects. Monadnock withdrew its termination of Glasswall without prejudice. All claims among the parties that had accrued thru the date of the Amendment Agreement were deferred pending the final delivery of Windows or the earlier termination of the Contracts.

18.     By October 28, 2014, Glasswall had neither completed production of the windows nor delivered all the windows it had produced. Instead, Glasswall first slowed down its shipment of completed windows and then stopped the deliveries completely, even though it had many truckloads of windows at its facilities ready for shipment. Glasswall also slowed its production of the remaining windows and other fabricated materials. Glasswall explained that it would not

6

continue shipment of completed windows or production of new windows until it was paid in advance by WFIC its entire contract balance. Glasswall also demanded that Monadnock pay WFIC in advance for Glasswall's remaining Work, even though it had neither been produced nor delivered to the Projects.

19.     On November 14, 2014, WFIC acceded to Glasswall's duress and paid Glasswall its entire contract balance on both Agreements.  On November 24, 2014, Monadnock likewise acceded to Glasswall's duress and paid WFIC the entire remaining contract balance on the Agreements without deduction. The Monadnock payment was made with a full reservation of rights and in order to mitigate the damages resulting from Glasswall's breaches of the Agreements that were delaying completion of the Projects.

20.     Despite being paid in advance and in full for all the Work required under the Agreements, Glasswall continued to breach same for reasons including but not limited to the following:

> (a) Glasswall has not completed its Work;
> (b) Glasswall has not corrected defective Work;
> (c) Glasswall has not provided documentation required under the Agreements including but not limited to warranties, LEED documentation, material certifications, and final lien waivers by Glasswall and its suppliers;
> (d) Glasswall delayed in performance of its Work thereby causing delays and increased costs to other contractors whom Monadnock has and/or will reimburse;
> (e) Glasswall delayed in performance of its Work thereby causing delays and increased costs to Monadnock;
> (e) Glasswall has failed to pay all its suppliers for materials used to fabricate the Work and for shipment of same to the Projects; and
> (f) Glasswall has ceased operations and it will not be able to fulfill its warranty obligations;

7

21.     For all the foregoing, Monadnock demands that a duly constituted Arbitration Panel determine the amount of damages suffered by Monadnock and fashion an Arbitration Award accordingly, inclusive of attorney fees, interest, costs and disbursements.

Dated: March 4, 2015
      New York, New York

                                    Greenblatt Lesser LLP
                                    Attorneys for Claimant
                                    Monadnock Construction, Inc.
                                    By: _____
                                       Judah D. Greenblatt, Esq.
                                    The Chanin Building
                                    122 East 42nd Street, 31st Floor
                                    New York, NY 10168
                                    (212) 867-9319

**EXHIBIT "C"**

<u>AMERICAN ARBITRATION ASSOCIATION</u>
<u>Construction Arbitration Tribunal</u>

In the Matter of the Arbitration between:

MONADNOCK CONSTRUCTION, INC.,

                                        Claimant,

                        -and-

GLASSWALL, LLC,

                                        Respondent.

AAA Case No. 02-15-0002-8160

---

## AWARD OF ARBITRATOR

We, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreements contained in the subcontracts entered into between the parties, dated as of January 3, 2013 (collectively, "Subcontracts"), and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby AWARD as follows:

### <u>PROCEEDINGS</u>

The panel conducted nine, non-consecutive evidentiary hearings in this matter beginning on November 14, 2016 and ending on February 28, 2017. By agreement, the parties submitted lengthy briefs and reply briefs, the last of which were submitted on June 5, 2017. Thereafter, the panel held a telephone conference with counsel for the parties to hear further arguments on several specific points raised by the post hearing submissions.

1

## THE PARTIES

Monadnock Construction, Inc. ("Monadnock") is a general contractor/construction manager.  Glasswall, LLC ("Glasswall") is a fabricator of curtain walls and windows based in the State of Florida.

## THE BUILDINGS, THE PRIME CONTRACTS & THE SUBCONTRACTS

### The Buildings

The dispute concerns the development of two high rise residential buildings in Long Island City, Queens County (collectively, "Buildings"), together with the work related to the design, fabrication and delivery of window wall units to enclose the Buildings (collectively, "Window Work").  The development was known as Hunters Point South ("HPS") and the Buildings were designated as Parcel A, a 31-story 619 residential building located at 1-50 50th Avenue, and Parcel B, a 32-story 306-unit residential building located at 1-55 Borden Avenue. The development was being constructed under an affordable housing plan through the City of New York.  Parcel A and Parcel B had different owners, HPS 50th Avenue Associates, LLC for Parcel A; and HPS Borden Avenue Associates, LLC for Parcel B (collectively, "Owners").  The Owners each had several members, but an affiliate of The Related Companies ("Related") and Monadnock were principals of both of the Owners.  Related served, in effect, as the managing owner in connection with the development of the Buildings.

### The Prime Contracts

In February, 2013, Monadnock and the Owners entered into separate, but identical agreements (except for address and scope of work) for the design and construction of the Buildings

2

(inclusive of the Window Work) at Parcel A and Parcel B (collectively, "Prime Contracts"), with Monadnock serving as the construction manager for the Owners.  The Prime Contracts did not contain guaranteed maximum prices, and Monadnock served in a no-risk position concerning the costs and timing of construction of the Buildings (inclusive of the Window Work), absent breach of its duties to cause the Buildings to be constructed on time and free of defects and otherwise in strict accordance with the subcontracts (inclusive of the Subcontracts for the Window Work.) The Prime Contracts also provided that the trade contractors/subcontractors (collectively, "Subcontractors") would contract directly with Monadnock.  The Owners were to pay Monadnock for the work performed by the Subcontractors, and Monadnock would pass payment onto the Subcontractors in accordance with the terms of their respective subcontracts.  The form of the subcontract to be used with the Subcontractors was annexed as an exhibit to the Prime Contracts, providing for a direct contractual relationship between Monadnock and the Subcontractors and expressly negating any contractual relationship between the Subcontractors and the Owners.

