UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MONADNOCK CONSTRUCTION, INC.,

                                        Plaintiff,

          -against-

WESTCHESTER FIRE INSURANCE

COMPANY,                                                    Case No.: 16 CIV 00420 (JBW)
                                                            ECF Case
                                        Defendant.

-------------------------------------------------------------X

WESTCHESTER FIRE INSURANCE

COMPANY,

                                Third-Party Plaintiff,

          -against-


GLASSWALL, LLC, UGO COLOMBO, and

SARA JAYNE KENNEDY COLOMBO,

                                Third-Party Defendants.

-------------------------------------------------------------X


**MEMORANDUM OF LAW BY MONADNOCK CONSTRUCTION, INC.
IN OPPOSITION TO MOTION BY THIRD-PARTY
DEFENDANT GLASSWALL, LLC TO DISMISS THE AMENDED COMPLAINT**


                                        WACHTEL MISSRY LLP
                                        885 Second Avenue
                                        New York, NY 10017
                                        (212) 909-9500

**Table of Contents**

**Table of Authorities** .................................................................................................(ii)

**Preliminary Statement** ................................................................................................1

**Factual Background** ....................................................................................................2

    The Project .................................................................................................................2

    The Contracts .............................................................................................................3

    Glasswall's Delays Begin ..........................................................................................4

    Glasswall Fails to Timely Provide Engineering Releases ........................................6

    Glasswall Chose to Work on Four Other Large Projects Instead of Hunter's Point ...............6

    Glasswall Defaults .....................................................................................................7

    Monadnock Obtains TCOs .......................................................................................14

    Arbitration ................................................................................................................15

    Procedural History ...................................................................................................16

**Argument** ..................................................................................................................17

    A.  Standard of Review ..........................................................................................17

    B.  Monadnock's Claims Against WFIC Are Valid ..............................................18

         i.  WFIC Is Bound By The Arbitration Award ................................18
        ii.  UCC Article 2 Is Irrelevant ......................................................21
       iii.  Monadnock Suffered Damages .................................................22

    C.  Monadnock Can Pursue Fraudulent Conveyance Claims
        Under Fed. R. Civ. P. 14 ..................................................................................23

    D.  The Fraudulent Conveyance Claims Were
        Not Subsumed in the Arbitration Nor
        Are They Subject to a New Arbitration Proceeding ..........................................24

    E.  This Court Should Not Abstain from The
        Fraudulent Conveyance Claims ........................................................................24

    F.  Glasswall's Instant Motion to Dismiss Should be Denied as Successive. .......26

**Conclusion** ................................................................................................................27

## Table of Authorities

**Cases**

Allen ex rel. Allen v. Devine,
   726 F. Supp. 2d 240 (E.D.N.Y. 2010) ................................................... 26

Ass'n Technostroyexport v. Intl. Dev. and Trade Services, Inc.,
   295 F. Supp. 2d 366 (S.D.N.Y. 2003) ................................................... 24

Bernstein v. Seeman,
   601 F. Supp. 2d 555 (S.D.N.Y. 2009) ................................................... 17

Chambers v. Time Warner, Inc.,
   282 F.3d 147 (2d Cir. 2002) ................................................................ 17

Corps, Inc. v. Meyers,
   442 F.3d 101 (2d Cir. 2006) ................................................................ 21

Fid. and Deposit Co. of Maryland v. Parsons & Whittemore Contractors Corp.,
   397 N.E.2d 380 (N.Y. 1979) .......................................................... 18, 19

Liberty Mut. Ins. Co. v. Fairbanks Co.,
   17 F. Supp. 3d 385 (S.D.N.Y. 2014) ..................................................... 24

Lopez-Serrano v. Rockmore,
   132 F. Supp. 3d 390 (E.D.N.Y. 2015) .................................................. 17

Mathis v. United Homes, LLC,
   607 F. Supp. 2d 411 (E.D.N.Y. 2009) .................................................. 17

McLennon v. City of New York,
   171 F. Supp. 3d 69 (E.D.N.Y. 2016) ..................................................... 3

Orlander v. Staples, Inc.,
   802 F.3d 289 (2d Cir. 2015) ................................................................ 21

QDR Consultants & Dev. Corp. v. Colonia Ins. Co.,
   675 N.Y.S.2d 117 (N.Y. App. Div. 2d Dept. 1998) ............................... 20

Revere Copper & Brass Inc. v. Aetna Cas. & Sur. Co.,
   426 F.2d 709 (5th Cir. 1970) .............................................................. 23

Schenectady Steel Co., Inc. v. Bruno Trimpoli Gen. Const. Co., Inc.,
   350 N.Y.S.2d 920 (N.Y. App. Div. 3d Dept. 1974) ............................... 22

St. Anne-Nackawic Pulp Co., Ltd. v. Research-Cottrell, Inc.,
   788 F. Supp. 729 (S.D.N.Y. 1992) ....................................................... 22

Villager Pond, Inc. v. Town of Darien,
   56 F.3d 375 (2d Cir. 1995) ................................................................. 17

**Rules**

Fed. R. Civ. P. 12 ...................................................................................... 26
Fed. R. Civ. P. 14 ...................................................................................... 23

**Other Authorities**

Unif.Commercial Code § 2-308 ........................................................... 21, 22

## PRELIMINARY STATEMENT

Third-party defendant, Glasswall, LLC ("Glasswall"), stipulated to confirm the award which resulted from its arbitration against plaintiff, Monadnock Construction, Inc. ("Monadnock").  Instead of paying Monadnock the $1.5 million it admittedly owes pursuant to the award, Glasswall has commenced an abusive litigation campaign, filing multiple motions to dismiss, to frustrate and delay Monadnock's ability to collect. Glasswall prefers to squander its remaining limited assets on never-ending motion practice rather than satisfy its debts.

Specifically, in its second motion to dismiss, Glasswall has assumed the untenable position that it can relitigate issues properly determined in arbitration by asserting them in its instant motion to dismiss. Only, this time, Glasswall attempts to relitigate these issues under the pretext that they are "defenses" belonging defendant, Westchester Fire Insurance Company ("WFIC"). Procedurally, Glasswall cannot do this. Glasswall cannot circumvent the collateral estoppel effect of the arbitration award by asserting defenses that were raised in arbitration and belong to a separate party that is also bound by the award. Glasswall's argument also substantively fails. Glasswall contends that WFIC's liability to Monadnock under certain bonds it underwrote is entirely excused by the arbitrators' dictum determination that, in 2013, Monadnock should have accepted a certain limited number of egregiously late windows from Glasswall. However, the "Owner Default" language in the bonds, upon which Glasswall relies, only applies to a "material" breach of the contracts that has "not been remedied."

