UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MONADNOCK CONSTRUCTION, INC.,

        Plaintiff,

-against-

WESTCHESTER FIRE INSURANCE
COMPANY,

        Defendant.
-----------------------------------------------------------X
WESTCHESTER FIRE INSURANCE
COMPANY,

        Third-Party Plaintiff,

-against-

GLASSWALL, LLC, UGO COLOMBO, and
SARA JAYNE KENNEDY COLOMBO

        Third-Party Defendants.
-----------------------------------------------------------X

Case No.: 16 CIV. 00420 (JBW)
ECF Case

## WESTCHESTER FIRE INSURANCE COMPANY'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Rule 56.1 of the Eastern District of New York, Defendant / Third-Party Plaintiff Westchester Fire Insurance Company ("Westchester"), by its attorneys, Cozen O'Connor, P.C., submits the following statement of undisputed material facts in support of its motion for summary judgment:

1.    On January 3, 2013, Plaintiff Monadnock Construction, Inc. ("Monadnock") entered into two contracts (the "Contracts") with Third-Party Defendant Glasswall, LLC ("Glasswall"), which were fully executed in February 2013, for the design and supply of a curtainwall system, including windows, doors, and other materials for two of Monadnock's

projects in Long Island City, New York. *See* the Contracts, annexed to the Declaration of James P. Cinque in Support of Third-Party Defendant Glasswall's Motion to Dismiss the Amended Complaint as Exhibit C (Doc. 84-3); *see also* Amended Complaint, Doc. 50, ¶¶ 14-16; Court's Memorandum and Order ("Order"), dated May 17, 2016, Doc. 30, at p. 3.

2. The price of the Contracts totaled $13 million, and both Contracts required Glasswall to obtain payment and performance bonds. *See* Complaint, Doc. 9, ¶¶ 11-12; Order at p. 3.

3. Accordingly, on February 1, 2013, Third-Party Defendants Glasswall, Ugo Colombo, and Sara Jayne Kennedy Colombo (collectively, the "Third-Party Defendants"), executed an Agreement of Indemnity (the "Indemnity Agreement") in favor of Westchester, as surety. *See* Declaration of Robert McL Boote in Support of Westchester's Motion for Partial Summary Judgment for Specific Performance of Third Party Defendants' Collateral Security Obligations or, in the Alternative, for a Preliminary Injunction ("MPSJ Boote Declr."), dated October 16, 2017, Doc. 58, Ex. A.

4. Following the execution of the Indemnity Agreement, Glasswall, as principal, obtained from Westchester, as surety, Payment and Performance Bonds, No. K08840295, dated February 12, 2013, and No. K08840258, dated February 11, 2013 (collectively, the "Bonds") in favor of Monadnock, as obligee, in connection with the Contracts. MPSJ Boote Declr., at ¶ 5; *see also* the Bonds, annexed to Plaintiff's Complaint as Exhibit A (Doc. 9-1).

5. The provisions of the Bonds relevant to the present motion are as follows:

> § 1 The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

*******

§ 3 If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after

1. the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt or the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;

2. the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

3. the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

******

§ 5 When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

§ 5.1 Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

§ 5.2 Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§ 5.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in

3

>Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or
>
>§ 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:
>
>>1. After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or
>>
>>2. Deny liability in whole or in part and notify the Owner, citing the reasons for the denial.
>
>******
>
>§ 6 If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 5.4, and the Owner refuses the payment or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

*See* the Bonds, Doc. 9-1.

6. By mid-summer 2013, Monadnock and Glasswall were engaged in continuing disputes concerning the timing of delivery, costs, delays, payment and other issues related to the Contracts. *See* Monadnock's Amended Complaint, Doc. 50, ¶¶ 19-27; Order at p. 3;

7. Subsequently, by letters dated September 16, 2013, October 23, 2013 and December 31, 2013, Monadnock sent notices of default to Glasswall and to Westchester, but did not give notice of termination of Glasswall's Contracts. *See* Amended Complaint, Doc. 50, ¶¶ 28, 34; Order at p. 4.

8. During this time, in or around October-November 2013, Glasswall had approximately 1,000 windows completed and ready to ship, but Monadnock refused delivery because it demanded an executed agreement resolving the disputes that had arisen. *See* the Award

4

of Arbitrator (the "Award"), dated August 29, 2017, annexed to the MPSJ Boote Declr. as Ex. B, at pp. 9-11 (Doc. 58-2); *see generally* Amended Complaint, Doc. 50, ¶¶ 32-33.

