# Exhibit K



April 25, 2015

**Robert McL. Boote**
Direct Phone    215-665-4630
Direct Fax 215-701-2424
rboote@cozen.com

**VIA EMAIL AND U.S. MAIL**

Judah D. Greenblatt, Esquire
Greenblatt Lesser LLP
Two University Plaza
Suite 511
Hackensack, NJ  07601

Re:     (a) Contract between Monadnock Construction, Inc. ("Monadnock") and Glasswall, LLC
        ("Glasswall") dated January 3, 2013 for the project known as HPS "Parcel A" (Bond. No.
        K08840295); (b) Contract between Monadnock and Glasswall dated January 3, 2013 for
        the project known as HPS "Parcel B" (Bond No. K08840258) (collectively, the
        "Contracts"); and (c) Agreement to Amend Contracts dated April 4, 2014

Dear Mr. Greenblatt:

I write as counsel on behalf of Westchester Fire Insurance Company, surety on the above-
referenced Bonds, to respond to your client, Monadnock Construction, Inc.'s claim under the
Bonds.

Background of the Claim

Monadnock's claim originated with its letter dated March 4, 2015 from Greg Bauso of
Monadnock to Glasswall stating that Glasswall was in breach of various contract obligations and
giving Glasswall a seven day notice to cure.  By letter dated March 16, 2015 to Glasswall,
Monadnock gave Glasswall notice that the Contracts between it and Glasswall were terminated
for failure to cure the defaults specified in Monadnock's March 4, 2015 letter.  On the same date
Monadnock sent a Performance Bonds Section 3.2 Notice to Westchester making claim under
the Bonds based on its termination of Glasswall's Contracts.

Following Westchester Fire's receipt of the letter terminating the Contracts with Glasswall and
its receipt of the Monadnock's 3.2 Notice, Westchester began its investigation of Monadnock's
bond claim.

The day after Monadnock's Notice Termination, John Anderson, President of Glasswall, sent a
letter dated March 17, 2015 to Mr. Bauso stating that Glasswall was ready, willing and able to
perform all of its unperformed contract obligations.

Mr. Bauso responded on behalf of Monadnock that Monadnock now had a bond claim and
desired only to deal with the surety, Westchester Fire.

On March 26, 2015 I wrote to you suggesting that during Westchester's investigation of
Monadnock's bond claim, Glasswall could perform some of the items that Monadnock had

LEGAL\22675697\5

Judah D. Greenblatt, Esquire
April 25, 2015
Page 2

---

alleged needed to be completed under the Contracts.  You responded in a letter the next day that the Contracts had been terminated and that Monadnock might permit Glasswall to perform, but only under a Takeover Agreement satisfactory to Monadnock.

Investigation of the Claim

Prior to Westchester's beginning its investigation of Monadnock's bond claim, Westchester already had considerable knowledge concerning the Contracts and the HPS project.  Henry Minissale and I visited the project site and Glasswall's facility in the fall of 2013.  George Brotherston of Surety and Construction Services, Westchester's consultant, visited Glasswall's facility four times and the HPS project site three times in order to follow the progress of the manufacture, delivery and installation of the window units manufactured by Glasswall.

As you know, following the April 4, 2014 Agreement to Amend Contracts, Glasswall submitted its monthly payment applications to Westchester, which reviewed them and confirmed that the windows Glasswall billed for had been manufactured.  Westchester thereafter confirmed deliveries of windows to the project site.  Westchester confirmed that Monadnock's payments to Westchester properly corresponded to deliveries to Monadnock of the manufactured windows that Westchester had paid for.

The final payment applications reflect that all of the windows required to be manufactured by Glasswall were manufactured.  The units were inspected by Monadnock's representative, Israel Berger & Associates before shipment to confirm that the windows complied fully with contract requirements.

By early 2015 all of the windows called for in the contract had been manufactured and delivered to Monadnock.  Monadnock paid 100% of the contract value of the windows as Monadnock's March 4, 2015 letter states.

On April 5, 2015 George Brotherston and I met with you, Greg Bauso and Paul Colapinto at the HPS construction site to review the elements of Monadnock's bond claim.  We reviewed the items listed in your Notice of Default.  Mr. Brotherston and I made notes of our conversation and provided those notes both to you and to Glasswall for comment.  We have reviewed both Monadnock's and Glasswall's responses.  In addition, we also requested Glasswall's statement of its legal and factual position concerning Monadnock's Notice of Default and Contract termination.  I enclose a copy of a letter dated April 23, 2015 from James Frankel, counsel for Glasswall, stating Glasswall's position concerning the bond claim.

