UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MONADNOCK CONSTRUCTION, INC.,                    Case No.: 16 CIV 00420 (JBW)(VMS)

                Plaintiff,                        ECF Case

    -against-


WESTCHESTER FIRE INSURANCE

COMPANY,

                Defendant.

------------------------------------------------------------------X

WESTCHESTER FIRE INSURANCE

COMPANY,

                Third-Party Plaintiff,

    -against-


GLASSWALL, LLC, UGO COLOMBO, and

SARA JAYNE KENNEDY COLOMBO,

                Third-Party Defendants.

------------------------------------------------------------------X


**MONADNOCK CONSTRUCTION, INC.'S RESPONSES TO DEFENDANT WESTCHESTER FIRE INSURANCE COMPANY'S STATEMENT OF UNDISPUTEDMATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO LOCAL RULE 56.1 AND COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF <u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Monadnock Construction, Inc. ("Monadnock" or "Plaintiff"), through its attorneys, hereby submits the following responses to defendant Westchester Fire Insurance Company's ("WFIC" or "Defendant") Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of WFIC's Motion for Summary Judgment ("WFIC'S R. 56.1 Stmnt.") and Counterstatement of Undisputed Material Facts in Support of Monadnock's Cross-Motion for Summary Judgment, and contends that as to the following material facts, there are no genuine issues to be tried. The evidentiary support for these facts is set forth in the accompanying Declaration of Howard Kleinhendler in opposition to WFIC's Motion for Summary Judgment and in Support of Monadnock's Cross-Motion for Summary Judgment, dated February 28, 2018 (the "Kleinhendler Decl."), and the exhibits annexed thereto, WFIC'S R. 56.1 Stmnt. and the Declaration of Robert McL Boote in support of WFIC's Motion for Summary Judgment, dated January 12, 2018 (the "Boote Decl.").

1. Monadnock admits the allegations contained in paragraph 1 of WFIC'S R. 56.1 Stmnt.

2. Monadnock admits the allegations contained in paragraph 2 of WFIC'S R. 56.1 Stmnt.

3. Monadnock admits the allegations contained in paragraph 3 of WFIC'S R. 56.1 Stmnt.

4. Monadnock admits the allegations contained in paragraph 4 of WFIC'S R. 56.1 Stmnt.

5. Monadnock admits the allegations contained in paragraph 5 of WFIC'S R. 56.1 Stmnt., except notes a typo in the seventh line of WFIC's reproduction of §3(1), which should read "receipt of the Owner's notice" not "receipt or the Owner's notice."

6. Monadnock admits the allegations contained in paragraph 6 of WFIC'S R. 56.1 Stmnt.

7. Monadnock admits the allegations contained in paragraph 7 of WFIC'S R. 56.1 Stmnt.

8. Monadnock admits that the award of the arbitrators dated August 29, 2017 in the American Arbitration Association arbitration between Monadnock and Glasswall, LLC

("Glasswall") Case Number 02-15-0002-8160 (the "Award") contains a finding that in or around October-November 2013, Glasswall had approximately 1,000 windows available for delivery and that Monadnock would not accept them without a signed agreement resolving the disputes that had arisen between them.

9. Monadnock admits the allegations contained in paragraph 9 of WFIC'S R. 56.1 Stmnt.

10. Monadnock admits the allegations contained in paragraph 10 of WFIC'S R. 56.1 Stmnt.

11. Monadnock admits the allegations contained in paragraph 11 of WFIC'S R. 56.1 Stmnt.

12. Monadnock admits the allegations contained in paragraph 12 of WFIC'S R. 56.1 Stmnt.

13. Monadnock admits the allegations contained in paragraph 13 of WFIC'S R. 56.1 Stmnt.

14. Monadnock admits the allegations contained in paragraph 14 of WFIC'S R. 56.1 Stmnt.

15. Monadnock admits the allegations contained in paragraph 15 of WFIC'S R. 56.1 Stmnt.

16. Monadnock admits the allegations contained in paragraph 16 of WFIC'S R. 56.1 Stmnt.

17. Monadnock admits the allegations contained in paragraph 17 of WFIC'S R. 56.1 Stmnt.

18. Monadnock admits the allegations contained in paragraph 18 of WFIC'S R. 56.1 Stmnt.

19. Monadnock admits the allegations contained in paragraph 19 of WFIC'S R. 56.1 Stmnt.

20. Monadnock admits the allegations contained in paragraph 20 of WFIC'S R. 56.1 Stmnt.

21. Monadnock admits the allegations contained in paragraph 21 of WFIC'S R. 56.1 Stmnt.

22. Monadnock denies the allegations contained in paragraph 22 of WFIC'S R. 56.1 Stmnt.

23. Monadnock admits the allegations contained in paragraph 23 of WFIC'S R. 56.1 Stmnt. to the extent that they allege that Monadnock sent a Notice of Default to Glaswall on March 4, 2015, Monadnock denies any further characterizations of that notice contained paragraph 23.

