UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MONADNOCK CONSTRUCTION, INC.,

                              Plaintiff,

        -against-

WESTCHESTER FIRE INSURANCE

COMPANY,

                              Defendant.

Case No.: 16 CIV 00420 (JBW)
ECF Case

-------------------------------------------------------------X

WESTCHESTER FIRE INSURANCE

COMPANY,

                              Third-Party Plaintiff,

        -against-


GLASSWALL, LLC, UGO COLOMBO, and

SARA JAYNE KENNEDY COLOMBO,

                              Third-Party Defendants.

-------------------------------------------------------------X


**MEMORANDUM OF LAW BY MONADNOCK CONSTRUCTION, INC.
IN OPPOSITION TO MOTION BY WESTCHESTER FIRE INSURANCE COMPANY
FOR SUMMARY JUDMENT AND IN SUPPORT OF ITS CROSS-MOTION FOR
SUMMARY JUDGMENT**


WACHTEL MISSRY LLP
885 Second Avenue
New York, NY 10017
(212) 909-9500


047842-002/00117565-1

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................(ii)

Preliminary Statement ................................................................................................1

Factual Background ....................................................................................................2

    The Project .............................................................................................................2

    The Contracts ........................................................................................................3

    Glasswall's Delays Begin ......................................................................................5

    Glasswall Fails to Timely Provide Engineering Releases .....................................6

    Glasswall Chose to Work on Four Other Large Projects Instead of Hunter's Point ...............7

    Glasswall Defaults .................................................................................................8

    The Amendment Agreement ................................................................................10

    Monadnock Obtains TCOs ..................................................................................13

    Arbitration ...........................................................................................................13

Argument ..................................................................................................................15

    A.  Standard of Review .......................................................................................15

    B.  Monadnock's Claims and WFIC's Defenses Were Resolved in Arbitration. .................15

        i.  WFIC is Liable for the Arbitration Award ..........................................15

        ii.  WFIC Incorrectly Argues that the Award's Damages Relate
           to Monadnock's 2014 Termination ..................................................17

        iii.  WFIC's Remaining Defenses Arguments Are Barred by the Award .................19

    C.  Questions of Fact Preclude Summary Judgment ...........................................22

Conclusion ................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

845 UN Ltd. Partn. v. Flour City Architectural Metals, Inc.,
   813 N.Y.S.2d 404 (N.Y. App. Div. 1st Dept. 2006)............................................................ 21

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986)........................................................................................................... 15

Azevedo & Boyle Contracting, Inc. v. J. Greaney Const. Corp.,
   728 N.Y.S.2d 743 (N.Y. App. Div. 2d Dept. 2001) ........................................................... 16

Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York,
   886 N.E.2d 127 (N.Y. 2008)............................................................................................... 22

Fid. and Deposit Co. of Maryland v. Parsons & Whittemore Contractors Corp.,
   397 N.E.2d 380 (N.Y. 1979)........................................................................................ 15, 17

Fox Film Corp. v. Springer,
   8 N.E.2d 23 (N.Y. 1937).................................................................................................... 21

Lockheed Martin Transportation Sec. Sols. v. MTA Capital Constr. Co., 09 CIV. 4077 (PGG),
   2014 WL 12560686 (S.D.N.Y. Sept. 16, 2014).................................................................. 21

Mahler v. Campagna,
   876 N.Y.S.2d 143 (N.Y. App. Div. 2d Dept. 2009) ........................................................... 16

Makowski v. Becom Real, Inc.,
   831 N.Y.S.2d 360 (N.Y. Sup. Ct. 2006) ............................................................................ 20

Matter of Oriskany Cent. Sch. Dist. (Edmund J. Booth Architects, A.I.A.),
   615 N.Y.S.2d 160 (N.Y. App. Div. 4th Dept. 1994) .......................................................... 21

Opals on Ice Lingerie v. Bodylines Inc.,
   320 F.3d 362 (2d Cir. 2003)............................................................................................... 15

Panasia Estates, Inc. v. Hudson Ins. Co.,
   886 N.E.2d 135 (N.Y. 2008)............................................................................................... 22

QDR Consultants & Dev. Corp. v. Colonia Ins. Co.,
   675 N.Y.S.2d 117 (N.Y. App. Div. 2d Dept. 1998) ........................................................... 16

Woodman v. WWOR-TV, Inc.,
   411 F.3d 69 (2d Cir. 2005)................................................................................................. 15

Plaintiff Monadnock Construction, Inc. ("Monadnock"), respectfully submits this memorandum of law in opposition to Westchester Fire Insurance Company's ("WFIC") Motion for Summary Judgment and in Support of its Cross-Motion for Summary Judgment.

## PRELIMINARY STATEMENT

WFIC underwrote and issued two identical payment and performance bonds (the "Bonds") guaranteeing the obligation of subcontractor Glasswall, LLC ("Glasswall") to provide curtainwall units for two buildings in Queens, New York to Monadnock, pursuant to two subcontracts (the "Contracts").  Glasswall failed to perform in multiple ways.  It provided the curtainwall egregiously late, and with significant defects. Pursuant to the Contracts, Monadnock commenced an arbitration against it (the "Arbitration") to recover.  At the conclusion of the Arbitration, the arbitrators awarded Monadnock nearly $1.5 million in damages not for Glasswall's delay, but only for its defective and deficient performance.  Monadnock brought this action against WFIC to recover that amount.

In WFIC's Motion for Summary Judgment, it admits that its Bonds incorporate the Contracts, including their mandatory arbitration requirement.  WFIC also admits that, as a result, collateral estoppel bars it from relitigating that which was decided in Arbitration.  Curiously, however, in an attempt to shirk its own obligations, WFIC does just that.

