# EXHIBIT 3

957

Monadnock v. Glasswall - Volume IV

record.)

DIRECT EXAMINATION
BY MR. KLEINHENDLER:

Q Good morning, Mr. Bauso.
A Good morning.
Q Could you explain to the panel your educational and professional background?
A Educational, some college. I have been in the construction industry in various capacities for close to 30 years now.
Q And where have you worked?
A I have worked for a number of different general contractors in the five boroughs. I have worked for an organization that was renovating vacant properties in East New York through City programs.
And I have been with Monadnock construction, I believe, 18 years now, 18 or 19 years.
Q What is your current title at Monadnock?

958

Monadnock v. Glasswall - Volume IV

A Current title is president.
Q Did there come a time where you got involved with the Hunters Point parcel A, parcel B project that is the subject of this case?
A Yes.
Q And tell us when you got involved.
A I was part of the team that responded to the City RFP, so really right from the beginning, helping conceive this project, putting together the team, submitting the application to the City, which obviously we won, and overseeing the whole development and construction process.
Q Now, in connection with your role as the construction manager on the case, did you ultimately have responsibility for hiring a curtain wall contractor?
A Yes.
Q What did you do to look for one, and then how did you end up with Glasswall?

959

Monadnock v. Glasswall - Volume IV

A The architectural design of this wall was -- was a major feature of the building. So we actually found Glasswall as a recommendation from somebody on the architectural team, felt like -- knew their work and felt like they were capable of doing a good job with this design.
They had only completed one project in New York at that time with Skanska. And I spoke with the individuals involved with that, and they had very good things to say about Glasswall.
Q One second. You spoke to the guys at Skanska?
A Yes.
Q Okay.
A Yes. A guy named David, who I actually knew, had good things to say, verified with a lot of the local references in Miami, where obviously most of their work had been done, spoke to the gentleman at Coastal Construction and other contractors down there.
And, obviously, the most

960

Monadnock v. Glasswall - Volume IV

important part of the vetting process with them and any sub is a large number of meetings that lasted several hours where we would go through with them every detail and every aspect of this project and this wall to make sure that they fully understood the project, fully understood the requirements of the project, and had it covered in a number.
Q So let's just go to show you Exhibit 2.
(Previously Marked Exhibit No. 2, E-Mail from Mr. Bauso to Federico in March of 2012, Document is introduced into the proceedings.)
Q Which is an E-Mail from you to Federico in March of 2012, do you see that?
A Okay.
Q Okay. We know this, but we want you to describe background.
Who is Federico?
A So Federico at the time was the president and my main contact at Glasswall.
Q Okay. And you started having

3 (Pages 957 to 960)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

Monadnock v. Glasswall - Volume IV

you thought that your company -- not you -- but the company thought that the company was at risk.

And I was told that this is not an at-risk CM agreement.

So could you comment on that?

THE WITNESS: We were not at risk in terms of costs. It was -- you know, although there were requirements for us to perform and meet dates and meet, you know, project budget goals, it was structured in a way that it's kind of almost as CM agent or cost plus type contract. There's no dollar amount.

MS. FODOR: Except for your -- except for your responsibility for the work of your trade contractors.

THE WITNESS: We have responsibility for the work. We are responsible for the trades --

MS. FODOR: Exactly.

THE WITNESS: -- and we're responsible to deliver the project by

Monadnock v. Glasswall - Volume IV

the date that it's established.

MS. FODOR: Okay. I just wanted to clarify that.

MR. KLEINHENDLER: You don't have to get your books. I want to show you 196 up on the screen.

MR. RENDA: I'm sorry. What page?

MR. KLEINHENDLER: This is -- this is Exhibit 196. You have seen it before. It's in book -- I believe book B.

(Previously Marked Exhibit No. 196, 12/3/15 Letter from Related about Parcel A, Document is introduced into the proceedings.)

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q We can just -- do you see this letter December 3, 2015, Related, on behalf of the owner, is writing a letter. And I want you to just scroll it down.

It says here that:

"We confirm that the above has

Monadnock v. Glasswall - Volume IV

been accepted, excluding ongoing litigation in Florida and arbitration in New York with the project's window manufacturer."

Do you see that?

A Yes, I do.

Q Is it your understanding that, although you delivered the project to Related, you still have obligations under your CM contract with regard to this litigation with Glasswall?

A Yes, that is my understanding.

CHAIRMAN ROSSI: What date is that letter, again?

MR. KLEINHENDLER: December 3, 2015. That's when the --

CHAIRMAN ROSSI: 2015. Okay. Thank you.

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q Okay. All right. And there is another letter for the other building, right? That is Exhibit 197.

A I understand.

(Previously Marked Exhibit No.

Monadnock v. Glasswall - Volume IV

196, 12/3/15 Letter from Related about Parcel B, Document is introduced into the proceedings.)

Q That's parcel A.

And then we have 197 is the same thing for parcel B. And it has the same carve out.

Do you see that? Do you see that second line, "excluding ongoing litigation"?

Do you see that?

A I see that.

Q Okay.

CHAIRMAN ROSSI: Was there any thought when you were negotiating this contract -- any thought to having the subcontracts just signed directly with the owner?

THE WITNESS: Very few conversations. We were holding the insurance. And this is just traditionally the way we had always worked with this client.

CHAIRMAN ROSSI: Just easier to

989

Monadnock v. Glasswall - Volume IV

about it?

THE WITNESS: This is -- this is standard language that I am familiar with. It says that --

CHAIRMAN ROSSI: Okay. Overruled to that extent. Go ahead. Go ahead.

A Any recourse that the owner has or responsibilities that we have towards the owner are also an obligation of the subcontractor. That's what this language provided.

MR. CINQUE: Okay. At this point, I would make an objection to this line of questioning. I think what they're trying to do here is to somehow just shoe-strap -- I want to make an objection.

MR. KLEINHENDLER: Are you objecting to form?

MR. CINQUE: The party here is Monadnock. It's not the owner of the project. And the only claim we are facing here is based on the

990

Monadnock v. Glasswall - Volume IV

subcontract under the demand of arbitration.

That is what we are here to litigate.

Now, apparently, they are trying to throw in an agreement we are not a party to and saying that they are suing under that agreement.

It's not in the demand for arbitration. The party, HPS, the owner, does not have an arbitration agreement with Glasswall.

And if they wanted to bring a claim, they could have brought a lawsuit, but they never did.

CHAIRMAN ROSSI: Right, but I think -- I think -- first of all, what he's referring to here -- what the witness is testifying at this present time, Exhibit 14, is a -- is a document that your client is a party to.

So he is just trying to -- I am not saying we are going to agree or

991

Monadnock v. Glasswall - Volume IV

disagree with it. He's trying to say -- I -- I'm imagining -- I know you are not arguing it at this point -- but that somehow because it's a -- because it's a reference here, that they have the same rights.

So, again, I am not agreeing, disagreeing.

No, I understand what your argument is, but you're arguing. And at this point, we are just getting facts.

