# EXHIBIT 4

P A U L C O L A P I N T O
doing business at Monadnock,
155 Third Street,
Brooklyn, New York,
having been sworn by the notary public to testify to the truth, testified as follows:
DIRECT EXAMINATION
BY MR. KLEINHENDLER:

Q Good morning, Mr. Colapinto.
A Good morning.
Q Could you please tell the panel your educational and professional background.
A Bachelor's of science, 1983, Cortland University; associate's, Nassau Community College, 1995. 32 years in construction field.
Q How long have you been with Monadnock?
A 15 and a half years.
Q And prior to Monadnock, where have you worked?
A Other general contractors, a few developers.

Q Okay. And presently what is your position in Monadnock?
A Senior vice president.
Q Okay. Did there come a time where you became involved with the Hunters Point project, the parcels A and B that we were just discussing in the opening?
A Yes.
Q Tell us when you first became involved with that project?
A Spring of 2011.
Q And what did you do?
A Came on board as one of the construction, not experts, but one of the construction people to work on the development of the project.
Q And just by the way, currently, what is your position at Monadnock?
A Senior vice president.
Q Okay. Did there come a time when you were involved, either personally or on behalf of Monadnock, in searching for a provider of window wall or curtain wall units for the project?

And by the way, we will just -- for ease of use, we will refer to the project as this "HPS project" which is the subject of the arbitration; is that okay?
A Yes.
Q Okay. So when was the first time you started looking for a glass -- a window glass supplier for this project?
A Late winter, early spring of 2012.
Q What did you do?
A Well, we looked into recommendations for curtain wall contractors. We vet them. We speak to other manufacturers.
Q Okay. Describe for the panel what is a "curtain wall" as it -- it relates to this project.
A A curtain wall is the most important part of this project because it's the skin or the envelope of the -- of the building.
Q And what is the composition of a curtain wall?

A Metal frames, louvers, hardware, glass, gaskets.
Q And prior to installation of the window wall or curtain wall, are there -- is there certain hardware or certain parts that need to go into the concrete structure that actually holds the wall?
A Yes.
Q What are they?
A They are called anchors or specifically on this job hardware anchors.
CHAIRMAN ROSSI: Halfen, H-a-l --
THE WITNESS: H-a-l-f-e-n.
A It's an embedment in the concrete superstructure.
CHAIRMAN ROSSI: Who puts them in?
THE WITNESS: The superstructure contractor.
CHAIRMAN ROSSI: And it's supplied -- supplied by the window manufacturer or not?

THE WITNESS: Supplied by the window manufacturer, correct.

CHAIRMAN ROSSI: Okay.

(Previously Marked Exhibit No. 2, Document is introduced into the proceedings.)

Q Okay. I refer you to Exhibit 2 in the book, binder one. If you can look at the -- you can look there or you can look at the book.

MR. RENDA: I have to look at the book because I can't read that far away.

CHAIRMAN ROSSI: Here you go. You want to take a look at this?

Q The bottom -- I will just wait for the arbitrator.

MR. KLEINHENDLER: Also, panel members, I think -- and Mr. Cinque -- we are going to mark exhibits. And can we just have a ground rule? Unless there is a stated objection, it will be considered received?

CHAIRMAN ROSSI: You are not

going to have to, you know, go through the exercise of -- of -- of what you call foundational exercise with exhibits. So just act as if they are all in.

Mr. Cinque, that's not to stop you. If something comes up --

MR. CINQUE: That's fair. I understand.

CHAIRMAN ROSSI: If something comes up, you just object; but otherwise we're going to assume everything is in.

MR. CINQUE: Okay.

CONTINUED EXAMINATION
BY MR. KLEINHENDLER:

Q Could you look at the lower E-Mail. It's from Mr. Bauso to Mr. Balestrazzi.

Who is Federico Balestrazzi?

A President of Glasswall.

Q And what was his role in connection with Glasswall's activity on this project?

A He was the point person for Glasswall on this project.

Q Do you know what position he held at Glasswall?

A He was the president of Glasswall.

Q Okay. And looking at the date, March 29, 2012, is this around the time frame when Monadnock started interacting with Glasswall in connection with this project?

A Yes.

Q And if you look at the top one, Federico is talking to Greg about base price and features.

What were -- what were the substance, if you know, of the discussions between Monadnock and Mr. Balestrazzi in or about the end of March of 2012?

A Well, they would have been preliminary conversations as to how we were going to clad this building with the curtain wall system.

Q And did you do any due

diligence about Glasswall -- and when I say "you," I mean you or Monadnock -- do any diligence about Glasswall as a company and their ability to perform?

A Yes.

Q Tell the panel what you did.

A References were checked. Some of their projects were looked at online. Glasswall had actually furnished a project for one of the partners at Hunters Point; and they came with a good recommendation.

Q Did you ever make any visits to their plant?

A We had sent people down to their plant. The outside consultant, Israel Berger Associates, also knew of Glasswall, didn't have anything negative to say.

Q Tell us who -- who is Israel Berger, and what exactly was their role here?

A They were hired by ownership of Monadnock to be the curtain wall expert so that the curtain wall would be fabricated

74

Arbitration -- Volume I

correctly for the Hunters Point project.

Q And during this project, did they prepare reports?

A Yes.

Q And tell us. What were those reports called?

A Some of them were called "plant reports." Some of them were called "field reports." So they did inspections in the factory and also in the field. The field ones would be later in the project.

Q Okay. Take a look at Exhibit 2 -- sorry. This is Exhibit 3.

(Previously Marked Exhibit No. 3, 5/18/12 Document is introduced into the proceedings.)

A Okay.

Q And that is Bates stamped Monadnock 909094. This is a document dated May 18, 2012. Could you explain to the panel what this is?

A This is an official invitation to bid the Hunters Point curtain wall project.

75

Arbitration -- Volume I

Q And could you just go through on the bottom some of these notes of what you were looking for in the bid?

A There was exclusions in the bid, such as fins, which is a metal projection, trees, again -- excuse me.

Trees were excluded. Fins were to be part of the bid.

We affectionately called trees an extra piece of architectural metal work that was applied in the field afterward.

Q Look at number six. What does number six say?

A When we thought we needed the windows --

Q Just read it -- just read it for the panel.

A "Anticipated delivery needed by the beginning of March 2013."

Q And this was communicated in May of 2012?

A That's correct.

Q Let's look at Exhibit 3 now in the book. Could you tell --

76

Arbitration -- Volume I

CHAIRMAN ROSSI: We are on Exhibit 3.

Q I'm sorry. Sorry. Exhibit 4?

(Previously Marked Exhibit No. 4, Document is introduced into the proceedings.)

Q It's Monadnock 93114.

And could you just describe to the panel what this is?

A This is Glasswall's official bid for one of the buildings, parcel A, specifically.

Q And was there ultimately a bid for parcel B?

A Yes.

Q Okay. Let's go through this because we want to talk about what -- what exactly was Glasswall bidding on here. And let's just -- take a look at the first page, 9315, if you look at the number, and products -- just explain in layman's terms what are these products that you are asking for.

A Well, unitized window wall

77

Arbitration -- Volume I

system is each individual curtain wall panel.

Q Okay.

A Unitized store front system is again an individual panel, but store front at the ground floor.

In-swing casement window, which was an important component of the curtain wall system, because all apartments have to have ventilation.

