# EXHIBIT 5

1938

Monadnock v. Glasswall - Volume VII

ongoing anyway.

Q Understood.

What work would the tarps have allowed Monadnock to perform on the lower floors when the windows hadn't yet arrived?

A When the windows hadn't yet arrived. Other trades could have continued to work through the -- through that wintertime frame perhaps at other levels.

I know that the work was ramped down, but there was a lot based -- upon a review of the payment applications, there was a lot of other core work to be done. So the ramping down was --

CHAIRMAN ROSSI: But the question, I think, is really this, is that:

We know without the windows there was a lot of interior work going on.

THE WITNESS: Right.

CHAIRMAN ROSSI: And that work, we can presume, wasn't weather sensitive, right?

1939

Monadnock v. Glasswall - Volume VII

THE WITNESS: Correct.

CHAIRMAN ROSSI: Okay. So I think what the question is:

You mentioned tarps or some sort of protection. Is there other work that could have been done that was weather sensitive, if what you claim is tarps were put up by the -- by the contractor?

That's yes or no.

Could there be other work?

THE WITNESS: Possibly, but I didn't indicate that they should put the tarps up. But it's not uncommon to see weather-protection tarps put up.

CHAIRMAN ROSSI: All right. So, again, I think the next question is:

Specifically, what other work could they -- have been done at this location, as counsel just said, on the East River, that is weather sensitive, that could be done without windows,

1940

Monadnock v. Glasswall - Volume VII

but with tarps?

THE WITNESS: That is weather sensitive? None.

CHAIRMAN ROSSI: None.

MR. WEINTRAUB: Thank you, Mr. Rossi. No further questions.

MR. CINQUE: I just have one.

CHAIRMAN ROSSI: Yes, go ahead.

FURTHER REDIRECT EXAMINATION

BY MR. CINQUE:

Q If weatherproofing or tarps were put up around the building, would that have stopped, for example, rust in the elevator shaft?

A It would have aided in that process; but, as I indicated earlier, I am still not quite sure why those shafts had water entering into them anyway if the temporary roofing was topped out and protected properly.

But, yes, it would have also added in that regard.

MR. CINQUE: Nothing further.

(There was a discussion off the

1941

Monadnock v. Glasswall - Volume VII

record.)

FURTHER RECROSS EXAMINATION

BY MR. WEINTRAUB:

Q Mr. Hanifin, would the tarps have prevented condensation from forming on the metal in those shafts on a high-rise building in New York City exposed to the elements in the -- in the winter right on the East River?

A No.

MR. WEINTRAUB: No further questions.

CHAIRMAN ROSSI: Do you have anything -- do you have anything? Nothing else.

Okay. Very nice to meet you Mr. Hanifin. Take care. You are off the hot seat.

(Mr. Hanifin was excused from the arbitration."

CHAIRMAN ROSSI: I guess we will take a lunch break now and come back in an hour. And so we are going to go with Mr. Anderson, right?

32 (Pages 1938 to 1941)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1982

Monadnock v. Glasswall - Volume VII

window in it. And this one is going to have a louver. And this one is going to be operable. And this one is not going to be operable."

MS. FODOR: So then I misspoke.

Then it's not design build because the architect is the one that is specifying a lot of the detail. And the only thing that Glasswall would be doing is completing the detail, like, you know, magnifying the drawing and putting in all the detail in order to come up with the engineering.

There was -- there was testimony earlier where -- that Glasswall had difficulty with the engineering components of the job, and the schedule fell behind because of that lack of engineering capability or manpower to do this.

Can you just clarify that for me a little bit because I am -- I need to understand it better.

1983

Monadnock v. Glasswall - Volume VII

THE WITNESS: Okay. I will try to clarify it.

MS. FODOR: Okay.

THE WITNESS: I am not -- I don't want to over-complicate it, but it's a fairly complicated scenario.

MS. FODOR: Right.

