# EXHIBIT 8

1443

Monadnock v. Glasswall - Volume VI

testify to the truth, testified as follows:

(There was a discussion off the record.)

DIRECT EXAMINATION

BY MR. KLEINHENDLER:

Q Good morning, Mr. Trovini. Could you briefly go through your educational and professional background for the panel?

A I have a bachelor of science and engineering in management. I have an MBA, and I also graduated from law school. I am licensed to practice in the State of New York. And do you want the professional background?

Q Yes.

A My professional background is I have been involved in real estate and construction since 1989. I presently an the president of Related Construction Holdings, which employs roughly 600 to 700 people, which has various concerns including a curtain wall manufacturing company in Pennsylvania, a construction

1444

Monadnock v. Glasswall - Volume VI

management company here in New York, and an HVAC company here in New York, amongst other concerns.

Q Are you also an officer of the Related Companies?

A I am a senior vice president of the Related Companies. And I -- as I said I am the president of Related Construction Holdings.

Q Did there come a time where you got involved with the Hunters Point project, the subject of this litigation?

A Yes.

Q Describe when you got involved.

A I usually get involved specifically with construction projects because they are -- they are delayed or there is some kind of major issue involved with them.

And at the time that I got involved we had basically what amounted to a naked or a partially naked building, partially only because it was only with -- the superstructure concrete had not been

1445

Monadnock v. Glasswall - Volume VI

completed yet and the curtain wall manufacturing had not commenced.

And there was no sight of it ever arriving to -- or, in this case, window wall -- to the project.

Q Okay. Let's back up. There came a time -- now, do you -- could you describe who are the owners of this project?

A I think it was HP.

Q HPS?

A Yes, right.

Q We can go to the document.

A But it amounts to, you know, the legal owners, the entity's name HPS is defined in the contract. But it was a tri-venture, if you will, among Monadnock, a Related entity, and Phipps Housing.

And it was actually a very highly publicized affordable housing project in the City of New York that was going to contribute over close to a thousand units to the City of New York. And so it was a great achievement of the

1446

Monadnock v. Glasswall - Volume VI

Bloomberg administration.

Q Okay. I'm going to take you to Exhibit 32, please.

(Previously Marked Exhibit No. 32, Parcel A CM Agreement between Monadnock and HPS, Document is introduced into the proceedings.)

Q And while we go get that up on the screen, 32. Do you know whether, in that tri-party, whether Related had a managerial role?

What was Related's role within that tri-party ownership entity?

A I mean, they certainly took -- I don't -- I don't know the document, and don't I know the actual definition of it.

However, they took -- they took the lead management role. Phipps is more of an investor, and Monadnock, obviously, is a builder of its own right.

But Related took the lead in that entire triumvirate, if you will.

CHAIRMAN ROSSI: The lead developer in that?

3 (Pages 1443 to 1446)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1451

Monadnock v. Glasswall - Volume VI

MR. RENDA: 4-1, what?
Q If you go to the top of that.
A 4-1-G.
Q Here, "administration of the contract."
MR. BURSTYN: It says "construction."
(There was a discussion off the record.)
CHAIRMAN ROSSI: All right. Excuse me, sir. We are just going to have witnesses and lawyers talking.
(There was a discussion off the record.)
Q "Administration of the construction: Construction managers shall insist on and perform the following services in connection with the bidding and award of written contracts."
And I will just slide down to G:
"Prepare each trade contract. Unless otherwise agreed, each trade contract shall be written on construction

1452

Monadnock v. Glasswall - Volume VI

manager's standard trade contract annexed as Exhibit F."
Okay. Do you see that?
A Right.
Q I want to go now to Exhibit F of this.
(There was a discussion off the record.)
Q It's page 14790. You guys have it?
A Yes.
Q Okay.
(There was a discussion off the record.)
Q And this is Exhibit F. And can you identify what this is, Exhibit F?
A It's standard form of agreement between contractor and subcontractor. It's an AIA form. It's -- it's used throughout the industry.
Q And it identifies project -- if you look at the first page on page 14791 -- she has it up there now -- stop.
It refers to the "project" as

1453

Monadnock v. Glasswall - Volume VI

"a prime contract." It refers to "a prime contract"?
A Right.
Q And is that the CM contract we were just looking at?
A Right.
Q Now, I just want -- I want you and the panel to take your time and read through article two of the form contract, called "Mutual Rights and Responsibilities" on the next page, on page 14793, right here.
(There was a discussion off the record.)
Q Just take -- take your time and read through that.
All right. And just to summarize it, we have gone through this. We have referred to it as a "pass-through" or whatever.
Could you -- is this something that you would typically have in a contract that Related -- would do -- with a CM?
MR. CINQUE: Objection. This

