# EXHIBIT 46

AMERICAN ARBITRATION ASSOCIATION
--------------------------------------------------------X

MONADNOCK CONSTRUCTION, INC.,      Case #: 02-15-0002-8160

                Claimant,

    -versus-

GLASSWALL, LLC,

                Respondent.

--------------------------------------------------------X

## RESPONDENT GLASSWALL, LLC'S
## POST TRIAL MEMORANDUM OF LAW

CINQUE & CINQUE, P. C.
Attorneys for Respondent
Glasswall, LLC
845 Third Avenue, Suite 1400
New York, New York 10022
Telephone: 212-759-5515
Telefax:    212-759-7737
Email:    CINQUE845@aol.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................ iv

MONADNOCK'S CLAIM IS BARRED BY AIA §15.1.2 ......... 1

MONADNOCK ACKNOWLEDGED COMPLETION
BY FULLY PAYING GLASSWALL ........................................ 3

MONADNOCK DID NOT PAY IN STRICT
ACCORDANCE WITH THE AMENDMENT ............................ 4

MONADNOCK HAS NOT
SUSTAINED ANY DAMAGES .............................................. 5

GLASSWALL SUBSTANTIALLY PERFORMED
THE CONTRACT ................................................................. 6

MONADNOCK BREACHED THE AGREEMENT
BY ITS WRONGFUL TERMINATION ................................... 11

MONADNOCK'S BREACH EXCUSES
GLASSWALL'S PERFORMANCE ........................................... 11

THE FLOW-DOWN CLAUSE IS INAPPLICABLE .................. 13

Page

MONADNOCK IS NOT ENTITLED TO                                         15
ASSERT ANY ALLEGED CLAIMS BY
THE OWNER

"SOFT COST" DAMAGES ARE SPECULATIVE                                 16

MONADNOCK WAS NOT LIABLE FOR                                        17
ESCALATION COSTS FROM ITS SUBCONTRACTORS

MONADNOCK IS NOT ENTITLED TO                                        17
OUT OF SEQUENCE DAMAGES

MONADNOCK HAS NO LIABILITY                                          19
TO THE OWNER

MONADNOCK CANNOT ASSERT                                             21
THE OWNER'S CLAIMS

        (A) There is No Liquidating Agreement                      22

        (B) The Florida Courts Have Stayed Proceedings             26
        Between the Owner And Glasswall

        (C) There Is No Arbitration Agreement Between              27
        the Owner and Glasswall

THE CONTRACTS HAVE A CAP FOR                                       27
DELAY DAMAGES

ii

Page

MONADNOCK'S TERMINATION                         31
OF THE GLASSWALL AGREEMENT
WAS NOT IN GOOD FAITH

    (A)  Delay Is Not a Ground for Termination     31
    Of the Agreement

    (B)  The Termination Was Untimely             33

    (C)  The Items Supporting the Termination      33
    Were Merely Punch List Items

    (D)  Monadnock Did Not Afford Glasswall With   34
    the Opportunity to Remedy the Alleged Defects

    (E)  Monadnock Had To Terminate The Glasswall   35
    Agreement in Order to Pursue a Bond Claim

    (F)  The Notice of Default Was Sent Simultaneously   35
    With The Arbitration Demand

THERE WERE NO CRITICAL DELAYS TO THE            36
PROJECT AS A RESULT OF GLASSWALL'S
DELIVERY OF WINDOWS

THE BUDD MISSING PIECE TO THE PUZZLE            40

CONCLUSION                                      44

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                    <u>Page</u>

153 Hudson Development, LLC v. DiNunno, 8 App.Div.3d 77,                    2
    778 N.Y.S.2d 482 (1st Dept. 2004)

845 UN Limited Partnership v. Flour City Architectural Metals, Inc.,        8, 11
    28 App.Div.3d 271, 813 N.Y.S.2d 404 (1st Dept. 2006)

Austin v. Afzal, 24 Misc.3d 128(A), 899 N.Y.S.2d 57                         12
    (App. Term 2009)

Barry, Bette & Led Duke Inc. v. State of New York, 240 App.Div.2d           24
    54, 669 N.Y.S.2d 741 (3rd Dept. 1998)

Corhill Corp. v. S.D. Plants, Inc., 9 N.Y.2d 595, 217 N.Y.S.2d             29
    1 (1961)

Dart Mechanical Corp. v. City of New York, 68 App.Div.3d 664,               5
    891 N.Y.S.2d 76 (1st Dept. 2009)

Endres Plumbing Corp. v. Chapin Home For The Aging,                         9
    851 N.Y.S.2d 69, 2007 WL 3399659 (Queens Co. Sup. Ct.)

F. Garafalo Electric Co., Inc. v. New York University,                      4
    270 App.Div.2d 76, 705 N.Y.S.2d 327 (1st Dept. 2000)

Grace v. Nappa, 46 N.Y.2d 560, 567, 415 N.Y.S.2d 793 (1979)               11

Helena Associates, LLC v. EFCO Corp., 2008 WL 2117621                      18, 25
    (S.D.N.Y.)

Honeywell, Inc. v. J.P. Maguire Co., Inc., 2000 WL 307398                  24
    (S.D.N.Y.)

Home Federal Savings Bank v. Sayegh, 250 App.Div.2d 646,                   28
    671 N.Y.S.2d 698

iv

Page

Kalisch & Jarcho, Inc. v. City of New York, 58 N.Y.2d 377,
    461 N.Y.S.2d 746 (1983)    27

Kingsley Arms, Inc. v. Sano Rubin Construction Co., Inc.,    1
    16 App.Div.3d 813, 814, 791 N.Y.S.2d 196 (3rd Dept. 2005)

Lambert Houses Redevelopment Co. v. HRH Equity Corp.,    24
    117 App.Div.2d 227, 502 N.Y.S.2d 433 (1st Dept. 1986)

Manshul Construction Corp. v. Dormitory Authority, 79 App.Div.2d    17
    383, 436 N.Y.S.2d 724 (1st Dept. 1981)

Mars Associates, Inc. v. NYC Educational Const. Fund,    23
    126 App.Div.2d 178, 513 N.Y.S.2d 125 (1st Dept. 1987)

Michael G. Buck & Son Construction Corp. v. Poncell Construction    11
    Co., Inc., 217 App.Div.2d 925, 629 N.Y.S.2d 584
    (4th Dept. 1995)

Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.,
    175 F.3d 1221 (10th Cir. 1999)    37

Nature's Plus Nordic A/S v. Natural Organics, Inc., 980 F.Supp.2d    11
    400 (E.D.N.Y. 2013)

Obremski v. Image Bank, Inc., 30 App.Div.3d 1141, 816 N.Y.S.2d    31
    448 (1st Dept. 2006)

Process America, Inc. v. Cynergy Holdings, LLC, 839 F.3d 125    28, 30
    (2d Cir. 2016)

Ruttenberg v. Davidge Data Systems Corp., 215 App.Div.2d 191,    29
    626 N.Y.S.2d 174 (1st Dep't 1995)

Smith-Hoy v. AMC Property Evaluations, Inc., 52 App.Div.3d 809,    30
    862 N.Y.S.2d 513 (2nd Dep't 2008)

Travelers Casualty & Surety Co. v. Dormitory Authority,    22, 25
    735 F.Supp.2d 42 (S.D.N.Y. 2010)

<u>Page</u>

<u>The Unloading Corp.</u> v. <u>State of New York</u>, 132 App.Div.2d         12
543, 517 N.Y.S.2d 276 (2nd Dept. 1987)

<u>United States ex rel. AWL Industries, Inc.</u> v. <u>Site Remediation         28</u>
<u>Services Corp.</u>, 92 F.Supp.2d 132 (E.D.N.Y. 2000)

<u>Wilson Trading Corp.</u> v. <u>David Ferguson,Ltd.</u>, 23 N.Y.2d 398,         30
297 N.Y.S.2d 108 (1968)

<u>Authorities</u>

New York General Business Law §756-a(3)(b)(i)                    4

New York Jurisprudence 2nd Contracts §363                       7

New York Jurisprudence 2nd Contracts §364                       7

AIA Rule §1.1.2                                                 14

AIA Rule §9.10.4                                                3

AIA Rule §15.1.2                                              1, 2

AMERICAN ARBITRATION ASSOCIATION

---------------------------------------------------------X

MONADNOCK CONSTRUCTION, INC.,                    Case #: 02-15-0002-8160

                       Claimant,

    -versus-

GLASSWALL, LLC,

                      Respondent.

---------------------------------------------------------X

## RESPONDENT GLASSWALL, LLC'S
## POST TRIAL MEMORANDUM OF LAW

### 1.    MONADNOCK'S CLAIM IS BARRED BY AIA §15.1.2

AIA General Conditions [applicable pursuant to §1.2 of the agreements] §15.1.2

provides that:

> Claims (defined in §15.1.1 as "a demand or assertion by one
> of the parties seeking, as a matter of right, payment of money,
> or other relief with respect to the terms of the Contract") by
> either party must be initiated within 21 days after occurrence
> of the event giving rise to such claim or within 21 days after
> the claimant first recognizes the condition giving rise to the
> Claim, whichever is later.

In Kingsley Arms, Inc. v. Sano Rubin Construction Co., Inc., 16 App.Div.3d 813, 814,

791 N.Y.S.2d 196, 197 (3rd Dept. 2005), it was expressly held that the failure to comply

with this 21-day provision mandates a dismissal of a complaint:

> Defendant moved for summary judgment, solely contending

1

that plaintiff failed to comply with the notice of claim procedure set forth in their contract. Plaintiff conceded that the written notice of claim did not strictly comply with the 21–day time frame set forth in the contract, but contended that defendant was generally aware, from oral conversations, that there were delays which induced additional costs to plaintiff. Supreme Court denied the motion and defendant appeals.

We reverse. Defendant sustained its prima facie burden of establishing its entitlement to judgment as a matter of law by the tender of the subcontract between plaintiff and defendant which incorporated, among other things, the "General Conditions of the Contract for Construction" made between defendant and Beechwood. That contract specifically stated that no claim can be asserted unless, "as a condition precedent thereto," the notice of claim provisions are complied with. The notice of claim provision states that "[c]laims by either party must be made within 21 days after occurrence of the event giving rise to such [c]laim or within 21 days after the claimant first recognizes the condition giving rise to the [c]laim, whichever is later. Claims must be made by written notice." With it clear that compliance with the notice provisions of this construction contract was a condition precedent to plaintiff's claim, its failure to strictly comply is a waiver of its claim (citations omitted).

See also, 153 Hudson Development, LLC v. DiNunno, 8 App.Div.3d 77, 78, 778 N.Y.S.2d 482, 483 (1st Dept. 2004):

Plaintiff's failure to comply with the notice provisions of the performance bond issued by Reliance precludes it from now maintaining this action for damages against the bond's surety.

Monadnock first asserted a claim on March 4, 2015, some three months after Glasswall had completed delivery of the windows (the latest possible date for purposes of §15.1.2). This was done "under the advisement of the attorneys" (Tr. 882), in an attempt

to set up a claim against the bonding company (as explained below) and Bauso admitted that there were discussions on this topic (Tr. 1167). Therefore, the claim is untimely and must be dismissed.

## 2.   MONADNOCK ACKNOWLEDGED COMPLETION BY FULLY PAYING GLASSWALL

Monadnock paid sums due Glasswall on November 25, 2014 (Exhibit J), without any reservation of rights. Under AIA Rule §9.10.4[1] Monadnock is not now entitled to claim a refund. Indeed, Colapinto (who signed the agreements with Glasswall) confirmed that he knew that final payment was not due unless Glasswall "fully performed" and that final payment was made in October of 2014 (Tr. 880). Even Bauso acknowledged that final payment equates to job completion (Tr. 1202).

---

[1] This rule provides:

> The making of final payment shall constitute a waiver of Claims by the Owner [Monadnock] except those arising from
>
> > .1 liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;
> >
> > .2 failure of the Work to comply with the requirements of the Contract Documents; or
> >
> > .3 terms of special warranties required by the Contract Documents.

At the time of final payment in November of 2014 Monadnock had not specified any alleged deficiencies with Glasswall's performance. In fact, no such complaints were made until March of 2015.

3

## 3.   MONADNOCK DID NOT PAY IN STRICT ACCORDANCE WITH THE AMENDMENT

Paragraph 13 of the April 4, 2014 amendment (Exhibit I) required Monadnock to

deposit monies into a Duane Morris escrow account[2] if it wished to assert any claims:

> If Monadnock asserts that any payments to WFIC should be reduced based on a backcharge, change order or similar reduction permitted under the terms of the contracts and arising after the date hereof, Monadnock shall make payment to WFIC by payment of the amount of the asserted backcharge, change order or other reduction to the escrow account of Duane Morris, pursuant to the attached escrow agreement (Exhibit G)....