The Subcontracts

Both Subcontracts for Parcel A and Parcel B provided that Glasswall, among other things, was to assist with the design and to fabricate the complex, custom made, glass window wall system comprising the Window Work. There was to be a shop drawing process governing the Window Work, and Glasswall was to commence production "on or about" April 15, 2013, and be ready to ship the windows portion of the Window Work for Parcel B on July 1, 2013 and for Parcel A on September 1, 2013. The dates for shipment were pushed back on consent of the parties until September 16, 2013 (Parcel B) and October 1, 2013 (Parcel A).  The Subcontracts also provided that the pace of delivery of the windows portion of the Window Work was to be such so

as to allow for the windows to be installed six floors below the rising superstructure of the Buildings. The "Subcontract Sum" under the Subcontracts for the Window Work at Parcel A was $8,412,502 and for the Window Work at Parcel B was $4,587,498, respectively.

The Subcontracts each contained handwritten language inserted after Article 3.3.1 for Parcel A and for Parcel B, respectively, reading as follows:

"Liquidated damages will be capped at $300,000", and "Liquidated damages will be capped at $200,000."

Article 3.3.1 of the Subcontracts, which was not substantively amended by the parties, reads as follows:

> "Liquidated damages for delay, if provided for in Section 9.3 of the Agreement, shall be assessed against the Manufacturer (Glasswall) only to the extent caused by the Manufacturer or any person or entity for whose conduct the Manufacturer may be liable, and in no case for delays or causes arising outside the scope of the Subcontract."

Despite this apparent handwritten limit on "liquidated damages," Article 9.3 does not provide for liquidated damages.

Article 2 of the Subcontracts provide, in essence, that Glasswall had the same duties, responsibilities and rights toward Monadnock as Monadnock had toward the Owners.

Amendment of Subcontracts

In January, 2014 the parties were engaged in a continuing dispute concerning timing of delivery, costs, delays, payment and other issues related to the Window Work. Actions were commenced in Florida and New York between Glasswall's surety, Westchester Fire Insurance Company ("Westchester"), indemnitors of Westchester, Monadnock, Glasswall and the Owners.

4

In April, 2014 Glasswall, Westchester, Monadnock, the Owners and indemnitors of Westchester entered into an agreement entitled "Agreement to Amend Contracts" ("Amended Agreement").

Under the Amended Agreement, (i) Monadnock agreed to withdraw its notice of default of the Subcontracts and its bond claims without prejudice, (ii) Westchester agreed to advance moneys to Glasswall and its suppliers for windows fabricated and to be fabricated, (iii) Glasswall agreed to deliver, and Monadnock agreed to accept, Window Work that had been fabricated, (iv) Glasswall agreed to commit to complete its Window Work under the Subcontracts, and (v) Monadnock agreed to pay the amounts due under the Subcontracts as the Window Work progressed and as windows were delivered. The progress payments would be paid to Westchester in escrow for the benefit of Glasswall. Glasswall and Monadnock also agreed to waive their respective rights to terminate the Subcontracts based upon events of default occurring prior to the Amended Agreement. All other rights were reserved.

## SUMMARY OF CLAIMS & DEFENSES

### Monadnock's Claims

Summarily, Monadnock asserts that Glasswall delayed completion of the Buildings by failing to timely perform the Window Work. Monadnock also claims that many of the windows delivered as part of the Window Work had significant defects which required field remediation work paid for by Monadnock. Monadnock refers to damages related to defects in the windows portion of the Window Work as "performance damages." Monadnock also seeks a category of damages it refers to as "Soft Costs" which are akin to delay damages and consist of increase in insurance costs, added inspection costs, increased bond and subsidy costs and legal fees to various

law firms (but not the litigation fees charged by counsel that represented Monadnock in this arbitration proceeding). In all Monadnock seeks damages as follows:

|                 |                              |
| --------------- | ---------------------------- |
| Delay Damages:  | $7,648,302.77                |
| Performance Damages: | $2,446,535.98           |
| Soft Costs:     | $7,261,919.16                |
| Grand Total:    | $17,356,757.91, plus interest |

Monadnock has been paid in full by the Owners, and Glasswall has been paid in full by Monadnock, for the Window Work.

## Glasswall's Claims

There are no affirmative claims from Glasswall before the panel.

## Glasswall's Defenses to Monadnock's Claims

In addition to challenging certain specific damage claims for, among other things, contractual defenses or for being too speculative, Glasswall has asserted a number of fundamental defenses that warrant separate mentioning.

1.      Defense of Lack of Standing

It is undisputed that Monadnock was reimbursed by the Owners for all costs incurred for the performance of the Window Work. This include, without limitation, all additional construction costs, escalations, extended general conditions and additional insurance and bond interest costs. Because of this, Glasswall argues, in essence, that Monadnock suffered no damages

6

and, therefore, cannot recover damages from Glasswall.   Glasswall goes on to argue that if there were damages caused by Glasswall, a point it does not concede, it is the Owners that sustained the damages because they reimbursed Monadnock for all increased costs.   Since there is no privity between the Glasswall and the Owners, Glasswall argues there can be no recovery by Monadnock from Glasswall.

To counter this lack of standing argument, Monadnock principally relies on the application of the collateral source rule and reference to the pass-through clause found at Article 2 of the Subcontracts.

2.    Allegation that the Subcontracts Capped Delay Damages at $300,000 and $200,000

Glasswall argues that even if it were responsible for delays relating to the completion of the Buildings, the damages that could be assessed by Monadnock against Glasswall were capped at $300,000 for Parcel A and $200,000 for Parcel B.  Glasswall argues that this was clearly the intention of the parties when they added the handwritten language to Article 3.3.1 of the Subcontracts capping the amount of "liquidated damages."  In essence, Glasswall argues that "liquidated damages" should read "delay damages."

Monadnock argues in opposition to this cap that the handwritten clause referred specifically to "liquidated damages," and that the entire clause to which the handwriting was added (Article 3.3.1) is applicable only if liquidated damages are "provided for in Section 9.3," and it is undisputed that no liquidated damages are provided for in Article 9.3 of the Subcontracts. Accordingly, Monadnock argues that the cap has no application to the claims asserted.