First, the limited number of windows at issue here - a few floors out of 69 floors that were already overdue - could hardly be deemed "material." Second, there is no dispute that beginning in April 2014, after the parties here executed a settlement or "amendment" agreement, Monadnock began accepting all windows that Glasswall had fabricated, thereby remedying any conceivable

breach. Thus, there was no "Owner Default" under the bonds that impacts Monadnock's ability to collect from WFIC. Separately, the $1.5 million awarded in the arbitration is for a discrete set of damages resulting from Glasswall's deficient performance in providing defective windows, and is unrelated to the arbitrators' 2013 finding concerning delay.

Glasswall's remaining arguments that Monadnock's fraudulent conveyance claims are or were subject to arbitration, and that this Court should abstain from jurisdiction in favor of proceedings before a Florida state court, are similarly meritless. It is well settled that efforts to collect on an arbitration award are proceedings not subject to arbitration. Furthermore, the Florida court has mooted the abstention issue by issuing two orders staying all proceedings in favor of this case going forward.  The motion should be denied.

### FACTUAL BACKGROUND

#### The Project

The Hunter's Point development was a New York City affordable housing initiative for the construction of high-rise residential towers in Long Island City. (Am. Compl. 14.) This included: Parcel A, a 37-floor 619-unit residential unit building on 1-50 50th Avenue; and Parcel B, a 32-story 306-unit residential unit building at 1-55 Borden Avenue. Monadnock was part of the team that won the bid to construct the towers. (Am. Compl. 14.) A member of the project's architectural team recommended Glasswall as a potential curtain wall manufacturer and, after checking references, Glasswall was invited to bid the job in 2012. Glasswall submitted the winning bid. (Am. Compl. 14.)  The value of the two construction contracts was $13 million. (Am. Compl. 15.)

Westchester Insurance Company underwrote two performance and payment bonds[1] for Glasswall (collectively, the "Bonds"), one for each tower. (Am. Compl. 15.)

A curtain or window wall unit is a slab-to-slab structure that makes up the skin or envelope of the building and is comprised of metal frames, louvers, hardware, glass and gaskets. (Am. Compl. 15.) Between the two buildings, Glasswall committed to provide over 9,000 window wall units consisting of several hundred different designs and multiple colors of glass. (Am. Compl. 15.) Window wall is a long lead time item and is critical to the timely completion of the project. (Am. Compl. 15.)

**The Contracts**

Glasswall's obligations were set forth in a modified AIA Standard Form Agreement Between Contractor and Subcontractor (the "Contracts" or "Subcontracts"), executed in February 2013[2]. (Am. Compl. 16.)  Indeed, the form contract was Exhibit F to the Construction Agreement between the property owner and Monadnock, the construction manager (the "CM Agreement"). Parcel A and Parcel B had separate CM and subcontractor agreements, which were virtually identical. (Am. Compl. 16.) The ownership entities for both parcels were represented by the Related Companies, which was also an owner. (Am. Compl. 16.) The Contracts had a standard flow-down provision that permitted Monadnock to pursue claims against Glasswall on behalf of the owners. (Am. Compl. 16.) Under the CM Agreement baseline schedules, Parcel A was to have obtained its first temporary certificate of occupancy ("TCO") by August 2014, and Parcel B by July 2014. (Am. Compl. 16.)

---

[1] The Bonds are attached here as Exhibit A, to the Weinstein Decl.  Documents referred in the Amended Complaint may be considered on a motion to dismiss.  <u>McLennon v. City of New York</u>, 171 F. Supp. 3d 69, 89 (E.D.N.Y. 2016)

[2] The Subcontracts are attached as Exhibit B to the Weinstein Decl.

Under the Contracts the window wall units were to be completed and ready to ship by July 1, 2013 for Parcel B and September 1, 2013 for Parcel A. (Am. Compl. 17.) These dates were "time is of the essence." (Am. Compl. 17.)  Glasswall was required to have enough window units completed to accommodate installation as the concrete infrastructure of the two buildings was being erected. (Am. Compl. 17.) In fact, the Contracts required the "Manufacturer to be 6 floors below the Superstructure Contractor." (Am. Compl. 17.) Window units were to be shipped floor by floor with completed assemblies in correct position to allow for seamless installation. (Am. Compl. 17.) The pace of window deliveries was required to accommodate the installation of "two floors per week."  (Am. Compl. 17.)

This was a design build contract. (Am. Compl. 18.) Glasswall's obligation involved procuring materials and developing all engineering designs to construct a window wall unit that conformed to the shop drawings and plans provided by the projects' architect, Ismael Levya Architects, P.C. (Am. Compl. 18.) Specifically, to permit the metal fabricator to make the correct cuts and holes for each window wall unit, Glasswall was required to engineer "cut sheets" that conformed to the shop drawings. (Am. Compl. 18.) The cut sheets took time to prepare because of the intricate detail required for every window wall panel. (Am. Compl. 18.) This task was exacerbated by the hundreds of different window wall unit designs required for the project.  (Am. Compl. 18.)

**Glasswall's Delays Begin**

Construction of the two buildings began in February 2013. (Am. Compl. 19.)  By April 2013, the window wall visual mockups had been approved; the glass and paint colors had been selected; and Glasswall's glass supplier, AGC, was told to manufacture the glass for the performance mock up. (Am. Compl. 19.) On May 31, 2013, Monadnock sent Glasswall a weekly

floor-by-floor concrete erection schedule showing exactly when each floor of each building was to be poured to ensure that Glasswall would deliver a steady and interrupted supply of Halfen anchors that were required to be embedded in the concrete. (Am. Compl. 19.)

During a June conversation between Mr. Colapinto, Monadnock's Senior Vice President and project manager, and Frederico Balestrazzi, Glasswall's president, Mr. Balestrazzi stated that Glasswall was going to have problems meeting the Contracts' delivery dates. (Am. Compl. 20.) As a result, by email dated June 12, 2013, Monadnock agreed to take delivery of the Parcel B windows on September 16, and Parcel A windows on October 1. (Am. Compl. 20.)  Although Monadnock permitted Glasswall extra time to deliver the windows, Monadnock was ready to receive the windows under the original time frames set in the Contracts and to store them on site until they were ready for installation. (Am. Compl. 20.)