9. In December 2013 and January 2014, Monadnock, Glasswall and Westchester engaged in discussions and exchanges of written proposals to settle the disputes between Monadnock and Glasswall. *See* Amended Complaint, Doc. 50, ¶ 35.

10. On January 13, 2014, Monadnock sent notice of its termination of Glasswall's Contracts, as required by in § 3.2 of the Bonds, and demanded that Westchester take action under the Bonds. *See* Amended Complaint, Doc. 50, ¶¶ 35, 37; Order at p. 4.

11. By letter dated January 15, 2014, counsel for Westchester acknowledged Monadnock's demand that Westchester take action under the Bonds and proposed a prompt meeting among counsel and the parties to discuss the appropriate course of action. *See* Westchester's January 15, 2014 letter, annexed to the Declaration of Robert McL Boote in Support of Westchester's Motion for Summary Judgment ("Boote Declr."), filed herewith, ¶ 3, Ex. A.

12. Although the parties had discussed resolving Monadnock's demand, on March 6, 2014, pursuant to Section 6 of the Bonds, Monadnock sent Westchester additional written notice demanding that Westchester perform its obligations under the Bonds within seven (7) days or be in default. *See* Amended Complaint, Doc. 50, ¶ 41; Order at p. 4.

13. After the March 6, 2014 notice, the parties and their counsel continued to attempt to negotiate a resolution of the various disputes. *See* Boote Declr., ¶ 4.

14. In an email dated March 11, 2014, Westchester stated its belief that the parties appeared to be moving towards a deal that would render Monadnock's Section 6 notice moot, and, therefore, Westchester requested an extension of time from Monadnock to perform its obligations under the Bonds to March 21, 2014. The same day, Greg Bauso, Senior Vice President of

Monadnock, sent Westchester a letter approving the request for an extension. *See* Boote Declr., ¶ 5, Ex. B.

15. By email dated March 21, 2014 and in a phone call between counsel for Westchester and Monadnock the same day, Westchester again requested a further extension of time from Monadnock to perform its obligations under the Bonds to March 28, 2014. The same day, counsel for Monadnock sent Westchester an email approving the request for an extension. *See* Boote Declr., ¶ 6, Ex. C.

16. Thereafter, the parties and their counsel continued to negotiate a resolution of the parties' disputes and Monadnock's bond claims and, on March 28, 2014, Westchester requested what became a final extension of time from Monadnock to perform its obligations under the Bonds to April 4, 2014. *See* Boote Declr., ¶ 7, Ex. D.

17. Settlement negotiations continued, and on April 4, 2014, Westchester, Monadnock, and Glasswall, with the written consent of Westchester's indemnitors, entered into an agreement titled "Agreement to Amend Contracts" (the "Amendment Agreement"). *See* Boote Declr., ¶ 7, Ex. E; *see also* Amended Complaint, Doc. 50, ¶ 43.

18. The Amendment Agreement provided that Glasswall would complete the Contracts. That is, Glasswall would "proceed to perform the Contracts … under their original terms, including price and payment, except as modified by this [Amendment Agreement]." *See* the Amendment Agreement, Boote Declr., Ex. E.

19. By way of the Amendment Agreement, Glasswall and Monadnock also agreed – as later found by the arbitrators – to waive their respective rights to terminate the Contracts based upon events of default occurring prior to the Amendment Agreement. *See* the Award, Doc. 58-2, at p. 5; *see also* the Amendment Agreement, Boote Declr., Ex. E, at ¶ 7.

20. Specifically, Section 7 of the Amendment Agreement provided:

> 7. The terminations and Bond claims are hereby withdrawn. Such withdrawal is without prejudice to the claims of any party nor shall it be deemed a waiver of any rights. The Bonds, at their full limits, remain in place. Glasswall agrees that it waives any right it may have to terminate the Contracts based on events occurring to date. ***Monadnock agrees that it waives any right it may have to terminate the Contracts based on events occurring to date.***

Amendment Agreement, Boote Declr., Ex. E, at ¶ 7 (emphasis added).

21. Westchester also entered into a separate agreement with Glasswall, dated April 4, 2014, providing that Westchester would pay (and, indeed, did pay), from its own funds, incentive payments to Glasswall, totaling $1.5 million, to be made as Glasswall manufactured and delivered windows. *See* Boote Declr., ¶ 9; *see also* Amended Complaint, Doc. 50, ¶ 43.

22. After the parties entered into the Amendment Agreement, Glasswall continued production of the windows and ancillary materials pursuant to its obligations under the Contracts and Amendment Agreement. *See* Boote Declr., ¶ 10.