Our review of the asserted deficiencies in Glasswall's performance described in Monadnock's March 4, 2015 letter revealed that the items asserted were essentially punch list items that Glasswall was ready, willing and able to perform and, in some cases, was currently performing.

Some items such as warranties and LEED documentation cannot be performed until certificates of occupancy have been issued.  The exhibit to Mr. Frankel's letter addresses thirty items listed by Monadnock as a basis for its claimed default by Glasswall.  In general terms, the items have been performed, or are not Glasswall's responsibility, or must be performed later, or require information form Monadnock that has not yet been provided.  We believe Glasswall's responses in the exhibit are substantially correct.

Judah D. Greenblatt, Esquire
April 25, 2015
Page 3

In short, what we observed was a list of defaults that were punch list items that Glasswall was willing to perform and for which Monadnock had refused performance.

We also considered the Agreement to Amend Contracts which provides in paragraph 13:

> If Monadnock asserts that any payments to WFIC should be reduced based on a backcharge, change order at similar reduction permitted under the terms of the Contracts and arising after the date hereof [April 14, 2014], Monadnock *shall* make payment to WFIC by payment of the amount of the asserted backcharge, change order or other reduction to the escrow account of Duane Morris, pursuant to the attached escrow agreement (Exhibit "G"), and the amounts so deposited shall thereafter be paid from the escrow account based on the agreement of the parties or as determined in arbitration pursuant to the Contracts. (Emphasis added.)

Monadnock's failure to make payment to the escrow account for items described in its March 4, 2015 default letter calls into question whether Monadnock has the right to assert those claims now. The words "shall deposit" stated in the paragraph, appear to create a mandatory requirement for the assertion of the described claims. A payment accompanied by unilateral reservation of rights does not appear to change the mandatory requirement of paragraph 13.

Various events occurring prior to April 4, 2014 (the date of the Agreement to Amend Contracts) are asserted as defaults in the March 4, 2015 default letter. We presume that the Monadnock's termination of the Contracts was based in part on these alleged defaults. However, paragraph 7 of the Agreement to Amend Contracts states that "Monadnock agrees that it waives any right it may have to terminate the Contracts based on events occurring to date [April 4, 2014]." Thus, only events after the date of the Agreement to Amend contracts could be relevant to the terminability of the contracts.

<u>Analysis of the Bond Claim</u>

As you know, the performance Bonds provide in Section 3 that:

> If there is no Owner Default under the Construction Contract the Surety's obligation under this Bond shall arise after
>
> . . . .
>
> .

Judah D. Greenblatt, Esquire
April 25, 2015
Page 4

---

> .2  the Owner declares a Contractor Default, terminates the
> Construction Contract and notifies the Surety . . . .

The validity of the defaults Monadnock asserts may be called into question by its failure to deposit payments in respect of the defaults into the Duane Morris escrow account. Monadnock's basis for termination is called into question by its apparent reliance on events occurring prior to April 4, 2014.

Regardless of those issues, one fact is controlling. Our investigation has led Westchester to conclude that Glasswall has substantially performed its Contracts with Monadnock. It has delivered all the windows it was contracted to manufacture. Monadnock has paid in full for the windows. Punch list items remain to be performed and Glasswall is ready, willing and able to perform them.

Under clear New York precedent a substantially completed construction contract cannot be terminated:

> *845 UN Limited Partnership v. Flour City Architectural Metals, Inc.*,
> 28 A.D. 3d 271, 813 N.Y.S.2d 404 (1st Dep't 2006) ("Since
> undisputed record evidence amply demonstrates that defendant
> substantially completed its work, plaintiff owner was powerless to
> terminate the contract for defendant's alleged default . . . ."). *See,
> also, F. Garofalo Electric Co. Inc. v. New York University*, 300 A.D.
> 2d 186, 754 N.Y.S.2d (1st Dept. 2002) and *Michael G. Buck & Son
> etc. v. Poncell Const. Co.*, 217 A.D. 2d 925, 629 N.Y.S.2d 584 (4th
> Dept. 1995).

As the quoted bond provisions state, termination of the bond principal's construction contract is a condition precedent to any obligation of the surety. In this situation, we have concluded that the Contracts have been substantially performed, and, under New York law, were not capable of being terminated. Accordingly, Westchester Fire must respectfully deny Monadnock's claims under the Bonds.

Westchester reserves all of its rights and defenses and states the foregoing without prejudice to its right to rely on additional facts and legal principles that may apply to this matter.

Sincerely,

COZEN O'CONNOR

By:    Robert McL. Boote

RMB/alc