24. Monadnock admits the allegations contained in paragraph 24 of WFIC'S R. 56.1 Stmnt.

25. Monadnock admits the allegations contained in paragraph 25 of WFIC'S R. 56.1 Stmnt.

26. Monadnock admits the allegations contained in paragraph 26 of WFIC'S R. 56.1 Stmnt.

27. Monadnock admits the allegations contained in paragraph 27 of WFIC'S R. 56.1 Stmnt.

28. Monadnock denies knowledge and information sufficient to form a belief about the truth or accuracy of the allegations contained in paragraph 28 of WFIC'S R. 56.1 Stmnt.

29. Monadnock denies knowledge and information sufficient to form a belief about the truth or accuracy of the allegations contained in paragraph 29 of WFIC'S R. 56.1 Stmnt.

30. Monadnock admits the allegations contained in paragraph 30 of WFIC'S R. 56.1 Stmnt.

31. Monadnock admits the allegations contained in paragraph 31 of WFIC'S R. 56.1 Stmnt.

32. Monadnock admits the allegations contained in paragraph 32 of WFIC'S R. 56.1 Stmnt. to the extent that they concern the number and dates of hearings. Monadnock denies the allegations contained in paragraph 32 of WFIC'S R. 56.1 concerning the date on which Monadnock and Glasswall submitted post-hearing reply briefs, which were submitted on June 9, 2017, not, as WFIC alleges, June 5, 2017.

33. Monadnock admits the allegations contained in paragraph 33 of WFIC'S R. 56.1 Stmnt.

34. Monadnock admits the allegations contained in paragraph 34 of WFIC'S R. 56.1 Stmnt.

35. Monadnock admits the allegations contained in paragraph 35 of WFIC'S R. 56.1 Stmnt. with respect to the existence of an Exhibit A to the Award which itemized the amounts awarded. Monadnock denies the allegations concerning the arbitrators' failure to attribute any delays to Glasswall. Rather, the arbitrators explicitly found that "Glasswall did cause delays." (Dkt. 58-2, p. 11.)

36. Monadnock denies the allegations in paragraph 36 of WFIC'S R. 56.1 Stmnt. to the extent that they concern the attribution of delays to Glasswall, but admits that the arbitrators

found that Monadnock wrongfully refused to accept the delivery of windows and ancillary materials in the fall and winter of 2013-2014.

37. Monadnock admits the allegations contained in paragraph 37 of WFIC'S R. 56.1 Stmnt.

38. Monadnock admits the allegations contained in paragraph 38 of WFIC'S R. 56.1 Stmnt.

39. Monadnock denies the allegations contained in paragraph 39 of WFIC'S R. 56.1 Stmnt. to they extent that they contain legal characterizations the nature of the damage items the arbitrators awarded. The Award contains no legal conclusions concerning whether the performance damages were "'completion items' akin to minor punch list [sic] items, rather than items that prevented Monadnock from realizing the benefits of Glasswall's work." Monadnock admits the remaining allegations contained in paragraph 39 of WFIC'S R. 56.1 Stmnt.

40. Monadnock admits the allegations contained in paragraph 40 of WFIC'S R. 56.1 Stmnt.

41. Monadnock admits the allegation contained in paragraph 41 of WFIC'S R. 56.1 Stmnt. to the extent that it stipulated with Glasswall to confirm the Award, however it denies that it did so on November 24, 2017. Rather, Monadnock and Glasswall executed the stipulation on November 14, 2017, which was so-ordered by the Honorable Judge Jack B. Weinstein on November 18, 2017, and the Court entered the so-ordered stipulation on November 22, 2017. (Dkt. 77.)

42. Monadnock admits the allegations contained in paragraph 42 of WFIC'S R. 56.1 Stmnt.

**Monadnock's Counterstatement of Material Facts**

43. The Hunter's Point development was a New York City affordable housing initiative for the construction of high-rise residential towers in Long Island City. This included: Parcel A ("Parcel A"), a 37-floor 619-unit residential unit building on 1-50 50th Avenue; and Parcel B

("Parcel B"), a 32-story 306-unit residential unit building at 1-55 Borden Avenue. (Kleinhendler Decl. Exs. 1; 2.)

44. Monadnock was part of the team that won the bid to construct the towers, which were to have "curtainwall" or glass window wall exteriors. (Kleinhendler Decl. Ex. 3 p. 958.)