In the course of its dealings with Glasswall, Monadnock terminated it twice and made two attendant bond claims: one in January 2014 (the "First Bond Claim") and one in March 2015 the ("Second Bond Claim").  WFIC points to the arbitrators' dicta determination that, in late 2013, Monadnock should have accepted a certain limited number of late windows from Glasswall, to escape liability.  WFIC argues that this invalidates Monadnock's January 2014 termination of

Glasswall for its delayed – not defective – performance and subsequent First Bond Claim. This finding fails to absolve WFIC of liability for many reasons. First, in April 2014, Monadnock, Glasswall, and WFIC executed a settlement agreement (the "Amendment Agreement") by which Monadnock agreed to accept Glasswall's curtainwall, thereby remedying any conceivable breach by Monadnock, and purging any capacity of that finding to taint the Second Bond Claim. Second, this argument fails to appreciate that the Award was for the Second Bond Claim, relating to Glasswall's defective and deficient performance, not the First.

To attempt to escape its liability for the Second Bond Claim, WFIC recycles the defenses Glasswall unsuccessfully asserted in the Arbitration. Specifically, WFIC argues that Monadnock's second termination was after Glasswall had substantially performed, and that Monadnock failed to abide by the Amendment Agreement's dispute resolution process. Glasswall made these exact arguments in Arbitration. The arbitrators dismissed them, and now WFIC is bound.

Because WFIC does not raise any viable defenses that were unique to the Bonds or not resolved against it in the Arbitration, it is not entitled to summary judgment absolving it of liability. As a corollary, since WFIC cannot avoid its liability, Monadnock is entitled to summary judgment on its cross-motion.

## FACTUAL BACKGROUND

### The Project

The Hunter's Point development was a New York City affordable housing initiative for the construction of high-rise residential towers in Long Island City. This included: Parcel A ("Parcel A"), a 37-floor 619-unit residential unit building on 1-50 50th Avenue; and Parcel B ("Parcel B"), a 32-story 306-unit residential unit building at 1-55 Borden Avenue. (Monadnock's Counterstatement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("CSOF") ¶ 43.)

Monadnock was part of the team that won the bid to construct the towers.  (CSOF ¶ 44.) A member of the project's architectural team recommended Glasswall as a potential curtainwall manufacturer and, after checking with references, Glasswall was invited to bid the job in 2012. (CSOF ¶ 45.)

A "curtainwall" or window wall unit is a slab-to-slab structure that makes up the skin or envelope of the building and is comprised of metal frames, louvers, hardware, glass and gaskets. (CSOF ¶ 47.) Between the two buildings, Glasswall committed to provide over 9,000 curtainwall units consisting of several hundred different designs and multiple colors of glass. (CSOF ¶ 48.) Curtainwall is a long lead time item and is critical to the timely completion of the project. (CSOF ¶ 47.)

**The Contracts**

Glasswall's obligations were set forth in two Contracts: modified AIA Standard Form Agreements Between Contractor and Subcontractor.  (CSOF ¶ 46.)  The value of the two Contracts was $13 million. (CSOF ¶ 46.) Westchester Insurance Company underwrote two performance and payment Bonds for Glasswall, one for each tower.  (CSOF ¶ 49, Dkt. 9-1.)  The Contracts are nearly identical and were modeled after a form contract annexed as Exhibit F to two construction management contracts between the ownership entities of Parcels A and B and Monadnock (the "CM Agreements").  (CSOF ¶ 46.)  The CM Agreements were also nearly identical.  (CSOF ¶ 46.) The ownership entities for Parcels A and B were represented by the Related Companies, which was also a member of the ownership entities. (CSOF ¶ 51.)

The Contracts had standard flow-down provisions that permitted Monadnock to pursue claims against Glasswall on behalf of the owners. (CSOF ¶ 51.)[1]  Under the CM Agreements'

---

[1]  A Related Companies executive, Michael Trovini, testified that under the CM Agreement, Monadnock remains liable to the ownership entities for damages incurred from Glasswall's late

baseline schedules, Parcel A was to have its first TCO by August 2014 and Parcel B was to have its first TCO by July 2014. (CSOF ¶ 52.)

Under the Contracts, the curtainwall units were to be completed and ready to ship by July 1, 2013 for Parcel B and September 1, 2013 for Parcel A. (CSOF ¶ 54.) These dates were "time is of the essence." (CSOF ¶ 54.) Glasswall was required to have enough curtainwall units completed to accommodate installation as the concrete infrastructure of the two buildings was being erected. In fact, the Contracts required the "Manufacturer to be 6 floors below the Superstructure Contractor." (CSOF ¶ 54.) Curtainwall units were to be shipped floor by floor with completed assemblies in correct positions to allow for seamless installation. (CSOF ¶ 54.) The pace of curtainwall deliveries was required to accommodate the installation of "two floors per week." (CSOF ¶ 54.)

The Contracts were "design-build." (CSOF ¶ 55.) As such, Glasswall was obligated to procure materials and develop all engineering designs to construct curtainwall units that conformed to the shop drawings and plans provided by the projects' architect, Ismael Levya Architects, P.C. (CSOF ¶ 55.) Specifically, to permit the metal fabricator to make the correct cuts and holes for each curtainwall unit, Glasswall was required to engineer "cut sheets" that conformed to the shop drawings. (CSOF ¶ 56.) The cut sheets took time to prepare because of the intense detail required for every curtainwall panel. (CSOF ¶ 56.) This task was exacerbated by the hundreds of different curtainwall unit designs required for the Project. (CSOF ¶ 56.)

---

and defective delivery of curtainwall units. (CSOF ¶ 51.) Greg Bauso, president of Monadnock, confirmed this. (CSOF ¶ 51.)