MR. CINQUE: Okay. I just want the objection because --

CHAIRMAN ROSSI: Yeah, I know.

MR. CINQUE: -- I will probably have to raise it later because there is nothing in the demand for arbitration that relates to this, the contract that they have with the owner. This is a total surprise.

MS. FODOR: Can I -- can I interject something here?

That is a typical flow-down

992

Monadnock v. Glasswall - Volume IV

provision, and it incor -- the subcontract incorporates all of the terms of the prime contract as an obligation of both your client's obligation and his client's obligation.

And I was very interested in addressing this just to understand how the deal was structured. And so there is nothing unusual, I think -- I don't think, in having the prime contract always kind of like incorporated by reference in a subcontract so that the subcontractor is bound by all of the terms that the prime contractor is bound by under the prime contract.

MR. CINQUE: Yes, but I think the argument that I am making is that I think there is going to be an attempt to somehow argue that they stand in the shoes of the owner.

And, therefore, they're -- they're asserting the owner's claims that the owner might have.

11 (Pages 989 to 992)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1001

Monadnock v. Glasswall - Volume IV

CHAIRMAN ROSSI: No. Okay.

(There was a discussion off the record.)

MR. RENDA: Just one thing, there's a lot of exhibits; and I don't know if we mentioned this. But we are going to need an index of all your exhibits so that, when we look for something during deliberations, we will be able to find it. Otherwise, we will go through 16 volumes.

MR. KLEINHENDLER: Absolutely.

MR. RENDA: Okay. And then, I would think, also, if it's not in evidence, you would have discussed that ahead of time; you would give your list that you say is in evidence to your adversary, vice versa.

And then, if there is an issue whether or not something went in or not, if you can't work it out, then you bring it to our attention.

MR. KLEINHENDLER: Well, that's a great idea. But what I was hoping

1002

Monadnock v. Glasswall - Volume IV

to do is, when I'm finished with all of my witnesses, I would just read into the record all the exhibits I believe are in.

If he wanted to object at that time, he could. So this way, if I've got to still get something in, I want to do it while I still have people here as opposed to having a fight about it, whatever is good for you.

CHAIRMAN ROSSI: All right. We will work that out, but that is a good idea to have a list.

MR. KLEINHENDLER: Yes, we will give you a list with -- I just want to go to -- we're jumping ahead a second.

Q I want to take you -- I want to take you to Exhibit 160.

(Previously Marked Exhibit No. 160, 3/4/15 Default Letter to Glasswall signed by Greg Bauso, Document is introduced into the proceedings.)

Q It's in the second book. It's

1003

Monadnock v. Glasswall - Volume IV

up on the screen if you want.

And if you recall there was an amendment agreement with Glasswall in 2014. And then in March -- on March 4, 2015, you signed a default letter, okay, to Glasswall. And that's what I have open here Exhibit 160.

Just go to the next page.

Okay. Now, you see that? Do you remember that?

A Yes, I do.

Q Now, in here, there is a list; and I am going to page 38118, a list of 30 items. Scroll down to the -- see -- stop there.

Do you see that?

A Yes.

Q Now, I want you to point out to panel and then read any of these items that would have prevented you from getting a TCO on -- this relates to which parcel, parcel A.

Go ahead.

CHAIRMAN ROSSI: You mean a TCO

1004

Monadnock v. Glasswall - Volume IV

on the entire building?

MR. KLEINHENDLER: Or any portion thereof.

CHAIRMAN ROSSI: Okay. Because -- all right. Go ahead.

MS. FODOR: For all the work, not just the Glasswall?

MR. KLEINHENDLER: Right.

A Just looking at this list now, the first item, obviously, the four terrace doors in parcel B.

MR. RENDA: Could you just give us a number. I just need the number.

THE WITNESS: Number one.

MS. FODOR: Number what?

THE WITNESS: Number one.

MR. KLEINHENDLER: On page 38118.

A So certainly number three.

Q Read it.

A "Replace all broken windows" --

Q Okay.

A -- "delivered to the project."

You know, I just want to add

14 (Pages 1001 to 1004)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1005

Monadnock v. Glasswall - Volume IV

two and four, they are certainly a possibility, although I wouldn't include those for now. But depending on what an inspector sees, there is certainly a possibility.

Number eight, "missing metal in-fill panels."

Number nine, "picture frame metal for the store front," that certainly could have prevented a passing TCO inspection.

Number ten as well, missing panels.

Number 13 certainly, "missing limit stops on the windows" certainly is something an inspector might have written up as a violation.

Number 16, "missing metal copings."

Number 18, "missing lock sets of the balcony doors provided by Glasswall."

Number 19, "missing windows for the roof bulkheads."

1006

Monadnock v. Glasswall - Volume IV

And the remainder of the items, while maybe things needed for substantial completion, I don't think would be needed for a certificate of occupancy to pass.

Q Okay. Do you -- now, go back to this document.

Are you familiar that there is a section in your subcontractor agreement that requires you to give the other side seven days' notice in order to make a claim?

A Yes, I recall that.

Q Okay. I want to take you now to Exhibit 171. Okay.

(Previously Marked Exhibit No. 171, 3/27/15 Claim with Bonding Company, Document is introduced into the proceedings.)

Q This is already March 27th. Do you see that?

A Yes, I do.

Q And do you recall that, when you defaulted out Monadnock, you also put a claim in against the bonding company?

1007

Monadnock v. Glasswall - Volume IV

A Yes, I think I recall that.

Q Okay. All right. I want you to go to this -- this -- do you have it -- scroll down a little bit so they can look at it on the first paragraph.

Okay. It talks about a notice of default --

(There was a discussion off the record.)

Q Sorry.

On March -- I'm in the second sentence:

"On March 4, Monadnock sent Glasswall a notice of default detailing various defaults by Glasswall of its agreements."

Do you see that?

A Yes.

Q And I believe there is a typo here. Was this March 4, 2014, or 2015 -- or we can get to it.

"The notice of default in compliance with the agreements provided Glasswall with a seven-working-day period

1008

Monadnock v. Glasswall - Volume IV

to cure the defaults listed there."

Do you see that?

A Yes, I do.

Q Do you agree that this notice of default, at least in your mind, satisfied the seven-day notice provision?

A Yes, that's what I recall.

Q Okay. And there were similar letters for the other parcel, too?

A Yes.

Q They're in evidence.

MR. RENDA: Can you just tell me who Greenwall -- Green --

THE WITNESS: Judah Greenblatt at the time was an attorney representing Monadnock.

MS. FODOR: What is the date of this letter.

MR. KLEINHENDLER: March 27, 2015.

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q All right. Okay. I'm going to go back now to the chronology. So we have

1013

Monadnock v. Glasswall - Volume IV

Okay.

CONTINUED EXAMINATION
BY MR. KLEINHENDLER:

Q Let's to Exhibit 57, please.