And store front doors, specifically, the aluminum doors, to get in and out of curtain wall systems.

Q Let's take a look at the inclusions on page two.

Just generally, what -- what is it that they were also including besides just what you just explained here?

A Well, they were including all of the components of the window wall system, meaning the frame, the louvers, the glass, the colored glass, the slab covers, fire stopping, the complete curtain wall assembly.

20 (Pages 74 to 77)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

Arbitration -- Volume I

Q Okay.

MR. RENDA: Can I ask you a question?

THE WITNESS: Yes.

MR. RENDA: How was the curtain wall -- how was the curtain wall attached to the structure?

THE WITNESS: So, glass wall shipped -- shipped out, these Halfen anchors with a shop drawing. We hand the shop drawing off to the superstructure contractor.

And he installs the Halfen anchor in the exact location that needs to be installed for a curtain wall unit, after which, an iron worker then affixes a C channel over the slab edge, and bolts it to the slab edge so that the curtain wall unit now can rest on top of the C channel.

So these had to be put in the exact, correct place so that each unitized window would sit on top of a C channel.

Arbitration -- Volume I

MR. RENDA: Okay.

MS. FODOR: Who manufactures the C channel?

THE WITNESS: Glasswall manufactured the C channel.

MR. KLEINHENDLER: All right.

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q Let's take a look at Exhibit 6.

(Previously Marked Exhibit No. 6, E-Mail dated 9/18, Document is introduced into the proceedings.)

Q And this is an E-Mail dated October 18th.

(There was a discussion off the record.)

Q This is an E-Mail dated September 18th.

If you go to the bottom, it talks about "mock-up creation."

Tell the panel what are -- what are these mock-ups and "from Shop," and tell us why you were even talking to Glasswall about mock-ups.

Arbitration -- Volume I

A Well, Shop was the architect that designed the envelope of the building, the envelope being the curtain wall system. So we needed to do a visual mock-up so the architect and the owners would be happy with what Glasswall proposed to build to take the architect's design or idea and put it into reality.

Q Is a mock-up sort of like a sample?

A It definitely is a sample. A visual mock-up is the sample.

(Previously Marked Exhibit No. 7, Document is introduced into the proceedings.)

Q Let go to Exhibit 7, please. I want to take you to the second page of that, and 9764. It's an E-Mail from Mr. Bauso. You are copied on it, September 2012.

And it talks about the pricing. Tell us about this E-Mail and what the pricing was from Glasswall on the two buildings.

Arbitration -- Volume I

A This is an E-Mail confirming what the bids were from Glasswall for parcel A, of 8,700,000 and change, and parcel B, 4,800,000 and change.

Q Let's go to Exhibit 8, please.

(Previously Marked Exhibit No. 8, E-Mail dated October 18, 2012, MC 9104, Document is introduced into the proceedings.)

Q Exhibit 8 is an E-Mail dated October 18, 2012, MC 9104.

It's from Greg to a whole bunch of people, including Federico and you, about a Glasswall meeting.

Could you describe what meetings this is referring to, and, in general, what meetings were you having now in October 2012 with Glasswall?

A A critical part of a curtain wall or a window wall system is who is going to be installing it.

And one of the reasons is because the manufacturer has to make the window system in such a way that it could

Why was that inserted? Do you know?

A Time is of the essence with a curtain wall project because we have to install windows in an unbroken sequence in order to make the building weather-tight.

Q Okay. Did you ever have discussions with Federico or leading up to this contract execution that they had -- only had to start the windows in September 1, 2015 [sic], but they can complete it anytime they want?

A No. They have to provide us with an unbroken stream of windows so that we can install the windows and weather-tight the building.

CHAIRMAN ROSSI: Can I ask you something?

The first date in that -- in that -- in that sentence, "production start date to be on or about April 15th," was that really kind of a deadline for you to get -- to make sure that they have everything so that

they can start on April 15th?

THE WITNESS: No, that was more of a date working backwards that they said they needed approximately three or four months prior to sending windows to start fabricating them.

CHAIRMAN ROSSI: Okay.

THE WITNESS: That -- that was based on Glasswall and our expert, Israel Berger, saying that the curtain wall units would take four or five months to manufacture.

Q Prior to executing this agreement, you talked about meeting with Glasswall.

Did they ever tell you that they believed it would be a problem getting glass from AGC?

A We didn't learn of a problem with glass from AGC until the summer of 2013.

Q Now, it says here:

"The work of this contractor shall be substantially completed."

What was your understanding as to when the work would be "substantially completed" for parcel A?

MR. CINQUE: Objection. The contract speaks for itself.

CHAIRMAN ROSSI: Overruled.

A Actually, we wanted Glasswall to have all of the windows manufactured and sitting in their warehouse in Florida prior to September so that we would be guaranteed an unbroken stream of windows.

Q Did you ever communicate that to Glasswall?

A Yes.

Q Who did -- who did you communicate it to?

A Federico.

Q Let's go to paragraph -- section 11, "Progress Payments," okay.

This talks about when -- what is your understanding under this contract as to when Glasswall was entitled to payment under this contract?

A Well, payment is based upon a

schedule of values that are worked out and agreed upon between contractor and fabricator. So Glasswall submitted a schedule of values, of which we approve the schedule of values first and then pay based upon that schedule of values.

Q Could you turn to page -- I am working with the Bates stamp -- 14 on the bottom. Take a look at 11.7.2.

Tell me why is that paragraph deleted.

A Why was this deleted?

Because we didn't want to pay for stored materials.

Q Sorry. Let's start.

What did that paragraph say and then -- clearly, it's deleted. But what -- what was intended by that paragraph before it was deleted, the -- the way you understand it?

CHAIRMAN ROSSI: Well, before we get here, what about this?

Did you intend under this contract to pay for materials that

122

Arbitration -- Volume I

Fund and Monadnock Construction as construction manager, Document is introduced into the proceedings.)

Q What is Exhibit 33? That's the --

A It's a contract for parcel B.

Q Between who and whom?

A Between Hunters Point South Borden Housing Development Fund and Monadnock Construction as construction manager, same obligations as parcel A.

Q And let's take a look -- and let's take a look at the Exhibit 34.

This goes to Mr. Rossi's question.

Could you identify what Exhibit 34 is?

(Previously Marked Exhibit No. 34, Amended Agreement dated February of 2013 of HPS, Document is introduced into the proceedings.)

A This is some sort of amended agreement that's dated February of 2013.

Q Of HPS?

123

Arbitration -- Volume I

A Yes.

Q Now, I just want to go to -- if you just go to page 44181. And it just identifies the percentage interest of the various members of this LLC.

Who are they?

MR. RENDA: Under what tab?

MR. KLEINHENDLER: That's -- this is tab 34. It's MC 44181. That's the page. It just tells you who -- who the owners are.

Q Okay. So it's --

A Related is 50 percent owner. Phipps is 25 percent owner. And Monadnock is 25 owner.

CHAIRMAN ROSSI: Got it.

Q And just going to page 44189, section 6.1, if you look at the bottom paragraph:

"The members hereby appoint Related to serve as the manager."

Who was your contact person in the ownership group in connection with the construction?

124

Arbitration -- Volume I

A Frank Monterisi.

Q And who does he work for?

A The Related company.

MR. RENDA: Can I ask a question.