THE WITNESS: From a design-build standpoint, the architect drew on the architectural drawings presented through those drawings what he wanted to see on the building.

MS. FODOR: When they looked at it.

THE WITNESS: All the different colors --

MS. FODOR: Right.

THE WITNESS: -- the glass -- there were, you know, specifications for the glass, the brick patterns, what they had to be, and so forth.

When Glasswall -- when Glasswall took the project, they assumed responsibility to design a

1984

Monadnock v. Glasswall - Volume VII

curtain wall system that would accomplish what the architect was looking for on the side of the building, including meet all the performance and aesthetic requirements that the architect would have.

So when I say we are design-build. We are design-built from the standpoint that the responsibility for the curtain wall system design is ours.

How we accomplish it in terms of the depth of the mullion or a framing member is something that we can pass through to the architect and he can review and say:

"I think it's a little too wide. I don't like the way it looks."

MS. FODOR: Okay.

THE WITNESS: But we were given certain dimensions to follow.

What the internal component of that is up is to us. We can design that internally.

1985

Monadnock v. Glasswall - Volume VII

MS. FODOR: So most curtain walls are design-build. And this is not unique.

THE WITNESS: I would -- I would say most custom curtain walls, which, for me in my experience, is completely design-built.

MS. FODOR: Completely design-build.

THE WITNESS: Yes.

(There was a discussion off the record.)

MS. FODOR: So then if something goes wrong with the curtain wall from not an aesthetic design, but the design engineering --

THE WITNESS: Structural.

MS. FODOR: -- structural problem, that's the curtain wall manufacturer's responsibility.

THE WITNESS: And in this case the installers.

MS. FODOR: And in this case the installers or the --

43 (Pages 1982 to 1985)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1986

Monadnock v. Glasswall - Volume VII

THE WITNESS: It could be the installer because the installer --

MS. FODOR: Not Ecker.

THE WITNESS: That would be Ecker on this particular project. And I am only using this project as the example for what we are talking about.

MS. FODOR: Okay. But the installer gets the completed engineered products, and then Ecker puts it in.

THE WITNESS: They install those components.

MS. FODOR: They install it.

THE WITNESS: Um-hum.

MS. FODOR: But the components are cut to fit.

THE WITNESS: That's correct. They have the responsibility to install it correctly, which is a part of the entire --

MS. FODOR: Yeah, okay, I got you.

So they are the responsible for

1987

Monadnock v. Glasswall - Volume VII

the installation. But if the curtain wall fails because of some engineering that's done on Glasswall's manufacturing facility, that's Glasswall's responsibility, not the architect's and not Ecker's?

I just want to --

THE WITNESS: Yes.

MS. FODOR: -- be able to separate it like that.

THE WITNESS: If it's something that Glasswall did wrong, yes.

MS. FODOR: Okay.

THE WITNESS: Yes.

MS. FODOR: Okay.

CONTINUED EXAMINATION

BY MR. CINQUE:

Q And, John, are you aware of any problems like that that came up?

A No, I am not aware of any.

MS. FODOR: No, I just wanted to understand how it works.

MR. RENDA: I want to understand something with regard to

1988

Monadnock v. Glasswall - Volume VII

this building.

You talked about different types of windows, and some casements where louvers were. And I am not going to hold you to the exact number.

But are we taking, there were 20 different types? I heard there was 9,000 units in total.

How many different types, you know, were there?

THE WITNESS: I'm sorry, but I don't know the exact number of different types. But I will -- I will venture again what I will just say is an educated guess from having been around it and actually manufactured it. It had to exceed 300 or 400 different types.

MR. RENDA: Now, I understand, also, when they -- when they start the installation, you are saying you start from one corner and you go around the building.

300 or 400 types of different

1989

Monadnock v. Glasswall - Volume VII

units, how does that work in a production line? In other words, you start this corner. You need unit 100; and then next to it is unit 35, and then you go around.