1454

Monadnock v. Glasswall - Volume VI

now is getting into the realm of expert testimony, and there is no expert report.
And, secondly, I think it speaks for itself.
And, thirdly, there is nothing in the arbitration demand that refers to any sort of a pass-through or anything like that. It looks like now they are coming up with a theory at the end of their case that somehow they are allowed to pass through certain charges; and there is nothing in the arbitration demand about that.
There is specific language in the contract between Monadnock and Glasswall, if I may just read it to you. It's Exhibit I -- I'm sorry -- Exhibit G in my book.
(Previously Marked Exhibit No. G, Contract between Monadnock and Glasswall, Document is introduced into the proceedings.)
MR. CINQUE: It specifically

5 (Pages 1451 to 1454)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1455

Monadnock v. Glasswall - Volume VI

says that there is no relationship between -- there is no contractual relationship between the owner and Glasswall.

It's paragraph 1.3. And it reads as follows:

This subcontract of -- "The subcontract document shall not be construed to create a contractual relationship of any kind between" -- and then, number two -- "the owner and the manufacturer," which is Glasswall, or, "three, between any persons or entities other than the contractor," which is Monadnock, "and manufacturer," which is Glasswall.

So I would object.

And on top of that, two more things:

There is litigation pending in Florida between Related and Glasswall. And if they want -- if Monadnock wants to assert a claim -- I'm sorry -- between Related and Glasswall.

1456

Monadnock v. Glasswall - Volume VI

And if Related wants to assert claims against Glasswall, the forum to do it is in the lit -- is in the litigation in the State of Florida, not in this arbitration.

And there is no arbitration agreement between Related and Glasswall. And they shouldn't be allowed at this point to start throwing in claims that aren't in the demand for arbitration. There is no privity of contract.

MS. FODOR: Okay. If he would have used the word "flow-down provision," instead of "pass-through provision," would you still have an objection?

MR. CINQUE: Yes, it's not really the terminology. It's just that there is no -- there's no privity of contract between Related and Glasswall. And there should be no claims at all about Related.

If Related has claims against

1457

Monadnock v. Glasswall - Volume VI

Glasswall, there is Florida litigation they can assert them in.

And there is nothing in the demand for arbitration that says there is any sort of claims being asserted on behalf of or in the name of or a pass-through or whatever. And this is taking us totally by surprise.

CHAIRMAN ROSSI: And anything else?

MR. CINQUE: I think that's about it.

CHAIRMAN ROSSI: Okay. So the objection is overruled. The document is in evidence. He asked him what he thought the document stood for, what his interpretation of it is.

And it's not necessarily binding on us, but, certainly, we would like to hear what the contracting parties thought they were signing when they signed this document.

What you're -- what you are

1458

Monadnock v. Glasswall - Volume VI

doing, Mr. Cinque, with all due respect, is you are a legal argument. Whether or not that claim is before us, whether or not there is a pass-through claim, or can it be prosecuted -- you know, I mean, it's an interesting point. We will have to make that decision. But since you gave a long objection, I am just giving a long -- a long overruling.

So you want to read back the question, and I know it's way back.

(Reporter read back pending question:

QUESTION: "All right. And just to summarize it, we have gone through this. We have referred to it as a `pass-through' or whatever. Could you -- is this something that you would typically have in a contract that Related -- would do -- with a CM?")

A Okay. Unlike a general contracting structure, and notwithstanding

6 (Pages 1455 to 1458)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

1471

Monadnock v. Glasswall - Volume VI

and the owner, that's 32. That's what we are looking at right now. 32 is parcel A. 33 is parcel B.

(Previously Marked Exhibit No. 33, Parcel B CM Agreement between Monadnock and HPS, Document is introduced into the proceedings.)

CHAIRMAN ROSSI: That's right. We -- we were looking at the -- at the exhibit.

MR. KLEINHENDLER: Yeah, that was the exhibit to it.

CHAIRMAN ROSSI: I apologize. Yeah, yeah.

MR. KLEINHENDLER: Okay.

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q Can we go?

A Yes, I'm sorry. Go ahead.

Q So we -- we -- do you rec -- can you take a look at that? It's a schedule dated March 14, 2013.

Do you see that?

A Yes.