It is uncontroverted that Monadnock never paid monies to the Duane Morris escrow

account and never even attempted to do so (Tr. 1124).  New York General Business Law

§756-a(3)(b)(i) states that "the contractor or subcontractor shall pay the subcontractor

strictly in accordance with the terms of the construction contract."  This statute precludes

a claim for backcharges, as Monadnock did not pay in accordance with the terms of the

relevant agreements.   See, F. Garafalo Electric Co., Inc. v. New York University, 270

App.Div.2d 76, 80, 705 N.Y.S.2d 327, 31 (1st Dept. 2000) expressly holding that a claim

for delay damages should be dismissed if the terms of the contract are not complied with:

> The contract's notice and documentation requirements for extra work and delay damages are condition precedents to plaintiff's recovery and the failure to strictly comply is deemed a waiver of such claims. Plaintiff conceded before the IAS court as well as on appeal that it did not strictly comply

---

[2] Duane Morris were the attorneys for the owner HPS (Tr. 596).  HPS was an LLC owned 50% by Related Companies, 25% by Monadnock and 25% by Phipps Housing (Tr. 123).

with the contract's mandates. Therefore, plaintiff clearly waived its claims and NYU's motion for summary judgment dismissing the third and fifth causes of action should be granted.

and <u>Dart Mechanical Corp.</u> v. <u>City of New York</u>, 68 App.Div.3d 664, 665, 891 N.Y.S.2d

76, 77 (1st Dept. 2009):

> Moreover, plaintiff waived any claim for delay damages by failing to strictly comply with the contract's notice provisions. Its submission of a detailed delay claim in connection with its request for final payment nearly one year after substantial completion of its work under the contract cannot act to revive its already waived claims for delay damages (citations omitted).

**4.    MONADNOCK HAS NOT**
**SUSTAINED ANY DAMAGES**

Both Messrs. Colapinto (Tr. 532, 537 and 540) and Bauso (Tr. 1115-16) testified

that Monadnock was reimbursed by the owner and lender for all of the change orders

introduced as evidence.  As succinctly stated by Bauso:

> All of the costs incurred by Monadnock from the subcontractors resulting from the Glasswall delay were paid for by the ownership entity.
>
> **CHAIRMAN ROSSI:** Does that include your – your –
>
> **MS. FODOR:** General conditions?
>
> **CHAIRMAN ROSSI:** Yeah, extended general conditions?
>
> **THE WITNESS:** It includes general conditions.  It includes additional insurance costs. Etcetera. (Tr. 1117).

5

Therefore, Monadnock has not been damaged.

## 5. GLASSWALL SUBSTANTIALLY PERFORMED THE CONTRACT

It is undisputed that Glasswall delivered more than 9,200 of the contractually required 9,300 windows[3], windows which everyone admitted were unique due to their many different sizes and colors (between 300 to 400 different types of windows, Tr. 1988), requiring what Colapinto characterized as "a customized system for a special high-end project" (Tr. 909) and Bauso labeled "a unique project" (Tr. 1195). It is also uncontroverted that, once Mr. Anderson[4] came on board in September of 2013, due to the illness of Glasswall's former President Frederico Ballesteri (Tr. 1962), the problems with the glass supplier AGC were straightened out and a continuous supply of windows was then made available. Mr. Barber, the "plant" in Glasswall's plant, confirmed that Glasswall had about 1,100 windows (Tr. 847) and was "in general conformance with the requirements" in mid-December of 2013 (Tr. 853): yet, Monadnock refused to accept delivery of the windows, ostensibly upon the ground that there were not enough windows

---

[3]   Monadnock's damages witness shockingly testified that he could not give a ball park estimate as to how many windows Glasswall was required to manufacture, and how many were delivered (Tr. 1394). He did, however, admit that "less than 100" were missing. Glasswall contends that there were only 39 missing windows (Tr. 2005). Glasswall further contends that it provided replacement glass for these missing windows (Tr. 2008).

[4]   Mr. Anderson's credentials in the curtain wall industry are impeccable, with over 40 years in the curtain wall business (Tr. 1942). In fact, he had worked on major projects for Related (AOL, Time Warner and Random House, Tr. 1953) and undoubtedly his involvement as Glasswall's President was a major reason why Monadnock did not terminate the agreement in the fall of 2013 (Tr. 2011-12). Mr. Anderson "had every confidence that I could get it done" when he took over and did not spare any expense to do so (Tr. 1967).

6

in December:

> **MR. BAUSO:** From what I recall – and, again, I think it was clear they weren't going to be shipped – but there were enough windows and enough progress had been made that I believe we probably would have accepted deliveries at that point (Tr. 1073).

As Barber testified that 1,100 windows (more than 1/3 of the total amount) were available and Bauso previously testified that "by the end of November, there were a pretty good amount of windows" (Tr. 1051), it is clear that Bauso was not being forthright as to the reason why Monadnock refused delivery in December. Monadnock had previously refused delivery of about 35 truckloads of windows in November (Tr. 2141-42, Exhibit C). Mr. Anderson opined that it would take about five to six weeks to install these windows (Tr. 2118). Indeed, Monadnock admitted that there was a "constant stream" of windows after execution of the April 2014 amendment (Tr. 287-88, and 583). As confirmed by Mr. Anderson, "the amendment had a series of milestones in it. And Glasswall met every milestone" (Tr. 2172). The mere fact that the structure was devoid of windows for a period of time is not unusual. Not only is it "not uncommon to see 15 to 20 floors without curtain wall while the building is going up" (Tr. 1645), but Monadnock currently has such a building at One Manhattan Square (Tr. 1646).

The relevant law regarding substantial performance is summarized in New York Jurisprudence 2nd Contracts §§363 and 364, which provide in relevant part that: "The theory of substantial performance permits recovery on a contract where the failure of

7

performance is relatively slight and occurs in good faith" and:

> Where the nonperformance of one party to a contract is innocent, does not thwart the purpose of the bargain, and is wholly dwarfed by that party's performance, the breaching party has substantially performed its obligations and the nonbreaching party is not excused from its responsibility under the contract.

> An attempt to defeat a recovery on the contract cannot be based upon technical or unimportant omissions or defects in the performance of either party.

Clearly, the fact that Glasswall supplied more than 9,200 out of 9,300 windows (99%) constitutes substantial performance.[5]  Also, Monadnock's payment of 100% of Glasswall's payment requisitions conclusively establishes its substantial performance under the holding in 845 UN Limited Partnership v. Flour City Architectural Metals, Inc., 28 App.Div.3d 271, 272, 813 N.Y.S.2d 404 (1st Dept. 2006) where the defendant contracted to fabricate and instate a curtain wall system for Trump Tower.  After plaintiff paid payment requisitions totaling "99.5% of the contract price" it purported to terminate the agreement and the court expressly held that the termination was improper in light of defendant's substantial completion of the agreement:

> Since undisputed record evidence amply demonstrates that defendant substantially completed its work, plaintiff owner

---

[5]  Monadnock's testimony, that "one screw missing should be grounds for termination" (Tr. 611), and that "it's not substantially complete until we get that one (missing) window" (Tr. 1206), highlights its bad faith.  Following the Monadnock party line, its damages witness testified that substantial completion equates to 100% completion of a project (Tr. 1396).  Mr. Hanifin testified that in his experience a job is substantially performed if 90% to 95% of the work has been completed (Tr. 1750-51).

> was powerless to terminate the contract for defendant's
> alleged default,.... 28 App.Div.3d at 271, 813 N.Y.S.2d at
> 405.

See also, Endres Plumbing Corp. v. Chapin Home For The Aging, 851 N.Y.S.2d 69, 2007

WL 3399659 at *3 (Queens Co. Sup. Ct.):

> H & H does not dispute that on the date of their termination
> notice to Prim–Con, they had paid Prim–Con the sum of
> $844,944 out of a total contract price of $935,000 (or
> approximately $967,000 with change orders). Such evidence
> supports a claim of substantial compliance.

As Monadnock paid Glasswall 100% of the contract price Monadnock cannot dispute

Glasswall's substantial performance.

Glasswall's good faith cannot be questioned. Once assembly of the windows

began in earnest in the Fall of 2013, Glasswall went "full speed ahead," working

"overtime everyday, every week, to complete this job" (Tr. 2017) under a "mandate

that...we would not stop production under any circumstances" (Tr. 2018-19). Glasswall

"did the things that we said we were going to do" (Tr. 2253), and continued to do so in

spite of all of the problems it was having with Monadnock, such as: Monadnock's

improper request for retainage (Tr. 2022 and Exhibit C); its refusal to accept C-channels

(Tr. 2027) and windows (Tr. 2033);[6] Monadnock's and Related's demand for an

additional $3 million (with no contractual foundation) at the November 2013 trailer

meeting (Tr. 2028-29) at a time when windows were not critical; Monadnock's failure to

---

[6] The normal procedure is to receive available windows and load the building (Tr. 2042) as the windows had to first be logistically placed around the floor of the building (Tr. 2041).

9

pay requisitions in November of 2013 totaling about $862,000.00[7] [despite Monadnock's testimony that "they paid it to you" (Tr. 2261)]; Monadnock's owing about $4 million as of the April 2014 Amendment (Exhibit I, ¶2), $2.8 million of which was paid directly to vendors (Tr. 2170); the failure of parties to reach an agreement during intensive negotiations in New York in January of 2014; and Glasswall's receipt of notices of breach and termination (Exhibit D). In fact, it is undisputed that Glasswall incurred a loss of over $5 million as a result of the agreement at issue[8] (Tr. 2204 and Exhibit A). Included among these expenses was $218,000.00 (Tr. 2202 and Exhibit B) for two iron workers' time over about 6 months to remedy any issues during installation - a fact which Mondnock's damages witness had no knowledge of (Tr. 1392). Knowing that it would lose millions of dollars Glasswall nevertheless completed the project within the timetable in the April 2014 amendment and delivered "first class quality curtain wall" (Tr. 2205) which to this day has not received a single quality complaint (Tr. 1969). Indeed, Monadnock had two representatives based in Miami (Steve Barber and an Israel Berger employee) who signed off on the quality of each window before it was shipped to New York (Tr. 219-20). Glasswall even sent two to three trucks' worth of extra materials to

---

[7] Although he testified on direct that Monadnock had paid all requisition forms, Mr. Bauso admitted on cross that Monadnock only paid $97,000.00 on a $328,000.00 requisition for Parcel B ) (Tr. 2376, Exhibit 121) and nothing on a $631,755.30 requisition for Parcel A (Tr. 2376-77, Exhibit 120).

[8] Glasswall knew as early as December of 2013 that it would incur a large loss (Tr. 2167), yet proceeded to fulfill the contract at a loss of $5-6 million (Tr. 1969).

Monadnock, after the agreement was terminated in 2015 (Tr. 2220).

**6.    MONADNOCK BREACHED THE AGREEMENT
        BY ITS WRONGFUL TERMINATION**

Monadnock terminated the agreement on March 16, 2015 (part of Exhibit D).

However, as of that date, Glasswall had substantially completed the contract and as a

result Monadnock was not permitted to terminate it.  See, 845 UN Limited Partnership,

supra at 405: "The substantial performance rule precludes contract termination...."  In

fact, a wrongful termination constitutes a material breach.  See, e.g., Nature's Plus Nordic

A/S v. Natural Organics, Inc., 980 F.Supp.2d 400, 413 (E.D.N.Y. 2013):

> Applying that principle [the UN holding] here, the Court
> finds that NPN's substantial performance of the minimal sales
> requirement during the year 2008 precluded NOI from
> terminating the Agreement on that basis. In this regard, NOI's
> termination of the Agreement on this basis constituted a
> breach of the Agreement. ...the Court concludes that NOI
> wrongfully terminated the Agreement,....

and Michael G. Buck & Son Construction Corp. v. Poncell Construction Co., Inc., 217

App.Div.2d 925, 629 N.Y.S.2d 584, 585 (4th Dept. 1995): "defendant breached the

contract by wrongfully ordering plaintiff off the job at a time when plaintiff was in

substantial compliance [having completed between 95% and 98% of the work]."

**7.    MONADNOCK'S BREACH EXCUSES
        GLASSWALL'S PERFORMANCE**

It is well established that a breaching party to a contract is not entitled to continued

performance by the other party.  See, e.g., Grace v. Nappa, 46 N.Y.2d 560, 567, 415

11

N.Y.S.2d 793, 797 (1979):

> Defendant's failure to provide the certificate was thus a material breach of the contract, excusing plaintiff's performance (*see, e.g.*, 3A Corbin, Contracts ss 663, 665).

Glasswall was therefore excused from remedying the alleged deficiencies and Monadnock is not entitled to recover any damages whatsoever.   See, Austin v. Afzal, 24 Misc.3d 128(A), 899 N.Y.S.2d 57 (App. Term 2009), expressly holding that a party which improperly terminates an agreement is not entitled to any damages whatsoever:

> We find no basis in the record to impose liability upon defendant for breach of contract, where the evidence shows that defendant substantially performed the home improvement contract and that he was prevented from completing the contract by plaintiff's improper termination. ... To the extent that plaintiff alleged that he incurred cost of completion damages, his wrongful termination of the contract prevents him from recovering such damages.