7

## GENERAL FINDINGS

<u>1.      The Issue of Standing</u>

We find the collateral source rule to be inapplicable to this contract dispute. However, we do find that the pass-through clause found in Article 2 of the Subcontracts is controlling and permits Monadnock to seek the damages sought in this proceeding. While the evidence established that the Owners have no intention of pursuing Monadnock for the increased costs incurred, we find that under the Prime Contracts the Owners could seek reimbursement if Monadnock breached the Prime Contract by failing to perform its duties, including failing to cause its Subcontractors to perform their work in strict accordance with the requirements of their respective subcontracts. For instance, at Article 6 of the Prime Contracts, Monadnock warrants that the work will be "free from improper workmanship and defective materials and in strict conformance with the applicable Trade Contract.......". Furthermore, in Article 9(d) of the Prime Contracts, Monadnock is in default if it fails to cause its Subcontractors to complete their work on time, as required under Article 13. To the extent that the Subcontractors' work did not comply with this standard, Monadnock could be held liable to the Owners. Therefore, if, as alleged by Monadnock, the Window Work exhibited poor workmanship, was defective or not in compliance with the plans and specifications, or was delayed and not on schedule, Glasswall would be liable to Monadnock, as Monadnock would be liable to the Owners.

Accordingly, because Article 2 of the Subcontracts binds Glasswall to the same extent that Monadnock is bound to the Owners under the Prime Contracts, we find that Monadnock is permitted to pursue the claims asserted here. Again, the fact that the Owners do not intend to pursue the claims does not diminish their ability to do so, and that is an obligation which Glasswall undertook.

8

2.      The Limits on "Liquidated Damages"

We find that the limits on "liquidated damages" of $300,000 and $200,000 for

Parcel A and Parcel B, respectively, are not applicable to the claims asserted by Monadnock in

this proceeding.  The Subcontracts clearly state that the clause will apply only if liquidated

damages are provided in Article 9.3, and the simple fact is that there are no liquidated damages

provided for in that Article.  As such, we find that the language has no application.  We sympathize

with Glasswall's speculative argument that the parties must have meant for the cap to apply to all

delay damages, whether liquidated or not, and we are troubled by the possibility of an unfair

overreach by Monadnock at the time of negotiations.  However, Glasswall did not provide

testimony or documentary evidence to show what was discussed during the negotiations and why

the language was inserted in Article 3.3.1 and no liquidated damages inserted in Article 9.

Therefore, we are left with the language of the Subcontracts themselves, which we find does not

support the defense.  In essence, Glasswall asks the Panel to change the handwritten phrase from

"Liquidated Damages" will be capped at $200,000 ($300,000) to "Delay Damages" will be capped

at $200,000 ($300,000), and we respectfully decline to do so.


## SPECIFIC FINDINGS ON THE CLAIMS

### Delays To The Window Work

1.      The Issue of Responsibility for Delay

Glasswall argues that in October-November, 2013 it had approximately 1,000

additional windows completed along with other Window Work all of which were available for

delivery, but that Monadnock refused delivery. Glasswall introduced evidence to suggest that the

actual reason Monadnock would not accept delivery of the completed windows was because it

9

demanded $3,000,000 in delay damages from Glasswall before it would continue with the Subcontracts and/or that Monadnock wished to hire an affiliated company to supply the windows. Around this time meetings were held, default notices were issued, and no new windows were delivered until after the Amended Agreement was executed in April, 2014. This delay, Glasswall argues, was not its responsibility but rather is attributed to Monadnock's conduct.

Monadnock did not materially dispute its refusal to accept the completed windows and ancillary Window Work, but countered it by arguing that at that time it had paid Glasswall more than $3,000,000, it had not obtained any windows, and had serious doubts as to whether Glasswall could complete the Window Work. If Glasswall could not complete, Monadnock would need to retain a substitute window manufacturer and any windows paid for and received from Glasswall would be useless and would need to be replaced.

We find that Monadnock wrongfully refused to accept delivery of the windows, including ancillary materials needed for their installation in the Fall and Winter of 2013-2014, in breach of the Subcontracts. While it is true that Glasswall was struggling to meet its contractual obligations, and there were quality control issues, when faced with those obstacles Monadnock did not exercise its right to terminate the Subcontracts as it could have done for failure to meet the agreed to delivery schedule. Rather it issued a series of Notices of Defaults and Notices of Continuing Defaults, all the while Glasswall continued to manufacture windows, trying to satisfy its contractual obligations. We do not conclude that there was a nefarious reason behind Monadnock's action, such as a desire to oust Glasswall to pursue use of an affiliated company, but we do find that Monadnock could not, whatever the reason, properly hold Glasswall in proverbial limbo while it decided whether to terminate the Subcontracts and hire a new subcontractor or exacted some damages before completion of the Window Work by Glasswall. We were

significantly persuaded by the ample documentary evidence showing that Monadnock would not accept Window Work without a signed agreement resolving the disputes that had arisen.

## Lack of a Baseline Schedule or Critical Path Schedule

It was not possible to accurately assess damages for delay without a baseline schedule containing a critical path schedule to compare it to the as built schedule. Monadnock admitted that there was no baseline schedule (including a critical path) prepared by it because, in essence, it did not need one. Without a baseline schedule with a critical path presented to Glasswall, there is nothing upon which we can determine how Glasswall impacted that baseline schedule, nor would Glasswall know how its delays would impact the baseline schedule. It is clear that Glasswall did cause delays and breached its Subcontracts by failing to deliver in accordance with the time requirements set forth in its Subcontracts, but without a baseline schedule against which an as-built schedule is compared, we are unable to determine which delays became the controlling delays and who was responsible for those controlling delays.

## Delay Damages

In addition to the issues we found assessing blame to Glasswall for delays as outlined above, we also find that certain categories of delay damages, even if Glasswall were responsible for the associated delays, could not be properly assessed against it.