Mr. Colapinto stressed that the projects could not suffer additional delays, and Mr. Balestrazzi assured him there would not be any. (Am. Compl. 21.) But the delays continued. (Am. Compl. 21.) In early summer 2013, Monadnock visited Glasswall's factory in Florida and repeatedly asked about progress on the window fabrication. (Am. Compl. 21.) By July, there was still no progress with window fabrication and Glasswall informed Monadnock that windows would not be ready even for the new revised delivery dates. (Am. Compl. 21.) As explained by Mr. Colapinto, this continued delay alarmed Monadnock management: "[B]ecause scheduling was of utmost importance when it came to curtain walls. If we didn't know where the windows were, we couldn't build the project correctly." (Am. Compl. 21.)

## Glasswall Fails to Timely Provide Engineering Releases

The problems in window fabrication were originally driven by delays in Glasswall's engineering and release dates. (Am. Compl. 22.)   As Mr. Bauso, Monadnock's president, explained:

> The curtain wall guys have to – their engineering department has to produce very specific cut sheets as to how they want the metal, how they want the glass sized and fabricated. They can't just send the approved shop drawings from the architect to the metal factory. They have to give very, very specific engineered cut sheets to their fabricators. And, you know, it's one of the things we typically ask about, because, if that isn't done, we have good reason to believe that they are not going to be able to get us the windows when they are promising. So just as a matter of business, this is – this is one of the things we always focus on. And it was becoming apparent that their engineering department wasn't getting these materials released when they should have been.  (Tr. 1015-16.) (Am. Compl. 22.)

In early summer 2013, Mr. Bauso contacted Glasswall's metal extruder, Keymark, to determine whether it had received Glasswall's cut sheets and was working on the project. (Am. Compl. 23.) Keymark confirmed it had a purchase order from Glasswall, but did not yet have the cut sheets and engineering releases from Glasswall. (Am. Compl. 23.) Monadnock continued to question Mr. Balestrazzi about the delays in releasing engineering to Keymark, "and the answers he was giving made it obvious he wasn't going to make the dates he had previously committed to, even the revised dates he had previously committed to." (Am. Compl. 23.)   This prompted Monadnock, on August 12, 2013, to write WFIC and alert it to a potential default by Glasswall. (Am. Compl. 22.)

## Glasswall Chose to Work on Four Other Large Projects Instead of Hunter's Point

On August 13, 2013, Mr. Bauso and Michael Trovini, a senior Related Companies executive, met with Glasswall officials at Glasswall's Miami facility. (Am. Compl. 24.) During the visit, Mr. Trovini observed that Glasswall was not working on the Hunter's Point project and instead was devoting its staff and resources to other projects. (Am. Compl. 24.)

Indeed, between January and September 2013 when Glasswall was supposed to be working on the Hunter's Point project, it was working on at least four other Florida curtain wall projects: 1) the Monte Carlo Hotel, a 20-story high rise; 2) Edition Hotel, a hotel and residential condominium; 3) Perry Rooney Hotel a hotel condo project; and 4) Oceana, a condo residence. These projects were all approximately 80-90 percent complete by September 2013 and were staffed by 80 Glasswall employees. (Am. Compl. 25.)

As Mr. Bauso recalls, by the time of the August 13th meeting, Ugo Colombo, Glasswall's owner, had fired Mr. Balestrazzi.  Mr. Balestrazzi's departure spurred the departure of many other Glasswall engineers, leaving the company disorganized and even less able to meet its already compromised contractual commitments to Monadnock. (Am. Compl. 26.) Nevertheless, Monadnock agreed to attempt to continue to work with Glasswall to get the project back on track. (Am. Compl. 26.)

By letter dated August 16, 2013, Glasswall's attorney, Clinton Flagg, wrote to Monadnock confirming that "Glasswall will expedite production and delivery of the completed window assemblies forthwith such that Glasswall can comply with its contractual obligations with Monadnock."  (Am. Compl. 27.)  But by early September, matters had not improved. Glasswall had no windows ready to ship. (Tr. 2013.) Yet at this point, as Mr. Bauso explained:

> [B]y September we had already paid them several million dollars for engineering, for performance mockups, the material deposits they requested – and we paid deposits to their material suppliers, which we paid to Glasswall, not directly to suppliers. So just keep in mind at this point we were out of pocket several million dollars, and things were not moving along very well. And it was a growing concern as to where this was all going. (Tr. 1033-34.) (Am. Compl. 27.)

**Glasswall Defaults**

By letter dated September 16, 2013, Monadnock issued a default notice to Glasswall. (Am. Compl. 28.) Notice was also provided to WFIC. (Am. Compl. 28.) The parties met in New York

on September 18, 2013 to try to resolve the situation. (Am. Compl. 28.) Glasswall had just hired John Anderson to replace Mr. Balestrazzi and promised to expedite its manufacture of windows. (Am. Compl. 28.)

However, Glasswall could not satisfy Monadnock's ongoing concerns about its ability to timely manufacture the window wall units. (Am. Compl. 29.) Specifically, in October 2013, Monadnock had sent its own consultant, Steve Barber, to Glasswall's facilities to monitor the window production progress. (Am. Compl. 29.) Barber's reports were disturbing. (Am. Compl. 29.)

Barber's detailed reports reflected that Glasswall did not have sufficient staff manning the construction lines and that they were not in a position to meet their own revised recovery schedules. (Am. Compl. 30.) Barber further confirmed that Glasswall was struggling to complete the engineering releases necessary for Keymark and Glasswall's glass supplier, AGC, to produce the glass and metal frames. (Am. Compl. 30.) Indeed, Barber further observed that even the work Glasswall reported to Monadnock as completed was in fact unfinished.  (Am. Compl. 30.)

Glasswall's continued delays in manufacturing the window wall units prompted Monadnock to send another default notice on October 23, 2013. (Am. Compl. 31.) WFIC was again noticed. (Am. Compl. 31.)