23. However, by letter dated March 4, 2015, Monadnock again sent a notice of default to Glasswall and to Westchester, enumerating the ways in which Glasswall allegedly had breached the Contracts and the Amendment Agreement. *See* Monadnock's March 4, 2015 Notice of Default, annexed to the Boote Declr. as Ex. F; *see also* Amended Complaint, Doc. 50, ¶ 59.

24. Further, also on March 4, 2015, Monadnock filed a Demand for Arbitration (the "Demand") (AAA Case. No. 02-15-0002-8160) against Glasswall with the American Arbitration Association in New York, seeking damages for Glasswall's alleged breaches of the Contracts. *See* Monadnock's Demand for Arbitration, annexed to the Boote Declr. as Ex. G; *see also* MPSJ Boote Declr., at ¶ 8; Amended Complaint, Doc. 50, ¶ 67.

7

25. In the Demand, Monadnock alleged that Glasswall breached the Contracts by, among other things, not completing its work, not correcting defective work, and delaying in the performance of its work. *See* Demand, Boote Declr., Ex. G, ¶ 20. The Demand further asserted, as bases for these claims, all of the Contract breaches that Monadnock had alleged from the inception of the Contracts, including several acts or omissions on the part of Glasswall *prior* to the execution of the Amendment Agreement on April 4, 2014. *See* Demand, Boote Declr., Ex. G, ¶¶ 6-15.

26. Thereafter, by letter dated March 16, 2015, Monadnock gave notice that it had terminated the Contracts based on Glasswall's alleged defaults and sent Westchester notice under Section 3.2 of the Bonds. *See* Monadnock's March 16, 2015 Notice of Termination and Section 3.2 Notice, annexed to the Boote Declr. as Ex. H; *see also* Amended Complaint, Doc. 50, ¶ 62.

27. The next day, March 17, 2015, Glasswall sent Monadnock a letter stating, among other things, that (i) it remained "ready, willing and able to perform its obligations under the [Contracts] and [was] continuing to address the remaining open items and punchlist"; that (ii) "consistent with the prior agreements, final payment was made by [Monadnock] in recognition of the fact that Glasswall's 'work was fully performed in accordance with the requirements of the [Contracts]"; and that (iii) "neither Glasswall nor [Westchester] (or its consultants) [had] ever been provided any backup or details of any claims or purported 'backcharges' and no funds were escrowed pursuant to the [Amendment Agreement]." *See* Glasswall's March 17, 2015 Letter, annexed to the Boote Declr. as Ex. I. Accordingly, Glasswall requested that Monadnock withdraw its "improper and baseless Notice of Termination/Default." *Id.*

28. In addition, following Monadnock's March 16, 2015 Section 3.2 notice, counsel for Westchester and Monadnock met on or about April 5, 2015, along with an expert retained by

8

Westchester and Monadnock personnel, to review the items stated in Monadnock's Notice of Default. *See* Boote Declr., ¶ 15.

29. Counsel for Westchester also engaged in numerous email and telephone communications with Glasswall and its attorneys in an effort to duly investigate Monadnock's claim and in an effort to understand Glasswall's position as it related to Monadnock's notice of termination. *See* Boote Declr., ¶ 16. Some of the various exchanges, as well as Glasswall's position with respect to Monadnock's notice of termination, were set forth in a letter from counsel for Glasswall to counsel for Westchester, dated April 23, 2015. *See* Glasswall's April 23, 2015 Letter, annexed to the Boote Declr. as Ex. J.

30. On April 20, 2015, pursuant to Section 6 of the Bonds, Monadnock again sent Westchester additional written notice demanding that Westchester perform its obligations under the Bonds within seven (7) days or be in default. *See* Amended Complaint, Doc. 50, ¶ 63.

31. On April 25, 2015, Westchester, through its counsel, denied Monadnock's claim under the Bonds stating, *inter alia*, that (i) Glasswall had substantially completed the contracts and, therefore, the Contracts could not properly be terminated; (ii) Monadnock waived its right to assert such a Bond claim by its failure to deposit payments in respect of the defaults into the Duane Morris escrow account; and (iii) Monadnock waived its right to assert such a Bond claim for events occurring prior to the date of the Amendment Agreement, or April 4, 2014. *See* Westchester's April 25, 2015 Denial Letter, annexed to the Boote Declr. as Ex. K.