45. A member of the architectural team for the towers recommended Glasswall as a potential curtainwall manufacturer and after checking with references, Glasswall was invited to bid the job in 2012. (Kleinhendler Decl. Ex. 3 p. 959-60.)

46. Glasswall won the bid and entered into two contracts: modified AIA Standard Form Agreement Between Contractor and Subcontrator with Monadnock (the "Contracts"). (Kleinhendler Decl. Exs. 6; 7; 8 p. 1452.) The Contracts are nearly identical and were modeled after a form contract annexed as Exhibit F to two construction management contracts between the ownership entities of Parcels A and B and Monadnock (the "CM Agreements"). (Kleinhendler Decl. Exs. 1; 2.) The CM Agreements were also nearly identical. (Kleinhendler Decl. Exs. 1; 2.)

47. The Contracts were worth $13 million. (Kleinhendler Decl. Exs. 6; 7.)

48. A curtainwall unit is a slab-to-slab structure that makes up the skin or envelope of the building and is comprised of metal frames, louvers, hardware, glass and gaskets. (Kleinhendler Decl. Ex. 4 p. 68-69.) Curtainwall is a long lead time item and is critical to the timely completion of the towers. (Kleinhendler Decl. Ex. 4 p. 152.)

49. Between the two towers, Glasswall committed to provide over 9,000 curtainwall units consisting of several hundred different designs and multiple colors of glass. (Kleinhendler Decl. Ex. 5 p. 1988, 2007.)

50. WFIC underwrote two performance and payment bonds for Glasswall (collectively, the "Bonds"), one for each tower. (Dkt. 9-1.)

51. The ownership entities for both Parcels A and B were represented by the Related Companies, which was also a member of each of the ownership entities. (Kleinhendler Decl. Ex. 8 p. 1445, 1491.)

52. The Contracts had standard flow-down provisions that permitted Monadnock to pursue claims against Glasswall on behalf of the owners. (Kleinhendler Decl. Exs. 3 p. 989-991; 6; 7; 8 p. 1457-48.)[1]

53. Under the CM Agreements' baseline schedules, Parcel A was to have its first TCO by August 2014 and Parcel B was to have its first TCO by July 2014. (Kleinhendler Decl. Exs. 8 p. 1472, 1476; 9; 10.)

54. Under the Contracts, the curtainwall units were to be completed and ready to ship by July 1, 2013 for Parcel B and September 1, 2013 for Parcel A. (Kleinhendler Decl. Exs. 6; 7.) These dates were "time is of the essence." (Kleinhendler Decl. Exs. 6; 7.) Glasswall was required to have enough curtainwall units completed to accommodate installation as the concrete infrastructure of the two towers was being erected. In fact, the Contracts required the "Manufacturer to be 6 floors below the Superstructure Contractor." (Kleinhendler Decl. Exs. 6; 7.) Curtainwall units were to be shipped floor by floor with completed assemblies in correct positions to allow for seamless installation. (Kleinhendler Decl. Exs. 4 p. 90; 6; 7.) The pace of curtainwall deliveries was required to accommodate the installation of "two floors per week." (Kleinhendler Decl. Exs. 6; 7.)

---

[1] A Related Companies executive, Michael Trovini, testified that under the CM Agreement, Monadnock remains liable to the Owners for damages incurred from Glasswall's late delivery of curtainwall units. (Kleinhendler Decl. Ex. 8 p. 1444, 1462-63.) Mr. Bauso confirmed this. (Kleinhendler Decl. Ex. 3 p. 981-83.)

55. The Contracts were "design-build" (Kleinhendler Decl. Ex. 4 p 226.) Accordingly, Glasswall's was obligated to procure materials and develop all engineering designs to construct curtainwall units that conformed to the shop drawings and plans provided by the projects' architect, Ismael Levya Architects, P.C. (Kleinhendler Decl. Exs. 1; 2; 5 p. 1983-84; 6; 7.)

56. Specifically, to permit the metal fabricator to make the correct cuts and holes for each curtainwall unit, Glasswall was required to engineer "cut sheets" that conformed to the shop drawings. (Kleinhendler Decl. Ex. 3 p. 1015-1018.) The cut sheets took time to prepare because of the intense detail required for every curtainwall panel. (Kleinhendler Decl. Ex. 3 p. 1015-1018.) This task was exacerbated by the hundreds of different curtainwall unit designs required for the Project. (Kleinhendler Decl. Ex. 5 p. 1938.)

**Glasswall's Delays Begin**

57. Construction of the two towers began in February 2013. (Kleinhendler Decl. Ex. 4 p. 125.)

58. By April 2013, the curtainwall visual mockups had been approved (Kleinhendler Decl. Ex. 11); the glass and paint colors had been selected; and Glasswall's glass supplier, AGC, was told to manufacture the glass for the performance mockups.[2] (Kleinhendler Decl. Ex. 4 p. 134-35, 143.)