**Glasswall's Delays Begin**

Construction of the two towers began in February 2013. (CSOF ¶ 57.)  By April 2013, the curtainwall visual mockups had been approved; the glass and paint colors had been selected; and Glasswall's glass supplier, AGC, was told to manufacture the glass for the performance mockups.[2] (CSOF ¶ 57.)  On May 31, 2013, Monadnock sent Glasswall a weekly floor-by-floor concrete erection schedule showing exactly when each floor of each building was to be poured to ensure that Glasswall would deliver a steady and interrupted supply of Halfen anchors that were required to be embedded in the concrete.[3] (CSOF ¶ 59.) During a June conversation between Paul Colapinto, Monadnock's Senior Vice President and project manager and Frederico Balestrazzi, Glasswall's president, Mr. Balestrazzi stated that Glasswall was going to have problems meeting the Contracts' delivery dates. (CSOF ¶ 60.)  As a result, by email dated June 12, 2013, Monadnock agreed to take delivery of the Parcel B curtainwall units on September 16, and Parcel A curtainwall on October 1.  (CSOF ¶ 61.)  Although Monadnock gave Glasswall extra time to deliver the windows, Monadnock was ready to receive the windows under the original time frames set in the Contracts and to store them on site until they were ready for installation. (CSOF ¶ 62.)

Mr. Colapinto stressed that the projects could not suffer additional delays, and Mr. Balestrazzi assured him there would not be any. (CSOF ¶ 63.) Nevertheless, the delays continued

---

[2] Problems arose with the performance mock ups; the curtainwall sample units fabricated by Glasswall to test performance. (CSOF ¶ 58.)  Israel Berger Associates ("IBA"), the projects' quality control consultant, reported that some of the glass leaked internally and the glass looked visually distorted.  (CSOF ¶ 58.)

[3] The Halfen anchor secures the curtainwall unit to the concrete slab and has to be installed in the correct position to properly mate with the window unit. Then a C channel is bolted to the slab edge. The curtainwall unit sits on top of the C-channel.  (CSOF ¶ 59.)  Glasswall was responsible for manufacturing, procuring and delivering the Halfen anchors and C-channels to the site.  (CSOF ¶ 59.)

and in early summer 2013, Monadnock visited Glasswall's factory in Florida and repeatedly asked about progress on the curtainwall fabrication. (CSOF ¶ 64.) By July, there was still no progress with curtainwall fabrication and Glasswall informed Monadnock that windows would not be ready even for the new, pushed out, delivery dates.  (CSOF ¶ 65.)  As explained by Mr. Colapinto, this continued delay alarmed Monadnock management: "[B]ecause scheduling was of utmost importance when it came to curtain walls. If we didn't know where the windows were, we couldn't build the project correctly."  (CSOF ¶ 65.)

**Glasswall Fails to Timely Provide Engineering Releases**

The problems in curtainwall fabrication were originally driven by delays in Glasswall's engineering and release dates.  (CSOF ¶ 66.)  As Mr. Bauso, Monadnock's president, explained:

> The curtain wall guys have to – their engineering department has to produce very specific cut sheets as to how they want the metal, how they want the glass sized and fabricated. They can't just send the approved shop drawings from the architect to the metal factory. They have to give very, very specific engineered cut sheets to their fabricators. And, you know, it's one of the things we typically ask about, because, if that isn't done, we have good reason to believe that they are not going to be able to get us the windows when they are promising. So just as a matter of business, this is – this is one of the things we always focus on. And it was becoming apparent that their engineering department wasn't getting these materials released when they should have been.

(CSOF ¶ 66.)

In early summer 2013, Mr. Bauso contacted Glasswall's metal extruder, Keymark, to determine whether they had received Glasswall's cut sheets and were working on the project. (CSOF ¶ 67.)  Keymark confirmed they had a purchase order from Glasswall, but did not yet have the cut sheets and engineering releases from Glasswall. (CSOF ¶ 67.)  Monadnock continued to question Mr. Balestrazzi about the delays in releasing engineering to Keymark, "and the answers he was giving made it obvious he wasn't going to make the dates he had previously committed to, even the revised dates he had previously committed to." (CSOF ¶ 67.)  This prompted Monadnock

to alert the bonding company, on August 12, 2013, to a potential default by Glasswall. (CSOF ¶ 67.)

## **Glasswall Chose to Work on Four Other Large Projects Instead of Hunter's Point**

On August 13, 2013, Mr. Bauso and Michael Trovini met with Glasswall officials at Glasswall's Miami facility. (CSOF ¶ 68.) During the visit, Mr. Trovini observed that Glasswall was not working on the Hunter's Point project and instead was devoting its staff and resources to other projects:

> And we discussed the status of the project, and we toured the factory and I recall breaking – and they were manufacturing not our product, meaning the window wall. I discovered because I went over to the engineering department as – as opposed to walking the factory and watching somebody else's window wall being manufactured, which is a complete waste of time, to see if the engineers had done anything as it relates to designing and getting the window wall parts and pieces designed so that they could go and manufacture it. And the engineers were not working on it – and there was only like a few of them – who were not working on our project.

(CSOF ¶ 68.)

Indeed, between January and September 2013 when Glasswall was supposed to be working on the Hunter's Point project, it was working on at least four other Florida curtainwall projects: 1) the Monte Carlo Hotel, a 20-story high rise; 2) the Edition Hotel, a hotel and residential condominium; 3) the Perry Rooney Hotel a hotel condo project; and 4) the Oceana a condo residence. (CSOF ¶ 69.)  These projects were all approximately 80-90 percent complete by September 2013 and were staffed by 80 Glasswall employees. (CSOF ¶ 69.)

As Mr. Bauso recalled, by the time of the August 13th meeting, Ugo Colombo, Glasswall's owner, had fired Mr. Balestrazzi. (CSOF ¶ 70.) Mr. Balestrazzi's departure spurred the departure of many other Glasswall engineers, leaving the company disorganized and even less able to meet its already compromised contractual commitments to Monadnock. (CSOF ¶ 70.) Nevertheless,

Monadnock agreed to attempt to continue to work with Glasswall to get the project back on track.
(CSOF ¶ 70.)