(Previously Marked Exhibit No. 57, E-Mail chain, top E-Mail dated 6/12/13 to Paul Colapinto from Federico Balestrazzi, Document is introduced into the proceedings.)

Q And do you see that there is an E-Mail below from Paul to Federico acknowledging that he's going to be missing some dates, but that there can be no more delays?

Do you see that?

A Yes, I do.

Q All right. And do you see on the top -- and you're copied -- where Paul -- where Federico writes back and says:

"I agree with you"?

A Yes, I do.

Q Were there any conversations with you and Federico on or about this time

1014

Monadnock v. Glasswall - Volume IV

similar to what's going on in this E-Mail?

A Yes. Myself, Andrew, and Paul were all having conversations with him at that time. We were obviously beginning to be very concerned about what was -- what was happening down there.

Q Go ahead. Just tell me the substance -- the substance of the conversation and the assurances you were getting from him.

A Well, at the time he was basically saying:

"Yes, our engineering and our release dates are a little bit behind."

You know, a lot of what we were focusing on was whether or not he had released metal and glass, which requires a significant amount of work by his engineering department.

CHAIRMAN ROSSI: When you say "release," you mean that he would have to give that -- he would have to have his engineers give it to the manufacturer --

1015

Monadnock v. Glasswall - Volume IV

THE WITNESS: Yes.

CHAIRMAN ROSSI: -- either his line or the supplier's, right?

THE WITNESS: So -- so even after shop drawings are approved by the architect --

CHAIRMAN ROSSI: Right.

THE WITNESS: -- the curtain wall guys have to -- their engineering department has to produce very specific cut sheets as to how they want the metal, how they want the glass sized and fabricated.

They can't just send the approved shop drawings from the architect to the metal factory. They have to give very, very specific engineered cut sheets to their fabricators.

And, you know, it's one of the things that we typically ask about, because, if that isn't done, we have good reason to believe that they are not going to be able to get us the

1016

Monadnock v. Glasswall - Volume IV

windows when they are promising.

So just as a matter of business, this is -- this is one of the things we always focus on. And it was becoming apparent that their engineering department wasn't getting these materials released when they should have been.

MS. FODOR: The cut sheets?

THE WITNESS: The cut sheets to the fabricators, yes.

MS. FODOR: So the shop drawing gets prepared by Glasswall?

THE WITNESS: Correct.

MS. FODOR: It's sent to the architect. And so the shop drawing by Glasswall has all kinds of dimensions and everything on the shop drawing?

THE WITNESS: Correct.

MS. FODOR: Because you want to build from that. You send that to the architect for approval?

THE WITNESS: Right.

MS. FODOR: The architect sends

17 (Pages 1013 to 1016)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1017

Monadnock v. Glasswall - Volume IV

it back, either rejecting, approved as noted, or just approved?

THE WITNESS: Correct.

MS. FODOR: What -- who -- what -- where does the cut sheet come in?

Once that is done, they are remeasuring everything?

THE WITNESS: It's really -- what it is, is that shop drawing is not in a form that the metal shop can fabricate the metal extrusions from.

MS. FODOR: So they redraw the same thing, though?

THE WITNESS: So with different information on it, but Glasswall's engineering department then takes that approved shop drawing and produces an engineering sheet for every piece of glass and every piece of metal extrusion that they need to fabricate what is on those shop drawings, and it's approved.

MS. FODOR: So just so that I

1018

Monadnock v. Glasswall - Volume IV

understand it, so one doesn't build from approved shop drawings; one builds from cut sheets?

THE WITNESS: To some degree, yes, that's absolutely true, yes.

MS. FODOR: And there could be variations between the shop drawings and the cut sheets?

THE WITNESS: There shouldn't be -- there shouldn't be. Those cut sheets take the information off of those approved shop drawings and just put it in a form that the various factories involved in fabricating can then do what they need to do.

MS. FODOR: Okay. So is it an extensive exercise, time wise, to take the approved shop drawings and prepare cut sheets?

THE WITNESS: Yes, it is.

MS. FODOR: Thank you. I didn't know that.

THE WITNESS: Yes.

MR. KLEINHENDLER: I want to

1019

Monadnock v. Glasswall - Volume IV

take you now to Exhibit 68.

CHAIRMAN ROSSI: And that's not something that has to be go back to the architect to be approved?

THE WITNESS: No, at that point -- no, at that point, it doesn't go back. It's just -- it's really an internal thing after --

CHAIRMAN ROSSI: Yeah, but is that something that people in the -- based upon your experience, people in the curtain wall business know has -- has to be done?

THE WITNESS: Yeah, anybody who is ordering metal.

CHAIRMAN ROSSI: Yeah, okay.

THE WITNESS: So we became aware of this because we were trying to get verification from Keymark and the glass manufacturer as to whether or not they were in production yet.

CHAIRMAN ROSSI: Who is Keymark?

THE WITNESS: Keymark is the

1020

Monadnock v. Glasswall - Volume IV

metal extruder.

CHAIRMAN ROSSI: Okay.

THE WITNESS: So what we were told is:

"Yes, we have a purchase order from Glasswall," meaning they had an agreement, "but we don't have the cuts to release for fabrication yet."

So that was the information we were getting. And we were questioning Federico:

"We are running out of time here. What's going on?"

MS. FODOR: So if one were to give the approved shop drawings to the ultimate supplier, they couldn't -- and they didn't have the cut sheets?

THE WITNESS: Yes.

MS. FODOR: They couldn't do what they were supposed to?

THE WITNESS: No. Keymark would not take those shop drawings and be able to fabricate metal extrusions from them.

18 (Pages 1017 to 1020)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1025

Monadnock v. Glasswall - Volume IV

MR. KLEINHENDLER: Okay.

CONTINUED EXAMINATION
BY MR. KLEINHENDLER:

Q Let's go to Exhibit 68.

(Previously Marked Exhibit No. 68, E-Mail chain, top E-Mail dated 7/17/13 from Paul Colapinto to Federico Balestrazzi, Document is introduced into the proceedings.)

Q Do you recall this E-Mail where it appears that Federico is moving the dates even a little more?

A Yes, that's what this correspondence seems to say.

Q Now, in July, are there more conversations with Federico about why are -- why are these days continuing to slip?

A Yes.

Q Describe the conversations.

A Well, again, we can tell that these were slipping just based on the fact that all the steps leading up to fabrication were not -- were not happening.

1026

Monadnock v. Glasswall - Volume IV

So Paul and others were questioning Federico as to why they weren't happening, what's being done to catch up. And he wasn't giving answers. And the answers he was giving made it obvious that he wasn't going to make the dates he had previously committed to, even the revised dates he had previously committed to.

Q All right. Okay. I want to forward you now to Exhibit 81.

(Previously Marked Exhibit No. 81, 8/16/13 Letter from Clinton D. Flagg to Greg Bauso, Document is introduced into the proceedings.)

Q This is a letter from Clinton Flagg, dated August 16th, to you. Okay. Scroll up. Scroll down a little bit.