With regard to the construction management contract, were these considered "at risk" or "not at risk"?

Do you understand what I am saying?

THE WITNESS: Not at risk.

MS. FODOR: Is the project under the CM agreement for the entire project?

THE WITNESS: There's a CM agreement for each building, parcel A and parcel B.

MS. FODOR: But it's for the total building?

THE WITNESS: Yes.

MS. FODOR: Including the glass?

THE WITNESS: Yes.

CHAIRMAN ROSSI: So Mr. Renda's

125

Arbitration -- Volume I

question, Monadnock was not at risk, you are saying, under the --

THE WITNESS: Financial risk for the cost of the project, no.

CHAIRMAN ROSSI: Yes, yes.

MR. RENDA: Otherwise, I have to read all of these pages. It will save me some time.

MS. FODOR: Right.

Q Okay. Let's go to page --

(There was a discussion off the record.)

Q Do you recall when the parcel A foundation started?

A February of 2013.

Q Okay. And if somebody wanted to find that exact date, what document would they look at?

A The Monadnock daily job report document.

Q Okay. Let's take -- let's pull it up on the screen because it's --

MR. RENDA: Just give me the date again, February what?

32 (Pages 122 to 125)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

134

Arbitration -- Volume I

proceedings.)

Q 38. And could you describe -- first of all, who is Glen Koenig?

A Glen was a project manager for Monadnock Construction.

Q It says here he's writing to Federico and Armand.

Who is Armand?

A Armand was, we believe, vice president of Glasswall at that time.

Q And the cc's are going to various people at your company and Related?

A That's correct.

Q Why -- why are you copying Related on some of these E-Mails?

A Because they are part of the design team.

Q Okay.

"Federico and Armand, as per HPS, parcel A and parcel B visual mock-up, the design team approved the VMU."

What is that?

A "Visual mock-up."

Q What happened here?

135

Arbitration -- Volume I

A They approved the colors and metal -- paint colors, glass colors, glass.

CHAIRMAN ROSSI: Is that on both projects?

THE WITNESS: Yes, it was one visual mock-up for both. So half the mock-up might have been for parcel A; and the other half would be for parcel B because it's two distinct.

Q All right.

"Glasswall is hereby to release all glass, metal, and sealant required to fabricate the performance mock-up."

What are you -- what are you telling them here?

A That now they have all the answers that they can release.

CHAIRMAN ROSSI: What about this final approval by somebody else?

THE WITNESS: Bruce Beal from Related wanted to fly down and see it himself.

Q And did that -- did that happen?

136

Arbitration -- Volume I

A I believe so.

CHAIRMAN ROSSI: But the approval was subject to him, so they really couldn't release it at this point, right, because, if Beal went down and didn't like it, there was going to be a problem --

THE WITNESS: If they didn't like the color, yes.

Q Did that happen?

A No, he was fine with the colors.

CHAIRMAN ROSSI: But when did he go down? Do you know?

THE WITNESS: Probably within a week after the memo went out.

Q Well, let's look at Exhibit 46.

(Previously Marked Exhibit No. 46, Document is introduced into the proceedings.)

Q Okay. So Glen Koenig is writing to Federico and Marco:

"Please make arrangements for a senior officer and the quality control

137

Arbitration -- Volume I

representative from AGC Glass and GE Momentous to be present during the mock-up. There have been issues observed on the mock-up, such as" -- "of glass such as damaged secondary sealant and roller wave distortion."

What is that?

A During the performance mock-up, some of the glass leaked internally, so some of the glass had a leak in it, not just the curtain wall system. And the glass visually looked distorted.

Q So by this date in May, the glass -- glass wall had the right colored glass, but now there was a problem with the mock-up?

A They had the right colored glass, and they needed AGC glass specifically for performance mock-up because you can't use a different glass manufacturer for the glass in the performance mock-up because that's what we were going to build the project from, is the components from the --

35 (Pages 134 to 137)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

Arbitration -- Volume I

CHAIRMAN ROSSI: So the mock-up was not done with AGC?

THE WITNESS: No, it was -- no, it was. Yes.

CHAIRMAN ROSSI: It was. Okay.

(Previously Marked Exhibit No. 48, Document is introduced into the proceedings.)

Q Well, let's go to Exhibit 48, please, May 30th.

During the 5/18/13 meeting -- this is from Glen to Federico.

"During the 5/18/13 meeting held at HP's trailer with Monadnock, Related, Ecker, Glasswall, the team discussed material delivery dates. At this time Glasswall was informed that parcel A material would be required by 9/1/13 and that parcel B would be required at 9/15."

So at this point, you are pushing out the dates?

A Parcel B slipped a little, but not parcel A.

Q And why were you pushing out

Arbitration -- Volume I

the dates?

A Just based upon where we were in the foundation of the project.

A schedule is something that is a breathing mechanism, subject to change.

Q Let's take a look at Exhibit 52.

(Previously Marked Exhibit No. 52, Document is introduced into the proceedings.)

Q You are copied on this. And, again, Andrew Baranello is who?

A He was the senior project manager on the project at the time from Monadnock Construction.

CHAIRMAN ROSSI: I'm sorry. What number did you go to?

MR. KLEINHENDLER: This is Exhibit 52, MC 10509.

Q Why was Andrew telling Federico about the, you know, the concrete erection schedules?

Why was he sending this E-Mail? Do you know?

Arbitration -- Volume I

A He wanted to sure that the Halfen anchors, which Glasswall was supplying, were sent to the job so that they could be installed in the slab.

CHAIRMAN ROSSI: Who is Glen Koenig again?

THE WITNESS: Glen was a project manager.

CHAIRMAN ROSSI: For you?

THE WITNESS: For Monadnock.

MS. FODOR: And who is Andrew?

THE WITNESS: Andrew was the senior project manager at the time from Monadnock.

Q If you go to the next page --

CHAIRMAN ROSSI: These are all people who reported to you?

THE WITNESS: Yes.

Q These dates are not theoretical. They are actual schedule dates, correct?

A Yes.

Q Do you know why he was capitalizing "Not"?

Arbitration -- Volume I

A He was stressing that we are installing concrete decks on these dates.

Q At this time, at this point in time, did it become apparent to you that Glasswall's manufacturing process would be delayed?

A There were issues.

Q Did they ever raise an issue with you at this point that they couldn't get glass from AGC?

A No, not in May.

Q And as you testified, your concrete infrastructure was already going up?

A Correct.

Q Let's go to Exhibit 54.

(Previously Marked Exhibit No. 54, June 3 E-Mail, Document is introduced into the proceedings.)

Q This is an E-Mail June 3rd, attaching certain minutes, which will be Exhibit 55. Take a look at 55 as well.

(Previously Marked Exhibit No. 55, Meeting Minutes, Document is

introduced into the proceedings.)

Q Can you describe this meeting, you know, what was happening at this meeting?

A This was a meeting at the testing lab to make sure that the mock-up, the performance mock-up installation had started and was proceeding along correctly.

Q Okay. And look under "thermal testing."

IB -- what is -- who is IBA?

A Israel Berger Associates is the curtain wall consultant for the Hunters Point project.

Q Okay. And:

"Thermal testing, IBA stated Glasswall didn't include installation."

What does that mean?

A It means that the installation wasn't part of the performance mock-up.

Q Okay. And look at "glass quality."