In the production line, each one of them is like one unit fabrication. Then you have to -- the line has to move on to the next unit.

How does that -- how does that work in the production? I am trying to understand that.

THE WITNESS: It's a very good point, and I am glad that I have an opportunity to relate to you exactly how that worked on this particular project.

For this project, the releases from engineering were done in blocks of floors, not a single floor at a time.

Because of the number of types that were involved, you couldn't produce this job on a one-floor basis

44 (Pages 1986 to 1989)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

2006

Monadnock v. Glasswall - Volume VII

well, it's -- either the glass was missing -- more than likely, the glass was missing rather than it was broken.

But it -- on the occasion where a lite of glass was broken, we would remove it and put a plywood in-fill in for safety purposes so that they could install the unit and continue what they needed to do on the site.

I communicated with Mr. Colapinto on this numerous times and maybe some other people that worked for him at the job site, about whether or not they needed that particular unit within this delivery or if they could wait because it's a possibility that the replacement lite might arrive and we could do it in the shop and not have to ship it with the in-fill piece.

So the decision to ship was a carefully considered one. But it was to allow for the installation to go in sequence.

2007

Monadnock v. Glasswall - Volume VII

CHAIRMAN ROSSI: And then you could put the glass in later on. I mean, it's not ideal, but it can be done.

THE WITNESS: That's correct. Yes.

CHAIRMAN ROSSI: Okay.

CONTINUED EXAMINATION

BY MR. CINQUE:

Q So only 39 of the 9,300 windows had that missing glass?

A 39.

CHAIRMAN ROSSI: And you would agree that -- I would assume -- that the cost to replace that glass or install it would be Glasswall's problem, right?

THE WITNESS: Yes.

CHAIRMAN ROSSI: Yeah.

THE WITNESS: We never -- we never had any discussion that the replacement of that glass was Glasswall's responsibility.

(There was a discussion off the

2008

Monadnock v. Glasswall - Volume VII

record.)

CONTINUED EXAMINATION

BY MR. CINQUE:

Q And you always agreed to do that, right, to replace the glass?

A Yes.

Q Were you given the opportunity to do it?

A We did provide the replacement glass.

Q Now, when you -- when is the first time you had a meeting relating to the Hunters Point project?

CHAIRMAN ROSSI: You mean in-house, in-house meeting or meeting with the --

MR. CINQUE: No, meeting with the Monadnock or Related people.

A September 18, 2013.

Q Where was that meeting?

A In New York at the Related offices in AOL Time Warner.

Q And who was present to the best of your recollection?

2009

Monadnock v. Glasswall - Volume VII

A There was more than 20 people in the meeting, so I won't recall everyone that was there.

But the primary people were Ugo Colombo from Glasswall --

(There was a discussion off the record.)

A Ugo Colombo, Art Murphy, Bruce Beal with Related. I believe Michael Trovini was in that meeting. Michael Lochran, with a "c," Lochran.

Q He's Related person?

A He's a Related person.

Mike -- I believe Mike Budd of Related. He's sort of their curtain wall guy.

Greg Bauso. I would say Mr. Colapinto; but to be honest with you, I am not positive. It was my first interaction with the group on this project.

But there were many other people. Probably, Frank Monterisi was in that meeting from Related.

Q What was discussed?

49 (Pages 2006 to 2009)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

Monadnock v. Glasswall - Volume VII

A In that meeting, I was more of a listener. And what was discussed, it was primarily Related and Monadnock indicating that -- and they had no idea what Glasswall was doing, in their words, and very little faith that Glasswall could get the project done.

And there were many things that went back and forth about not meeting the schedules and the commitments that had been made. And, again, I was a listener because this was really, virtually my first day at Glasswall.

So I was sort of hearing some things that, you know, were surprising, but not so surprising because I knew it was a dire situation at Hunters Point.