1472

Monadnock v. Glasswall - Volume VI

Q And do you recognize that?

A Yes.

Q And that was the project schedule under the CM agreement for A?

A Yes.

Q Can we just go to the next one. In 235, it's pages MC 140 to 143.

Do you have that up there -- the next one -- okay. And do you see that?

Do you recognize that as the project schedule for B?

A Yes.

Q Okay. Now, if you go back to the first project schedule, please, and you go to the end of it for parcel A, and blow it up.

Do you see "project complete dates" there?

A Yeah, first TCO.

Q When was the first TCO?

A The first TCO is August -- they give a range usually -- that date -- August 1, '14.

Q 2014?

1473

Monadnock v. Glasswall - Volume VI

A The year 2014.

Q For parcel A.

And can we go to the first TCO for parcel B, Jocelyn, the next entry.

And when is the first TCO?

A First TCO is June 18th of 2014.

Q And when was the final TCO?

I mean, when was the TCO for the last floors on parcel B?

A Third TCO is floor 16 to 32, September 30, 2014.

Q And the fact is this project did not make those TCO dates; did it?

A No.

Q No, they didn't.

Okay. So can you just quickly -- Jocelyn, I just want to get it in the record. We have the actual TCO numbers. Jocelyn, could you put up exhibit -- parcel A, the first TCO, that's Exhibit 53, please.

(Previously Marked Exhibit No. 53, Document is introduced into the proceedings.)

1474

Monadnock v. Glasswall - Volume VI

MR. KLEINHENDLER: What is the first exhibit, first TCO.

MS. WEINSTEIN: I'll find it.

MR. KLEINHENDLER: 44044. Sorry -- no -- no -- it's exhibit -- sorry.

(There was a discussion off the record.)

MR. KLEINHENDLER: 183, sorry, 183, I apologize.

(Previously Marked Exhibit No. 183, First TCO for floors 1 to 8, Document is introduced into the proceedings.)

Q Do you see that? Could you identify that as the first TCO for floors -- is that 1 through 8?

MR. KLEINHENDLER: Is that the first one? Yeah.

A Yep, if you go up, it says "Certificate of Occupancy."

Q What floors?

A It says number of stories, 37. Go to the first one.

10 (Pages 1471 to 1474)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

                                                                    1475

Monadnock v. Glasswall - Volume VI

(There was a discussion off the record.)

Q 1 through 11?

A Right.

Q So what is the date on that?

A Scroll up to the top. Usually, that's where it is.

(There was a discussion off the record.)

A Top of the document. It's okay.

Q That's --

A Dated -- effective date is July 08, 2015.

(There was a discussion off the record. Multiple people were speaking at the same time.)

Q July twenty -- July 8th?

A Yeah, July 8, 2015.

Q From August 1st to July 8th is about how many months?

A 12 months.

Q Okay. And let's just go to parcel B, the first that -- we have just

1476

Monadnock v. Glasswall - Volume VI

seen the first TCO on the contract was supposed to be --

(There was a discussion off the record.)

Q -- 186. When was the second -- when was the first TCO of parcel A?

MS. WEINSTEIN: Parcel B?

MR. KLEINHENDLER: Parcel B, sorry.

(Previously Marked Exhibit No. 186, TCO, Document is introduced into the proceedings.)

A Effective date, July 22, 2015.

Q And when was the date -- parcel TCO --

(There was a discussion off the record. Multiple people were speaking at the same time.)

Q Parcel B, first TCO, Exhibit one seventy -- 178, please.

(Previously Marked Exhibit No. 178, TCO, Document is introduced into the proceedings.)

A Okay. May 14, 2015. So it's

1477

Monadnock v. Glasswall - Volume VI

roughly, 11, right. Yeah, that date was June, if I remember correct -- correctly.

Q Right, June 18th.

A Yeah.

Q So one was about 12 months; one was about 11 months?

A Yeah.

Q Okay. Now, let's go back to the contract, and I am back to the CM agreement, page 21, paragraph one.

Okay. Let's go to the top. It says here:

"Construction manager shall promptly and diligently perform" and -- "services and shall cause the work of all trade contractors to be performed in strict accordance with the project construction schedule approved by the owner" as same as revised. "Construction manager acknowledges that time is of the essence in performance of the services and the progress of the work." And "this requirement applies to all dates, times, limits, and requirements."

1478

Monadnock v. Glasswall - Volume VI

Did Monadnock meet that requirement under article 15?

A No.