See also, The Unloading Corp. v. State of New York, 132 App.Div.2d 543, 517 N.Y.S.2d 276, 277 (2nd Dept. 1987), dismissing a construction contract claim because the plaintiff had breached the agreement:

> It is well settled that "a promisee may not recover for a broken promise unless he has performed his obligations, usually categorized as a condition precedent", under the contract (*McGrath v. Hilding*, 41 N.Y.2d 625, 629, 394 N.Y.S.2d 603, 363 N.E.2d 328; *see*, 5 Williston, Contracts § 676 [3rd ed] ). Here, the claimant failed to establish that it had performed its obligations under the contract; thus, the court properly granted the defendant's motion to dismiss the claim.

12

## 8.   <u>THE FLOW-DOWN CLAUSE IS INAPPLICABLE</u>

Monadnock's argument, that it can pursue claims that the owner HPS may have, is based upon the premise that Glasswall "agreed to abide by the prime contract":

> that says Monadnock can pursue claims that the owner has incurred.
>
> Why?  Because when they signed – when Glasswall signed their subcontract agreement, they agreed to abide by that prime contract, end of story. ...
>
> The subcontract – you may not like it – incorporates by reference the prime contract.  (Tr. 1580-81).

Glasswall agrees that a review of the subcontract will "end the story:" however, because the subcontract specifically <u>excludes</u> the Prime Contract from the subcontract documents, the story ends in Glasswall's favor.

While Trovini noted the specific language in Article 2 limiting the subcontractor's obligations of the owner to the extent the Prime Contract is applicable, he mistakenly testified tht the terms of the Prime Contract "obviously apply":

> It basically – it says right on it, that, to the extent that they apply – right, they apply, which, obviously, they apply, right – in the prime contract, the sub – the subcontractor is obligated.  (Tr. 1466-67)

Trovini was obviously wrong.

Article 2 of the subcontract (Exhibits G and H) is set forth below:

> The Contractor (Monadnock) and Manufacturer (Glasswall) shall be mutually bound by the terms of this

13

Agreement and, <u>to the extent that</u> the provisions of AIA Document A201, apply to this Agreement pursuant to Section 1.2 and <u>provisions of the Prime Contract apply to the Work of the Manufacturer</u>, the Contractor shall assume toward the Manufacturer all obligations and responsibilities which the Contractor, under such documents, assume toward the Owner and the Architect.  The Contractor shall have the benefit of all rights, remedies and redress against the Manufacturer that the Owner, under such documents, has against the Contractor, and the Manufacturer shall have the benefit of all rights, remedies and redress against the Contractor that the Contractor, under such documents, has against the Owner, insofar as applicable to this Subcontract.  <u>Where a provision of such documents is inconsistent with a provision of this Agreement, this Agreement shall govern</u> (emphasis added).

Paragraphs 1.1[9] and 16.1.2[10] of the subcontract specifically <u>exclude</u> the Prime Contract between the owner and Monadnock as a Subcontract Document.  To similar effect, see AIA Rule §1.1.2 providing in relevant part:

The Contract Documents shall not be construed to create a contractual relationship of any kind... (2) between the Owner and a Subcontractor or a Subcontractor... or (4) between any persons other than the Owner [Monaddock] and the Contractor [Glasswall].

---

[9]   This paragraph <u>deleted</u> the following under the definition of "Subcontract Documents": (2) the Prime Contract, consisting of the Agreement between the Owner and Contractor and the other Contract Documents enumerated therein; (3) Modifications issued subsequent to the execution of the Agreement between the Owner and Contractor, whether before or after the execution of this Agreement.

[10]   This paragraph, entitled "Enumeration of Subcontract Documents," specifically <u>excludes</u> the following: "The Prime Contract, consisting of the Agreement between the Owner and Contractor dated as first entered above and the other Contract Documents enumerated in the Owner Contractor Agreement."

14

Therefore since the provisions of the Prime Contract were specifically excluded from the subcontract, its provisions do not apply and the flow-down argument is inapplicable.

## 9.    MONADNOCK IS NOT ENTITLED TO ASSERT ANY ALLEGED CLAIMS BY THE OWNER

In its demand for arbitration, Monadnock sought damages allegedly incurred by Monadnock.  No reference whatsoever was made to any alleged damages incurred by the owner.  Specifically, paragraph 13 of the demand alleges that Glasswall's conduct:

> expose Monadnock to substantial damages including, but not limited to, extended general conditions, extended field costs, extended overhead costs, trade delay claims, extended financing costs, loss of rents and other damages,

Paragraph 21 of the demand alleges that the arbitrators "determine the amount of damages suffered by Monadnock."  Nowhere does the demand give any notice that Monadnock was seeking to assert damages allegedly incurred by the owner.

Monadnock sought to assert the owner's alleged damages through the testimony of Trovini, after Monadnock's witnesses testified that Monadnock itself had sustained no damages, having been reimbursed for all of its expenses.  Trovini was not listed as a Monadnock witness and the documents referred to during his testimony were produced a day or two before he testified, in violation of the April 28, 2016 scheduling order which required that such documents be produced by July 8, 2016.

In addition, Monadnock never established how much the owner paid Monadnock.

15

Mr. Colapinto stated that Monadnock was paid by "HPS [the owner] <u>and the lender</u>" (Tr. 532 and 537).[11] Mr. Trovini could not identify who paid Monadnock:

> **MR. RENDA:** Okay.  Who paid the money to Monadnock?  Was it the Related Companies, or was it HPS?
>
> **THE WITNESS:**  I mean, look, I can't factually answer that.  (Tr. 1468)

Without a delineation of monies paid by the owner an award of damages would be speculative, even if the owner's claims are asserted.

## 10.   "SOFT COST" DAMAGES ARE SPECULATIVE

It is not possible to specify alleged "soft cost" damages allegedly sustained by Monadnock.  Not a single Monadnock check in payment of these expenses was proferred at trial,and it is clear that Monadnock did not pay them.  Mr. Christensen could not testify who was billed for these expenses (Tr. 1369) and never asked to see the canceled checks in payment of these alleged expenses (Tr. 1371) - yet he charged them all to Glasswall. In addition, Mr. Christensen testified that the "soft costs" included in his damages report came from a spreadsheet created by Related (Tr,. 1403), indicating that Monadnock did not pay these bills.

Even Trovini, proffered as Monadnock's "soft costs" witness, was unable to identify the payor of these expenses (Tr. 1527).

---

[11]   Clearly there is no basis for Monadnock to assert claims of the lender.

16

11. **MONADNOCK WAS NOT LIABLE FOR ESCALATION COSTS FROM ITS SUBCONTRACTORS**

A large amount of the damages sought by Monadnock relate to escalation costs Monadnock allegedly paid its subcontractors. In addition to the fact that there is no evidence of these payments, the only two subcontracts introduced into evidence both contain a provision pursuant to which the subcontractors agreed to bear all escalation costs. None of the subcontractors testified during the hearings. Paragraph C to Rider 5 of both the Glasswall subcontract (Exhibit 14) and the Ecker subcontract (Exhibit 43) contain the following provision:

> This Contractor [Glasswall and Ecker] price includes all escalation costs for labor and material for the duration of this project.

As the Monadnock subcontracts absolve Monadnock from any liability for escalation costs and as Monadnock has failed to introduce any evidence of these alleged payments, they should all be disallowed.[12] In addition, Monadnock was unable to state how much of the claimed escalation costs accrued monthly from September 2013 through June of 2014 (Tr. 2389), rendering such alleged damages totally speculative.

12. **MONADNOCK IS NOT ENTITLED TO OUT OF SEQUENCE DAMAGES**

The measure of delay damages in a construction case was set forth in Manshul

---

[12] Monadnock's damages witness did not even look at the Ecker subcontract or subcontracts with anyone other than Glasswall (Tr. 1393) – yet he assessed all subcontractor escalations costs against Glasswall.

17

Construction Corp. v. Dormitory Authority, 79 App.Div.2d 383, 387, 436 N.Y.S.2d 724, 728 (1st Dept. 1981):

> As in all contract actions, the burden of proving the damages is on plaintiff. When claims are made for damages for delay, plaintiff must show that defendant was responsible for the delay; that these delays caused delay in completion of the contract (eliminating overlapping or duplication of delays); that the plaintiff suffered damages as a result of these delays, and plaintiff must furnish some rational basis for the court to estimate those damages, although obviously a precise measure is neither possible nor required (citations omitted).

See also, Helena Associates, LLC v. EFCO Corp., 2008 WL 2117621 (S.D.N.Y.) at *4:

> Helena, in order to recover delay damages, must demonstrate that EFCO was responsible for the delay, that EFCO's delay caused a delay in the completion of the project (sometimes referred to as a delay on the "critical path"), without any concurrent delays, and that Helena suffered rationally estimable damages as a result.

Glasswall's expert applied the "rule of concurrent delay" cited above (Tr. 1924) to delays chargeable to other contractors (such as for Cross County [Tr. 1730], gas risers [Tr. 1740], flanking [Tr. 1741] and generally "all the trades that were actually being worked on were progressing slowly" ]Tr. 1732]), and therefore opined that damages arising from these delays are not a proper measure of damages. As explained by Mr. Hanifin the mere fact that windows may have been delayed does not equate to a delay in the overall project (Tr. 1670).[13] In fact, windows were not even on the original critical path (Tr. 1611).

---

[13]  As explained by Mr. Hanifin: "The question is whether or not those delays to the window delivery dates caused really material or critical delays to the project as opposed to activity delays where there was an ability to provide work-arounds or have some float in those

18

While arguably Glasswall would be liable for any out of sequence work which was required by Monadnock's subcontractors as a result of the late delivery of windows, no evidence of these damages was provided by Monadnock (Tr. 1639, 1644, and 2149).

In addition, Monadnock's form subcontract Rider 1, Article 4.1(C) (Exhibit 14) provides:

> Out of sequence and comeback work shall be at no additional cost to Monadnock.

Therefore, Monadnock had absolutely no liability for any out of sequence work which may have been occasioned by Glasswall's conduct.  Furthermore, no evidence of payment of these monies has been introduced into evidence.

## 13.   MONADNOCK HAS NO LIABILITY TO THE OWNER

Monadnock bears no liability to the owner for any delay in construction of the project, for several reasons:

(a) the 21 day limit for asserting a claim under the AIA Rules (explained above) expired years ago;

(b)  no notice of default was ever sent by the owner to Monadnock.  Article 9(1)(d) of the Prime Contract[14] specifies that Monadnock could be held in default if "for reasons

---

activities." (Tr. 1617).

[14] Mr. Christensen not only never read the Prime Contract, but also he testified that he did not consider that he needed to review it in connection with the preparation of his report (Tr. 1357).

19

due to the fault of Construction Manager and/or its Trade Contractors completed services on or before the date of substantial completion...." Bauso testified that the owner never put Monadnock in default for being late (Tr. 1115).[15]

(c) the owner fully paid Monadnock - Article 11(2) of the Prime Contract gave the owner the right to withhold from payment to Monadnock "any amount necessary to reimburse owner for its actual or potential expenditures for the account of Construction Manager or to secure owner's remedies in consequence of any actual or potential default or breach by Construction Manager under this Agreement." The owner paid Monadnock in full, so cannot now seek to claw back any of these payments;

(d) the owner waived claims against Monadnock - the owner sent letters dated December 3, 2015 (Exhibits 196 and 197) confirming completion of the building and stating:

> Excluding ongoing litigation in Florida and arbitration in New York with the project's window manufacturer Glasswall, LLC, there are no unsettled disputes with any other contractors/materialmen.

Monadnock confirmed that this letter waived all claims against it, testifying that it was for "Monadnock's benefit because we want to know that we are complete on the project" (Tr. 314). As the only claim allegedly reserved by the owner was a claim against Glasswall,

---

[15]   While Trovini testified that the owner "can assert a claim" or "can default (Monadnock)" (Tr. 1480), he never testified or introduced any evidence that the owner did default Monadnock.

20

the owner released any potential claims against Monadnock;

(e) Monadnock's admission - Mr. Colapinto testified that "Monadnock didn't suffer any damages from the owner" (Tr. 555);

(f) Monadnock's "not at risk" testimony - both Colapinto (Tr. 124) and Bauso (Tr. 981) confirmed that Monadnock was not at risk and therefore has no liability to the owner for delays. In fact, Colapinto flatly testified that Monadnock had absolutely no financial expense: "Financial risk for the cost of the project, no" (Tr. 125);

(g) Trovini's testimony - Trovini testified that the owner "can go after them [Monadnock] - we refrain from going after them because they are going to assert our claims" (Tr. 1462-63). He confirmed that the owner has no intention of suing Monadnock, stating that ownership is "not going to pursue it any further" (Tr. 1525) and that "whatever the recovery is, the ownership is not going to go after Monadnock" (Tr. 1519). As a matter of law this does not support an award of damages;

(h) Monadnock had no completion deadlines - As testified to by Mr. Colapinto, Monadnock had no specific deadlines for completion in its contract with the owner (Tr. 872).