The significant amount paid to Subcontractors for escalations, we find cannot be properly assessed. The executed subcontracts (Eckert and Glasswall) submitted into evidence provide that escalations were to be borne by the Subcontractors and not Monadnock. Additionally, the executed subcontracts and the form subcontract annexed to the Prime Contracts provide at Article 4.1 (C) that the Subcontractors may be required, at no additional charge to Monadnock, to

do work out of sequence and perform "comeback work." We were not persuaded by Monadnock's argument that these clauses applied only to the initial work period and not for any extended period. These types of subcontractor clauses are specifically included in subcontracts to avoid delay damages claims and escalation charges against the general contractor or construction manager.

In addition, the claims for "bond interest" and "subsidy interest" were never adequately explained or established by Monadnock or its expert. The same is true of the claim for reimbursement of legal fees, with Monadnock's witness, at one point, being unaware of which entity a particular law firm was representing or why the fees should be chargeable to Glasswall. Under such circumstances we would have declined to award these damages even if entitlement were to be found.

### Performance Damages

The evidence established that Glasswall was paid for some materials it did not supply or some which required extensive field remediation. In fact, Glasswall has conceded that a credit of $308,739.16 is due to Monadnock for such matters. We have carefully reviewed the category of damages referred to by Monadnock as "Performance Damages" and have awarded such damages as indicated in the attached Schedule A.

### Schedule A

Schedule A to this Award is a list of all damages sought by Monadnock and the amount awarded, if any, for each item. Schedule A is hereby made part of this Award.

### MONETARY AWARD

Based upon our findings outlined above and the amount awarded for each item of damages sought by Monadnock as indicated at Schedule A, Monadnock Construction, Inc. is

hereby Awarded the sum of $1,280,003.25 against Glasswall, LLC with interest at the rate of 5% per annum commencing on March 5, 2015 which calculated to August 31, 2017 totals $159,289.61 for a grand total of $1,439,292.86

The administrative fees and expenses of the American Arbitration Association totaling $29,986.30 shall be borne as incurred, and the compensation and expenses of the arbitrators $137,174.65 shall be shared equally by the parties so that Respondent shall pay to Claimant the sum of $59,962.32.

Therefore, within 30 days of the date that this Award is transmitted to counsel for the parties Respondent shall pay the Claimant the total sum of $1,499,255.18.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

_8/29/17_  
Date

_____  
Thomas J. Rossi

_____  
Date

_____  
Susanna S. Fodor

_____  
Date

_____  
Michael Oscar Renda

13

Schedule A to this Award is a list of all damages sought by Monadnock and the amount awarded, if any, for each item. Schedule A is hereby made part of this Award.

## MONETARY AWARD

Based upon our findings outlined above and the amount awarded for each item of damages sought by Monadnock as indicated at Schedule A, Monadnock Construction, Inc. is hereby Awarded the sum of $1,280,003.25 against Glasswall, LLC with interest at the rate of 5% per annum commencing on March 5, 2015 which calculated to August 31, 2017 totals $159,289.61 for a grand total of $1,439,292.86

The administrative fees and expenses of the American Arbitration Association totaling $29,986.30 shall be borne as incurred, and the compensation and expenses of the arbitrators $137,174.65 shall be shared equally by the parties so that Respondent shall pay to Claimant the sum of $59,962.32.

Therefore, within 30 days of the date that this Award is transmitted to counsel for the parties Respondent shall pay the Claimant the total sum of $1,499,255.18.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

| | |
|---|---|
| _____ | _____ |
| Date | Thomas J. Rossi |
| _8/29/17_ | _____ |
| Date | Susanna S. Fodor |
| | |
| _____ | _____ |
| Date | Michael Oscar Renda |

13

Schedule A to this Award is a list of all damages sought by Monadnock and the amount awarded, if any, for each item. Schedule A is hereby made part of this Award.

## MONETARY AWARD

Based upon our findings outlined above and the amount awarded for each item of damages sought by Monadnock as indicated at Schedule A, Monadnock Construction, Inc. is hereby Awarded the sum of $1,280,003.25 against Glasswall, LLC with interest at the rate of 5% per annum commencing on March 5, 2015 which calculated to August 31, 2017 totals $159,289.61 for a grand total of $1,439,292.86

The administrative fees and expenses of the American Arbitration Association totaling $29,986.30 shall be borne as incurred, and the compensation and expenses of the arbitrators $137,174.65 shall be shared equally by the parties so that Respondent shall pay to Claimant the sum of $59,962.32.

Therefore, within 30 days of the date that this Award is transmitted to counsel for the parties Respondent shall pay the Claimant the total sum of $1,499,255.18.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

_____        _____
Date                           Thomas J. Rossi


_____        _____
Date                           Susanna S. Fodor

8/29/17
_____        _____
Date                           Michael Oscar Renda

13

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

8/25/17
_____
Date

_____
Thomas J. Rossi

I, Susanna S. Fodor, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

_____
Date

_____
Susanna S. Fodor

I, Michael Oscar Renda, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

_____
Date

_____
Michael Oscar Renda

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

_____                    _____
Date                                              Thomas J. Rossi

I, Susanna S. Fodor, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

*8/29/17*                              _____
Date                                              Susanna S. Fodor

I, Michael Oscar Renda, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

_____                    _____
Date                                              Michael Oscar Renda

14

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

_____                    _____
Date                                                              Thomas J. Rossi

I, Susanna S. Fodor, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

_____                    _____
Date                                                              Susanna S. Fodor

I, Michael Oscar Renda, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is our Final Award.