The parties met again in mid-November in New York. (Am. Compl. 32.)  By then, Glasswall claimed to have window wall units for five floors ready to ship and was demanding payment before shipment. (Am. Compl. 32.) The units that Glasswall was purportedly ready to ship were not complete floors, but instead were merely incomplete sections of each floor. (Am. Compl. 32.) Additionally, the units had deficiencies identified by IBA in a 10-page report. As Mr. Bauso explained:

John had some quantity of widows that he was purporting were ready for shipment. But there were still a number of open issues. There was still quality control issues that had not been addressed ... There was still an issue in my mind of what is really our ongoing schedule here, about all the material that they needed to continue assembly was in their shop.  There was some concern. "Okay. We are going to take a couple of trucks of windows, mobilize all iron workers.  And then what happens? You know, are they going to really have material to continue working?"  This was a critical question. (Tr. 1047.) (Am. Compl. 32.)

Mr. Bauso further explained that Monadnock could not take and install a handful of floors of windows and then look elsewhere should Glasswall fail to complete the Contract:

[I]f we started installing two or three floors of windows, and their factory was not able to complete this we – you would not be able to find another factory that could manufacture that exact window. So essentially, you'd have to tear out and start all over again whatever you installed.  (Tr. 1053.)  (Am. Compl. 33.)

Accordingly, on November 27, 2013, the project architect, Ismael Levya, stated that sufficient cause existed to terminate the Glasswall Contract. (Am. Compl. 34.)  Monadnock sent another default letter on December 31, 2013. (Am. Compl. 34.)  WFIC was notified. (Am. Compl. 34.)  At that point, the concrete infrastructures of both towers were complete and not a single window wall unit hfad been delivered to the site.  (Am. Compl. 34.)

The parties continued to talk, but to no avail. (Am. Compl. 35.) Glasswall did not deliver any units. (Am. Compl. 35.)  On January 13, 2014, Monadnock terminated Glasswall's Contract. Monadnock kept a skeleton crew on the job site to avoid a shutdown by the NYC Department of Buildings but very little work could be accomplished without the weatherproofing provided by the window wall units. (Am. Compl. 35.)

On February 24, 2014, WFIC sued Glasswall, its owner Ugo Colombo, and Ugo's wife, Sara Jayne Kennedy Colombo in the Southern District of New York, seeking the immediate payment of $13 million under their indemnity of the Bonds. (Am. Compl. 36.)

Also on January 13, 2014, Monadnock provided WFIC with the required Section 3.2 notice under the Bonds and demanded that WFIC take action pursuant to Section 5 of the Bonds which required WFIC to, inter alia, "promptly": takeover the Contracts (with Monadnock's consent) and arrange for Glasswall to complete them (Section 5.1); takeover the Contracts (without Monadnock's consent) and complete them itself or through other independent contractors (Section 5.2); arrange for a bonded completion contractor to contract with Monadnock to complete the work and pay for it, along with Section 7 damages (Section 5.3); or, choose between paying Monadnock the amount owed under the Bonds or denying liability (Section 5.4). (Am. Compl. 37.)

WFIC refused to take any Section 5 action whatsoever and thereby breached the contractual terms of the Bonds. (Am. Compl. 38.)

WFIC's denial of Monadnock's Bond claim constituted an act of bad faith. All of the reasons given by WFIC for denial of Monadnock's Bond claim were patently false and WFIC knew them to be false. (Am. Compl. 39.)

Rather than conduct an independent investigation of Monadnock's Bond claim, as it was required to do under the terms of the Bonds, WFIC simply parroted the position of Glasswall's attorneys. (Am. Compl. 40.)

On March 6, 2014, Monadnock sent WFIC a 7-day notice under Section 6 of the Bonds demanding that WFIC "perform its obligations" under the Bonds and chose a Section 5 course of action. (Am. Compl. 41.) Again, WFIC refused to take any Section 5 action whatsoever and thereby breached the contractual terms of the Bonds. (Am. Compl. 42.)

Ultimately, on April 4, 2014, in an effort to mitigate damages, and without any waiver of its rights, Monadnock entered into an Agreement to Amend Contracts ("Amendment Agreement") with Glasswall, WFIC, HPS and the indemnitors on the Bonds, Ugo Colombo and Sara Jayne

Colombo Kennedy (the "Indemnitors") that provided for the completion of the Contracts by Glasswall. (Am. Compl. 43.) In addition, unbeknownst to Monadnock at the time, WFIC entered into a side agreement ("Side Agreement") with Glasswall to increase its Contracts' prices by 7.5%. (Am. Compl. 43.)

The Amendment Agreement permitted Glasswall to complete the Contracts but preserved all parties' claims that had accrued to date, including Monadnock's claims against Glasswall and Monadnock's claims against WFIC, and deferred them until the earlier of the completion of the Contracts or termination thereof. (Am. Compl. 44.)

The Amendment Agreement provided, inter alia, that Monadnock would withdraw Glasswall's termination without prejudice and without waiver of any rights and Glasswall would complete the Contracts' work for the projects according to an April 4, 2014 production schedule and "deliver Competed Windows Units on a continuous basis to the project as expeditiously as possible consistent with the Production Schedules". (Am. Compl. 45.) The production schedules required production to be completed by October 28, 2014. (Am. Compl. 45.)

The original Contracts required Glasswall to complete its work so that the projects could be completed by "4th quarter of 2014 to 1st quarter of 2015" for Parcel A (Rider 5, ¶44c) and "3rd quarter of 2014" for Parcel B (Rider 5, ¶43c). (Am. Compl. 46.) The Amendment Agreement further required Glasswall to deliver completed windows "on a continuous basis to the Project as expeditiously as possible consistent with the Production Schedules" (Amendment Agreement, ¶6. (Am. Compl. 46.)

The Amendment Agreement also provided that WFIC would pay Glasswall for all materials it produced at its Miami facilities and Monadnock would pay WFIC for all materials it received at the projects. (Am. Compl. 47.) All claims among the parties that had accrued through

the date of the Amendment Agreement were preserved and deferred pending the completion of the Contracts or the earlier termination thereof. (Am. Compl. 47.)

Neither the Amendment Agreement nor the Side Agreement were permitted Section 5 choices under the Bonds and did not satisfy WFIC's obligations to undertake a Section 5 choice; thus WFIC's default under the Bonds continued. (Am. Compl. 48.) In any event, the Amendment Agreement explicitly preserved and reserved Monadnock's Bond claims that had accrued to the date of the Amendment Agreement. (Am. Compl. 49.)