32. Following Monadnock's arbitration Demand, the AAA panel conducted nine, non-consecutive evidentiary hearings beginning on November 14, 2016 and ending on February 28, 2017. *See* the Award, Doc. 58-2, at p. 1. The parties then submitted post-hearing briefs and reply briefs, the last of which was submitted on June 5, 2017. *Id.*

33. On August 29, 2017, the AAA issued an Award of Arbitrator, awarding to Monadnock the amount of $1,499,255.18 against Glasswall, to be paid within 30 days of the date the Award was transmitted to counsel for the parties. *See* the Award, Doc. 58-2.

34. The Award summarized Monadnock's damage claims as follows:

> "Summarily, Monadnock asserts that Glasswall delayed completion of the Buildings by failing to timely perform the Window Work. Monadnock also claims that many of the windows delivered as part of the Window Work had significant defects which required field remediation work paid for by Monadnock. Monadnock refers to damages related to defects in the windows portion of the Window Work as 'performance damages.' Monadnock also seeks a category of damages it refers to as 'Soft Costs' which are akin to delay damages and consist of increase in insurance costs, added inspection costs, increased bond and subsidy costs and legal fees to various law firms (but not the litigation fees charged by counsel that represented Monadnock in this arbitration proceeding). In all Monadnock seeks damages as follows:
>
> | | |
> |---|---|
> | Delay Damages: | $7,648,302.77 |
> | Performance Damages: | $2,446,535.98 |
> | Soft Costs: | <u>$7,261,919.16</u> |
> | <u>Grand Total:</u> | $17,356,757.91, plus interest."

*See* the Award, Doc. 58-2, pp. 5-6.

35. Schedule A to the Award is a list of all damages sought by Monadnock and the amount awarded, if any, for each item. *See* the Award, Doc. 58-2, p. 12. As set forth in Schedule A, the arbitrators awarded <u>zero</u> of Monadnock's claimed "Delay Damages," finding that any delays could not properly be attributable to Glasswall. *See* Schedule A, Boote Declr., ¶ 18, Ex. L.

36. As set forth in the Award, any such "Delay Damages" could not properly be attributable to Glasswall because, among other things, Monadnock breached the Contracts when it wrongfully refused to accept Glasswall's delivery of the windows and ancillary materials in the fall and winter of 2013-2014, thereby causing such delays. *See* the Award, 58-2, pp. 9-10.

10

37. In the Award, the arbitrators also found that while Glasswall and Monadnock reserved various rights in the Amendment Agreement, both parties agreed to waive their respective rights to terminate the Contracts based upon events of default occurring prior to April 4, 2014. *See* the Award, 58-2, p. 5.

38. Accordingly, the arbitrators awarded Monadnock no damages for events prior to April 4, 2014. *See* the Award, 58-2; *see also* Schedule A, Boote Declr., ¶ 18, Ex. L. In fact, the arbitrators only awarded Monadnock part of its claimed "Performance Damages" on the basis that Glasswall was paid for some items that Glasswall did not complete or supply and other items requiring field remediation. *See* the Award, 58-2, p. 12; *see also* Schedule A, Boote Declr., ¶ 18, Ex. L.

39. Schedule A further shows that the items for which damages were awarded represent "completion items" akin to minor punch list items, rather than items that prevented Monadnock from realizing the benefits of Glasswall's work. *See* Schedule A, Boote Declr., ¶ 18, Ex. L. To this end, Schedule A does not indicate *any* award of damages for missing windows. *Id.*

40. In the Award, the arbitrators adjudicated all claims presented in the arbitration, stating "[t]his Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied." *See* the Award, Doc. 58-2, at pg. 13.

41. On November 24, 2017, Monadnock and Glasswall, by mutual agreement, submitted a Stipulation and Order Confirming Arbitration Award, pursuant to which the Award was confirmed by this Court. Doc. 77.

42. On December 22, 2017, Monadnock filed a motion requesting entry of judgment based on the Award, thereby confirming that the Award is valid and enforceable. Doc. 90.

Dated: New York, New York
January 12, 2017

COZEN O'CONNOR

By: /s/ John J. Sullivan
John J. Sullivan
Alexander Selarnick
45 Broadway Atrium, Suite 1600
New York, NY 10006
P: 212-453-3729
F: 646-461-2073
JSullivan@cozen.com
ASelarnick@cozen.com

Robert McL. Boote*
*Admitted Pro Hac Vice
Suite 400, 200 Four Falls Corporate Center
P.O. Box 800
West Conshohocken, PA 19428
P: 215-665-4630
F: 215-701-2424
RBoote@cozen.com

*Attorneys for Defendant*
*Westchester Fire Insurance Company*