59. On May 31, 2013, Monadnock sent Glasswall a weekly floor-by-floor concrete erection schedule showing exactly when each floor of each building was to be poured to ensure that

---

[2] Problems arose with the performance mock ups; the curtainwall sample units fabricated by Glasswall to test performance. (Kleinhendler Decl. Ex. 4 p. 143.) Israel Berger Associates ("IBA"), the projects' quality control consultant (Kleinhendler Decl. Ex. 4 p.73-74, 142), reported that some of the glass leaked internally and the glass looked visually distorted. (Kleinhendler Decl. 4 p. 137.)

Glasswall would deliver a steady and interrupted supply of Halfen anchors that were required to be embedded in the concrete.[3] (Kleinhendler Decl. Exs. 4 p. 69, 140; 12.)

60. During a June conversation between Mr. Colapinto, Monadnock's Senior Vice President and project manager (Kleinhendler Decl. Ex. 4 p. 67), and Frederico Balestrazzi, Glasswall's president (Kleinhendler Decl. Ex. 4 p. 71), Mr. Balestrazzi stated that Glasswall was going to have problems meeting the Contracts' delivery dates. (Kleinhendler Decl. Ex. 4 p. 145.)

61. As a result, by email dated June 12, 2013, Monadnock agreed to take delivery of the Parcel B windows on September 16, and Parcel A windows on October 1. (Kleinhendler Decl. Ex. 13.)

62. Although Monadnock gave Glasswall extra time to deliver the windows, Monadnock was ready to receive the windows under the original time frames set in the Contracts and to store them on site until they were ready for installation. (Kleinhendler Decl. Ex. 4 p. 150.)

63. Mr. Colapinto stressed that the projects could not suffer additional delays, and Mr. Balestrazzi assured him there would not be any. (Kleinhendler Decl. Ex. 13.)

64. The delays continued and, in early summer 2013, Monadnock visited Glasswall's factory in Florida and repeatedly asked about progress on the curtainwall fabrication. (Kleinhendler Decl. Ex. 4 p. 151-152.)

65. By July, there was still no progress with curtainwall fabrication and Glasswall informed Monadnock that windows would not be ready even for the new, pushed out, delivery dates. (Kleinhendler Decl. Ex. 14.) As explained by Mr. Colapinto, this continued delay alarmed

---

[3] The Halfen anchor secures the curtainwall unit to the concrete slab and has to be installed in the correct position to properly mate with the window unit. Then a C channel is bolted to the slab edge. The curtainwall unit sits on top of the C-channel. (Kleinhendler Decl. Ex. 4 p.78.) Glasswall was responsible for manufacturing, procuring and delivering the Halfen anchors and C-channels to the site. (Kleinhendler Decl. Ex. 4 p. 78-79, 114.)

Monadnock management: "[B]ecause scheduling was of utmost importance when it came to curtain walls. If we didn't know where the windows were, we couldn't build the project correctly." (Kleinhendler Decl. Ex. 4 p. 152.)

**Glasswall Fails to Timely Provide Engineering Releases**

66. The problems in curtainwall fabrication were originally driven by delays in Glasswall's engineering and release dates. (Kleinhendler Decl. Ex. 3 p. 1013.) As Mr. Bauso, Monadnock's president, explained:

> The curtain wall guys have to – their engineering department has to produce very specific cut sheets as to how they want the metal, how they want the glass sized and fabricated. They can't just send the approved shop drawings from the architect to the metal factory. They have to give very, very specific engineered cut sheets to their fabricators. And, you know, it's one of the things we typically ask about, because, if that isn't done, we have good reason to believe that they are not going to be able to get us the windows when they are promising. So just as a matter of business, this is – this is one of the things we always focus on. And it was becoming apparent that their engineering department wasn't getting these materials released when they should have been.

(Kleinhendler Decl. Ex. 3 p. 1015-16.)

67. In early summer 2013, Mr. Bauso contacted Glasswall's metal extruder, Keymark, to determine whether they had received Glasswall's cut sheets and were working on the projects. (Kleinhendler Decl. Ex. 3 p. 1013-19.) Keymark confirmed they had a purchase order from Glasswall, but did not yet have the cut sheets and engineering releases from Glasswall. (Kleinhendler Decl. Ex. 3 p. 1020.) Monadnock continued to question Mr. Balestrazzi about the delays in releasing engineering to Keymark, "and the answers he was giving made it obvious he wasn't going to make the dates he had previously committed to, even the revised dates he had previously committed to." (Kleinhendler Decl. Ex. 3 p. 1026.) This prompted Monadnock to alert WFIC on August 12, 2013 to a potential default by Glasswall. (Kleinhendler Decl. Exs. 15; 16.)