By letter dated August 16, 2003, Glasswall's attorney, Clinton Flagg, wrote to Monadnock
confirming that "Glasswall will expedite production and delivery of the completed window
assemblies forthwith such that Glasswall can comply with its contractual obligations with
Monadnock." (CSOF ¶ 71.) But, by early September, matters had not improved. Glasswall had
no windows ready to ship. (CSOF ¶ 71.) Yet, at that point, as Mr. Bauso explained:

> [B]y September we had already paid them several million dollars for engineering,
> for performance mockups, the material deposits they requested – and we paid
> deposits to their material suppliers, which we paid to Glasswall, not directly to
> suppliers. So just keep in mind at this point we were out of pocket several million
> dollars, and things were not moving along very well. And it was a growing concern
> as to where this was all going.

(CSOF ¶ 71.)

### Glasswall Defaults

By letter dated September 16, 2013, Monadnock issued a default notice to Glasswall.
(CSOF ¶ 72.) Notice was also provided to WFIC. (CSOF ¶ 72.) The parties met in New York on
September 18, 2013 to try to resolve the situation. (CSOF ¶ 72.) Glasswall had just hired John
Anderson to replace Mr. Balestrazzi and promised to expedite its manufacture of curtainwall units.
(CSOF ¶ 72.)

However, Glasswall could not satisfy Monadnock's ongoing concerns about its ability to
timely manufacture the curtainwall units. (CSOF ¶ 73.) Specifically, in October 2013,
Monadnock had sent its own consultant, Steve Barber, down to Glasswall's facilities to monitor
the window production progress. (CSOF ¶ 73.)

Barber's reports were disturbing. Barber sent back detailed reports showing that Glasswall
did not have sufficient staff manning the construction lines and that they were not in a position to

meet their own revised recovery schedules. (CSOF ¶ 74.) Barber further confirmed that Glasswall was struggling to complete the engineering releases necessary for Keymark and AGC to produce the glass and metal frames. (CSOF ¶ 74.) Indeed, Barber further observed that even the work Glasswall reported to Monadnock as completed was in fact unfinished. (CSOF ¶ 74.)

Glasswall's continued delays in manufacturing the curtainwall units prompted Monadnock to send another default notice on October 23, 2013. (CSOF ¶ 75.) WFIC was again noticed. (CSOF ¶ 75.)

The parties met again in mid-November in New York. (CSOF ¶ 76.) By then, Glasswall claimed to have curtainwall units for five floors ready to ship and were demanding payment before shipment. (CSOF ¶ 76.) The units were not complete floors, but were sections of each floor. (CSOF ¶ 76.) Additionally, the units had deficiencies identified by IBA in a 10-page report. (CSOF ¶ 76.) As Mr. Bauso explained:

> John had some quantity of widows that he was purporting were ready for shipment. But there were still a number of open issues. There was still quality control issues that had not been addressed ... There was still an issue in my mind of what is really our ongoing schedule here, about all the material that they needed to continue assembly was in their shop. There was some concern. "Okay. We are going to take a couple of trucks of windows, mobilize all iron workers. And then what happens? You know, are they going to really have material to continue working?"

(CSOF ¶ 76.) This was a critical question.

Monadnock could not take and install a handful of floors of curtainwall units and then look elsewhere should Glasswall fail to complete the Contract:

> [I]f we started installing two or three floors of windows, and their factory was not able to complete this we – you would not be able to find another factory that could manufacture that exact window. So essentially, you'd have to tear out and start all over again whatever you installed.

(CSOF ¶ 77.)

Accordingly, on November 27, 2013, the project architect, Ismael Levya, stated that sufficient cause existed to terminate the Glasswall Contract. (CSOF ¶ 78.) Monadnock sent another default letter on December 31, 2013. (CSOF ¶ 78.)  WFIC was notified. (CSOF ¶ 78.) At that point, the concrete infrastructures of both towers were complete and not a single curtainwall unit had been delivered to the site. (CSOF ¶ 78.)

The parties continued to talk, but to no avail. (CSOF ¶ 79.) Glasswall did not deliver any units. (CSOF ¶ 79.) On January 13, 2014, Monadnock terminated Glasswall's Contracts. (CSOF ¶ 79.)  Monadnock kept a skeleton crew on the job site to avoid a shutdown by the NYC Department of Buildings, but very little work could be accomplished without the weatherproofing provided by the curtainwall units. (CSOF ¶ 79.)

On February 24, 2014, WFIC sued Glasswall, its owner Ugo Colombo, and Ugo's wife, Sara Jayne Kennedy Colombo in the Southern District of New York, seeking the immediate payment of $13 million under their indemnity of the Bonds. (CSOF ¶ 80.)  WFIC did not immediately take over the project. (CSOF ¶ 80; see also Boote Decl. ¶¶ 3-7.)  Instead, it let the project linger in a practical shutdown while it negotiated with the parties. (CSOF ¶ 80; see also Boote Decl. ¶¶ 3-7.)

**The Amendment Agreement**

Discussions proceeded between the parties and on April 4, 2014, the parties, including WFIC, executed an Amendment Agreement which permitted Glasswall to continue to manufacture windows. (CSOF ¶ 81.) Under the agreement, WFIC immediately wired $3,893,943 to Glasswall to help it finance the curtainwall manufacture.  (CSOF ¶ 81.)