And in this he refers to a meeting on August 13th in Miami. And then he says:

"Glasswall intends to comply with the agreement, and window assembly will be ready to ship September 1st."

So do you recall having a meeting down in Miami in August?

1027

Monadnock v. Glasswall - Volume IV

A Yes, I do.

CHAIRMAN ROSSI: Did you go?

THE WITNESS: Yes, I did.

CONTINUED EXAMINATION
BY MR. KLEINHENDLER:

Q Well, let's talk about that meeting. Who was there? What was discussed?

A So just a little context of that meeting, by that point in time, Federico had been fired by Ugo Colombo. Armand, who was Federico's main, you know, right-hand person, had been let go or quit. I really don't know.

So myself, Nick Lembo, the founder of Monadnock, and several people from Related, flew down to meet with Ugo Colombo to discuss what is happening next now.

Q Okay. So tell us about the meeting.

A The basic --

CHAIRMAN ROSSI: Did Mr. Colapinto go also?

1028

Monadnock v. Glasswall - Volume IV

THE WITNESS: I -- at that meeting, I don't believe so, no.

CHAIRMAN ROSSI: Okay.

CONTINUED EXAMINATION
BY MR. KLEINHENDLER:

A Basically, Ugo's position at that time was:

"I have got a mess here. This guy Federico left me with a tremendous mess here. I am trying to figure it out. And I don't yet have a date for you as to when you are going to get these windows. But I'm working on figuring it out."

And, really, there wasn't anything more of substance discussed at that meeting.

Q When -- when Federico left, did that impact any other employees leaving?

A Well, Federico really had kind of put together that whole team that was running that factory, both, you know, on the floor and in the fabrication shop and in the engineering department.

20 (Pages 1025 to 1028)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1029

Monadnock v. Glasswall - Volume IV

So, yes, other people started. I think there was a sense that there were problems in the factory and other people were starting to leave, also.

Q Now, at this meeting in Miami, did you ask for a letter from their lawyer like the one you got here, Exhibit 81?

A No, not at all. And this lawyer was not at that meeting.

(Previously Marked Exhibit No. 84, 8/27/13 Letter from Clinton D. Flagg to Greg Bauso, Document is introduced into the proceedings.)

Q Okay. Let's go to Exhibit 84. There is another letter here from Clinton Flagg. And here he's complaining about two things, payments and joint check agreements.

Could you discuss what you recall that led to this letter in August, August 27th?

A So one of the things we were discovering is that some of these vendors had not gotten progress payments from

1030

Monadnock v. Glasswall - Volume IV

Glasswall, and there was some indication that that was eventually going to be an impediment to getting, you know, glass, metal, and other materials fabricated.

We offered to Glasswall and to the vendors, if necessary, to keep things moving going to two-party checks, which at one point I believe Glasswall was open to.

What was the rest of your question? What else do you want me --

Q That's all -- that's what I want you to talk about.

A This letter.

Q Okay. He just says:

"Please fund our prior payment applications."

Do you see that?

A Yep.

Q Okay. We are taking you now to book two, and I want to take you to Exhibit 86.

MS. FODOR: Are we coming back to book one?

MR. KLEINHENDLER: No, I don't

1031

Monadnock v. Glasswall - Volume IV

think we are coming back to book one. We are now on book two.

MS. FODOR: Sorry. What exhibit?

MR. KLEINHENDLER: 86. This is -- we will just do the things from yesterday. You will take a minute to read it, and then I will go to the witness because this is new.

CHAIRMAN ROSSI: Go ahead.

(Previously Marked Exhibit No. 86, 9/9/13 Letter to Chad Zalman from Greg Bauso, Document is introduced into the proceedings.)

Q Okay. So do you see here that you are enclosing money for two parcels:

"And we have been advised by your counsel that payment issues with suppliers have been resolved."

Do you recall this letter and this happening?

A Yes, I do.

Q And because of that you sent out the payments that were owed?

1032

Monadnock v. Glasswall - Volume IV

A Correct.

Q Now, you are saying here in the second:

"As we have advised you, we have not processed payment applications due to the fact that you haven't confirmed orders."

Is it your understanding that, until they confirmed orders and delivery dates, they weren't entitled to material payments?

Well, what are you -- what are you saying here?

A There were -- I don't remember specifically the contract terms regarding, you know, when certain progress payments were due. But payments were delayed because this began with Federico saying, you know:

"Keymark may need a two-party or a joint check agreement in order to feel more comfortable with the situation going forward."

So we were holding money at

21 (Pages 1029 to 1032)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1033

Monadnock v. Glasswall - Volume IV

that point trying to figure out whether or not we were making these two-party checks or whether we were doing something else. You know, as this was a critical part of getting this metal released from fabrication.

Q Okay. Nevertheless, you are saying in the next paragraph:

"We are giving you the money"?

A Correct.

Q Okay. So by September 9th, Glasswall to your knowledge was not owed any money under the contract?

A I don't recall exactly, but that's -- this is what this appears to say.

CHAIRMAN ROSSI: Okay. Is this the first check you sent to them? Do you know?

THE WITNESS: No, we had -- look, part of the problem was I think by September we had already paid them several millions of dollars for engineering, for performance mock-ups, the material deposits they

1034

Monadnock v. Glasswall - Volume IV

requested -- and we paid deposits to their materials suppliers, which we paid to Glasswall, not directly to the suppliers.

So just keep in mind at this point in time we were out of pocket several million dollars, and things were not moving along very well. And it was a growing concern as to where this was all going.

CHAIRMAN ROSSI: Okay. Thank you.

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q Okay. And, finally, you are making a request for a firm schedule as to when you will begin delivering windows.

What kind of schedule were you looking for in that last sentence?

A We had been asking for a detailed schedule showing all the milestones leading up to, you know, assembly of windows and delivery to the job site, you know, with dates that could be

1035

Monadnock v. Glasswall - Volume IV

verified as realistic.

And up to that pint in time, we still had not really gotten that information from Glasswall.

Q Okay. So we are in September now, and are you getting any window deliveries?

A No.

Q So take you to Exhibit 87.

(Previously Marked Exhibit No. 87, 9/16/13 Fax Letter Notice of Default, Document is introduced into the proceedings.)

Q This is a default letter. Do you see that?

A Yes.

Q Okay. Do you understand -- were you involved in the decision to issue this notice of default?

A Yes.

Q So explain why you -- why Monadnock did that.

A At this point in time, even though Glasswall had acknowledged they had

1036

Monadnock v. Glasswall - Volume IV

a problem, we didn't feel like enough steps were being taken to fix that problem. And we felt we needed to send this default letter out to protect ourselves.

Q And so you sent one for each parcel; that is 86 -- that is 87 and 88.

A Correct.

(Previously Marked Exhibit No. 88, 9/16/13 Fax Letter Notice of Default, Document is introduced into the proceedings.)

Q Did you also advise the bond -- taking out Exhibit 89.

(Previously Marked Exhibit No. 89, 9/16/13 Bond Notice, Document is introduced into the proceedings.)