Do you see issues there with glass quality?

A Yes.

Q Okay. If there was --

CHAIRMAN ROSSI: I thought that this was already approved, right, approved mock-up on April the 3rd, right?

THE WITNESS: This is the performance mock-up; so, now, the visual mock-ups with the glass colors were approved is now -- based on the coloring and the spandrel glass -- AGC was now released to manufacture glass for the performance mock-up.

(There was a discussion off the record.)

CHAIRMAN ROSSI: I see.

MR. RENDA: It's really like a performance test where you test the performance?

THE WITNESS: Correct.

CHAIRMAN ROSSI: Okay.

So this is really when they are testing to see if these things are really going to work, right?

THE WITNESS: That's correct.

Q Let's take a look at an exhibit that was in June, early June. Let's take a look at Exhibit 57, please.

(Previously Marked Exhibit No. 57, Early June E-Mail, Document is introduced into the proceedings.)

Q 57.

This is an E-Mail. Let's go to the bottom part of it. This is an E-Mail from you to Federico that we went through in our opening statement where you talk about pushing off the accepting of the delivery windows.

Do you see that?

A Yes.

Q In the third paragraph.

Why were you pushing off the delivery of some of these windows, or why were you pushing off the delivery on parcel A and parcel B?

CHAIRMAN ROSSI: Where are you now?

MR. KLEINHENDLER: I am on

Exhibit 57, the bottom half of it, which is Paul's E-Mail to Federico.

CHAIRMAN ROSSI: Okay.

Q Okay. So you talk about a conversation you had on June 11th, and then you talked about moving the dates.

Tell us to the best that you can recall the conversation with Federico that you refer to here on June 11th?

A Well, it started previous to June 11th.

Q Tell us the story.

A All right. June -- the end of June when the performance mock-up --

Q It was May.

A May, excuse me, the end of May when the performance mock-up testing was underway and experiencing some problems, Federico informed us at one of the tests down in Florida that they were going to have trouble meeting our production requirements.

So we went back, visited with other members of the Monadnock team, went

150

Arbitration -- Volume I

right. So then -- so what I'm asking then, I guess, is:

When you wrote on June 12th and you said 9/16, that wasn't -- that was -- I mean, you are not even sure if they can make it on 9/16; but that was -- you couldn't really accept them before that -- or could you have accepted them?

THE WITNESS: No, no, we could have accepted them. As I said earlier, we were making preparations to store them in New York if need be.

CHAIRMAN ROSSI: Okay. All right.

Q Okay. Let's take a look at 68.

(Previously Marked Exhibit No. 68, E-Mail chain, Document is introduced into the proceedings.)

Q This is another E-Mail between you and Federico. And you are referring here to a -- you were told by Chad, your PM.

Who is Chad?

151

Arbitration -- Volume I

A Chad was hired by or assigned by the owner of Glasswall to assist Federico because Armand was no longer at Glasswall.

Q Okay. And you are telling Federico:

"I hear you can't even make these new dates of 9/15 and 10/1. I am sure you can imagine how upset I am about this. You need to call me back, so we can set up a meeting."

And at the end:

"Prior to that meeting, I would like from Glasswall firm commitments with new delivery dates."

CHAIRMAN ROSSI: What exhibit is that now?

MR. KLEINHENDLER: This is Exhibit 68.

Q So tell me about your discussions now with Federico in July.

A Continued discussions with Federico that, you know, not only did we have people in the factory, we were down

152

Arbitration -- Volume I

there -- I was down there myself. And we would -- scheduling was of the utmost importance when it came to curtain walls.

If we didn't know where the windows were, we couldn't build the project correctly. So we were talking about windows everyday with Glasswall.

Q Okay. And at this point, even in July, were they telling you, "We can't get the glass"?

A They started to inform us, not in July, but there were issues with the glass.

Q Okay. But I am saying:

Do you recall in July -- do you recall them telling you, "We have got a problem getting glass"?

A They didn't say they had a problem getting glass for the Hunters Point project in July. They had problems with the glass.

Q Okay. All right. We are going now to talk about AGC now.

A Okay.

153

Arbitration -- Volume I

MR. KLEINHENDLER: Just by the way, just when do you guys want to break for lunch today?

CHAIRMAN ROSSI: What is it, 12:15 now?

(There was a discussion off the record.)

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q Let's take a look at Exhibit 58, please.

A 58.

(Previously Marked Exhibit No. 58, 7/1/13 E-Mail chain, Document is introduced into the proceedings.)

Q And this is July 1, 2013. Greg is writing to Federico. And they are talking about the heat soaking issue.

So explain to the panel what this heat stoking issue is Greg is referring to on July 1st?

A It's a process.

Q What was the problem? What was the problem?

39 (Pages 150 to 153)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

work, what good is it?

CHAIRMAN ROSSI: Right, but I don't -- I don't understand. I thought you were way beyond shop drawings at this point. They're making windows, right?

THE WITNESS: These were changes in the -- because of failures in the window system.

MS. FODOR: To the architect's design?

THE WITNESS: No, the engineer -- Glasswall's engineers had to make these changes.

MS. FODOR: Design-builts, so they were building and manufacturing.

THE WITNESS: Yes, because of the fact we were behind.

MS. FODOR: So there was no independent review of the shop drawings by anybody? It was whatever they had as shop drawings is what was built?

THE WITNESS: That's what was

going to be built. And they weren't even sharing that information with us so that we could cooperate and verify that this will work or, no, do something different.

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q And were they required to provide the shop drawings to you under the contracts?

A Yes, it's a common part of construction.

Q Just explain it to them. What is the common, you know, sequence of events?

A Architects design it. Engineers engineer it. Contractors build it.

Contractors build it based upon a set of drawings that -- of their understanding on how they want to build it.

Q And whose obligation was it to prepare these drawings?

A Glasswall's.

Q Now, attached to this letter is a very detailed -- what we call a summary that Mr. Bauso forwarded -- you have to turn that around.

A Yes, these are the IBA reports.

Q Now, you have to explain to them because, if you look at the top, these are summaries of those reports.

A Um-hum.

Q And so explain to them first what the reports are and then what the summaries show?

A These are deficiency logs. So you --

CHAIRMAN ROSSI: We are still on C 123, right?

MR. KLEINHENDLER: Yes, yes, this is an attachment to that letter.

CHAIRMAN ROSSI: Yeah.

A And so these are deficiency logs on all of the things that Israel Berger was finding wrong with the windows being manufactured at Glasswall in the month of October.

Q So you were documenting in excruciating detail what this independent consultant was telling you?

A Well, this is their documentation.

Q Right.

A Yes. Israel Berger was hired to spend time in the factory, quality control, and to make sure that the curtain wall system was being built to the specifications they originally wrote.

Q And is it correct that certain aspects of the performance did not past testing?

A Certain aspects of the window didn't pass testing back in May, end of June -- excuse me -- end of May, early June.

Q Okay. And what are these IBA --

A These here are deficiencies that they noted during the production, some of which were discovered during the performance mock-up.

that "previous" meant that all the "previous"es were paid up to this point?

THE WITNESS: Correct.

MR. RENDA: Okay.

A So, I mean, we have the option of paying retainage or not, even if it's in the contract. If you are a good employee or a good fabricator, and we need to feed you, pay you money, so that we are going to get our project in a timely fashion, it would be our choice if we were going to release retainage or no.