The thrust of the meeting in the end was that Mr. Beal, I believe, stated that they were going to think about they -- whether they wanted to continue with Glasswall.

And that was the end. I mean, that's what I took away from the meeting,

Monadnock v. Glasswall - Volume VII

was that they were going to think about whether they wanted to continue with Glasswall.

Q Did you hear back from them?

A We did nominally a few days later. Another meeting was scheduled in New York for -- and I believe it was the 26th of September, approximately a week later.

Q Was it the same participants basically?

A Pretty much. There might have been a couple more participants. But to a great extent, it was the same group.

Q And what was discussed at that meeting?

A In the first meeting -- and I will drop back and just say Mr. Murphy stated to the group that Mr. Anderson had been brought in to lead Glasswall and to work to rectify the issues on Hunters Point.

So some of the people in the room knew who I was, and I think that had a

Monadnock v. Glasswall - Volume VII

little bit to do with why Mr. Beal said, "We are going to think about it this week."

Then we returned one week later, which is the meeting that we're talking about -- basically, the same group.

We came in with a production plan roughed out in terms of what we thought we could produce and projected the number of units and the number of lines that we could produce. And that was the point of discussion throughout the meeting.

And, again, there was still, you know, some reservation on Monadnock and Related's part about whether or not we should continue. But it was sort of a:

"Wait and see. Well, let's see what you are going to do over the next, you know, two weeks. And then we will, you know, regroup again or come down and meet."

So when I left that meeting, I had a -- I'm not going to say a good feeling because I never left Related's office with a good feeling to be honest

Monadnock v. Glasswall - Volume VII

with you.

But I left with a feeling that there was a good chance that Glasswall was going to be the producer of the curtain wall for this job.

Q Now, directing your attention to Exhibit C in my book.

(Previously Marked Exhibit No. C, Document is introduced into the proceedings.)

CHAIRMAN ROSSI: At this point, did you have any windows ready to ship at this point?

THE WITNESS: We did not.

CHAIRMAN ROSSI: Okay. And had -- had -- had Glasswall done any work producing anything?

THE WITNESS: Yes. When I arrived at Glasswall, there was material in fabrication -- and "fabrication" means the piece parts were being fabricated that make up the framing of these elements for the casement windows.

2030

Monadnock v. Glasswall - Volume VII

THE WITNESS: Yes, the number was 3 million.

CONTINUED EXAMINATION

BY MR. CINQUE:

Q Was Mr. Beal screaming that he wanted this money?

A Yes. He was screaming at our attorney. He was screaming at Mr. Colombo.

And Mr. Trovini, who was sitting adjacent to me, was screaming alongside of him as he so eloquently described in his testimony the other day.

But he was much more emphatic than in his testimony. But he did describe that portion of it adequately. He did -- he did demand to know when the units would be delivered to the site, on November 6, 2013.

CHAIRMAN ROSSI: Well at this point were you ready to deliver units to the site?

THE WITNESS: We had units packaged. But I will, you know, clarify this because I don't want

2031

Monadnock v. Glasswall - Volume VII

there to be any confusion.

We did not have the units ready to complete an entire floor in sequence. We had portions of floors in packages ready to deliver.

CONTINUED EXAMINATION

BY MR. CINQUE:

Q Did you tell them that at that meeting?

A I don't believe that that really came up in the meeting because the thrust of the meeting was not really about what we had produced. It was more about Mr. Beal's demand for the $3 million.

Q Did there come a time when you had enough materials to start delivering so they could install them in the project?

CHAIRMAN ROSSI: Before you get there, on 11/6, you said you had parts -- parts of floors. Does that do them any good if you have to do them in sequence?

THE WITNESS: It does. And I -- I don't recall offhand. I am

2032

Monadnock v. Glasswall - Volume VII

sure it's going to be put in front of me at some point in this testimony -- the number of units that were ready on 11/6, because it has all been documented. It was documented at that time.