Q No. Okay. Now, I want to take you back to -- still in this agreement, I want to take you to article nine, page 11. And that is article nine on page 11 of the agreement, the "default" section.

Okay. "Events of default," do you see that? I want to take you down to D, please, and it reads:

"An event of default is construction manager cannot, for reasons due to fault of the construction manager and/or its trade contractors, complete its services on or before the date of substantial completion set forth in the project construction schedule."

Do you see that?

A Yes.

Q Is it your understanding --

CHAIRMAN ROSSI: Could you push that up a little bit -- no, the other way.

11 (Pages 1475 to 1478)

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

Monadnock v. Glasswall - Volume VI
the proceedings.)
Q In Exhibit 15, would you please identify who is identified as the owner?
Exhibit 15 is the subcontract for parcel B with Glasswall.
Who is the owner entity?
A HPS Borden Avenue Associates.
Q Now, if you look at Exhibit 33, which is the CM agreement for parcel B, who is the owner?
A HPS Borden Avenue Associates.
Q Now, these two LLCs that we just identified, is Related a partner of both LLCs?
A Yes.
Q Okay. And to the best of your recollection, were you the manager of both LLCs?
A Related was the manager of both LLCs.
Q Okay. Fine.
MS. FODOR: The joint venture partners are both composed the same way?

Monadnock v. Glasswall - Volume VI
THE WITNESS: Yeah, the tri-venture partners, yes, a related entity, a Monadnock entity, and a Phipps entity.
MS. FODOR: Same percentage interest, or you don't recall?
THE WITNESS: You have to go to the operating agreement.
(There was a discussion off the record.)
THE WITNESS: You have to look at the operating agreement. I don't know.
CONTINUED EXAMINATION
BY MR. KLEINHENDLER:
Q Now, you have reviewed this agreement, haven't you, before today?
A Hmmm.
Q In the --
(There was a discussion off the record.)
A Yes, I'm sorry.
Q There is a -- there was a scope of work attached in article five, and,

Monadnock v. Glasswall - Volume VI
specifically, do you recall what was Glasswall's obligation with regard to providing windows vis-a-vis the -- the contract -- sorry -- the concrete construction of the building?
MR. CINQUE: Objection. He's not even a party to this contract, and he's being asked what -- what it means.
MR. KLEINHENDLER: I can ask what it means.
CHAIRMAN ROSSI: Overruled. I think he's familiar with the --with the -- with the project, and, you know, we'll -- we'll evaluate the -- the weight to give it after we have heard.
So go ahead.
A I am going from my recollection. So, however, in -- the documents state the specific number of floors that they were supposed to stay in step with insofar as delivery to the project.

Monadnock v. Glasswall - Volume VI
Q Okay.
A I believe it's within a few floors. It's --
Q We will go to it.
A It's in the schedule B of the contract --
Q All right. Let's go to --
A -- or the scope schedule of the contract.
CHAIRMAN ROSSI: Are you now -- is he testifying as to the subcontract between Glasswall and Monadnock?
MR. KLEINHENDLER: Yeah, yeah.
CHAIRMAN ROSSI: I mean, I realize that, but, you know, although I overruled the objection, where are we really getting with this gentleman?
He's not -- he's not a party to the contract. The contract is going to say what it says.
We have already heard several times it's supposed to stay six -- six floors ahead. So with all due respect to the witness, if he repeats that,

Monadnock v. Glasswall - Volume VI

where does that get us, you know?

I don't think it really advances anything. Okay. So I'm -- I'm just a -- reverse ourselves.

MR. KLEINHENDLER: I guess it's sustained.

THE WITNESS: Strike it.

CHAIRMAN ROSSI: You don't have to strike it.

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q Well, I was just going to get to the next question, and that's why I asked that question.

In your role at -- at Related -- and you've had -- had an opportunity to construct the buildings, is there any reason why Related or the owner here would have wanted the window deliveries to be within six floors of the concrete superstructure?

A Especially in a residential structure, the only way -- there is a lot of finishes, right? It's not a corn shell,

Monadnock v. Glasswall - Volume VI

commercial building -- juxtapose it against that.

You have to install finishes, bathrooms, kitchens, flooring, drywall, painting, wallpaper, whatever the case may be for each individual building -- put in kitchens.

And in order to do that, you need a weather-tight and dry environment. It's impossible to do that without an exterior wall, whatever that may be. And in this application, it was a window wall.

So, usually, you want to stay -- sorry -- usually, you want to stay within a certain amount of floors of the concrete. In this case, I -- you know, how -- whatever the stipulation was in the -- in the contract that you have gone over already, they -- they stipulated how many floors of -- within the working deck of the concrete that they wanted the contract to be in.