## 14.   MONADNOCK CANNOT ASSERT THE OWNER'S CLAIMS

Recognizing that Monadnock has not sustained any damages, Trovini testified that "they are asserting our [the owner's] claims" (Tr. 1466). However, as explained below, it

is clear that Monadnock cannot assert these claims for several reasons.

### (A) There is No Liquidating Agreement

In order for a general contractor to sue a subcontractor on the owner's behalf, there must be a "liquidating agreement" in order to overcome the fact that there is no privity of contract between the owner and a subcontractor.  In the case at bar, paragraph 1.3 of the contract between Monadnock and Glasswall specifically states that there is no contractual relationship of any kind between the owner and Glasswall:

> The Subcontract Documents shall not be construed to create a contractual relationship of any kind... (2) between the Owner [defined on the first page as HPS] and the Manufacturer [defined on the first page as Glasswall], or (3) between any person or entities other than the Contractor [defined on the first page as Monadnock] and Manufacturer.

Liquidating agreements were explained in Travelers Casualty & Surety Co. v. Dormitory Authority, 735 F.Supp.2d 42, 70 (S.D.N.Y. 2010):

> Liquidating agreements are written agreements by which an intermediary (for example, a general contractor) admits liability to an injured contractual counterparty (for example, a subcontractor) and then agrees to pursue a claim for damages on behalf of that injured counterparty against a different, responsible party with whom the intermediary is also in privity (for example, an owner). "The courts of New York and other jurisdictions recognize liquidating agreements as a valid mechanism for bridging the privity gap between owners and subcontractors who sustain damages as the result of the others' actions."
>
> To be valid, liquidating agreements must meet certain requirements. "Liquidating agreements [under New York law] have three basic elements: (1) the imposition of liability upon

22

the general contractor for the subcontractor's increased costs, thereby providing the general contractor with a basis for legal action against the owner; (2) a liquidation of liability in the amount of the general contractor's recovery against the owner; and, (3) a provision that provides for the 'pass-through' of that recovery to the subcontractor." A liquidating agreement must "satisf[y] all three elements," and must represent " 'an actual contractual commitment' " by the parties, although this commitment " 'need not take any particular form.'" Liquidating agreements "may be memorialized in the subcontract or in a separate written agreement and may be assembled from several documents executed over a period of years." Nevertheless, "only an express—as opposed to implied—contractual undertaking to pass through a claim recovery gives rise to a liquidating agreement." "Absent a showing of actual contractual liability [running from the prime contractor to the subcontractor], there can be no liquidating agreement" (citations omitted).

In Mars Associates, Inc. v. NYC Educational Const. Fund, 126 App.Div.2d 178, 513 N.Y.S.2d 125 (1st Dept. 1987), a prime contractor sought to assert claims of subcontractors against the owner, based upon an agreement that the subcontractors would accept "whatever amount, if any, Mars [the prime contractor] is able to recover from the Fund [the owner]." The court dismissed these claims, upon the ground that the prime contractor never admitted its liability and therefore there was no liquidating agreement:

We have entertained claims without prior payment only where the party seeking indemnification was bringing a claim "on behalf of" another party, pursuant to a liquidation agreement, which contained an admission of liability by the party to the original claimant and provided that the amount of the payment would be the amount, if any, subsequently collected by the party seeking indemnification. However, our examination of the record indicates that Mars has never admitted its liability to subcontractors Smith and S & M in

23

> Mars' liquidation agreements with them, which agreements
> provide that these two subcontractors agree to accept in
> satisfaction of their claims against Mars, whatever sum, if
> any, Mars is able to recover from the Fund (citations omitted).

See also, Barry, Bette & Led Duke Inc. v. State of New York, 240 App.Div.2d 54, 57,669

N.Y.S.2d 741, 744 (3rd Dept. 1998):

> we conclude that claimant's mere agreement to prosecute
> Brickman's claim against the State and pay over any sums
> recovered would amount to nothing more than an assignment
> of Brickman's contract rights which would subject claimant,
> as assignee, to the State's defense of lack of privity.

Lambert Houses Redevelopment Co. v. HRH Equity Corp., 117 App.Div.2d 227, 232,

502 N.Y.S.2d 433, 436 (1st Dept. 1986):

> In the absence of such [liquidating] agreement, HRH cannot
> recover from the subcontractors because the damage has been
> suffered by the owner, and the owner cannot recover from the
> subcontractors for breach of contract because it lacks privity
> of contract with the subcontractors.

Honeywell, Inc. v. J.P. Maguire Co., Inc., 2000 WL 307398 (S.D.N.Y.) at *13:

> Maguire also argues that because it has now decided to
> assert claims on Honeywell's behalf, a valid liquidating
> agreement has come into existence notwithstanding the lack
> of a contractual obligation, because "as long as the option for
> the [prime] contractor to sue exists and is ultimately taken by
> the contractor, that is sufficient." However, the appropriate
> test for a liquidating agreement is not whether the prime
> contractor eventually decides, in the absence of any
> contractual obligation, to assert a subcontractor's claims,
> because "if a liquidating agreement could be implied any time
> a general contractor asserts a claim on behalf of a
> subcontractor, an 'implied' liquidating agreement could be
> found in every case." In the absence of contractually imposed

24

> liability, Maguire's present willingness to assert claims on
> behalf of Honeywell is a "mere agreement" to pursue those
> claims (citations omitted).

At no time did Monadnock testify that it would pay over to the owner any recovery in this proceeding.[16] No evidence whatsoever of any liquidating agreement was introduced into evidence. In addition, at no time has Monadnock ever admitted liability to the owner – in fact, Monadnock has taken the position that it is "not at risk." As noted in Travelers Casualty, supra, 735 F.Supp.2d at 72, n. 54: "Courts routinely dismiss pass-through claims in the absence of an admission of liability creating a liquidating agreement." See also, Helena Associates, supra at *10:

> New York courts have made clear that "only an express-as
> opposed to implied-contractual undertaking to pass through a
> claim recovery gives rise to a liquidating agreement." Helena,
> however, has not asserted that it has "an actual contractual
> commitment," between Helena and KBF or Rose Associates,
> in which Helena admits liability to KBF or Rose Associates,
> agrees to liquidate such liability in the amount it recovers on
> behalf of KBF or Rose Associates, and obligates itself to pass
> through any recovery it makes on behalf of KBF or Rose
> Associates. Esposito stated in his affidavit that Helena would
> pay any recovery on Claims 2 and 11 to KBF and Rose
> Associates, respectively, however, there is no evidence of a
> contractual agreement to that effect between Helena and KBF
> or Rose Associates. Because Helena has offered no evidence
> of a liquidating agreement between it and KBF or Rose
> Associates, Helena may not assert damages claims on behalf
> of KBF or Rose Associates. Therefore, EFCO's motion for
> summary judgment on Claims 2 and 11 of Helena's itemized

---

[16] While Trovini testified that it was his understanding that Monadnock was obligated to transfer any recovery to the owner (Tr. 1523), Monadnock did not so testify and, since it is the responsible party, this failure precludes the enforceability of such alleged understanding.

25

damages is granted (citations omitted).

As there is no liquidating agreement between the owner and Monadnock, Monadnock simply cannot assert the owner's claims.

**(B)     The Florida Courts Have Stayed Proceedings Between the Owner And Glasswall**

The Panel can take judicial notice of the Order entered by the Florida Court on July 11, 2015 in <u>Kennedy</u> v. <u>Glasswall, LLC, et al.</u> and <u>Glasswall, LLC</u> v. <u>Monadnock Construction, Inc., Westchester Fire Ins. Co., HPS 50th Avenue Associates, LLC [owner of Parcel A], HPS Borden Avenue Associates, LLC [owner of Parcel B], The Related Companies, Inc. and Bruce Beal</u>, 15-6405-CA-40, 14-2090-CA-40, 14-5447-CA-40 (attached hereto as Exhibit A), which stayed all litigation between the owner and Glasswall based upon the owner's motion.  As noted at pages 6 and 7 of this order, the owner (one of the Defendants) argued that "none of the parties will be prejudiced if the three [Florida] cases are stayed while the New York Arbitration proceeds."  Clearly Glasswall will be prejudiced if it is stayed in Florida from pursuing its claims against the owner if the owner is permitted to assert claims against Glasswall in this arbitration. Therefore, to the extent that any of the owner's claims are sought to be asserted in the arbitration, such action would not only violate the Court's stay but also lead to an inequitable result since the owner should not be allowed to assert inconsistent positions - asserting in Florida that Glasswall's claims against it should be stayed while asserting in this arbitration that it can pursue claims against Glasswall.

26

### (C)   There Is No Arbitration Agreement Between the Owner and Glasswall

There is no arbitration agreement between the owner and Glasswall, so that if the owner sought to assert claims it must be do so in Court and not in an arbitration. Indeed, since there is no arbitration agreement between Glasswall and the owner, Glasswall cannot assert any counterclaims against the owner and permitting only the owner to assert claims would violate Glasswall's due process rights.

## 15.   THE CONTRACTS HAVE A CAP FOR DELAY DAMAGES

Section 9.3 of the contract refers to "liquidated damages relating to failure to complete on time." Monadnock's representatives testified that they knew what "liquidated damages for delay" were damages due to a "vendor's failure to perform" (Tr. 55) and its signatory Mr. Colapinto understood that "damages of some sort" were being capped (Tr. 560). Mr. Bauso stated that he understood this to be an amount "specified by the contract for failure to complete by a date specified in the contract" (Tr. 1110). The contract which was negotiated without the assistance of attorneys contained handwritten language capping liquidated damages at $100,000.00 in one contract and $200,000.00 in another (§3.3.1, Exhibits G and H).[17] Glasswall had requested a cap on delay damages

---

[17] A cap on damages is different from a "no damages for delay" clause. But even the latter are enforceable. See, e.g., Kalisch & Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 384,461 N.Y.S.2d 746, 749 (1983): "Such a provision, not uncommon in construction contracts, especially when entered into at arm's length by sophisticated contracting parties, in this case between a large contractor and a large city, are enforceable."

during the negotiations, before the Agreement was signed (Exhibit M), so that

Monadnock well knew what Glasswall was requesting.  As a matter of contract

interpretation, handwritten language is to be given precedence over typed provisions.

See, Home Federal Savings Bank v. Sayegh, 250 App.Div.2d 646, 647, 671 N.Y.S.2d

698:

> It is a fundamental principle of contract interpretation
> that when a handwritten or typewritten provision conflicts
> with the language of a preprinted form document, the former
> will control, "as it is presumed to express the latest intention
> of the parties."

and United States ex rel. AWL Industries, Inc. v. Site Remediation Services Corp., 92

F.Supp.2d 132, 136 (E.D.N.Y. 2000):

> Two other canons of contract interpretation are
> relevant here.  First, a contract should be interpreted so as to
> give meaning to all language used.  Second, handwritten
> portions of an agreement should be interpreted to take
> precedence over any inconsistencies appearing in form
> language.

This is especially appropriate since Glasswall told Monadnock that it "needed" the cap

(Tr. 86).

Contract language is to be interpreted so as to make each clause meaningful, as

recently held in Process America, Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 133 (2d

Cir. 2016):

> In interpreting a contract under New York law, "words and
> phrases ... should be given their plain meaning, and the
> contract should be construed so as to give full meaning and

28

effect to all of its provisions." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks omitted). "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (alterations and internal quotation marks omitted).

See also, Corhill Corp. v. S.D. Plants, Inc., 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3 (1961):

> It is a cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract *** without force and effect'.

and Ruttenberg v. Davidge Data Systems Corp., 215 App.Div.2d 191, 196, 626 N.Y.S.2d 174, 177 (1ˢᵗ Dep't 1995):

> It is a recognized "'rule of construction that a court should not "adopt an interpretation" which will operate to leave a "provision of a contract *** without force and effect"'." An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation (citations omitted).

Here, where the parties did not have attorneys, the only interpretation of the language is to limit delay damages to a total of $300,000.00. The handwritten provision should not be construed to be "meaningless" and "of no significance" as suggested by Bauso (Tr. 1103). Even though he acknowledged that damages caps are "common" (Tr, 1350), Mr. Christensen did not consider them at all in his report (Tr. 1351).