_8/29/17_____                    _____
Date                                                              Michael Oscar Renda

14

# Schedule A

*Monadnock v. Glasswall*

| # | Subcontractor | Category | Amount of Damages |
|---|---|---|---|
| 1 | All Fasteners (Coping Fasteners) | Performance Damage | $305.68 |
| 2 | All Fasteners (Coping Fasteners) | Performance Damage | $379.12 |
| 3 | RSG Caulking & Waterproofing CRSG Scaffold) | Performance Damage | $1,678.70 |
| 4 | RSG Caulking & Wateroroofing (RSG Rigging) | Performance Damage | $462,131.00 |
| 5 | Ornamental Erectors (Union Workers to Reglaze Windows) | Performance Damage | $242,547.00 |
| 6 | Digital Buyer (Casement Window Reversal Equipment) | Performance Damage | $975.25 |
| 7 | Leed Himmel Industries (Tree Bracket Engineering) | Performance Damage | $0.00 |
| 8 | Ornamental Erectors (Fix Tree Brackets and Re-Install Trees) | Performance Damage | $0.00 |
| 9 | Hadco Metal Trading (Metal Closure Pieces) | Performance Damage | $0.00 |
| 10 | Pride Equipment (Boom Lift) | Performance Damage | $0.00 |
| 11 | Pride Equipment (Included in Previous Line Item) | Performance Damage | $0.00 |
| 12 | Hadco Metal Trading (Paraoet Anchor Plates) | Performance Damage | $705.51 |
| 13 | Kenseal Construction Products (Dow Coming Sealant and etc.) | Performance Damage | $15,629.77 |
| 14 | Metropolitan Lumber and Hardware (Harnesses) | Performance Damage | $1,468.21 |
| 15 | Stanley Supply & Tool (Tools) | Performance Damage | $0.00 |
| 16 | AGC Glass Company North America (Reolacement Glass) | Performance Damage | $22,000.00 |
| 17 | Woodworks Construction Company (Carpentry Protection) | Performance Damage | $22,555.00 |
| 18 | Kings County Waterproofing (Bulkhead Windows) | Performance Damage | $12,600.00 |
| 19 | Various Vendors for Miscellaneous Supplies | Performance Damage | $0.00 |
| 20 | Ecker Window (Casement Reversal) | Performance Damage | $146,124.06 |
| 21 | Ecker Window (Structural Glazing) | Performance Damage | $13,979.00 |
| 22 | Spieler & Ricca Electrical (Casement Edge Insoection/Repair) | Performance Damage | $0.00 |
| 23 | Spieler & Ricca Electrical (Weather Damaged Equipment) | Performance Damage | $0.00 |
| 24 | Intercoastal Erectors (Storefront Support Steel) | Pertixmance Damage | $0.00 |
| 25 | Trulite Glass & Aluminum Solutions (Replacement Glass) | Performance Damage | $51,209.71 |

| 26 | S&J Sheet Metal Supply (Window Install Clips) | Performance Damage | $5,879.25 |
| 27 | Pinquist Tool & Die Company (Coping Fasteners) | Performance Damage | $12,860.00 |
| 28 | D. LaMontana Transport (Trucking) | Performance Damage | $12,250.00 |
| 29 | Pioneer Window Manufactor. (Fist Brackets) | Performance Damage | $15,528.16 |
| 30 | Pinquist Tool & Die Company (Parapet Hook Anchor Fabrication) | Performance Damage | $0.00 |
| 31 | Air Performance (Picture Frame Material) | Performance Damage · | $28,278.00 |
| 32 | All Fasteners (Fasteners for Coping and etc.) | Performance Damage | $18,732.46 |
| 33 | Kenseal Construction Products and Garvin Brown | Performance Damage | $24,802.18 |
| 34 | Eagle One Roofing Contractors (Roofing Repairs) | Performance Damage | $0.00 |
| 35 | Crown Partition (Additional Carpentry Wall Framing) | Performance Damage | $0.00 |
| 36 | Kings County Waterproofing (ACM Panel Work) | Performance Damage | $0.00 |
| 37 | WAIVED | | |

$1,112,618.06

*Monadnock v. Glasswall*
Summary of Claimant's Damages

| # | Subcontractor | Category | Amount of Damages |
|---|---|---|---|
| 38 | Ecker Window (Additional Storefront Installation) | Performance  Damage | $0.00 |
| 39 | All-Safe (Damaged Overhead Protection) | Performance  Damage | $0.00 |
| 40 | Eagle One Roofing Contractors (Parapet Coping Installation) | Perrormance  Damage | $0.00 |
| 41 | Iron Horse Transport (Trailer Storage) | Performance  Damage | $0.00 |
| 42 | Ecker Window (Moving & Handling) | Performance  Damage | $0.00 |
| 43 | L & L Painting (Parapet Panels) | Performance  Damage | $0.00 |
| 44 | Ecker Window (Premium Time Hoist Window Installation) | Performance  Damage | $0.00 |
| 45 | Navillus Contracting (Engineer and Lull to Load/Unload Hoist Run) | Performance  Damage | $0.00 |
| 46 | Ecker Window (Window Unit Modifications) | Performance  Damage | $0.00 |
| 47 | Ecker Window (Window Unit Modifications) | Performance  Damage | $0.00 |
| 48 | Ecker Window (Field Window Modifications) | Performance  Damage | $0.00 |
| 49 | Ecker Window (Misc. Glasswall Problems) | Performance Damage | $0.00 |
| 50 | Ecker Window (Glasswall Open Items) | Performance  Damage | $103,523.19 |
| 51 | Jerome Aluminum Products (Interior Storefront Metal Trim) | Performance  Damage | $9,200.00 |
| 52 | Woodworks Constructiun Company (Carpenter) | Delav Damage | $0.00 |
| 53 | B.W.B. Crown Partition (Carpenter) | Delav Damage | $0.00 |

| 54 | S.J. Electric (Electrical Contractor) | Delay Damaee | $0.00 |
| 55 | Spieler & Ricca Electrical (Electrical Contractor) | Delay Damage | $0.00 |
| 56 | Paramount Plumbing Company (Plumbing Comractor) | Delav Damage | $0.00 |
| 57 | Parkview Plumbing (Plumbing Contraclor) | Delav Damage | $0.00 |
| 58 | Federated Fire Protection (Fire ProtectionContractor) | Delav Damage | $0.00 |
| 59 | Federated Fire Protection (Fire Protection Contractor) | Delay Damage | $0.00 |
| 60 | Ecker Window (Labor Installational Escalation) | Delay Damage | $0.00 |
| 61 | Ecker Window (Labor Installational Escalation) | Delay Damage | $0.00 |
| 62 | City Elevator (Elevator Cab Storage) | Delay Damage | $0.00 |
| 63 | Islandaire (PTAC Sleeve Storage) | Delay Damaee | $0.00 |
| 64 | Various Emities (Additional General Conditions) | Delay Damage | $0.00 |
| 65 | Various Entities (Additional General Conditions) | Delay Damage | $0.00 |
| 66 | AON/Alliant (Additional Insurance Costs) | Delay Damage | $0.00 |
| 67 | AON/Alliant (Additional Insurance Costs) | Delay Damage | $0.00 |
| 68 | City Elevator (Elevator Shaft Rust Remediation) | Delay Damage | $0.00 |
| 69 | City Elevator (Elevator Shaft Rust Remediation) | Delay Damage | $0.00 |