For the next few months, Glasswall continued to refuse to ship any Windows to the projects. Moreover, WFIC continued to refuse to take action under Section 5 of the Bonds. (Am. Compl. 50.) By October 28, 2014, Glasswall had neither completed production of the materials nor delivered all the materials it had produced. (Am. Compl. 51.) Instead, Glasswall first slowed down its shipment of materials to the projects and then stopped the deliveries completely, even though it had many truckloads of Windows at its facilities ready for shipment. (Am. Compl. 51.) Glasswall explained that it would not continue shipment of completed materials or production of new materials until it was paid in advance by WFIC the entire balance of each of the contracts. (Am. Compl. 51.) Glasswall also demanded that Monadnock pay WFIC in advance for Glasswall's remaining materials, even though the materials had neither been produced nor delivered to the projects. (Am. Compl. 52.)

WFIC recognized that Glasswall's position that it would not ship completed materials to the projects unless Monadnock pre-paid WFIC for delivery was contrary to the Amendment Agreement. (Am. Compl. 53.) In fact, WFIC's attorneys prepared litigation papers acknowledging and confirming that Glasswall's demand was contrary to the Amendment Agreement and created a potentially "disastrous condition". (Am. Compl. 53.) Nevertheless, on November 11, 2014,

WFIC pre-paid Glasswall the entire balances on each of the Contracts and an extra 7.5% pursuant to the Side Agreement. (Am. Compl. 54.)

At WFIC's urging, on November 25, 2014, Monadnock sent WFIC checks totaling $1,979,309 representing the entire Contracts' balances for the undelivered materials but specifically reserved all of its rights to assert any "backcharge, change order or similar reduction" for a later date. (Am. Compl. 55.)

Thereafter, Glasswall re-commenced delivery of Windows and other materials to Parcels A and B but never completed its work. (Am. Compl. 56.) The reason became apparent to all concerned when Monadnock discovered that, on or about January 13, 2015, Glasswall had sold all of its assets, including its Miami manufacturing facility, to one of its competitors, Tecnoglass, Inc. ("Tecnoglass"). (Am. Compl. 56.)

In addition, Monadnock has and discovered and is continuing to discover and uncover QA/QC issues on a continuous basis, including leaking window units. (Am. Compl. 57.) With the sale of Glasswall and its Miami manufacturing facility to Tecnoglass, Glasswall was unresponsive to any of Monadnock's requests to complete the work or correct defects. (Am. Compl. 57.) Monadnock also discovered that Glasswall had not paid several of its suppliers, one of which liened Parcel A. (Am. Compl. 58.)

Finally, on March 4, 2015, four months after Glasswall was required to complete its work as per the Amendment Agreement, Monadnock served a Notice of Default on Glasswall detailing 30 different defaults and affording Glasswall a seven (7) day cure period. (Am. Compl. 59.) Monadnock also served a copy of the Notice on WFIC. (Am. Compl. 59.)

Glasswall failed to cure any of the listed defaults and continued to breach the Contracts for reasons including, but not limited to, the following:

(a) Glasswall did not complete its Work;
(b) Glasswall did not correct defective Work;
(c) Glasswall did not provide documentation required under the Agreements including but not limited to warranties, LEED documentation, material certifications, and final lien waivers by Glasswall and its suppliers;
(d) Glasswall delayed in performance of its Work thereby causing delays and increased costs to other contractors whom Monadnock has reimbursed;
(e) Glasswall delayed in performance of its Work thereby causing delays and increased costs to Monadnock;
(e) Glasswall failed to pay all its suppliers for materials used to fabricate the Work and for shipment of same to the Projects; and
(f) Glasswall ceased operations and was not able to fulfill its warranty obligations.
(Am. Compl. 60.)

After the expiration of the cure period, and upon certification of sufficient cause from the architect, Monadnock terminated Glasswall on March 16, 2015. (Am. Compl. 61.)  Also on March 16, 2015, Monadnock provided WFIC with the required Section 3.2 notice under the Bonds and demanded that WFIC take action pursuant to Section 5 of the Bonds.  (Am. Compl. 62.)

On April 20, 2015, Monadnock sent WFIC a 7-day notice under Section 6 of the Bonds demanding that WFIC "perform its obligations" under the Bonds and chose a Section 5 course of action. (Am. Compl. 63.)

On April 25, 2015, WFIC, through its counsel, denied Monadnock's Bond claim stating, inter alia, that: (a) Monadnock's payment in full of the entire Contracts price to WFIC constituted a waiver of its right to assert claims; (b) Monadnock's termination of Glasswall was based, in part, on events occurring prior to the Amendment Agreement and the parties had agreed that those claims could not constitute the basis of a later termination; and (c) Glasswall had substantially completed the Contracts and thus could not be terminated. (Am. Compl. 64.)

**Monadnock Obtains TCOs**

Monadnock obtained the first TCO for groups of floors in Parcel A on July 8, 2015, 11 months later than the original baseline schedule. (Am. Compl. 65.) The first TCO for Parcel B was

obtained on July 22, 2015, 12 months later than the baseline schedule. (Am. Compl. 65.) Subsequent TCOs were obtained for the upper floors of each building. (Am. Compl. 65.) The project architect certified both Parcels as substantially completed on November 30, 2015. (Am. Compl. 65) The owners accepted the completed buildings from Monadnock on December 3, 2015 with the exception for any disputes or claims related to Glasswall. (Am. Compl. 65.)

**Arbitration**

Section 6.3 of the Contracts provided for, among other things, arbitration of disputes between the parties. (Am. Compl. 66.) Section 6.3.6 provides:

> This agreement to arbitrate. . . shall be specifically enforceable under applicable law in any court having jurisdiction thereof.  The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.  (Am. Compl. 66.)

Because of Glasswall's late and defective performance of the Contracts, on March 4, 2015, Monadnock commenced an arbitration (the "Arbitration") under the auspices of the American Arbitration Association (the "AAA") in New York, New York, by filing a demand (the "Demand") seeking, among other things an award of its delay damages and damages because of Glasswall's defective performance.  (Am. Compl. 67.)

After nine days of hearings, beginning November 14, 2016 and ending February 28, 2017, and Monadnock's and Glasswall's submissions of post-hearing briefs, the panel issued an award (the "Award").  (Am. Compl. 69.)

The Award ordered Glasswall to pay Monadnock $1,499,255.18 plus 5% interest per annum in "Performance Damages".  (Am. Compl. 70.)

The AAA provided a copy of the Award to the parties on August 30, 2017. (Am. Compl. 71.)