**Glasswall Chose to Work on Four Other Large Projects Instead of Hunter's Point**

68. On August 13, 2013, Mr. Bauso and Michael Trovini, a senior Related executive (Kleinhendler Decl. Ex. 8 p. 1444), met with Glasswall officials at Glasswall's Miami facility. (Kleinhendler Decl. Exs. 3 p. 1027; 8 p. 1503-04.) During the visit, Mr. Trovini observed that Glasswall was not working on the Hunter's Point project and instead was devoting its staff and resources to other projects:

> And we discussed the status of the project, and we toured the factory and I recall breaking – and they were manufacturing not our product, meaning the window wall. I discovered because I went over to the engineering department as – as opposed to walking the factory and watching somebody else's window wall being manufactured, which is a complete waste of time, to see if the engineers had done anything as it relates to designing and getting the window wall parts and pieces designed so that they could go and manufacture it. And the engineers were not working on it – and there was only like a few of them – who were not working on our project.

(Kleinhendler Decl. Ex. 8 p. 1505-06.)

69. Indeed, between January and September 2013 when Glasswall was supposed to be working on the Hunter's Point project, it was working on at least four other Florida curtainwall projects: 1) the Monte Carlo Hotel, a 20-story high rise (Kleinhendler Decl. Ex. 5 p. 2218); 2) the Edition Hotel, a hotel and residential condominium (Kleinhendler Decl. Ex. 5 p. 2222-2223); 3) the Perry Rooney Hotel a hotel condo project (Kleinhendler Decl. Ex. 5 p. 2225); and 4) the Oceana a condo residence. (Kleinhendler Decl. Ex. 5 p. 2226-27.) These projects were all approximately 80-90 percent complete by September 2013 and were staffed by 80 Glasswall employees. (Kleinhendler Decl. 5 p. 2217, 2219, 2224, 2225, 2227.)

70. As Mr. Bauso recalled, by the time of the August 13th meeting, Ugo Colombo, Glasswall's owner, had fired Mr. Balestrazzi. (Kleinhendler Decl. Ex. 3 p. 1027.) Mr. Balestrazzi's departure spurred the departure of many other Glasswall engineers, leaving the

company disorganized and even less able to meet its already compromised contractual commitments to Monadnock. (Kleinhendler Decl. 3 p. 1028-29.) Nevertheless, Monadnock agreed to attempt to continue to work with Glasswall to get the project back on track. (Kleinhendler Decl. Exs. 8 p. 1506; 17.)

71. By letter dated August 16, 2013, Glasswall's attorney, Clinton Flagg, wrote to Monadnock confirming that "Glasswall will expedite production and delivery of the completed window assemblies forthwith such that Glasswall can comply with its contractual obligations with Monadnock." (Kleinhendler Decl. Ex. 18.) But, by early September, matters had not improved. Glasswall had no curtainwall units ready to ship. (Kleinhendler Decl. Ex. 5 p. 2013.) Yet at that point, as Mr. Bauso explained:

> [B]y September we had already paid them several million dollars for engineering, for performance mockups, the material deposits they requested – and we paid deposits to their material suppliers, which we paid to Glasswall, not directly to suppliers. So just keep in mind at this point we were out of pocket several million dollars, and things were not moving along very well. And it was a growing concern as to where this was all going.

(Kleinhendler Decl. Ex. 3 p. 1033-34.)

**Glasswall Defaults**

72. By letter dated September 16, 2013, Monadnock issued a default notice to Glasswall. (Kleinhendler Decl. Exs. 19; 20.) Notice was also provided to WFIC. (Kleinhendler Decl. Exs. 20; 21.) The parties met in New York on September 18, 2013 to try to resolve the situation. Glasswall had just hired John Anderson to replace Mr. Balestrazzi and promised to expedite its manufacture of windows. (Kleinhendler Decl. Ex. 5 p. 2009.)

73. However, Glasswall could not satisfy Monadnock's ongoing concerns about its ability to timely manufacture the curtainwall units. (Kleinhendler Decl. Exs. 3 p. 1052.) Specifically, in October 2013, Monadnock had sent its own consultant, Steve Barber, down to Glasswall's

facilities to monitor the window production progress. (Kleinhendler Decl. Exs. 3 p. 1050; 23 p. 666.)