Subsequent to signing the Amendment Agreement, Monadnock agreed to accept delivery of all of the window assemblies that Glasswall had finished, and Glasswall finally began delivering

units.  (CSOF ¶ 82.) By October 2014, more than a full year after the originally required delivery dates, several floors were still missing. (CSOF ¶ 83.) However, Glasswall refused to make the last shipment unless Monadnock first paid for the windows. (CSOF ¶ 83.) This was contrary to the Amendment Agreement which permitted Monadnock to place the last payment in escrow pending resolution of performance claims since April 2014 when the Amendment Agreement was signed. (CSOF ¶ 83.) Nevertheless, with no other options, Monadnock paid. Glasswall shipped the final windows in late December 2016. (CSOF ¶ 83.)

In February 2015, Mr. Anderson left Glasswall and Ugo Colombo sold Glasswall's assets. (CSOF ¶ 84.) By this time, the curtainwall units had been delivered but there were substantial issues with missing or damaged parts. Despite repeated requests from Monadnock, Glasswall did not respond to demands to fix the deficiencies. (CSOF ¶ 84.)

On March 4, 2015, Monadnock sent Glasswall a notice of default detailing at least 30 deficiencies in the delivered curtainwall units. (CSOF ¶ 85; Boote Decl. ¶ 11, Ex. F.) Notice was also given to WFIC.  (CSOF ¶ 86; Boote Decl. ¶ 11, Ex. F.)  The deficiencies included:

1.  4 terrace doors for Parcel B remain to be supplied;
2.  Over 150 window casements were supplied with the handle on the wrong side of the casement and need to be corrected;
3.  Replace all broken windows delivered to the Projects;
4.  All casements with noted IBA deficiencies including but not limited to structural glazing leak repairs, gasket repairs and casement edge delineation repairs, must be corrected;
5.  PE stamped shop drawings and structural calculations must be provided;
6.  All warranties required by the Agreements must be provided and the companies behind the warranties including but not limited to Glasswall, Keymark and AGC, must be capable of satisfying the warranty obligations;
7.  All LEED documentation required by the Agreements must be provided;
8.  Field measured metal infill panels at three and four way window system transitions must be provided;
9.  The picture frame metal for Parcel B storefront must be provided;
10. All missing or damaged painted finished metal alucobond panels must be provided;

11.     All window panels that were not supplied with tree attachment clips (or that were supplied with the clips installed in the wrong location) must be supplied, installed and/or corrected, as needed;

12.     All windows with micro bubble silicon sealant deficiencies noted in the IBA reports must be corrected;

13.     All limit arms without a visible DOH stamp must be corrected;

14.     All deficiencies, if any, in the hoist run apartment windows must be corrected;

15.     All missing interior finish metal trim material, if any, must be supplied;

16.     All missing exterior metal coping material must be supplied;

17.     All material certifications must be supplied;

18.     All missing locksets for the balcony doors must be supplied;

19.     Windows for each roof bulkhead must be supplied;

20.     All overrun extrusions must be supplied;

21.     All missing Parcel B ACM panel work must be supplied;

22.     All missing sheet metal left handed clips must be supplied;

23.     All missing coping fasteners must be supplied;

24.     All missing parapet hook anchors must be supplied;

25.     All missing sealant must be supplied;

26.     All missing fasteners must be supplied;

27.     All missing fist brackets must be supplied;

28.     All additional window locksets must be supplied;

29.     All touch up spray paint must be supplied; and,

30.     Final lien waivers for all suppliers must be provided.

(CSOF ¶ 85; Boote Decl. ¶ 11, Ex. F.)

Glasswall did not respond. (CSOF ¶ 87.)  The deficiencies prevented Monadnock from obtaining Temporary Certificates of Occupancy ("TCO").  (CSOF ¶ 87.)

On March 16, 2015, Monadnock again terminated the Glasswall Contracts. (CSOF ¶ 88; WFIC'S R. 56.1 Stmnt. ¶ 26; Boote Decl. ¶ 13, Ex. H.) The architect, Ismael Levya, concurred with the termination. (CSOF ¶ 88.)  WFIC was notified.  (CSOF ¶ 88; WFIC'S R. 56.1 Stmnt. ¶ 26; Boote Decl. ¶ 13, Ex. H.)  By letter dated April 25, 2015, WFIC denied coverage under the Bonds and refused to remedy the deficiencies set forth in the March 4 letter, or pay for them. (CSOF ¶ 88; WFIC'S R. 56.1 Stmnt. ¶ 31; Boote Decl. ¶ 17, Ex. K.)

**Monadnock Obtains TCOs**

Monadnock obtained the first TCO for groups of floors in Parcel A on July 8, 2105, eleven months later than the original baseline schedule. (CSOF ¶ 89.) The first TCO for Parcel B was obtained on July 22, 2015, 12 months later than the baseline schedule. (CSOF ¶ 89.) Subsequent TCOs were obtained for the upper floors of each building. (CSOF ¶ 89.) The project architect certified both Parcels A and B as substantially completed on November 30, 2015. (CSOF ¶ 89.) The ownership entities accepted the completed buildings from Monadnock on December 3, 2015, with an exception for any disputes or claims related to Glasswall. (CSOF ¶ 89.)

**Arbitration**

Section 6.3 of the Contracts provided for, among other things, arbitration of disputes between the parties:

> This agreement to arbitrate. . . shall be specifically enforceable under applicable law in any court having jurisdiction thereof.  The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

(CSOF ¶ 90.)

Because of Glasswall's late and defective performance of the Contracts, on March 4, 2015, Monadnock commenced an Arbitration under the auspices of the American Arbitration Association (the "AAA") in New York, New York, by filing a demand seeking, among other things an award of its delay damages and damages because of Glasswall's defective and deficient performance.  (CSOF ¶ 91; WFIC'S R. 56.1 Stmnt. ¶ 24; Boote Decl. ¶ 12, Ex. G.)