Q Did you also call on the bond at this time?

A Yes, absolutely.

Q So tell us what Exhibit 89 is.

A The bond requires -- I wouldn't use the term we were "calling the bond," but the bond requires that, when you call a bonded subcontractor into default, that you

22 (Pages 1033 to 1036)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1037

Monadnock v. Glasswall - Volume IV

give proper notification that this is happening to the bonding company. So this is really not necessarily calling the bond, but it's a notification that is required.

Q You did that for both parcels?

A Correct.

Q Okay. So I want to take you -- by now, there are lawyers involved in this?

A Yes.

Q There are lawyers writing letters back and forth?

A Yes.

Q That's what we see in Exhibit 93.

(Previously Marked Exhibit No. 93, 9/24/13 Letter from Flagg to Lembo, Document is introduced into the proceedings.)

Q You have a letter here from Clinton Flagg to Mr. Lembo?

A Yes.

Q And then in '94 we have got Greenblatt Lesser writing back. The lawyers are fighting it?

1038

Monadnock v. Glasswall - Volume IV

(Previously Marked Exhibit No. 94, 10/2/13 Letter from Greenblatt to Flagg, Document is introduced into the proceedings.)

A That's a good way to describe it, I guess.

Q All right. Now, at this point -- do you know who a guy named Steve Barber is?

A Yes.

Q All right. Tell me who he is and when he came on the scene.

A I don't remember specifically dates. But around the time that it seemed that window was assembly was going to begin in the factory, we asked Glasswall if we could have a representative down there at the factory just to monitor progress, not necessarily monitor quality control as there were others doing that, but keep an eye on that as well, but really mainly just to monitor that things were moving forward in an orderly fashion that was going to get us windows on the site.

1039

Monadnock v. Glasswall - Volume IV

And they agreed to allow us to have somebody down there. And Steve was the guy retained to do that.

Q And was Steve sending you reports from down there?

A From what I recall, yeah, I don't remember the frequency of them, whether they were daily or weekly; but, yes, he was.

Q And just in general what was Steve telling you?

A Generally, what was going on. At this point, John Anderson had come in as Federico's replacement, you know --

Q Sorry. Come in where?

A John -- Ugo Colombo had hired by now John Anderson as the new president of the company.

Q Of Glasswall?

A Of Glasswall.

Q Go ahead.

A So John was responsible for getting this order filled. And there was some progress being made, but it was in

1040

Monadnock v. Glasswall - Volume IV

fits and starts. I don't know how else to categorize it.

It was still a little bit in disarray, although there was some progress being made.

Q And was Steve Barber telling you -- what was he telling you? Was he satisfied, dissatisfied?

A In general, Steve is saying, you know, they have got a couple of lines working, but not all of the material they need to continue working is here. Some of it is not being assembled correctly.

Again, there continued to be a trend of people leaving the engineering department, of people -- I think at some point the floor manager quit. You know, there were -- there were lots of indications that, you know, things were moving, but not necessarily in a straight line.

Q Okay. And who is IBA on this project?

A They are Israel Berger

23 (Pages 1037 to 1040)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1045

Monadnock v. Glasswall - Volume IV

A Okay.

Q Do you have any windows yet?

A No.

Q And lawyers are still fighting. So Exhibit 101, Greenblatt Lesser is writing a letter to Flagg; is that what you see here?

(Previously Marked Exhibit No. 101, Greenblatt Lesser letter to Flagg, Document is introduced into the proceedings.)

A Correct.

Q He's representing you?

A Judah Greenblatt, yes.

MR. RENDA: Which exhibit?

MR. KLEINHENDLER: 101.

(Mr. Colapinto arrived at the arbitration.)

Q So I want to take you to Exhibit 109. And this is an E-Mail thread -- start on the back page, which is MC 10023. John Anderson is writing to you on November 14th -- on November 14, 2013.

Take a look at that. We have

1046

Monadnock v. Glasswall - Volume IV

seen it a couple of times already, but I want to you to read it. Okay.

(Previously Marked Exhibit No. 109, E-Mail thread, with Bates No. MC 10023, from John Anderson to Greg Bauso on November 14th, 2013, Document is introduced into the proceedings.)

Q Just follow through on the thread.

A Okay. What is your question?

Q I want you to go through on the thread here.

A Okay.

Q And then I'm going to ask you question. Tell me when you are finished reading it.

A Okay.

Q All right. So there is a back and forth here about should you take windows or not windows. So I want you to -- other than what it says here -- because we have seen it -- can you add some color or background to the give and take that this E-Mail string represents?

1047

Monadnock v. Glasswall - Volume IV

A So at the time from what I remember, John had some quantity of windows that he was purporting were ready for shipment. But there was still a number of open issues. There was still quality control issues that had not been addressed interest.

There was still an issue in my mind of what is really our ongoing schedule here, about all the material that they needed to continue assembly was in their shop.

There was some concern:

"Okay. We are going to take a couple of trucks of windows, mobilize all the iron workers. And then what happens? You know, are they going to really have material to continue working?"

There were a number of different issues, somewhat of that going on, that was making us a little nervous about just saying:

"Okay. You have a few windows. Send them to us."

1048

Monadnock v. Glasswall - Volume IV

You know.

Q And other than the E-Mail exchange, were there any telephone conversations between you and John on this issue?

A Oh, just about daily, sure.

Q All right. So other than what is in here, can you add anything with those conversations, or was it just more of the same?

A It was -- yeah, it was really what I just said:

"How much do you have? What is the plan to continue? When are you going to have the next shipment available? What are we doing about all of these open issues on the IBA reports that have been talked about?"

How do I know what is in these crates, really, was what my concerns and conversations were.

Q And what was his answers to those questions?

A "We are working on it. We are

25 (Pages 1045 to 1048)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1049

Monadnock v. Glasswall - Volume IV

working on it. We are working on it."

But there was no -- it was really very little firm progress being made.

CHAIRMAN ROSSI: Are you moving off of this document?

MR. KLEINHENDLER: Yes.

CHAIRMAN ROSSI: I have a question on this document.

MR. KLEINHENDLER: Go ahead.

CHAIRMAN ROSSI: You wrote to Mr. -- Mr. Anderson at 2 o'clock on November 14th. Do you see at the bottom of that, on the first page, 22 --

THE WITNESS: 2:13?

CHAIRMAN ROSSI: Yeah, you see -- and you say:

"As well" -- "as" -- "As well, please stop pretending that I did not tell you personally on phone conversation last night that we will accept no windows until the agreement is signed."

1050

Monadnock v. Glasswall - Volume IV

What agreement are you talking about?

THE WITNESS: I think at the time, from what I remember, there had been a meeting and some conversations between Ugo Colombo and some people at Related where there was some type of agreement that they had told me was going to be put in place regarding the completion of the job.

I was not a party to those conversations. And, ultimately, it just never materialized into anything.

But at the time it was one of the things that I was expecting to get from Glasswall.