CHAIRMAN ROSSI: But if the contract had -- didn't provide for retainage, then you couldn't hold back retainage, correct?

THE WITNESS: I believe the contract did.

CHAIRMAN ROSSI: Well, I am just asking.

THE WITNESS: Well, that would be true. Yes, sir.

CHAIRMAN ROSSI: That's what he

said. I don't know. I haven't looked at it yet, but --

Q If you go down to their -- the requisition for parcel B, if you turn the page, is there a requisition for parcel A?

Is there a requisition for parcel A, or is that just B?

A This is just B.

Q Okay. Just back up to Exhibit 120, please.

A Okay.

(Previously Marked Exhibit No. 120, 11/30/13 Requisition Ten for Hunters Point parcel A, Document is introduced into the proceedings.)

A This is requisition ten for Hunters Point, parcel A.

Q Okay.

A Dated November 30, 2013.

Q And how much had been paid to date on that?

A $2,280,000.

Q Okay. So between these two contracts, you paid two on one, and one on

the --

A Over $3 million on both.

Q Had a single window been delivered?

A No, it was close to a concern on our end.

Q Let's take a look when -- all right.

By the end of December, was the parcel A superstructure completed?

A Yes.

Q Let's take a look at Exhibit 231.

(Previously Marked Exhibit No. 231, Document is introduced into the proceedings.)

A Exhibit 231?

Q Yes.

A That's not in this book.

Q No, we are going to put it on the screen, page 4714, Document 472.

CHAIRMAN ROSSI: So let me just ask you -- I'm sorry -- before we get off that.

So what you are testifying to, is you are getting a little concerned because on parcel A you paid almost $3 million, right?

THE WITNESS: Between the two -- between the two buildings, almost 3 million, over $3 million.

CHAIRMAN ROSSI: Right, I mean, you don't see any windows, right?

THE WITNESS: That's correct, and although windows --

CHAIRMAN ROSSI: You know they are being fabricated.

THE WITNESS: They are being fabricated, but they -- we don't know if they work --

CHAIRMAN ROSSI: Right.

THE WITNESS: If they have been crated correctly, if the quality issues have been rectified. At some point in time, enough is enough. "You made windows fantastic, but we can't use them; we can't install them without the subsequent

Arbitration -- Volume I

information."

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q Okay. Let's take a look at -- before we go to that, let's take a look at Exhibit 126.

(Previously Marked Exhibit No. 126, 12/6 E-Mail chain, Document is introduced into the proceedings.)

A Okay.

Q December 6th E-Mail. And Glen is writing to Chad, and it says here:

"Monadnock is in receipt of your application ten for the month of November," right.

So we got your -- basically, a request for a check, right -- he's saying -- which we just looked at. And he's saying:

"Glasswall neglected to comply and added their own assessed values to the requisition" --

A Um-hum.

Q -- "which deviate from

Arbitration -- Volume I

Monadnock's previous comments."

What is he saying there?

A Well, Glen was the project manager in charge of Glasswall, so he's -- his first responsibility with the requisition is to review it and make sure --

CHAIRMAN ROSSI: That the percentage completed is correct and accurate.

THE WITNESS: Exactly.

A SOL Glen is writing back that:

"Okay. Glasswall, you put a bunch of stuff on the requisition and sent it to us, but we are not in agreement with this."

It's common. Sometimes it's amicable. Sometimes it's hostile.

Q Let's go down to:

"The value indicated in line items 30 through 37, column B should represent zero as there wasn't a value billed in the previous requisition."

A Maybe an honest mistake, maybe.

Arbitration -- Volume I

Q Okay. The value indicated in items 30 through 37 should represent zero. No panel deliveries were sent to Hunters Point."

What does he mean by that?

A It means you are not allowed to build for windows in New York because there are no windows in New York.

Q "Additional, Glasswall didn't revise their requisition, stored material value for the month of October. So your requisition is being denied. The reasons are as follows."

Okay.

"Contract language, section 11, allowing payment for stored materials has been stricken."

Now, if you recall -- I want to go back and remind the panel.

Let's go back to exhibit -- what exhibit is the first contract?

MS. WEINSTEIN: It's 14.

Q Go to Exhibit 14.

MR. KLEINHENDLER: Just put it

Arbitration -- Volume I

up on the board, Jocelyn. Exhibit 14 --

CHAIRMAN ROSSI: Where the paragraph is crossed out.

MR. KLEINHENDLER: Yes. And that's what I want to remind you, that that paragraph, talking about payment for stored panels, was stricken.

And that's what he's saying here.

CHAIRMAN ROSSI: Okay. Let's not argue. I thought you said you would have paid any delivered, right?

THE WITNESS: Yes, we would have. It was a gentlemen's agreement that:

"If you are making windows that we are going to accept and we're comfortable with them, we will take them."

But there comes a point in time, also, where you can't just tell me:

"I made the windows. Pay me."

Arbitration -- Volume I

Q Whose handwriting is on this?
A That's mine.
Q Okay.
A It works better in color, so -- well, it's in color up on the screen.
Q Color up there. Okay. Let's go to Exhibit 151. We will take a look at the letter here from Monadnock to Mr. Anderson.
Does this explain what the circumstances are here, Exhibit 151?
(Previously Marked Exhibit No. 151, Letter from Monadnock to Mr. Anderson, Document is introduced into the proceedings.)
A Well, it's getting towards the end of the job where there's a couple of floors left to be delivered and also what we call the hoist department.
So high-rise buildings are built with outside elevators, and the hoist is put up in a certain location. And the curtain wall units that need to be fabricated --

Arbitration -- Volume I

CHAIRMAN ROSSI: Leave it to the end, right.
THE WITNESS: -- leave it to the end. Yeah.
CHAIRMAN ROSSI: All right. Could we just read this letter for a second.
THE WITNESS: Sure.
A So it's October of 2014. We have run out of windows to install because the balance of the windows are not on-site. And Glasswall demands final payment in accordance with the agreement, their interpretation of the agreement.
So they wouldn't ship windows until a check was cut in full for all of the windows left still in Florida.
Q All right.
A Installation had come to a halt.
Q Okay.
CHAIRMAN ROSSI: All you have left at this point is the -- is the hoist line?

Arbitration -- Volume I

THE WITNESS: No, we had the remaining top floors in both buildings and the hoist departments.
Q We have that document now.
We wanted to just point out again when -- when the window installation started in parcel B. And we have -- let me just identify it. It's Exhibit 232, Bates stamp MC 41753.
And could you identify for the panel --
A Window -- eight men, delivery and installing the windows.
Q Okay. And if you could just go to the top and show the panel what date it is.
A 4/28.
(There was a discussion off the record.)
Q 2014?
A Correct.
Q All right. Let's go to Exhibit 153.
(Previously Marked Exhibit No.

Arbitration -- Volume I

153, Money Wire Document is introduced into the proceedings.)
Q Could you describe what that is for the panel?
CHAIRMAN ROSSI: Let us take a look at it. What number is it?
THE WITNESS: 153.
A This is 154. Is that what you want me to look at? Is that 153?
Q Let's do 153, sorry, 153.
A It's the wiring of the money that Glasswall demanded.
Q So you ultimately just gave in and wired the money?
A Sure, we needed the rest of the windows. What were we -- going to go back to 2013?
Q Okay.
CHAIRMAN ROSSI: Is that what was left, a million 2? Is that what you sent them?
THE WITNESS: That's correct.
Q Let's take a look -- I think the next exhibit is the balance. Take a

Monadnock v. Glasswall, Volume II

THE WITNESS: -- to maintain the electrical systems, maintain the outside elevators. The union shop steward was still there.