But for the sake of argument, let's say there was 600 units. That is 40 on a truck. To offload those trucks would take two to three weeks at the job site.

So why wouldn't you begin to take the materials, put them on the floor, distribute them logistically to where they need to go, and know that you have got units coming?

It might be a morale-builder on a project where people were thinking there was never going to be a curtain wall unit.

CHAIRMAN ROSSI: Okay.

CONTINUED EXAMINATION

BY MR. CINQUE:

Q We can go to two pages in.

2033

Monadnock v. Glasswall - Volume VII

It's a November 14th E-Mail from you to Greg.

Do you see it at the bottom? No, it's not -- November 14th -- it's at the bottom of the page.

(There was a discussion off the record.)

Q On November 14th, you write to Greg Bauso of Monadnock:

"This E-Mail will" confirm -- "will serve as confirmation of your verbal instruction to cancel the scheduled shipment of CW units on November 15th from Glasswall to the job site at parcel A."

Tell me, what happened on or about November 14th?

A Well, the E-Mail speaks for itself. Obviously, we were instructed not to ship shipments after they had been asked for.

Q Did Mr. Bauso ever tell you why?

A If you read further in the E-Mail -- and I will read it:

55 (Pages 2030 to 2033)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

Page 2215

Monadnock v. Glasswall - Volume VIII

A I don't have to look at it. I do recall saying that.
Q So who controlled the money with regard to Glasswall after you came in as an equity partner?
A Ugo Colombo controlled the money and the company.
Q Now, you testified on page 1960 that, when you joined in September, Glasswall was working on five projects.
Do you recall that, page 1960?
CHAIRMAN ROSSI: So I think we're if you ask him a question, "Do you recall testifying." And if he doesn't recall, then you can refer him to the testimony.
MR. KLEINHENDLER: All right. Okay.
A And the answer is, yes, I do recall it.
Q All right. And one was the Monte Carlo in Miami Beach?
A Yes.
Q Now, one, I think the court

Page 2216

Monadnock v. Glasswall - Volume VIII

reporter marked it down as the "Edison"; is that really the Edition in Miami Beach?
A Yes, it's the Edition.
Q One was the Perry Rooney in Miami Beach?
A Yes.
Q And one was the Oceana in Key Biscayne; do you recall saying that?
A Yes.
Q Now, since you were here, we went online, and we pulled some photos which we have provided to the other side. These are just internet photos. I just want to walk you through some of them, so let's put up Exhibit 285, Jocelyn, which is --
(Previously Marked Exhibit No. CX 285, Photograph of Monte Carlo Hotel in Miami Beach, Document is introduced into the proceedings.)
Q That's the best picture we have? Is there another page of that.
Do you recognize that as the Monte Carlo?

Page 2217

Monadnock v. Glasswall - Volume VIII

A I do.
Q Okay. And how many floors is that building?
A To be honest with you, I can't tell you; but it's around, I'd say, 18 maybe 20.
Q And that project involved either curtain wall or glass wall?
A Involved window wall and sliding glass doors.
Q And what stage in the Monte Carlo project was Glasswall on in September 2013 when you joined?
A Fabrication was about 80 to 90 percent complete, and the job was being installed.
Q Okay. Now, let's just stick with that job.
For the fabrication to be 80 to 90 percent complete, how long would Glasswall have had to have been working on this job prior to your arrival in September?
A I mean, I could give you my

Page 2218

Monadnock v. Glasswall - Volume VIII

best guess at how long they were working on it, if you would like to have that.
Q I don't want your guess. You are -- you're in now as an equity owner. I am just assuming that, before you took the position, you want to know what's going on with the job and how long have they been working on this job.
So my question is:
How long had they been working on Monte Carlo by the time you got in there?
A A year.
Q A year. So all of -- like from the end of 2012 to September 2013, they were working on Monte Carlo?
A I wasn't there prior to September of 2013.
Q Right. But you just said you thought they were working on it for a year.
A That's correct. I thought they were working on it for a year.
Q So I just -- I am just trying to get the number.