You can't finish this room or any room in a residential building without

Monadnock v. Glasswall - Volume VI

a weather-tight environment.

Q Okay. All right.

Now, did there come a time when you learned -- again, as -- we're talking to you as a representative of the owner, in your role as Related's executive -- that Glasswall was not going to adhere to the schedule that you understood the project was going on?

A I can't -- no. As I get older, I can't name the year, but I know the month. It was around August. And I was brought in. And as I said before, I usually get brought in to help projects that are in trouble.

Q All right. So let's take a look at Exhibit 72, please, give everybody time to get there. Exhibit 72.

CHAIRMAN ROSSI: How much longer do you have on direct with the witness?

MR. KLEINHENDLER: Maybe half an hour.

CHAIRMAN ROSSI: Okay. You

Monadnock v. Glasswall - Volume VI

know what? I -- I -- could we take -- let's take a break right now, okay, just a comfort break. And we will take a normal morning break. I know it's a little early, but ten minutes or so.

(A break is taken.)

CONTINUED EXAMINATION

BY MR. KLEINHENDLER:

Q Okay. Showing you Exhibit 72, and I want to focus you on the middle E-Mail here. Just go up a drop, Jocelyn -- Frank Monterisi to Bruce Beal. And you are copied. Do you see that?

And just take a look at it and review that middle section. And then we are going to talk about it. Okay.

(Previously Marked Exhibit No. 72, E-Mail from Frank Monterisi to Bruce Beal, Document is introduced into the proceedings.)

A All right.

Q I want to focus you now: "News today was not good.

Monadnock v. Glasswall - Volume VI

BY MR. KLEINHENDLER:

Q This is a letter from a lawyer for Glasswall named Clinton Flagg. Let's go -- and just go to the back. You are copied on this. I am just going to show you the last page.

(There was a discussion off the record.)

Q And, yeah, here, Michael Trovini, Related Companies, right?

That's you?

A Right.

Q And I just want to take you to the first paragraph, "the undersigned."

Do you see that?

"This will acknowledge receipt of your letter dated August 12, 2013, with questions that a conference be scheduled to discuss Glasswall's compliance with the agreement. This will confirm that representatives of Glasswall, Monadnock, and the Related Companies met on August 13th in Miami and discussed the project."

Monadnock v. Glasswall - Volume VI

Now, does this refresh your recollection that there was a meeting in Miami in August?

A Right.

Q Did you attend -- one second -- did you attend that meeting?

A Which I attended.

Q I would like you to discuss that meeting with the panel starting with who was there and then what was talked about, to the best of your recollection?

A Ugo was there. Bruce Beal was there. I was there. Frank Monterisi was there.

Q Who is Frank Monterisi?

A Frank Monterisi was the development manager.

Q For who?

A For the ownership entity and he works for the Related Companies.

Q Bruce Beal, who is he?

A Bruce Beal is the president of the Related Companies.

Q Go ahead.

Monadnock v. Glasswall - Volume VI

Go ahead. Keep going.

A Greg Bauso runs Monadnock.

Q Okay. And this was where in Miami; do you know?

A This was at the facilities, the Glasswall facilities.

Q Okay. Go ahead. Take us through the meeting.

A And we met with Ugo, and I cannot remember the name of the other -- the other people that was -- that were working for Ugo.

CHAIRMAN ROSSI: Who was the president, you said, of your entity that was there?

THE WITNESS: The president of the Related Companies.

CHAIRMAN ROSSI: What was his name?

THE WITNESS: Bruce Beal.

CHAIRMAN ROSSI: Okay. Sorry.

A And we discussed the status of the project, and we toured the factory and I recall breaking -- and they were

Monadnock v. Glasswall - Volume VI

manufacturing not our product but someone else's product, meaning the window wall.

I discovered because I went over to the engineering department as -- as opposed to walking the factory and watching somebody else's window wall be manufactured, which is a complete waste of time, to see if the engineers had done anything as it relates to designing and getting the window wall parts and pieces designed so that they could then go and manufacture it.

And the engineers were not working on it -- and there was only like a few of them -- who were not working on our project. And it was a -- it was a very sad state of affairs as it relates to the manufacturing of the window wall for Hunters Point South.

We -- however, we did meet, and we did kind of agree to work with each other to try to get this window wall manufactured, and to move on. And subsequent to that, obviously --

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022