As noted by the Second Circuit, caps on damages are routinely enforced:

> New York courts have routinely enforced liability-limitation provisions when contracted by

29

sophisticated parties, recognizing such clauses as a means of allocating economic risk in the event that a contract is not fully performed. *See, e.g., Biotronik A.G. v. Conor Medsystems Ireland, Ltd.,* 22 N.Y.3d 799, 822, 988 N.Y.S.2d 527, 11 N.E.3d 676 (2014); *Peluso v. Tauscher Cronacher Prof'l Eng'rs, P.C.,* 270 A.D.2d 325, 704 N.Y.S.2d 289, 290 (2000); *Scott v. Palermo,* 233 A.D.2d 869, 649 N.Y.S.2d 289, 290–91 (1996).   Id. at 138.

See also: Wilson Trading Corp. v. David Ferguson,Ltd., 23 N.Y.2d 398, 403, 297

N.Y.S.2d 108, 112 (1968):

> It follows that contractual limitations upon remedies are generally to be enforced unless unconscionable.

and Smith-Hoy v. AMC Property Evaluations, Inc., 52 App.Div.3d 809, 810, 862

N.Y.S.2d 513, 516 (2nd Dep't 2008):

> A clear contractual provision limiting damage is enforceable absent a special relationship between the parties, a statutory prohibition, or an overriding public policy (citations omitted).

In Process America, supra, 839 F.3d at 137, the court enforced a cap which did not have a

per diem measure of damages:

> Section 4.6 of the ISO Agreement provides that:
>
> > Except for the liability arising from gross negligence, recklessness, or willful misconduct, the total cumulative liability of Cynergy Data in the aggregate for damages arising from any breach of this Agreement or for any other claims under this Agreement, shall not exceed ... fees derived by Cynergy Data ... during the last 4 months of this Agreement [which equals $300,818].

30

> J.A. 208. The district court found, and we agree, that
> the plain language of Section 4.6 limits damages for
> Cynergy's breach of contract to $300,818.

See also, Obremski v. Image Bank, Inc., 30 App.Div.3d 1141, 816 N.Y.S.2d 448, 449-50

(1ˢᵗ Dept. 2006): "It is well settled that a contractual limitation on liability is enforceable."

Monadnock understood the significance of the cap, as it attempted to renegotiate its terms

in January of 2014 (Tr. 2155).

### 16.   MONADNOCK'S TERMINATION OF THE GLASSWALL AGREEMENT WAS NOT IN GOOD FAITH

It is clear that Monadnock only terminated the Glasswall agreement because it

wished to assert a bond claim against ACE.

#### (A)   Delay Is Not a Ground for Termination Of the Agreement

Paragraph 7 of the April 4, 2014 Amendment (Exhibit I) clearly states that

Monadnock waived any right to terminate the agreements with respect to events occurring

prior to April 4, 2014:

> Monadnock agrees that it waives any right it may have to
> terminate the Contracts based on events occurring to date.

Bauso acknowledged that Monadnock agreed that it could not purport to terminate the

Agreement based upon events prior to the Amendment (Tr. 1183).

As noted in one of the "WHEREAS" clauses to the Amendment, the Production

Schedules attached to the Amendment "show final window production (including

storefront windows) completed by October 28, 2014." Paragraph 6 of the Amendment

31

stated that "Glasswall will deliver completed window units on a continuous basis to the project as expeditiously as possible consistent with the Production Schedules." It is uncontroverted that Glasswall did in fact deliver what Monadnock characterized as a "constant stream" of windows after the date of the Amendment and that final window production was completed by October 28, 2014 (see also, John Anderson's October 24, 2014 letter advising that the last months' production of windows was on schedule, Exhibit T).[18]

The overwhelming majority of the testimony and evidence adduced during the arbitration related to the issue of Glasswall's delay. However, it is clear that any delay by Glasswall could not support a termination of the Agreements in 2015. Therefore, the only basis for Monadnock to have properly terminated the Agreements is the alleged failure to complete the 30 "punch list" items contained in the March 4, 2015 Notice of Default (Exhibit D). However, Mr. Bauso himself admitted that the total cost of completing these 30 items was in the area of $100,000.00 to $200,000.00: trivial in comparison to the $13 million contract price (Tr. 1150).

Furthermore, Glasswall was never given the opportunity to remedy these 30 items.

_____

[18]   Monadnock took the position that it did not have to pre-pay for the last shipment of windows (see second page of Exhibit T, Mr. Bauso's November 20, 2014 letter), despite the fact that paragraph 10 of the Amendment stated that "before the last month's production is shipped...WFIC will advance payment to Glasswall for the last full months' production." In any event, this dispute is not relevant since the Amendment only required that the windows be completed (not received in New York) by October 28, 2014, which condition was clearly established. In addition, Mr. Colapinto confirmed a "gentlemen's agreement" that Monadnock would accept windows upon production (Tr. 245).

After Mr. Anderson wrote his March 17, 2015 letter advising that Glasswall was "ready, willing and able" to complete these items (Exhibit D), Mr. Bauso told him that he could not speak with him since the matter was in the hands of the lawyers (Id.). Indeed, Monadnock's bad faith in sending the notice of default is manifest by the fact that it was sent the same day as Monadnock commenced this arbitration. It is clear that Monadnock had no intention of having Glasswall complete the alleged deficiencies.

As Monadnock had no basis to terminate the agreements, its wrongful termination is itself a material breach of the Agreements and precludes Monadnock from obtaining any relief in this matter.

### (B)     The Termination Was Untimely

Three months after delivery of the last shipment of windows Monadnock purports to have terminated the agreement – clearly late. In fact, prior to the arbitration Monadnock had never asserted a claim for back-charges (Tr. 2178). A contract cannot be terminated after substantial performance, as explained above.

### (C)     The Items Supporting the Termination Were Merely Punch List Items

The thirty items which supported the alleged termination (Exhibit D, March 4, 2015 letter from Bauso to Glasswall), were clearly punch list items and not material. Mr. Anderson testified that "they could all have been fixed" but Glasswall wasn't given the opportunity to take care of them (Tr. 2200). Monadnock confirmed that the independent expert retained by the bonding company concluded that "they weren't big items" (Tr.

33

615). Bauso testified that the approximate cost to complete all 30 items supporting termination was between $100,000.00 and $200,000.00 (Tr. 1150) – clearly insignificant for a $13 million contract.[19]    In addition, the consultant retained by Ace told Bauso that he considered the 30 items to be punch list items (Tr. 1152) and the bonding company's attorney agreed with this assessment:

> Our review of the asserted deficiencies in Glasswall's performance described in Monadnock's March 4, 2015 letter revealed that the items asserted were essentially punch list items that Glasswall was ready, willing and able to perform and, in some cases, was currently performing.  (Exhibit D, Robert Boote, Esq.'s April 25, 2015 letter to Judah Greenblatt, Esq.)

**(D)   Monadnock Did Not Afford Glasswall With the Opportunity to Remedy the Alleged Defects**

Bauso testified that Glasswall was "in breach when they refused to finish off those other (30) items" (Tr. 1129).  However, upon receipt of the notice of default both the bonding company attorney (Tr. 1133) and Mr. Anderson advised that Glasswall was "ready, willing and able" to complete the work (Exhibit D, March 17, 2015 letter from Anderson to Bauso), but Monadnock refused to have any further dealings with Glasswall (Exhibit D, March 18, 2015 e-mail from Bauso to Anderson).[20]  Mr. Anderson testified that "I can assure you that we would have put together a program to go and accomplish

---

[19]  Monadnock's damages witness Mr. Christensen refused to provide an estimate for completing these 30 items (Tr. 1397).

[20]  Mr. Colapinto's testimony, that "we asked them to come up and do the work" (Tr. 571), is belied by Mr. Bauso's e-mail.

34

the work" had Monadnock taken him up on his offer (Tr. 2301). The independent evaluator retained by the bonding company was also of the opinion that Glasswall was capable of finishing the project (Tr. 2137).

### (E)   Monadnock Had To Terminate The Glasswall Agreement in Order to Pursue a Bond Claim

As testified to by Bauso, Monadnock was advised by its attorneys that it had to terminate the Glasswall agreement in order to pursue a claim against Ace on the bond (Tr. 1167). See also, Exhibit S, 1/11/14 attorney time sheet entry billing for research on the question:

> Can the performance bond cover the damages incurred by the Contractor as a result of the Manufacturer's late delivery of windows ordered by the Contractor if the Owner has never terminated the contract between the Contractor and the Owner ("Construction Contract").

Therefore, it is clear that the termination was only attempted so that Monadnock could sue Ace (which it subsequently did in Federal Court).

### (F)   The Notice of Default Was Sent Simultaneously With The Arbitration Demand

Monadnock sent the notice of default on March 4, 2015 (Exhibit D), the same date as its arbitration demand. Clearly, Monadnock has no intention of permitting Glasswall to remedy the alleged deficiencies.

17.   **THERE WERE NO CRITICAL DELAYS TO THE PROJECT AS A RESULT OF GLASSWALL'S DELIVERY OF WINDOWS**

Monadnock's delays began in October of 2013, when it refused to accept C-channels which had to be installed prior to windows.  While claiming that it needed to proceed as quickly as possible with window installation, Monadnock could not recall why it refused this shipment (Tr. 918).  In addition, although Trovini testified that "we did kind of agree to work with each other to try to get this window wall manufactured and to move on" at an August 2013 meeting at Glasswall's plant, it is undisputed that Monadnock refused to accept delivery of windows until the April 2014 Amendment.  As testified to by Glasswall's expert Mr. Hanifin, who has prepared more than 100 delay damages reports (Tr. 1932), the windows did not become "critical" to the project as a whole until sometime in January of 2014 (Tr. 1644).  Indeed, the project was simply not ready to accommodate window installation in September of 2013 (Tr. 1790).  Mr. Hanifin had to create a CPM schedule based on the original Monadnock schedules which didn't have a critical path (Tr. 1691) due to the fact that Monadnock had none (Tr. 499).  It is clear from both the documentary evidence (Exhibit C) and Anderson's testimony (Tr. 2142) that enough windows were available in November, December and January[21] so that,

_____

[21]  Monadnock's damages witness didn't even know that windows were available for delivery to the site in January and February of 2014 (Tr. 1389-90).  He did not review any of the correspondence between the parties (Tr. 1337), but acknowledged that delays which accrued due to Monadnock's unjustified refusal to accept manufactured windows could not be charged to Glasswall (Tr. 1339).  He also admitted that, if Glasswall had windows for floors 2 to 6 ready to ship in November, the project could have started rolling then (Tr. 1336), and if he were

had Monadnock accepted delivery of windows which were then available there would have been no impact to the critical path of the project as a whole.[22] Mr. Anderson testified that there is "no doubt in my mind" that Glasswall would have manufactured all windows by the end of July 2014 if Monadnock had not interfered with the payment and delivery process (Tr. 2307) based upon actual production runs of Glasswall in January of 2014 (Exhibit CC) showing a nominal pace of 1,100 units in a four week period (Tr. 2164). Even Mr. Colapinto agreed that all of the windows would have been manufactured by the end of July of 2014 if Monadnock had not terminated the agreements in January (Tr. 2390). Therefore, to the extent that there was a seventeen day delay in the "critical path" of the project, as opined by Mr. Hanifin (Tr. 1720), this delay is solely attributable to Monadnock's failure to accept windows which were ready for delivery. As Mr. Hanifin testified, he did not assign any responsibility to Glasswall for this delay because the seventeen day delay damages "could have easily been mitigated had those windows been there in January" (Tr. 1613 and 1721) as they could have if

---

Monadnock he would have begun accepting delivery when 1,000 units had been manufactured (Tr. 1331). Mr. Christensen did not know how much time had elapsed between Glasswall's advising Monadnock that it had windows ready to ship and Monadnock's giving the green light to ship them (Tr. 1327) and did not in any fashion take this delay into consideration when preparing his report (Tr. 1328).

[22] As explained in Morrison Knudsen Corp. v. Fireman's Fund Ins. Co., 175 F.3d 1221, 1222 (10th Cir. 1999): "Critical Path Methodology (CPM) is a term of art for a method of scheduling and administering construction contracts. The Court of Claims has explained that CPM enables contractors performing complex projects to identify a critical path of tasks that must each be completed before work on other tasks can proceed. A delay on the critical path will thus delay the entire project."

37

Monadnock did not refuse to accept delivery.  Mr. Hanifin concluded that:

> if the windows were accepted on the job site in December and January, we would have had no delays as a result of the window activities – any project delay at all, no material delay to the project, had they just been on the site in December and January, when they were ready to ship. (Tr, 1886-87).

See also: the following Hanifin testimony: "There would have been no delays whatsoever related to the window installation at all" if Monadnock had accepted available windows in December (Tr. 1905); and "Had they [the windows] been accepted to the job, there would have been no material critical delays to the project related to the windows at all" (Tr. 1918).