$112,723.19

*Monadnock v. Glasswall*
Summary of Claimant's Damages

| # | Subcontractor | Category | Amount of Damages |
|---|---|---|---|
| 70 | Ecker Window (Overtime for Interior Job Catch Up) | Delay Damage | $0.00 |
| 71 | Ecker Window (Overtime for Interior Job Catch Up) | Delav Damage | $0.00 |
| 72 | Ecker Window (Overtime for Glasswall Late Deliveries) | Delay Damage | $0.00 |
| 73 | L & L Painting (KADEX Repair) | Delav Damage | $0.00 |
| 74 | S.J. Electric (Electric Heating) | Delay Damage | $0.00 |
| 75 | L & L Painting (Coping Paint Cost) | Performance Damage | $0.00 |
| 76 | Air Performance (Hoist Run Window) | Performance Damage | $0.00 |
| 77 | M Cohen and Sons (Missine Windows) | Performance Damaee | $29,010.00 |
| 78 | Summit HVAC Mechanical (North Curtain Wall PTAC Grills) | Performance Damage | $7,000.00 |
| 79 | City Elevator (Additional Rust Rcmcdialion) | Delay Damage | $0.00 |
| 80 | City Elevator (Labor and Material Escalation) | Delay Damage | $0.00 |
| 81 | M Cohen and Sons (Terrace Door) | Performance Damage | $18,652.00 |

$54,662.00

*Monadnock v. Glasswall*
Summary of Claimant's Damages

| # | Subcontractor | Category | Amount of Damages |
|---|---|---|---|
| 82 | AGS Ventures II. LLC (Builders Risk Extension) | Soft Cost | $0.00 |
| 83 | AGS Ventures II, LLC (Builders Risk Extension) | Soft Cost | $0.00 |
| 84 | Steven D. Barber (Glasswall Inspections) | Soft Cost | $0.00 |
| 85 | Steven D. Barber (Glasswall Insoections) | Soft Cost | $0.00 |
| 86 | Vidaris (Exterior Wall Inspections) | Soft Cost | $0.00 |
| 87 | Vidaris (Exlerior Wall Inspections) | Soft Cost | $0.00 |
| 88 | Various Entities (Bond Interest Costs) | Soft Cost | $0.00 |
| 89 | Various Entities (Bond Interest Costs) | Soft Cost | $0.00 |
| 90 | Various Entities (HPD Subsidy Interest Cost) | Soft Cost | $0.00 |
| 91 | Varies Entities (HPD Subsidy Interest Costs) | Soft Cost | $0.00 |
| 92 | Greenblatt Lesser (Legal Fees) | Soft Cost | $0.00 |
| 93 | Greenblatt Lesser (Legal Fees) | Soft Cost | $0.00 |
| 94 | Duane Morris (Legal Fees) | Soft Cost | $0.00 |
| 95 | Duane Morris (Legal Fees) | Soft Cost | $0.00 |
| 96 | Pathman Lewis (Legal Fees) | Soft Cost | $0.00 |
| 97 | Pathman Lewis (Legal Fees) | Soft Cost | $0.00 |

$0.00

**TOTAL**      **$1,280,003.25**

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840  (7/2012)

**Supreme** _____ COURT, COUNTY OF_____ **New York**

**Index No:** _____   **Date Index Issued:** _____

In the Matter of the Arbitration of Certain Controversies Between

Glasswall, LLC,

**Plaintiff(s)/Petitioner(s)**

-against-

Monadnock Construction, Inc.,

**Defendant(s)/Respondent(s)**

## MATRIMONIAL
- ☐ Contested

  **NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum.** For Uncontested Matrimonial actions, use RJI form UD-13.

## TORTS
- ☐ Asbestos
- ☐ Breast Implant
- ☐ Environmental: _____
  (specify)
- ☐ Medical, Dental, or Podiatric Malpractice
- ☐ Motor Vehicle
- ☐ Products Liability:_____
  (specify)
- ☐ Other Negligence:_____
  (specify)
- ☐ Other Professional Malpractice:_____
  (specify)
- ☐ Other Tort:_____
  (specify)

## OTHER MATTERS
- ☐ Certificate of Incorporation/Dissolution   [see **NOTE** under Commercial]
- ☐ Emergency Medical Treatment
- ☐ Habeas Corpus
- ☐ Local Court Appeal
- ☐ Mechanic's Lien
- ☐ Name Change
- ☐ Pistol Permit Revocation Hearing
- ☐ Sale or Finance of Religious/Not-for-Profit Property
- ☐ Other:_____
  (specify)

## COMMERCIAL
- ☐ Business Entity (including corporations, partnerships, LLCs, etc.)
- ☐ Contract
- ☐ Insurance (where insurer is a party, except arbitration)
- ☐ UCC (including sales, negotiable instruments)
- ☐ Other Commercial:_____
  (specify)

  **NOTE:** For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the **COMMERCIAL DIV RJI Addendum.**

## REAL PROPERTY   How many properties does the application include?
- ☐ Condemnation
- ☐ Mortgage Foreclosure (specify):    ☐ Residential   ☐ Commercial

  Property Address:_____
  Street Address          City          State      Zip

  **NOTE:** For Mortgage Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the **FORECLOSURE RJI Addendum.**
- ☐ Tax Certiorari - Section: _____ Block: _____ Lot: _____
- ☐ Tax Foreclosure
- ☐ Other Real Property:_____
  (specify)