**Procedural History**

Monadnock commenced this action against WFIC in New York State Supreme Court on December 22, 2015, which WFIC removed to this Court on January 26, 2016. [Dkt. 1.] WFIC filed a motion to dismiss, which was denied and the case was stayed pending resolution of the Glasswall arbitration. [Dkt. 30.] On September 12, 2017, WFIC filed a third-party summons and complaint (the "Third-Party Complaint") in the instant action against Glasswall, Ugo Colombo and Sara Jayne Kennedy Colombo (collectively, "Third-Party Defendants"), seeking, among other things, a declaration that Third-Party Defendants are required to indemnify WFIC for any liability it may incur as a result of having executed the Bonds. [Dkt. 42.]

On September 19, 2017, the Court issued an order requiring Monadnock to amend its complaint and file its application to confirm the Award by October 3, 2017. [Dkt. 44.]

On September 22, 2017, Glasswall filed a petition to confirm the Award in New York State Supreme Court, New York County, thereby conceding liability under the Award. [Dkt. 51.]   On October 3, 2017, Monadnock filed an amended complaint (the "Amended Complaint") and also filed a motion to confirm the arbitration award. [Dkt. 51.] On October 6, 2017, rather than oppose Monadnock's motion to confirm, Glasswall filed a cross-motion to dismiss the confirmation under the first-filed rule arguing that confirmation of the Award should be handled in state court. [Dkt. 53.] Glasswall's cross-motion to dismiss did not contain any defenses to the Amended Complaint such as WFIC's liability under the Bonds, Monadnock's damages, Glasswall's liability for fraudulent conveyance, or abstention in favor of proceedings in Florida court. [Dkt. 53.] On October 17, 2017, WFIC answered the Amended Complaint. [Dkt. 61.]

On November 14, 2017, Glasswall and Monadnock stipulated to confirming the Award in this Court, and the Court accordingly found Glasswall's first motion to dismiss to be moot. [Dkt. 71, 72.] The New York action was withdrawn.

WFIC has filed a motion for a preliminary injunction against Ugo and Jane Colombo seeking indemnification and collateral under the Bonds. [Dkt. 55.]

On November 30, 2017, Glasswall filed the instant second motion to dismiss, asserting defenses that were available to it at the time it filed the cross-motion to dismiss the confirmation proceeding. [Dkt. 83.]

## ARGUMENT

### A.    Standard of Review.

In reviewing a motion to dismiss, courts construe the complaint liberally, accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. See, e.g., Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). "[T]he issue is not whether a [] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Mathis v. United Homes, LLC, 607 F. Supp. 2d 411, 418 (E.D.N.Y. 2009) (quoting Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995)). "[C]laims for breach of contract . . . are not subject to a heightened pleading standard, and a motion to dismiss is not the proper stage at which to resolve factual disputes." Bernstein v. Seeman, 601 F. Supp. 2d 555, 556 (S.D.N.Y. 2009).

Facts outside the pleadings may not be considered on a motion to dismiss. Lopez-Serrano v. Rockmore, 132 F. Supp. 3d 390, 399 (E.D.N.Y. 2015)("a court considering a ...motion to dismiss ...may not consult evidence outside the pleadings.")

**B. Monadnock's Claims Against WFIC Are Valid.**

    **i.     WFIC Is Bound By The Arbitration Award.**

Section 1 of the Bonds states:

> The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, <u>which is incorporated by reference herein.</u>

(emphasis added). The "Contractor" is defined on the first page of the Bonds as Glasswall; the "Surety" is WFIC; and the "Owner" is Monadnock.  The "Construction Contract" refers to the Subcontracts between Glasswall and Monadnock.  Therefore, WFIC is bound by the Subcontracts, including their arbitration provisions.

WFIC chose not to participate in the arbitration, even though it was aware of the proceedings.  Indeed, this Court stayed this case for nearly a year, awaiting the result of the arbitration. However, by incorporating the Subcontracts into the Bonds, WFIC bound itself to the conclusion of the arbitrators. This is precisely the conclusion reached by the New York Court of Appeals in <u>Fid. and Deposit Co. of Maryland v. Parsons & Whittemore Contractors Corp.</u>, 397 N.E.2d 380, 421 (N.Y. 1979).

In <u>Fid. and Deposit Co. of Maryland</u>, the court found that although the surety that issued a performance bond did not agree to participate in the arbitration between the general contractor and the subcontractor, it was bound by the arbitrators' ruling because it had incorporated the subcontract, which contained a broad arbitration clause, into the bond:

> Although it did not agree to participate in any arbitration, it did accept the agreement of the general contractor and the subcontractor that disputes between them would be settled by arbitration.  An implicit corollary of that acceptance was agreement by the surety company that for purposes of later determining its liability under its performance bond, it would accept and be bound by the resolution reached in the arbitration forum of any dispute between the general contractor and the subcontractor.

48 N.Y.2d 127.

Here, the arbitrators concluded that Glasswall was liable to Monadnock for breach of the Subcontracts in the amount of $1.5 million. That conclusion is binding on WFIC insofar as it settles the dispute between Monadnock and Glasswall.

The only issue to be determined in this case is whether WFIC can demonstrate that the terms of the Bonds raise a question of liability that is unrelated to issues submitted to the arbitrators. Fidelity and Deposit Co. of Maryland, 48 N.Y.2d 127. Glasswall argues, on behalf of WFIC, that WFIC is not liable to pay the Award because the arbitrators found that Monadnock breached the Subcontracts by not taking a delivery of some windows from Glasswall at the end of 2013.

Specifically, Glasswall points to language in section 3 of the Bonds which hinges WFIC's performance obligation on whether there is "no Owner Default under the Construction Contract." Owner Default is defined in section 14.4 as:

> Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with a material term of the Construction Contract. (Emphasis added).

To begin with, the Bonds were specifically referred to in the Subcontracts. Section 13.7 of the Subcontract[3] for Parcel A provides:

> § 13.7 Performance Bond and Payment Bond:
> (If the ~~Subcontractor~~ Manufacturer is to furnish bonds, insert the specific requirements here.)

| Bond type | Bond amount ~~($0.00)~~($ 0.00) | Bond delivery date | Bond form |
|---|---|---|---|
| Supply Bond | 8,412,502 | January 3, 2013 | A312 |

---

[3] Section 13.7 in the Subcontract for Parcel B is substantively identical, the only difference is in the bond amount.