74. Barber's reports were disturbing. Barber sent back detailed reports showing that Glasswall did not have sufficient staff manning the construction lines and that they were not in a position to meet their own revised recovery schedules. (Kleinhendler Decl. Ex. 23 p. 689.) Barber further confirmed that Glasswall was struggling to complete the engineering releases necessary for Keymark and AGC to produce the glass and metal frames. (Kleinhendler Decl. Exs. 3 p. 1040; 23 p. 706-08.) Indeed, Barber further observed that even the work Glasswall reported to Monadnock as completed was in fact unfinished. (Kleinhendler Decl. Ex. 23 p. 721.)

75. Glasswall's continued delays in manufacturing the curtainwall units prompted Monadnock to send another default notice on October 23, 2013. (Kleinhendler Decl. Ex. 24.) WFIC was again noticed. (Kleinhendler Decl. Exs. 25; 26.)

76. The parties met again in mid-November in New York. (Kleinhendler Decl. Exs. 3 Bauso Tr. 1050; 5 p. 2028.) By then, Glasswall claimed to have curtainwall units for five floors ready to ship and were demanding payment before shipment. (Kleinhendler Decl. Ex. 27.) The units were not complete floors, but were sections of each floor. (Kleinhendler Decl. Exs. 5 p. 2031; 23 p. 760.) Additionally, the units had deficiencies identified by IBA in a 10-page report. (Kleinhendler Decl. Ex. 28.) As Mr. Bauso explained:

> John had some quantity of widows that he was purporting were ready for shipment. But there were still a number of open issues. There was still quality control issues that had not been addressed ... There was still an issue in my mind of what is really our ongoing schedule here, about all the material that they needed to continue assembly was in their shop. There was some concern. "Okay. We are going to take a couple of trucks of windows, mobilize all iron workers. And then what happens? You know, are they going to really have material to continue working?"

(Kleinhendler Decl. Ex. 3 p. 1047.) This was a critical question.

77. Monadnock could not take and install a handful of floors of curtainwall units and then look elsewhere should Glasswall fail to complete the Contracts:

> [I]f we started installing two or three floors of windows, and their factory was not able to complete this we – you would not be able to find another factory that could manufacture that exact window. So essentially, you'd have to tear out and start all over again whatever you installed.

(Kleinhendler Decl. Ex. 3 p. 1053.)

78. Accordingly, on November 27, 2013, the project architect, Ismael Levya, stated that sufficient cause existed to terminate the Glasswall Contracts. (Kleinhendler Decl. Exs. 29; 30.) Monadnock sent another default letter on December 31, 2013. (Kleinhendler Decl. Ex. 31) WFIC was notified. (Kleinhendler Decl. Ex. 32.) At that point, the concrete infrastructures of both towers were complete and not a single curtainwall unit had been delivered to the site. (Kleinhendler Decl. Ex. 4 p. 240.)

79. The parties continued to talk, but to no avail. (Kleinhendler Decl. Ex. 3 p. 1076-77.) Glasswall did not deliver any units. (Kleinhendler Decl. Ex. 3 p. 1076-82.) On January 13, 2014, Monadnock terminated Glasswall's Contracts. (Kleinhendler Decl. Ex. 33.) Monadnock kept a skeleton crew on the job site to avoid a shutdown by the NYC Department of Buildings but very little work could be accomplished without the weatherproofing provided by the curtainwall units. (Kleinhendler Decl. Exs. 4 p. 418; 8 p. 1495-96.)

80. On February 24, 2014, WFIC sued Glasswall, its owner Ugo Colombo, and Ugo's wife, Sara Jayne Kennedy Colombo in the Southern District of New York, seeking the immediate payment of $13 million under their indemnity of the performance bonds. (Kleinhendler Decl. Ex. 34.) WFIC did not immediately take over the project. (See Boote Decl. ¶¶ 3-7.) Instead, it let the project linger in a practical shutdown while it negotiated with the parties. (See Boote Decl. ¶¶ 3-7.)

**The Amendment Agreement**

81. Discussions proceeded between the parties and on April 4, 2014, the parties, including WFIC, executed an Agreement to Amend Contracts (the "Amendment Agreement") which permitted Glasswall to continue to manufacture curtainwall. (WFIC'S R. 56.1 Stmnt. ¶¶ 17, 18; Boote Decl. ¶ 8, Ex. E.) Under the agreement, WFIC immediately wired $3,893,943 to Glasswall to help it finance the curtainwall manufacture. (WFIC'S R. 56.1 Stmnt. ¶¶ 17, 18; Boote Decl. ¶¶ 8, 9, Ex. E.)

82. Subsequent to signing the Amendment Agreement, Monadnock agreed to accept delivery of the window assemblies Glasswall had finished, and Glasswall finally began delivering units. (Kleinhendler Decl. Exs. 4 p. 294, 581-86; 35.)