Monadnock additionally commenced the instant action on December 22, 2015, by summons with notice in New York State Supreme Court.  (Dkt. 1)  WFIC subsequently removed it to this Court.  (Dkt. 1.)  Thereafter, on March 1, 2016, Monadnock filed a complaint (the "Complaint").  (Dkt. 9.)  On April 4, 2016, WFIC moved to dismiss the Complaint.  (Dkt. 20.)  By

order dated May 16, 2016, Judge Weinstein denied WFIC's motion, and issued a stay of the action

pending resolution of the Arbitration.  (Dkt. 30.)  Judge Weinstein, acknowledging that WFIC's

liability was contingent upon the outcome of the Arbitration, wrote "[the outcome of the

Arbitration] may moot the present case."  (Dkt. 30.)

Following nine days of hearings, beginning November 14, 2016 and ending February 28,

2017, and Monadnock and Glasswall submitted post-hearing briefs.  (CSOF ¶ 93.)  In its post-

hearing brief, Glasswall sought to avoid liability by asserting defenses including that (1) Glasswall

substantially performed; (2) Monadnock did not afford Glasswall an opportunity to remedy

defects; and (3) Monadnock did not pay in strict accordance with the Amendment Agreement, and

thus waived its claims against Glasswall.  (CSOF ¶ 93.)

The panel issued an award (the "Award") on August 29, 2017.  (CSOF ¶ 93; WFIC'S R.

56.1 Stmnt. ¶ 32; Boote Decl. ¶ 18, Ex. L.) Although the Award mentions, in dicta, that Monadnock

should have accepted some windows in the fall of 2013, it concluded that delay damages were

appropriate but for the lack of a baseline schedule:

> It is clear that Glasswall did cause delays and breached its Subcontracts by failing
> to deliver in accordance with the time requirements set forth in its Subcontracts,
> but without a baseline schedule against which an as-built schedule is compared, we
> are unable to determine which delays became the controlling delays and who was
> responsible for those controlling delays.

(Award p. 11).

The Panel concluded that performance damages should be awarded:

> The evidence established that Glasswall was paid for some material it did not
> supply or some which required extensive field remediation.  In fact, Glasswall has
> conceded that a credit of $308,739.16 is due to Monadnock for such matters.  We
> have carefully reviewed the category of damages referred to by Monadnock as
> "Performance Damages" and have awarded such damages as indicated in the
> attached Schedule A.

(Award p. 12).

The decision went on to award "the sum of $1,280,003.25 against Glasswall with interest at the rate of 5% per annum commencing on March 5, 2015" plus administrative fees and expenses. The total Award was $1, 499,255.18. (Award p. 13.) This Court confirmed the Award and entered judgment in the amount of $1,526,257.87, on February 2, 2018. (Dkt. 105.)

## ARGUMENT

### A.    Standard of Review.

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005); Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 367–68 (2d Cir. 2003). The substantive law governing the case will determine those facts that are "material;" only factual disputes that might affect the result of the proceeding under the governing law are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Disputes about material facts are "genuine" only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

### B. Monadnock's Claims and WFIC's Defenses Were Resolved in Arbitration.

#### i.    WFIC is Liable for the Arbitration Award.

In Fid. and Deposit Co. of Maryland, the New York Court of Appeals held that where a performance bond incorporates by reference the subcontract between a contractor and a subcontractor, and the subcontract contains an arbitration clause, the surety is bound by the outcome of the arbitration. Fid. and Deposit Co. of Maryland v. Parsons & Whittemore Contractors Corp., 397 N.E.2d 380 (N.Y. 1979). The court further found that the surety was so bound, even though it refused to participate in the arbitration:

> Although it did not agree to participate in any arbitration, it did accept the agreement of the general contractor and the subcontractor that disputes between them would be settled by arbitration. An implicit corollary of that acceptance was

agreement by the surety company that for purposes of later determining its liability under its performance bond, it would accept and be bound by the resolution reached in the arbitration forum of any dispute between the general contractor and the subcontractor.

48 N.Y.2d 127.

Furthermore, collateral estoppel applies to arbitration awards, and binds sureties to the outcomes of proceedings between contractors and subcontractors. QDR Consultants & Dev. Corp. v. Colonia Ins. Co., 675 N.Y.S.2d 117 (N.Y. App. Div. 2d Dept. 1998)(collateral estoppel bars surety with notice of the arbitration from relitigating issues decided in arbitration between contractor and subcontractor); Mahler v. Campagna, 876 N.Y.S.2d 143 (N.Y. App. Div. 2d Dept. 2009) ("res judicata and collateral estoppel apply to arbitration awards"); Azevedo & Boyle Contracting, Inc. v. J. Greaney Const. Corp., 728 N.Y.S.2d 743 (N.Y. App. Div. 2d Dept. 2001)(granting summary judgment to subcontractor on its claim against surety based on the arbitration award it obtained against contractor).  Accordingly, a surety seeking to assert a defense relating to issues adjudicated in the arbitration between the contractor and subcontractor, should do so in the arbitration, not in a later proceeding on the performance bond.  See QDR Consultants & Development Corp., 675 N.Y.S.2d at 119; Azevedo & Boyle Contracting, Inc., 285 A.D.2d at 572.

Section 1 of each of the Bonds here states:

The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated by reference herein. (emphasis added)

The "Contractor" is defined on the first page of the Bonds as Glasswall; the "Surety" is WFIC; and the "Owner" is Monadnock.  The "Construction Contract" refers to the Contracts

between Glasswall and Monadnock.   Moreover, the Bonds were specifically referenced in the

Contracts.  Section 13.7 of the Subcontract[4] for Parcel A provides:

> **§ 13.7** Performance Bond and Payment Bond:
> *(If the ~~Subcontractor~~ Manufacturer is to furnish bonds, insert the specific requirements here.)*

| Bond type | Bond amount ($0.00)($0.00) | Bond delivery date | Bond form |
|---|---|---|---|
| Supply Bond | 8,412,502 | January 3, 2013 | A312 |

In light of the above, and as WFIC admits, it is bound by the Award.   (WFIC's Moving

Br. 8.)  As such, WFIC was obligated to raise in the Arbitration, not here, any defenses it had to

payment that arise from the circumstances giving rise to the Arbitration.   Collateral estoppel

precludes WFIC from recycling defenses that were litigated in the Arbitration.