CHAIRMAN ROSSI: Okay. But what do you -- what -- what -- what were you -- what were you accomplishing at that point by saying:

"We don't want -- we don't want the windows that you have down there"?

I mean, it just seems to me, you know, if it were me, I mean, yeah,

1051

Monadnock v. Glasswall - Volume IV

if you only have one window, what -- what's the sense? Right.

But if he's got -- I think there was something. I'm not sure. I'd have -- I'd have to go back, but there were several hundred, maybe a thousand windows ready -- ready to go at that point.

Yeah, just -- just tell me.

THE WITNESS: So I know -- I think at that point there were less than that.

CHAIRMAN ROSSI: Okay.

THE WITNESS: I think by the end -- by the end of November, there were a pretty good amount of windows.

CHAIRMAN ROSSI: Okay.

THE WITNESS: And there were different issues at that point.

CHAIRMAN ROSSI: Okay.

THE WITNESS: But by that point, there really weren't that many windows made. We were a little concerned about the quality.

1052

Monadnock v. Glasswall - Volume IV

Like I said, we were kind of mitigating our damages from other trades, mobilizing iron workers and then having to tell them to stop.

And to be completely honest, there was still in the back of our minds:

"Where is this going? Are they really going to be able to complete this thing?"

CHAIRMAN ROSSI: I mean, if you have to get somebody else to do it.

THE WITNESS: That became a thought that we had starting in August and September.

CHAIRMAN ROSSI: Okay.

THE WITNESS: You know, really, are these guys really going to be able to finish this?

CHAIRMAN ROSSI: Right, and then -- and then -- if -- if -- if I'm imagining -- I'm -- I'm not sure -- but I am managing that, if you have a thousand windows made by Glasswall,

26 (Pages 1049 to 1052)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

Monadnock v. Glasswall - Volume IV

now, you have got the rest by somebody else --

THE WITNESS: If there were -- we would have to -- if we started installing two or three floors of windows, and their factory was not able to complete this, we -- you would not be able to find another factory that could manufacture that exact window.

So, essentially, you'd have to tear out and start all over again whatever you installed.

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q Why, because you needed matching?

A There's just a number of reasons why it just wouldn't work. You couldn't have somebody else come in and fabricate that same window.

All factories are going to assemble things differently, and paint colors. There is just a long, long list of

Monadnock v. Glasswall - Volume IV

reasons why that wouldn't work.

CHAIRMAN ROSSI: Okay.

MR. RENDA: I have a question:

When you say, in the screen, "We will accept no windows until the agreement is signed," I am still not clear what kind of agreement were you looking to have signed.

THE WITNESS: There is -- I was being told at one point that Glasswall was going to issue some type of amended agreement that was going to lay out the completion and the terms under which this thing would be completed, the project with dates, and with consequences if they didn't hit those dates.

MR. RENDA: So you were looking for something firm from them --

THE WITNESS: Yes.

MR. RENDA: -- as to delivery and what would happen if they didn't deliver?

THE WITNESS: Correct, correct,

Monadnock v. Glasswall - Volume IV

and it just never happened.

CHAIRMAN ROSSI: All right. Why don't we take a little break now.

(There was a discussion off the record.)

(A break is taken.)

CHAIRMAN ROSSI: All right. You are still under oath, Mr. Bauso. All right.

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q I would like to show you Exhibit 117 and 118 there.

(Previously Marked Exhibit No. 117, Payment Application Document is introduced into the proceedings.)

(Previously Marked Exhibit No. 118, Payment Application Document is introduced into the proceedings.)

Q Payment application number ten from Glasswall, one for each building.

Do you see those?

A Yes.

Q And can you just describe to

Monadnock v. Glasswall - Volume IV

the panel what they are.

A It's a monthly payment requisition from Glasswall with an itemized payment breakdown.

Q Does it say how much was paid to date for these guys for each month?

A It says how much is previously -- previous certificates of payment.

Q So from parcel A, as of 11 -- as of November, how much was paid to Glasswall?

CHAIRMAN ROSSI: He's not saying they were paid -- is the way these things work, as you know, is that you come in; you have a certificate of payment; and you say what was billed in the past -- isn't that right -- not necessarily paid.

So that's going to be my next -- I guess your next question afterwards -- were these numbers, the previous certificates, actually paid?

THE WITNESS: From my

1073

Monadnock v. Glasswall - Volume IV

And this letter was simply sent out as a:

"All right. Here we are. It's December 31st. We still don't have windows. You are still in default."

CONTINUED EXAMINATION
BY MR. KLEINHENDLER:

Q Do you recall a meeting on December 6th or 7th in Miami?

CHAIRMAN ROSSI: But at this time, when you wrote this letter, Exhibit 133, you wanted the windows?

THE WITNESS: From what I recall -- and, again, I think it was clear they weren't going to be shipped -- but there were enough windows and enough progress had been made that I believe we probably would have accepted deliveries at that point.

CHAIRMAN ROSSI: All right. Okay. Thank you.

CONTINUED EXAMINATION
BY MR. KLEINHENDLER:

1074

Monadnock v. Glasswall - Volume IV

Q But they said no deliveries until payment, correct?

A Correct.

Q Okay. Let's go to 141.

(Previously Marked Exhibit No. 141, 1/13/14 Notice of Termination from Mr. Bauso to Mr. Colombo, Document is introduced into the proceedings.)

Q And just 135. There was the same letter for the other parcel, one letter for each one?

A Correct.

Q And then?

(Previously Marked Exhibit No. 135, 12/31/13 Notice of Continuing Default, Document is introduced into the proceedings.)

Q 141 is a termination. Why don't you just take a look at that?

You signed it. Do you agree with what you put in there.

A Yes, I remember that.

CHAIRMAN ROSSI: What -- what

1075

Monadnock v. Glasswall - Volume IV

number is that?

MR. KLEINHENDLER: 141. 141.

Q Now, at this point, in January, 2014, they are now terminated, right?

A As of the date of this letter, yes.

MR. KLEINHENDLER: Can you put the picture back up.

MS. FODOR: They are not?

MR. KLEINHENDLER: They are now --

MS. FODOR: Now terminated?

THE WITNESS: Yeah, as of the date of that letter. Yes.

Q Okay. And let's just -- you know, we have got this picture up. This is a picture of the buildings as of early January.

Do you see that?

Do you -- do you recognize that that was the -- that was the status of the project at that time?

A I remember it vividly.

Q So explain now to this panel.

1076

Monadnock v. Glasswall - Volume IV

You have got these completed superstructures and no windows. So what were you going to do?

What did you do then?

Now that you've defaulted, what are you going to do?

Or what did you discuss doing with the owner, with Glasswall, with anybody else?

A Well, just one step back, the last step before this termination letter was issued, I asked John and decided to call a meeting where he came to New York with his attorney.