So we tried to continue to work, putting the switch gear room together, which was a watertight room, doing whatever internal feeding -- feeder work that we could do without thinking we were going to incur damage because of --

CHAIRMAN ROSSI: All right. So I -- so I understand.

So what you are saying is that you kind of like -- you don't moth-ball, as you said. Yet, you could do some work. But any type of work you had, you had to have some electricians. And I'm assuming you have temporary lighting on the --

THE WITNESS: You had temporary lighting, correct.

CHAIRMAN ROSSI: Right, hoist had to go --

Monadnock v. Glasswall, Volume II

THE WITNESS: The hoist had to be on 24/7 for the fire department use.

CHAIRMAN ROSSI: Okay. All right. I got you. Thank you.

THE WITNESS: Okay.

Q Now, we are up to --

A 55.

Q Which is tab 53 here, okay.

A 55 is the change order amount of $235,000 to Spiel and Recca Electric. They are the parcel B electrical contractor. And that's page number 13870. And this is for the same items that we just discussed in parcel A.

Q Do we have the --

A I am on line item 56.

Q Before that -- just getting to --

A You want to know --

(There was a discussion off the record.)

CHAIRMAN ROSSI: Can I just ask you one other question? I'm sorry.

Monadnock v. Glasswall, Volume II

And I am going to ask you about this one since we have it open.

Like, on 13876, which is the final lien waiver --

THE WITNESS: Okay.

CHAIRMAN ROSSI: You have total revised contract of 6,000,323. But that -- that -- that -- that includes a lot of other stuff, right?

THE WITNESS: That's correct.

CHAIRMAN ROSSI: I am assuming they had a lot of change orders.

THE WITNESS: That's correct.

CHAIRMAN ROSSI: Yeah. Okay. I'm sorry. The total change order was 644 right, okay. And this represents -- I don't know.

THE WITNESS: $235,000 of it.

CHAIRMAN ROSSI: So there were other change orders.

THE WITNESS: There were definitely other change orders.

(There was a discussion off the record.)

Monadnock v. Glasswall, Volume II

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q And this was a negotiated sum?

A This was a negotiated --

(There was a discussion off the record. Multiple people were speaking at the same time.)

Q This was a negotiated sum? Yes?

A Yes.

Q All right. We are up to 56, which is tab 54.

A 56 is the plumbing contractor for parcel A, their labor and material escalation, the Paramount Plumbing, page number 13878, amount of $400,000, again, for labor and material escalation costs to the plumbing contractor on the job -- copper pipe, wage increase, men on the job this size -- temporary water had to be maintained.

CHAIRMAN ROSSI: And was -- these contracts with the -- with the electrician, the carpenter, now, the

574

Monadnock v. Glasswall, Volume II

default?

A No, you asked me if we ever gave John Anderson the opportunity. And my reply was yes.

Whether or not it was after the notice of default or before, does that not make a difference?

Q After the notice of default, did you personally give John --

A I don't believe I spoke to John Anderson after the notice of default.

Q Isn't it true that, after the notice of default, Glasswall was basically told, "Take a hike"?

A I don't believe Glasswall existed in March of 2015.

Q When -- withdrawn. How do you know that?

A When calling for the missing hoist run window, we got nowhere with calling. Nobody answered the phone. The contacts that we had dealt with named Ron, who was in charge of shipping, he was no longer there. Marco --

575

Monadnock v. Glasswall, Volume II

Q What about John Anderson? You had John Anderson's E-Mail. You had his E-Mail address. You couldn't contact him by E-Mail?

CHAIRMAN ROSSI: Hold on a second. You asked, how does he know that Glasswall was no longer around. So he's answering that question. Okay.

Had you finished your answer? You called up and nobody responded, basically?

THE WITNESS: Exactly.

CHAIRMAN ROSSI: Okay. So go ahead now.

Q Okay. Isn't it true that, after you sent the notice of default in March of 2015, that Glasswall was not given an opportunity to come in and take care of the 30 items in your notice of default?

A I don't know if they were or weren't after March.

Q Do you disbelieve that Mr. Bauso told them:

576

Monadnock v. Glasswall, Volume II

"Hey, it's in the hands of the lawyers now"?

A No, I don't disbelieve the E-Mail.

Q Let's go back to the notice of default, a couple of pages in.

There were prior notices of default; weren't there?

A Yes.

Q And didn't those all have attached like 50 pages from Israel Berger saying what deficiencies existed?

A I don't know if all of them did, but there were deficiencies attached to those notices of defaults, yes.

Q Were there deficiencies attached to this notice of default?

A There was a list of deficiencies.

Q Did Israel Berger provide a list so you could send it to Glasswall like you did with the other notice?

A No, there is a reference to --

(There was a discussion off the

577

Monadnock v. Glasswall, Volume II

record.)

A There's references in this default to:

"... IBA items that were still open, such as casements noted with deficiencies not limited to structural" --

CHAIRMAN ROSSI: You have got to slow down when you are reading.

A "... not limited to structural glazing, leak repairs, gasket repairs, and casement edged delineation repairs" --

(There was a discussion off the record.)

A I'm sorry. Should I start over.

"All casements with noted IBA deficiencies, including but not limited to structural glazing, leak repairs, gasket repairs, and casement edged delineation repairs must be corrected."

That is item four. If we look and see --

Q I believe my question -- not to interrupt you -- was did Mr. -- did you

64 (Pages 574 to 577)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

Monadnock v. Glasswall, Volume II
accompany this with any report from Berger, independent report?
CHAIRMAN ROSSI: No, no, he said no, but that Berger reports are referenced in there, correct?
THE WITNESS: Correct.
CHAIRMAN ROSSI: All right. That's your answer.
Q Okay. When did Glasswall deliver the final shipment?
A Of curtain wall?
Q Yes.
A We have to go back and see when the missing single hoist run window was delivered to the project.
Q Put aside the one window.
Okay. There were 9,300 windows, correct?
When did it produce -- when did it deliver 9,000 of them?
A In 2014.
Q Okay. Why did you wait three months to write a notice of default?
A You would have to ask the

Monadnock v. Glasswall, Volume II
person who wrote that.
Q Okay. I mean, after they delivered the 9,000 units -- 9 -- what -- withdrawn.
CHAIRMAN ROSSI: Just so we have the dates correct, I mean, my notes indicate that the last of the windows -- and there may have been one on the roof that was -- but the last of the windows, according to your testimony yesterday, on the B building was in January 12th -- January 12th of 2015. That was the date.
And on the A building on February 27, 2015.
THE WITNESS: No, that would be installation completion.
CHAIRMAN ROSSI: Installation completion?
THE WITNESS: Yes.
CHAIRMAN ROSSI: Okay. So the -- so the delivery would have been before that?
THE WITNESS: Correct.