43 (Pages 2215 to 2218)

U.S. LEGAL SUPPORT
(877) 479-2484

Page 2219

Monadnock v. Glasswall - Volume VIII

A But you have to understand something. I was not there before September of 2013. So it would be logical to say that they were working on the project for approximately a year before if they were 85 or 95 percent done in September.

CHAIRMAN ROSSI: But you don't know for sure?

THE WITNESS: That's correct.

CHAIRMAN ROSSI: Okay.

CONTINUED EXAMINATION
BY MR. KLEINHENDLER:

Q Okay. And how many people were working on Monte Carlo during that year; do you know?

CHAIRMAN ROSSI: You mean before he got there, you want to know?

Q How many people?

A I do not know that.

CHAIRMAN ROSSI: Hold on.

Q How many --

CHAIRMAN ROSSI: The rules are as follows, Mr. Anderson.

Page 2220

Monadnock v. Glasswall - Volume VIII

THE WITNESS: Yes.

CHAIRMAN ROSSI: He's going to ask you a question. Take a breath. Give an answer. If I interrupt or if there is an objection, you wait until that is concluded before you answer. Okay.

THE WITNESS: Yes, sir.

MS. FODOR: Take another breath.

CHAIRMAN ROSSI: So -- so are you asking him --

MR. KLEINHENDLER: I'm going to ask him a new question, a new question.

CHAIRMAN ROSSI: Okay.

CONTINUED EXAMINATION
BY MR. KLEINHENDLER:

Q When you arrived in 2013, how many folks at Glasswall were working on the Monte Carlo?

A I do not know the exact number.

Q What's your estimate?

A I don't know the exact number.

Page 2221

Monadnock v. Glasswall - Volume VIII

Q So you're president of a company that you just bought into, and you can't tell our panel how many people are working on one of the projects?

A No, I cannot.

Q Okay. Did Glasswall make money on the Monte Carlo deal?

A I believe the Monte Carlo, we did make some money.

Q Now, do you know whether Ugo Colombo has any type of financial interest, not in providing windows for the Monte Carlo, but in the actual Monte Carlo project?

A To my knowledge, he did not.

Q But you did not -- but you can't say for sure one way or the other; can you?

A To my knowledge, he did not.

Q I don't know what that means. Does that mean --

CHAIRMAN ROSSI: Well, he -- what that -- what the means is, to the best of his knowledge, he did not

Page 2222

Monadnock v. Glasswall - Volume VIII

know. He did not. So --

THE WITNESS: I will say this. I'm sorry.

CHAIRMAN ROSSI: That's it.

CONTINUED EXAMINATION
BY MR. KLEINHENDLER:

Q Okay. Let's go to the next project that you referred to, which we now clarified is the Edition, not the Edison. It's Exhibit 284. Let's put that up, Jocelyn.

(Previously Marked Exhibit No. CX 284, Photograph of the Edition Hotel in Miami Beach, Document is introduced into the proceedings.)

CHAIRMAN ROSSI: "Addition" to what?

MR. KLEINHENDLER: No, that's the name of the -- no, in the transcript our ace here -- sometimes he makes a mistake -- it was called the "Edison," E-d-i-s-o-n. We have clarified that really the project is the Edition, E-d with an E.

Page 2223

Monadnock v. Glasswall - Volume VIII

CHAIRMAN ROSSI: All right.

MR. KLEINHENDLER: I may be saying that wrong.

CHAIRMAN ROSSI: Oh, the Edition.

MR. KLEINHENDLER: Yes, E-d-i-t-i-o-n.

CHAIRMAN ROSSI: Okay.