In addition, to the extent that there were any delays to the "critical path" of the project, Monadnock has not supported a claim for damages for these alleged delays. Monadnock's expert Mr. Christensen's report was not a "critical path method" but a "total time" report, which is improper because it does not consider what other delays the project experienced (Tr. 1751-52).[23]  In fact, he admitted that he did not create a critical

---

[23]   Mr. Hanifin explained the deficiencies with Mr. Christensen's report as follows:

> "Well, there is no – there was no analysis of the CPM schedule in Mr. Christensen's report.  And there was no analysis other than comparing dates in the original schedule to the actual delivery date.
>
> So there was no real analysis of a critical path method schedule.
>
> * * *
>
> he [Christensen] compared the original delivery date that is

path in his report, even though he acknowledged that critical path scheduling was "typically the one you would use" (Tr. 1313) and the preferred method of preparing a report (Tr. 1386-88). Mr. Christensen only looked at dates in the original contract (which Bauso admitted did not have a substantial completion date, Tr. 1111) and delivery dates and attributed all of the delays to Glasswall (indeed, he attributed all of the broken glass to Glasswall despite the fact that Colapinto testified that "some broke in transit" and "some was broke on the job site, which is fully our responsibility" (Tr. 282-83) and Bauso testified that "I am sure there was a dozen to two dozen pieces of glass that had to be broken on-site by people other than Glasswall" (Tr. 1162)[24] and Ecker admittedly broke a number of windows upon installation (Tr. 624). The $715,000.00 damage claim attributed to windows relates to "damage to broken or incorrect installed glass" (Tr. 349) - even though it is undisputed that Glasswall had no installation responsibilities. Mr.

---

> contained in the original project schedule and never took into consideration that a project schedule evolves during the course of the project.
>
> The critical path on a project can evolve with the project and change.
>
> So using a base-line schedule, three months in, four months in, five months in, without updating it to consider what was actually happening on the job, and looking at the project on a path-forward basis, the old schedule becomes outdated pretty quickly. It's not really an accurate measure." (Tr. 1588-90).

[24] Yet, Monadnock is charging all broken glass to Glasswall (Tr. 625), despite the fact that IBA inspected the windows when they left Miami and again when they arrived in New York (Tr. 472).

Christensen attributed all delays to Glasswall, even though PAL (an Ecker subcontractor) was by Monadnock's own testimony "way behind, terribly behind" schedule (Tr. 874, Exhibit O). He also never considered the fact that the dates in the original contract had been modified twice by Monadnock (before the delivery of windows was required[25] and again in the April 4, 2014 amendment). He did not even consider the production schedules in the amendment (Tr. 1353). He also did not consider the fact that as early as May of 2013, a project completion date of mid-2015 was anticipated (Exhibit N). The Christensen report was a "total time" report (Tr. 1751-52) which is not generally accepted in assessing project delay damages, as explained by Mr. Hanifin, who taught CPM and construction at Columbia University (Tr. 1427). This was only the first delay damages report he prepared for his company (Tr. 1258) (as opposed to Hanifin, who prepared about a hundred of such reports, Tr. 1428) and the first time he testified as an expert (Tr. 1258) (as opposed to Mr. Hanifin, who has testified as an expert witness in CPM scheduling 30 to 50 times (Tr. 1429). Indeed, Mr. Christensen's head in the sand analysis, coupled with his failure to disclose his prior relationship with Related (Tr. 1378-79), raises serious questions of bias.

## 18.   **THE BUDD MISSING PIECE TO THE PUZZLE**

During the hearings a perplexing issue arose: why didn't Monadnock (which claimed to desperately need windows) refuse to accept the more than 1,000 windows

---

[25]   Mr. Colapinto testified that the Parcel A date was extended to October 1st (Tr. 149) and the Parcel B date to September 15th (Tr. 149).

which Glasswall had manufactured in or about November or December of 2013? This just didn't seem to make sense, as Monadnock was claiming that it desperately needed windows and Glasswall was anxious to begin delivery of the units. The answer to this question was provided by the testimony of Michael Budd, who Glasswall submits was at that exact time surreptitiously in the process of setting up a competing curtain wall business with Related as his partner.

In 2013 Mr. Budd was the President of a company called Tesla, which was engaged in the curtain wall business. Tesla's sole customer was Related (Tr. 2067). Mr. Budd was introduced to Glasswall as a representative of Related (not Tesla) (Tr. 2205 and Exhibit Z). Tesla was a competitor of Glasswall (Tr. 2070). Unbeknown to Glasswall, Budd had recommended Steve Barber as Monadnock's and Related's in-house "spy" at the Glasswall plant (Tr. 2062-63), and in fact Barber is so close to Budd that Barber is now an employee of Budd's company New Hudson Facades (Tr. 2061)[26], which is also engaged in the of curtain wall business (Tr. 2059). Budd is a 10% owner of New Hudson Facades, and the majority owner is Related Companies (one of the owners of the Hudson Yards project) (Tr. 2060), which in turn owns Monadnock (Exhibit L). Related is the sole customer of New Hudson Facades (Tr. 2094). Budd was intimately involved with the Hunters Point Project, having visited both the site (Tr. 2073) and Glasswall's Miami plant twice (Tr. 2071).

---

[26] Mr. Barber did not acknowledge his association with Related during his testimony.

41

Tesla sued Budd in Federal Court, claiming that he improperly participated in the planning, purchase, staffing and operation of a competing facade business (i.e., New Hudson Facades), and the jury entered a verdict of $14.5 million against him (Tr. 2074-75). Budd testified that, while he was employed by Tesla as its President, he met on several occasions with various Related senior officials, beginning as early as the end of July 2013 (Tr. 2086-88). In or about September of 2013, when Budd was becoming involved with the Glasswall project, Related terminated its business relationship with Tesla (Tr. 2096) and Related starting putting together a list of projects for Budd to work on (Tr. 2097). Budd was not sure if Hunters Point was one of the projects on this list (Id.). Budd testified that he started looking for employment at Related in the beginning of December 2013 (Tr. 2099) and came to New York at Related's expense to interview with Mr. Trovini that month (Tr. 2101). Mr. Budd sent Trovini a business proposal involving curtain wall projects in December 2013 (Tr. 2102). In January of 2014, when Monadnock sent a termination letter to Glasswall, Budd (while still President of Tesla) was negotiating the terms of his employment agreement with Trovini (Tr. 2106).

As opined by Mr. Anderson, it is Glasswall's belief that the reason why Monadnock refused to accept windows at the end of 2013 and the beginning of 2014 was that Monadnock and Related were trying to put Glasswall in default by not paying Glasswall for windows it had manufactured and was continuing to manufacture.[27] If

---

[27] Glasswall owner Mr. Colombo continued to fund the project at a time when it is submitted that most owners of a business would have walked away from the project.

Glasswall stopped manufacturing windows the bonding company would have taken over the job. Monadnock and Related would have collected on the bond and then turned the business over to New Hudson Facades, the company it was forming with Mr. Budd. Perhaps New Hudson Facades would even have purchased the Glasswall-manufactured windows at a steep discount, thereby increasing Related's windfall. As Mr. Anderson testified:

> **Q.** Do you have any belief as to what Monadnock was trying to accomplish by not paying Glasswall?
>
> **A.** I have a belief about it.
>
> **Q.** What is it?
>
> **A.** That by not paying us, we would stop, and that would put the project further into default or further their default plan, and then act on the bond. (Tr. 2169-70)
>
> \* \* \*
>
> **A.** I believe that there was an ongoing action to have the bonding company act on the bond and take over the contract, and produce the job either away from Glasswall or under different management. (Tr. 2209).

Monadnock/Related's fraudulent scheme was negated when Glasswall continued to manufacture windows in spite of the fact that it was not being paid for the windows it was manufacturing and the bonding company took the position that Glasswall was fully capable of completing the project. Monadnock was therefore forced to proceed with Glasswall. The greed of Monadnock and Related explains why Monadnock refused to

43

accept manufactured windows at the end of 2013, and in equity Monadnock should not be allowed to utilize its fraudulent intent to the detriment of Glasswall.

## **CONCLUSION**

For the foregoing reasons, respondent Glasswall, LLC respectfully requests that an award be entered in its favor, denying Monadnock any damages.

Respectfully submitted,

CINQUE & CINQUE, P. C.

By: _James P. Cinque_

James P. Cinque
Attorneys for Respondent
Glasswall, LLC
845 Third Avenue, Suite 1400
New York, New York 10022
Telephone: 212-759-5515
Telefax:   212-759-7737
Email:    CINQUE845@aol.com

44

**EXHIBIT "A"**

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR MIAMI-DADE COUNTY,
FLORIDA

COMPLEX BUSINESS LITIGATION
DIVISION

SARA JAYNE KENNEDY,

      Plaintiff,

v.

GLASSWALL, LLC, MONADNOCK
CONSTRUCTION, INC., WESTCHESTER FIRE
INSURANCE COMPANY, HPS 50TH AVENUE
ASSOCIATES, LLC, HPS BORDEN AVENUE
ASSOCIATES, LLC, THE RELATED COMPANIES,
INC., and BRUCE BEAL,

      Defendants.

_____/

GLASSWALL, LLC,

      Cross-Plaintiff,

v.

MONADNOCK CONSTRUCTION, INC.,
WESTCHESTER FIRE INSURANCE COMPANY,
HPS 50TH AVENUE ASSOCIATES, LLC, HPS
BORDEN AVENUE ASSOCIATES, LLC, THE
RELATED COMPANIES, INC., and BRUCE BEAL,

      Cross-Defendants.

_____/

CASE NO.: 15-6405-CA-40
14-2090-CA-40
14-5447-CA-40

## ORDER GRANTING DEFENDANTS/CROSS-DEFENDANTS' MOTION TO STAY CASES PENDING CONCLUSION OF THE NEW YORK ARBITRATION

    This matter came before the Court on July 7, 2015 at 1:30 p.m. for hearing on

Defendants/Cross-Defendants Monadnock Construction, Inc. ("Monadnock"), HPS 50th Avenue

Associates, LLC ("HPS 50th"), HPS Borden Avenue Associates, LLC ("HPS Borden"), The

Related Companies, Inc. ("Related"), and Bruce Beal ("Beal", collectively, "Defendants") Motion to Stay Cases Pending Conclusion of the New York Arbitration ("Motion to Stay"), to which Defendant/Cross-Plaintiff Glasswall, LLC ("Glasswall"), Plaintiff Sara Jayne Kennedy ("Kennedy"), and Plaintiff Ugo Colombo ("Colombo") filed Responses in opposition, and Defendants filed a Reply. Having reviewed the record, the Motion to Stay, the Responses, the Reply, the relevant authorities, and considered the arguments of counsel during the hearing, it is hereby **ORDERED AND ADJUDGED** that the Motion to Stay is **GRANTED**.

## I.     <u>INTRODUCTION</u>

On January 3, 2013, Monadnock (a Florida-based manufacturer of impact-resistant windows and door systems) and Glasswall (a New York-based construction company) entered into AIA-modified contracts[1] ("Contracts") under which Glasswall agreed to produce and deliver approximately 9,300 windows, doors, and other materials (collectively, the "Windows") to two high-rise affordable development projects in New York City (the "Projects") for which Monadnock is the construction manager.

On March 4, 2015, as a result of Glasswall's alleged failures to perform under the Contracts, Monadnock instituted an arbitration proceeding with the American Arbitration Association ("AAA") in New York against Glasswall, seeking damages for its alleged breaches ("New York Arbitration"). Monadnock subsequently moved to stay the proceedings in this

---

[1] "AIA" stands for The American Institute of Architects. AIA contracts are "commonly used in the construction industry." *Higley S., Inc. v. Park Shore Dev. Co.*, 494 So. 2d 227, 228 (Fla. 2d DCA 1986); *see Lake Plumbing, Inc. v. Seabreeze Constr. Corp.*, 493 So. 2d 1100, 1102 (Fla. 2d DCA 1986) ("Arbitration is especially appropriate in situations involving issues that are unique to certain industries and which require specialized knowledge for their resolution. We believe the construction industry is such an industry and that the industry has heeded this intent by its adoption of the 'Standard AIA Contract.'").

Court pending the conclusion of the New York Arbitration.[2]  Glasswall argues that despite agreed-upon arbitration provisions in the Contracts, the New York Arbitration should not go forward and the Motion to Stay should be denied because this Court, not arbitrators, must decide issues of arbitrability.  As discussed below, the Contracts require, and the law is clear, that issues of arbitrability are to be decided by the arbitrators, and not this Court.  A stay of the proceedings is appropriate pending conclusion of the New York Arbitration.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Three Cases And The Relevant Parties

This consolidated action stems from Glasswall's alleged failures to perform under the Contracts.  As outlined below, the parties filed four lawsuits, one of which was voluntarily dismissed.[3]

On January 14, 2014, Kennedy filed suit (Case No. 14-2090) against Glasswall, Westchester Fire Insurance Company ("WFIC"),[4] Monadnock, HPS 50th, and HPS Borden for declaratory relief seeking to have the Court declare her rights vis-à-vis her obligations under the surety Bonds—that the Contracts between Monadnock and Glasswall were wrongfully terminated by Monadnock in January 2014 and Monadnock's demand under the Bonds was improper.[5]  "Friendly" defendant Glasswall cross-claimed against HPS 50th, HPS Borden and

---

[2]  On May 12, 2015, this Court entered an Order denying Glasswall's motion to temporarily enjoin/stay an ongoing arbitration proceeding in New York.  Glasswall appealed that Order to the Third District Court of Appeal, which it denied.  The Court's May 12, 2015 Order contains certain findings of fact and conclusions of law that are relevant to the instant Order.