## SPECIAL PROCEEDINGS
- ◉ CPLR Article 75 (Arbitration)   [see **NOTE** under Commercial]
- ☐ CPLR Article 78 (Body or Officer)
- ☐ Election Law
- ☐ MHL Article 9.60 (Kendra's Law)
- ☐ MHL Article 10 (Sex Offender Confinement-Initial)
- ☐ MHL Article 10 (Sex Offender Confinement-Review)
- ☐ MHL Article 81 (Guardianship)
- ☐ Other Mental Hygiene:_____
  (specify)
- ☐ Other Special Proceeding:_____
  (specify)

## STATUS OF ACTION OR PROCEEDING

|  | YES | NO |  |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ◉ | ☐ | If yes, date filed: 09/22/2017 _____ |
| Has a summons and complaint or summons w/notice been served? | ☐ | ◉ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ◉ | If yes, judgment date: _____ |

- ○ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice        Date Issue Joined: _____
- ○ Notice of Motion        Relief Sought: _____        Return Date: _____
- ◉ Notice of Petition        Relief Sought: Confirm/Reject Award or Report        Return Date: 11/17/2017
- ○ Order to Show Cause        Relief Sought: _____        Return Date: _____
- ○ Other Ex Parte Application        Relief Sought: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other  (specify): _____

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| Parties | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case.  For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N) | Insurance Carrier(s) |
|---|---|---|---|
| Glasswall, LLC<br>**Last Name**<br><br>**First Name**<br>Primary Role:<br>Petitioner<br>Secondary Role (if any): | Cinque            James<br>**Last Name**          **First Name**<br>Cinque & Cinque, P. C.<br>**Firm Name**<br>845 Third Avenue, Suite 1400     New York    New York    10022<br>**Street Address**        **City**      **State**      **Zip**<br>+1 (212) 759-5515    +1 (212) 759-7737    CINQUE845@aol.com<br>**Phone**          **Fax**        **e-mail** | ○ YES<br><br>◉ NO |  |
| **Last Name**<br>Monadnock Construction, Inx.<br>**First Name**<br>Primary Role:<br>Respondent<br>Secondary Role (if any): | Kleinhendler          Howard<br>**Last Name**          **First Name**<br>Wachtel Missry, LLC<br>**Firm Name**<br>885 Second Avenue       New York    New York    10017<br>**Street Address**        **City**      **State**      **Zip**<br>+1 (866) 526-2877    +1 (212) 371-0320    hkleinhendler@wmllp.com<br>**Phone**          **Fax**        **e-mail** | ○ YES<br><br>◉ NO |  |
| **Last Name**<br><br>**First Name**<br>Primary Role:<br><br>Secondary Role (if any): | **Last Name**          **First Name**<br><br>**Firm Name**<br><br>**Street Address**        **City**      **State**      **Zip**<br><br>**Phone**          **Fax**        **e-mail** | ○ YES<br><br>○ NO |  |
| **Last Name**<br><br>**First Name**<br>Primary Role:<br><br>Secondary Role (if any): | **Last Name**          **First Name**<br><br>**Firm Name**<br><br>**Street Address**        **City**      **State**      **Zip**<br><br>**Phone**          **Fax**        **e-mail** | ○ YES<br><br>○ NO |  |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.**

Dated: 09/22/2017        _____
                         SIGNATURE
1367168                  James P. Cinque
ATTORNEY REGISTRATION NUMBER        PRINT OR TYPE NAME

From: efile <efile@nycourts.gov>
To: CINQUE845 <CINQUE845@aol.com>; efile <efile@nycourts.gov>
Subject: NYSCEF Notification: New York - Special Proceedings - CPLR Article 75 - <PETITION> (Glasswall, LLC - v. - Monadnock Construction, Inc.)
Date: Fri, Sep 22, 2017 2:48 pm



# *New York County Supreme Court Notification 09/22/2017*

*Please retain this notification for your records.*

The NYSCEF web site has received documents from the filing user, **JAMES CINQUE** , for the following case/claim.

## Case Information
Index #: **Not Assigned**
Short Caption: **Glasswall, LLC - v. - Monadnock Construction, Inc.**
Assigned Case Judge: **No Judge Assigned**

## Filing User Information
User Name: **JAMES CINQUE**
Phone Number: **212-759-5515**
Fax Number: **212-759-7737**
Email Service Address: **CINQUE845@aol.com**
Work Address: **845 Third Avenue, Suite 1400, New York, NY, 10022**

## Documents Filed
*(To view a document, click the document type link)*

| Doc # | Document Type | Additional Doc Info | Special Instructions | Filed Date |
|---|---|---|---|---|
| 1 | PETITION | to Confirm Arbitration Award | | 09/22/2017 |
| 2 | EXHIBIT(S) | Two January 3, 2013 Contracts **Exhibit #: A** | | 09/22/2017 |
| 3 | EXHIBIT(S) | Respondent's Demand for Arbitration (with exhibits omitted) | | 09/22/2017 |

| | | Exhibit #: B | | |
|---|---|---|---|---|
| 4 | EXHIBIT(S) | August 29, 2017 Arbitration Award<br>Exhibit #: C | | 09/22/2017 |
| 5 | RJI -RE:<br>OTHER | Petition to Confirm Arbitration Award | | 09/22/2017 |

## E-mail Service Notifications Sent

| Name | Email Address |
|---|---|
| JAMES CINQUE | CINQUE845@aol.com |

## No E-mail Service Notifications Sent

Uniform Rules §§ 202.5-b and 202.5-bb require hard copy service upon opted-out and non-participating parties. NYSCEF has no record of opt out or participation recorded for the parties listed below.

| Party Name | Role |
|---|---|
| Monadnock Construction, Inc. | Defendant/Respondent |

*THIS E-MAIL IS INTENDED ONLY FOR THE USE OF THE NAMED ADDRESSEE(S) AND FOR THE PURPOSES OF THE NEW YORK STATE COURTS ELECTRONIC FILING SYSTEM. IF YOU ARE NEITHER THE INTENDED RECIPIENT NOR A PERSON DESIGNATED TO RECEIVE MESSAGES ON BEHALF OF THE INTENDED RECIPIENT, PLEASE NOTIFY THE SENDER IMMEDIATELY. THANK YOU.*