Because the Subcontracts referred to the Bonds, WFIC was obligated to raise in the arbitration any defenses to payment particular to the Bonds.  It cannot do so now. QDR Consultants & Dev. Corp. v. Colonia Ins. Co., 675 N.Y.S.2d 117 (N.Y. App. Div. 2d Dept. 1998)(collateral estoppel bars surety from relitigating issues decided in arbitration between contractor and subcontractor).

Second, if the Court finds that WFIC was not obligated to litigate its unique bond defenses in the arbitration, then the discussion by the arbitrators of Monadnock's breach of contract is irrelevant to this case because the issue of "Owner Default" under the Bonds was not before the arbitrators and therefore cannot be used against Monadnock.  In other words, WFIC cannot on the one hand argue that it is not bound by the Award because the liability language of the Bonds was not before the arbitrators, and then in the next breath argue that it is exonerated from liability because of a discussion by the arbitrators on an issue the arbitrators never considered against Monadnock and Monadnock did not litigate. See QDR Consultants & Development Corp., 675 N.Y.S.2d at 118.

Third, under the Bonds, an Owner Default only applies if it "has not been remedied or waived."  The arbitrators stated that Monadnock should have taken delivery of some windows in 2013.  At most, this conclusion might have impacted Monadnock's claim for delay damages, which ultimately were not awarded because the arbitrators could not calculate a precise amount. [Award, p. 11].  However, in April 2014, the parties entered into an Amendment Agreement (Am. Compl. 45) and Monadnock subsequently took delivery of all the windows that Glasswall had earlier offered (Am. Compl. 51), and paid Glasswall the full amount of the Subcontracts (Am. Compl. 55).  Thus, any prior breach was remedied, and there is no "Owner Default" applicable to the $1.5 million in "Performance Damages" awarded by the arbitrators which was entirely based on the

deficiencies in the delivered windows that were accepted by Monadnock. (Award, p. 12). Notably, the arbitrators did not issue any setoff or other reduction in their performance damages award based on the 2013 refusal of Monadnock to accept some windows.

Finally, an Owner Default must encompass the breach of "material terms" of the Subcontracts.  Materiality is a question of fact.  Orlander v. Staples, Inc., 802 F.3d 289, 298 (2d Cir. 2015)("the materiality of a breach 'is usually a question of fact'").  The Amended Complaint states that during 2013 and early 2014, Monadnock refused to accept two or three of floors of windows. (Am. Compl. 33.)  Glasswall had been required to deliver 69 floors of windows by September 2013, under a "time of the essence" contract delivery clause.  (Am. Compl. 17.) Monadnock's refusal to accept a few floors out of 69 is not material[4].  New Windsor Vol. Ambul. Corps, Inc. v. Meyers, 442 F.3d 101, 117 (2d Cir. 2006)(for a breach to be "material" it must go to the root of the contract).

### ii.    UCC Article 2 Is Irrelevant.

Glasswall argues that under UCC Article 2, as a matter of law, Monadnock's refusal to accept several floors of windows in 2013 is a material breach which excuses WFIC's obligations under the Bonds.  As explained above, the breach was remedied beginning in April 2014 under the Amendment Agreement and the damages awarded by the arbitrators was unrelated to the short delay in Monadnock's acceptance of those several floors of windows.  Second, the UCC does not

---

[4] Glasswall has misrepresented to the Court facts upon which it can rely in deciding the instant motion to dismiss. Specifically, in its moving brief, Glasswall wrote "As explained on pages 9 and 10 of the [Award]…Glasswall had manufactured approximately 1,000 windows and tendered delivery of them to Monadnock". Contrary to Glasswall's representation, the Award only acknowledges that "Glasswall argue[d] that in October-November, 2013 it had approximately 1,000 additional windows completed" (emphasis added). The Award does not address the technical UCC term of "tendering delivery." These purported facts are not in the pleadings or the Award, and accordingly, the Court cannot rely upon them in deciding the motion to dismiss.

apply here, because Glasswall was a subcontractor in a construction project with obligations to design, manufacture and assist with installation of the window wall units. (Contract Art. 3.) UCC provisions "are not applicable to either service or construction contracts." <u>Schenectady Steel Co., Inc. v. Bruno Trimpoli Gen. Const. Co., Inc.</u>, 350 N.Y.S.2d 920 (N.Y. App. Div. 3d Dept. 1974), <u>aff'd</u>, 316 N.E.2d 875 (N.Y. 1974).

Third, the UCC does not apply because Glasswall never delivered the windows as required. (Subcontract, Rider 5, par. 62). They merely stated they were available for delivery. (Award p. 9). "Tender of delivery occurs when the seller puts conforming goods at the buyer's disposition." <u>St. Anne-Nackawic Pulp Co., Ltd. v. Research-Cottrell, Inc.</u>, 788 F. Supp. 729, 734 (S.D.N.Y. 1992). The Subcontact required[5] Glasswall to deliver windows to Monadnock in New York. Its offer to deliver them is not tender of delivery.

Finally, as explained above, materiality is a question of fact. Here, the delay in accepting an offer to deliver several floors of windows when 69 floors were supposed to be ready for delivery is not a material breach.

### iii.   Monadnock Suffered Damages.

Glasswall also argues that Monadnock suffered no damages because they were paid by the owner and cannot recover from WFIC. This argument was rejected by the arbitrators' finding that the pass-through clause in section 2 of the Subcontracts applied. (Award p.8.) As explained above, WFIC incorporated the Subcontracts into the Bonds by reference and any recovery by Monadnock under the Subcontracts is binding in WFIC. Further, paragraph 2 of the Subcontracts applies where

---

[5] UCC 2-308(a) provides: "<u>Unless otherwise agreed</u>, the place of delivery of goods is the seller's place of business." Here, the parties agreed that Glasswall "is responsible for all goods until such time they are delivered and under the care, custody and control of Owner and Contractor." (Subcontract, Rider 5, par 62).

the Owner has "rights and remedies" against the Contractor.[6] Thus, the arbitrators found that Monadnock had liability to the Owner for Glasswall's contract breach and therefore had suffered damages.