83. By October 2014, more than a full year after the originally required delivery dates, several floors were still missing. (Kleinhendler Decl. Exs. 4 p. 294; 36.) However, Glasswall refused to make the last shipment unless Monadnock first paid for the windows. (Kleinhendler Decl. Exs. 4 p. 295; 36.) This was contrary to the Amendment Agreement which permitted Monadnock to place the last payment in escrow pending resolution of performance subsequent to April 2014 when the Amendment Agreement was signed. (Kleinhendler Decl. Exs. 3 p. 1084; 4 p. 600.) Nevertheless, with no other options, Monadnock paid. Glasswall shipped the final windows in late December 2014. (Kleinhendler Decl. Ex. 4 p. 582-83.)

84. In February 2015, Mr. Anderson left Glasswall and Ugo Colombo sold Glasswall's assets. (Kleinhendler Decl. Ex. 4 p. 2297.) By that time, the curtainwall units had been delivered but there were substantial issues with missing or damaged parts. Despite repeated requests from Monadnock, Glasswall did not respond to demands to fix the deficiencies. (Kleinhendler Decl. Exs. 3 p. 1135, 1166; 4 p. 574.)

85. On March 4, 2015, Monadnock sent Glasswall a notice of default detailing at least 30 deficiencies in the delivered curtainwall units. (WFIC'S R. 56.1 Stmnt. ¶ 23; Boote Decl. ¶ 11, Ex. F.) These included:

1. 4 terrace doors for Parcel B remain to be supplied;
2. Over 150 window casements were supplied with the handle on the wrong side of the casement and need to be corrected;
3. Replace all broken windows delivered to the Projects;
4. All casements with noted IBA deficiencies including but not limited to structural glazing leak repairs, gasket repairs and casement edge delineation repairs, must be corrected;
5. PE stamped shop drawings and structural calculations must be provided;
6. All warranties required by the Agreements must be provided and the companies behind the warranties including but not limited to Glasswall, Keymark and AGC, must be capable of satisfying the warranty obligations;
7. All LEED documentation required by the Agreements must be provided;
8. Field measured metal infill panels at three and four way window system transitions must be provided;
9. The picture frame metal for Parcel B storefront must be provided;
10. All missing or damaged painted finished metal alucobond panels must be provided;
11. All window panels that were not supplied with tree attachment clips (or that were supplied with the clips installed in the wrong location) must be supplied, installed and/or corrected, as needed;
12. All windows with micro bubble silicon sealant deficiencies noted in the IBA reports must be corrected;
13. All limit arms without a visible DOH stamp must be corrected;
14. All deficiencies, if any, in the hoist run apartment windows must be corrected;
15. All missing interior finish metal trim material, if any, must be supplied;
16. All missing exterior metal coping material must be supplied;
17. All material certifications must be supplied;
18. All missing locksets for the balcony doors must be supplied;
19. Windows for each roof bulkhead must be supplied;
20. All overrun extrusions must be supplied;
21. All missing Parcel B ACM panel work must be supplied;
22. All missing sheet metal left handed clips must be supplied;
23. All missing coping fasteners must be supplied;
24. All missing parapet hook anchors must be supplied;
25. All missing sealant must be supplied;
26. All missing fasteners must be supplied;
27. All missing fist brackets must be supplied;
28. All additional window locksets must be supplied;
29. All touch up spray paint must be supplied; and,
30. Final lien waivers for all suppliers must be provided.

(Boote Decl. ¶ 11, Ex. F.)

86. Notice was also given to WFIC. (WFIC'S R. 56.1 Stmnt. ¶ 23; Boote Decl. ¶ 11, Ex. F.)

87. Glasswall did not respond. (Kleinhendler Decl. Ex. 3 p. 1135, 1090-91.) The deficiencies prevented Monadnock from obtaining Temporary Certificates of Occupancy ("TCO"). (Kleinhendler Decl. Ex. 3 p. 1003-07.)

88. On March 16, 2015, Monadnock again terminated the Glasswall Contracts. (WFIC'S R. 56.1 Stmnt. ¶ 26; Boote Decl. ¶ 13, Ex. H.) The architect, Ismael Levya, concurred with the termination. (Kleinhendler Decl. Exs. 37; 38.) WFIC was notified. (WFIC'S R. 56.1 Stmnt. ¶ 26; Boote Decl. ¶ 13, Ex. H.) By letter dated April 25, 2015, WFIC denied coverage under the Bonds and refused to remedy the deficiencies set forth in the March 4 letter, or pay for them. (WFIC'S R. 56.1 Stmnt. ¶ 31; Boote Decl. ¶ 17, Ex. K.)