WFIC elected to abstain from participating in the Arbitration.  WFIC chose to do so even

though there can be no doubt it was aware of the proceeding, as the instant proceeding was stayed

in favor of the Arbitration.  Because WFIC, as surety, is liable for the damages assessed against

Glasswall, unless it can demonstrate that the terms of the Bonds raise a question of liability that is

unrelated to issues submitted to the arbitrators, it is responsible for the $1.5 in damages the

arbitrators awarded.  See Fidelity and Deposit Co. of Maryland, 48 N.Y.2d 127.  As is discussed

below, WFIC cannot raise such a question, and thus cannot escape its liability.

ii.   **WFIC Incorrectly Argues that the Award's Damages Relate to Monadnock's 2014 Termination.**

WFIC separates Monadnock's bond claims into its 2014 claim, which it calls the "First

Bond Claim" and Monadnock's 2015 claim which it calls the "Second Bond Claim."

---

[4] Section 13.7 in the Contract for Parcel B is substantively identical, the only difference is in the bond amount.

Monadnock's January 2014 termination, which resulted in the First Bond Claim, was based upon Glasswall's delayed performance of the Contracts.  The Award's $1.5 million in damages was not for Glasswall's delay, as arbitrators ultimately could not calculate a precise amount of damages attributable to Glasswall's delay.  (Boote Decl. Ex L, p. 11.)  Rather, the Award awarded a discrete set of damages called "Performance Damages" for Glasswall's defective and deficient work. (Boote Decl. Ex L, p. 12.)  Accordingly, the circumstances surrounding the First Bond Claim are of no moment to the damages Monadnock seeks.

Nevertheless, WFIC argues that the arbitrators' dicta finding that Monadnock breached the Contracts by refusing delivery of some windows from Glasswall at the end of 2013 exonerates it from liability for the First Bond Claim. WFIC argues that arbitrators' finding invalidates the First Bond Claim.   WFIC cites language in section 3 of the Bonds which conditions WFIC's performance obligation on whether there is "no Owner Default under the Construction Contract." Owner Default is defined in section 14.4 as:

> Failure of the Owner, <u>which has not been remedied or waived</u>, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with a <u>material term</u> of the Construction Contract.  (Emphasis added).

Under the Bonds, an Owner Default only applies if it "has not been remedied or waived." As discussed above, at most, this conclusion might have impacted Monadnock's claim for delay damages, but not for damages related to deficient and defective work.  Furthermore, in April 2014, the parties entered into the Amendment Agreement (WFIC'S R. 56.1 Stmnt. ¶ 17) and Monadnock took delivery of all of the windows that Glasswall had fabricated (Kleinhendler Decl. Exs. 4 p. 294, 581-86; 35).  Thus, any conceivable prior breach was remedied, and there is no "Owner Default" that could taint Monadnock's Second Bond Claim in March 2015, which is the only claim relevant to the $1.5 million in "Performance Damages" awarded by the arbitrators based on the

deficiencies in the delivered windows that were accepted by Monadnock. (Boote Decl. Ex L, p. 12.)

### iii.   <u>WFIC's Remaining Defenses Arguments Are Barred by the Award.</u>

WFIC raises three arguments in its moving brief relating to the Second Bond Claim.  First, it argues that Monadnock's demand for coverage under the Bonds in March 2015 referred to conduct prior to the Amendment Agreement.  (WFIC Moving Br. 16.) This is irrelevant.  As discussed above, the damages Monadnock seeks are for deficient performance and defective windows delivered after the Amendment Agreement was executed.  Monadnock's demand letter clearly referred to the deficiencies and thus gave WFIC proper notice of the coverage sought. Further, there is no dispute that WFIC denied coverage.

Second, WFIC argues that Monadnock could not have properly terminated Glasswall in March 2015 because Glasswall had substantially performed the work by then.   Glasswall unsuccessfully argued this in Arbitration.  Specifically, point five of its post-hearing brief was entitled "Glasswall Substantially Performed the Contract." (Kleinhendler Decl. Ex. 46 p. 17.) Among other things, Glasswall argued "Clearly the fact that Glasswall supplied more than 9,200 of the 9,300 windows (99%) constitutes substantial performance."[5]  Accordingly, WFIC cannot

---

[5]WFIC also argues that Glasswall had offered to complete the deficiencies set forth in Monadnock's March 4, 2015 letter. (WFIC Moving Br. 16).  Glasswall made this argument in its post-hearing brief, and the arbitrators rejected it.  Glasswall wrote:

> **(D)  Monadnock Did Not Afford Glasswall With the Opportunity to Remedy the Alleged Defects**
> [Monadnock's President] testified that Glasswall was "in breach when they refused to finish off those other (30) items."  However, upon receipt of the notice of default both the bonding company attorney and [Glasswall's President] advised that Glasswall was "ready, willing and able" to complete the work, but Monadnock refused to have any further dealings with Glasswall. (Kleinhendler Decl. Ex. 46 p. 34) (internal transcript cites omitted).

raise this argument here.   Makowski v. Becom Real, Inc., 831 N.Y.S.2d 360 (N.Y. Sup. Ct. 2006)(precluding relitigation of issues raised in arbitration).

Furthermore, the contract documents clearly provide that substantial completion could not be achieved until the project architect issued a substantial completion letter and TCOs were obtained for all floors of the project.   Specifically, section 11.9 of the Contracts, entitled, "Substantial Completion," states:

> When Manufacturer's Work or designated portion thereof is substantially completed and in accordance with the Prime Contract, the Contractor shall, upon application by the Manufacturer make prompt application for payment for such Work.