And the four of us, myself with Judah, sat in a room for three days and tried to come to an agreement on terms under which -- tried basically to find a middle ground between their demand for payment prior to shipping windows, come up with a payment schedule acceptable to both parties, come up with a schedule-to-complete acceptable to both parties, come up with a means for

32 (Pages 1073 to 1076)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

Monadnock v. Glasswall - Volume IV

addressing quality control issues and a way for us to hold back some money, at least, until they were addressed in the field.

If we accepted windows that still had quality control issues, I was trying to say we will accept windows, but you have got to let us hold back a little bit of money until they're resolved, the QC issues.

We spent three days in a room. And in the end, my feeling was there was just little to no effort on Glasswall's part to meet me halfway. And at the end of that, I just -- it just seemed there was no other solution other than terminating.

And our hope was terminating would result in either the bonding company coming in and taking over Glasswall's operations and completing this job, or the bonding company allowing us to -- and funding us in hiring another company to build the job, build the curtain wall.

Q Okay. So you sent a copy of the termination to the bonding company?

Monadnock v. Glasswall - Volume IV

A Yes.

(Previously Marked Exhibit No. 142, Complaint, Westchester Fire versus Glasswall, Document is introduced into the proceedings.)

Q And, in fact, if you look at Exhibit 142, it didn't take long, and the bonding company filed a lawsuit, didn't they, in New York against Glasswall and Sara Jayne Kennedy Colombo?

(There was a discussion off the record.)

A I see it. I am not familiar with the details of that document. But I see it.

MS. FODOR: What number is that? Excuse me.

MR. KLEINHENDLER: That's 142.

Q So tell me. So what happened next?

Again, you have got the skeleton. You have got these completed infrastructures. You have got a defaulted window contractor. You have got

Monadnock v. Glasswall - Volume IV

discussions with the -- the bonding company.

What happened next?

A Sorry.

Q What happened next?

A So from what I recall, the bonding company's response was:

"Look, there's some windows made down there. We don't feel that bringing in another company is the right course of action here."

And that -- that began the period of time where they took a role in formulating what eventually became this three-party agreement that was signed several months later that at that point began the delivery of windows to the site.

Q All right. And that's --

CHAIRMAN ROSSI: Are you talking about the amendment in March, right then?

THE WITNESS: I think the -- I forget what the document is called, but it was March or April, late March,

Monadnock v. Glasswall - Volume IV

maybe.

CHAIRMAN ROSSI: Is that -- is that true, Mr. Kleinhendler? Is that true? That's what you are talking about, right?

MR. KLEINHENDLER: Yes, we are going to get to that. Yes.

CONTINUED EXAMINATION BY MR. KLEINHENDLER:

Q Just -- let's just go through some of these documents.

143 is another letter from you to the bond company asking them basically what's going on.

(Previously Marked Exhibit No. 143, Letter from Monadnock to Westchester Fire, Document is introduced into the proceedings.)

A Correct.

Q Let's go to -- 146 is what the arbitrator was asking you. The amendment agreement, do you recall signing this agreement?

A Yes.

1081

Monadnock v. Glasswall - Volume IV

(There was a discussion off the record.)

Q Do you recall signing this agreement?

A Yes.

CHAIRMAN ROSSI: 146.

(Previously Marked Exhibit No. 146, Amendment Agreement, Document is introduced into the proceedings.)

Q And was the -- when you signed this agreement, did you understand that you were giving up the -- were you in your mind giving up any rights that you had against Glasswall to date?

A No, not at all. The -- the intention of the agreement was to say:

"Okay. Bonding company, owner, Glasswall, Monadnock, are agreeing on the terms under which they will finish this job and deliver the windows. And we are going to basically defer our grievances with each other until after that is done."

That was my understanding of the purpose of the agreement, as well as,

1082

Monadnock v. Glasswall - Volume IV

you know, setting out the payment terms under which that would happen.

Q Now, after you signed this agreement, how did the shipments of windows progress?

A Well, the first thing that happened was, the day after it was signed, I got a call from John Anderson saying:

"I need to tell you that several hundred of the windows were fabricated incorrectly with the hinges on the wrong side. What should we do?"

Which -- we began to work on how to resolve that issue.

But I believe -- I don't remember exactly, but I believe, within a week to two weeks of the agreement being signed, shipments began to happen to the job site.

Q And were shipments continuous, or were there problems with it?

A You know, for the most part, there were obviously some stumbles and dates missed along the way, missed by a few

1083

Monadnock v. Glasswall - Volume IV

days or as much as a week or more.

There were some points where the iron workers became very close to running out of work, and maybe a day or two where they had no work. But for the most part, the shipments continued.

Q Okay. Let's take a look at Exhibit 151.

(Previously Marked Exhibit No. 151, 10/28/14 Letter from Mr. Bauso to Mr. Anderson, Document is introduced into the proceedings.)

Q Which is an October letter from you to John Anderson.

CHAIRMAN ROSSI: What number?

MR. KLEINHENDLER: 151.

Q Do you recall whether, towards the end of October, there became an issue as to payments with -- between you and Glasswall?

A Yes. Yes. John Anderson at the time notified me that they were not going to complete. I believe there were like a few floors remaining in the hoist

1084

Monadnock v. Glasswall - Volume IV

run to be shipped, and he basically started telling me that they were not going to make those deliveries until they received -- or, rather, the bonding company received payment in full for the balance of the project.

And he was asking for it in a way that seemed to not be in accordance with the agreement that had been signed back in March or April.

Q And that's why you wrote him this letter?

A We conferred, and we decided that sending the money -- yeah, this was saying that, you know -- I asked him point blank if we sent the money directly there -- because he -- he made a point of stating to me on several occasions, that if accordance -- in accordance with the agreement, we deposited the money in the Duane Morris escrow account, he in no uncertain terms told me that they would not ship the windows to us.

We discussed this, and we

34 (Pages 1081 to 1084)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1089

Monadnock v. Glasswall - Volume IV

A Correct.

(Previously Marked Exhibit No. 180, Formal Termination, Document is introduced into the proceedings.)

Q You did it for both parcels?

(There was a discussion off the record.)

Q And you did it for both parcels?

A Correct.

Q So what happened subsequent to this termination? What work did you do on the project in connection with the curtain wall?

A Subsequent to the termination, I mean, Paul and his staff basically went through a process of getting all of the remaining items dealt with through other vendors.

Q Okay. I want you to take a look at Exhibit 167.

(Previously Marked Exhibit No. 167, E-Mail Chain, between Judah Greenblatt and Robert Boote,

1090

Monadnock v. Glasswall - Volume IV

March 23rd, 2015, Document is introduced into the proceedings.)

Q And this is an E-Mail between Judah Greenblatt and Robert Boote, March 23rd.

When you terminated Glasswall in 2015, again, did you turn to the bonds to step in and perform?

A Yes, we sent notification to them.

Q Did they agree to that?

A From what I recall and from reading this, I think they made statements to the effect that:

"Yes, we think Glasswall can complete these items."

But nothing ever became of that.

Q Did Glasswall ever send people down to complete the work that you had identified in your March 4th letter of 2015?