Monadnock v. Glasswall, Volume II
CHAIRMAN ROSSI: Okay. All right. So sorry. Go ahead.
MR. CINQUE: That's all right.
Q Do you know, sitting here today, when the last glass was delivered except for that one unit?
A In 2014.
Q Okay. And when were they required to be delivered by, under the contract?
A Six to nine months after the start of deliveries in 2013.
Q Wasn't there an amendment?
Wasn't there an amendment?
A Amendment, there was a work-out deal executed in March of 2014.
Q Didn't that have a new schedule?
A It had recovery schedules attached to it.
Q Didn't it give a completion date in that document?
A I don't know.
Q Okay. Let's look at it.

Monadnock v. Glasswall, Volume II
A Sure.
Q It's Exhibit I in my book.
(Previously Marked Exhibit No. I, March 2014 Work-Out Document is introduced into the proceedings.)
A What page?
Q Well, on the first page, there is a "whereas" clause, the third from the bottom.
A Okay. I see that.
Q It says:
"The production schedules show final window production completed by October 28, 2014."
A I see that.
Q Isn't it true, Mr. Colapinto, that on April 4, 2014, Glasswall was given until October 28, 2014, to deliver the windows?
A By execution of this amendment agreement, yes.
Q And you say they delivered it sometime in 2014?
A No, I did not. The end of

582

Monadnock v. Glasswall, Volume II

2014.

Q Yes.

A We can check specific delivery tickets to see when the last windows arrived. I want to say December 26th or thereabouts.

Q And it was a rolling production; wasn't it?

A When you say "rolling production"?

Q You didn't get them all on December 20 -- whatever that date was -- you didn't get all the windows that day; did you?

A No, we got the balance of the windows for the project.

Q I mean, my question is:

They were coming every week or two, correct?

A No, there were no windows coming in the months of October, November -- until the end of December. We can check the shipping tickets too and see when the last window delivery occurred in

583

Monadnock v. Glasswall, Volume II

the fall of 2014.

Q Weren't you getting a constant stream of shipments from April 14th up until --

A Up until -- up until --

Q -- the end of the year?

CHAIRMAN ROSSI: You have got to wait until he finishes.

THE WITNESS: Okay.

Q Until the end of the year?

A No.

Q Until when were you getting a regular shipment?

A Early fall of 2014.

Q And then didn't Glasswall want to get paid for the last shipment in advance?

A Glasswall wanted to be paid in full prior to the last shipment.

Q So it was a constant steam up until the last shipment?

A It was a constant stream up until the last shipment, would be a fair thing to say.

584

Monadnock v. Glasswall, Volume II

Q Glasswall said, "We want to get paid in advance," correct?

A That was one part of the conversation.

Q But weren't they entitled to be paid up in advance?

A If this agreement says they were, then, yes.

Q And you didn't want to pay them in advance; did you?

A I didn't have anything to do with wanting to or not wanting to pay them.

Q Well, did you understand why there was a delay to the last shipment?

A Yes, I understood.

Q And what was your understanding?

A A dispute over payment.

Q And did you understand that Glasswall said they wanted to be paid in advance for the last shipment?

A I understood that.

Q And did you understand that Monadnock said, "No, we are not going to

585

Monadnock v. Glasswall, Volume II

pay you in advance"?

A I understood that ownership said no to that.

Q Let's look at paragraph ten of this Exhibit I.

And just so, before you look at that, Mr. Colapinto, I just want to get the mechanism that was put in place by the amendment.

Isn't it true that, under the amendment, Monadnock was going to pay Westchester Fire and then Westchester Fire would pay Glasswall?

A Yes, we used to send checks to Cozen, I think, was the attorney for Westchester Fire.

Q Okay. So now let's look at Exhibit 10 -- I'm sorry -- paragraph ten.

Doesn't this say that, before the last month's production is shipped, Westchester will advance payment to Glasswall for the last month's production?

A It does. And it also says provision for final lien waiver was in

66 (Pages 582 to 585)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

586

Monadnock v. Glasswall, Volume II

such --

Q Do you understand that the lien waiver was ever discussed in November or December of 2014?

A I am sure it was, but not by me.

Q So isn't it true that Glasswall was absolutely entitled to get paid for the last shipment in advance?

A According to this agreement, yes.

Q And up until that last shipment, they were totally on schedule; wasn't they?

MR. KLEINHENDLER: Objection.

A Well, I wouldn't say that, "totally on schedule." But there was a continuous stream of windows being shipped to the job.

CHAIRMAN ROSSI: After this was signed, right?

THE WITNESS: After this was signed, yes.

Q And we know that the last

587

Monadnock v. Glasswall, Volume II

shipment that you said was a little bit delayed was made by the end of the year, correct?

A The last shipment was delayed by more than two months, and it was at the end of the year, correct.

Q Okay. So if the last shipment was delayed by two months, then everything other than the last shipment would have been made by the end of October, correct?

A Well, I don't know. We would have to check the shipping tickets to see when the windows came for the job in the fall of 2014.

Q Well, approximately?

A I am not going to approximate, sir. I told you the fall of 2014. That's approximate enough.

Q Well, you said also that the last shipment was except -- I'm sorry -- the second-to-the-last shipment would have been made about two months before about the end of the year?

A No, I didn't say that.

588

Monadnock v. Glasswall, Volume II

Q Okay. Well, the record will reflect whatever it is that you said.

So even with this delay for the last shipment, you got all of the windows by the end of 2014, correct?

A We received all the windows by the end of 2014, except for one.

Q Except for one. And when was the date that they were supposed to be delivered by?

A According to this, October 28th of 2014. Is that the correct date?

Q So the delay in delivery of the windows under this amendment was at best -- at best, even if you take out this argument over the final payment, two months?

A I disagree.

Q When were the windows supposed to be delivered by?

A The spring of 2014.

Q Under this amendment?

A According to the AIA contract.

MR. KLEINHENDLER: 2014?

THE WITNESS: 2014.

589

Monadnock v. Glasswall, Volume II

Q Are you ignoring this amendment?

A I am -- I'm saying that I am not an attorney, but I am not ignoring the amendment.

CHAIRMAN ROSSI: All right. All right. Okay. So let's -- let's get a little more precision with the questions, okay, so that we understand -- he understands what you are asking.

And maybe just everybody is getting a little tired, but let's try to repeat the question again. What he wants to know --

Q As of April --

CHAIRMAN ROSSI: So -- so -- this -- this contract -- let me -- let me just see if I -- to recap -- this contract, this amendment to the contract, they were supposed to get you all the windows by the end of October, right -- under this amendment?

67 (Pages 586 to 589)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

590

Monadnock v. Glasswall, Volume II

THE WITNESS: Correct.

CHAIRMAN ROSSI: Okay.

THE WITNESS: But without waiving our rights to the original contract.

CHAIRMAN ROSSI: I understand that.

So -- so under this agreement -- forget about your rights or damages or the like.

I think what he's trying to say, is, under this contract -- and putting aside what you're -- you're reserving your rights -- and putting aside the payment issue, which they -- they are going to say, I imagine, is some sort of justification -- I am not agreeing or disagreeing.

Under this agreement, if all -- if everything went perfectly, they were a couple of months late, right, because they were supposed to give it at the end of October and they gave it to you by the end of December, except

591

Monadnock v. Glasswall, Volume II

for the one on the roof, correct?

THE WITNESS: That's a fair statement.

CHAIRMAN ROSSI: Okay. That's what you are getting at, right?

MR. CINQUE: Yes.