CONTINUED EXAMINATION
BY MR. KLEINHENDLER:

Q So this was another project that Glasswall was working on when you came in in 2013, correct; is that the Edition?
A That's correct.
Q And what work was Glasswall doing for the Edition? Did it -- did it involve curtain wall?
A There was curtain wall in the round piece that you see right there.
Q Okay.
A The rest of the job was window wall and sliding glass doors.
Q And what was that, a condo project?

Page 2224

Monadnock v. Glasswall - Volume VIII

A Yes, it's a hotel and condo residents.
Q Do you know how many rooms?
A I do not.
Q And what percentage of the Edition -- what percentage of completion was the Edition at when you arrived in September 2013?
A From a production standpoint, it was around, similar, 80, 80 percent or so.
Q And how long prior to September of 2013 was Glasswall working on the Edition?
A Over a year.
Q Do you know how many people would have been devoted to that project during that prior year?
A I do not.
Q Did Glasswall make money on its job for the Edition?
A It did not.
Q Does Mr. Colombo have an interest in that project, in the Edition project?
A Not that I'm aware of.

Page 2225

Monadnock v. Glasswall - Volume VIII

Q Let's look at the next one, the Perry Rooney. Let's look at the Perry Rooney, which is Exhibit 287.

(Previously Marked Exhibit No. CX 287, Photograph of Perry Rooney Hotel on Miami Beach, Document is introduced into the proceedings.)

Q Is that a fair depiction of the Perry Rooney?
A Yes.
Q And describe what that is?
A It's a hotel slash condo.
Q And when you arrived in 2013, what percentage of completion was the Perry Rooney at?
A Again, approximately, 75 to 80 percent.
Q And how long had Glasswall been working on that project?
A I believe it's a similar time frame, about a year.
Q Did Glasswall make money on the Perry Rooney?

Page 2226

Monadnock v. Glasswall - Volume VIII

A It did not.
Q Did Ugo have a financial interest in the Perry Rooney project?
A Not that I'm aware of.
Q All right.
A Let's look at the Oceana, which is Exhibit 286.

(Previously Marked Exhibit No. CX 286, Photograph of Oceana Hotel in Key Biscayne, Document is introduced into the proceedings.)

Q Let's go to the second page of that exhibit. Is that a fair picture of the Oceana?
A Yes, it is.
Q It's beautiful; isn't it?
A Yes.
Q It sure is.
Could you describe to the panel what -- what type of construction that is?
What is that, a hotel, a condo?
A It's a -- it may -- a piece of it may be a hotel. I am not aware for a

45 (Pages 2223 to 2226)

U.S. LEGAL SUPPORT
(877) 479-2484

fact that it is; but it's a condo, residences on Key Biscayne.

Q All right. And about what percentage of completion were you done with the Oceana when you arrived at Glasswall?

A About 80 percent.

Q Same story, you had been working on it for about a year?

A For fabrication about 80 percent.

Q What does that mean?

A I'm sorry.

Q "For fabrication"?

A Yes, each one of these percentages I am giving you are for production, fabrication. They do not relate to installation.

Q Okay. How many rooms in the Oceana?

A I don't know.

Q Okay. And you were working on the Oceana -- how long was Glasswall working on the Oceana when you arrived in September of 2013?





A We didn't finish the job until, from an installation standpoint, until maybe April or May of 2014.

Q Did Glasswall make money on the Oceana?

A They did not.

Q Does Ugo have an interest in the Oceana?

A Not that I'm aware of.

Q Well, I could tell you that Mr. Barber testified at pages 766 to 67 -- and you can put that up -- that he believed that Ugo -- that the Oceana was indeed a Ugo Colombo project.

Do you have any reason to dispute that testimony?

A Could you say it again. Did you just say he believed he did or didn't have an interest?

Q Yes, we can -- we can put it up if you want. Let's put it up so you can see it. Go to page 766. It's Glasswall -- page 766.

A I can't read that.





CHAIRMAN ROSSI: It's in front of you as well.

(There was a discussion off the record.)