[3] On March 13, 2015, Glasswall filed suit (Case No. 15-6017) against Monadnock.  Glasswall voluntarily dismissed this suit on April 9, 2015.

[4] WFIC, the surety, issued payment and performance bonds ("Bonds") for the Contracts.

[5] Kennedy is not a party to the Contracts.

3

Monadnock for declaratory relief, breach of contract and tortious interference with the Contracts.[6]

On February 28, 2014, Colombo filed suit (Case No. 14-5447) against Glasswall, HPS 50th, HPS Borden, Monadnock, Beal, Related, and WFIC for declaratory relief and tortious interference with the Contracts.[7]   Colombo's claims are substantially similar to Kennedy's claims in her January 2014 suit.

On March 18, 2015, Kennedy filed a second suit (Case No. 15-6405) for declaratory relief and tortious interference against Glasswall, Monadnock, HPS 50th, HPS Borden, Beal, Related, and WFIC.  This suit seeks to stop the New York Arbitration and have all the pending claims heard before this Court, and alleges that HPS 50th, HPS Borden, Beal, and Related tortiously interfered with the Contracts between Monadnock and Glasswall by requiring a default and termination of the Contracts and demanding arbitration.

On May 8, 2015, Glasswall filed cross-claims in Case No. 15-6405 against Monadnock, HPS 50th, HPS Borden, Beal, Related, and WFIC for declaratory relief (ultimately to enjoin the New York Arbitration), tortious interference with the Contracts, and civil conspiracy based on the underlying tort of tortious interference with the Contracts.

On May 19, 2015, the three cases were transferred to the Complex Business Litigation Division.  On June 5, 2015, Defendants filed their Motion to Stay.  On June 8, 2015, the three cases were consolidated for all purposes.  On July 7, 2015 this hearing was conducted.

---

[6] The Court notes that Kennedy is Colombo's wife.  Colombo was the owner of Glasswall during the relevant time periods, and Colombo and Kennedy are indemnitors and guarantors on the surety Bonds that Glasswall was required to secure for the Contracts with Monadnock.

[7] Beal is a vice-president of Related.  The claims are against Beal individually.

4

This Court previously denied Kennedy and Glasswall's emergency motion to enjoin the New York Arbitration.  Glasswall appealed that Order to the Third District Court of Appeal, which also denied a stay of the New York Arbitration pending determination of its appeal.  All Defendants filed motions to dismiss for lack of personal jurisdiction except for Related and WFIC, which filed motions to dismiss for other reasons.[8]  Nothing of any substance has occurred and no discovery has been concluded in any of the cases.  Arbitration has not been waived.

### B.      The Construction Contracts

It is undisputed that the Contracts were entered into between Glasswall and Monadnock and binding arbitration provisions were included.  Section 6.1.1 of the Contracts contains identical binding arbitration provisions: "Any claim arising out of or related to this Subcontract, except claims as otherwise provided in Section 4.1.5 and except those waived in this Subcontract, shall be subject to mediation as a condition precedent to binding dispute resolution." Section 4.1.5 provides Monadnock and the Projects' architect with the unquestioned authority to reject Glasswall's work based upon aesthetic considerations without any review.  Section 6.2 provides that if any claim is not resolved in mediation, the parties are to be bound by arbitration proceedings in accordance with Section 6.3 of the method to resolve the claims.  Section 6.3.1 provides that dispute resolution shall be in the place where the Projects are located (New York City), unless another location is mutually agreed upon:

> If the Contractor [Monadnock] and Manufacturer [Glasswall] have selected arbitration as the method of binding dispute resolution in Section 6.2, any claim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, *shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of the Agreement.* (emphasis added).

---

[8] Related's motion to dismiss is for failure to state a cause of action based on the premise that one cannot interfere with their own contract as a related party.  WFIC filed a motion to dismiss for improper venue.

### C.     The New York Arbitration And Monadnock's Claims

On March 4, 2015, Monadnock instituted the New York Arbitration with the AAA against Glasswall, seeking damages for its alleged breaches. In its Statement of Claim, Monadnock seeks damages from Glasswall for breaching the Contracts on the following matters (collectively, "Monadnock's Claims"):

(a)     Glasswall has still not completed the Work;

(b)     Glasswall has not corrected defective Work;

(c)     Glasswall has not provided documentation required under the Contracts, as amended, including but not limited to warranties, LEED documentation, material certifications, and final lien waivers by Glasswall and its suppliers;

(d)     Glasswall delayed its performance of its Work thereby causing delays and increased costs to other contractors whom Monadnock has and/or will reimburse;

(e)     Glasswall delayed in performance of its Work thereby causing delays and increased costs to Monadnock;

(e)     Glasswall has failed to pay all its suppliers for materials used to fabricate the Work and for shipment of same to the Projects; and

(f)     Glasswall has ceased operations and it will not be able to fulfill its warranty obligations.

Today, the New York Arbitration is ongoing.

### D.     Defendants' Motion to Stay

Defendants' Motion to Stay argues that the three cases should be stayed because they involve the same construction Projects, parties, Contracts, surety Bonds, and New York Arbitration.  Defendants further argue that the three cases seek to have the Court decide the same core issues that are either pending before the New York Arbitration or are so intricately involved (inextricably intertwined) in that proceeding that any Court action would risk inconsistent determinations.  In other words, Defendants argue that the parties' core disputes can and should be decided in the New York Arbitration, whose outcome will be determinative of most, if not all, of the issues pending before this Court in the three cases.  Finally, Defendants argue that none of

6

the parties will be prejudiced if the three cases are stayed while the New York Arbitration proceeds.

Glasswall opposes the Motion to Stay on the grounds that the Court has not yet made a merits determination that Glasswall must arbitrate the claims raised in the New York Arbitration. In this regard, Glasswall argues that before it can be "forced" to arbitrate, the Court must first determine who should determine issues of arbitrability (the Court or the arbitrator), and second, if the Court determines it should determine issues of arbitrability, the Court must determine which claims are subject to arbitration. Glasswall also argues its claims of tortious interference (against Related and Beal) and civil conspiracy (against Defendants and WFIC) are independent of, will not be resolved by, and are beyond the scope of the New York Arbitration and involve parties that are not signatories to the Contracts. Finally, Glasswall argues the Court must resolve its declaratory relief claim against Monadnock prior to ruling on the Motion to Stay.

Kennedy opposes the Motion to Stay on the grounds that her claims (against HPS 50th, HPS Borden, Beal, and Related) cannot be resolved by the New York Arbitration. Colombo filed a notice of joinder with Kennedy's Response to the Motion to Stay wherein he adopted and incorporated the arguments set forth in Kennedy's Response as his own.[9]

### III.  ANALYSIS

#### A.  Material Facts Not In Dispute

The following material facts are not in dispute: (i) Glasswall and Monadnock executed the Contracts, which include binding arbitration provisions incorporating the AAA and the Construction AAA Rules; and (ii) the Contracts call for the design and production of Windows in Florida for delivery to the Projects in New York.

---

[9] No party has alleged any other defenses to arbitration, such as unconscionability, duress, or coercion.

7

**B.      Applicable Legal Principles**

Both sides agree that the Federal Arbitration Act ("FAA") applies to the construction Contracts.  The FAA "provides for the enforceability of '[a] written provision in . . . a contract evidencing a transaction involving commerce . . . .'" *Rewards Hotel Mgmt. Co. v. Elite Gen. Contractors, Inc.*, 860 So. 2d 1011, 1013 (Fla. 3d DCA 2003) (quoting 9 U.S.C. § 2).  This provision of the FAA represents "'a congressional declaration of a liberal federal policy favoring arbitration agreements.'" *Davis v. S. Energy Homes, Inc.*, 305 F.3d 1268, 1273 (11th Cir. 2002) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  As such, "upon being satisfied that the issue involved . . . is referable to arbitration under such an agreement, [the Court] shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ."  9 U.S.C. § 3. This Court treats the Motion to Stay as a section 3 application to stay.

The FAA "applies if the transaction involves 'interstate commerce, even if the parties did not contemplate an interstate commerce connection.'" *Rewards Hotel Mgmt. Co.*, 860 So. 2d at 1013 (quoting *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 277 (1995)).  The FAA requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24-25.

The Construction Industry Arbitration Rules of the AAA, effective as of October 1, 2009 ("Construction AAA Rules") and incorporated into the Contracts, state as follows regarding jurisdiction:

R-9. Jurisdiction

(a)    *The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.*

(b)   ***The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part.***   Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract.  A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

(c)   A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection.  The arbitrator may rule on such objections as a preliminary matter or as part of the final award.  (emphasis added).

In *Terminix Int'l Co. v. Palmer Ranch Ltd.*, 432 F.3d 1327 (11th Cir. 2005), the court

ruled that the AAA rules referenced in the parties' arbitration agreement meant that the parties

"clearly and unmistakably" agreed that the arbitrator should decide issues of arbitrability:

Here, we are able to avoid the usual process [of answering the question of arbitrability] for a different reason:  the parties have agreed that the arbitrator will answer this question by providing (in all three of the arbitration clauses at issue) that "arbitration shall be conducted in accordance with the Commercial Arbitration Rules then in force of the American Arbitration Association" (AAA).  ***AAA Rule 8(a), in turn, provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."***  By incorporating the AAA Rules, including Rule 8, into their agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid.

*Id.* at 1332 (emphasis added).  Rule 8(a) of the Commercial AAA rules applied in *Terminix*,

which is identical to Rule 9(a) of the Construction AAA Rules in this case.

Similarly, in *Brandon, Jones, et al. v. MedPartners, Inc.*, 203 F.R.D. 677, 683-84 (S.D.

Fla. 2001), the court found that the AAA rules incorporated into the parties' contract provided

for the arbitrator to decide arbitrability.  That court, interpreting the identical AAA rules,

concluded that "these facts provide clear and unmistakable evidence that the parties agreed to

arbitrate arbitrability.  Under Rules 1 and 8, the Arbitrators have the authority over arbitrability

determinations and other jurisdictional questions." *Id.* at 685; *see Younessi v. Recovery Racing,*

*LLC*, 88 So. 3d 364, 365 (Fla. 4th DCA 2012) ("[W]here language of the contract clearly

indicates that AAA rules govern, they are expressly incorporated into the contract. The contract expressly stated that any dispute arising from it was to be arbitrated under AAA rules."). Therefore, Florida federal and state courts have found that incorporation of the AAA rules into a contract evinces a clear and unmistakable intent for an arbitrator to decide arbitrability.

### C.    The FAA And Who Should Consider Issues Of Arbitrability

It is well-settled law in Florida that "[i]f the court finds that there is an enforceable agreement to arbitrate, it shall order the parties to arbitrate." Fla. Stat. § 682.03(2). Our Third District Court of Appeal has recognized that "under Florida law a trial court has broad discretion to order stays in proceedings before it." *Wilcox v. Hotelerama Assocs., Ltd.*, 19 So. 2d 444, 446 (Fla. 3d DCA 1993); *see Hessen v. Schemmel*, No. 3D15-262 (Fla. 3d DCA April 29, 2015) (directing a trial court to stay court proceedings before it pending arbitration).

There is no dispute that the Contracts affect and involve interstate commerce—they concern the design and production of Windows in Florida for delivery to the Projects in New York. Therefore, the FAA applies to the Contracts' arbitration provisions. *See Jensen v. Rice*, 809 So. 2d 895, 899 (Fla. 3d DCA 2002) ("[W]e find the employment agreement is covered within the provisions of the [FAA], given the interstate business involved."); *see Default Proof Credit Card Sys., Inc. v. Friedland*, 992 So. 2d 442, 444 (Fla. 3d DCA 2008) (when contracts involve interstate commerce, agreements to arbitrate are enforceable in Florida under the FAA).

The Court must next consider whether the Contracts' arbitration provisions delegate the authority to determine issues of arbitrability to the Court or arbitrators. "Generally, arbitrability is a question for the trial court—and not the arbitrator—unless the parties 'clearly and unmistakably' provide otherwise." *Bhim v. Rent-A-Center, Inc.*, 655 F. Supp. 2d 1307, 1310 (S.D. Fla. 2009) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *see Rent-A-Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2777 (2010) (stating that "parties can agree

10

to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy"). However, when parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator. *Terminix*, 432 F.3d at 1332 (holding that the incorporation of the AAA rules into an arbitration provision serves as clear and unmistakable evidence that the parties agreed an arbitrator would decide gateway determinations).