**Hon. Milton A. Tingling , New York County Clerk and Clerk of the Supreme Court**

**Phone:** 646-386-5956   **Website:** http://www.nycourts.gov/courts/1jd/supctmanh /county_clerk_operations.shtml

 

# NYSCEF - New York County Supreme Court
# Confirmation Notice

This is an automated response for Supreme Court / Court of Claims cases.  The NYSCEF site has received your electronically filed document(s) for:

**Glasswall, LLC - v. - Monadnock Construction, Inc.**

**Index Number NOT assigned**

**Assigned Judge: None Recorded**

## Documents Received on  09/22/2017 02:48 PM

| Doc # | Document Type | Motion # |
|---|---|---|
| 1 | PETITION | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 2 | EXHIBIT(S) A | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 3 | EXHIBIT(S) B | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 4 | EXHIBIT(S) C | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |
| 5 | RJI -RE: OTHER | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |

## Filing User

| Name: | **JAMES P CINQUE** | | |
|---|---|---|---|
| Phone #: | **212-759-5515** | E-mail Address: | **CINQUE845@aol.com** |
| Fax #: | **212-759-7737** | Work Address: | **845 Third Avenue** |
| | | | **Suite 1400** |
| | | | **New York, NY 10022** |

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 09/22/2017 02:48 PM :

**CINQUE, JAMES P - CINQUE845@aol.com**

---

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
Phone: 646-386-5956     Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

**NYSCEF Resource Center - EFile@nycourts.gov**
**Phone: (646) 386-3033     Fax: (212) 401-9146     Website: www.nycourts.gov/efile**



# NYSCEF - New York County Supreme Court
## Confirmation Notice

**Glasswall, LLC - v. - Monadnock Construction, Inc.**

**Index Number NOT assigned**

**Assigned Judge: None Recorded**

**NOTE: If submitting a working copy of this filing to the court, you must include
as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
Phone: 646-386-5956      Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

**NYSCEF Resource Center - EFile@nycourts.gov**
**Phone: (646) 386-3033     Fax: (212) 401-9146     Website: www.nycourts.gov/efile**

Page 2 of 2



# NYSCEF - New York County Supreme Court
# Confirmation Notice



This is an automated response for Supreme Court / Court of Claims cases.  The NYSCEF site has received your electronically filed document(s) for:

### Glasswall, LLC - v. - Monadnock Construction, Inc.

### Index Number NOT assigned

### Assigned Judge: None Recorded

## Documents Received on  09/22/2017 04:55 PM

| Doc # | Document Type | Motion # |
|-------|---------------|----------|
| 1 | PETITION | |
| | Does not contain an SSN or CPI as defined in 202.5(e) or 206.5(e) | |

## Filing User

| | | | |
|---|---|---|---|
| Name: | **JAMES P CINQUE** | | |
| Phone #: | **212-759-5515** | E-mail Address: | **CINQUE845@aol.com** |
| Fax #: | **212-759-7737** | Work Address: | **845 Third Avenue** |
| | | | **Suite 1400** |
| | | | **New York, NY 10022** |

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 09/22/2017 04:55 PM :

**CINQUE, JAMES P - CINQUE845@aol.com**

**NOTE: If submitting a working copy of this filing to the court, you must include as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

---

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
Phone: 646-386-5956     Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

---

**NYSCEF Resource Center -  EFile@nycourts.gov**
**Phone: (646) 386-3033     Fax: (212) 401-9146     Website: www.nycourts.gov/efile**

**From:** efile <efile@nycourts.gov>
**To:** CINQUE845 <CINQUE845@aol.com>; efile <efile@nycourts.gov>
**Subject:** NYSCEF Notification: New York - Special Proceedings - CPLR Article 75 - <PETITION> (Glasswall, LLC - v. - Monadnock Construction, Inc.)
**Date:** Fri, Sep 22, 2017 4:55 pm



# *New York County Supreme Court Notification 09/22/2017*

*Please retain this notification for your records.*

The NYSCEF web site has received 1 or more corrected documents from the filing user, **JAMES CINQUE** , for the following case/claim.

## Case Information

Index #: **Not Assigned**
Short Caption: **Glasswall, LLC - v. - Monadnock Construction, Inc.**
Assigned Case Judge: **No Judge Assigned**

---

## Filing User Information

User Name: **JAMES CINQUE**
Phone Number: **212-759-5515**
Fax Number: **212-759-7737**
Email Service Address: **CINQUE845@aol.com**
Work Address: **845 Third Avenue, Suite 1400, New York, NY, 10022**

---

## Documents Filed

*(To view a document, click the document type link)*

| Doc # | Document Type | Additional Doc Info | Special Instructions | Filed Date |
|-------|---------------|---------------------|----------------------|------------|
| 1 | PETITION  *Corrected* | to Confirm Arbitration Award | | 09/22/2017 |

---

## E-mail Service Notifications Sent

| Name | Email Address |
|------|---------------|
| JAMES CINQUE | CINQUE845@aol.com |

**No E-mail Service Notifications Sent**

Uniform Rules §§ 202.5-b and 202.5-bb require hard copy service upon opted-out and non-participating parties. NYSCEF has no record of opt out or participation recorded for the parties listed below.

| Party Name | Role |
|------------|------|
| Monadnock Construction, Inc. | Defendant/Respondent |

*THIS E-MAIL IS INTENDED ONLY FOR THE USE OF THE NAMED ADDRESSEE(S) AND FOR THE PURPOSES OF THE NEW YORK STATE COURTS ELECTRONIC FILING SYSTEM. IF YOU ARE NEITHER THE INTENDED RECIPIENT NOR A PERSON DESIGNATED TO RECEIVE MESSAGES ON BEHALF OF THE INTENDED RECIPIENT, PLEASE NOTIFY THE SENDER IMMEDIATELY. THANK YOU.*

 **Hon. Milton A. Tingling , New York County Clerk and Clerk of the Supreme Court**

**Phone:** 646-386-5956    **Website:** http://www.nycourts.gov/courts/1jd/supctmanh /county_clerk_operations.shtml