## C.  Monadnock Can Pursue Fraudulent Conveyance Claims Under Fed. R. Civ. P. 14.

Glasswall wrongly contends that Monadnock's fraudulent conveyance claims do not arise out of the same transaction or occurrence as the Bond claims it asserts against WFIC, and thus are improper under Fed. R. Civ. P. 14.  Monadnock's pleading against WFIC centers on Glasswall's breach of the construction Subcontracts which WFIC insured. The core of WFIC's liability derives from the Award; Monadnock seeks to collect that Award from Glasswall, whose assets are wrongfully held by its owner, Ugo Colombo, who, along with Ms. Kennedy Colombo, is an indemnitor of WFIC.

Separately, Glasswall conceded the relatedness of the arbitration claims and Bond claims by stipulating to the confirmation of the Award in the instant proceeding. [Dkt. 71.] Monadnock's instant collection action necessarily arises from the same transactions or occurrences that gave rise to the confirmation proceeding.  The cases are clearly "an outgrowth of the same aggregate or core of facts which is determinative of plaintiff's claim." Revere Copper & Brass Inc. v. Aetna Cas. & Sur. Co., 426 F.2d 709, 713 (5th Cir. 1970) (holding that claims against indemnitor on construction performance bond properly included in third-party Rule 14 action).

---

[6] Specifically, Article 2 of the Subcontracts states in relevant part "The Contractor shall have the benefit of all rights, remedies and redress against the Manufacturer that the Owner, under such documents, has against the Contractor."

**D.**     **The Fraudulent Conveyance Claims Were Not Subsumed in the Arbitration Nor**
          **<u>Are They Subject to a New Arbitration Proceeding.</u>**

Glasswall erroneously contends that Monadnock's enforcement action against Glasswall is subject to arbitration.  However, "judgment enforcement claims [are] not subject to arbitration." <u>JSC For. Econ. Ass'n Technostroyexport v. Intl. Dev. and Trade Services, Inc.</u>, 295 F. Supp. 2d 366, 387 (S.D.N.Y. 2003).  Additionally, Ugo Columbo is not a party to any arbitration agreement with Monadnock.  Therefore, for a second reason, Glasswall's argument that the fraudulent conveyance claims are subject to arbitration is wrong.

Finally, Glasswall incorrectly argues that Monadnock's fraudulent conveyance claims against Columbo were subsumed in the arbitration.  Columbo was not a party to the arbitration, and the issues of Glasswall's creditworthiness and discovery of its assets were not submitted to the arbitration panel for determination.  As explained above, the fraudulent conveyance claims spring from the issuance of the Award, and therefore are collection efforts not subject to arbitration, nor part of the prior arbitration proceeding before the AAA.

**E.**     **<u>This Court Should Not Abstain from The Fraudulent Conveyance Claims.</u>**

Glasswall argues that this Court should stay this case in favor of litigation in Florida. However, abstention in unwarranted.  First, the Florida court has issued two recent orders, staying its proceedings in favor of resolution of this case here in New York.  (<u>See</u> Weinstein Decl., Ex. C). Thus, there has already been a ruling addressing the issue of where Monadnock's claims should be adjudicated; i.e., in this Court.  <u>Liberty Mut. Ins. Co. v. Fairbanks Co.</u>, 17 F. Supp. 3d 385, 400 (S.D.N.Y. 2014)(denying as moot motion to dismiss or stay in federal court based on dispositive decision in state court).

Further, this Court has already confirmed the Award.  Abstention is not appropriate after a Court already decided a key issue in the case.

Here, confirming the Award was the predicate for the fraudulent conveyance claims. Had Glasswall wanted this Court to abstain, it should have requested that relief when the parties briefed Monadnock's motion for confirmation. Instead, it conceded the motion by stipulating to the Award thereby accepting this Court's involvement in the arbitration proceeding. It cannot now avoid this Court's involvement in follow-up judgment collection proceedings through a fraudulent conveyance claim by seeking a new forum in Florida.

Further, an analysis of the <u>Colorado River</u> factors militates for denying abstention. This forum is convenient. Both Ugo and Jane Colombo are already parties in this Court through WFIC's Third-Party Complaint, pursuant to their indemnity agreement. Indeed, WFIC's preliminary injunction motion seeking collateral from them is before this Court. That indemnity is in turn dependent on WFIC's liability to Monadnock. Should Glasswall pay the Award or should Monadnock recover the Award from Ugo Colombo, WFIC's liability to Manadnock would be satisfied. Thus, the cases are connected and should be litigated here.

Because the collection effort against Ugo Columbo is related to WFIC's indemnification claims, it is in both the interest of judicial economy and to avoid piecemeal litigation for this Court to adjudicate both matters. Furthermore, the Subcontracts were executed in New York, and the Award applies New York law. This Court is better suited than the Florida court to interpret New York law. Finally, Monadnock's rights are better protected by having the fraudulent conveyance case go forward in this Court which would provide it a wider range of enforcement options than a judgment by a state court in Florida.

**F.**   **<u>Glasswall's Instant Motion to Dismiss Should be Denied as Successive.</u>**

As the Court is aware, Glasswall's instant motion to dismiss is its second such motion. This procedure is improper under Fed. R. Civ. P. 12(g)(2) which forbids such a serial motion procedure and provides:

> **Limitation on Further Motions.** Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

The exceptions do not apply here. All of the defenses Glasswall now asserts were available to it when filed its first motion to dismiss in October. Moreover, the proper party to whom the defenses belong – WFIC – declined to assert these defenses on its own behalf when it answered the Amended Complaint.  Therefore, the Court should not consider the instant Motion to Dismiss which is improper under Fed. R. Civ. P. 12(g)(2) and appears to be an effort to vexatiously delay and multiply these proceedings. <u>Allen ex rel. Allen v. Devine</u>, 726 F. Supp. 2d 240, 258 (E.D.N.Y. 2010) (second motion was precluded by Rule 12(g) and Rule 12(h) "as an improper subsequent motion to dismiss").

## **CONCLUSION**

For the reasons set forth above, Monadnock respectfully requests that this Court deny

Glasswall's motion to dismiss.


Dated: New York, New York
      January 9, 2018                              */s/ Howard Kleinhendler*
                                     Howard Kleinhendler
                                     Evan Weintraub
                                     Jocelyn Weinstein
                               WACHTEL MISSRY LLP
                               885 Second Avenue
                               New York, NY 10017
                               (212) 909-9500
                               (212) 909-9430 (fax)
                               kleinhendler@wmllp.com
                               weintraub@wmllp.com
                               jweinstein@wmllp.com
                               *Counsel for Plaintiff*
                               *Monadnock Construction, Inc.*