**Monadnock Obtains TCOs**

89. Monadnock obtained the first TCO for groups of floors in Parcel A on July 8, 2105 (Kleinhendler Decl. Exs. 3 p. 1475; 39), eleven months later than the original baseline schedule. (Kleinhendler Decl. Ex. 9.) The first TCO for Parcel B was obtained on July 22, 2015 (Kleinhendler Decl. Exs. 8 p. 1476; 40), 12 months later than the baseline schedule. (Kleinhendler Decl. Ex. 10.) Subsequent TCOs were obtained for the upper floors of each building. (Kleinhendler Decl. Ex. 41.) The project architect certified both Parcels A and B as substantially completed on November 30, 2015. (Kleinhendler Decl. Exs. 42 and 43.) The ownership entities accepted the completed buildings from Monadnock on December 3, 2015, with an exception for any disputes or claims related to Glasswall. (Kleinhendler Decl. Exs. 3 p. 982-83; 44; 45.)

**Arbitration**

90. Section 6.3 of the Contracts provided for, among other things, arbitration of disputes between the parties:

> This agreement to arbitrate. . . shall be specifically enforceable under applicable law in any court having jurisdiction thereof. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

(Kleinhendler Decl. Exs. 6; 7 sec. 6.3).

91. Because of Glasswall's late and defective performance of the Contracts, on March 4, 2015, Monadnock commenced an arbitration (the "Arbitration") under the auspices of the American Arbitration Association (the "AAA") in New York, New York, by filing a demand (the "Demand") seeking, among other things an award of its delay damages and damages for Glasswall's defective performance. (WFIC'S R. 56.1 Stmnt. ¶ 24; Boote Decl. ¶ 12, Ex. G.)

92. Monadnock additionally commenced the instant action against WFIC on December 22, 2015, by summons with notice in New York State Supreme Court. (Dkt. 1.) WFIC subsequently removed it to this Court. (Dkt. 1.) Thereafter, on March 1, 2016, Monadnock filed a complaint (the "Complaint"). (Dkt. 9.) On April 4, 2016, WFIC moved to dismiss the Complaint. (Dkt. 20.) By order dated May 16, 2016, Judge Weinstein denied WFIC's motion, and issued a stay of the action pending resolution of the Arbitration. (Dkt. 30.) Judge Weinstein, acknowledging that WFIC's liability was contingent upon the outcome of the Arbitration, wrote "[the outcome of the Arbitration] may moot the present case." (Dkt. 30.)

93. Following nine days of hearings, beginning November 14, 2016 and ending February 28, 2017, Monadnock and Glasswall submitted post-hearing briefs. (WFIC'S R. 56.1 Stmnt. ¶ 32; Boote Decl. ¶ 18, Ex. L.)

94. In its post-hearing brief, Glasswall sought to avoid liability by asserting defenses including that (1) Glasswall substantially performed; (2) Monadnock did not afford Glasswall an opportunity to remedy defects; and (3) Monadnock did not pay in strict accordance with the Amendment Agreement, and thus waived its claims against Glasswall.  (Kleinhendler Decl. Ex. 46.)

95.  The panel issued an award (the "Award") on August 29, 2017.  (WFIC'S R. 56.1 Stmnt. ¶ 32; Boote Decl. ¶ 18, Ex. L.)  Although the Award mentions, in dicta, that Monadnock should have accepted some windows in the fall of 2013, it concluded that delay damages were appropriate but for the lack of a baseline schedule:

> It is clear that Glasswall did cause delays and breached its Subcontracts by failing to deliver in accordance with the time requirements set forth in its Subcontracts, but without a baseline schedule against which an as-built schedule is compared, we are unable to determine which delays became the controlling delays and who was responsible for those controlling delays.

(Award p. 11.)

96.   The Panel concluded that performance damages should be awarded:

> The evidence established that Glasswall was paid for some material it did not supply or some which required extensive field remediation.  In fact, Glasswall has conceded that a credit of $308,739.16 is due to Monadnock for such matters.  We have carefully reviewed the category of damages referred to by Monadnock as "Performance Damages" and have awarded such damages as indicated in the attached Schedule A.

(Award p. 12.)

97.  The decision went on to award "the sum of $1,280,003.25 against Glasswall, LLC with interest at the rate of 5% per annum commencing on March 5, 2015" plus administrative fees and expenses.  The total Award was $1,499,255.18.  (Award p. 13.)  This Court confirmed the Award and entered judgment in the amount of $1,526,257.87, on February 2, 2018. (Dkt. 105.)

Dated: New York, New York
February 28, 2018

                                                       **WACHTEL MISSRY LLP**

By:   */s/ Howard Kleinhendler*
      Howard Kleinhendler
      Evan Weintraub
      Jocelyn Weinstein
One Dag Hammarskjold Plaza
885 Second Avenue, 47th Floor
New York, NY 10017
(212) 909-9519
*Attorneys for Plaintiff*