(Kleinhendler Decl. Exs. 6, 7 §11.9 (emphasis added)).

The recitals to the Contracts define the "Prime Contracts" as the CM Agreements between Monadnock and the ownership entities of Parcels A and B (Kleinhendler Decl. Exs. 1, 2, 6, 7). The CM Agreements strictly define Substantial Completion in Article 13:

> Substantial Completion.   "Substantial Completion" of the Project shall mean the date: (a) Architect certifies that the Project is finally complete; (b) the project is sufficiently complete in accordance with the Contract Documents and Legal Requirements so Owner can use the Project without interference for all its intended purposes, with only minor punch-list items of Work incomplete; and (c) a temporary certificate of occupancy has been issued by the appropriate local government authority for all parts of the building that is the subject of the Project except for two (2) apartments used for marketing and retail.

(Kleinhendler Decl. Exs. 1, 2.)

The project architect certified both Parcels as substantially completed on November 30, 2015, (Kleinhendler Decl. Exs. 41; 42), long after the March 2015 default and termination.   TCOs could not have been obtained on all floors with the deficiencies set forth in Monadnock's March 4, 2015 letter.   (Kleinhendler Decl. Ex. 3 p. 1003-07; 41; 42.)   Accordingly, as of Monadnock's March 2015 termination, Glasswall had not reached substantial completion of the project.

WFIC's reliance on <u>845 UN Ltd. Partn. v. Flour City Architectural Metals, Inc.</u>, 813 N.Y.S.2d 404 (N.Y. App. Div. 1st Dept. 2006) to argue that, by its common law definition, Glasswall had "substantially completed" is misplaced.  Rather, parties to a contract are free to specifically define terms, and those definitions control over common law definitions.  <u>See, e.g.,</u> <u>Fox Film Corp. v. Springer</u>, 8 N.E.2d 23 (N.Y. 1937)(parties may agree in contracts to assign terms specific definitions, and in construing those contracts courts should use the definitions upon which the parties agreed).  This is true when parties to a construction contract define "substantial completion."  <u>Matter of Oriskany Cent. Sch. Dist. (Edmund J. Booth Architects, A.I.A.)</u>, 615 N.Y.S.2d 160 (N.Y. App. Div. 4th Dept. 1994), <u>aff'd</u>, 654 N.E.2d 1208 (N.Y. 1995)(applying contractual definition of "substantial completion"); <u>Lockheed Martin Transportation Sec. Sols. v. MTA Capital Constr. Co.</u>, 09 CIV. 4077 (PGG), 2014 WL 12560686, at *12 (S.D.N.Y. Sept. 16, 2014)(determining substantial completion date based on definition in contract documents).

Finally, WFIC argues that under the Amendment Agreement, Monadnock was required to deposit its last payment to Glasswall in escrow in order to assert a claim.  (WFIC Moving Br. 16.)  Like its other defenses, Glasswall presented this argument at the Arbitration.  Point 3 of Glasswall's post hearing brief reads:

> **Monadnock Did Not Pay in Strict Accordance with the [Amendment Agreement]**
>
> Paragraph 13 of the [Amendment Agreement] required Monadnock to deposit monies into a Duane Morris escrow account if it wished to assert any claims… It is uncontroverted that Monadnock never paid monies to the Duane Morris escrow account and never even attempted to do so.  (Kleinhendler Decl. Ex. 46 p. 4.)

As is evidenced by the Award, the Arbitrators rejected this argument and awarded Monadnock its Performance Damages.  WFIC is bound by this conclusion.

**C.**     **Questions of Fact Preclude Summary Judgment on Monadnock's Bad Faith Claim**

By September 2013, Glasswall was in material breach of the Subcontracts.  It did not have any window wall units ready for shipment. Monadnock sent default letters in September, October and December.  (Kleinhendler Decl. Exs. 19; 21; 22; 24; 31.)  WFIC was copied.  (Kleinhendler Decl. Exs. 20; 25; 26; 32.)  By December 2013, the concrete infrastructures of the two towers were complete, yet Glasswall did not have the window wall units necessary for the project and the project came to a halt. (Kleinhendler Decl. Exs. 4 p. 240-42; 47.)

WFIC knew of Glasswall's failure to produce window wall units well in advance of the January termination.  It had ample time to prepare a plan to prevent Monadnock from having to stop work for several months between January and the April 4, 2014 Amendment Agreement. WFIC's refusal to promptly take over the project was a bad faith breach of the covenant of good faith and fair dealing in its performance bond. Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York, 886 N.E.2d 127 (N.Y. 2008)("implicit in contracts of insurance is a covenant of good faith and fair dealing"; Panasia Estates, Inc. v. Hudson Ins. Co., 886 N.E.2d 135 (N.Y. 2008)(claims for damages for breach of the covenant of good faith and fair dealing "may be asserted in an insurance contract context, so long as the damages were 'within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting'"(internal cites omitted))

## CONCLUSION

For the reasons set forth above, Monadnock respectfully requests that this Court deny WFIC's Motion for Summary Judgment and grant its Cross-Motion for Summary Judgment.

Dated: New York, New York
      February 28, 2018               */s/ Howard Kleinhendler*
                                  Howard Kleinhendler
                                  Evan Weintraub
                                  Jocelyn Weinstein
                          WACHTEL MISSRY LLP
                          885 Second Avenue
                          New York, NY 10017
                          (212) 909-9500
                          (212) 909-9430 (fax)
                          kleinhendler@wmllp.com
                          weintraub@wmllp.com
                          jweinstein@wmllp.com
                          *Counsel for Plaintiff*
                          *Monadnock Construction, Inc.*