A Not that I recall. I don't believe any of the items on that list were

1091

Monadnock v. Glasswall - Volume IV

ultimately completed by them.

Q It says here:

"MC" -- Monadnock -- "will not meet with Glasswall to discuss the completion of the work unless it is within the context of the WFIT takeover agreement."

Do you know what they are taking about here?

A I think the lawyer was trying to say that:

"We are not having -- Glasswall has been terminated. We are not having any direct conversations with them regarding the completion of these items. If Westchester wants to basically take over these responsibilities and on their behalf have Glasswall complete them, then that's fine."

We are basically saying we will communicate with the bonding company regarding that, but not directly with Glasswall.

Q And did Glasswall ever -- did

1092

Monadnock v. Glasswall - Volume IV

the bonding company ever ask Glasswall to do the work to your knowledge?

A They may have asked, but it didn't happen.

Q Let's take a look at 189. I want to back it up a little here. Sorry, 182.

(Previously Marked Exhibit No. 189, Document is introduced into the proceedings.)

(Previously Marked Exhibit No. 182, Temporary Certificate of Occupancy for building B, floors 1 through 21, with the exception of the retail, Document is introduced into the proceedings.)

Q This is a -- can you just describe what this is, 182?

A This is a temporary certificate of occupancy for building B, floors 1 through 21, with the exception of the retail.

Q 183, 183?

(Previously Marked Exhibit No.

36 (Pages 1089 to 1092)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

Monadnock v. Glasswall - Volume IV

written, or any form. He communicated this after the termination.

Q This came one day after the termination?

A Correct.

Q And because it came one day after the termination, you didn't want him to come back?

A At that point, it's up to the bonding company to get him back. The contract, the agreement was terminated; and it was up to the bonding company to get him back.

Q Didn't the bonding company -- didn't the bond being company attorney, Mr. Boote, tell you that they were ready, willing, and able to send Glasswall back?

A Yes, he did.

Q And you said no?

A I don't recall saying no, but I don't recall it happening. Do you have something --

Q Take a look at the last document in Exhibit D in my book.

Monadnock v. Glasswall - Volume IV

(Previously Marked Exhibit No. D, March 18 E-Mail, Document is introduced into the proceedings.)

Q The last page of D.

(There was a discussion off the record.)

MR. KLEINHENDLER: March 18th E-Mail?

MR. CINQUE: Yes.

Q So on the bottom one there, John Anderson sends you his letter on March 17th at 5:58. On March 18th at 9:50 in the morning, you say:

"John, the contracts have been terminated, and this is now a legal matter that will be handled by attorneys."

A Correct.

Q So is it your position that because he was one day late in sending the letter you didn't want anything to do with him?

A My position is that, once the termination notice is sent, it then becomes a matter of the attorneys communicating

Monadnock v. Glasswall - Volume IV

with each other. I was under the impression that I was not to communicate directly with him about these matters, that it was now up to the attorneys to communicate what would happen next.

Q Hadn't you previously sent termination notices to Glasswall?

A And ceased all communications directly with them on those previous termination notices as well.

Q Isn't it true that you didn't want Glasswall to come back?

A Absolutely not.

Q Why didn't you just accept the offer then?

A Because we had waited for several months. Glasswall in my opinion ceased to exist as a company. It was John Anderson and one or two people. They verbally basically told me they had no intention of finishing this.

We sent them multiple letters. We sent them a default notice. They did not respond. They -- this E-Mail was

Monadnock v. Glasswall - Volume IV

received, my first communication from him, only after the termination letter went out.

And I was advised by counsel at that point:

"It's out of your hands now. Just let the attorneys settle if. If the bonding company wants to come back in, then they will."

And they did not.

Q And weren't you told -- withdrawn.

A Let's look at the third paragraph of that letter. I'm back now to Mr. Anderson's letter to Mr. Bauso, March 17th.

MR. KLEINHENDLER: We are back --

MR. CINQUE: We are back to --

MR. KLEINHENDLER: The book.

MR. CINQUE: I forget what exhibit it is.

(There was a discussion off the record.)

MR. KLEINHENDLER: Exhibit 164.

1165

Monadnock v. Glasswall - Volume IV

A Which we already discussed, yes.

Q Seven, LEED documentation, said it would be delivered with warranties.

Eight, in-fill panels:

"Need schedule of panels, dimensions, and measurements."

Wouldn't they need that information?

A I am 99 plus percent sure that our staff, prior to the default notice, conveyed that information on the specifications.

Q Number nine, the picture frame metal, he says:

"Material was shipped and received at the job site."

Do you know if it was?

A I don't believe -- if it was on the list, I am 99 percent certain it was not.

Q Number ten on the leuco band, he says he needs a list of the panels.

Wouldn't they need the list?

1166

Monadnock v. Glasswall - Volume IV

A Yes, and I am sure they got it.

Q But sitting here today, do you know for sure, or are you just speculating?

A I don't know for sure, but we had a team of people trying to close out this contract. And they sent constant correspondence to Glasswall's team leading up to the time of the default to try to get these items finished.

We were under tremendous pressure to finish the building.

Q So if you were under such pressure, why didn't you just say:

"Hey, come on in and do the work" when they were offering to do it?

A As I stated before, my feeling was, if they had ceased to exist as a company, that they had no ability to do it, that they had no resources to do it, they verbally told me they would not do it.

We sent them written letters asking them to do it, and they did not. And only after this termination, did they respond. And I was advised by counsel at

1167

Monadnock v. Glasswall - Volume IV

that point that it's out of my hands.

Q Weren't you advised that you needed to terminate your contract with Glasswall in order to bring a claim against the bonding company?

A There was some discussions about that, but, honestly, I don't remember -- and I am not sure I understood whether that was even true or -- and all I know is -- you know, this list of items that we needed to get done is the reason I wanted the letter sent.

Q Didn't your lawyers send you legal statements like monthly bills?

A Yes.

Q I'm going to show you a bill from February 3, 2014. Mark it as S -- this is S, I believe.

MR. KLEINHENDLER: Some of the soft costs are legal fees. That is why we had to produce these records.

MR. CINQUE: It's S.

(Previously Marked Exhibit No. S, Legal Bills, Document is introduced

1168

Monadnock v. Glasswall - Volume IV

into the proceedings.)

Q I direct your attention to the entry for 1/11/2014.

MR. KLEINHENDLER: Do you have the page on the bottom?

MR. CINQUE: It's page 39173. This is S.

MS. FODOR: Respondent's S.

MR. KLEINHENDLER: What are you up to?

MR. CINQUE: I am on page 39173, an entry for 1/11/2014, number three.

Q The lawyer's billing you for this answer to this question:

"Can the performance bond cover the damages incurred by the contractor as a result of the manufacturer's late delivery of windows ordered by the contractor if the owner has never terminated the contract between the contractor and the owner?"

Did you have any conversations with your lawyer about that issue?

MR. KLEINHENDLER: I'm going to

55 (Pages 1165 to 1168)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022