CHAIRMAN ROSSI: Okay. But it's easier from this -- you know -- from here.

MR. CINQUE: Want to take over the questioning?

CHAIRMAN ROSSI: No, not really.

MR. RENDA: I have a question. The sentence says:

"The production schedule shows final window production, including store front windows, completed by October 28, 2014."

I haven't read this agreement, but does it also provide when -- when they will be received in New York FOB?

THE WITNESS: Are you asking me

592

Monadnock v. Glasswall, Volume II

that question?

MR. RENDA: Yes, I'm not familiar with it.

THE WITNESS: In our estimation, immediately thereafter production. The job at that time had the wherewithal to store the windows on-site because the building was naked.

MR. RENDA: Okay.

CHAIRMAN ROSSI: How -- how long did it take to -- to deliver the stuff? How long did it take to ship it?

THE WITNESS: Well, it would be a 24-hour shipment from Miami to New York.

CHAIRMAN ROSSI: Really?

THE WITNESS: Yes, so, I mean, if the -- if the trucker drove -- and I don't know the trucking laws -- but a trucker could leave the Glasswall plant and get there within about a 24-hour period.

593

Monadnock v. Glasswall, Volume II

CHAIRMAN ROSSI: All right. Thank you.

MS. FODOR: Just so that we are all on the same page, I thought I also heard that the October date slippage was attributable to the fact that Glasswall wasn't paid its last shipment --

THE WITNESS: That's correct.

MS. FODOR: -- required under --

THE WITNESS: -- this agreement, correct.

MS. FODOR: -- the amendment?

THE WITNESS: Yes.

MS. FODOR: So but it wasn't done until December -- well, it may be because they weren't paid for the last shipment -- I just want to get that clarified.

THE WITNESS: It wasn't paid. I don't know the exact date of payment. But there are checks that were entered into evidence yesterday

Monadnock v. Glasswall, Volume II

2014.

Q Yes.

A We can check specific delivery tickets to see when the last windows arrived. I want to say December 26th or thereabouts.

Q And it was a rolling production; wasn't it?

A When you say "rolling production"?

Q You didn't get them all on December 20 -- whatever that date was -- you didn't get all the windows that day; did you?

A No, we got the balance of the windows for the project.

Q I mean, my question is:

They were coming every week or two, correct?

A No, there were no windows coming in the months of October, November -- until the end of December. We can check the shipping tickets too and see when the last window delivery occurred in

Monadnock v. Glasswall, Volume II

the fall of 2014.

Q Weren't you getting a constant stream of shipments from April 14th up until --

A Up until -- up until --

Q -- the end of the year?

CHAIRMAN ROSSI: You have got to wait until he finishes.

THE WITNESS: Okay.

Q Until the end of the year?

A No.

Q Until when were you getting a regular shipment?

A Early fall of 2014.

Q And then didn't Glasswall want to get paid for the last shipment in advance?

A Glasswall wanted to be paid in full prior to the last shipment.

Q So it was a constant steam up until the last shipment?

A It was a constant stream up until the last shipment, would be a fair thing to say.

Monadnock v. Glasswall, Volume II

Q Glasswall said, "We want to get paid in advance," correct?

A That was one part of the conversation.

Q But weren't they entitled to be paid up in advance?

A If this agreement says they were, then, yes.

Q And you didn't want to pay them in advance; did you?

A I didn't have anything to do with wanting to or not wanting to pay them.

Q Well, did you understand why there was a delay to the last shipment?

A Yes, I understood.

Q And what was your understanding?

A A dispute over payment.

Q And did you understand that Glasswall said they wanted to be paid in advance for the last shipment?

A I understood that.

Q And did you understand that Monadnock said, "No, we are not going to

Monadnock v. Glasswall, Volume II

pay you in advance"?

A I understood that ownership said no to that.

Q Let's look at paragraph ten of this Exhibit I.

And just so, before you look at that, Mr. Colapinto, I just want to get the mechanism that was put in place by the amendment.

Isn't it true that, under the amendment, Monadnock was going to pay Westchester Fire and then Westchester Fire would pay Glasswall?

A Yes, we used to send checks to Cozen, I think, was the attorney for Westchester Fire.

Q Okay. So now let's look at Exhibit 10 -- I'm sorry -- paragraph ten.

Doesn't this say that, before the last month's production is shipped, Westchester will advance payment to Glasswall for the last month's production?

A It does. And it also says provision for final lien waiver was in

598

Monadnock v. Glasswall, Volume II

one -- are you looking --
A It has a bunch -- I am at the top of the page. It says, "escrow agreement." It starts with the:
(There was a discussion off the record.)
A "This escrow agreement is entered into" -- is that the first sentence?
Q No. You are looking at a different escrow agreement.
(There was a discussion off the record.)
MR. CINQUE: Next, Exhibit G.
CHAIRMAN ROSSI: Part of I, still part of I.
(There was a discussion off the record.)
A Okay. Where -- should we start again?
Q Just because things may have been confused.
CHAIRMAN ROSSI: I have G. Is that where we are, Exhibit G?

599

Monadnock v. Glasswall, Volume II

MR. CINQUE: Yes. Exhibit G to Exhibit I.
Q Okay. Paragraph one:
"In accordance with paragraph 13 of the agreement to amend contracts, Monadnock shall deposit certain funds into an escrow account of the escrow agent. In the event that Monadnock asserts that any payment to WFIC" -- that's Westchester Fire, the bonding company -- "should be reduced based on a back charge, change order, or similar reduction permitted under the terms of the contracts as amended."
Isn't it true, Mr. Colapinto, that, if Monadnock was going to claim any claim against Glasswall for the delivery of the windows, it was required under the terms of the agreement to deposit the money with the escrow agent?
MR. KLEINHENDLER: Objection. Calls for a legal conclusion. The agreement speaks for itself, and there are other passages in the agreement -- objection. The agreement speaks --

600

Monadnock v. Glasswall, Volume II

says what it says.
CHAIRMAN ROSSI: Well, if you want to ask him if it was his understanding at the time, if he knows.
MR. KLEINHENDLER: First, ask him if he even signed this agreement.
CONTINUED EXAMINATION
BY MR. CINQUE:
Q Was it your understanding at the time in 2014 of April that Monadnock had to pay money into an escrow account if it was going to assert any sort of a claim against Glasswall?
A I had heard that. But I had also heard that the conversation with John Anderson was, if any money gets deposited in an escrow agreement, we are not shipping any windows. So payment in full was due.
Q If John Anderson did say that, John Anderson would be totally wrong, right?
He didn't have the right to say -- to make that statement?

601

Monadnock v. Glasswall, Volume II

A I don't know if he had the right to or not. I can't get into John Anderson's head.
Q Did you ever hear John Anderson say that?
A I think Greg Bauso might have heard John Anderson say that. You should ask Greg.
Q And wasn't the whole point -- I mean, this was negotiated -- well, withdrawn.
There were a number of parties to this settlement agreement; weren't there?
A Including Greg Bauso.
Q Let's just take a look at Exhibit I, the signature page. We have Glasswall, Monadnock, HPS, 50th Avenue Associates, HPS Borden Avenue. We have Ugo Colombo, Sarah Jane Colombo-Kennedy, and Westchester Fire Insurance Company.
That's seven different people signed this -- this agreement, correct?
A On this page, yes.

70 (Pages 598 to 601)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022