Q Sorry, I apologize, 769. Let's go down, 769.

Okay.

"I think you mentioned before that Oceana was owned -- was a project that was owned by Glasswall's owner."

ANSWER: "That was my understanding. That's what I was told."

QUESTION: "Was that a Ugo Colombo?"

"That's my understanding. That is what I was told."

So having seen Mr. Barber's testimony, are you ready to state unequivocally that Mr. Ugo Colombo had no financial interest in the Oceana project?

A Yes, I believe that I would have known if Ugo Colombo had a financial interest in any of these projects.

Q Why?





A I believe he would have shared that with me.

Q Why?

A Because I believe Mr. Colombo would have shared that with me.

Q This is a man that you knew for all of two weeks, and you think he just would have shared everything with you?

A I think I have known Ugo Colombo since August of 2013, so in --

Q Four weeks, sorry.

A But you are asking me the question today, and I am telling you --

Q Yes, I am asking you an open-ended, which nobody is supposed to do. But I am asking you anyway.

Why, why do you think Ugo Colombo would have told you that he has a piece of Oceana?

A But you just said that:

"Why would Ugo Colombo tell you that if he only knew you for two weeks?"

And what I am saying is I have known him since September or August of

Monadnock v. Glasswall - Volume VIII

beginning.

A Yes.

Q You mentioned, I think, that, when you came in in September of 2013, they were all more or less about 75, 80 percent done, right?

A In fabrication.

Q Sorry. But that sort of suggested there was still 20 percent of work left on each of those fairly large projects, right?

So my question to you is:

In the September through -- September through November time frame of 2013, how many lines were devoted to a -- of fabrication were devoted to non Hunters Point work?

A Maybe one, one and a half. We did have half lines.

Q So out of a total of how many lines, there were two --

A We eventually had five; but, early on, in the October, November, going into December, we had three and were moving

Monadnock v. Glasswall - Volume VIII

to four.

Q All right. Let's break that down. In September, how many lines did you have going?

A Two lines on Hunters Point, one line on other projects.

Q And that stayed the same in October?

A It pretty much stayed the same.

Q What about --

A We moved to the third line for Hunters Point as we moved into the end of October, and into November.

Q And how many employees would you say were devoted to the non Hunters Point work during, again, the September, November time frame?

A We had nominally over 100 employees in the plant. I would say there was probably 12 to 15 devoted to other projects besides Hunters Point.

Q Now, I think you mentioned in your testimony that you came in; you got an equity position.

Monadnock v. Glasswall - Volume VIII

But you are no longer with Glasswall; are you?

A No, I am not.

Q When did your affiliation with Glasswall end?

A As an employee?

Q Start there.

A I am trying to get the date in my head here. February of 2015.

Q Does Glasswall exist today as a operating entity?

A It is -- it exists as a company today.

Q Does it still own the 140,000 square foot fabrication?

A It does not.

Q Does it employ anybody?

A To tell you the truth, I don't know that.

Q When did -- when all of that stop, having employees and --

A The assets of the company were sold in 2015, beginning of 2015, somewhere in there.

Monadnock v. Glasswall - Volume VIII

Q So I just want to take you back to -- you know, your counsel showed you Exhibit B in your book. Jocelyn, you want to put up his Exhibit B for a second? This was the accounts payable to Ecker, if you remember. It's in your counsel's book. If we can blow it up for you, we can see it.

(There was a discussion off the record.)

Q Do you have -- and I am just looking at the dates here. It doesn't show any payables -- and correct me if I'm wrong -- beyond -- beyond November 2014.

Do you see that?

I see the last one a couple of lines up.

I don't see any payables here to Ecker in 2015; do you?

A No.

Q Okay. So when your counsel was talking to you about the March 2015 letter with those 30 items, at that point, you weren't paying Ecker anything; were you?

A No.

U.S. LEGAL SUPPORT
(877) 479-2484