Here, the Court finds that it need not look past the language of the Contracts to find clear and unmistakable evidence of the parties' intent to delegate the issue of arbitrability of the claims to the arbitration panel. *See 24 Go Wireless, Inc. v. AT&T Mobility II, LLC*, No. 11-CV-20930-MORENO, 2011 U.S. Dist. LEXIS 70817, at *2 (S.D. Fla. June 29, 2011) (stating that "the parties clearly and unmistakably agreed to submit that issue to arbitration as well by expressly incorporating the rules of the American Arbitration Association ("AAA") into the arbitration provision of their Agreement"); *Mercury Telco Group, Inc. v. Empresa De Telecommunicaciones De Bogota S.A.E.S.P.*, 670 F. Supp. 2d 1350, 1354-55 (S.D. Fla. 2009) (finding "clear and unmistakable evidence of the parties' intent to delegate the issue of arbitrability of the claims to an arbitrator" based on the incorporation of certain arbitration rules).

Glasswall and Monadnock explicitly incorporated the Construction AAA Rules into the arbitration provisions of the Contracts. These rules delegate the issue of arbitrability of a dispute to the arbitrator. To illustrate, the Construction AAA Rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." Construction AAA Rule 9(a). Accordingly, any argument as to issues of arbitrability, the scope of the arbitration agreement, as

well as all of Glasswall's challenges to the jurisdiction of the arbitrators, must be presented to the arbitrators. *See Mercedes Homes, Inc. v. Colon*, 966 So. 2d 10, 14 (Fla. 5th DCA 2007) (holding that the "trial court erred in deciding the scope of the instant arbitration argument because the parties had vested the authority to make that decision in the arbitrator"). The Court therefore finds that Glasswall and Monadnock "clearly and unmistakably" agreed that issues of arbitrability should be decided in the New York Arbitration.

## D.   Glasswall Can Preserve Its Objection To And Participate In Arbitration

Apart from who should determine issues of arbitrability, Glasswall is also concerned that it will be prejudiced should it participate in the New York Arbitration as it will be deemed to have waived any objection to arbitration. Glasswall's concern is not supported by law. In fact, contrary to Glasswall's position, a party does not waive its right to have the issue of arbitrability decided by a court after the conclusion of an arbitration, provided that the party has timely objected to the jurisdiction of the arbitrators to decide such issue. *See First Options*, 514 U.S. at 946-47. Accordingly, a party may address the issue of the arbitrator's jurisdiction during the arbitration on the merits, without risk of waiver, provided it has also objected to the arbitrator's authority to decide such issue. *Id.*[10] Notably, Florida's Fifth District Court of Appeal's recent

---

[10] Decisions of multiple federal circuit courts of appeal are in accord. *See, e.g., China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 291-92 (3d Cir. 2003) (finding no waiver where a party "consistently objected to [arbitrator's] jurisdiction throughout the proceedings"); *Opals on Ice Lingerie, Designs by Bernadette, Inc. v. Bodylines Inc.*, 320 F.3d 362, 368 (2d Cir. 2003) (finding no waiver where a party "objected repeatedly to arbitration"); *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 9 n.10 (1st Cir. 2000) (finding no waiver where a party "consistently and vigorously maintained its objection to the scope of arbitration"); *AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir. 2000) (finding no waiver where a party "carefully and explicitly, in unambiguous language", preserved its objection to arbitrability); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 846 (6th Cir. 2003) (finding no waiver where a party "never submitted or acquiesced in the submission of the issue" to the arbitration panel).

decision in *Grant v. Rotolante*, 147 So. 3d 128 (Fla. 5th DCA 2014), discusses a party's ability to preserve its objection to arbitrability all while participating in an arbitration under the FAA:

> Under the FAA, in determining the threshold issue of arbitrability, courts consider whether the party opposing confirmation objected throughout the arbitration proceeding. *See, e.g., Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286, 1294 (11th Cir. 2004); *Avis Rent A Car Sys. v. Garage Emps. Union*, 791 F.2d 22, 26 (2d Cir. 1986). In *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1510 (3d Cir. 1994), the Third Circuit held that **"where a party objects to arbitrability but nevertheless voluntarily participates in the arbitration proceedings, waiver of the challenge to arbitral jurisdiction will not be inferred."** In that case, after the arbitrator rejected the plaintiffs' objection to arbitration, they participated in the arbitration on the merits and lost. In affirming, the United States Supreme Court concluded that since the plaintiffs had "forcefully object[ed] to the arbitrators deciding their dispute," they had not clearly agreed to submit the issue of arbitrability to arbitration.

*Id.* at 131-32 (emphasis added); *see Shank/Balfour Beatty v. IBEW Local 99*, 497 F.3d 83, 90 n.2 (1st Cir. 2007) (determining that appellant "did not waive its right to challenge arbitrability by participating in the hearing on the merits after it raised the arbitrability issues before the arbitrator and the arbitrator ruled against [the appellant]"). Therefore, Glasswall's argument— that if it participates in arbitration it will be deemed to have waived any objections to the arbitrability of the underlying claims—is contrary to established law. *See, e.g., Kaplan*, 19 F.3d 1503, 1510 (3d Cir. 1994) ("where a party objects to arbitrability but nevertheless voluntarily participates in the arbitration proceedings, waiver of the challenge to arbitral jurisdiction will not be inferred").

In summary, Glasswall's concern that it will be prejudiced and irreparably harmed if the New York Arbitration moves forward is misplaced because it can preserve its objection to arbitrability all while participating in that proceeding.

13

### E.  The New York Arbitration May Affect The Non-Contractual Claims

A stay is also appropriate here because "it cannot be said that 'resolution of the arbitrable claims will have no effect' on the pending litigation." *Shores of Pan., Inc. v. Safeco Inc. Co. of Am.*, No. 07-00602-KD-B, 2008 U.S. Dist. LEXIS 75956, at *13 (S.D. Ala. Sept. 29, 2008) (quoting *Am. Int'l Group, Inc. v. Cornerstone Bus., Inc.*, 872 So. 2d 333, 338 (Fla. 2d DCA 2004)); *see Okeelanta Corp. v. United States Sugar Corp.*, 712 So. 2d 814, 815 (Fla. 2d DCA 1998) (reversing a trial court's decision and directing it to enter an order staying the litigation until the conclusion of an arbitration proceeding, noting that "[w]hile this court makes no determination regarding the effect the arbitration decision might have on the litigation, it cannot be said that the resolution of the arbitrable claims will have no effect on the claims pending in court") (citing *Sabates v. Int'l Med. Ctrs., Inc.*, 450 So. 2d 514, 519 (Fla. 3d DCA 1984)); *see also Cornerstone*, 872 So. 2d at 338 (finding the trial court erred by denying a motion to stay pending arbitration where the claims involving third-parties "reasonably and logically derive from [the party's] ostensibly arbitrable claim"; noting that "[w]here the claims involving a third party are based on the same operative facts and are inherently inseparable from the claims subject to arbitration, the third party is entitled to a stay of proceedings pending arbitration even though it is not a signatory to the arbitration agreement") (citation omitted).

The New York Arbitration will resolve the specific issues between Monadnock and Glasswall and will determine the core issues of the claims filed by Kennedy and Colombo as indemnitors and guarantors on the Bonds that were obtained to insure Glasswall's performance under the Contracts.  The gravamen of Kennedy's and Colombo's claims are that Monadnock improperly terminated or defaulted Glasswall under the Contracts or waived its right to arbitrate and therefore the surety has no obligation, and, in turn the indemnitors/guarantors of the Bonds have no liability.  Whether Monadnock properly terminated or sought defaults under the

14

Contracts or has a right to bring the claims in arbitration will all be decided by the arbitrators in the New York Arbitration.  The outcome of that proceeding will likely determine whether Kennedy and Colombo as indemnitors/guarantors have any potential liability.  If Glasswall prevails on its claim of improper termination or otherwise prevails in the New York Arbitration, the surety and its indemnitors/guarantors will have no liability.  Simply put, there is no viable way that these issues are distinguishable from the claims before the New York Arbitration, nor would attempting to do so make any practical sense.[11]

In summary, while the New York Arbitration may not resolve every claim raised before this Court, that proceeding will decide all of Glasswall's objections and may resolve or greatly impact the remaining claims of Kennedy and Colombo. *See Shores of Pan., Inc.*, 2008 U.S. Dist. LEXIS at *37 ("Tort claims and other non-contract claims, however, are not automatically excluded from a contractual arbitration clause, where the claims are intimately founded in and intertwined with the obligations in the contract.") (quotations omitted).  A stay is especially appropriate in this instance where continuing the litigation would undermine the New York Arbitration. *See Id.* at *21 ("the court may stay litigation pending arbitration where the litigation would undermine the arbitration and thwart federal policy in favor of arbitration").  Accordingly, no party will be prejudiced if the litigation is stayed while the New York Arbitration proceeds.  However, if these cases proceed, the Court is likely to undermine the New York Arbitration or at least risk inconsistent decisions.

---

[11]  In fact, Kennedy's Response to the Motion to Stay, to which Colombo joined, acknowledges that "[w]hile Monadnock's arbitration demand is only against Glasswall, **the issues raised in the arbitration demand clearly affect the substantive rights and interests of** [Kennedy]." Kennedy's Response at p.4 (emphasis added).

**F.    The Court Need Not Rule On Glasswall's Declaratory Relief Claim Against Monadnock Prior To Staying The Litigation**

Glasswall's contention that this Court must decide its declaratory relief claim against Monadnock before it can grant Defendant's Motion to Stay is contrary to federal law.[12]  The parties do not dispute that this matter is subject to the FAA and relevant federal case law.  9 U.S.C. § 1 *et seq.*  And neither the FAA nor relevant case law require a court to determine the arbitrability of a claim before it can order a stay of proceedings pending an arbitration.

A court's power to grant a stay under section 3 of the FAA is not conditioned on its power to compel arbitration under section 4 of the FAA.  *Shanferoke Coal & Supply Corp. v. Westchester Serv. Corp.*, 293 U.S. 449, 453 (1935) ("[T]here is no reason to imply that the power to grant a stay is conditioned upon the existence of power to compel arbitration in accordance with section 4 of the act."), *overruled on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 287 (1988); *Midwest Mech. Contractors, Inc. v. Commonwealth Constr. Co.*, 801 F.2d 748, 751 (5th Cir. 1986) ("[W]e hold that a motion to compel arbitration under section 4 is not a prerequisite to raising the issue of arbitrability under section 3"); *B-S Steel of Kan. v. Tex. Indus.*, 321 F. Supp. 2d 1214 (D. Kan. 2004) ("[T]he power to stay is not conditioned on the power to compel arbitration under § 4 of the FAA."); *Sanders v. Kave Enters., LLC*, No. 3:07-CV-123(CDL), 2008 U.S. Dist. LEXIS 6835, at *6 (M.D. Ga. Jan. 30, 2008) ("The FAA also permits a court to grant a motion for stay even if it does not have the authority to compel the arbitration.").

---

[12]  Because the FAA applies in this case, the Court construes federal law in resolving the Motion to Stay.  *See Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1033 (11th Cir. 2003) ("[W]hether a court or arbitrator is to decide particular issues is not a question of contract law, but is instead governed by the FAA; it is a federal law issue to be decided under the 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA].'" (citing *Moses H. Cone*, 460 U.S. at 24)).

The United States Supreme Court has rejected the argument that a court can only order a stay when it also has the power to compel arbitration. *Shanferoke*, 485 U.S. at 452-53. Where a defendant has notified a plaintiff of its willingness to arbitrate pursuant to their arbitration agreement, and the defendant has moved the court to stay proceedings, it is appropriate for the court to grant the stay even if it would lack the authority to compel arbitration, and even if the defendant has not requested that the court compel arbitration. *Id.* Because neither a motion to compel nor the authority to compel are necessary prerequisites for a court to order a stay, a court need not determine if arbitration is appropriate before entering an order to stay proceedings. Accordingly, this Court need not decide Glasswall's declaratory relief claim against Monadnock before ordering a stay pending the conclusion of the New York Arbitration.

## IV.   CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Stay is **GRANTED**. This matter is hereby **STAYED**. The parties are instructed to file a joint notice with this Court within 30 days of a final decision by the arbitration panel. Aside from Glasswall's Verified Emergency Motion for Expedited Declaratory Relief and to Compel Depositions, for which the Court will enter a separate order, all pending motions are **DENIED AS MOOT**.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 07/11/15.

JOHN W. THORNTON
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

17

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed and stamped original Order sent to court file by Judge Thornton's staff.

Copies furnished to: Counsel of Record