# EXHIBIT B

S-4 1 v412857_s4.htm S-4

**As filed with the Securities and Exchange Commission on July 9, 2015**

Registration No. 333-

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# Form S-4

**REGISTRATION STATEMENT UNDER**
**THE SECURITIES ACT OF 1933**

# TECNOGLASS INC.

*(Exact name of registrant as specified in its charter)*

| **Cayman Islands** | **3211** | **N/A** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**Avenida Circunvalar a 100 mts de la Via 40**
**Barrio Las Flores**
**Barranquilla, Colombia**
**(57)(5)3734000**

*(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)*

**Joaquin Fernandez**
**Chief Financial Officer**
**Avenida Circunvalar a 100 mts de la Via 40**
**Barrio Las Flores**
**Barranquilla, Colombia**
**(57)(5)3734000**

*(Name, address, including zip code, and telephone number, including area code, of agent for service)*

*Copies of communications to:*

**David Alan Miller, Esq.**
**Jeffrey M. Gallant, Esq.**
**Graubard Miller**
**The Chrysler Building**
**405 Lexington Avenue**
**New York, New York 10174**
**(212) 818-8800**
**(212) 818-8881 — Facsimile**

**Approximate date of commencement of proposed sale of the securities to the public:** As soon as practicable after this registration statement becomes effective and after all conditions of the warrant exchange offer described herein have been met or waived.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐                                         Accelerated filer ☐
Non-accelerated filer ☐ (Do not check if a smaller reporting company)      Smaller reporting company ☒

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Exchange Act Rule 13e-4(i) (Cross-Border Third-Party Tender Offer) ☐

TABLE OF CONTENTS

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered[1] | Proposed Maximum Offering Price per Share | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee[4] |
|---|---|---|---|---|
| Ordinary Shares, par value $0.0001 per share | 3,499,012[2] | $ 4.77[3] | $16,690,287.24 | $ 1,939.41[5] |

(1) Pursuant to Rule 416 under the Securities Act of 1933, as amended, this registration statement also covers an indeterminate number of additional shares as may hereafter be offered or issued with respect to the shares registered hereby resulting from stock splits, stock dividends, recapitalizations or certain other capital adjustments.

(2) Represents the maximum number of ordinary shares of the registrant that may be issued directly to holders of warrants pursuant to the Offer (as defined in the prospectus included in this Registration Statement).

(3) Estimated pursuant to Rule 457(f)(1) solely for the purpose of computing the amount of the registration fee, based on the average of the high and low prices of warrants to purchase Tecnoglass ordinary shares on the OTC Pink Marketplace on June 30, 2015.

(4) Determined in accordance with Section 6(b) of the Securities Act at a rate equal to $116.20 per $1,000,000 of the proposed maximum aggregate offering price.

(5) This fee was previously paid by us in connection with the registration of the ordinary shares issuable upon exercise of the warrants on Form S-1 (No. 333-193882), declared effective by the SEC on June 16, 2014.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective time until the registrant shall file an amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the registration statement shall become effective on such date as the Commission, acting pursuant to such Section 8(a), may determine.**

**TABLE OF CONTENTS**

The information in this document may change. We may not complete the exchange offer and issue these securities until the registration statement filed with the Securities and Exchange Commission is effective. This document is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer is not permitted.

PRELIMINARY PROSPECTUS/OFFER TO EXCHANGE

# TECNOGLASS INC.

## Offer to Exchange Warrants to Acquire Ordinary Shares
## of
## Tecnoglass Inc.
## for
## Ordinary Shares of Tecnoglass Inc.

**THE OFFER (AS DEFINED BELOW) AND WITHDRAWAL RIGHTS WILL EXPIRE AT 5:00 P.M., EASTERN TIME, ON     , 2015, UNLESS THE OFFER IS EARLIER WITHDRAWN OR IS EXTENDED.**

For a limited period of time, we are offering to each of our warrant holders the opportunity to receive one of our ordinary shares in exchange for every 2.6 of our outstanding warrants tendered by the holder and exchanged pursuant to the offer (the "Offer"). The Offer is being made to:

- All holders of our publicly traded warrants to purchase ordinary shares that were issued in connection with our March 2012 initial public offering of units, referred to as the "Public Warrants." The Public Warrants were included in the 4,200,000 units (the "Units") issued in our initial public offering, each such Unit consisting of one ordinary share and one warrant to purchase one ordinary share. As of June 30, 2015, 4,097,430 Public Warrants were outstanding. Pursuant to the Offer, we are offering up to an aggregate of 1,575,935 of our ordinary shares in exchange for the Public Warrants.

- All holders of our warrants to purchase ordinary shares that were issued in private placements prior to, or simultaneously with, the consummation of our initial business combination, referred to as the "Private Warrants." The Public Warrants and Private Warrants are referred to collectively as the "Warrants." The Private Warrants were issued (i) simultaneously with the closing of our initial public offering, in a private sale of 4,800,000 warrants to certain of our initial shareholders and Graubard Miller, our counsel, and (ii) simultaneously with the closing of our initial business combination, in a private transaction upon conversion of an outstanding convertible promissory note. As of June 30, 2015, 5,000,000 Private Warrants were outstanding. Pursuant to the Offer, we are offering up to an aggregate of 1,923,077 of our ordinary shares in exchange for the Private Warrants. We anticipate that the holders of the Private Warrants will exchange all of their Private Warrants pursuant to the Offer but there is no assurance of this fact.

Each Warrant holder whose Warrants are exchanged pursuant to the Offer will receive one of our ordinary shares for every 2.6 Warrants tendered by such holder and exchanged. No fractional ordinary shares will be issued pursuant to the Offer. In lieu of issuing fractional shares, we will round up to the nearest whole share based upon the aggregated number of Warrants tendered by the holder.

The Offer is made solely upon the terms and conditions in this Prospectus/Offer to Exchange, and in the related Letter of Transmittal. The Offer will be open until [    ], 2015 at 5:00 p.m., Eastern Time, unless earlier withdrawn or extended by us (the period during which the Offer is open, giving effect to any withdrawal or extension, is referred to as the "Offer Period," and the date and time at which the Offer Period ends is referred to as the "Expiration Date"). The Offer is not made to those holders who reside in states or other jurisdictions where an offer, solicitation or sale would be unlawful. We may withdraw the Offer only if the conditions to the Offer are not satisfied prior to the Expiration Date. Promptly upon any such withdrawal, we will return the tendered Warrants to the holders.

You may tender some or all of your Warrants on these terms. *If you elect to tender Warrants in response to this Offer, please follow the instructions in this document and the related documents, including the Letter of Transmittal.* If you tender Warrants, you may withdraw your tendered Warrants before the Expiration Date and retain them on their current terms, by following the instructions in this Prospectus/Offer to Exchange. If the Offer Period is extended, you may withdraw your tendered Warrants at any time until the Expiration Date, as extended. In addition, tendered Warrants that are not accepted by us for exchange by [    ], 2015, may thereafter be withdrawn by you until such time as the Warrants are accepted by us for exchange.

**[TABLE OF CONTENTS](#)**

**Warrants not exchanged for our ordinary shares pursuant to the Offer will remain outstanding subject to their current terms, including any such terms allowing us to redeem such Warrants prior to their expiration. We reserve the right to redeem any of the Warrants, as applicable, pursuant to their current terms at any time, including prior to the completion of the Offer.**

This Offer is conditioned upon the effectiveness of a registration statement on Form S-4 that we filed with the Securities and Exchange Commission (the "SEC") regarding the ordinary shares issuable upon exchange of the Warrants pursuant to the Offer. This Prospectus/Offer to Exchange forms a part of the registration statement.

Our board of directors has approved this Offer. However, neither we nor any of our management, our board of directors, or the information agent or the depositary for the Offer is making any recommendation as to whether holders of Warrants should tender Warrants for exchange in the Offer. Each holder of a Warrant must make its own decision as to whether to exchange some or all of its Warrants.

All questions and requests for additional information should be directed to Devin Sullivan, The Equity Group, 800 3rd Avenue, 36th Floor, New York, NY 10022, Tel: (212) 371-8660, Fax: (212) 421-1278, Email: info@equityny.com. You may also request additional copies of this document, the Letter of Transmittal or the Notice of Guaranteed Delivery from the information agent.

We will amend our offering materials, including this Prospectus/Offer to Exchange, to the extent required by applicable securities laws to disclose any material changes to information previously published, sent or given to Warrant holders.

---

**The securities offered by this Prospectus/Offer to Exchange involve a high degree of risk.
See "Risk Factors" beginning on page 5.**

---

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this Prospectus/Offer to Exchange. Any representation to the contrary is a criminal offense.**

The date of this Prospectus/Offer to Exchange is [　　　], 2015.

TABLE OF CONTENTS

# TABLE OF CONTENTS

| | Page |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 5 |
| CAUTIONARY NOTE REGARDING FORWARD LOOKING STATEMENTS | 16 |
| THE OFFER | 17 |
| INFORMATION CONCERNING OUR COMPANY | 33 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 46 |
| CERTAIN RELATIONSHIPS AND RELATED PERSON TRANSACTIONS | 52 |
| DESCRIPTION OF SECURITIES | 55 |
| LEGAL MATTERS | 58 |
| EXPERTS | 58 |
| WHERE YOU CAN FIND ADDITIONAL INFORMATION | 58 |
| INDEX TO FINANCIAL STATEMENTS | FS-1 |

i

5/8/2018    Case 1:16-cv-00420-ILG-VMS   Document 117-13   Filed 05/14/18   Page 9 of 140 PageID #:
3297

**TABLE OF CONTENTS**

## ABOUT THIS PROSPECTUS/OFFER TO EXCHANGE

This Prospectus/Offer to Exchange is a part of the registration statement that we filed on Form S-4 with the Securities and Exchange Commission. You should read this Prospectus/Offer to Exchange, including the detailed information regarding our company, ordinary shares and Warrants, and the financial statements and the notes to those statements that appear elsewhere in this Prospectus/Offer to Exchange and any applicable prospectus supplement.

**You should rely only on the information contained in this Prospectus/Offer to Exchange and in any accompanying prospectus supplement. We have not authorized anyone to provide you with information different from that contained in this Prospectus/Offer to Exchange. You should not assume that the information in this Prospectus/Offer to Exchange or any prospectus supplement is accurate as of any date other than the date on the front of those documents. You should not consider this Prospectus/Offer to Exchange to be an offer or solicitation relating to the securities in any jurisdiction in which such an offer or solicitation relating to the securities is not authorized. Furthermore, you should not consider this Prospectus/Offer to Exchange to be an offer or solicitation relating to the securities if the person making the offer or solicitation is not qualified to do so, or if it is unlawful for you to receive such an offer or solicitation.**

Unless the context requires otherwise, in this Prospectus/Offer to Exchange, we use the terms "our company," "we," "us," "our," and similar references to refer to Tecnoglass Inc., a Cayman Islands corporation formerly named Andina Acquisition Corporation, and its subsidiaries. References to "Tecnoglass Holding" are to our wholly owned subsidiary, Tecno Corporation; references to "TG" are to Tecnoglass Holding's indirect subsidiary, Tecnoglass S.A.; and references to "ES" are to Tecnoglass Holding's indirect subsidiary, C.I. Energía Solar S.A. E.S. Windows.

ii

TABLE OF CONTENTS

## PROSPECTUS SUMMARY

*This summary provides a brief overview of the key aspects of the Offer. Because it is only a summary, it does not contain all of the detailed information contained elsewhere in this Prospectus/Offer to Exchange or in the documents included as exhibits to the registration statement that contains this Prospectus/Offer to Exchange. Accordingly, you are urged to carefully review this Prospectus/Offer to Exchange in its entirety (including all documents filed as exhibits to the registration statement that contains this Prospectus/Offer to Exchange, which may be obtained by following the procedures set forth herein in the section entitled "Where You Can Find Additional Information").*

### Summary of the Offer

| | |
|---|---|
| Our Company | Tecnoglass Inc., a Cayman Islands exempted company, is a leading manufacturer of hi-spec, architectural glass and windows for the western hemisphere residential and commercial construction industries, operating through our direct and indirect subsidiaries. |
| Corporate Contact Information | Our principal executive offices are located at Avenida Circunvalar a 100 mts de la Via 40, Barrio Las Flores, Barranquilla, Colombia, and our telephone number at such offices is (57)(5)3734000. |
| Warrants that qualify for the Offer | *"Public Warrants"* |

*"Public Warrants"*

As of June 30, 2015, we had outstanding Public Warrants to purchase an aggregate of 4,097,430 of our ordinary shares. The Public Warrants were included in the 4,200,000 Units issued in our initial public offering, each consisting of one ordinary share and one warrant to purchase one ordinary share. The Units were mandatorily separated into their component parts (one ordinary share and one warrant) effective November 25, 2013. Pursuant to the Offer, we are offering up to an aggregate of 1,575,935 of our ordinary shares in exchange for the Public Warrants.

*"Private Warrants"*

As of June 30, 2015, we had outstanding Private Warrants to purchase an aggregate of 5,000,000 of our ordinary shares. The Private Warrants were issued (i) simultaneously with the closing of our initial public offering, in a private sale of 4,800,000 warrants to certain of our initial shareholders and Graubard Miller, our counsel, and (ii) simultaneously with the closing of our initial business combination, in a private transaction upon conversion of an outstanding convertible promissory note. Pursuant to the Offer, we are offering up to an aggregate of 1,923,077 of our ordinary shares in exchange for the Private Warrants. We anticipate that the holders of the Private Warrants will exchange all of their Private Warrants pursuant to the Offer but there is no assurance of this fact.

*General Terms of the Warrants*

Each Public Warrant is exercisable for one ordinary share at an exercise price of $8.00 per share. Warrants may be exercised for cash or on cashless basis provided that there is an effective and current registration statement relating to the ordinary shares issuable upon exercise of the warrants. We may call the Public

1

**TABLE OF CONTENTS**

Warrants for redemption, at any time while the Warrants are exercisable, upon not less than 30 days' prior written notice of redemption to each Warrant holder, at $0.01 per warrant, if and only if the last sale price of our ordinary shares (or the closing bid price of our ordinary shares in the event the ordinary shares are not traded on any specific trading day) equals or exceeds $14.00 per share, for any 20 trading days within a 30 consecutive trading day period and if, and only if, there is a current registration statement in effect with respect to the ordinary shares underlying the Warrants commencing five business days prior to the 30-day trading period and continuing each day thereafter until the date of redemption. If we call the Warrants for redemption, our management will have the option to require any holder that wishes to exercise its warrant to do so on a cashless basis. The terms of the Private Warrants are identical to the Public Warrants, except that such Private Warrants are exercisable on a cashless basis even if a registration statement covering the ordinary shares issuable upon exercise of such Warrants is not effective and are not redeemable by us, in each case so long as they are still held by the initial purchasers or their affiliates. The Warrants expire on December 20, 2016.

Market Price of Our Ordinary Shares

Our ordinary shares listed on the Nasdaq Capital Market tier of The NASDAQ Stock Market LLC ("Nasdaq") under the symbol "TGLS," and the Warrants are quoted on the OTC Pink Marketplace under the symbol "TGLSW." See "*The Offer — Market Price, Dividends and Related Shareholder Matters*" beginning on page 25.

The Offer

Each Warrant holder whose Warrants are exchanged pursuant to the Offer will receive one ordinary share for every 2.6 Warrants so exchanged. No fractional ordinary shares will be issued pursuant to the Offer. In lieu of issuing fractional shares, we will round up to the nearest whole share based upon the aggregated number of Warrants tendered by the holder.

Holders of the Warrants tendered for exchange will not have to pay any of the exercise price for the tendered Warrants in order to receive ordinary shares in the exchange.

The shares issued in exchange for the Warrants will be unrestricted and freely transferable, as long as the holder is not an affiliate of ours and was not an affiliate of ours within the three months prior to the proposed transfer of such shares.

This Offer is being made to all Warrant holders except those holders who reside in states or other jurisdictions where an offer, solicitation or sale would be unlawful. The purposes of the Offer are to attempt to simplify our corporate structure, reduce the potential dilutive impact of the warrants thereby providing us with more flexibility for financing our operations in the future, and to reduce our derivative warrant liability to increase shareholders' equity. Due to the terms of the Warrants, we are required to revalue the warrants quarterly and have recorded significant non-cash derivative losses and gains which

2

**TABLE OF CONTENTS**

| | |
|---|---|
| | are not reflective of our actual operating performance. By eliminating the warrants, we would no longer be required to record these non-cash losses or gains. Additionally, the Offer will allow holders of Warrants the opportunity to participate in our recently announced dividend policy of declaring regular quarterly cash dividends of $0.125 per share, or $0.50 per share annually, by exchanging their Warrants for our ordinary shares. See "*The Offer — Background and Purpose of the Offer*" beginning on page 24. |
| Offer Period | The Offer will expire on the Expiration Date, which is 5:00 p.m., Eastern Time, on [        ], 2015, unless earlier withdrawn or extended by us. All Warrants tendered for exchange pursuant to the Offer, and all required related paperwork, must be received by the depositary by the Expiration Date, as described in this Prospectus/Offer to Exchange. |
| | If the Offer Period is extended, we will make a public announcement of such extension by no later than 9:00 a.m., Eastern Time, on the next business day following the Expiration Date as in effect immediately prior to such extension. |
| | We may withdraw the Offer only if the conditions of the Offer are not satisfied prior to the Expiration Date. Promptly upon any such withdrawal, we will return the tendered Warrants. We will announce any intention to withdraw the Offer by disseminating notice by public announcement or otherwise as permitted by applicable law. See "*The Offer — General Terms — Offer Period*" on page 18. |
| Conditions to the Offer | The Offer is subject to customary conditions, including the effectiveness of the registration statement of which this document is a part and there being no action or proceeding, statute, rule, regulation or order that would challenge or restrict the making or completion of the Offer. We may waive some of the conditions to the Offer. See "*The Offer — General Terms — Conditions to the Offer*" on page 18. |
| Withdrawal Rights | If you tender your Warrants and change your mind, you may withdraw your tendered Warrants at any time prior to the Expiration Date, as described in greater detail in the section entitled "*The Offer — Withdrawal Rights*" beginning on page 22. If the Offer Period is extended, you may withdraw your tendered Warrants at any time until the extended Expiration Date. In addition, tendered Warrants that are not accepted by us for exchange by [        ], 2015 may thereafter be withdrawn by you until such time as the Warrants are accepted by us for exchange. |
| Participation by Directors, Executive Officers and Affiliates | We anticipate that several of our directors, executive officers and their affiliates will exchange their Private Warrants in accordance with the terms of the Offer. However, they are not required to do so. |

3

5/8/2018                    https://www.sec.gov/Archives/edgar/data/1534675/000114420415041802/v412857_s4.htm

TABLE OF CONTENTS

| | |
|---|---|
| Federal and State Regulatory Approvals | Other than compliance with the applicable federal and state securities laws, no federal or state regulatory requirements must be complied with and no federal or state regulatory approvals must be obtained in connection with the Offer. |
| Absence of Appraisal or Dissenters' Rights | Holders of the Warrants do not have any appraisal or dissenters' rights under applicable law in connection with the Offer. |
| Tax Consequences of the Offer | For U.S. federal income tax purposes, Warrant holders should not recognize gain or loss on the receipt of ordinary shares in exchange for Warrants pursuant to the Offer. The holder's initial tax basis in the ordinary shares received in the exchange should equal such holder's tax basis in the Warrants tendered in the exchange. The holder's holding period for the ordinary shares received in the exchange should include the holding period for such holder's Warrants tendered in the exchange. See "*The Offer — Material U.S. Federal Income Tax Consequences*" beginning on page 28. |
| Depositary | The depositary for the Offer is: |
| | Continental Stock Transfer & Trust Company |
| | 17 Battery Place, 8th Floor New York, New York 10004 Attention: Corporate Actions Department Facsimile: (212) 616-7610 |
| Additional Information | We recommend that our Warrant holders review the registration statement on Form S-4, of which this prospectus forms a part, including the exhibits, that we have filed with the SEC in connection with the Offer and our other materials that we have filed with the SEC, before making a decision on whether to accept the Offer. All reports and other documents we have filed with the SEC can be accessed electronically on the SEC's website at *www.sec.gov*. |
| | If you have any questions about the Offer or need additional copies of this Prospectus/Offer to Exchange, the Letter of Transmittal or Notice of Guaranteed Delivery, you should contact: |
| | Devin Sullivan The Equity Group 800 3rd Avenue, 36th Floor New York, NY 10022 Phone: 212.371.8660 Fax: 212.421.1278 info@equityny.com |

4

TABLE OF CONTENTS

## RISK FACTORS

*An investment in our securities involves significant risks. Before tendering any Warrants for exchange pursuant to the Offer, you should carefully consider and evaluate all of the information included in this Prospectus/Offer to Exchange or any applicable prospectus supplement, including the risk factors set forth below. Our business, financial position, results of operations or liquidity could be adversely affected by any of these risks. The risks and uncertainties we describe are not the only ones facing us. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business or operations. Any adverse effect on our business, financial position, results of operations or liquidity could result in a decline in the value of our ordinary shares and other securities and the loss of all or part of your investment.*

### Risks Related to Our Business Operations

***We operate in competitive markets, and our business could suffer if we are unable to adequately address potential downward pricing pressures and other factors that may reduce operating margins.***

The principal markets that our subsidiaries, Tecnoglass and ES, serve are highly competitive. Competition is based primarily on the precision and range of achievable tolerances, quality, price and the ability to meet delivery schedules dictated by customers. Our competition comes from companies of various sizes, some of which have greater financial and other resources than we do and some of which have more established brand names in the markets that we serve. Any of these competitors may foresee the course of market development more accurately than we will, develop products that are superior to ours, have the ability to produce similar products at a lower cost than us or adapt more quickly than we can to new technologies or evolving customer requirements. Increased competition could force us to lower our prices or to offer additional services at a higher cost to us, which could reduce gross profit and net income. Accordingly, we may not be able to adequately address potential downward pricing pressures and other factors, which consequently may adversely affect our financial condition and results of operations.

***Failure to maintain the performance, reliability and quality standards required by our customers could have a materially negative effect on our financial condition and results of operation.***

We manufacture a significant portion of our products based on the specific requirements of our customers. If our products or services have performance, reliability or quality problems, or products are installed with incompatible glazing materials, we may experience additional warranty and service expenses, reduced or canceled orders, diminished pricing power, higher manufacturing or installation costs or delays in the collection of accounts receivable. Additionally, performance, reliability or quality claims from our customers, with or without merit, could result in costly and time-consuming litigation that could require significant time and attention of management and involve significant monetary damages that could negatively affect our financial results.

***The volatility of the cost of raw materials used to produce our products could materially adversely affect our results of operations in the future.***

The cost of raw materials included in our products, including aluminum extrusion and polyvinyl butyral, are subject to significant fluctuations. A variety of factors over which we have no control, including global demand for aluminum, fluctuations in oil prices, speculation in commodities futures and the creation of new laminates or other products based on new technologies, affect the cost of raw materials which we purchase for the manufacture of our products. While we may attempt to minimize the risk from severe price fluctuations by entering into aluminum forward contracts to hedge these fluctuations in the purchase price of aluminum extrusion we use in production, substantial, prolonged upward trends in aluminum prices could significantly increase the cost of our aluminum needs and have an adverse effect on our results of operations. If we are not able to pass on significant cost increases to our customers, our results in the future may be negatively affected by a delay between the cost increases and price increases in our products. Accordingly, the price volatility of raw materials could adversely affect our financial condition and results of operations in the future.

TABLE OF CONTENTS

***We depend on third-party suppliers for our raw materials and any failure of such third-party suppliers in providing raw materials could negatively affect our ability to manufacture our products.***

Our ability to offer a wide variety of products to our customers depends on receipt of adequate material supplies from manufacturers and other suppliers. It is possible in the future that our competitors or other suppliers may create products based on new technologies that are not available to us or are more effective than our products at surviving hurricane-force winds and wind-borne debris or that they may have access to products of a similar quality at lower prices. We do not have long-term contracts with the suppliers of our raw materials. Failures of third-party suppliers to provide raw materials to us in the future could have an adverse effect on our operating results or our ability to manufacture our products.

***The home building industry and the home repair and remodeling sector are regulated and any increased regulatory restrictions could negatively affect our sales and results of operations.***

The home building industry and the home repair and remodeling sector are subject to various local, state and federal statutes, ordinances, rules and regulations concerning zoning, building design and safety, construction, and similar matters, including regulations that impose restrictive zoning and density requirements in order to limit the number of homes that can be built within the boundaries of a particular area. Increased regulatory restrictions could limit demand for new homes and home repair and remodeling products, which could negatively affect our sales and results of operations. We may not be able to satisfy any future regulations, which consequently could have a negative effect on our sales and results of operations.

***Changes in building codes could lower the demand for our impact-resistant windows and doors.***

The market for our impact-resistant windows and doors depends in large part on our ability to satisfy state and local building codes that require protection from wind-borne debris. If the standards in such building codes are raised, we may not be able to meet such requirements, and demand for our products could decline. Conversely, if the standards in such building codes are lowered or are not enforced in certain areas, demand for impact-resistant products may decrease. If we are unable to satisfy future regulations, including building code standards, it could negatively affect our sales and results of operations. Further, if states and regions that are affected by hurricanes but do not currently have such building codes fail to adopt and enforce hurricane protection building codes, our ability to expand our business in such markets may be limited.

***Equipment failures, delays in deliveries and catastrophic loss at any of our manufacturing facilities could lead to production curtailments or shutdowns that prevent us from producing our products.***

An interruption in production capabilities at any of our facilities because of equipment failure or other reasons could result in our inability to produce our products, which would reduce our sales and earnings for the affected period. In addition, we generally manufacture our products only after receiving the order from the customer and thus do not hold large inventories. If there is a stoppage in production at our manufacturing facilities, even if only temporarily, or if they experience delays because of events that are beyond our control, delivery times could be severely affected. Any significant delay in deliveries to our customers could lead to increased returns or cancellations and cause us to lose future sales. Our manufacturing facilities are also subject to the risk of catastrophic loss due to unanticipated events such as fires, explosions or violent weather conditions. If we experience plant shutdowns or periods of reduced production because of equipment failure, delays in deliveries or catastrophic loss, it could have a material adverse effect on our results of operations or financial condition. Further, we may not have adequate insurance to compensate for all losses that result from any of these events.

***Our business involves complex manufacturing processes that may result in costly accidents or other disruptions of our operations in the future.***

Our business involves complex manufacturing processes. Some of these processes involve high pressures, temperatures, hot metal and other hazards that present certain safety risks to workers employed at our manufacturing facilities. The potential exists for accidents involving death or serious injury. The potential liability resulting from any such accident, to the extent not covered by insurance, could cause us to incur unexpected cash expenditures, thereby reducing the cash available to operate our business. Such an accident could disrupt operations at any of our facilities, which could adversely affect our ability to deliver products to our customers on a timely basis and to retain our current business.

TABLE OF CONTENTS

*Our operations are located in Colombia, which may make it more difficult for U.S. investors to understand and predict how changing market conditions will affect our financial results.*

Our operations are located in Colombia and, consequently, are subject to the economic, political and tax conditions prevalent in that country. The economic conditions in Colombia are subject to different growth expectations, market weaknesses and business practices than seen in the U.S. market. We may not be able to predict how changing market conditions in Colombia will affect our financial results.

*Our net sales and operating profits may be difficult to predict and could fall below our expectations and those of securities analysts and investors, which likely would have an adverse effect on the market price of our securities.*

Our net operating revenues and operating results may fall below provided guidance and the expectations of securities analysts or investors in future periods. Our annual net sales and operating results may vary depending on a number of factors, including, but not limited to, fluctuating customer demand, delay or timing of shipments, construction delays or cancellations due to lack of financing for construction projects or market acceptance of new products. Manufacturing or operational difficulties that may arise due to quality control, capacity utilization of our production equipment or staffing requirements may also adversely affect annual net sales and operating results. In addition, competition, including new entrants into Tecnoglass and ES's markets, the introduction of new products by competitors, adoption of improved technologies by competitors and competitive pressures on prices of products and services, could adversely affect our annual net sales and operating results. Finally, our annual net sales and operating results may vary depending on raw material pricing, the potential for disruption of supply and changes in legislation that could have an adverse effect on labor or other costs. Our failure to meet net sales and operating result expectations would likely adversely affect the market price of our securities.

*New construction remains below average levels, and repair and remodeling markets are still flat and such market pressures could negatively affect our results of operations.*

The glass industry is subject to the cyclical market pressures of the larger new construction and repair and remodeling markets. In turn, these larger markets may be affected by adverse changes in economic conditions such as demographic trends, employment levels and consumer confidence. Any future downturn or any other negative market pressures could negatively affect our results of operations in the future.

*We may be adversely affected by disruptions to our manufacturing facilities or disruptions to our customer, supplier or employee base.*

Any disruption to our facilities resulting from weather-related events, fire, an act of terrorism or any other cause could damage a significant portion of our inventory, affect our distribution of products and materially impair our ability to distribute products to customers. We could incur significantly higher costs and longer lead times associated with distributing our products to customers during the time that it takes for us to reopen or replace a damaged facility. In addition, if there are disruptions to our customer and supplier base or to our employees caused by weather-related events, acts of terrorism or any other cause, our business could be temporarily adversely affected by higher costs for materials, increased shipping and storage costs, increased labor costs, increased absentee rates and scheduling issues. Any interruption in the production or delivery of our supplies could reduce sales of our products and increase costs.

*The nature of our business exposes each of our subsidiaries to product liability and warranty claims that, if adversely determined, could negatively affect our financial condition and results of operations and the confidence of customers in our products.*

TG and ES are, from time to time, involved in product liability and product warranty claims relating to the products they manufacture and distribute that, if adversely determined, could adversely affect our financial condition, results of operations and cash flows. In addition, they may be exposed to potential claims arising from the conduct of homebuilders and home remodelers and their sub-contractors. We may not be able to maintain insurance on acceptable terms or insurance may not provide adequate protection against potential liabilities in the future. Product liability claims can be expensive to defend and can divert the attention of management and other personnel for significant periods, regardless of the ultimate outcome. Claims of this nature could also have a negative effect on customer confidence in our products and us.

7

TABLE OF CONTENTS

***We are subject to potential exposure to environmental liabilities and are subject to environmental regulation and any such liabilities or regulation may negatively affect our costs and results of operations in the future.***

TG and ES are subject to various federal, state and local environmental laws, ordinances and regulations. Although we believe that our facilities are in material compliance with such laws, ordinances and regulations, as owners of real property, TG and ES can be held liable for the investigation or remediation of contamination on such properties, in some circumstances, without regard to whether we knew of or were responsible for such contamination. Remediation may be required in the future because of spills or releases of petroleum products or hazardous substances, the discovery of unknown environmental conditions, or more stringent standards regarding existing residual contamination. Environmental regulatory requirements may become more burdensome, increase our general and administrative costs, and increase the risk that TG and ES incur fines or penalties or be held liable for violations of such regulatory requirements.

***Our success depends upon our ability to develop new products and services, integrate acquired products and services and enhance existing products and services through product development initiatives and technological advances; any failure to make such improvements could harm our future business and prospects.***

We have continuing programs designed to develop new products and to enhance and improve our existing products. We are expending resources for the development of new products in all aspects of our business, including products that can reach a broader customer base. Some of these new products must be developed due to changes in legislative, regulatory or industry requirements or in competitive technologies that render certain of our existing products obsolete or less competitive. The successful development of our products and product enhancements are subject to numerous risks, both known and unknown, including unanticipated delays, access to significant capital, budget overruns, technical problems and other difficulties that could result in the abandonment or substantial change in the design, development and commercialization of these new products. The events could have a materially adverse effect on our results of operations.

Given the uncertainties inherent with product development and introduction, including lack of market acceptance, we cannot provide assurance that any of our product development efforts will be successful on a timely basis or within budget, if at all. Failure to develop new products and product enhancements on a timely basis or within budget could harm our business and prospects. In addition, we may not be able to achieve the technological advances necessary for us to remain competitive, which could have a materially negative effect on our financial condition.

***We are dependent on sales to customers outside Colombia and any failure to make these sales may adversely affect our operating results in the future.***

A significant portion of our sales is to customers outside Colombia, including to Panama and the U.S., and we expect sales in foreign markets to continue to represent a significant portion of our net sales. Foreign sales and operations are subject to changes in local government regulations and policies, including those related to tariffs and trade barriers, investments, property ownership rights, taxation, exchange controls and repatriation of earnings. Changes in the relative values of currencies occur from time to time and could affect our operating results. This risk and the other risks inherent in foreign sales and operations could adversely affect our operating results in the future.

***We are dependent on certain key personnel, the loss of whom could materially affect our financial performance and prospects in the future.***

Our continued success depends largely upon the continued services of our senior management and certain key employees. Each member of our senior management teams has substantial experience and expertise in his or her industry and has made significant contributions to our growth and success. We face the risk, however, that members of our senior management may not continue in their current positions and the loss of the services of any of these individuals could cause us to lose customers and reduce our net sales, lead to employee morale problems and the loss of other key employees or cause disruptions to production. In addition, we may be unable to find qualified individuals to replace any senior executive officers who leave the company.

8

**TABLE OF CONTENTS**

*Our results of operations could be significantly affected by foreign currency fluctuations and currency regulations.*

About 40% of our revenues are priced and realized in the Colombian peso. Accordingly, we are subject to risks relating to fluctuations in currency exchange rates. In the future, and especially as we further expand our sales in other markets, our customers may increasingly make payments in non-U.S. currencies. Fluctuations in foreign currency exchange rates could affect our sales, cost of sales and operating margins. In addition, currency devaluation can result in a loss to us if we hold monetary assets in that currency. Hedging foreign currencies can be difficult and costly, especially if the currency is not actively traded. We cannot predict the effect of future exchange rate fluctuations on our operating results.

In addition, we are subject to risks relating to governmental regulation of foreign currency, which may limit our ability to:

- transfer funds from or convert currencies in certain countries;

- repatriate foreign currency received in excess of local currency requirements; and

- repatriate funds held by foreign subsidiaries to the United States at favorable tax rates.

As we continue to increase our operations in foreign countries, there is an increased risk that foreign currency controls may create difficulty in repatriating profits from foreign countries in the form of taxes or other restrictions, which could restrict our cash flow.

*We conduct all of our operations through our subsidiaries, and will rely on payments from our subsidiaries to meet all of our obligations and may fail to meet our obligations if our subsidiaries are unable to make payments to us.*

We are a holding company and derive substantially all of our operating income from our subsidiaries, ES and TG. All of our assets are held by our subsidiaries, and we rely on the earnings and cash flows of our subsidiaries to meet our debt service obligations or dividend payments. The ability of our subsidiaries to make payments to us will depend on their respective operating results and may be restricted by, among other things, the laws of their jurisdiction of organization (which may limit the amount of funds available for distributions to us), the terms of existing and future indebtedness and other agreements of our subsidiaries, including their credit facilities, and the covenants of any future outstanding indebtedness we or our subsidiaries incur.

**Risks Related to Operations in Colombia**

*Economic and political conditions in Colombia may have an adverse effect on our financial condition and results of operations.*

Our financial condition and results of operations depend significantly on macroeconomic and political conditions prevailing in Colombia. Decreases in the growth rate, periods of negative growth, increases in inflation, changes in law, regulation, policy, or future judicial rulings and interpretations of policies involving exchange controls and other matters such as (but not limited to) currency depreciation, inflation, interest rates, taxation, banking laws and regulations and other political or economic developments in or affecting Colombia may affect the overall business environment and may, in turn, adversely affect our financial condition and results of operations in the future.

Colombia's fiscal deficit and growing public debt could adversely affect the Colombian economy. The Colombian fiscal deficit was 3.2% of GDP in 2010, 2.2% of GDP in 2011, 2.4% of GDP in 2012, 2.3% of GDP in 2013, and 2.4% of GDP in 2014.

The Colombian government frequently intervenes in Colombia's economy and from time to time makes significant changes in monetary, fiscal and regulatory policy. Our business and results of operations or financial condition may be adversely affected by changes in government or fiscal policies, and other political, diplomatic, social and economic developments that may affect Colombia. We cannot predict what policies the Colombian government will adopt and whether those policies would have a negative effect on the Colombian economy or on our business and financial performance in the future.

9

5/8/2018 Case 1:16-cv-00420-ILG-VMS https://www.sec.gov/Archives/edgar/data/1534675/000114420415041802/v412857_s4.htm Document 172-2 Filed 05/11/18 Page 20 of 140 PageID #: 3308

TABLE OF CONTENTS

We cannot assure you as to whether current stability in the Colombian economy will be sustained. If the condition of the Colombian economy were to deteriorate, we would likely be adversely affected.

The Colombian government and the Central Bank may seek to implement new policies aimed at controlling further fluctuation of the Colombian peso against the U.S. Dollar and fostering domestic price stability. The Central Bank may impose certain mandatory deposit requirements in connection with foreign-currency denominated loans obtained by Colombian residents, including Tecnoglass and ES. Although no mandatory deposit requirement is currently in effect, a mandatory deposit requirement was set at 40% in 2008 after the Colombian peso appreciated against foreign currencies. We cannot predict or control future actions by the Central Bank in respect of such deposit requirements, which may involve the establishment of a different mandatory deposit percentage. The U.S. dollar/Colombian peso exchange rate has shown some instability in recent years. We cannot assure you that measures adopted by the Colombian government and the Central Bank will suffice to control this instability. We cannot predict the effects that such policies will have on the Colombian economy. In addition, we cannot assure you that the Colombian peso will not depreciate relative to other currencies in the future, which could have a materially adverse effect on our financial condition.

***Economic instability in Colombia could negatively affect our ability to sell its products.***

A significant decline in economic growth of any of Colombia's major trading partners — in particular, the United States, China, Brazil and Venezuela — could have a material adverse effect on each country's balance of trade and economic growth. In addition, a "contagion" effect, where an entire region or class of investments becomes less attractive to, or subject to outflows of funds by, international investors could negatively affect the Colombian economy.

The 2008 global economic and financial crisis, which began in the U.S. financial system and spread to different economic sectors and countries around the world, had negative effects on the Colombian economy. During 2009, the economies of the United States and most major European countries contracted, which, in turn, affected the Colombian economy. The economic recovery in the U.S. since 2013 has been fragile and at lower rates than in the past recoveries. Several European Union countries have been obliged to severely reduce their public expenditures due to their high indebtedness, which has severely affected the Eurozone's economic growth. The ability of governments and companies in certain countries, such as Greece, Italy, Portugal, and Spain to repay their debt obligations or remain in the euro currency system remains uncertain. In addition, certain events, such as the outbreak of civil and political unrest in several countries in Africa and the Middle East, including, Libya, Syria, Iraq, and Yemen, might further strain and adversely affect the global economy and the global financial system.

Even though exports from Colombia, principally petroleum and petroleum products, coffee and gold, have grown in recent years, fluctuations in commodity prices pose a significant challenges to their contribution to the country's balance of payments and fiscal revenues. Unemployment continues to be high in Colombia compared to other economies in Latin America. Furthermore, recent political and economic actions in the Latin American region, including actions taken by the Argentine and Venezuelan governments, may negatively affect international investor perception of the region. We cannot assure you that growth achieved over the past decade by the Colombian economy will continue in future periods. The long-term effects of the global economic and financial crisis on the international financial system remain uncertain. In addition, the effect on consumer confidence of any actual or perceived deterioration of household incomes in the Colombian economy may have a material adverse effect on our results of operations and financial condition.

***Colombia has experienced and continues to experience internal security issues that have had or could have a negative effect on the Colombian economy and our financial condition.***

Colombia has experienced and continues to experience internal security issues, primarily due to the activities of guerrilla groups such as the Revolutionary Armed Forces of Colombia (*Fuerzas Armadas Revolucionarias de Colombia*), or "FARC," paramilitary groups and drug cartels. In remote regions of the country with minimal governmental presence, these groups have exerted influence over the local population and funded their activities by protecting, and rendering services to, drug traffickers. Even though the Colombian government's "democratic security" program has reduced guerilla and criminal activity,

10

5/8/2018    Case 1:16-cv-00420-ILG-VMS   Document 172-2   Filed 05/11/18   Page 22 of 140 PageID #:
3309

**TABLE OF CONTENTS**

particularly in the form of terrorism attacks, homicides, kidnappings and extortion, such activity persists in Colombia, and possible escalation of such activity and the effects associated with them have had and may have in the future a negative effect on the Colombian economy and on us, including our customers, employees, results of operations and financial condition. Our business or financial condition could be adversely affected by rapidly changing economic or social conditions, including the Colombian government's response to current peace negotiations, which may result in legislation that increases our tax burdens or that of other Colombian companies.

***Tensions with Venezuela, Ecuador and Nicaragua may affect the Colombian economy and, consequently, our results of operations and financial condition in the future.***

Diplomatic relations with Venezuela and Ecuador, two of Colombia's main trading partners, have from time to time been tense and affected by events surrounding the Colombian armed forces combat of the FARC throughout Colombia, particularly on Colombia's borders with Venezuela or Ecuador. In November 2012, the International Court of Justice placed a sizeable area of the Caribbean Sea within Nicaragua's exclusive economic zone. Until then, Colombia had deemed this area as part of its own exclusive economic zone. A worsening of diplomatic relations between Colombia and Nicaragua involving the disputed waters could result in the Nicaraguan government taking measures, or a reaction among the Nicaraguan public, which is detrimental to Colombian-owned interests in that country. Any future deterioration in relations with Venezuela, Ecuador and Nicaragua may result in the closing of borders, the imposition of trade barriers or a breakdown of diplomatic ties, any of which could have a negative effect on Colombia's trade balance, economy and general security situation, which may adversely affect our results of operations and financial condition.

***Government policies and actions, and judicial decisions, in Colombia could significantly affect the local economy and, as a result, our results of operations and financial condition in the future.***

Our results of operations and financial condition may be adversely affected by changes in Colombian governmental policies and actions, and judicial decisions, involving a broad range of matters, including interest rates, exchange rates, exchange controls, inflation rates, taxation, banking and pension fund regulations and other political or economic developments affecting Colombia. The Colombian government has historically exercised substantial influence over the economy, and its policies are likely to continue to have a significant effect on Colombian companies, including our subsidiaries. The president of Colombia has considerable power to determine governmental policies and actions relating to the economy, and may adopt policies that negatively affect our subsidiaries. Future governmental policies and actions, or judicial decisions, could adversely affect our results of operations or financial condition.

***New or higher taxes resulting from changes in tax regulations or the interpretation thereof in Colombia could adversely affect our results of operations and financial condition in the future.***

New tax laws and regulations, and uncertainties with respect to future tax policies, pose risks to us. In recent years, Colombian tax authorities have imposed additional taxes in a variety of areas, such as taxes on financial transactions and taxes to fund Colombia's war against terrorism. Changes in tax-related laws and regulations, and interpretations thereof, can affect tax burdens by increasing tax rates and fees, creating new taxes, limiting tax deductions, and eliminating tax-based incentives and non-taxed income. In addition, tax authorities or courts may interpret tax regulations differently than we do, which could result in tax litigation and associated costs and penalties. On December 26, 2012, the Colombian Congress approved a number of tax reforms that took effect on January 1, 2013. These changes include, among others, VAT rate consolidation, a reduction in corporate income tax, changes to transfer pricing rules, the creation of a new corporate income tax to pay for health, education and family care issues, modifications to the individual income tax rules, new "thin capitalization" rules and a reduction of social contributions paid by certain employees. In December 2014, the Colombian Congress approved a number of significant tax reforms that took effect on January 1, 2015. These changes include among others, the creation of a net wealth tax for tax years 2015 through 2017 for both domestic entities and foreign entities that hold any wealth in Colombia, the permanent establishment of the CREE tax created in the 2012 reform to pay for health, education and family care programs, a CREE surtax at varying rates for tax years through 2019, and the extension of the financial transactions tax through 2019. The tax reforms are likely to impose a greater tax burden on us in the future and likely decrease profits

11

TABLE OF CONTENTS

and net income. Additional details about the 2014 tax reform and its potential effects on our financial statements are further disclosed in the notes to our financial statements appearing elsewhere in this Offer.

***Natural disasters in Colombia could disrupt our business and affect our results of operations and financial condition in the future.***

Our operations are exposed to natural disasters in Colombia, such as earthquakes, volcanic eruptions, tornadoes, tropical storms and hurricanes. Heavy rains in Colombia, attributable in part to the La Niña weather pattern, have resulted in severe flooding and mudslides. La Niña is a recurring weather phenomenon, and it may contribute to flooding, mudslides or other natural disasters on an equal or greater scale in the future. In the event of a natural disaster, our disaster recovery plans may prove to be ineffective, which could have a material adverse effect on its ability to conduct our businesses. In addition, if a significant number of our employees and senior managers were unavailable because of a natural disaster, our ability to conduct our businesses could be compromised. Natural disasters or similar events could also result in substantial volatility in our results of operations for any fiscal quarter or year.

## Risks Related to Us and Our Securities

***Because we are incorporated under the laws of the Cayman Islands, you may face difficulties in protecting your interests, and your ability to protect your rights through the U.S. Federal courts may be limited.***

We are a company incorporated under the laws of the Cayman Islands, and substantially all of our assets are located outside the United States. In addition, a majority of our directors and officers are nationals or residents of jurisdictions other than the United States and all or substantial portions of their assets are located outside the United States. As a result, it may be difficult for investors to effect service of process within the United States upon our directors or executive officers, or enforce judgments obtained in the United States courts against our directors or officers.

Our corporate affairs are governed by our third amended and restated memorandum and articles of association, the Companies Law (2013 Revision) of the Cayman Islands (as the same may be supplemented or amended from time to time) and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are largely governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law, the decisions of whose courts are of persuasive authority, but are not binding on a court in the Cayman Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are different from what they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a different body of securities laws as compared to the United States, and certain states, such as Delaware, may have more fully developed and judicially interpreted bodies of corporate law. In addition, Cayman Islands companies may not have standing to initiate a shareholders derivative action in a Federal court of the United States.

We have been advised by our Cayman Islands legal counsel that the courts of the Cayman Islands are unlikely (i) to recognize or enforce against us judgments of courts of the United States predicated upon the civil liability provisions of the federal securities laws of the United States or any state; and (ii) in original actions brought in the Cayman Islands, to impose liabilities against us predicated upon the civil liability provisions of the federal securities laws of the United States or any state, so far as the liabilities imposed by those provisions are penal in nature. In those circumstances, although there is no statutory enforcement in the Cayman Islands of judgments obtained in the United States, the courts of the Cayman Islands will recognize and enforce a foreign money judgment of a foreign court of competent jurisdiction without retrial on the merits based on the principle that a judgment of a competent foreign court imposes upon the judgment debtor an obligation to pay the sum for which judgment has been given provided certain conditions are met. For such a foreign judgment to be enforced in the Cayman Islands, such judgment must be final and conclusive and for a liquidated sum, and must not be in respect of taxes or a fine or penalty, inconsistent with a Cayman Islands judgment in respect of the same matter, impeachable on the grounds of fraud or obtained in a manner, and or be of a kind the enforcement of which is, contrary to natural justice or the public policy of the Cayman

12

**TABLE OF CONTENTS**

Islands (awards of punitive or multiple damages may well be held to be contrary to public policy). A Cayman Islands Court may stay enforcement proceedings if concurrent proceedings are being brought elsewhere.

***If we fail to maintain an effective system of internal controls, we may be unable to accurately report our financial results or prevent fraud, and investor confidence and the market price of our ordinary shares may be adversely affected.***

Our financial reporting obligations as a public company will place a significant strain on our management, operational and financial resources, and systems for the near future. The standards required for a public company under Section 404 of the Sarbanes-Oxley Act of 2002 are significantly more stringent than required of our subsidiaries as privately held companies in Colombia prior to the business combination in December 2013 and the registration of the securities in this prospectus. We may not be able to implement effective internal controls and procedures to detect and prevent errors in our financial reports, file our financial reports on a timely basis in compliance with SEC requirements, or prevent and detect fraud. Our management may not be able to respond adequately to changing regulatory compliance and reporting requirements. If we become an "accelerated filer" or a "large accelerated filer" as those terms are defined under Rule 12b-2 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and no longer qualify as an "emerging growth company", our auditors will be required to attest to our evaluation of internal controls over financial reporting. If we not able to adequately implement the requirements of Section 404 in a timely manner, we may not be able to assess whether internal controls over financial reporting are effective, which may subject us to adverse regulatory consequences and could harm investor confidence, the market price of our ordinary shares and our ability to raise additional capital.

We carried out an evaluation required by Rule 13a-15 of the Securities Exchange Act of 1934 under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of disclosure controls and procedures and internal control over financial reporting as of the year ended December 31, 2014. Based on this evaluation, we concluded that, because of the material weaknesses in our internal control over financial reporting described below, our disclosure controls and procedures as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 were not effective. Notwithstanding the material weaknesses in our internal control over financial reporting as of December 31, 2014 described below, we believe that the consolidated financial statements incorporated by reference in this prospectus present our financial condition, results of operations, and cash flows for the fiscal years covered thereby in all material respects. To address the material weaknesses in our internal control over financial reporting described below, the Company performed additional manual procedures and analysis and other post-closing procedures in order to prepare the consolidated financial statements included elsewhere in this Offer.

We identified the following material weaknesses in our internal controls over financial reporting as of December 31, 2014:

• Entity-Level Controls — We have not established the proper structure of entity level controls (including information technology general controls) which support the effectiveness of the internal controls over financial reporting, risk management and fraud detection.

• Financial Closing and Reporting Process — We have not established an adequate control system for the preparation and disclosure of financial information related to the identification and classification of non-routine, unusual transactions inclusive of significant related party transactions, and for management's evaluation of certain accounting estimates and timely reconciliation of related party transactions.

• Revenue Accounting — We have not developed adequate process controls that include the validation of information for fixed price contracts and other parameters required to apply the percentage of completion (POC) method for revenue recognition properly.

We have taken steps in the year ended December 2014 to remediate the material weaknesses. These include, but are not limited to: increasing the staffing levels of finance and accounting personnel with the requisite education, experience and skills for public company financial reporting; implementing procedures to improve controls over updates to the scope, costs and sales prices of construction projects under fixed price

13

**TABLE OF CONTENTS**

contracts; implementing procedures for periodic review for key balance sheet accounts and the related accounting estimates such as accounts receivable, inventories, valuation allowances, property, plant and equipment and depreciation, payables and debt. We plan to continue upgrades to our internal control policies and procedures, including developing training and education programs, and selecting a recognized advisory firm to support the implementation of entity level control structures and effective financial statement disclosure and reporting processes.

***Our warrants and unit purchase options may be exercised, which would increase the number of shares eligible for future resale in the public market and result in dilution to our shareholders.***

Our warrants are currently exercisable. There are warrants outstanding to purchase 9,097,430 ordinary shares. In addition, in connection with our initial public offering, we granted to the underwriters in the initial public offering (and their designees) options to purchase (i) at $11.00 per unit, an aggregate of 400,000 units, each consisting of one ordinary share and one warrant (exercisable at $8.00 per share) and (ii) at $10.00 per unit, an aggregate of 500,000 units, each consisting of one ordinary share and one warrant (exercisable at $8.00 per share). All of these unit purchase options are outstanding, which options and underlying warrants, if fully exercised, would result in an additional 1,800,000 ordinary shares being outstanding. To the extent our outstanding warrants and unit purchase options are exercised, additional ordinary shares of ours will be issued, which will result in dilution to the holders of our ordinary shares and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market could adversely affect the market price of our ordinary shares.

***Our financial results may vary due to fluctuations in our warrant liability.***

Our financial results may vary due to fluctuations in our warrant liability. Because our ordinary shares are publicly traded, these fluctuations are expected to increase or decrease significantly based on changes in the price of our ordinary shares. Accordingly, our financial results for any period should not be relied upon as indications of future operating performance.

***NASDAQ may delist our ordinary shares from quotation on its exchange. Failure to maintain NASDAQ listing could limit investors' ability to make transactions in our ordinary shares and subject us to additional trading restrictions.***

Our ordinary shares are currently listed on NASDAQ. We may not be able to meet the continued listing requirements for our ordinary shares in the future. Failure to meet the continued listing requirements could result in NASDAQ delisting our ordinary shares from trading on its exchange. If this should happen, we could face significant material adverse consequences, including:

- • a limited availability of market quotations for our securities;

- • a limited amount of news and analyst coverage for us; and

- • a decreased ability to issue additional securities or obtain additional financing in the future.

Our warrants were previously listed on NASDAQ but we were unable to meet certain continued listing requirements and NASDAQ delisted the warrants from trading on its exchange.

**Risks Relating to Our Warrants and the Offer to Exchange**

***Our Warrants may be exchanged for ordinary shares pursuant to the Offer, which will increase the number of shares eligible for future resale in the public market and result in dilution to our shareholders.***

The exchange of the Warrants will result in the issuance of additional ordinary shares, although there can be no assurance that warrant exchange will be completed or that all of the holders of the Warrants will elect to participate in the Offer. Any Warrants remaining outstanding after the exchange likely will be exercised only if the $8.00 per share exercise price remains below the market price of our ordinary shares. To the extent such Warrants are exercised, additional ordinary shares will be issued. These issuances of ordinary shares will result in dilution to our shareholders and increase the number of shares eligible for resale in the public market.

14

TABLE OF CONTENTS

***The liquidity of the Warrants that are not exchanged will be reduced.***

The ability to sell unexchanged Warrants will become more limited and could cease to exist due to the reduction in the amount of the Warrants outstanding upon completion of the Offer. A more limited trading market might adversely affect the liquidity, market price and price volatility of unexchanged Warrants. In addition, there can be no assurance that market makers will continue to make a market in our unexchanged Warrants and, if they do not, then our Warrants may be removed from quotation on the OTC Pink Marketplace. As a result, investors in our Warrants may find it more difficult to dispose of or obtain accurate quotations as to the market value of our Warrants, and the ability of our shareholders to sell our Warrants in the secondary market may be materially limited. If there continues to be a market for our unexchanged Warrants, these securities may trade at a discount to the price at which the securities would trade if the number outstanding were not reduced, depending on the market for similar securities and other factors. However, there can be no assurance that an active market in the unexchanged Warrants will continue to be maintained or as to the prices at which the unexchanged Warrants may be traded.

***There is no guarantee that tendering your Warrants in the Offer will put you in a better future economic position.***

We can give no assurance as to the market price of our ordinary shares in the future. If you choose to tender some or all of your Warrants in the Offer, future events may cause an increase in the market price of our ordinary shares and Warrants, which may result in a lower value realized by participating in the Offer than you might have realized if you did not exchange your Warrants. Similarly, if you do not tender your Warrants in the Offer, you will continue to bear the risk of ownership of your Warrants after the closing of the Offer, and there can be no assurance that you can sell your Warrants (or exercise them for ordinary shares) in the future at a higher value than would have been obtained by participating in the Offer. You should consult your own individual tax and/or financial advisor for assistance on how this may affect your individual situation.

15

Case 1:16-cv-00420-ILG-VMS Document 172-2 Filed 05/11/18 Page 26 of 140 PageID #: 3314

TABLE OF CONTENTS

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Prospectus/Offer to Exchange contains "forward-looking statements" within the meaning of the federal securities laws, with respect to our financial condition, results of operations, cash flows and business, and our expectations or beliefs concerning future events. These forward-looking statements can generally be identified by phrases such as "expects," "anticipates," "believes," "estimates," "intends," "plans to," "ought," "could," "will," "should," "likely," "appears," "projects," "forecasts," "outlook" or other similar words or phrases. There are inherent risks and uncertainties in any forward-looking statements. Although we believe that our expectations are reasonable, we can give no assurance that these expectations will prove to have been correct, and actual results may vary materially. Except as required by law, we undertake no obligation to update, amend or clarify any forward-looking statements to reflect events, new information or otherwise. Some of the important factors that could cause actual results to differ materially from our expectations are discussed below. All written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by these cautionary statements.

Among the factors that could cause actual results to differ materially are: competition; business conditions and industry growth; rapidly changing consumer preferences and trends; general economic conditions; large variations in sales volume with significant customers; addition or loss of significant customers; continued compliance with government regulations; loss of key personnel; fluctuations in currency exchange rates; labor practices; product development; management of growth; increases of costs of operations or inability to meet efficiency or cost reduction objectives; timing of orders and deliveries of products; and foreign government regulations and risks of doing business abroad.

You should refer to the "Risk Factors" section of this Prospectus/Offer to Exchange and to our periodic and current reports filed with the SEC for specific risks which would cause actual results to be significantly different from those expressed or implied by any of our forward-looking statements. It is not possible to identify all of the risks, uncertainties and other factors that may affect future results. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Prospectus/Offer to Exchange may not occur and actual results could differ materially from those anticipated or implied in the forward-looking statements. Accordingly, readers of this Prospectus/Offer to Exchange are cautioned not to place undue reliance on the forward-looking statements.

For additional information about factors that could cause actual results to differ materially from those expressed or implied by the forward-looking statements, please see the reports that we have filed with the SEC as described in this Prospectus/Offer to Exchange in the section entitled "*Where You Can Find Additional Information*" on page 58.

16

5/8/2018    Case 1:16-cv-00420-ILG-VMS   Document 122-25   Filed 05/14/18   Page 27 of 140 PageID #: 3315

TABLE OF CONTENTS

## THE OFFER

*Participation in the Offer involves a number of risks, including, but not limited to, the risks identified in the section entitled "Risk Factors." Warrant holders should carefully consider these risks and are urged to speak with their personal legal, financial, investment and/or tax advisor as necessary before deciding whether or not to participate in the Offer. In addition, we strongly encourage you to read this Prospectus/Offer to Exchange in its entirety, and the publicly-filed information about us, before making a decision regarding the Offer.*

**General Terms**

For a limited period of time, we are offering to holders of our Warrants the opportunity to receive one ordinary share in exchange for every 2.6 Warrants they hold. Holders of the Warrants tendered for exchange will not have to pay any of the exercise price for the tendered Warrants in order to receive ordinary shares in the exchange.

No fractional shares will be issued pursuant to the Offer. In lieu of issuing fractional shares, we will round up to the nearest whole share based upon the aggregated number of Warrants tendered by the holder.

The Offer is subject to the terms and conditions contained in this Prospectus/Offer to Exchange and the Letter of Transmittal.

You may tender some or all of your Warrants on these terms. ***If you elect to tender Warrants in response to the Offer, please follow the instructions in this Prospectus/Offer to Exchange and the related documents, including the Letter of Transmittal.***

If you tender Warrants, you may withdraw your tendered Warrants before the Expiration Date and retain them on their current terms, by following the instructions herein. If the Offer Period is extended, you may withdraw your tendered Warrants at any time until the expiration of such extended Offer Period. In addition, Warrants that are not accepted by us for exchange by [          ], 2015 may thereafter be withdrawn by you until such time as the Warrants are accepted by us for exchange.

*Corporate Information*

We were formed under the name "Andina Acquisition Corporation" as an exempted company incorporated in the Cayman Islands on September 21, 2011 in order to effect a merger, share exchange, asset acquisition, share purchase, recapitalization, reorganization or other similar business combination with one or more businesses or entities. On December 20, 2013, we completed the Merger in which Tecnoglass Holding and its indirect, wholly-owned subsidiaries, TG and ES, became our direct and indirect subsidiaries (the "Merger"). Following the Merger, we changed our name from Andina Acquisition Corporation to Tecnoglass, Inc.

Our principal executive offices are located at Avenida Circunvalar a 100 mts de la Via 40, Barrio Las Flores, Barranquilla, Colombia, and our telephone number at such offices is (57)(5)3734000, and our web address is *www.tecnoglass.com*. We do not intend for information contained in our website to be a part of this Prospectus and Offer to Exchange. Our ordinary shares are listed on the Nasdaq Global Market under the symbol "TGLS," and our Warrants are quoted on the OTC Pink Marketplace under the symbol "TGLSW."

*Warrants Subject to the Offer*

The Public Warrants were included in the 4,200,000 Units issued in our initial public offering, each Unit consisting of one ordinary share and one warrant to purchase one ordinary share. As of June 30, 2015, 4,097,430 Public Warrants were outstanding. Pursuant to the Offer, we are offering up to an aggregate of 1,575,935 of our ordinary shares in exchange for the Public Warrants.

The Private Warrants were issued (i) simultaneously with the closing of our initial public offering, in a private sale of 4,800,000 warrants to certain of our initial shareholders and Graubard Miller, our counsel, and (ii) simultaneously with the closing of our initial business combination, in a private transaction upon conversion of an outstanding convertible promissory note. As of June 30, 2015, 5,000,000 Private Warrants were outstanding. Pursuant to the Offer, we are offering up to an aggregate of 1,923,077 of our ordinary shares in exchange for the Private Warrants.

17

TABLE OF CONTENTS

*Offer Period*

The Offer will expire on the Expiration Date, which is 5:00 p.m., Eastern Time, on [        ], 2015, unless the Offer is earlier withdrawn or extended by us. We expressly reserve the right, in our sole discretion, at any time or from time to time, to extend the period of time during which the Offer is open. There can be no assurance that we will exercise our right to extend the Offer Period. During any extension, all Warrant holders who previously tendered Warrants will have a right to withdraw such previously tendered Warrants until the Expiration Date, as extended. If we extend the Offer Period, we will make a public announcement of such extension by no later than 9:00 a.m., Eastern Time, on the next business day following the Expiration Date as in effect immediately prior to such extension.

We may withdraw the Offer only if the conditions to the Offer are not satisfied prior to the Expiration Date. Promptly upon any such withdrawal, we will return the tendered Warrants. We will announce any intention to withdraw the Offer by disseminating notice by public announcement or otherwise as permitted by applicable law.

At the expiration of the Offer Period, the current terms of the Warrants will continue to apply to any unexchanged Warrants until the Warrants expire by their terms on December 20, 2016.

*Partial Exchange Permitted*

If you choose to participate in the Offer, you may exchange less than all of your Warrants pursuant to the terms of the Offer. No fractional shares will be issued pursuant to the Offer. In lieu of issuing fractional shares, we will round up to the nearest whole share based upon the aggregated number of Warrants tendered by the holder.

*Conditions to the Offer*

This Offer is conditioned upon the following:

- the registration statement, of which this document is a part, shall have become effective under the Securities Act, and shall not be the subject of any stop order or proceeding seeking a stop order; and

- no action or proceeding by any government or governmental, regulatory or administrative agency, authority or tribunal or any other person, domestic or foreign, shall have been threatened, instituted or pending before any court, authority, agency or tribunal that directly or indirectly challenges the making of the Offer, the tender of some or all of the Warrants pursuant to the Offer or otherwise relates in any manner to the Offer; and

- there shall not have been any action threatened, instituted, pending or taken, or approval withheld, or any statute, rule, regulation, judgment, order or injunction threatened, proposed, sought, promulgated, enacted, entered, amended, enforced or deemed to be applicable to the Offer or us, by any court or any authority, agency or tribunal that, in our reasonable judgment, would or might, directly or indirectly, (i) make the acceptance for exchange of, or exchange for, some or all of the Warrants illegal or otherwise restrict or prohibit completion of the Offer, or (ii) delay or restrict our ability, or render us unable, to accept for exchange or exchange some or all of the Warrants.

We will not complete the Offer unless and until the registration statement described above is declared effective by the SEC. If the registration statement is not effective at the Expiration Date, we may, in our discretion, extend, suspend or cancel the Offer, and will inform Warrant holders of such event. If we extend the Offer Period, we will make a public announcement of such extension and the new Expiration Date by no later than 9:00 a.m., Eastern Time, on the next business day following the Expiration Date as in effect immediately prior to such extension.

In addition, as to any Warrant holder, the Offer is conditioned upon such Warrant holder desiring to tender Warrants in the Offer delivering to the depositary in a timely manner the holder's Warrants to be tendered and any other required paperwork, all in accordance with the applicable procedures described in this Prospectus/Offer to Exchange and set forth in the Letter of Transmittal.

18

Case 1:16-cv-00420-ILG-VMS Document 112-2 Filed 05/11/18 Page 28 of 140 PageID #: 3317

TABLE OF CONTENTS

We may withdraw the Offer only if the conditions of the Offer are not satisfied prior to the Expiration Date. Promptly upon any such withdrawal, we will return the tendered Warrants. We will announce any intention to withdrawal by disseminating notice by public announcement or otherwise as permitted by applicable law.

### *No Recommendation; Warrant Holder's Own Decision*

None of our company, directors, officers or employees, or the information agent or the depositary for the Offer, is making any recommendations to any Warrant holder as to whether to exchange their Warrants. Each Warrant holder must make its own decision as to whether to tender Warrants for exchange pursuant to the Offer.

## Procedure for Tendering Warrants for Exchange

Issuance of ordinary shares upon exchange of Warrants pursuant to the Offer and acceptance by us of Warrants for exchange pursuant to the Offer will be made only if Warrants are properly tendered pursuant to the procedures described below and set forth in the Letter of Transmittal. A tender of Warrants pursuant to such procedures, if and when accepted by us, will constitute a binding agreement between the tendering holder of Warrants and us upon the terms and subject to the conditions of the Offer.

### *Registered Holders of Warrants; Beneficial Owners of Warrants*

For purposes of the tender procedures set forth below, the term "registered holder" means any person in whose name Warrants are registered on our books or who is listed as a participant in a clearing agency's security position listing with respect to the Warrants.

Persons whose Warrants are held through a direct or indirect participant of The Depository Trust Company ("DTC"), such as a broker, dealer, commercial bank, trust company or other financial intermediary, are not considered registered holders of those Warrants, but are "beneficial owners." Beneficial owners cannot directly tender Warrants for exchange pursuant to the Offer. Instead, a beneficial owner must instruct its broker, dealer, commercial bank, trust company or other financial intermediary to tender Warrants for exchange on behalf of the beneficial owner. See the section of this Prospectus/Offer to Exchange entitled "*The Offer — Procedure for Tendering Warrants for Exchange — Required Communications by Beneficial Owners*" on page 20.

### *Tendering Warrants Using Letter of Transmittal*

A registered holder of Warrants may tender Warrants for exchange using a Letter of Transmittal in the form provided by us with this Prospectus/Offer to Exchange. A Letter of Transmittal is to be used only if (i) Warrant certificates are to be forwarded to the depositary with the Letter of Transmittal (or such certificates will be delivered pursuant to a Notice of Guaranteed Delivery as described in the section of this Prospectus/Offer to Exchange entitled "*The Offer — Procedure for Tendering Warrants for Exchange — Guaranteed Delivery Procedures*" on page 21); or (ii) delivery of Warrants is to be made by book-entry transfer to the depositary's account at DTC pursuant to the procedures set forth in the section of this Prospectus/Offer to Exchange entitled "*The Offer — Procedure for Tendering Warrants for Exchange — Tendering Warrants Using Book-Entry Transfer*" beginning on page 19; provided, however, that in the event of delivery by book-entry transfer, it is not necessary to execute and deliver a Letter of Transmittal if instructions with respect to the tender of such Warrants are transmitted through DTC's Automated Tender Offer Program ("ATOP"). If you are a registered holder of Warrants, unless you intend to tender those Warrants through ATOP, you should complete, execute and deliver a Letter of Transmittal to indicate the action you desire to take with respect to the Offer.

In order for Warrants to be properly tendered for exchange pursuant to the Offer using a Letter of Transmittal, the registered holder of the Warrants being tendered must ensure that the depositary receives the following: (i) a properly completed and duly executed Letter of Transmittal, in accordance with the instructions of the Letter of Transmittal (including any required signature guarantees); (ii) the Warrant certificate(s) for the Warrants being tendered by the holder for exchange or, alternatively, delivery of the Warrants by book-entry transfer to the depositary's account at DTC; and (iii) any other documents required by the Letter of Transmittal.

**TABLE OF CONTENTS**

In the Letter of Transmittal, the tendering registered Warrant holder must set forth: (i) its name and address; (ii) the number of Warrants being tendered by the holder for exchange; (iii) the certificate number(s) of the Warrant certificate(s) representing the tendered Warrants, unless the tendered Warrants have been or will be delivered by book-entry transfer; and (iv) certain other information specified in the form of Letter of Transmittal.

In certain cases, all signatures on the Letter of Transmittal must be guaranteed by an "Eligible Institution." See the section of this Prospectus/Offer to Exchange entitled "*The Offer — Procedure for Tendering Warrants for Exchange — Signature Guarantees*" on page 20.

If the Letter of Transmittal is signed by someone other than the registered holder of the tendered Warrants (for example, if the registered holder has assigned the Warrants to a third-party), or if the ordinary shares to be issued upon exchange of the tendered Warrants are to be issued in a name other than that of the registered holder of the tendered Warrants, the tendered Warrant certificates must be properly endorsed or accompanied by appropriate assignment documents, in either case signed exactly as the name(s) of the registered holder(s) appear on the Warrants, with the signature(s) on the Warrants or assignment documents guaranteed by an Eligible Institution.

### *Lost or Destroyed Certificates*

Warrant holders whose certificate(s) for part or all of their Warrants has been mutilated, lost, stolen, or destroyed should contact the depositary, Continental Stock Transfer & Trust Company, at (800) 509-5586 for instructions as to obtaining a replacement Warrant certificate(s). The replacement certificate(s) will then be required to be submitted together with the Letter of Transmittal in order for such Warrants to be validly tendered pursuant to the Offer. The holder may also be required to give us a bond as indemnity against any claim that may be made against us with respect to the certificate(s) alleged to have been mutilated, lost, stolen, or destroyed. Warrant holders whose Warrant certificates have been mutilated, lost, stolen, or destroyed should contact the depositary immediately in order to permit timely processing of this documentation. However, there can be no assurances that such mutilated, lost, stolen or destroyed certificates will be replaced prior to the Expiration Date.

### *Signature Guarantees*

In certain cases, all signatures on the Letter of Transmittal must be guaranteed by an "Eligible Institution." An "Eligible Institution" is a bank, broker dealer, credit union, savings association or other entity that is a member in good standing of the Securities Transfer Agents Medallion Program or a bank, broker, dealer, credit union, savings association or other entity which is an "eligible guarantor institution," as that term is defined in Rule 17Ad-15 promulgated under the Exchange Act.

Signatures on the Letter of Transmittal need not be guaranteed by an Eligible Institution if (i) the Letter of Transmittal is signed by the registered holder of the Warrants tendered therewith exactly as the name of the registered holder appears on such Warrants and such holder has not completed the box entitled "Special Issuance Instructions" or the box entitled "Special Delivery Instructions" in the Letter of Transmittal; or (ii) such Warrants are tendered for the account of an Eligible Institution.

In all other cases, an Eligible Institution must guarantee all signatures on the Letter of Transmittal by completing and signing the table in the Letter of Transmittal entitled "Guarantee of Signature(s)."

### *Required Communications by Beneficial Owners*

Persons whose Warrants are held through a direct or indirect DTC participant, such as a broker, dealer, commercial bank, trust company or other financial intermediary, are not considered registered holders of those Warrants, but are "beneficial owners," and must instruct the broker, dealer, commercial bank, trust company or other financial intermediary to tender Warrants on their behalf. Your broker, dealer, commercial bank, trust company or other financial intermediary should have provided you with an "Instructions Form" with this Prospectus/Offer to Exchange. The Instructions Form is also filed as an exhibit to the registration statement of which this prospectus forms a part. The Instructions Form may be used by you to instruct your broker or other custodian to tender and deliver Warrants on your behalf.

TABLE OF CONTENTS

### Tendering Warrants Using Book-Entry Transfer

The depositary has established an account for the Warrants at DTC for purposes of the Offer. Any financial institution that is a participant in DTC's system may make book-entry delivery of Warrants by causing DTC to transfer such Warrants into the depositary's account in accordance with ATOP. However, even though delivery of Warrants may be effected through book-entry transfer into the depositary's account at DTC, a properly completed and duly executed Letter of Transmittal (with any required signature guarantees), or an "Agent's Message" as described in the next paragraph, and any other required documentation, must in any case also be transmitted to and received by the depositary at its address set forth in this Prospectus/Offer to Exchange prior to the Expiration Date, or the guaranteed delivery procedures described in the section of this Prospectus/Offer to Exchange entitled "*The Offer — Procedure for Tendering Warrants for Exchange — Guaranteed Delivery Procedures*" must be followed.

DTC participants desiring to tender Warrants for exchange pursuant to the Offer may do so through ATOP, and in that case the participant need not complete, execute and deliver a Letter of Transmittal. DTC participants accepting the Offer may transmit their acceptance to DTC through ATOP. DTC will verify the acceptance and execute a book-entry delivery of the tendered Warrants to the depositary's account at DTC. DTC will then send an "Agent's Message" to the depositary for acceptance. Delivery of the Agent's Message by DTC will satisfy the terms of the Offer as to execution and delivery of a Letter of Transmittal by the DTC participant identified in the Agent's Message. The term "Agent's Message" means a message, transmitted by DTC to, and received by, the depositary and forming a part of a Book-Entry Confirmation, which states that DTC has received an express acknowledgment from the participant in DTC tendering the Warrants for exchange that such participant has received and agrees to be bound by the terms of the Letter of Transmittal and that our company may enforce such agreement against the participant. Any DTC participant tendering by book-entry transfer must expressly acknowledge that it has received and agrees to be bound by the Letter of Transmittal and that the Letter of Transmittal may be enforced against it.

***Delivery of a Letter of Transmittal or any other required documentation to DTC does not constitute delivery to the depositary. See the section of this Prospectus/Offer to Exchange entitled "The Offer — Procedure for Tendering Warrants for Exchange — Timing and Manner of Deliveries."***

### Guaranteed Delivery Procedures

If a registered holder of Warrants desires to tender its Warrants for exchange pursuant to the Offer, but (i) the Warrant certificates are not immediately available, (ii) the procedure for book-entry transfer cannot be completed on a timely basis, or (iii) time will not permit all required documents to reach the depositary prior to the Expiration Date, the holder can still tender its Warrants if all the following conditions are met:

- the tender is made by or through an Eligible Institution;

- the depositary receives by hand, mail, overnight courier or facsimile transmission, prior to the Expiration Date, a properly completed and duly executed Notice of Guaranteed Delivery in the form we have provided with this Prospectus/Offer to Exchange, with signatures guaranteed by an Eligible Institution; and

- the certificates for all physically-delivered Warrants in proper form for transfer by delivery, or a confirmation of a book-entry transfer into the depositary's account at DTC of all Warrants delivered electronically, in each case together with a properly completed and duly executed Letter of Transmittal with any required signature guarantees (or, in the case of a book-entry transfer, an Agent's Message in accordance with ATOP), and any other documents required by the Letter of Transmittal, must be received by the depositary within three Over-the-Counter Bulletin Board quotation days after the date the depositary receives such Notice of Guaranteed Delivery.

In any case where the guaranteed delivery procedure is utilized for the tender of Warrants pursuant to the Offer, the issuance of ordinary shares for those Warrants tendered for exchange pursuant to the Offer and accepted pursuant to the Offer will be made only if the depositary has timely received the applicable foregoing items.

TABLE OF CONTENTS

*Timing and Manner of Deliveries*

**UNLESS THE GUARANTEED DELIVERY PROCEDURES DESCRIBED ABOVE ARE FOLLOWED, WARRANTS WILL BE PROPERLY TENDERED ONLY IF, BY THE EXPIRATION DATE, THE DEPOSITARY RECEIVES SUCH WARRANTS AT ITS ADDRESS SET FORTH IN THE SECTION OF THIS PROSPECTUS/OFFER TO EXCHANGE ENTITLED "THE OFFER — DEPOSITARY" ON PAGE 31 OR BY BOOK-ENTRY TRANSFER, TOGETHER WITH A PROPERLY COMPLETED AND DULY EXECUTED LETTER OF TRANSMITTAL OR, IN THE CASE OF WARRANTS DELIVERED BY BOOK-ENTRY TRANSFER, AN AGENT'S MESSAGE.**

**ALL DELIVERIES IN CONNECTION WITH THE OFFER, INCLUDING ANY LETTER OF TRANSMITTAL AND THE TENDERED WARRANTS, MUST BE MADE TO THE DEPOSITARY. NO DELIVERIES SHOULD BE MADE TO US. ANY DOCUMENTS DELIVERED TO US WILL NOT BE FORWARDED TO THE DEPOSITARY AND THEREFORE WILL NOT BE DEEMED TO BE PROPERLY TENDERED. IN ALL CASES, SUFFICIENT TIME SHOULD BE ALLOWED TO ENSURE TIMELY DELIVERY.**

**THE METHOD OF DELIVERY OF ALL REQUIRED DOCUMENTS IS AT THE OPTION AND RISK OF THE TENDERING WARRANT HOLDERS. IF DELIVERY IS BY MAIL, WE RECOMMEND REGISTERED MAIL WITH RETURN RECEIPT REQUESTED (PROPERLY INSURED). IN ALL CASES, SUFFICIENT TIME SHOULD BE ALLOWED TO ASSURE TIMELY DELIVERY.**

*Determination of Validity*

All questions as to the form of documents and the validity, eligibility (including time of receipt) and acceptance for exchange of any tender of Warrants will be determined by us, in our sole discretion, and our determination will be final and binding. We reserve the absolute right to reject any or all tenders of Warrants that we determine are not in proper form or reject tenders of Warrants that may, in the opinion of our counsel, be unlawful. We also reserve the absolute right to waive any defect or irregularity in any tender of any particular Warrant, whether or not similar defects or irregularities are waived in the case of other tendered Warrants. Neither we nor any other person will be under any duty to give notice of any defect or irregularity in tenders, nor shall any of us or them incur any liability for failure to give any such notice.

*Fees and Commissions*

Tendering Warrant holders who tender Warrants directly to the depositary will not be obligated to pay any charges or expenses of the depositary or any brokerage commissions. Beneficial owners who hold Warrants through a broker or bank should consult that institution as to whether or not such institution will charge the owner any service fees in connection with tendering Warrants on behalf of the owner pursuant to the Offer.

*Transfer Taxes*

We will pay all transfer taxes, if any, applicable to the transfer of Warrants to us in the Offer. If transfer taxes are imposed for any other reason, the amount of those transfer taxes, whether imposed on the registered holder or any other persons, will be payable by the tendering holder. Other reasons transfer taxes could be imposed include (i) if our ordinary shares are to be registered or issued in the name of any person other than the person signing the Letter of Transmittal, or (ii) if tendered Warrants are registered in the name of any person other than the person signing the Letter of Transmittal. If satisfactory evidence of payment of or exemption from those transfer taxes is not submitted with the Letter of Transmittal, the amount of those transfer taxes will be billed directly to the tendering holder and/or withheld from any payment due with respect to the Warrants tendered by such holder.

**Withdrawal Rights**

Tenders of Warrants made pursuant to the Offer may be withdrawn at any time prior to the Expiration Date. If the Offer Period is extended, you may withdraw your tendered Warrants at any time until the expiration of such extended Offer Period. After the Offer Period expires, such tenders are irrevocable, provided, however, that Warrants that are not accepted by us for exchange on or prior to [          ], 2015 may thereafter be withdrawn by you until such time as the Warrants are accepted by us for exchange.

22

**TABLE OF CONTENTS**

To be effective, a written notice of withdrawal must be timely received by the depositary at its address identified in this Prospectus/Offer to Exchange. Any notice of withdrawal must specify the name of the person who tendered the Warrants for which tenders are to be withdrawn and the number of Warrants to be withdrawn. If the Warrants to be withdrawn have been delivered to the depositary, a signed notice of withdrawal must be submitted prior to release of such Warrants. In addition, such notice must specify the name of the registered holder (if different from that of the tendering Warrant holder) and the certificate numbers shown on the particular certificates evidencing the Warrants to be withdrawn. Withdrawal may not be cancelled, and Warrants for which tenders are withdrawn will thereafter be deemed not validly tendered for purposes of the Offer. However, Warrants for which tenders are withdrawn may be tendered again by following one of the procedures described above in the section entitled "*The Offer — Procedure for Tendering Warrants for Exchange*" beginning on page 19, at any time prior to the Expiration Date.

A beneficial owner of Warrants desiring to withdraw tendered Warrants previously delivered through DTC should contact the DTC participant through which such owner holds its Warrants. In order to withdraw Warrants previously tendered, a DTC participant may, prior to the Expiration Date, withdraw its instruction by (i) withdrawing its acceptance through DTC's Participant Tender Offer Program ("PTOP") function, or (ii) delivering to the depositary by mail, hand delivery or facsimile transmission, notice of withdrawal of such instruction. The notices of withdrawal must contain the name and number of the DTC participant. A withdrawal of an instruction must be executed by a DTC participant as such DTC participant's name appears on its transmission through the PTOP function to which such withdrawal relates. If the tender being withdrawn was made through ATOP, it may only be withdrawn through PTOP, and not by hard copy delivery of withdrawal instructions. A DTC participant may withdraw a tendered Warrant only if such withdrawal complies with the provisions described in this paragraph.

A holder who tendered its Warrants other than through DTC should send written notice of withdrawal to the depositary specifying the name of the Warrant holder who tendered the Warrants being withdrawn. All signatures on a notice of withdrawal must be guaranteed by an Eligible Institution, as described above in the section entitled "*The Offer — Procedure for Tendering Warrants for Exchange — Signature Guarantees*" on page 20; provided, however, that signatures on the notice of withdrawal need not be guaranteed if the Warrants being withdrawn are held for the account of an Eligible Institution. Withdrawal of a prior Warrant tender will be effective upon receipt of the notice of withdrawal by the depositary. Selection of the method of notification is at the risk of the Warrant holder, and notice of withdrawal must be timely received by the depositary.

All questions as to the form and validity (including time of receipt) of any notice of withdrawal will be determined by us, in our sole discretion, which determination shall be final and binding. Neither we nor any other person will be under any duty to give notification of any defect or irregularity in any notice of withdrawal or incur any liability for failure to give any such notification.

**Acceptance for Issuance of Shares**

Upon the terms and subject to the conditions of the Offer, we will accept for exchange Warrants validly tendered until the Expiration Date, which is 5:00 p.m., Eastern Time, on [          ], 2015, unless earlier withdrawn or extended by us. The ordinary shares to be issued upon exchange of Warrants pursuant to the Offer, along with a certificate representing the balance of any Warrants not exchanged, will be delivered promptly following the Expiration Date. In all cases, Warrants will only be accepted for exchange pursuant to the Offer after timely receipt by the depositary of (i) certificates for such Warrants tendered physically, or book-entry delivery of the tendered Warrants, (ii) a properly completed and duly executed Letter of Transmittal, or compliance with ATOP where applicable, (iii) any other documentation required by the Letter of Transmittal, and (iv) any required signature guarantees.

For purposes of the Offer, we will be deemed to have accepted for exchange Warrants that are validly tendered and for which tenders are not withdrawn, unless we give written notice to the Warrant holder of our non-acceptance.

**Announcement of Results of the Offer**

We will announce the final results of the Offer, including whether all of the conditions to the Offer have been satisfied or waived and whether we will accept the tendered Warrants for exchange, as promptly as

23

TABLE OF CONTENTS

practicable following the end of the Offering Period. The announcement will be made by a press release and by amendment to the Schedule TO we file with the SEC in connection with the Offer.

**Background and Purpose of the Offer**

The purposes of the Offer are to attempt to simplify our corporate structure, reduce the potential dilutive impact of the warrants thereby providing us with more flexibility for financing our operations in the future, and to reduce our "derivative warrant liability" to increase shareholders' equity. Due to the terms of the warrants, we are required to revalue the warrants quarterly and have recorded significant non-cash derivative losses and gains which are not reflective of our actual operating performance. By eliminating the warrants, we would no longer be required to record these non-cash losses or gains. The Warrants that are tendered for exchange pursuant to the Offer will be retired. Additionally, the Offer will allow holders of Warrants the opportunity to participate in our recently announced dividend policy of declaring regular quarterly cash dividends of $0.125 per share, or $0.50 per share annually, by exchanging their Warrants for our ordinary shares.

**Agreements, Regulatory Requirements and Legal Proceedings**

Other than as set forth under the sections entitled "*The Offer — Interests of Directors, Executive Officers and Others,*" "*The Offer — Transactions and Agreements Concerning Our Securities*" and "*The Offer — Registration under the Exchange Act*" beginning on pages 24, 26 and 27, respectively, there are no present or proposed agreements, arrangements, understandings or relationships between us, and any of our directors, executive officers, affiliates or any other person relating, directly or indirectly, to the Offer or to our securities that are the subject of the Offer.

Except for the requirements of applicable federal and state securities laws, we know of no federal or state regulatory requirements to be complied with or federal or state regulatory approvals to be obtained by us in connection with the Offer. There are no antitrust laws applicable to the Offer. The margin requirements under Section 7 of the Exchange Act, and the related regulations thereunder, are inapplicable to the Offer.

There are no pending legal proceedings relating to the Offer.

**Interests of Directors, Executive Officers and Others**

We do not beneficially own any of the Warrants. The following table lists the Warrants beneficially owned by our directors, executive officers and other affiliates or related persons as of June 30, 2015:

| Name[1] | Aggregate Number of Warrants Beneficially Owned | Percentage of Warrants Beneficially Owned[2] |
|---|---|---|
| Jose M. Daes | 0[3] | 0 |
| Christian T. Daes | 0[3] | 0 |
| Joaquin F. Fernandez | 789,082[4] | 8.7% |
| Julio A. Torres | 125,000 | 1.4% |
| Martha L. Byorum | 125,000 | 1.4% |
| Energy Holding Corporation | 789,082 | 8.7% |
| Nicholas B. Weil[5] | 200,000 | 2.2% |
| B. Luke Weil[6] | 484,255 | 5.3% |

------

\*   Less than one percent.

[1] Unless otherwise indicated, the business address of each of the individuals is 333 8th Street SE, 3rd Floor, Calgary, Alberta T2G 3A4.

(2) Determined based on 9,097,430 Warrants, representing 4,097,430 Public Warrants and 5,000,000 Private Warrants outstanding as of June 30, 2015.

(3) Does not include Warrants held by Energy Holding Corporation, in which this person has an indirect ownership interest.

TABLE OF CONTENTS

(4) Represents Warrants held by Energy Holding Corporation, of which Mr. Fernandez is a director and may be deemed to share voting and dispositive power over such Warrants.

(5) Nicholas B. Weil is the son of A. Lorne Weil, our Chairman of the Board.

(6) B. Luke Weil is the son of A. Lorne Weil, our Chairman of the Board, and is a former Chief Executive Officer.

We anticipate that several of the foregoing individuals and entities will exchange their Warrants in the Offer. However, there is no assurance that they will. None of such individuals will receive any benefit by virtue of such exchange that is not shared on a pro rata basis with other holders of the same type of Warrants exchanged pursuant to the Offer. Each such individual also has registration rights under the agreement described in the sections of this Prospectus/Offer to Exchange entitled "*Certain Relationships and Related Person Transactions*" and "*Description of Securities*" beginning on pages 52 and 55, respectively.

**Market Price, Dividends and Related Shareholder Matters**

*Market Price of Ordinary Shares and Warrants*

Currently, our ordinary shares are listed on the NASDAQ Capital Market under the symbol TGLS, and our warrants are quoted on the OTC Pink Marketplace under the symbol TGLSW.

Until January 2014, our Warrants were listed on the NASDAQ Capital Market. Prior to the Merger, the trading symbols of our ordinary shares and Warrants were ANDA and ANDAW, respectively. From March 2012 through November 2013, our units, sold in our IPO and described elsewhere in this Form 10-K, were traded on the NASDAQ Capital Market under the symbol ANDAU. However, as a condition to the Merger, we separated the units into their component securities (one ordinary share and one warrant) on a mandatory basis and the units ceased public trading.

The following table sets forth the high and low sales prices for our ordinary shares and Warrants for the periods indicated since our ordinary shares and Warrants commenced trading on May 10, 2012:

| Period* | Ordinary Shares | | Warrants | |
| --- | --- | --- | --- | --- |
| | High | Low | High | Low |
| Fiscal 2015: | | | | |
|    Second Quarter** | $ 13.51 | $ 8.50 | $ 4.95 | $ 2.05 |
|    First Quarter | $ 10.73 | $ 9.16 | $ 2.75 | $ 2.20 |
| Fiscal 2014: | | | | |
|    Fourth Quarter | $ 12.00 | $ 9.80 | $ 3.44 | $ 2.10 |
|    Third Quarter | $ 12.29 | $ 10.70 | $ 4.15 | $ 3.06 |
|    Second Quarter | $ 15.00 | $ 10.20 | $ 4.85 | $ 2.20 |
|    First Quarter | $ 11.15 | $ 8.50 | $ 2.95 | $ 1.08 |
| Fiscal 2013: | | | | |
|    Fourth Quarter* | $ 10.40 | $ 8.15 | $ 1.45 | $ 0.45 |
|    Third Quarter | $ 10.23 | $ 9.93 | $ 0.60 | $ 0.18 |
|    Second Quarter | $ 10.00 | $ 9.90 | $ 0.25 | $ 0.15 |
|    First Quarter | $ 10.00 | $ 9.87 | $ 0.27 | $ 0.13 |

---

\*    Prior to consummation of the Merger, our fiscal year end was February 28th. We changed our fiscal year end to December 31st in connection with the Merger and all periods are stated on a December 31st year end.

\*\*   Through June 30, 2015.

*Holders*

As of June 30, 2015, there were 316 holders of record of our ordinary shares and 17 holders of record of our Warrants.

25

TABLE OF CONTENTS

### Dividends

We have not paid any dividends on our ordinary shares to date. On April 14, 2015, our Board of Directors authorized the payment of regular quarterly dividends to holders of our ordinary shares at a quarterly rate of $0.125 per share (or $0.50 per share on an annual basis). The first quarterly dividend payment will be made to shareholders of record 15 days after the end of the Offer.

## Source and Amount of Funds

Because this transaction is an offer to holders to exchange their existing Warrants for our ordinary shares, there is no source of funds or other cash consideration being paid by us to, or to us from, those tendering Warrant holders pursuant to the Offer. We estimate that the total amount of cash required to complete the transactions contemplated by the Offer, including the payment of any fees, expenses and other related amounts incurred in connection with the transactions will be approximately $[•]. We expect to have sufficient funds to complete the transactions contemplated by the Offer and to pay fees, expenses and other related amounts from our cash on hand.

## Fees and Expenses

We have retained Continental Stock Transfer & Trust Company as depositary and exchange agent in connection with the Offer. We will pay Continental Stock Transfer & Trust reasonable and customary compensation for its services in connection with the Offer will reimburse its reasonable out-of-pocket expenses and will indemnify it against certain liabilities and expenses, including certain liabilities under the U.S. federal securities laws.

We will reimburse brokers, dealers, commercial banks and trust companies and other nominees, upon request, for customary clerical and mailing expenses incurred by them in forwarding offering materials to their customers. Except as set forth above, we will not pay any fees or commissions to any broker, dealer or other person for soliciting tenders of Warrants pursuant to the Offer.

## Transactions and Agreements Concerning Our Securities

Other than as set forth below and in the sections of this Prospectus/Offer to Exchange entitled "*Certain Relationships and Related Person Transactions*" and "*Description of Securities*" beginning on pages 52 and 55, respectively, and as set forth in our third amended and restated memorandum and articles of association, there are no agreements, arrangements or understandings between our company, or any of our directors or executive officers, and any other person with respect to our securities that are the subject of the Offer.

### Agreements Relating to our Initial Public Offering

As described in the section of this Prospectus/Offer to Exchange entitled "*Description of Securities — Registration Rights*" beginning on page 57, in connection with our initial public offering, we entered into a registration rights with our initial shareholders with respect to their securities held at the time of our initial public offering.

### Agreements Relating to the Merger

At the closing of the Merger, 2,251,853 of the 4,200,000 public shares sold in our IPO were converted to cash at a conversion price of approximately $10.18 per share, or an aggregate of approximately $22.9 million of the approximately $42.7 million held in the trust account. As consideration for the Merger, we issued Energy Holding Corporation, a holding company and sole shareholder of Tecnoglass Holding, of which former shareholders of TG and ES are the sole shareholders, an aggregate of 20,567,141 ordinary shares, or approximately 87% of the outstanding ordinary shares. Pursuant to the agreement and plan of reorganization, we also issued to Energy Holding Corporation. an additional 500,000 ordinary shares upon the achievement of specified EBITDA targets in the fiscal year ended December 31, 2014. Additionally, Energy Holding Corp. also has the contractual right to receive an additional 2,500,000 ordinary shares, to be released upon the attainment of specified share price targets or targets based on our EBITDA in the fiscal years ending December 31, 2015 or 2016.

26

TABLE OF CONTENTS

As described in the section of this Prospectus/Offer to Exchange entitled "*Description of Securities — Registration Rights*" beginning on page 57, at the closing of the Merger, we entered into a registration rights with the former shareholders of TG and ES with respect to the shares of our ordinary shares they received in the Merger.

### Securities Transactions

Except as set forth in the section of this Prospectus/Offer to Exchange entitled "*Certain Relationships and Related Person Transactions*" beginning on page 52, neither we, nor any of our directors, executive officers or controlling persons, or any executive officers, directors, managers or partners of any of our controlling persons, has engaged in any transactions in our Warrants in the last 60 days.

### Plans

Except as described in the sections of this Prospectus/Offer to Exchange entitled "*Risk Factors*," "*The Offer*," "*Information Concerning Our Company*," "*Certain Relationships and Related Person Transactions*" and "*Description of Securities*" beginning on pages 5, 17, 33, 52 and 55, respectively, neither the Company, nor any of its directors, executive officers, or controlling persons, or any executive officers, directors, managers or partners of its controlling persons, has any plans, proposals or negotiations that relate to or would result in:

- any extraordinary transaction, such as a merger, reorganization or liquidation, involving us or any of our subsidiaries;

- any purchase, sale or transfer of a material amount of assets of us or any of our subsidiaries;

- any material change in our present dividend rate or policy, or our indebtedness or capitalization;

- any change in our present board of directors or management, including, but not limited to, any plans or proposals to change the number or the term of directors or to fill any existing vacancies on the board or to change any material term of the employment contract of any executive officer;

- any other material change in our corporate structure or business;

- any class of our equity securities to be delisted from the Nasdaq Global Market;

- any class of our equity securities becoming eligible for termination of registration under section 12(g)(4) of the Exchange Act;

- the suspension of our obligation to file reports under Section 15(d) of the Exchange Act;

- the acquisition or disposition by any person of our securities; or

- any changes in our third amended and restated memorandum and articles of association or other governing instruments or other actions that could impede the acquisition of control of our company.

### Registration under the Exchange Act

The Warrants currently are registered under the Exchange Act. This registration may be terminated upon application by us to the SEC if there are fewer than 300 record holders of the Warrants, provided we obtain the consent of the representative of the underwriters for our initial public offering of the Units as required pursuant to the underwriting agreement for such offering. We currently do not intend to deregister the Warrants, if any, that remain outstanding after completion of the Offer. Notwithstanding any termination of the registration of our Warrants, we will continue to be subject to the reporting requirements under the Exchange Act as a result of the continuing registration of our ordinary shares.

### Accounting Treatment

The exchange of the Warrants will be accounted for as an ordinary stock issuance. We will record the aggregate par value of the ordinary shares issued in the exchange as a credit to the capital stock account. Offer-related costs, which include advisory, legal, accounting, depositary and other professional or consulting fees, will be expensed in the period incurred.

The Company previously classified the Warrants as a liability at fair value as the terms of the warrant agreement are such that the instruments do not meet the criteria for equity treatment. The Exchange Offer

TABLE OF CONTENTS

does not modify any terms of the warrant agreements or the current accounting treatment for the un-exchanged warrants. For the exchanged warrants, the difference between the actual fair value of the warrant liability as of the date of their exchange and the actual fair value of the ordinary shares issued is recorded as a gain/loss to the income statement.

**Absence of Appraisal or Dissenters' Rights**

Holders of the Warrants do not have any appraisal or dissenters' rights under applicable law in connection with the Offer.

**Material U.S. Federal Income Tax Consequences**

*General*

The following description summarizes the material U.S. federal income tax consequences of the receipt of ordinary shares in exchange for the Warrants pursuant to the Offer and the ownership and disposition of the ordinary shares. This description assumes that holders hold the Warrants, and will hold the ordinary shares received upon exchange of the Warrants, as capital assets (generally, property held for investment). This description does not address all of the tax consequences that might be relevant to a holder's particular circumstances or to holders that may be subject to special tax rules, such as banks or other financial institutions, insurance companies, real estate investment trusts, regulated investment companies, tax exempt organizations, dealers in securities, traders in securities that elect to use a mark-to-market method of accounting for their securities holdings, persons who hold ordinary shares or Warrants as part of a "straddle," hedging transaction, conversion transaction, or other similar integrated transaction for U.S. federal income tax purposes, or U.S. holders (as defined below) that have a functional currency other than the U.S. dollar.

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds ordinary shares or Warrants, the tax treatment of the partnership and a partner in such partnership generally will depend on the status of the partner and the nature of the activities of the partnership. A holder that is a partnership, and the partners in such partnerships, should consult its own tax advisors regarding the tax consequences of the receipt of ordinary shares in the exchange and the ownership and disposition of ordinary shares received in the exchange.

This description does not address the tax consequences arising under the laws of any foreign, state, or local tax jurisdiction. Moreover, except to the extent specifically set forth below, this description does not address the U.S. federal estate and gift tax, or alternative minimum tax, or other non-income tax consequences of the ownership and disposition of ordinary shares received upon exchange of the Warrants.

This description is based on the Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed Treasury Regulations promulgated thereunder, judicial decisions, published positions of the Internal Revenue Service (the "IRS"), and other applicable authorities, each as in effect on the date hereof. These authorities are subject to change, possibly with retroactive effect, or differing interpretations by the IRS or a court, which could affect the tax consequences described herein. We have not obtained, and have no plans to request, a ruling from the IRS with respect to any of the U.S. federal income tax consequences described below, and as a result, there can be no assurance that the IRS or the courts will agree with any of the conclusions stated in this description.

**This description is for general information only and is not tax advice. It is not intended to constitute a complete description of all tax consequences for holders relating to the exchange of Warrants for our ordinary shares or relating to the ownership and disposition of our ordinary shares. You are urged to consult with your tax advisor regarding the U.S. federal income tax consequences of the receipt of ordinary shares in exchange for the Warrants, and of the ownership and disposition of such ordinary shares, applicable in your particular situation, as well as any consequences under the federal estate or gift tax, the federal alternative minimum tax, or under the tax laws of any state, local, foreign, or other taxing jurisdiction.**

*Tax Consequences to U.S. Holders*

Subject to the limitations stated above, the following description addresses certain material U.S. federal income tax consequences of the receipt of ordinary shares in exchange for the Warrants, and of the ownership

28

TABLE OF CONTENTS

and disposition of our ordinary shares, that are expected to apply if you are a U.S. holder of the Warrants or our ordinary shares. For this purpose, you are a "U.S. holder" if you are:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States or any State thereof, including the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust (i) if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons (as defined in Section 7701(a)(30) of the Code) have the authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

*Exchange of Warrants for Ordinary shares*

Your exchange of Warrants for our ordinary shares pursuant to the Offer should be treated as a "recapitalization" pursuant to which (i) you should not recognize any gain or loss on the exchange of Warrants for shares of our ordinary shares, (ii) your aggregate tax basis in the shares received in the exchange should equal your aggregate tax basis in your Warrants surrendered in the exchange, and (iii) your holding period for the shares received in the exchange should include your holding period for the surrendered Warrants. Special tax basis and holding period rules apply to holders that acquired different blocks of Warrants at different prices or at different times. You should consult your tax advisor as to the applicability of these special rules to your particular circumstances.

If you exchange Warrants for our ordinary shares pursuant to the Offer, and if you hold five percent or more of our ordinary shares prior to the exchange, or if you hold Warrants and other securities of ours prior to the exchange with a tax basis of $1 million or more, you will be required to file with your U.S. federal income tax return for the year in which the exchange occurs a statement setting forth certain information relating to the exchange (including the fair market value, prior to the exchange, of the Warrants transferred in the exchange and your tax basis, prior to the exchange, in our ordinary shares or securities), and to maintain permanent records containing such information.

If you do not tender your Warrants in the Offer, you will not have any U.S. federal income tax consequences from declining to exchange such Warrants for our ordinary shares pursuant to the Offer.

*Ownership and Disposition of Ordinary Shares*

Distributions of cash or property that we pay on our ordinary shares will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits (as determined under U.S. federal income tax principles) and will be includible in your gross income as ordinary dividend income when actually or constructively received by you. Distributions in excess of our current and accumulated earnings and profits will be treated first as a tax-free return of capital to the extent of your tax basis in our ordinary shares, and thereafter will be treated as capital gain from the sale or exchange of the ordinary shares. If you are a non-corporate U.S. holder, dividends you receive with respect to our ordinary shares are eligible for U.S. federal income taxation at the rates generally applicable to long-term capital gains for individuals, provided you satisfy applicable holding period and other requirements. If you are a corporate U.S. holder, dividends you receive with respect to our ordinary shares will be taxable at regular rates and will not be eligible for the dividends received deduction generally allowed to domestic corporations in respect of dividends received from other domestic corporations.

Upon a sale or other taxable disposition of our ordinary shares, you generally will recognize capital gain or loss equal to the difference between (i) the amount of cash and the fair market value of any property you receive on the disposition and (ii) your adjusted tax basis for the ordinary shares. The capital gain or loss will be long-term capital gain or loss if you held the ordinary shares more than one year. The deductibility of capital losses is subject to limitations.

29

TABLE OF CONTENTS

*Tax on Net Investment Income*

A 3.8% Medicare contribution tax will generally apply to all or some portion of the net investment income of a U.S. holder who is an individual with adjusted gross income that exceeds a threshold amount. In the case of individuals, a 3.8% tax is imposed for each taxable year on the lesser of (a) net investment income for the year or (b) the modified adjusted gross income for such year in excess of a threshold amount ($250,000 if married filing jointly or if considered a "surviving spouse" for federal income tax purposes, $125,000 if married filing separately, and $200,000 in other cases). For these purposes, dividends received with respect to our ordinary shares, and gains or losses realized from the taxable disposition of our ordinary shares, will generally be taken into account in computing your net investment income.

*Information Reporting and Backup Withholding*

In general, dividends you receive with respect to our ordinary shares, and amounts you receive with respect to a sale or other disposition of our ordinary shares, are reported to the IRS and to you, unless you are an exempt payee (such as a corporation) and the payment is not subject to backup withholding. Such dividends and other amounts may be subject to backup withholding (at a rate of 28%), and subject to related information reporting with respect to otherwise exempt payees, unless you provide to us (i) your correct taxpayer identification number and certification (on Form W-9) that you are not subject to backup withholding, or (ii) proof that you are an exempt payee. Any amounts withheld from a payment under the backup withholding rules will be allowed as a credit against your U.S. federal income tax liability and may entitle you to a refund, provided you timely furnish the required information or returns to the IRS.

### Tax Consequences to Non-U.S. Holders

Subject to the limitations stated above, the following description addresses certain material U.S. federal income tax consequences of the receipt of ordinary shares in exchange for the Warrants, and of the ownership and disposition of our ordinary shares, that are expected to apply if you are a non-U.S. holder of the Warrants or our ordinary shares. For this purpose, you are a "non-U.S. holder" if you are an individual, corporation, estate, or trust that is not a U.S. holder as defined above. Special rules may apply to certain non-U.S. holders such as "controlled foreign corporations," "passive foreign investment companies," individuals present in the United States for 183 days or more in the taxable year of disposition (but who are not U.S. residents) or, in certain circumstances, individuals who are former U.S. citizens or residents.

*Exchange of Warrants for Ordinary Shares*

Your exchange of Warrants for our ordinary shares pursuant to the Offer should have the same tax consequences as described above for U.S. holders. Assuming you are not engaged the conduct of a trade or business within the U.S., you should not be required to make any U.S. federal income tax filings solely on account of the exchange of Warrants for our ordinary shares.

*Ownership and Disposition of Ordinary shares*

Dividends (including constructive dividends) paid or deemed paid to a non-U.S. holder in respect to our ordinary shares generally will not be subject to U.S. federal income tax, unless the dividends are effectively connected with the non-U.S. holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, are attributable to a permanent establishment or fixed base that such holder maintains in the United States).

In addition, a non-U.S. holder generally will not be subject to U.S. federal income tax on any gain attributable to a sale or other disposition of our ordinary shares unless such gain is effectively connected with its conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment or fixed base that such holder maintains in the United States) or the non-U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of sale or other disposition and certain other conditions are met (in which case, such gain from United States sources generally is subject to tax at a 30% rate or a lower applicable tax treaty rate).

Dividends and gains that are effectively connected with the non-U.S. holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, are attributable to a permanent establishment or fixed base in the United States) generally will be subject to U.S. federal income

**TABLE OF CONTENTS**

tax (but not the Medicare contribution tax) at the same regular U.S. federal income tax rates applicable to a comparable U.S. Holder and, in the case of a non-U.S. holder that is a corporation for U.S. federal income tax purposes, may also be subject to an additional branch profits tax at a 30% rate or a lower applicable tax treaty rate.

*Information Reporting and Backup Withholding*

In general, dividends you receive with respect to our ordinary shares, and any U.S. federal withholding tax withheld with respect to those dividends, are reported to the IRS and to you, regardless of whether withholding is reduced or eliminated by an applicable income tax treaty. Copies of this information reporting may also be provided under the provisions of a specific tax treaty, or under the provisions of a tax information exchange agreement, to the tax authorities in the country in which you reside or are established. Amounts you receive from of a sale or other disposition of our ordinary shares effected through the U.S. office of any broker (as defined in applicable Treasury regulations) or from a sale or other disposition conducted outside the United States through certain U.S.-related brokers, are also reported to the IRS and to you.

You will generally be exempt from backup withholding on dividends and other amounts you receive with respect to our ordinary shares if you provide a certification (on an applicable IRS Form W-8) or proof of exempt status as described above with respect to U.S. federal income tax withholding. Any amounts withheld under the backup withholding rules from a payment will be allowed as a credit against your U.S. federal income tax liability and may entitle you to a refund, provided you timely furnish the required information or returns to the IRS.

**Foreign Account Reporting and Withholding**

A U.S. federal withholding tax of 30% may apply to dividends on, and the gross proceeds of a sale or other disposition of, our ordinary shares, paid to a "foreign financial institution" (as defined in Section 1471 of the Code), unless such institution enters into an agreement with the U.S. government to collect and verify information regarding holders of accounts maintained by such institution, to report information with respect to U.S. accounts maintained by such institution, and to withhold on certain "passthru payments" made by such institution. In general, U.S. accounts are depositary and custodial accounts maintained by the foreign financial institution, and certain equity and debt interests in such institution, which are held by U.S. persons or U.S. — owned foreign entities. A U.S. federal withholding tax of 30% may also apply to dividends and the gross proceeds of a sale or other disposition of our ordinary shares paid to a non-financial foreign entity unless the foreign entity provides the withholding agent either (i) a certification that the foreign entity does not have any "substantial U.S. owners" or (ii) identifying information for each substantial U.S. owner. A substantial U.S. owner is generally defined as any U.S. person, other than a publicly traded corporation or its affiliates and certain other specified exempt persons, owning more than 10% of the foreign entity. Under certain circumstances, a non-U.S. holder might be eligible for refunds or credits of such taxes.

**Depositary**

The depositary and exchange agent for the Offer is:

Continental Stock Transfer & Trust Company
17 Battery Place
New York, New York 10004
Attention: Corporate Actions Department
Facsimile: (212) 616-7610

**Additional Information; Amendments**

We have filed with the SEC a Tender Offer Statement on Schedule TO, of which this Prospectus/Offer to Exchange is a part. We recommend that Warrant holders review the Schedule TO, including the exhibits, and our other materials that have been filed with the SEC before making a decision on whether to accept the Offer.

We will assess whether we are permitted to make the Offer in all jurisdictions. If we determine that we are not legally able to make the Offer in a particular jurisdiction, we will inform Warrant holders of this decision. The Offer is not made to those holders who reside in any jurisdiction where the offer would be unlawful.

31

**TABLE OF CONTENTS**

Our board of directors recognizes that the decision to accept or reject this Offer is an individual one that should be based on a variety of factors and Warrant holders should consult with personal advisors if they have questions about their financial or tax situation.

We are subject to the information requirements of the Exchange Act and in accordance therewith file and furnish reports and other information with the SEC. All reports and other documents we have filed or furnished with the SEC, including the registration statement on Form S-4 relating to the Offer, or will file or furnish with the SEC in the future, can be accessed electronically on the SEC's website at *www.sec.gov*.

If you have any questions regarding the Offer or need assistance, you should contact the information agent for the Offer. You may request additional copies of this document, the Letter of Transmittal or the Notice of Guaranteed Delivery from the information agent. All such questions or requests should be directed to:

Devin Sullivan
The Equity Group

800 3rd Avenue, 36th Floor
New York, NY 10022
Phone: 212.371.8660
Fax: 212.421.1278
info@equityny.com

We will amend our offering materials, including this Prospectus/Offer to Exchange, to the extent required by applicable securities laws to disclose any material changes to information previously published, sent or given by us to Warrant holders in connection with the Offer.

TABLE OF CONTENTS

## INFORMATION CONCERNING OUR COMPANY

### Overview

We were originally formed under the name "Andina Acquisition Corporation" for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, recapitalization, reorganization or other similar business combination with one or more businesses or entities. On March 22, 2012, we consummated our initial public offering, and on December 20, 2013, we consummated our initial business combination, whereby our wholly-owned subsidiary merged with and into Tecnoglass Holding. As a result of this transaction, Tecnoglass Holding and its indirect, wholly-owned subsidiaries, TG and ES, became our direct and indirect subsidiaries. Accordingly, the business of Tecnoglass Holding and its subsidiaries became our business. We are now a holding company operating through our direct and indirect subsidiaries.

The transaction with Tecnoglass Holding was accounted for as a reverse acquisition with Tecnoglass Holding being considered the accounting acquirer in the transaction. For accounting and financial purposes, we were treated as the acquired company, and Tecnoglass Holding was treated as the acquiring company. Accordingly, historical information, including historical financial information and the historical description of our business, for periods and dates prior to December 20, 2013, include information for Tecnoglass Holding and its subsidiaries.

### General

We are a leading manufacturer of hi-spec, architectural glass and windows for the western hemisphere residential and commercial construction industries, operating through our direct and indirect subsidiaries. Headquartered in Barranquilla, Colombia, we operate out of a 2.3 million square foot vertically-integrated, state-of-the-art manufacturing complex that provides easy access to the Americas, the Caribbean, and the Pacific.

We sell our products to more than 800 customers in North, Central and South America. The United States accounted for approximately 51% and 36% of our combined revenues in 2014 and 2013, while Colombia accounted for approximately 41% and 56%, and Panama for approximately 6% and 6% of our combined revenues in those years. Our tailored, high-end products are found on some of the world's most distinctive properties, including the El Dorado Airport (Bogota), Imbanaco Medical Center (Cali), Brickell City Centre (Miami), and The Woodlands (Houston).

*TG.* TG is a leading manufacturer of a variety of glass products installed primarily in commercial and residential buildings, including tempered safety, double thermo-acoustic and laminated glass. TG products are installed in hotels, residential buildings, commercial and corporate centers, universities, airports and hospitals in a variety of applications such as floating facades, curtain walls, windows, doors, handrails, interior and bathroom spatial dividers. Approximately 43% of TG products are supplied to ES for installation in various products that ES manufactures, with the balance of TG products being sold to customers throughout North, Central and South America.

TG also produces aluminum products such as profiles, rods, bars, plates and other hardware used in the manufacture of windows. In 2007, TG established its Alutions plant in Barranquilla, Colombia for extrusion, smelting, painting and anodizing processes, and for exporting, importing and marketing aluminum products. The Alutions plant contributes more than 90% of the raw materials needed for production of TG aluminum products.

Glass Magazine ranked TG as the second largest glass fabricator serving the U.S. market in 2013. We believe that it is the leading glass transformation company in Colombia, capturing 40% of the market share in the country.

*ES.* ES is a leader in the production of high-end windows, with more than 29 years of experience in the glass and aluminum structure assembly market in Colombia. ES designs, manufactures, markets and installs architectural systems for high, medium and low rise construction, glass and aluminum windows and doors, office dividers and interiors, floating facades and commercial display windows.

Since 2004, we have a strategic commercial relationship with ES Windows LLC ("ESW LLC"), a Florida-based company partially owned by Christian T. Daes and José M. Daes, who are also our executive

33

TABLE OF CONTENTS

officers and directors. ESW LLC is a member of the American Architectural Manufacturers Association, a technical information center for the architecture industry with highest standards. ESW LLC sends project specifications and orders from its clients to ES, and in turn, receives pricing quotes from ES which are conveyed to the client. ESW LLC does not install any of our products. Our transactions with ESW LLC are further disclosed in the notes to our financial statements appearing elsewhere in this Annual Report.

Based on our knowledge of the South Florida construction market, we believe that ES participated in 80% of the high rise building projects in South Florida in the years leading up to the 2008 economic crises through the sale of its products to RC Aluminum Industries ("RC Aluminum"). ES also possesses the requisite permits, known as Notices of Acceptance ("NOA") to commercialize hurricane windows in Miami-Dade County, Florida, one of the most demanding certifications in the world for manufacturers of windows and window frames. In 2014, we were awarded a contract from one of the largest real estate development firms in the United States to manufacture and supply windows for 10 multi-dwelling residential buildings to be constructed in South Florida for approximately $40 million.

ES has expanded its U.S. sales outside of the Florida market for windows, into the high-tech market for curtain walls, a product that is in high demand and represents a new trend in architecture, and floating facades. Due to the sophistication of these new products, ES believes that sales of curtain walls will generate higher margins as compared to traditional window frames from walls or floor to ceiling windows. Curtain walls produced by ES are composed of "high performance" materials that are produced by Alutions, the aluminum smelting plant, and TG with state of the art technology.

In 2014, we established two entities in South Florida, Tecno LLC and Tecno RE, to acquire manufacturing and warehousing facilities, customer lists and exclusive design permits in order to support sales growth in the United States. We will continue to manufacture our products at our facilities in Barranquilla, Colombia while performing select manufacturing and light assembly in the U.S. to enhance client service and create certain cost efficiencies.

In Panama, ES sells products primarily to companies participating in large construction projects in the most exclusive areas of Panama City. For example, ES products were supplied in the construction of the tallest building in Central and South America, The Point, as well as in the construction of other modern hotels in the region such as Megapolis and The Trump. Based on ES's knowledge of the construction market in Central America, we believe that it has also entered into one of the highest value window supply contracts in the hotel industry in Central America for the Soho Plaza.

**Competitive Strengths**

*Vertical Integration*

We believe we are unique in vertically integrating the purchase of raw materials, the manufacture of glass and aluminum products and the subsequent production of customized glass and windows for architectural and industrial settings. By vertically integrating these functions, we are able to price our products competitively while maintaining strict quality control measures to guarantee the high quality of our products. Additionally, we benefit from significant advantages in efficiency and time-to-market for new or customized products. This vertically integrated model provides attractive margins with significant operating leverage.

*Innovation*

We have made significant investments in machinery and equipment in order to utilize the latest technology on our production lines, including a recently completed approximately $56.9 million capital investment in land, warehouses and state-of-the-art glass making equipment thereby expanding our manufacturing capacity. In August 2014, we entered into a contract to purchase equipment from Magnetron Sputter Vacuum Deposition to produce soft coated low emissivity glass as part of our improvements plan in 2015 and 2016. The investment for this project is estimated at $45 million for the equipment and facilities.

Additionally, we purchased two glass laminating and tempering furnaces that use new technologies to produce tempered glass with no distortion using air cushion technology and to produce curved glass in a broad range of easily modifiable curvatures.

34

TABLE OF CONTENTS

For certain of our products, we offer DuPont Sentryglass® laminated glass interlayers which are recognized as industry-leading laminated glass solutions with five times the resistance strength of other materials available on the market. We also use a laminator and jumbo tempering oven capable of producing extra-large slabs of laminated glass which are sought after in the high-end window market. These investments in machinery and equipment, together with our highly trained labor force, allow us to offer state-of-the-art custom designed products quickly modified to meet customer demands. We also have a staff of specialists dedicated to product design in order to meet customer specifications.

*Superior Customer Service*

In addition to manufacturing high quality products, our value proposition to our customers is based on industry-leading lead times, on-time delivery and superior after-sale support. Through the coordinated efforts of our sales teams, product specialists, and field service teams, we deliver high quality service to our customers, from the time the initial order is placed through the delivery and installation of our products. By providing an efficient flow of product from order through delivery, our manufacturing processes allow us to deliver made-to-order products consistently on time, which we believe is an important competitive strength.

*Management Experience*

José Daes, our chief executive officer, and Christian Daes, our chief operating officer, have more than 30 and 20 years of industry experience, respectively. In addition, our executive management teams have worked together for many years at our operating subsidiaries. This long tenure in the industry, and as a team, has enabled our management to build significant relationships with both clients and field level management. We believe that these relationships, coupled with management's strong technical expertise, create a significant competitive advantage.

*Location*

Our headquarters and principal manufacturing facilities are located in Barranquilla, Colombia, which is strategically located near three major ports in Barranquilla, Cartagena and Santa Marta. These ports, which are only two hours' drive from each other, provide us with sea access to all major markets globally.

*High Barriers to Entry*

Entry into many of the markets that we serve is limited due to the technical certifications required on high specification building projects. Our success is due in large part to the breadth of our product offering and our reputation for delivering high quality, made-to-order architectural glass on time. These factors are required to compete successfully for multimillion dollar projects typical of our business. Given the vertically-integrated nature of our operations, including the aluminum extrusion products provided by Tecnoglass, there is a more limited set of competitors and entry into these markets. In addition, the equipment needed to operate in the glass and window industry is expensive, requiring a significant upfront capital investment.

*Competitive pricing*

We offer our customers highly competitive prices due to efficiencies realized from vertical integration and low labor costs. These competitive advantages allow us great flexibility in pricing their components to be competitive in a variety of markets.

***Strategy***

We have identified the following items that we believe are important in advancing our business:

*Continued investments in machinery and equipment with state-of-the-art technology*

We have made investments of approximately $94.5 million since 2013, including $56.9 million in 2014 in state-of-the-art glass making equipment, the installation of new laminating lines, high-volume insulating equipment, a new aluminum extrusion press with the capacity for an additional one thousand tons per month, a new paint line with the capacity to treat one million pounds of aluminum per month, and a new aluminum foundry.

35

5/8/2018 Case 1:16-cv-00420-ILG-VMS Document 172-2 https://www.sec.gov/Archives/edgar/data/1534675/000114420415041802/v412857_s4.htm Filed 05/14/18 Page 48 of 140 PageID #: 3336

TABLE OF CONTENTS

*Development of additional high value products*

We have a demonstrated track record of developing new products and will continue to focus on capitalizing on new product opportunities in the future. We constantly identify shifting global trends and growing marketplace needs, and design proposals to meet those needs. A feasibility and tuning program, including testing at specialized laboratories in the U.S., is carried out before marketing a new product. In 2014 we started producing architectural systems that integrate LED lighting allowing the façade of the building to display different colors and patterns.

Additionally, we are in the process of implementing new technologies to produce tempered glass that offers notably more transparency with significantly less distortion than industry standard using air cushion technology, as well as new technology used to produce curved glass in a broad range of easily modifiable curvatures.

*Manufacture the highest quality products in the market through a rigorous quality assurance program*

Our plants are organized internally by processes, each of which is independently and continually supervised by the Quality Assurance department. The Quality Assurance department maintains rigorous oversight over energy, water, recyclable waste and process optimization indicators, in order to produce high quality sustainable products. Approximately 30% of all our waste is recycled.

*Continued vertical integration provides margin enhancement*

We benefit from operating together under a combined facility, providing advantages in meeting customer and market needs and managing costs. By continuing to expand our degree of vertical integration, we can further enhance productivity, create cost efficiencies and increase operating margins.

*Leverage strength in Colombia market to further penetrate Latin America*

With a strong base in Colombia, we have already successfully expanded into nearby geographies. Our glass products are featured in major construction projects in Argentina, Aruba, Costa Rica, Panama and Puerto Rico. As the construction market throughout Latin America grows, we are positioned to capture new growth in the markets we have currently penetrated, as well as in new high growth countries.

*Leverage strength in Florida market to further penetrate U.S.*

We believe we have an established and leading presence in the Florida construction market as providers of high value, impact-resistant glass products. ES's hurricane-proof products are certified in compliance with the stringent requirements of hurricane-proof windows in accordance with applicable U.S. regulations. With a quality of product proven by our success and compliance in the impact-resistant market, we have successfully entered the U.S. remodeling and replacement parts market. In addition, we have the opportunity to grow geographically in the U.S., particularly into other coastal markets on the East Coast which are affected by hurricanes, significant temperature fluctuations and other extreme weather.

*Maintain fast and reliable delivery to customers due to strategic location*

From the Port of Barranquilla, products can be transported to Panama by air in one hour and to Houston and Miami within two hours, within two days by sea to Panama and within four days by sea to Houston and Miami.

*Penetrate additional markets*

With a strong base in Colombia and Florida, we will seek to expand into further geographies, such as Asia and Europe. We believe the centralized location of the Port of Barranquilla will aid in our expanding into such new markets.

**Products**

TG manufactures and sells the following products:

*Laminated/Thermo-Laminated Glass* — produced by bonding two glass sheets with an intermediate film in-between. As a safety feature, this product fractures into small pieces if it breaks.

*Thermo-Acoustic Glass* — manufactured with two or more glass sheets separated by an aluminum or micro-perforated steel profile. This product has a double-seal system that ensures the unit's tightness, buffering

36

5/8/2018 Case 1:16-cv-00420-ILG-VMS Document 122-15 filed 05/11/18 Page 50 of 140 PageID #: 3338

TABLE OF CONTENTS

noise and improving thermal control. This product serves as an excellent noise barrier, which is used especially in zones close to airports, traffic or wherever there are unpleasant sounds.

*Tempered Glass* — glass subject to a tempering process through elevated temperatures resulting in greater superficial elasticity and resistance than conventional glass.

*Silk-Screened Glass* — special paint is applied to glass using automatic machinery and numerical control which ensures paint homogeneity and an excellent finish.

*Curved Glass* — produced by bending a flat glass sheet over a mold, using an automated heat process, which maintains the glass' physical properties.

*Digital Print Glass* — digital printing allows any kind of appearance required by the client, offering versatility to projects.

TG's aluminum products sold through its Alutions brand include bars, plates, profiles, rods and tubes used primarily in the manufacture of architectural glass settings including windows, doors, spatial separators and similar products.

ES manufactures and sells the following products:

*Floating facades* — act as a window screen hanging outside a building and are available in many technical specifications and profiles to define colors, thickness, glass types and finishes, and types of ventilation and design complements.

*Windows and Doors* — line of window and door products defined by the different types of glass finish, such as normal, impact resistant, hurricane-proof, safety, soundproof and thermal. Additionally, they are available in numerous structures, including fixed body, sliding windows, projecting windows, guillotine windows, sliding doors and swinging doors.

*Commercial display windows* — commercial and interior display windows with a broad range of profiles, colors and crystal finishes. Products combine functionality, aesthetics and elegance and are available in a broad range of structures and materials.

*Hurricane-proof windows* — combine heavy-duty aluminum or vinyl frames with special laminated glass to provide protection from hurricane-force winds up to 180 mph and wind-borne debris by maintaining their structural integrity and preventing penetration by impacting objects.

*Automatic doors* — exclusive representative in Colombia of Horton Automatics, a manufacturer of automatic doors including glass window systems.

*Bathroom dividers* — bathroom cubicle division systems, formed by combining glass panels, frames and doors.

*Other* — photovoltaic structures and other components of architectural systems.

### Brands and Trademarks

Our brands include Tecnoglass, ES Windows and Alutions. Our registered trademarks include "Alutions by Tecnoglass" with the accompanying logo and "Alutions". Tecnoglass and ES Windows are not registered as trademarks by us.

### Sales, Marketing and Customer Service

#### Sales and marketing

Our sales strategy primarily focuses on attracting and retaining customers by consistently providing exceptional customer service, leading product quality, and competitive pricing. Our customers also value their shorter lead times, knowledge of building code requirements and technical expertise, which collectively generate significant customer loyalty. Our products are marketed using a combination of their internal sales representatives and independent sales representatives and directly to distributors. Our internal sales representatives receive performance-based compensation based on sales and profitability metrics. We primarily market our products based on product quality, outstanding service, shorter lead times and on-time delivery.

37

TABLE OF CONTENTS

*Customer Service*

We believe that our ability to provide customers outstanding service quality serves as a strong competitive differentiator. Our customer relationships are established and maintained through the coordinated efforts of our sales and production teams. We employ a team of highly seasoned professionals devoted to addressing customer support with the goal of resolving any issue in a timely manner. In order to promote customer loyalty and employee development, we developed ES Windows University with the primary objectives of training employees to be aware of client and supplier needs and familiarizing them with our strategic goals in order to improve the competitiveness, productivity and quality of all products and services offered.

### Working Capital Requirements

Trade accounts receivable is the largest component of working capital, including receivables relating to contractual retention amounts that can be outstanding throughout the project duration for large-scale architectural projects. Our inventory requirements are not significant since our products are made-to-order rather than build-to-stock. As a result, inventory levels follow customer demand for products produced.

### Customers

Our customers include architects, building owners, general contractors and glazing subcontractors in the commercial construction market. We have over 800 customers. Of our 200 most representative customers, about 24% are located in North America, 13% in Central America and the Caribbean, and 63% in South America. Excluding revenue from related parties, only one customer accounted for more than 10% or more of our net sales during 2014 or 2013 with 14% of sales during 2014.

### Materials and Suppliers

Our primary manufacturing materials include glass, ionoplast, polyvinyl butyral, and aluminum and vinyl extrusions. Although in some instances we have agreements with our suppliers, these agreements are generally terminable by us or the supplier counterparties on limited notice. Typically, all of our materials are readily available from a number of sources, and no supplier delays or shortages are anticipated.

We source raw materials and glass necessary to manufacture our products from a variety of domestic and foreign suppliers. For the year ended December 31, 2014, no single supplier accounted for more than 10% of total raw material purchases.

### Warranties

We offer product warranties which we believe are competitive for the markets in which our products are sold. The nature and extent of these warranties depend upon the product. Our standard warranties are generally from five to ten years for architectural glass, curtain wall, laminated and tempered glass, window and door products. Warranties are not priced or sold separately and do not provide the customer with services or coverages in addition to the assurance that the product complies with original agreed-upon specifications. In the event of a claim against a product for which we have received a warranty from the supplier, we transfer the claim back to the supplier.

### Certifications

Among our many designations and certifications, Tecnoglass has earned the Miami-Dade County Notice of Acceptance ("NOA"), one of the most demanding certificates in the industry and a requirement to market hurricane-resistant glass in Florida. Tecnoglass's products comply with Miami-Dade county's safety code standards as its laminated anti-hurricane glass resists impact, pressure, water and wind. Tecnoglass is also the only company in Latin America authorized by PPG Industries and Guardian Industries to manufacture floating glass facades.

38

5/8/2018    Case 1:16-cv-00420-ILG-VMS   Document 172-2   Filed 05/04/18   Page 52 of 140 PageID #: 3340

TABLE OF CONTENTS

Our subsidiaries have received a number of other certifications from other national and international standard-setting bodies.

Tecnoglass Certifications include:

- NTC-1578

- ASTM E774 1997

- ISO 9001: 2008 Certificate of Quality Assurance

- ISO 14001: 2004 Certificate of Environmental Management

- Safety Glazing Certification Council (SGCC) for tempered and laminated glass: ANZI

- Z97 1-2004

- International Glass Certification Council (IGCC) for insulated glass: ASTM E774 – 97

- Pittsburgh Plate Glass (PPG) certified supplier

- Member of ACOLVISE (Colombia Association of Safety Glass Transformers)

ES Certifications include:

- NTC-ISO 9001: 2008 Certificate of Quality Assurance

- NTC-ISO 14001: 2004 Certificate of Environmental Management

- Member of the American Architectural Manufacturers Association (AAMA)

- Complies with Miami-Dade County's stringent safety code regulations for hurricane-proof windows

**Competitors**

We have local competitors in Colombia as well as competitors in the markets internationally, in each of the glass, aluminum and finished products sectors. Glass Tecnologia en Vidrios y Ventanas S.A., Arquicentro S.A., Aluminum Estructural S.A. and Ventanar Ltda, compete with us in the finished products market in Colombia. Apogee Enterprises, Inc., PGT, Inc. and WinDoor Inc. compete with us in the U.S. finished products market. Golden Glass Security, Vid-plex Universal S.A., Aluace Ltda and Laminados y Blindados compete with us locally in the glass and aluminum markets. Oldcastle, Inc., Trulite Inc., and PRL Glass Systems are among others that compete with us in the U.S. glass and aluminum products markets.

The key factors on which we and our competitors compete for business include: quality, price and reputation, breadth of products and service offerings, and production speed. We face intense competition from both smaller and larger market players who compete against us in our various markets including glass, window and aluminum manufacturing.

The principal methods of competition in the window and door industry are the development of long-term relationships with window and door distributors and dealers, and the retention of customers by delivering a full range of high-quality customized products on demand with short turnaround times while offering competitive pricing. The vertical integration of our operations, our geographic scope, low labor costs and economies of scale have helped our subsidiaries consolidate their leading position in Colombia and bolstered their expansion in the U.S. and other foreign markets.

**Sales and Marketing**

We employ a limited number of in-house sales employees. Most of our sales and marketing efforts are handled by area sales representatives who work on a commission basis.

We do not rely on significant traditional advertising expenditures to drive net sales. We have established and maintain credibility primarily through the strength of our products, our customer service and quality assurance, the speed at which we deliver finished products and the attractiveness of our pricing. Our advertising expenditures consist primarily of maintaining our subsidiaries' websites.

39

TABLE OF CONTENTS

**Backlog**

We had combined outstanding orders of $280 million as of December 31, 2014 as compared to $120 million as of December 31, 2013. The backlog as of December 31, 2014 is expected to be filled during the current fiscal year. We do not believe that backlog is indicative of our future results of operations or prospects. Although we seek commitments from customers well in advance of shipment dates, actual confirmed orders are typically not received until close to the required shipment dates.

**Government Regulations**

We are subject to extensive and varied federal, state and local government regulation in the jurisdictions in which we operate, including laws and regulations relating to our relationships with our employees, public health and safety and fire codes. Additionally, certain of the jurisdictions in which we operate require that installation of doors and windows be approved by competent authorities that grant distribution licenses.

Although our business and facilities are subject to federal, state and local environmental regulation, environmental regulation does not have a material effect on our operations.

**Research and Development**

During the years ended December 31, 2014 and December 31, 2013, we spent approximately $1.3 and $1.7 million, respectively, in research and development.

Our commercial ally and related party in the United States, ES Windows LLC, bears significant costs related to the development of new products, since they pay for the external tests that need to be performed on our products in order to comply with strict building codes. ESWindows LLC is fully permitted to commercialize hurricane windows in the Miami-Dade County, Florida, which has one of the most demanding certifications in the world of window frames.

**Employees**

As of December 31, 2014, we had a total of 3,412 employees, with 2,267 employed by ES and 1,145 employed by TG, none of whom is represented by a union. Most of our employees are hired through seven temporary staffing companies and are employed under one-year fixed-term employment contracts. Management believes it has good relations with our employees. We provide ongoing training programs to our employees through the self-established E.S. Windows University.

**Properties**

We own and operate a 2.3 million square foot manufacturing complex located in Barranquilla, Colombia. This manufacturing campus houses a glass production plant, aluminum plant and window and facade assembly plant. The glass plant has four lamination machines with independent assembly rooms, six specialized tempering furnaces and glass molding furnaces, a computer numerical-controlled profile bending machine, as well as five silk-screening machines. The Alutions plant has an effective installed capacity of 1,000 tons per month and can create a variety of shapes and forms for windows, doors and related products. We also own three natural gas power generation plants with a capacity of 1,750 kilowatts each which supply the electricity requirements of the entire manufacturing complex and are supported by three emergency generators.

In December 2014, we acquired a 160,000 square foot manufacturing and warehousing facility in Miami-Dade County, Florida, United States. The facility houses manufacturing and assembly equipment, warehouse space, and administrative and sales offices.

We believe that our existing properties are adequate for the current operating requirements of our business and that additional space will be available as needed.

**Legal Proceedings**

TG is a named defendant in In the matter of Diplomat Properties, Limited Partnership as assignee of Shower Concepts, Inc. v. Tecnoglass Colombia, S.A. et al., Case No. CACE 11-02811(09), 17th Judicial Circuit in and for Broward County, Florida. Plaintiff Diplomat Properties, Limited ("Diplomat") has asserted a claim for indemnification against TG and Tecnoglass USA, a related party. The claim arises from the

40

TABLE OF CONTENTS

supplying of glass shower doors to a hotel/spa in Broward County, Florida. Specifically, in 2006, Diplomat commenced arbitration against Shower Concepts, Inc. seeking damages for breach of contract due to fractures in the installed glass shower doors. The claim was based upon a contract between Diplomat and Shower Concepts for the sale and installation of glass shower and bath doors to be used by Diplomat in hotel that it owned. Shower Concepts chose not to defend against the breach of contract claim and in 2007, the arbitrator rendered an award in the amount of approximately $2 million in favor of Diplomat and against Shower Concepts. The award was confirmed by the Circuit Court and, on July 23, 2008, a final judgment for breach of contract was entered against Shower Concepts. No appeal of the decision was made. On August 11, 2009, Shower Concepts assigned its rights under the contract to Diplomat. On November 9, 2011, Diplomat initiated the underlying action against the Tecnoglass entities and co-defendant, Guardian Industries Corp. The complaint asserted various claims which were dismissed with prejudice. The only remaining claim against the Tecnoglass entities is common law indemnification. TG denies liability and asserts that Shower Concepts was at fault and that as a joint tortfeasor, it cannot sue for indemnity. A trial date has not yet been set for this case.

### Security Ownership of Certain Beneficial Owners and Management

The following tables set forth information as of June 30, 2015, and upon completion of the exchange pursuant to the Offer, assuming exchange of all of our outstanding Warrants, regarding the beneficial ownership of our ordinary shares by:

- each person known to be the beneficial owner of more than five percent of our outstanding ordinary shares;

- each of our directors and our named executive officers; and

- all current executive officers and directors as a group.

Unless otherwise indicated, we believe that all persons named in the table have sole voting and investment power with respect to all ordinary shares beneficially owned by them.

| Name and Address of Beneficial Owner[1] | Beneficial Ownership[2] | | Beneficial Ownership Upon Completion of Exchange[3] | |
| --- | --- | --- | --- | --- |
| | Amount and Nature of Beneficial Ownership | Approximate Percentage of Beneficial Ownership | Amount and Nature of Beneficial Ownership | Approximate Percentage of Beneficial Ownership |
| *Directors and Executive Officers* | | | | |
| Jose M. Daes | 0[4] | 0% | 0 | 0% |
| Christian T. Daes | 0[4] | 0% | 0 | 0% |
| Samuel R. Azout | 0 | 0% | 0 | 0% |
| Juan Carlos Vilariño | 0 | 0% | 0 | 0% |
| Joaquin F. Fernandez | 21,856,223[5] | 83.8% | 21,370,634 | 74.2% |
| A. Lorne Weil | 95,693[6] | * | 95,693 | * |
| Julio A. Torres | 172,000[7] | * | 95,077 | * |
| Martha L. Byorum | 205,000[7] | * | 128,077 | * |
| All directors and executive officers as a group (11 persons) | 22,328,916 | 84.8% | 21,689,481 | 75.3% |
| *Five Percent Holders:* | | | | |
| Energy Holding Corporation | 21,856,223[5] | 83.8% | 21,370,634 | 74.2% |
| Red Oak Partners, LLC 1969 SW 17th Street Boca Raton, FL 33486 | 1,858,516[8] | 7.0% | 1,029,239 | 3.6% |

\* Less than 1%.

(1) Unless otherwise indicated, the business address of each of the individuals is Avenida Circunvalar a 100 mts de la Via 40, Barrio Las Flores, Barranquilla, Colombia.

41

https://www.sec.gov/Archives/edgar/data/1534675/000114420415041802/v412857_s4.htm

TABLE OF CONTENTS

(2) Unless otherwise indicated, we believe that all persons named in the table have sole voting and investment power with respect to all ordinary shares beneficially owned by them. The percentage of beneficial ownership is calculated based on 25,301,132 ordinary shares outstanding as of June 30, 2015. Shares which an individual or group has a right to acquire within 60 days pursuant to the exercise or conversion of options, Warrants or other similar convertible or derivative securities are deemed to be outstanding for the purpose of computing the percentage ownership of such individual or group, but are not deemed to be outstanding for the purpose of computing the percentage ownership of any other person shown in the table.

(3) The percentage of beneficial ownership upon completion of the exchange pursuant to the Offer is calculated based on 28,800,144 ordinary shares deemed outstanding, which assumes that all Warrants are surrendered for exchange pursuant to the Offer.

(4) Does not include shares held by Energy Holding Corporation, in which this person has an indirect ownership interest.

(5) Represents all ordinary shares held by Energy Holding Corporation, of which Messrs. Joaquin Fernandez and Alberto Velilla Becerra are directors and may be deemed to share voting and dispositive power over such shares. Includes 789,082 ordinary shares issuable upon the exercise of 789,082 Private Warrants held by Energy Holding Corporation, which became exercisable upon the consummation of our initial business combination. Does not include the shares that may be issued to Energy Holding Corporation upon achievement of certain share price and earnings targets for the fiscal years ending December 31, 2015 and 2016.

(6) Does not include 253,000 ordinary shares held by Child's Trust f/b/o Francesca Weil u/a dated March 4, 2010 and 253,000 ordinary shares held by Child's Trust f/b/o Alexander Weil u/a dated March 4, 2010, irrevocable trusts established for the benefit of Mr. Weil's children. Does not include 95,693 ordinary shares held by The A. Lorne Weil 2006 Irrevocable Trust – Family Investment Trust, of which Mr. Weil, his spouse and his descendants are beneficiaries but over which Mr. Weil does not exercise voting or dispositive power.

(7) Includes 125,000 ordinary shares issuable upon the exercise of 125,000 Private Warrants held by such reporting person, which became exercisable upon consummation of our initial business combination.

(8) Red Oak Partners may be deemed to beneficially own 1,858,516 ordinary shares, which includes: (i) 155,977 ordinary shares held by The Red Oak Fund, LP ("Red Oak"); (ii) 484,330 ordinary shares issuable upon the exercise of Warrants held by Red Oak; (iii) 27,334 ordinary shares issuable upon exercise of unit purchase options (and the underlying Warrants) held by Red Oak; (vi) 68,561 ordinary shares held by Red Oak Long Fund, L.P. ("Red Oak Long Fund"); (vii) 225,962 ordinary shares issuable upon the exercise of Warrants held by Red Oak Long Fund; (viii) 13,084 ordinary shares issuable upon exercise of unit purchase options (and the underlying Warrants) held by Red Oak Long Fund; (ix) 208,981 ordinary shares held by Pinnacle Opportunities Fund, LP ("Pinnacle"); (x) 637,282 ordinary shares issuable upon the exercise of Warrants held by Pinnacle; and (xi) 37,004 ordinary shares issuable upon exercise of unit purchase options (and the underlying Warrants) held by Pinnacle. David Sandberg is the managing member of Red Oak Partners and may be deemed the beneficial owner of shares held by Red Oak Partners through the funds. Information was derived from a Schedule 13D filed on March 9, 2015.

**Directors and Executive Officers**

Our current directors and executive officers are as follows:

| Name | Age | Position |
| --- | --- | --- |
| José M. Daes | 54 | Chief Executive Officer and Director |
| Christian T. Daes | 50 | Chief Operating Officer and Director |
| Joaquin Fernandez | 54 | Chief Financial Officer |
| A. Lorne Weil | 64 | Non-Executive Chairman of the Board |
| Samuel R. Azout | 55 | Independent Director |
| Juan Carlos Vilariño | 52 | Independent Director |
| Martha (Stormy) L. Byorum | 60 | Independent Director |
| Julio A. Torres | 47 | Independent Director |

Case 1:16-cv-00420-ILG-VMS Document 172-13 Filed 05/11/18 Page 57 of 140 PageID #: 3345

TABLE OF CONTENTS

*José M. Daes* has served as our chief executive officer and a director since December 2013. Mr. Daes has over 30 years' experience starting and operating various businesses in Colombia and the U.S. Mr. Daes has served as chief executive officer of ES since its inception in 1984, responsible for all aspects of ES's operations. Mr. Daes began his career in textiles, importing textiles from Japan to Colombia and later owned and operated an upscale clothing store with multiple locations in Miami. Mr. Daes is the older brother of Christian T. Daes, our chief operating officer and director.

We believe Mr. Daes is well-qualified to serve as a member of our board of directors due to his operational experience with ES and TG and his knowledge of the industry within which they operate.

*Christian T. Daes* has served as our chief operating officer and a director since December 2013. Mr. Daes has served as the chief executive officer of TG since its inception in 1994, responsible for all aspects of TG's operations. Mr. Daes's philanthropic activities include founding the Tecnoglass-ES Windows Foundation, which promotes local development, health and social programs in Barranquilla, Colombia. Mr. Daes is the younger brother of José M. Daes, our chief executive officer and director.

We believe Mr. Daes is well-qualified to serve as a member of our board of directors due to his operational experience with ES and TG and his knowledge of the industry within which they operate.

*Joaquín F. Fernández* has served as our chief financial officer since December 2013 and the chief financial officer for TG and ES since 2007. He has also served as a director of ES since January 2002. Mr. Fernández oversees the gathering, reporting, presentation and interpretation of the historical financial information for us and our subsidiaries, as well as implementation of financial strategy for us. Prior to joining TG and ES, Mr. Fernández worked at fuel distribution, outsourcing, and public utility companies.

*A. Lorne Weil* has served as a member of our board of directors and non-executive chairman of the board since our inception. Mr. Weil has served as Chairman and Chief Executive Officer of Hydra Industries Acquisition Corp., a blank check company seeking to acquire a target business, since May 2014. He has also served as a principal of Hydra Management, an investment vehicle formed by Mr. Weil, since September 2014. Mr. Weil has also served as a director of Sportech Plc, one of the largest suppliers and operators of pools/tote (often also referred to as pari-mutuel) betting in the world, since October 2010. From October 1991 to November 2013, Mr. Weil served as chairman of the board of Scientific Games Corporation, a supplier of technology-based products, systems and services to gaming markets worldwide, and served as its chief executive officer from April 1992 until November 2013. Mr. Weil also served as president of Scientific Games from August 1997 to June 2005. From 1979 to November 1992, Mr. Weil was president of Lorne Weil, Inc., a firm providing strategic planning and corporate development services to high technology industries. Previously, Mr. Weil was vice president of corporate development at General Instrument Corporation, working with wagering and cable systems.

We believe Mr. Weil is well-qualified to serve as a member of our board of directors due to his extensive business experience in strategic planning and corporate development, his contacts he has fostered throughout his career, as well as his operational experience.

*Samuel R. Azout* has served on our board of directors since December 2013 and on the board of TG since February 2009. Since March 2013, Mr. Azout has served as an investment manager for Abacus Real Estate. From January 2012 to March 2013, Mr. Azout served as the chief executive officer of the National Agency for Overcoming Extreme Poverty in Colombia, an organization formed by the government of Colombia to assist families in poverty. From September 2008 to January 2012, Mr. Azout was the senior presidential advisor for Social Prosperity, employed by the administration of the President of Colombia. Prior to this, Mr. Azout served as chief executive officer of Carulla Vivero S.A., the second largest retailer in Colombia, for 10 years, until he led its sale to Grupo Exito in 2006.

We believe Mr. Azout is well-qualified to serve as a member of our board of directors due to his contacts and business relationships in Colombia.

*Juan Carlos Vilariño* has served on our board of directors since December 2013, on the board of TG since November 1995 and on the board of ES since March 1997. Mr. Vilariño has worked as the general manager of various business highway concession consortiums in Colombia including the Malla Vial del

43

5/8/2018     Case 1:16-cv-00420-ILG-VMS  Document 172-2  Filed 05/11/18  Page 58 of 140 PageID #: 3346

TABLE OF CONTENTS

Atlántico Highway Concession Consortium since 1993 and the Barranquilla-Ciénaga Highway Concession consortium since 1999. Mr. Vilariño began his career as the assistant vice president in the general consulting department of Finance Corporation of the North, S.A. We believe Mr. Vilariño is well-qualified to serve as a member of our board of directors due to his contacts and business relationships in Colombia.

*Martha (Stormy) L. Byorum* has served as a member of our board of directors since November 2011. Ms. Byorum is founder and chief executive officer of Cori Investment Advisors, LLC (Cori Capital), a financial services entity that was most recently (January 2005 through August 2013) a division of Stephens Inc., a private investment banking firm founded in 1933. Ms. Byorum was also an executive vice president of Stephens Inc. from January 2005 until August 2013. From March 2003 to December 2004, Ms. Byorum served as chief executive officer of Cori Investment Advisors, LLC, which was spun off from VB&P in 2003. Ms. Byorum co-founded VB&P in 1996 and served as a Partner until February 2003. Prior to co-founding VB&P in 1996, Ms. Byorum had a 24-year career at Citibank, where, among other things, she served as chief of staff and chief financial officer for Citibank's Latin American Banking Group from 1986 to 1990, overseeing $15 billion of loans and coordinating activities in 22 countries. She was later appointed the head of Citibank's U.S. Corporate Banking Business and a member of the bank's Operating Committee and a Customer Group Executive with global responsibilities.

Ms. Byorum is a Life Trustee of Amherst College and a chairman of the finance committee of the board of directors of Northwest Natural Gas, a large distributor of natural gas services in the Pacific Northwest.

We believe Ms. Byorum is well-qualified to serve as a member of the board of directors due to her operational experience with Cori Capital Advisors, VB&P and Citibank and her financial background, which includes having served on the audit committees of four publicly-traded companies.

*Julio A. Torres* has served on our board of directors since October 2011. He previously served as our co-chief executive officer from October 2011 through January 2013. Since March 2008, Mr. Torres has served as managing director of Nexus Capital Partners, a private equity firm. From April 2006 to February 2008, Mr. Torres served with the Colombian Ministry of Finance acting as general director of public credit and the treasury. From June 2002 to April 2006, Mr. Torres served as managing director of Diligo Advisory Group, an investment banking firm. From September 1994 to June 2002, Mr. Torres served as vice president with JPMorgan Chase Bank.

We believe Mr. Torres is well-qualified to serve as a member of our board of directors due to his operational experience with Nexus Capital Partners, his work with the Colombian government and his extensive contacts he has fostered while working at Nexus Capital Partners, JPMorgan Chase Bank and in the Colombian government.

Our ordinary shares are listed on the NASDAQ Capital Market and therefore, we adhere to the NASDAQ listing standards in determining whether a director is independent. Our board of directors consults with its counsel to ensure that the board's determinations are consistent with those rules and all relevant securities and other laws and regulations regarding the independence of directors.

The NASDAQ listing standards define an "independent director" as a person, other than an executive officer of a company or any other individual having a relationship which, in the opinion of the issuer's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. Consistent with these considerations, we have affirmatively determined that Messrs. Weil, Azout, Vilariño, Torres and Ms. Byorum qualify as independent directors. Our independent directors have regularly scheduled meetings at which only independent directors are present.

**Executive and Director Compensation**

**Executive Compensation**

Our policies with respect to the compensation of our executive officers are administered by our board in consultation with our compensation committee. Our compensation policies are intended to provide for compensation that is sufficient to attract, motivate and retain executives of outstanding ability and potential and to establish an appropriate relationship between executive compensation and the creation of shareholder value. To meet these goals, the compensation committee is charged with recommending executive compensation packages to our board.

44

TABLE OF CONTENTS

Prior to consummation of the Merger in December 2013, none of our executive officers or directors received compensation for services rendered to us. No compensation or fees of any kind, including finders, consulting or other similar fees, were paid to any of our initial shareholders, including our officers and directors, or any of their respective affiliates, prior to, or for any services they rendered in order to effectuate, the consummation of the initial business combination.

### Summary Compensation Table

The following table summarizes the total compensation for the years ended December 31, 2014 and 2013 of each of our named executive officers.

| Name and principal position | Year | Salary | Bonus | Total |
|---|---|---|---|---|
| Jose M. Daes[1] | 2014 | $ 683,000 | $ — | $ 683,000 |
| *Chief Executive Officer* | 2013 | $ 720,000 | $ 100,000 | $ 820,000 |
| Christian T. Daes[2] | 2014 | $ 430,000 | $ — | $ 430,000 |
| *Chief Operating Officer* | 2013 | $ 720,000 | $ 100,000 | $ 820,000 |
| Joaquin Fernández[3] | 2014 | $ 180,000 | $ 34,000 | $ 214,000 |
| *Chief Financial Officer* | 2013 | $ 120,000 | $ — | $ 120,000 |

(1) Mr. Daes was appointed chief executive officer in December 2013 in connection with the Merger. Mr. Daes also serves as chief executive officer of ES. Compensation information for 2013 includes amounts paid to Mr. Daes in his capacity as chief executive officer of ES prior to the Merger.

(2) Mr. Daes was appointed chief operating officer in December 2013 in connection with the Merger. Mr. Daes also serves as chief executive officer of Tecnoglass. Compensation information for 2013 includes amounts paid to Mr. Daes in his capacity as chief executive officer of Tecnoglass prior to the Merger. Compensation information for 2014 does not include certain amounts paid to ESW LLC, of which Mr. Daes owns 20%, on Mr. Daes' behalf.

(3) Mr. Fernández was appointed chief financial officer in December 2013 in connection the Merger. Mr. Fernández also serves as chief financial officer of Tecnoglass and ES. Compensation information for 2013 includes amounts paid to Mr. Fernández in his capacity as chief financial officer of Tecnoglass and ES prior to the Merger.

*Compensation Arrangements with Named Executive Officers*

At present, we do not have employment agreements in place for our current executive officers. We have determined to continue the compensation arrangements that were in place prior to the Merger for each of Messrs. Daes and Daes with ES and Tecnoglass, respectively, generally providing for an annual base salary of $720,000, and to provide an annual base salary to Mr. Fernández equal to approximately $180,000 going forward. Our compensation committee may determine to award a discretionary cash bonus to such executive officers as has been awarded in the past by Tecnoglass and ES, and may also determine to award to such executive officers share options, share appreciation rights or other awards under our 2013 Long-Term Equity Incentive Plan. We anticipate continuing these compensation arrangements until we enter into employment agreements with our executive officers. Upon entry into employment agreements with our executive officers, we will file a Current Report on Form 8-K to disclose the material terms of such agreements.

### Equity Awards at Fiscal Year End

As of December 31, 2014, we had not granted any share options, share appreciation rights or any other awards under long-term incentive plans to any of our executive officers.

### Director Compensation

For the year ended December 31, 2014, we did not compensate any of our directors for their service on the board. However, we did reimburse our directors for out-of-pocket expenses incurred by them in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations.

45

5/8/2018
Case 1:16-cv-00420-ILG-VMS   Document 123-2   Filed 05/11/18   Page 60 of 140 PageID #:
3349
https://www.sec.gov/Archives/edgar/data/1534675/000114420415041802/v412857_s4.htm

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and notes to those statements included in this Prospectus/Offer to Exchange. This discussion contains forward-looking statements that involve risks and uncertainties. Please see the sections entitled "Cautionary Note regarding Forward-Looking Statements" and "Risk Factors" in this Prospectus/Offer to Exchange.*

### Overview

We are a holding company operating through our indirect, wholly-owned subsidiaries: TG, which manufactures, transforms, markets and exports a variety of glass products since 1994 and established the Alutions plant in 2007 for aluminum products, and ES, a leader in the production of high-end windows and architectural glass systems. We have more than 30 years' experience in the glass and aluminum structure assembly market in Colombia.

We manufacture hi-specification architectural glass and windows for the global residential and commercial construction industries. Currently we offer design, production, marketing, and installation of architectural systems for buildings of high, medium and low elevation size. Products include windows and doors in glass and aluminum, floating façades, office partitions and interior divisions, and commercial window showcases.

In recent years, we have expanded our US sales outside of the Florida market, entering into high-tech markets for curtain walls, obtaining a niche market access since this product is in high demand and marks a new trend in architecture. This product is a very sophisticated product and therefore garners high margins for us. These products involve high performance materials that are produced by Alutions and TG with state of the art technology.

In Panama, ES sells products primarily to companies participating in large construction projects in the most exclusive areas of the city. For example, ES products were supplied in the construction of the tallest building in Central and South America, The Point, as well as in the construction of the most modern hotels in the region such as Megapolis and The Trump. Based on ES's knowledge of the construction market in Central America, ES has entered into one of the highest value window supply contracts in the hotel industry in Central America for the Soho Plaza.

### How We Generate Revenue

TG manufactures both glass and aluminum products. Its glass products include tempered glass, laminated glass, thermo-acoustic glass, curved glass, silk-screened glass, and digital print glass as well as mill finished, anodized, painted aluminum profiles and produces rods, tubes, bars and plates.

Window production lines are defined depending on the different types of windows: normal, impact resistant, hurricane-proof, safety, soundproof and thermal. ES produces fixed body, sliding windows, projecting windows, guillotine windows, sliding doors and swinging doors. ES produces façade products which include: floating facades, automatic doors, bathroom dividers and commercial display windows.

TG sells to over 300 customers using several sales teams based out of Colombia to specifically target regional markets in South, Central and North America. TG has sales representatives in the United States to address that market specifically. In addition, TG has approximately 10 free-lance sales representatives in North America.

ES sells its products through four main offices/sales teams based out of Colombia, Panama and the US. The Colombia sales team is our largest sales group, which has deep contacts throughout the construction industry. The Colombia sales team markets both ES's products as well as installation services. The Peruvian office is responsible for South American sales, excluding Colombia. Its sales forces in Panama and the US are not via subsidiaries but arms-length agreements with sales representatives. ES has two types of sales operations: Contract sales, which are the high-dollar, specifically-tailored customer projects; and Standard Form Sales.

46

TABLE OF CONTENTS

## Liquidity and Cash Flow

As of March 31, 2015 and December 31, 2014, we had cash and cash equivalents of approximately $15 million and $16 million, respectively. We expect that cash flow from operations, proceeds from borrowings under our lines of credit, and the proceeds from the merger will be its primary sources of liquidity and will be sufficient to fund our cash requirements for the next twelve months.

## Capital Resources

We transform glass and aluminum into high specification architectural glass which requires significant investments in state of the art technology. During the years ended December 31, 2014 and 2013, we made investments primarily in building and construction, and machinery and equipment in the amount of $56.9 million and $37.7 million, respectively.

In August 2014, we entered into a contract to purchase equipment from Magnetron Sputter Vacuum Deposition to produce soft coated low emissivity glass as part of our improvements plan in 2015 and 2016. The investment for this project is estimated at $45 million for the equipment and facilities, to be financed primarily with a credit facility with an export credit guarantee by the German Federal Government.

In June 2014, we acquired selected assets of RC Aluminum Industries, Inc. ("RC Aluminum") for $2.0 million. RC Aluminum designs, manufactures and installs glass products for architects, designers, developers and general contractors. The primary assets acquired include approximately $70 million in RC Aluminum backlog for high-rise projects in South Florida, the right to complete a number of RC Aluminum's contracted projects with an estimated value of approximately $12 million, and Miami-Dade Notices of Acceptance (NOA) for more than 50 products manufactured and sold by RC Aluminum.

In December 2014, we acquired assets of Glasswall, LLC, a Miami, Florida-based manufacturer of impact-resistant windows and door systems used in high-rise commercial and residential buildings. As part of the transaction, we acquired a 160,000 square foot warehouse/manufacturing/office facility in Miami, manufacturing and assembly equipment, and Miami-Dade NOAs for products manufactured and sold by Glasswall. The Company did not acquire any equity interest in Glasswall. Total consideration consisted of $4.0 million in our stock and $5.0 million in cash financed in part by a 15-year, $3.9 million term loan that we secured to acquire the facilities. At December 31, 2014 the Company is still assessing the accounting and allocation of the purchase price related to this transaction.

## Results of Operations
## (Dollars in thousands)

| | For the three months ended March 31 | |
| --- | --- | --- |
| | 2015 | 2014 |
| Net operating revenues | $ 52,043 | $ 47,841 |
| Cost of sales | 34,861 | 33,245 |
| Operating expenses, net | 9,180 | 6,739 |
| **Operating income** | 8,002 | 7,857 |
| Non-operating revenues, net | 3,725 | 1,286 |
| Interest Expense | 2,152 | 1,973 |
| Change in fair value of warrant liability | 5,078 | (8,880) |
| Income tax provision | 4,772 | 2,971 |
| **Net income (loss)** | $ 9,881 | $ (4,681) |

47

TABLE OF CONTENTS

**Comparison of quarterly periods ended March 31, 2015 and March 31, 2014**

Our net operating revenues increased $4.2 million or 8.8% from $47.8 million to $52.0 million for the quarterly period ended March 31, 2015 compared the quarterly period ended March 31, 2014.

Sales in the U.S. market for the quarterly period ended March 31, 2015 increased $9.8 million or 44.9% when compared to the quarterly period ended March 31, 2014. Our sales in the American market continue to grow primarily in the South Florida region, where we have historically had a stronger presence as a supplier of windows and doors for high rise buildings. Sales in the Colombian market with a significant participation of long-term contracts priced in local currency, presented a $3.6 million decline or 17.1% for the quarters ended March 31, 2015 compared to the same period of 2014, primarily as an effect of a decline in the Colombian peso. In terms of local currency, sales in Colombia decreased by 1.3% between the quarterly periods ended March 31, 2015 and 2014. Sales to Panama declined by $2.9 million, or 66.7% from the first quarter of 2014 to the first quarter of 2015.

Sales margins increased from 30.5% to 33.0% in the quarterly periods ended March 31, 2015 and 2014. Costs of sales increased $1.6 million, or 4.9% in the quarters ended March 31, 2015 and 2014. The increase in indirect cost of manufacturing is below the growth level for sales as most of these are fixed costs.

Selling and Administrative Expenses increased 36.2% from $6.7 million to $9.2 million in the quarterly period ended March 31, 2015 when compared to the quarterly period ended March 31, 2014. The increase was primarily the result of a new temporary tax on equity in the most recent reform to the Colombian Tax Statute in December 2014 for taxable years 2015, 2016 and 2017 which amounted to $0.8 million for 2015 and must be charged in January 1, 2015 for the taxable year, as well as increased sales commissions and shipping expenses for higher sales outside Colombia and amortizations of Notices of Acceptance purchased during 2014.

Non-operating revenues rose $2.4 million or 190%, from $1.3 million in the three months ended March 31, 2014 to $3.7 million in the same period of 2015 as an effect of foreign currency transaction gains.

A non-cash, non-operating gain of $5.1 million arose from the increase in the fair value of the warrant liability in the three month period ended March 31, 2015 relative to its fair value at December 31, 2014. The fair value of the warrants liability changes in response to market factors not directly controlled by us such as the market price of our shares and the volatility index of comparable companies. There are no income tax effects as we are registered in the Cayman Islands.

As a result of the foregoing, we recorded a net income for the three month period ended March 31, 2015 of $9.9 million ($0.35 per diluted share), compared to a loss of $4.7 million net income ($0.20 per diluted share) in the three month period ended March 31, 2014.

During the three month periods ended March 31, 2015 and 2014, $5.3 million and $11.1 million were generated and used from operating activities, respectively. The principal use of cash was an increase in trade accounts receivable that occurred as a consequence of higher sales, in spite of days sales outstanding being reduced by 6 days. During the three months ended in March 31, 2015 the company made capital expenditures for $13.9 million, of which $9.1 million were financed with bank loans and capital leases.

|  | Three months ended | |
|  | March 31, 2015 | March 31, 2014 |
| --- | --- | --- |
| Cash Flow from Operating Activities | $ 5,339 | (11,381) |
| Cash Flow from Investing Activities | (4,917) | (1,535) |
| Cash Flow from Financing Activities | 488 | 30,218 |
| Effect of exchange rates on Cash and Cash Equivalents | 292 | 100 |
| Cash Balance – Beginning of Period | 15,930 | 2,866 |
| Cash Balance – End of Period | $ 17,132 | 20,268 |

48

TABLE OF CONTENTS

|  | For the Years ended December 31, | |
| --- | --- | --- |
|  | **2014** | **2013** |
| Net operating revenues | $ 197,452 | $ 183,294 |
| Cost of sales | 136,021 | 127,875 |
| Operating expenses |  |  |
| Selling expenses | 17,872 | 17,287 |
| Administrative expenses | 16,327 | 10,862 |
| Total operating expenses | 34,199 | 28,149 |
| **Operating income** | 27,232 | 27,270 |
| Non-operating revenues and expenses (net) | 1,624 | 3,738 |
| Income tax provision | 8,538 | 8,696 |
| **Net income (loss)** | $ 20,318 | $ 22,312 |

### Comparison of years ended December 31, 2014 and December 31, 2013

Our net operating revenues increased from $183.3 million in 2013 to $197.5 million in 2014, or 7.7%. The increase mostly was driven by planning strategies designed to increase participation in the U.S. market.

The increase is partially due to high quality, reliability, and competitive prices which allowed us to further penetrate our existing markets. Sales in the U.S. market accounted for a $34.9 million increase, which represents 52%. The increase is also partially due to a diversification of markets within the country since our sales in the U.S. have historically been in the South Florida region where sales continue to increase significantly, but is now also expanding to other regions of the United States. Sales to other markets outside Colombia increased by about $1.2 million, or 7.9%. Sales in Colombia decreased by $21.7 million, which represents a 21% decrease between the years ended December 31, 2013 and 2014. We believe the decrease in sales in the Colombian market is primarily due to a transition stage between large projects ending and delays in projects that will start in 2015.

Our total backlog at December 31, 2014 was $280 million, compared with $120 million at December 31, 2013. Backlog represents the dollar amount of revenues we expect to recognize in the future from contracts or received orders, as well as those that are in progress. Backlog is not a term defined under generally accepted accounting principles and is not a measure of contract profitability. We include a project within our backlog at the time a signed contract or a firm purchase order is received.

Our backlog is comprised mostly of ES' contract sales for projects that can last up to several years until completion. Our backlog at December 31, 2014 increased from December 31, 2013 as a result of contact awards and business growth, primarily in U.S. markets. We do not believe that backlog is indicative of our future results of operations or prospects.

Sales margins increased from 30.2% to 31.1% between the years ended December 31, 2013 and 2014, respectively. Cost of raw materials increased 3.1%, significantly below the sales growth at about 7.7%. We believe this is the result of a higher degree of vertical integration as intercompany sales increased from 22% of total consolidated sales during the year ended December 31, 2013 to 27% during the year ended December 31, 2014.

Improvement in margin by raw materials was offset with a spike in the cost of labor and shipping charges. The number of employees in production and installation increased by 27% during the year ended December 31, 2014 as we prepare to continue growing and new employees need to undergo extensive training before becoming fully productive.

Selling, General and Administrative Expenses increased 21.5%, or $6.0 million, from the year ended December 31, 2013 to December 31, 2014. A significant increase in administrative expenses arose as a result of our merger in December 2013 which has required increased spending in accounting and audit services as well as consultants and personnel for the new reporting standards. Additionally, our Colombian subsidiaries had to adopt International Financial Reporting Standards (IFRS) and incurred significant expenses for software upgrades, personnel training and consulting services.

49

TABLE OF CONTENTS

Between the years ended December 31, 2014 and 2013, interest expense increased by $1.0 million, or approximately 13%, from $7.9 million to $8.9 million in line with the increase in total debt.

We incurred a non-cash, non-operating loss of $1.7 million in the year ended December 31, 2014 due to the increase in the fair value of our Warrants relative to their fair value at December 31, 2013. The fair value of the Warrants changes in response to market factors not controlled by us such as the market price of our shares and the volatility index of comparable companies. There are no income tax effects of this warrant liability due to our company being registered in the Cayman Islands. Management does not consider the effects of the change in the fair value of the Warrants to be indicative of our results of operations.

**Off-Balance Sheet Arrangements**

We did not have any off-balance sheet arrangements as of March 31, 2015 and December 31, 2014.

**Contractual Obligations**

Future contractual obligations represent an impact to future cash flows as shown in the table for the period ended December 31, 2014:

| | | Payments Due by Period | | | |
|---|---|---|---|---|---|
| Contractual Obligations | TOTAL | Less than 1 year | 1 – 3 years | 3 – 5 years | More than 5 years |
| Long Term Debt Obligations | 39,835 | 12,243 | 18,228 | 5,985 | 3,379 |
| Capital Lease Obligations | 15,505 | 3,824 | 6,034 | 2,507 | 3,140 |
| Total | 55,340 | 16,067 | 24,261 | 8,493 | 6,519 |

The above financial liabilities do not include future interest to be paid on this debt as such rates are variable. The average interest rate is approximately 9.4% and 9.5% per annum for long term debt and capital lease obligations respectively, and can vary up or down in accordance with money market rates in Colombia.

**Critical Accounting Policies**

The preparation of financial statements in conformity with U.S. GAAP requires that management make significant estimates and assumptions that affect the assets, liabilities, revenues and expenses, and other related amounts during the periods covered by the financial statements. Management routinely makes judgments and estimates about the effect of matters that are inherently uncertain. As the number of variables and assumptions affecting the future resolution of the uncertainties increases, these judgments become more subjective and complex. We have identified the following accounting policies as the most important to the portrayal of our current financial condition and results of operations.

*Revenue Recognition*

Our principal sources of revenue are derived from product sales of manufactured glass and aluminum products.

Revenues from fixed price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs incurred to date to total estimated costs for each contract. Revenues recognized in advance of amounts billable pursuant to contracts terms are recorded as unbilled receivables on uncompleted contracts based on work performed and costs to date. Unbilled receivables on uncompleted contracts are billable upon various events, including the attainment of performance milestones, delivery of product and/or services, or completion of the contract. Revisions to cost estimates as contracts progress have the effect of increasing or decreasing expected profits each period. Changes in contract estimates occur for a variety of reasons, including changes in contract scope, estimated revenue and cost estimates.

*Estimation of Fair Value of warrant liability*

The best evidence of fair value is current prices in an active market for similar financial instruments. We determine the fair value of warrant liability by the Company using the Binomial Lattice pricing model. This model is dependent upon several variables such as the instrument's expected term, expected strike price, expected risk-free interest rate over the expected instrument term, the expected dividend yield rate over the

50

**TABLE OF CONTENTS**

expected instrument term and the expected volatility of our stock price over the expected term. The expected term represents the period of time that the instruments granted are expected to be outstanding. The expected strike price is based upon a weighted average probability analysis of the strike price changes expected during the term as a result of the down round protection. The risk-free rates are based on U.S. Treasury securities with similar maturities as the expected terms of the options at the date of valuation. Expected dividend yield is based on historical trends. We measure volatility using a blended weighted average of the volatility rates for a number of similar publicly-traded companies. The inputs to the model were stock price, dividend yield, risk-free rate, expected term and volatility. In general, the inputs used are unobservable; therefore unless indicated otherwise, warrant liability is classified as level 3 under guidance for fair value measurements hierarchy.

### Derivative Financial Instruments

We conduct interest rate swap (IRS) transaction with key non-related financial entities to reduce the effect of interest rate fluctuations as economic hedges against interest rate risk. We have designated this derivatives at fair value and the accounting for changes is recorded in Income statement. The inputs used are similar to the prices for similar assets and liabilities in active markets directly or indirectly through market corroboration; therefore unless indicated otherwise, warrant liability is classified as level 2 under guidance for fair value measurements hierarchy.

### Income taxes

We are subject to income taxes in some jurisdictions. Significant judgment is required in determining the worldwide provision for income taxes. There are many transactions and calculations for which the ultimate tax determination is uncertain. We recognize liabilities for anticipated tax audit issues based on estimates of whether additional taxes will be due. Where the final tax outcome of these matters is different from the amounts that were initially recorded, such differences will impact the current and deferred income tax assets and liabilities in the period in which such determination is made.

51

TABLE OF CONTENTS

## CERTAIN RELATIONSHIPS AND RELATED PERSON TRANSACTIONS

**Related Person Policy**

Our Code of Ethics requires us to avoid, wherever possible, all related party transactions that could result in actual or potential conflicts of interests, except under guidelines approved by the board of directors (or the audit committee). Related-party transactions are defined as transactions in which (1) the aggregate amount involved will or may be expected to exceed $120,000 in any calendar year, (2) we or any of our subsidiaries are a participant, and (3) any (a) executive officer, director or nominee for election as a director, (b) greater than 5% beneficial owner of our ordinary shares, or (c) immediate family member, of the persons referred to in clauses (a) and (b), has or will have a direct or indirect material interest (other than solely as a result of being a director or a less than 10% beneficial owner of another entity). A conflict of interest situation can arise when a person takes actions or has interests that may make it difficult to perform his or her work objectively and effectively. Conflicts of interest may also arise if a person, or a member of his or her family, receives improper personal benefits as a result of his or her position.

Our audit committee, pursuant to its written charter, is responsible for reviewing and approving related-party transactions to the extent we enter into such transactions. The audit committee will consider all relevant factors when determining whether to approve a related party transaction, including whether the related party transaction is on terms no less favorable than terms generally available to an unaffiliated third-party under the same or similar circumstances and the extent of the related party's interest in the transaction. No director may participate in the approval of any transaction in which he is a related party, but that director is required to provide the audit committee with all material information concerning the transaction. Additionally, we require each of our directors and executive officers to complete an annual directors' and officers' questionnaire that elicits information about related party transactions.

These procedures are intended to determine whether any such related party transaction impairs the independence of a director or presents a conflict of interest on the part of a director, employee or officer.

**Related Person Transactions**

**_Pre-Merger Related Transactions of the Company_**

On May 20, 2013, the A. Lorne Weil 2006 Irrevocable Trust — Family Investment Trust, a trust of which A. Lorne Weil, his spouse and his descendants are among the beneficiaries, loaned us $100,000 to meet our working capital needs pending our initial business combination. This loan was evidenced by a promissory note payable upon consummation of our initial business combination, in cash without interest, or, at the holder's discretion and upon approval by our shareholders (which was obtained in connection with the Merger), by conversion into Warrants at a price of $0.50 per warrant. This note was converted into 200,000 Warrants upon consummation of the Merger.

**_Pre-Merger Related Transactions of TG and ES_**

_TG_

In the fiscal year ended December 31, 2013 prior to the Merger, transactions with TG shareholders resulted in TG generating $39.2 million in revenues exclusively comprised of sales to ES which was a shareholder of TG leading up to the Merger and $5.8 million in accounts receivables. Transactions with directors resulted in less than $0.1 million in accounts receivable. TG also paid its directors $0.5 million in salaries.

_ES_

In the fiscal year ended December 31, 2013 prior to the Merger, transactions with ES shareholders resulted in ES generating $0.2 million in revenues, $0.1 million in accounts receivables and $17.3 million in accounts payables. ES also purchased equipment from its shareholders $5,276,000. Transactions with its directors resulted in less than $0.1 million in accounts receivables and less than $0.1 million in revenues. ES paid its directors $0.8 million in salaries.

52

5/8/2018    Case 1:16-cv-00420-ILG-VMS   Document 112-2   Filed 05/11/18   Page 68 of 140 PageID #: 3356

### E.S. Windows, LLC

The majority of shares of ESW LLC, a Florida limited liability company, are owned by Jose Daes, Christian Daes and Evelyn Daes. ESW LLC acts as one of ES's importers and distributors in the U.S. ESW LLC sends project specifications and orders from its clients to ES, and in turn, receiving pricing quotes from ES which are conveyed to the client. ESW LLC does not install any of our products. The Company's CEO and COO, other family members, and other related parties own 100% of the equity in ESW LLC. Sales to ESW LLC amounted to $37.1 and $28.9 million during the years ended December 31, 2014 and December 31, 2013.

### Ventanas Solar S.A.

Ventanas Solar S.A. ("VS"), a Panama *sociedad anonima,* is an importer and installer of the Company's products in Panama. Family members of the Company's CEO and COO and other related parties own 100% of the equity in VS. The Company's sales to VS for the year ended December 31, 2014 and 2013 were $0.2 million and $7.9 million, respectively. Outstanding receivables from VS at December 31, 2014 and 2013 were $12.2 million and $10.8 million, respectively, including a long term payment agreement for trade receivables of $4.2 million as of December 31, 2014 related to a collection agreement, pursuant to which VS collects the Company's receivables from customers in Panama.

### Merger Consideration

Energy Holding Corporation, the sole shareholder of Tecnoglass Holding whose shareholders are all of the former shareholders of Tecnoglass and ES, received 20,567,141 ordinary shares in consideration of all of the outstanding and issued ordinary shares of Tecnoglass Holding.

Pursuant to the agreement and plan of reorganization, we issued to Energy Holding Corp. an aggregate of 500,000 ordinary shares based on its achievement of specified EBITDA targets set forth in such agreement for the fiscal year ended December 31, 2014.

Energy Holding Corp. also has the contractual right to receive an additional 2,500,000 ordinary shares, to be released upon the attainment of specified share price targets or targets based on our EBITDA in the fiscal years ending December 31, 2015 or 2016. The following table sets forth the targets and the number of earnout shares issuable to Tecnoglass Holding shareholders upon the achievement of such targets:

| | Ordinary Share Price Target | EBITDA Target | | Number of Earnout Shares | |
|---|---|---|---|---|---|
| | | Minimum | Maximum | Minimum | Maximum |
| Fiscal year ending 12/31/15 | $ 13.00 per share | $ 35,000,000 | $ 40,000,000 | 875,000 | 1,000,000 |
| Fiscal year ending 12/31/16 | $ 15.00 per share | $ 40,000,000 | $ 45,000,000 | 1,333,333 | 1,500,000 |

If either the ordinary share target or the maximum EBITDA target is met in any fiscal year, Energy Holding Corporation receives the maximum number of earnout shares indicated for the year. In the event the ordinary share target is not met but the combined company's EBITDA falls within the minimum and maximum EBITDA target for a specified year, the number of earnout shares to be issued will be interpolated between such targets. In the event neither the ordinary share target nor the minimum EBITDA target is met in a particular year, but a subsequent year's share price or EBITDA target is met, Energy Holding Corporation will earn the earnout shares for the previous year as if the prior year's target had been met.

Joaquin Fernandez and Alberto Velilla Becerra are directors of Energy Holding Corporation. Jose Daes and Christian Daes are shareholders of Energy Holding Corporation.

### Registration Rights

Our initial shareholders, Energy Holding Corporation, holders of the Private Warrants and Warrants issued upon conversion of the promissory note (described above) (and all underlying securities), are entitled to registration rights pursuant to an agreement entered into on December 20, 2013. The holders of a majority of these securities are entitled to make up to two demands that we register such securities, and have certain "piggy-back" registration rights with respect to registration statements filed subsequent to our consummation of the Merger. Pursuant to the agreement, we will bear the expenses incurred in connection with the filing of any such registration statements. All such securities were included on our Registration Statement on Form S-3 filed on February 11, 2014 and later amended on Form S-1, declared effective on June 16, 2014.

https://www.sec.gov/Archives/edgar/data/1534675/000114420415041802/v412857_s4.htm    67/139

TABLE OF CONTENTS

### Transfer Agreements in connection with Merger

On December 19, 2013, we entered into an agreement with an affiliate of A. Lorne Weil, our non-executive chairman of the board, and a third party shareholder pursuant to which the third party shareholder agreed to use commercially reasonable efforts to purchase up to 1,000,000 ordinary shares in the open market and agreed that it would not seek conversion or redemption of any such purchased shares in connection with the Merger. This third party shareholder and its affiliates purchased an aggregate of 985,896 ordinary shares pursuant to this agreement. Pursuant to the agreement, Mr. Weil's affiliate transferred to the third party shareholder and its affiliates an aggregate of 2,167,867 Private Warrants. Additionally, EarlyBirdCapital, Inc., our financial advisor, transferred to the third party shareholder and its affiliates certain unit purchase options, each to purchase one ordinary share and one warrant to purchase one ordinary share. We agreed to file a registration statement with the Securities and Exchange Commission covering the resale of the Warrants and shares underlying the Warrants, as well as the unit purchase options and underlying securities, transferred to the shareholder and its affiliates, which such registration statement was filed on February 11, 2014 and declared effective on June 16, 2014.

Also on December 19, 2013, we entered into subscription agreements with two investors pursuant to which such investors agreed to purchase an aggregate of 649,382 ordinary shares at $10.18 per Share, or an aggregate of $6,610,709. In connection with this purchase, the affiliate of Mr. Weil transferred an aggregate of 608,796 Private Warrants to such investors. We agreed to file a registration statement with the Securities and Exchange Commission covering the resale of the Warrants and shares underlying the Warrants, transferred to these investors, which such registration statement was filed on February 11, 2014, and agreed to use our best efforts to have such registration statement declared effective by the Securities and Exchange Commission as soon as possible. Such registration statement was declared effective on June 16, 2014.

### Indemnification Agreements

Effective March 5, 2014, we entered into indemnification agreements with each of our executive officers and members of our board of directors. The indemnification agreements supplement our Third Amended and Restated Memorandum and Articles of Association and Cayman Islands law in providing certain indemnification rights to these individuals. The indemnification agreements provide, among other things, that we will indemnify these individuals to the fullest extent permitted by Cayman Islands law and to any greater extent that Cayman Islands law may in the future permit, including the advancement of attorneys' fees and other expenses incurred by such individuals in connection with any threatened, pending or completed action, suit or other proceeding, whether of a civil, criminal, administrative, regulatory, legislative or investigative nature, relating to any occurrence or event before or after the date of the indemnification agreements, by reason of the fact that such individuals is or were our directors or executive officers, subject to certain exclusions and procedures set forth in the indemnification agreements, including the absence of fraud or willful default on the part of the indemnitee and, with respect to any criminal proceeding, that the indemnitee had no reasonable cause to believe his conduct was unlawful.

### Private Placement with Affiliate of A. Lorne Weil

On March 5, 2014, we entered into a subscription agreement with an affiliate of A. Lorne Weil, our Non-Executive Chairman of the Board, pursuant to which such affiliate agreed to purchase an aggregate of 95,693 ordinary shares at an aggregate price of $1,000,000, or approximately $10.45 per share, representing a slight premium to the closing price of our ordinary shares immediately prior to the execution of the subscription agreement. The closing of the purchase took place on March 14, 2014. A registration statement covering the resale of these shares was declared effective on June 16, 2014.

54

TABLE OF CONTENTS

## DESCRIPTION OF SECURITIES

### General

As of the date of this Prospectus/Offer to Exchange, we are authorized to issue 100,000,000 ordinary shares, par value $0.0001, and 1,000,000 preferred shares, par value $0.0001. As of June 30, 2015, 25,301,132 ordinary shares were outstanding, held by 316 shareholders of record, and no preferred shares were outstanding. In addition, as of June 30, 2015, we had outstanding 9,097,430 Warrants, held by 17 holders of record.

### Ordinary Shares

As of June 30, 2015, there are 25,301,132 ordinary shares are outstanding, held by 316 shareholders of record. Our shareholders of record are entitled to one vote for each share held on all matters to be voted on by shareholders.

Our board of directors is divided into three classes, each of which will generally serve for a term of three years with only one class of directors being elected in each year. There is no cumulative voting with respect to the election of directors, with the result that the holders of more than 50% of the shares eligible to vote for the election of directors can elect all of the directors.

Our shareholders have no conversion, preemptive or other subscription rights and there are no sinking fund or redemption provisions applicable to the ordinary shares.

The ordinary shares are listed on the NASDAQ Capital Market under the symbol TGLS. We cannot assure you that our ordinary shares will continue to be listed on the NASDAQ Capital Market as we might not in the future meet certain continued listing standards.

### Warrants

As of June 30, 2015, 9,097,430 Warrants are outstanding, including 4,097,430 Public Warrants and 5,000,000 Private Warrants held by 17 holders of record. Each Warrant entitles the registered holder to purchase one ordinary share at a price of $8.00 per share, subject to adjustment as discussed below. The Warrants became exercisable on December 20, 2013 (the date of the consummation of our initial business combination). Warrants may be exercised for cash or, at the option of the holder, on a "cashless basis" pursuant to the exemption provided by Section 3(a)(9) of the Securities Act by surrendering the Warrants for that number of ordinary shares equal to the quotient obtained by dividing (x) the product of the number of ordinary shares underlying the Warrants, multiplied by the difference between the exercise price of the Warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the ordinary shares for the 10 trading days ending on the day prior to the date of exercise; provided, however, that in the event the Warrants are being called for redemption, the "fair market value" shall mean the average reported last sale price of the ordinary shares for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of Warrants. Notwithstanding the foregoing, no public Warrants will be exercisable for cash unless we have an effective and current registration statement covering the ordinary shares issuable upon exercise of the Warrants and a current prospectus, relating to such ordinary shares. The Warrants expire December 20, 2016 (three years following the date of consummation of our initial business combination) at 5:00 p.m., New York City time.

The Private Warrants are identical to the Public Warrants except that such Warrants may be exercisable for cash even if a registration statement covering the ordinary shares issuable upon exercise of such Warrants is not effective and will not be redeemable by us, in each case so long as they are still held by the initial purchasers or their affiliates.

We may call the Warrants for redemption (excluding the Private Warrants and certain Warrants that may be issued upon exercise of outstanding unit purchase options), in whole and not in part, at a price of $0.01 per Warrant,

- at any time while the Warrants are exercisable,

- upon not less than 30 days' prior written notice of redemption to each Warrant holder,

TABLE OF CONTENTS

- if, and only if, the reported last sale price of the ordinary shares (or the closing bid price of our ordinary shares in the event the ordinary shares are not traded on any specific trading day) equals or exceeds $14.00 per share, for any 20 trading days within a 30-day trading period ending on the third business day prior to the notice of redemption to Warrant holders, and

- if, and only if, there is a current registration statement in effect with respect to the ordinary shares underlying such Warrants commencing five business days prior to the 30-day trading period and continuing each day thereafter until the date of redemption.

The right to exercise will be forfeited unless the Warrants are exercised prior to the date specified in the notice of redemption. On and after the redemption date, a record holder of a Warrant will have no further rights except to receive the redemption price for such holder's Warrant upon surrender of such Warrant.

The redemption criteria for our Warrants have been established at a price which is intended to provide Warrant holders a reasonable premium to the initial exercise price and provide a sufficient differential between the then-prevailing share price and the Warrant exercise price so that if the share price declines as a result of our redemption call, the redemption will not cause the share price to drop below the exercise price of the Warrants.

The Warrants have been issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. The warrant agreement provides that the terms of the Warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval, by written consent or vote, of the holders of a majority of the then outstanding Public Warrants in order to make any change that adversely affects the interests of the registered holders.

If the number of outstanding ordinary shares is increased by a share dividend payable in ordinary shares, or by a split-up of ordinary shares or other similar event, then, on the effective date of such share dividend, split-up or similar event, the number of ordinary shares issuable on exercise of each Warrant will be increased in proportion to such increase in the outstanding ordinary shares. A rights offering to holders of ordinary shares entitling holders to purchase ordinary shares at a price less than the fair market value will be deemed a share dividend of a number of ordinary shares equal to the product of (i) the number of ordinary shares actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for ordinary shares) multiplied by (ii) one (1) minus the quotient of (x) the price per ordinary share paid in such rights offering divided by (y) the fair market value. For these purposes (i) if the rights offering is for securities convertible into or exercisable for ordinary shares, in determining the price payable for ordinary shares, there will be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion and (ii) fair market value means the volume weighted average price of ordinary shares as reported during the ten (10) trading day period ending on the trading day prior to the first date on which the ordinary shares trade on the applicable exchange or in the applicable market, regular way, without the right to receive such rights.

In addition, if we, at any time while the Warrants are outstanding, pay a dividend or make a distribution in cash, securities or other assets to the holders of ordinary shares on account of such ordinary shares (or other shares into which the Warrants are convertible), other than (a) as described above or (b) certain ordinary cash dividends, then the Warrant exercise price will be decreased, effective immediately after the effective date of such event, by the amount of cash and/or the fair market value of any securities or other assets paid on each ordinary share in respect of such event.

If the number of outstanding ordinary shares is decreased by a consolidation, combination, reverse shares split or reclassification of ordinary shares or other similar event, then, on the effective date of such consolidation, combination, reverse shares split, reclassification or similar event, the number of ordinary shares issuable on exercise of each Warrant will be decreased in proportion to such decrease in outstanding ordinary shares. Whenever the number of ordinary shares purchasable upon the exercise of the Warrants is adjusted, as described above, the Warrant exercise price will be adjusted by multiplying the Warrant exercise price immediately prior to such adjustment by a fraction (x) the numerator of which will be the number of ordinary

56

TABLE OF CONTENTS

shares purchasable upon the exercise of the Warrants immediately prior to such adjustment, and (y) the denominator of which will be the number of ordinary shares so purchasable immediately thereafter.

In case of any reclassification or reorganization of the outstanding ordinary shares (other than those described above or that solely affects the par value of such ordinary shares), or in the case of any merger or consolidation of us with or into another corporation (other than a consolidation or merger in which we are the continuing corporation and that does not result in any reclassification or reorganization of its outstanding ordinary shares), or in the case of any sale or conveyance to another corporation or entity of our assets or other property as an entirety or substantially as an entirety in connection with which we are dissolved, the holders of the Warrants will thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the Warrants and in lieu of ordinary shares immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the holder of the Warrants would have received if such holder had exercised their Warrants immediately prior to such event. The warrant agreement provides for certain modifications to what holders of Warrants will have the right to purchase and receive upon the occurrence of certain events, and that if more than 30% of the consideration receivable by the holders of ordinary shares in the applicable event is payable in the form of ordinary shares in the successor entity that is not listed for trading on a national securities exchange or on the OTC Bulletin Board, or is not to be so listed for trading immediately following such event, then the Warrant exercise price will be reduced in accordance with a formula specified in the warrant agreement.

The Warrants may be exercised upon surrender of the Warrant certificate on or prior to the expiration date at the offices of the warrant agent, with the exercise form on the reverse side of the Warrant certificate completed and executed as indicated, accompanied by full payment of the exercise price, by certified or official bank check payable to us, for the number of Warrants being exercised. The Warrant holders do not have the rights or privileges of holders of ordinary shares and any voting rights until they exercise their Warrants and receive ordinary shares. After the issuance of ordinary shares upon exercise of the Warrants, each holder will be entitled to one vote for each share held of record on all matters to be voted on by shareholders.

Except as described above, no Public Warrants will be exercisable and we will not be obligated to issue ordinary shares unless at the time a holder seeks to exercise such Warrant, a prospectus relating to the ordinary shares issuable upon exercise of the Warrants is current and the ordinary shares have been registered or qualified or deemed to be exempt under the securities laws of the state of residence of the holder of the Warrants. Under the terms of the warrant agreement, we have agreed to use our best efforts to meet these conditions and to maintain a current prospectus relating to the ordinary shares issuable upon exercise of the Warrants until the expiration of the warrants.

Warrant holders may elect to be subject to a restriction on the exercise of their Warrants such that an electing Warrant holder would not be able to exercise their Warrants to the extent that, after giving effect to such exercise, such holder would beneficially own in excess of 9.8% of the ordinary shares outstanding.

No fractional shares will be issued upon exercise of the Warrants. If, upon exercise of the Warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round up or down to the nearest whole number the number of ordinary shares to be issued to the Warrant holder.

The Warrants are quoted on the OTC Pink marketplace under the symbol TGLSW.

**Registration Rights**

Our initial shareholders, Energy Holding Corporation, holders of the Private Warrants and Warrants issued upon conversion of the promissory note (described above) (and all underlying securities), are entitled to registration rights pursuant to an agreement entered into on December 20, 2013. The holders of a majority of these securities are entitled to make up to two demands that we register such securities, and have certain "piggy-back" registration rights with respect to registration statements filed subsequent to our consummation of the Merger. Pursuant to the agreement, we will bear the expenses incurred in connection with the filing of

57

TABLE OF CONTENTS

any such registration statements. All such securities were included on our Registration Statement on Form S-3 filed on February 11, 2014 and later amended on Form S-1, declared effective on June 16, 2014.

**Our Transfer Agent and Warrant Agent**

The transfer agent for our securities and warrant agent for our Warrants is Continental Stock Transfer & Trust Company, 17 Battery Place, New York, New York 10004.

## LEGAL MATTERS

The validity of the ordinary shares offered in this Prospectus/Offer to Exchange is being passed upon for us by Maples and Calder, Cayman Islands. Graubard Miller, New York, New York, has provided an opinion regarding certain federal income tax matters relating to the Offer and the ordinary shares covered by this Prospectus/Offer to Exchange.

## EXPERTS

The financial statements of Tecnoglass Inc. and Subsidiaries for the year ended December 31, 2013, included in this prospectus, have been audited by Marcum LLP, an independent registered public accounting firm, as set forth in their report thereon appearing elsewhere in this prospectus and are included in reliance upon such report given on the authority of Marcum LLP as an expert in auditing and accounting.

The financial statements for the year ended December 31, 2014 included in this Prospectus have been so included in reliance on the report of PricewaterhouseCoopers Ltda, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We file annual, quarterly and current reports and proxy statements and other information with the SEC. Our SEC filings are available to the public through the SEC's website at *http://www.sec.gov*. You may also read and copy any document we file at the SEC's public reference room in Washington, D.C. located at 100 F Street, N.E., Washington D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room.

58

**TABLE OF CONTENTS**

**Tecnoglass Inc.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**Audited Financial Statements**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firms | FS-2 |
| Consolidated Balance Sheets at December 31, 2014 and 2013 | FS-4 |
| Consolidated Statements of Income and Comprehensive Income for the Years Ended December 31, 2014 and 2013 | FS-6 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2014 and 2013 | FS-7 |
| Consolidated Statements of Changes in Shareholders' Equity for the Years Ended December 31, 2014 and 2013 | FS-9 |
| Notes to Consolidated Financial Statements | FS-10 |

**Interim Financial Statements**

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Condensed Consolidated Balance Sheets at March 31, 2015 and December 31, 2014 | FS-32 |
| Condensed Consolidated Statements of Operations and Comprehensive Income for the quarters ending March 31, 2015 and 2014 | FS-33 |
| Condensed Consolidated Statements of Cash Flows for the quarters ending March 31, 2015 and 2014 | FS-34 |
| Notes to Condensed Consolidated Financial Statements | FS-35 |

FS-1

**TABLE OF CONTENTS**

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders
of Tecnoglass Inc. and Subsidiaries

In our opinion, the accompanying consolidated balance sheet and the related consolidated statements of income and comprehensive income, of shareholders' equity and of cash flows present fairly, in all material respects, the financial position of Tecnoglass Inc. and its subsidiaries at December 31, 2014, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers Ltda.


PricewaterhouseCoopers Ltda.
Barranquilla, Colombia
April 15, 2015

FS-2

TABLE OF CONTENTS

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Audit Committee of the
Board of Directors and Shareholders
of Tecnoglass, Inc. and Subsidiaries

We have audited the accompanying consolidated balance sheet of Tecnoglass, Inc. and Subsidiaries (the "Company") as of December 31, 2013, and the related consolidated statements of income and comprehensive income, stockholders' equity and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Tecnoglass, Inc. and Subsidiaries, as of December 31, 2013, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

/s/ Marcum LLP

Marcum LLP
New York, NY
April 16, 2014, except for Note 4 to the consolidated financial statements as to which the date is April 15, 2015.

FS-3

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Consolidated Balance Sheets**
**(In thousands, except share and per share data)**

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| ASSETS |  |  |
| Current assets: |  |  |
| Cash | $ 15,930 | $ 2,866 |
| Restricted cash | — | 3,633 |
| Due from transfer agent | — | 15,908 |
| Subscription receivable | — | 6,611 |
| Investments | 1,209 | 1,353 |
| Trade accounts receivable, net | 44,955 | 50,928 |
| Unbilled receivables on uncompleted contracts | 9,931 | 11,640 |
| Due from related parties | 28,327 | 21,418 |
| Advances and other receivables | 5,508 | 13,165 |
| Deferred income taxes | 5,373 | 2,321 |
| Inventories | 28,965 | 24,181 |
| Prepaid expenses | 1,298 | 824 |
| Total current assets | 141,496 | 154,848 |
| Long term assets: |  |  |
| Property, plant and equipment, net | 103,980 | 87,382 |
| Long term receivables from related parties | 4,220 | 5,722 |
| Other long term assets | 6,195 | 262 |
| Total long term assets | 114,395 | 93,366 |
| Total assets | $ 255,891 | $ 248,214 |
| LIABILITIES AND SHAREHOLDERS' EQUITY |  |  |
| Liabilities and shareholders equity |  |  |
| Current liabilities |  |  |
| Short-term debt and current portion of long-term debt | $ 54,925 | $ 29,720 |
| Note payable to shareholder | 80 | 80 |
| Accounts payable and accrued expenses | 33,493 | 29,285 |
| Due to related parties | 1,456 | 8,397 |
| Taxes payables | 7,930 | 4,847 |
| Deferred income taxes | 8,416 | 6,698 |
| Labor liabilities | 449 | 6 |
| Accrued liabilities and provisions | 505 | 994 |
| Current portion of customer advances on uncompleted contracts | 5,782 | 28,470 |
| Total current liabilities | 113,036 | 108,497 |
| Warrant liability | 19,991 | 18,280 |
| Customer advances on uncompleted contracts | 8,333 | 8,220 |
| Long-term debt | 39,273 | 48,097 |
| Total long term liabilities | 67,597 | 74,597 |
| Total liabilities | 180,633 | 183,094 |

**The accompanying notes are an integral part of these consolidated financial statements.**

FS-4

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Consolidated Balance Sheets – (continued)**
**(In thousands, except share and per share data)**

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Commitments and contingencies |  |  |
| Shareholders' equity |  |  |
| Preferred shares, $0.0001 par value, 1,000,000 shares authorized, 0 shares issued and outstanding at December 31, 2014 and 2013 | — | — |
| Ordinary shares, $0.0001 par value, 100,000,000 shares authorized, 24,801,132 and 24,214,670 shares issued and outstanding at December 31, 2014 and 2013, respectively | $ 2 | $ 2 |
| Legal reserves | 1,367 | 1,367 |
| Additional paid capital | 46,514 | 40,693 |
| Retained earnings | 38,806 | 18,488 |
| Accumulated other comprehensive income | (11,431) | 4,570 |
| Total shareholders equity | 75,258 | 65,120 |
| Total liabilities and shareholders equity | $ 255,891 | $ 248,214 |

**The accompanying notes are an integral part of these consolidated financial statements.**

FS-5

Case 1:16-cv-00420-ILG-VMS Document 172-2 Filed 05/11/18 Page 88 of 140 PageID #: 3368

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Consolidated Statements of Income and Comprehensive Income**
**(In thousands, except share and per share data)**

| | Years ended December 31, | |
| | 2014 | 2013 |
| --- | --- | --- |
| Operating revenues | $ 197,452 | $ 183,294 |
| Cost of sales | 136,021 | 127,875 |
| Gross profit | 61,431 | 55,419 |
| Operating expenses: | | |
| Selling | 17,872 | 17,287 |
| General and administration | 16,327 | 10,862 |
| Operating expenses net | 34,199 | 28,149 |
| Operating income | 27,232 | 27,270 |
| Change in fair value of warrant liability | (1,711) | 7,626 |
| Non-operating revenues | 12,235 | 3,998 |
| Interest expense | (8,900) | (7,886) |
| Income before taxes | 28,856 | 31,008 |
| Income tax provision | 8,538 | 8,696 |
| Net income | $ 20,318 | $ 22,312 |
| Comprehensive income: | | |
| Net income | $ 20,318 | $ 22,312 |
| Foreign currency translation adjustments | (16,001) | (953) |
| Total comprehensive income | $ 4,317 | $ 21,359 |
| Basic income per share | $ 0.83 | $ 1.08 |
| Diluted income per share | $ 0.73 | $ 1.08 |
| Basic weighted average common shares outstanding | 24,347,620 | 20,677,067 |
| Diluted weighted average common shares outstanding | 27,737,679 | 20,714,275 |

**The accompanying notes are an integral part of these consolidated financial statements.**

FS-6

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Consolidated Statements of Cash Flows**
**(In thousands)**

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net income | $ 20,318 | $ 22,312 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | — | |
| Provision for bad debts | 20 | 265 |
| Provision for obsolete inventory | (1,036) | 1,483 |
| Change in fair value of investments held for trading | 168 | |
| Depreciation and amortization | 8,542 | 7,238 |
| Loss on disposition of assets | 1,300 | |
| Change in value of derivative liability | (25) | |
| Change in fair value of warrant liability | 1,711 | (7,626) |
| Deferred income taxes | (915) | 4,513 |
| Changes in operating assets and liabilities: | — | |
| Receivables | (5,002) | (20,891) |
| Deferred income taxes | 466 | 98 |
| Inventories | (10,696) | (6,143) |
| Prepaid expenses | (761) | 646 |
| Other assets | 1,852 | 1,002 |
| Accounts payable and accrued expenses | 11,846 | (11,216) |
| Taxes payable | 4,817 | 1,151 |
| Labor liabilities | 530 | (16) |
| Accrued liabilities and provisions | (352) | (598) |
| Related parties | (19,132) | 375 |
| Advances from customers | (18,461) | 18,141 |
| CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES | (4,810) | 10,734 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Proceeds from sale of investments | 825 | 3,222 |
| Proceeds from sale of property and equipment | 3,609 | — |
| Cash acquired from Andina Acquisition Corporation | — | 3 |
| Purchase of investments | 400 | (107) |
| Acquisition of property and equipment | (24,848) | (20,001) |
| Restricted cash | 3,633 | (3,746) |
| CASH USED IN INVESTING ACTIVITIES | (16,381) | (20,629) |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Proceeds from debt | 87,109 | 21,237 |
| Proceeds from the sale of common stock | 1,000 | — |
| Proceeds from the exercise of warrants | 821 | — |
| Repayments of debt | (77,924) | (12,865) |
| Merger proceeds held in trust | 22,519 | — |
| CASH PROVIDED BY FINANCING ACTIVITIES | 33,525 | 8,372 |
| Effect of exchange rate changes on cash and cash equivalents | 730 | 2,254 |

**The accompanying notes are an integral part of these consolidated financial statements.**

FS-7

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Consolidated Statements of Cash Flows – (continued)**
**(In thousands)**

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| NET INCREASE (DECREASE) IN CASH | 13,064 | 731 |
| CASH – Beginning of year | 2,866 | 2,135 |
| CASH – End of year | $ 15,930 | $ 2,866 |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION | | |
| Cash paid during the year for: | | |
| Interest | $ 7,451 | $ 7,303 |
| Taxes | $ 3,101 | $ 4,183 |
| NON-CASH INVESTING AND FINANCING ACTIVITIES: | | |
| Assets acquired under capital lease and financial obligations | $ 27,778 | $ 17,686 |
| Assets acquired with issuance of debt | $ 4,000 | $ — |

**The accompanying notes are an integral part of these consolidated financial statements.**

FS-8

5/8/2018     Case 1:16-cv-00420-ILG-VMS   Document 127-2   Filed 05/11/18   Page 84 of 140 PageID #: 3372

**Tecnoglass, Inc. and Subsidiaries**

**Consolidated Statements of Shareholders' Equity**
**For the Years Ended December 31, 2014 and 2013**
**(In thousands, except share data)**

| | Preferred Shares, $0.0001 Par Value | | Ordinary Shares, $0.0001 Par Value | | Additional Paid in Capital | Legal Reserve | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Loss | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| Balance at January 1, 2013 | — | — | 20,567,141 | 2 | $ 44,219 | $ 1,367 | $ (3,824) | $ 5,523 | $ 47,287 |
| Outstanding ordinary shares of Andina Acquisition at the time of the exchange | — | — | 3,647,529 | — | 35,351 | — | (38,877) | — | (3,526) |
| Recapitalization of Andina Acquisition accumulated deficit | — | — | — | — | (38,877) | — | 38,877 | — | — |
| Foreign currency translation | — | — | — | — | — | — | — | (953) | (953) |
| Net income | — | — | — | — | — | — | 22,312 | — | 22,312 |
| Balance at December 31, 2013 | — | — | 24,214,670 | 2 | 40,693 | 1,367 | 18,488 | 4,570 | 65,120 |
| Issuance of common stock | — | — | 483,892 | — | 5,000 | — | — | — | 5,000 |
| Exercise of warrants | — | — | 102,570 | — | 821 | — | — | — | 821 |
| Foreign currency translation | — | — | — | — | — | — | — | (16,001) | (16,001) |
| Net income | — | — | — | — | — | — | 20,318 | — | 20,318 |
| Balance at December 31, 2014 | — | $ — | 24,801,132 | $ 2 | $ 46,514 | $ 1,367 | $ 38,806 | $ (11,431) | $ 75,258 |

**The accompanying notes are an integral part of these consolidated financial statements.**

FS-9

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

## Note 1. Organization, Plan of Business Operation

Tecnoglass Inc. ("TGI," the "Company," "we," "us" or "our") was incorporated in the Cayman Islands on September 21, 2011 under the name "Andina Acquisition Corporation" ("Andina") as a blank check company. Andina's registration statement for its initial public offering (the "Public Offering") was declared effective on March 16, 2012. Andina consummated the Public Offering, the private placement of warrants ("Private Placement") and the sale of options to the Underwriters on March 22, 2012, receiving proceeds, net of transaction costs, of $43,163, of which $42,740 was placed in a trust account. Andina's objective was to acquire, through a merger, share exchange, asset acquisition, share purchase recapitalization, reorganization or other similar business combination, one or more operating businesses. On December 20, 2013, Andina consummated a merger transaction (the "Merger") with Tecno Corporation ("Tecnoglass Holding") as ultimate parent of Tecnoglass S.A. ("TG") and C.I. Energía Solar S.A. ES. Windows ("ES"). The surviving entity was renamed Tecnoglass Inc. The Merger transaction was accounted for as a reverse merger and recapitalization where Tecnoglass Holding was the acquirer and TGI was the acquired company.

The Company manufactures hi-specification, architectural glass and windows for the global residential and commercial construction industries. Currently the Company offers design, production, marketing, and installation of architectural systems for buildings of high, medium and low elevation size. Products include windows and doors in glass and aluminum, office partitions and interior divisions, floating façades and commercial window showcases. The Company sells to customers in North, Central and South America, and exports about half of its production to foreign countries.

TG manufactures both glass and aluminum products. Its glass products include tempered glass, laminated glass, thermo-acoustic glass, curved glass, silk-screened glass, acoustic glass and digital print glass. Its Alutions plant produces mill finished, anodized, painted aluminum profiles and rods, tubes, bars and plates. Alutions' operations include extrusion, smelting, painting and anodizing processes, and exporting, importing and marketing aluminum products.

ES designs, manufactures, markets and installs architectural systems for high, medium and low rise construction, glass and aluminum windows and doors, office dividers and interiors, floating facades and commercial display windows.

In 2014, the Company established two Florida limited liability companies, Tecnoglass LLC ("Tecno LLC") and Tecnoglass RE LLC ("Tecno RE") to acquire manufacturing facilities, manufacturing machinery and equipment, customer lists and exclusive design permits.

## Note 2. Reverse Merger

The Company entered into an Agreement and Plan of Reorganization (the "Merger Agreement") as of August 17, 2013. Pursuant to the Merger Agreement, on the closing date of December 20, 2013 (the "Closing"), the former Tecnoglass Holding shareholders, through an intermediary entity, received, as consideration for all ordinary shares of Tecnoglass Holding they held: (i) an aggregate of 20,567,141 ordinary shares of the Company, par value $0.0001 per share ("Ordinary Shares") at the Closing; and (ii) up to an aggregate of 3,000,000 additional Ordinary Shares ("Earnout Shares") of the Company to be released after the Closing as described below. At the Closing, the Company had 3,647,529 ordinary shares outstanding with a net tangible book value of ($3,526). The net tangible book value consisted of a stock subscription receivable aggregating $6,610, amount due from the transfer agent of $15,909, liabilities of $139 and a warrant liability of $25,906. The balance due from the transfer agent is net of $22,915 paid, from the proceeds of $42,740 held in the trust account, to the holders of 2,251,853 public shares electing not to participate in the business combination. In addition, transaction expenses of approximately $3.9 million were also paid. The balance of $15,909 is available for working capital and is classified on the balance sheet at December 31, 2013 as Due from Transfer Agent. The funds were received from the Transfer Agent in January 2014. Prior to the business combination the Company entered into subscription agreements with two investors pursuant to which such

FS-10

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

**Note 2. Reverse Merger  – (continued)**

investors purchased 649,382 ordinary shares of for an aggregate price of $6,610. As of December 31, 2013 such amount has been classified as a subscription receivable. The proceeds were received in January 2014.

The Merger Agreement was accounted for as a reverse merger and recapitalization where Tecnoglass Holding was the acquirer and TGI was the acquired company. Accordingly, the historical financial statements presented are the consolidated financial statements of Tecnoglass Holding. The ordinary shares and the corresponding capital amounts of the Company pre-merger have been retroactively restated as ordinary shares reflecting the exchange ratio in the merger.

The Earnout Shares have been issued and placed in escrow to be released to the former shareholders of Tecnoglass Holding's upon the achievement of specified share price targets or targets based on Tecnoglass Holding's net earnings before interest income or expense, income taxes, depreciation, amortization and any expenses arising solely from the Merger charged to income ("EBITDA") in the fiscal years ending December 31, 2014, 2015 or 2016. The following table sets forth the targets and the number of Earnout Shares issuable to the former shareholders of Tecnoglass Holding's upon the achievement of such targets:

| | Ordinary Share Price Target | EBITDA Target | | Number of Earnout Shares | |
|---|---|---|---|---|---|
| | | Minimum | Maximum | Minimum | Maximum |
| Fiscal year ending 12/31/14 | $ 12.00 per share | $ 30,000 | $ 36,000 | 416,667 | 500,000 |
| Fiscal year ending 12/31/15 | $ 13.00 per share | $ 35,000 | $ 40,000 | 875,000 | 1,000,000 |
| Fiscal year ending 12/31/16 | $ 15.00 per share | $ 40,000 | $ 45,000 | 1,333,333 | 1,500,000 |

If either the ordinary share target or the maximum EBITDA target is met in any fiscal year, the former shareholders of Tecnoglass Holding's receive the maximum number of Earnout Shares indicated for the year.

In the event the ordinary share target is not met but the combined company's EBITDA falls within the minimum and maximum EBITDA target for a specified year, the number of Earnout Shares to be issued will be interpolated between such targets.

In the event neither the ordinary share target nor the minimum EBITDA target is met in a particular year, but a subsequent year's share price or EBITDA target is met, the former shareholders of Tecnoglass Holding's will earn the Earnout Shares for the previous year as if the prior year's target had been met.

The Company and the former shareholders of Tecnoglass Holdings have agreed to indemnify and hold harmless the other for their inaccuracies or breaches of the representations and warranties or for the non-fulfillment or breach of any covenant or agreement contained in the Merger Agreement and for certain other matters. To provide a fund for payment to the Company with respect to its post-closing rights to indemnification under the Merger Agreement, an aggregate of 890,000 of the Ordinary Shares issuable to the Tecnoglass Holding shareholders were placed in escrow with an independent escrow agent at closing. The escrow fund will be the sole remedy for the Company for its rights to indemnification under the Merger Agreement. On the date that is the earlier of (i) 30 days after the date on which the Company has filed its Annual Report on Form 10-K for its 2014 fiscal year or (ii) June 30, 2015, the shares remaining in such escrow fund will be released to the former shareholders of Tecnoglass Holding's except for any shares subject to pending claims and certain other matters.

**Note 3. Summary of significant accounting policies**

Basis of Presentation and Use of Estimates

These consolidated financial statements include the consolidated results of TGI, its indirect wholly-owned subsidiaries TG and ES, and its direct subsidiaries Tecno LLC and Tecno RE. Material intercompany accounts, transactions and profits are eliminated in consolidation. These financial statements include adjustments of a normal recurring nature considered necessary by management for a fair presentation of the Company's

FS-11

TABLE OF CONTENTS

Tecnoglass Inc. and Subsidiaries

Notes to Consolidated Financial Statements
(Amounts in thousands, except share and per share data)

Note 3. Summary of significant accounting policies – (continued)

consolidated financial position, results of operations and cash flows. Estimates inherent in the preparation of these consolidated financial statements relate to the collectability of account receivables, the valuation of inventories, estimated earnings on uncompleted contracts, useful lives and potential impairment of long-lived assets, and valuation of warrants and other derivative financial instruments.

The results of TGI, as the acquired company in the reverse merger, have been included for the period after the reverse merger on December 20, 2013 to the reporting date December 31, 2013.

Foreign Currency Translation

The consolidated financial statements are presented in United States Dollars, the reporting currency. The functional currency of the Company's operations in Colombia is the Colombian Peso. The consolidated financial statements of the Company's foreign operations are prepared in the functional currency. The Statements of Income and Comprehensive Income prepared in the functional currency are translated into the reporting currency using average exchange rates for the respective periods. Assets and liabilities on the consolidated Balance Sheets are translated into the reporting currency using rates of exchange at the end of the period and the related translation adjustments are recorded as Accumulated other comprehensive income, a component of Equity in the consolidated Balance Sheet. Transaction and remeasurement gains or losses resulting from foreign currency transactions are recorded in the consolidated Statement of Operations.

Revenue Recognition

The Company generates revenue from product sales of manufactured glass and aluminum products. Revenue is recognized when persuasive evidence of an arrangement exists, a price has been fixed, delivery has occurred per the terms of the customer order, and collectability of the sale is reasonably assured. All revenue is recognized net of discounts, returns and allowances. Evidence of an arrangement consists of a contract or purchase order approved by the customer and accepted by the Company.

Payments received from customers in advance of delivery are recorded as advances from customers at the time payment is received.

Product Sales

The Company recognizes revenue when goods are shipped, which is "FOB shipping point." Delivery to the customer is deemed to have occurred when the customer takes title to the product. Generally, title passes to the customer upon shipment, but title transfer may occur when the customer receives the product based on the terms of the agreement with the customer.

The selling prices of all goods that the Company sells are fixed and agreed to with the customer prior to shipment. Selling prices are generally based on established list prices. The Company does not customarily permit its customers to return any of its products for monetary refunds or credit against completed or future sales.

Contract Sales

Revenues from fixed price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs incurred to date to total estimated costs for each contract. Revenues recognized in advance of amounts billable pursuant to contracts terms are recorded as unbilled receivables on uncompleted contracts based on work performed and costs to date. Unbilled receivables on uncompleted contracts are billable upon various events, including the attainment of performance milestones, delivery of product and/or services, or completion of the contract. Revisions to cost estimates as contracts progress have the effect of increasing or decreasing expected profits each period. Changes in contract estimates occur for a variety of reasons, including changes in contract scope, estimated revenue and cost estimates. Provisions for anticipated losses are recorded in the period in which they become determinable. No provisions have been recorded for losses on uncompleted contracts for the years ended December 31, 2014 and 2013.

FS-12

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

### Note 3. Summary of significant accounting policies  – (continued)

Standard Form Sales

The Company recognizes revenue for standard form sales once the installation is complete. Standard form sales are customer sales comprising low value installations that are of short duration.

A standard form agreement is executed between the Company and its customer. Services are performed by the Company during the installation process. The price quote is determined by the Company, based on the requested installation, and approved by the customer before the Company proceeds with the installation. The customer's credit worthiness and payment capacity is evaluated before the Company will proceed with the initial order process.

Shipping and Handling Costs

The Company classifies amounts billed to customers related to shipping and handling in sale transactions as product revenues. Shipping and handling costs incurred are recorded in cost of product revenues.

Sales Tax and Value Added Taxes

The Company accounts for sales taxes and value added taxes imposed on its goods and services on a net basis — value added taxes paid for goods and services purchased is netted against value added tax collected from customers and the net amount is paid to the government. The current value added tax rate in Colombia for all of the Company's products is 16%. A municipal industry and commerce tax (ICA) sales tax of 0.7% is payable on all of the Company's products sold in the Colombian market.

Product Warranties

The Company offers product warranties in connection with the sale and installation of its products that are competitive in the markets in which the products are sold. Standard warranties depend upon the product and service, and are generally from five to ten years for architectural glass, curtain wall, laminated and tempered glass, window and door products. Warranties are not priced or sold separately and do not provide the customer with services or coverages in addition to the assurance that the product complies with original agreed-upon specifications. Claims are settled by replacement of the warrantied products.

Non Operating Revenues

The Company recognizes non-operating revenues from foreign currency transaction gains and losses, interest income on receivables, proceeds from sales of scrap materials and other activities not related to the Company's operations. Foreign currency transaction gains and losses occur when monetary assets, liabilities, payments and receipts that are denominated in currencies other than the Company's functional currency are recorded in the Colombian peso accounts of the Company in Columbia. During the years ended December 31, 2014 and 2013, the Company recorded net gains from foreign currency transactions of $10,790 and $1,311, respectively.

The Company does not accrue contingent liabilities for estimated losses from product warranty obligations because the information available to the Company does not indicate that it is probable that customers will make claims under warranties for window products that have been sold. The amount of losses cannot be reasonably estimated. USGAAP guidance indicates that an inability to make a reasonable estimate of the amount of a warranty obligation at the time of sale because of significant uncertainty about possible claims precludes accrual. Actual losses from replacements under warranties do not appear to be material and are systematically accounted for as cost of product sold.

Cash and Cash Equivalents

All liquid investments with an original maturity of three months or less when purchased are considered to be cash equivalents. Cash equivalents are stated at cost, which approximates market value. At December 31, 2014 the Company had no cash equivalents.

FS-13

TABLE OF CONTENTS

## Tecnoglass Inc. and Subsidiaries

### Notes to Consolidated Financial Statements
**(Amounts in thousands, except share and per share data)**

**Note 3. Summary of significant accounting policies  – (continued)**

Concentration of Credit Risk

Financial instruments which potentially subject the Company to credit risk consist primarily of cash and trade accounts receivable. The Company mitigates its cash risk by maintaining its cash deposits with major financial institutions in Colombia and the Cayman Islands. At times the balances held at financial institutions in Colombia may exceed the Colombia government insured limits of the Ministerio de Hacienda y Crédito Público. The Company has not experienced such losses in such accounts. As discussed below, the Company mitigates its risk to trade accounts receivable by performing on-going credit evaluations of its customers.

Trade Accounts Receivable

Trade accounts receivable are recorded net of allowances for cash discounts for prompt payment, doubtful accounts and sales returns. Estimates for cash discounts and sales returns are based on contractual terms, historical trends and expectations regarding the utilization rates for these clients.

The Company's policy is to reserve for uncollectible accounts based on its best estimate of the amount of probable credit losses in its existing accounts receivable. The Company periodically reviews its accounts receivable to determine whether an allowance for doubtful accounts is necessary based on an analysis of past due accounts and other factors that may indicate that the collectability of an account may be in doubt. Other factors that the Company considers include its existing contractual obligations, historical payment patterns of its customers and individual customer circumstances, and a review of the local economic environment and its potential impact on the collectability of accounts receivable. Account balances deemed to be uncollectible are charged to the allowance for doubtful accounts after all means of collection have been exhausted and the potential for recovery is considered remote. As of the years ended December 31, 2014 and 2013, the reserve for doubtful accounts was $110 and $403, respectively.

Inventories

Inventories, which consist primarily of purchased and processed glass, aluminum, parts and supplies held for use in the ordinary course of business, are valued at the lower of cost or market. Cost is determined using a weighted-average method. Inventory consisting of certain job specific materials not yet installed are valued using the specific identification method.

Reserves for excess or slow-moving raw materials inventories are updated based on historical experience of a variety of factors including sales volume and levels of inventories at the end of the period. The Company's reserve for excess or slow-moving inventories at December 31, 2014 and 2013 amounted to $292 and $1,438, respectively. The Company does not maintain allowances for the lower of cost or market for inventories of finished products as its products are manufactured based on firm orders rather than built-to-stock.

FS-14

TABLE OF CONTENTS

Tecnoglass Inc. and Subsidiaries

Notes to Consolidated Financial Statements
(Amounts in thousands, except share and per share data)

Note 3. Summary of significant accounting policies  – (continued)

Property, Plant and Equipment

Property, plant and equipment are recorded at cost. Significant improvements and renewals that extend the useful life of the asset are capitalized. Repairs and maintenance are charged to expense as incurred. When property is retired or otherwise disposed of, the cost and related accumulated depreciation are removed from the accounts and any related gains or losses are included in income as a reduction to or increase in selling, general and administrative expenses. Depreciation is computed on a straight-line basis, based on the following estimated useful lives:

| | |
|---|---|
| Buildings | 20 years |
| Machinery and equipment | 10 years |
| Furniture and fixtures | 10 years |
| Office equipment and software | 5 years |
| Vehicles | 5 years |

Long Lived Assets

The Company periodically reviews the carrying values of its long lived assets when events or changes in circumstances would indicate that it is more likely than not that their carrying values may exceed their realizable values, and record impairment charges when considered necessary.

When circumstances indicate that impairment may have occurred, the Company tests such assets for recoverability by comparing the estimated undiscounted future cash flows expected to result from the use of such assets and their eventual disposition to their carrying amounts. If the undiscounted future cash flows are less than the carrying amount of the asset, an impairment loss, measured as the excess of the carrying value of the asset over its estimated fair value, is recognized. Fair value is determined through various valuation techniques, including discounted cash flow models, quoted market values and third-party independent appraisals, as considered necessary.

Common Stock Purchase Warrants

The Company classifies as equity any warrants contracts that (i) require physical settlement or net-share settlement or (ii) gives the Company a choice of net-cash settlement or settlement in its own shares (physical settlement or net-share settlement). The Company classifies as assets or liabilities any contracts that (i) require net-cash settlement (including a requirement to net cash settle the contract if an event occurs and if that event is outside the Company's control) or (ii) gives the counterparty a choice of net-cash settlement or settlement in shares (physical settlement or net-share settlement).

The Company assesses classification of its common stock purchase warrants and other freestanding derivatives, if any, at each reporting date to determine whether a change in classification between assets and liabilities is required.

Warrant Liability

An aggregate 9,200,000 warrants were issued as a result of the Public Offering, the Private Placement and the Merger. Of the aggregate total, 4,200,000 warrants were issued in connection with the Public Offering ("IPO Warrants"), 4,800,000 warrants were issued in connection with the Private Placement ("Insider Warrants"), and 200,000 warrants were issued upon conversion of a promissory note at the closing of the Merger ("Working Capital Warrants"). The Company classifies the warrant instruments as a liability at their fair value because the warrants do not meet the criteria for equity treatment under guidance contained in ASC 815-40-15-7D. The aggregate liability is subject to re-measurement at each balance sheet date and adjusted at each reporting period until exercised or expired, and any change in fair value is recognized in the Company's consolidated statement of operations.

FS-15

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

**Note 3. Summary of significant accounting policies – (continued)**

Following the SEC's Notice of Effectiveness dated June 16, 2014 of the Company's registration statement on Form S-1 that registered the IPO Warrants and the Working Capital Warrants, an aggregate of 102,570 Warrants have been exercised as of December 31, 2014. See more about the Company's registration statement at Note 18.

Stock-Based Compensation

The Company accounts for share-based awards exchanged for employee services at the estimated grant date fair value of the award. At December 31, 2014 and 2013, no share-based awards had been granted to employees.

Derivative Financial Instruments

The Company records all derivatives on the balance sheet at fair value, regardless of the purpose or intent for holding them. The Company has not designated its derivatives as hedging instruments, therefore, the Company does not designate them as fair value or cash flow hedging instruments. The accounting for changes in fair value of the derivatives is recorded within earnings.

Advertising Costs

Advertising costs are expensed as they are incurred and are included in general and administrative expenses. Advertising costs for the years ended December 31, 2014 and 2013 amounted to approximately $383 and $255, respectively.

Income Taxes

The Company's operations in Colombia are subject to the taxing jurisdiction of the Republic of Colombia. Tecnoglass LLC and Tecnoglass RE LLC are subject to the taxing jurisdiction of the United States. TGI and Tecnoglass Holding are subject to the taxing jurisdiction of the Cayman Islands. Annual tax periods prior to December 2013 are no longer subject to examination by taxing authorities in Colombia.

The Company believes that its income tax positions and deductions would be sustained on audit and does not anticipate any adjustments that would result in a material changes to its financial position. There are no significant uncertain tax positions requiring recognition in the Company's consolidated financial statements. The Company records interest and penalties, if any, as a component of income tax expense.

The Company accounts for income taxes under the asset and liability model (ASC 740 "Income Taxes") and recognizes deferred tax assets and liabilities for the expected impact of differences between the financial statements and tax bases of assets and liabilities and for the expected future tax benefit to be derived from tax loss and tax credit carry forwards. A valuation allowance is established when management determines that it is more likely than not that all or a portion of deferred tax assets will not be realized.

ASC 740 also clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements and prescribes a recognition threshold and measurement process for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. The Company believes that its income tax positions and deductions would be sustained on audit and does not anticipate any adjustments that would result in a material changes to its financial position. Based on the Company's evaluation, it has been concluded that there are no significant uncertain tax positions requiring recognition in the Company's consolidated financial statements. The Company records interest and penalties, if any, as a component of income tax expense.

Earnings per Share

The Company computes basic earnings per share is computed by dividing net income by the weighted-average number of ordinary shares outstanding during the period. Income per share assuming dilution (diluted earnings per share) would give effect to dilutive options, warrants, and other potential

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements
(Amounts in thousands, except share and per share data)**

**Note 3. Summary of significant accounting policies – (continued)**

ordinary shares outstanding during the period. Basic loss per share is computed by dividing loss available to common shareholders by the weighted-average number of common shares outstanding. Diluted loss per share excludes options, warrants and other potential ordinary shares outstanding, since the effect is anti-dilutive. The calculation of the weighted-average number of ordinary shares includes 20,567,141 recapitalized shares, assumed to be outstanding as of January 1, 2013, and 3,647,529 ordinary shares of Andina Acquisition outstanding at the time of the Merger. The computation of basic and diluted income per share for the years ended January 1, 2014 and 2013 excludes the effect of Unit Purchase Options to purchase 900,000 units (consisting of one warrant and one ordinary share) because their inclusion would be anti-dilutive.

The following table sets forth the computation of the basic and diluted earnings per share for the years ended December 31, 2014 and 2013:

|  | December 31, | |
|---|---|---|
|  | **2014** | **2013** |
| Numerator for basic and diluted earnings per shares |  |  |
| Net Income | 20,318 | 22,312 |
| Denominator |  |  |
| Denominator for basic earnings per ordinary share – weighted average shares outstanding | 24,347,620 | 20,677,067 |
| Effect of dilutive warrants | 3,390,059 | 37,208 |
| Denominator for diluted earnings per ordinary share – weighted average shares outstanding | 27,737,679 | 20,714,275 |
| Basic earnings per ordinary share | 0.83 | 1.08 |
| Diluted earnings per ordinary share | 0.73 | 1.08 |

***Recently Issued Accounting Pronouncements***

In May 2014, the FASB issued ASU No. 2014-09, "Revenue from Contracts with Customers" (ASU 201-09). ASU 201-09 provides guidance for revenue recognition and affects any entity that either enters into contracts with customers to transfer goods or services or enters into contracts for the transfer of nonfinancial assets and supersedes the revenue recognition requirements in Topic 605, "Revenue Recognition," and most industry-specific guidance. The core principle of ASU 2014-09 is the recognition of revenue when a company transfers promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. ASU 2014-09 defines a five-step process to achieve this core principle and, in doing so, companies will need to use more judgment and make more estimates than under the current guidance. These may include identifying performance obligations in the contract, estimating the amount of variable consideration to include in the transaction price and allocating the transaction price to each separate performance obligation. ASU 2014-09 is effective for fiscal years beginning after December 15, 2016 and interim periods therein, using either of the following transition methods: (i) a full retrospective approach reflecting the application of the standard in each prior reporting period with the option to elect certain practical expedients, or (ii) a retrospective approach with the cumulative effect of initially adopting ASU 2014-09 recognized at the date of adoption (which includes additional footnote disclosures). Early adoption is not permitted. The Company is currently evaluating the method and impact the adoption of ASU 2014-09 will have on the Company's consolidated financial statements and disclosures.

FS-17

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

**Note 4. Revision to prior year financial statements**

The Company revised the presentation of trade accounts receivable, due from related parties and long term receivables from related parties in its consolidated financial statement balance sheets for the year ending December 31, 2013 to reflect amounts due the Company that had not been reconciled and recorded on a timely basis into the correct balance sheet accounts. The Company subsequently executed a long term payment agreement as of December 31, 2014 with related party Ventanas Solar. The correction of the error did not affect previously reported net income in either of the years ended December 31, 2013 or 2014.

A tabular summary of the revisions to correct these errors is presented below:

|  | Consolidated Balance Sheet Year ended December 31, 2013 | | |
|  | Previously Reported | Revisions | Revised Reported |
|---|---|---|---|
| Trade accounts receivables, net | 59,010 | (8,082) | 50,928 |
| Due from related parties | 19,058 | 2,360 | 21,418 |
| Total current assets | 160,570 | (5,722) | 154,848 |
| Long term receivables from related parties | — | 5,722 | 5,722 |
| Total assets | 248,214 | — | 248,214 |
| Net income | 22,312 | — | 22,312 |

The Company analyzed the errors under SEC staff guidance (Staff Accounting Bulletin 108) and determined that the errors are immaterial on a quantitative and qualitative basis and that it is probable that the judgment of a reasonable person relying upon the financial statements would not have been changed or influenced by the inclusion or correction of the items in the year ended December 31, 2013.

**Note 5. Variable Interest Entities**

The Company conducted an evaluation as a reporting entity of its involvement with certain significant related party business entities as of December 31, 2013 and 2014 in order to determine whether these entities were variable interest entities requiring consolidation or disclosures in the financial statements of the Company. The Company evaluated two entities with whom it has maintained significant commercial relationships since 2004.

ES Windows LLC ("ESW LLC"), a Florida LLC, imports and resells the Company's products in the United States and acts as a freight forwarder for certain raw materials inventory purchased in the United States. The Company's CEO and COO, other family members, and other related parties own 100% of the equity in ESW LLC. The Company's sales to ESW LLC for the years ended December 31, 2014 and 2013 were $37.1 million and $28.9 million, respectively. Outstanding receivables from ESW LLC at December 31, 2014 and December 31, 2013 were $13.8 million and $11.8 million, respectively.

Ventanas Solar S.A. ("VS"), a Panama sociedad anonima, is an importer and installer of the Company's products in Panama. Family members of the Company's CEO and CFO and other related parties own 100% of the equity in VS. The Company's sales to VS for the year ended December 31, 2014 and 2013 were $0.2 million and $7.9 million respectively. Outstanding receivables from VS at December 31, 2014 and 2013 were $12.2 million and $10.8 million respectively, including a three year payment agreement for trade receivables for $4.2 million as of December 31, 2014 related to a collection agreement, pursuant to when VS collects the Company's receivables from customers in Panama.

Management evaluated several factors, including whether (i) these entities required subordinated financial support from the Company in order to operate, (ii) what variable interests existed in the risks and operations of the entities, (iii) what explicit or implicit interests the Company had in these entities as a result of the significant commercial relationships, (iv) whether the Company or its related parties had the controlling

FS-18

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

**Note 5. Variable Interest Entities – (continued)**

financial interests in these entities, and as a result, (v) who were the primary beneficiaries of those controlling variable interests. In order to evaluate these considerations, the Company analyzed the designs and initial purposes of these entities using available quantitative information, qualitative factors and guidance under ASC 810-10-25 Consolidation and related Subsections.

As of the date of the initial evaluation and for the year ended December 31, 2014, the Company concluded that (i) both entities are deemed variable interest entities because of the presence and effect of significant related parties; (ii) neither variable interest entity requires subordinated financial support for its operations as these operations are designed to provide residual returns to their equity investors, (iii) the Company's explicit variable interests are its arms-length commercial relationships which do not absorb the entities' risks and variability, (iv) that neither the Company nor its related parties had the controlling financial interests but that, as a related party group, they had controlling financial interest, and finally (v) the CEO, COO, family members and other equity investors are more closely related to the ESW LLC and VS and were therefore the primary beneficiaries of those entities' variable interests and residual returns or eventual losses, not the Company. The Company concluded that consolidation of these entities was not indicated. No subordinated financial support has been provided to these entities as of December 31, 2014 or as of December 31, 2013.

**Note 6. Fair Value of Financial Instruments**

The carrying amounts of the Company's financial instruments, including cash and cash equivalents, accounts receivable, accounts payable and advances from customers approximate their fair value due to their relatively short-term maturities. The Company bases its fair value estimate for long term debt obligations on its internal valuation that all debt is floating rate debt based on current interest rates in Colombia.

**Note 7. Trade Accounts Receivable**

Trade accounts receivable consists of the following:

|  | December 31, | |
| --- | --- | --- |
|  | 2014 | 2013 |
| Trade accounts receivable | $45,065 | $ 51,331 |
| Less: Allowance for doubtful accounts | (110) | (403) |
|  | $44,955 | $ 50,928 |

The changes in allowances for doubtful accounts for the years ended December 31, 2014 and 2013 are as follows:

|  | December 31, | |
| --- | --- | --- |
|  | 2014 | 2013 |
| Balance at beginning of year | $    403 | $    273 |
| Provision for bad debts | 20 | 265 |
| Deductions and write-offs | (313) | (135) |
| Balance at end of year | $    110 | $    403 |

FS-19

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

## Note 8. Advances and Other Receivables

|  | December 31, | |
|---|---|---|
|  | 2014 | 2013 |
| Advances to Suppliers and Loans | $ 1,353 | $ 8,310 |
| Prepaid Income Taxes and Social Contributions | $ 3,376 | $ 2,281 |
| Employee Receivables | $ 552 | $ 374 |
| Other Creditors | $ 227 | $ 2,200 |
|  | $ 5,508 | $ 13,165 |

Included in advances to suppliers and loans is a loan to Finsocial, a company that makes loans to public school system teachers. At December 31, 2014 and 2013, the loan balances were $2,255 and $4,308 respectively.

## Note 9. Inventories

Inventories are comprised of the following

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Raw materials | $ 22,421 | $ 17,121 |
| Work in process | 2,136 | 3,243 |
| Finished goods | 2,158 | 2,741 |
| Stores and spares | 2,371 | 2,404 |
| Packing material | 171 | 110 |
|  | 29,257 | 25,619 |
| Less: inventory allowances | (292) | (1,438) |
|  | $ 28,965 | $ 24,181 |

## Note 10. Property, Plant and Equipment

Property, plant and equipment comprises the following:

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Building | $ 36,228 | $ 34,710 |
| Machinery and equipment | 76,497 | 61,539 |
| Office equipment and software | 2,868 | 3,221 |
| Vehicles | 1,412 | 1,193 |
| Furniture and fixtures | 1,651 | 1,888 |
| Total property, plant and equipment | 118,656 | 102,551 |
| Accumulated depreciation and amortization | (31,646) | (27,403) |
| Net value of property and equipment | 87,010 | 75,148 |
| Land | 16,970 | 12,234 |
| Total property, plant and equipment, net | $ 103,980 | $ 87,382 |

Depreciation and amortization expense inclusive of capital lease amortization was $8,542 and $7,238 for the years ended December 31, 2014 and 2013.

FS-20

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

**Note 10. Property, Plant and Equipment  – (continued)**

In the year ended December 31, 2014 the Company purchased land adjacent to the Company's current facilities for approximately $6.1 million and purchased land and warehouses in Miami-Dade County, Florida for approximately $5.2 million. These purchases bring the Company's total manufacturing facilities to approximately 2.5 million square feet.

**Note 11. Long-Term Debt**

Long-term debt is comprised of the following:

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Obligations under borrowing arrangements | $ 94,198 | $ 77,817 |
| Less: Current portion of long-term debt and other current borrowings | 54,925 | 29,720 |
| Long-term debt | $ 39,273 | $ 48,097 |

At December 31, 2014, the Company owed approximately $94,198 under its various borrowing arrangements with several banks in Colombia and Panama including obligations under various capital leases as discussed below. The bank obligations have maturities ranging from nine months to 15 years that bear interest at rates ranging from 4.56% to 12.01%. These loans are generally secured by substantially all of the Company's accounts receivable or inventory, except for the 15-year mortgage secured by the Company's real properties in Miami-Dade County. Certain obligations include covenants and events of default including requirements that the Company maintain a minimum debt to EBITDA ratio, a minimum debt service ratio, total debt to total assets ratio and sales growth ratios.

The Company was not in compliance with certain financial covenants as of December 31, 2013 for its financial obligations with Banco Colpatria. In April 2014, the bank confirmed with the Company it would take no actions to accelerate payments, increase interest, or any other actions as a result of the non-compliance with the covenants against the Company. In December 2014, the loan agreement with Colpatria was modified to exclude covenants as a basis for underwriting compliance. At December 31, 2014, the Company was in compliance with all its covenants for its financial obligations.

Net proceeds from debt were $9,185 and $8,372 during the years ended December 31, 2014 and 2013, consisting of $87,109 and $21,237 new obligations entered with similar terms to existing debt, and repayments of debt for $77,924 and $12,865 for the years ended December 31, 2014 and 2013, respectively.

Maturities of long term debt and other current borrowings are as follows as of December 31, 2014:

| Year Ending December 31, | |
|---|---|
| 2015 | $ 51,101 |
| 2016 | 11,690 |
| 2017 | 6,538 |
| 2018 | 3,815 |
| 2019 | 2,170 |
| Thereafter | 3,379 |
| Total | $ 78,693 |

Revolving Lines of Credit

The Company has approximately $1.9 million available in two lines of credit under a revolving note arrangement as of December 31, 2014. The floating interest rates on the revolving notes are between DTF+6% and DTF+7%. DTF is the primary measure of interest rates in Colombia. The notes are secured by all assets of the Company. At December 31, 2014 and 2013, $375 and $1,872 was outstanding under these lines, respectively.

FS-21

5/8/2018

Case 1:16-cv-00420-ILG-VMS   Document 127-2   Filed 05/14/18   Page 100 of 140 PageID #:
3388

https://www.sec.gov/Archives/edgar/data/1534675/000114420415041802/v412857_s4.htm

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

**Note 11. Long-Term Debt – (continued)**

Capital Lease Obligations

The Company is obligated under various capital leases under which the aggregate present value of the minimum lease payments amounted to approximately $15,505. The present value of the minimum lease payments was calculated using discount rates ranging from 7.94% to 12.20%.

The future minimum lease payments under all capital leases at December 31, 2014 are as follows:

| Year Ending December 31, | | |
|---|---|---:|
| 2015 | $ | 3,824 |
| 2016 | | 3,621 |
| 2017 | | 2,412 |
| 2018 | | 1,141 |
| 2019 | | 1,366 |
| Thereafter | | 3,141 |
| Total | $ | 15,505 |

Interest expense for the year ended December 31, 2014 and 2013 was $8.9 million and $7.9 million, respectively.

**Note 12. Note Payable to Shareholder**

From September 5, 2013 to November 7, 2013 A. Lorne Weil loaned the Company $150 of which $70 was paid at closing of the Merger and $80 remained unpaid as of December 31, 2014 and December 31, 2013.

**Note 13. Income Taxes**

The Company files income tax returns for TG and ES in the Republic of Colombia where, as a general rule, taxable income for companies is subject to a 25% Income Tax rate, except for taxpayers with special rates approved by the Congress. A minimum taxable income is calculated as 3% of net equity on the last day of the immediately preceding period and is used as taxable income if it is higher than taxable income otherwise calculated.

On December 23, 2014, Colombia's president signed into effect a tax reform bill amending the Colombian Tax Statute fixing the Income Tax Rate at 25%. A CREE Tax based on taxable income also applies at a rate of 9% to certain taxpayers including the Company. Prior to the reform, the CREE Tax would only apply for years 2013 – 2015. The reform makes the CREE tax rate of 9% permanent and an additional CREE Surtax will also apply for the years 2015 through 2018 at varying rates. The Income tax reform resulted in differed tax liabilities being increased by $286 at December 31, 2014 when compared with previous income tax rates.

The following table summarizes income tax rates under the tax reform law.

| | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---:|---:|---:|---:|---:|
| Income Tax | 25% | 25% | 25% | 25% | 25% |
| CREE Tax | 9% | 9% | 9% | 9% | 9% |
| CREE Surtax | 5% | 6% | 8% | 9% | — |
| Total Tax on Income | 39% | 40% | 42% | 43% | 34% |

FS-22

TABLE OF CONTENTS

Tecnoglass Inc. and Subsidiaries

Notes to Consolidated Financial Statements
(Amounts in thousands, except share and per share data)

**Note 13. Income Taxes  – (continued)**

The components of income tax expense (benefit) are as follows:

|  | December 31, | |
|---|---|---|
|  | 2014 | 2013 |
| Current income tax |  |  |
| Foreign | $ 9,453 | $   4,183 |
| Deferred income Tax |  |  |
| Foreign | (915) | 4,513 |
| Total Provision for Income Tax | $ 8,538 | $   8,696 |

A reconciliation of the statutory tax rate in Colombia to the Company's effective tax rate is as follows:

|  | December 31, | |
|---|---|---|
|  | 2014 | 2013 |
| Income tax expense at statutory rates | 34.0% | 34.0% |
| Non-deductible expenses | 1.6% | 6.5% |
| Non-taxable income | -6.0% | -12.2% |
| Effective tax rate | 29.6% | 28.3% |

The Company's effective tax rate of 29.6% for the year ended December 31, 2014 reflects non-deductible income (losses) of $3,744 mostly due to the change in fair value of the Company's warrant liability and other non-deductible expenses such as amortization of intangible assets.

The Company has the following net deferred tax assets and liabilities:

|  | December 31, | |
|---|---|---|
|  | 2014 | 2013 |
| Deferred tax assets: |  |  |
| Accounts Receivable Clients – not delivered FOB | $ 1,260 | $     518 |
| Accounts Receivable Clients – POC | 2,452 | 849 |
| Depreciation | 1,542 | 465 |
| Financials Liabilities | 5 |  |
| Provision Inventory obsolescence | 114 | 489 |
| Total deferred tax assets | $ 5,373 | $   2,321 |
| Deferred tax liabilities: |  |  |
| Inventory – not delivered FOB | $     984 | $     405 |
| Accounts Receivable Clients – POC | 6,325 | 4,706 |
| Depreciation | 485 | 565 |
| Financials Liabilities | — | 78 |
| Provision Accounts Receivable | 622 | 944 |
| Total deferred tax liabilities | $ 8,416 | $   6,698 |
| Net deferred tax liability | $ 3,043 | $   4,377 |

The Company does not have any uncertain tax positions for which it is reasonably possible that the total amount of gross unrecognized tax benefits will increase or decrease within twelve months of December 31, 2014. The unrecognized tax benefits may increase or change during the next year for items that arise in the ordinary course of business.

FS-23

Case 1:16-cv-00420-ILG-VMS Document 127-2 Filed 05/11/18 Page 103 of 140 PageID #: 3391

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

## Note 14. Fair Value Measurements

The Company accounts for financial assets and liabilities in accordance with accounting standards that define fair value and establish a framework for measuring fair value. The hierarchy prioritizes the inputs into three broad levels. Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities. Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration, for substantially the full term of the financial instrument. Level 3 inputs are unobservable inputs based on the Company's assumptions used to measure assets and liabilities at fair value. A financial asset's or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

Assets and Liabilities Measured at Fair Value on a Recurring Basis:

| At December 31, 2014 | Quotes Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| --- | --- | --- | --- |
| Warrant Liability | — | — | 19,991 |
| Interest Rate Swap Derivative Liability | — | 134 | — |
| Long Term Receivables from Related Parties | | 4,220 | |

| At December 31, 2013 | Quotes Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| --- | --- | --- | --- |
| Warrant Liability | | | 18,280 |
| Interest Rate Swap Derivative Liability | — | 178 | — |
| Foreign Currency Forward Liability | | 53 | |

## Note 15. Related Parties

The Company's major related party entities disclosed in this footnote are: (i) ES Windows LLC ("ESW LLC"), a Florida LLC partially owned by the Company's Chief Executive Officer and Chief Operating Officer, (ii) Ventanas Solar S.A. ("VS"), an importer and installer based in Panama owned by related party family members, (iii) Union Temporal ESW ("UT ESW"), a temporary contractual joint venture with Ventanar S. A. under Colombian law that is managed by related parties and that expires at the end of its applicable contract, (iv) UT Semáforos Barranquilla ("UT SB"), a temporary contractual joint venture with related party Construseñales S.A. under Colombian law that expires at the end of its applicable contract, (v) A Construir S.A., a heavy construction company in which the Company's CEO, COO and other related parties are equity investors, (vi) Construseñales S.A., a traffic signal construction company in which the Company's CEO, COO and other related parties are equity investors.

FS-24

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

**Note 15. Related Parties – (continued)**

The following is a summary of assets, liabilities, and income and expense transactions with all related parties, shareholders, directors and managers:

|  | At December 31, 2014 | At December 31, 2013 |
|---|---|---|
| Current Assets |  |  |
| Due from ESW LLC | $ 13,814 | $ 11,823 |
| Due from VS | 7,979 | 5,050 |
| Due from UT ESW | 2,001 | 3,199 |
| Due from other related parties | 4,534 | 1,346 |
|  | $ 28,327 | $ 21,418 |
| Trade receivable from VS | $ 4,220 | $ 5,722 |
| Liabilities |  |  |
| Due to A Construir S.A. | $ (995) | $ (2,314) |
| Due to UT SB | — | (1,287) |
| Due to Construseñales S.A. | — | (3,633) |
| Due to other related parties | (461) | (1,163) |
|  | $ (1,456) | $ (8,397) |

Sales to other related parties was less than $0.1 million in the year ended December 31, 2014 and 2013.

|  | Year Ended | |
|---|---|---|
|  | 2014 | 2013 |
| Revenues– |  |  |
| Sales to ESW LLC and VS | $ 47,630 | $ 28,788 |
| Expenses– |  |  |
| Fees paid to Directors and Officers | 1,327 | 408 |
| Paid to other related parties | 3,549 | 512 |

In 2014, the Company and VS executed a three year payment agreement for recovery of trade receivables outstanding for $6.6 million with an interest rate of Libor + 4.7% paid semiannually. As of December 31, 2014, the payment plan was accounted for at fair value.

In 2013, the Company guaranteed a loan for $163 used to develop a lot adjacent to the Alutions plant into a related party fuel service station, Santa Maria del Mar S.A. At December 31, 2014, the guarantee was in good standing and no liabilities have been recorded, and the Company was in the process of restructuring the guarantee to exclude the involvement of Tecnoglass, S.A., as required by the merger agreement.

In April 2014, the Company guaranteed approximately $300 of bank loans for the Company's Foundation. As of December 31, 2014, the loan balance was $60, and the guarantee is in good standing. No liabilities have been recorded.

In December 2014, ESW LLC, a related party, guaranteed a mortgage loan for $3,920 for the acquisition of real properties in Miami-Dade County, Florida by Tecnoglass RE LLC, a wholly owned subsidiary of the Company.

FS-25

TABLE OF CONTENTS

## Tecnoglass Inc. and Subsidiaries

### Notes to Consolidated Financial Statements
### (Amounts in thousands, except share and per share data)

### Note 16. Derivative Financial Instruments

In 2012, the Company entered into two interest rate swap (IRS) contracts as economic hedges against interest rate risk through 2017, and two currency forward contracts as economic hedges against foreign currency rate risk on U.S. dollar loans. The currency forwards expired in January 2014. Hedge accounting treatment per guidance in ASC 815-10 and related Subsections was not pursued at inception of the contracts. Changes in the fair value of the derivatives will be recorded in current earnings. The derivative contracts were initially recorded on the balance sheet as liabilities as December 31, 2013, at an aggregate fair value of $230.

The Company entered into three interest rate swap (IRS) contracts as economic hedges against interest rate risk on its peso loans through 2017. Hedge accounting treatment per guidance in ASC 815-10 and related Subsections was not pursued at inception of the contracts. Changes in the fair value of the derivatives are recorded in current earnings. The derivative contracts were initially recorded on the balance sheet as liabilities as of December 31, 2014 at an aggregate fair value of $134.

### Note 17. Warrant Liability

The fair value of the warrant liability was determined by the Company using the Binomial Lattice pricing model. This model is dependent upon several variables such as the instrument's expected term, expected strike price, expected risk-free interest rate over the expected instrument term, the expected dividend yield rate over the expected instrument term and the expected volatility of the Company's stock price over the expected term. The expected term represents the period of time that the instruments granted are expected to be outstanding. The expected strike price is based upon a weighted average probability analysis of the strike price changes expected during the term as a result of the down round protection. The risk-free rates are based on U.S. Treasury securities with similar maturities as the expected terms of the options at the date of valuation. Expected dividend yield is based on historical trends. The Company measures volatility using a blended weighted average of the volatility rates for a number of similar publicly-traded companies. The inputs to the model were as follows:

|  | December 31, | |
|  | 2014 | 2013 |
| --- | --- | --- |
| Stock Price | $ 10.15 | $ 8.55 |
| Dividend Yield | N/A | N/A |
| Risk-free rate | 0.67% | 0.78% |
| Expected Term | 1.97 | 2.97 |
| Expected Volatility | 33.62% | 44.69% |

The table below provides a reconciliation of the beginning and ending balances for the warrant liability measured using significant unobservable inputs (Level 3):

| | |
| --- | --- |
| Balance – December 31, 2013 | $ 18,280 |
| Fair value adjustment for year ended December 31, 2014 | 1,711 |
| Balance at December 31, 2014 | $ 19,991 |

### Note 18. Commitments and Contingencies

Guarantees

Guarantees on behalf of or from related parties are disclosed in Note 15 — Related Parties.

Legal Matters

Tecnoglass S.A. and Tecnoglass USA, Inc., a related party, were named in a civil action for wrongful death, negligence and negligent infliction of emotional distress arising out of a workplace accident where a crate of glass fell and fatally crushed a worker during the unloading process. TG denied liability and rigorously defended the claim in court. TG's insurance carrier provided coverage to TG under a $3.0 million

FS-26

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

**Note 18. Commitments and Contingencies  – (continued)**

wasting policy, which meant that the attorneys' fees and expenses incurred during the defense of the claim reduced the amount of coverage available. On October 1, 2014 the case was settled. The plaintiffs accepted $1,075, with a payment time of 60 days. The Company's insurance policy covered 90% of the loss.

Tecnoglass S.A. is also a named defendant in in the matter of Diplomat Properties, Limited Partnership as assignee of Shower Concepts, Inc. v. Tecnoglass Colombia, S.A. in the 17th Judicial Circuit in and for Broward County, Florida. Plaintiff Diplomat Properties, Limited ("Diplomat") has asserted a claim for indemnification against TG and Tecnoglass USA, Inc. The claim arises from the supplying of glass shower doors to a hotel/spa in Broward County, Florida. Specifically, in 2006, Diplomat commenced arbitration against Shower Concepts, Inc. seeking damages for breach of contract due to fractures in the installed glass shower doors. Diplomat initiated a complaint asserting various claims which were dismissed with prejudice. The only remaining claim against the Tecnoglass entities is common law indemnification. TG denies liability and asserts that Shower Concepts was at fault and that as a joint tort feasor, it cannot sue for indemnity. A trial date has not yet been set for this case. Management and TG's counsel believes that a liability in this claim is remote and immaterial and there are no significant reasonably estimated amounts for a possible loss.

General Legal Matters

From time to time, the Company is involved in legal matters arising in the ordinary course of business. While management believes that such matters are currently not material, there can be no assurance that matters arising in the ordinary course of business for which the Company is, or could be, involved in litigation, will not have a material adverse effect on its business, financial condition or results of operations.

**Note 19. Shareholder's Equity**

Preferred Shares

TGI is authorized to issue 1,000,000 preferred shares with a par value of $0.0001 per share with such designation, rights and preferences as may be determined from time to time by the Company's board of directors.

As of December 31, 2014, there are no preferred shares issued or outstanding.

Ordinary Shares

The Company is authorized to issue 100,000,000 ordinary shares with a par value of $0.0001 per share. As of December 31, 2014, a total of 27,801,132 Ordinary shares were issued and outstanding which includes 3,000,000 Earnout shares which have been issued and placed in escrow but have no voting rights. The Earnout shares are not considered issued and outstanding as a matter of Cayman Islands law.

Legal Reserve

Colombian regulation requires that companies retain 10% of net income until it accumulates to least 50% of subscribed and paid in capital.

Restricted Securities

Energy Holding Corporation, the sole shareholder of Tecnoglass Holding whose shareholders are all of the former shareholders of Tecnoglass and ES, received 20,567,141 ordinary shares in consideration of all of the outstanding and issued ordinary shares of Tecnoglass Holding. Under the terms of the merger agreement, the shareholders of Energy Holding Corporation entered into lock-up agreements precluding the sale or transfer of their shares until December 20, 2014. Certain other holders of ordinary shares and warrants had been restricted from selling any of their securities until December 20, 2014. This restriction expired on that date.

FS-27

https://www.sec.gov/Archives/edgar/data/1534675/000114420415041802/v412857_s4.htm

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

**Note 19. Shareholder's Equity  – (continued)**

Energy Holding Corp. also has the contractual right to receive an additional 2,500,000 ordinary shares, to be released upon the attainment of specified share price targets or targets based on our EBITDA in the fiscal years ending December 31, 2015 or 2016. The following table sets forth the targets and the number of earnout shares issuable to Tecnoglass Holding shareholders upon the achievement of such targets:

| | Ordinary Share Price Target | EBITDA Target | | Number of Earnout Shares | |
| | | Minimum | Maximum | Minimum | Maximum |
|---|---|---|---|---|---|
| Fiscal year ending 12/31/15 | $ 13.00 per share | $35,000,000 | $40,000,000 | 875,000 | 1,000,000 |
| Fiscal year ending 12/31/16 | $ 15.00 per share | $40,000,000 | $45,000,000 | 1,333,333 | 1,500,000 |

If either the ordinary share target or the maximum EBITDA target is met in any fiscal year, Energy Holding Corp. receives the maximum number of earnout shares indicated for the year. In the event the ordinary share target is not met but the combined company's EBITDA falls within the minimum and maximum EBITDA target for a specified year, the number of earnout shares to be issued will be interpolated between such targets. In the event neither the ordinary share target nor the minimum EBITDA target is met in a particular year, but a subsequent year's share price or EBITDA target is met, Energy Holding Corp. will earn the earnout shares for the previous year as if the prior year's target had been met.

Long Term Incentive Compensation Plan

On December 20, 2013, our shareholders approved our 2013 Long-Term Equity Incentive Plan ("2013 Plan"). Under the 2013 Plan, 1,593,917 ordinary shares are reserved for issuance in accordance with the plan's terms to eligible employees, officers, directors and consultants. As of December 31, 2014, no awards had been made under the 2013 Plan.

Registration Statement and Company Securities

The Company filed a securities registration statement on Form S-1 on April 28, 2014, related to 31,362,216 ordinary shares and 5,500,000 warrants. This represents (i) 649,382 ordinary shares issued pursuant to two subscription agreements in connection with our initial business combination, (ii) 23,567,141 ordinary shares issued or to be issued as consideration in connection with our initial business combination, (iii) 1,050,000 ordinary shares issued in connection with our formation, (iv) 500,000 ordinary shares and 500,000 warrants underlying unit purchase options (and 500,000 ordinary shares underlying the warrants included in the unit purchase options) originally issued in connection with our initial public offering, (v) 4,800,000 warrants, or "insider warrants," (and 4,800,000 ordinary shares underlying the insider warrants) purchased simultaneously with our initial public offering, (vi) 200,000 "working capital warrants," (and 200,000 ordinary shares underlying the working capital warrants) upon conversion of a promissory note issued by us in consideration of a working capital loans and (vii) 95,693 ordinary shares sold pursuant to a subscription agreement in March 2014.

The Company did not receive any proceeds from the sale of the securities in the registration statement, although the Company could receive up to $40.0 million upon the exercise of all of the insider warrants and working capital warrants, up to $9.4 million upon the exercise of the unit purchase options, up to $7.2 million upon the exercise of the warrants underlying such unit purchase options and up to $33.6 million upon the exercise of the warrants issued in the Public Offering. Any amounts received from such exercises will be used for working capital and other general corporate purposes.

Following the SEC's Notice of Effectiveness dated June 16, 2014 of the Company's registration statement on S-1, an aggregate of 102,570 warrants have been exercised for proceeds of $821 as of December 31, 2014. As of the latest practicable date before these consolidated financial statements were available for publication, a total of 102,570 warrants had been exercised for Company ordinary shares through March 20th, 2015.

FS-28

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

**Note 19. Shareholder's Equity – (continued)**

Issuance of Common Stock

In March 2014, the Company entered into an agreement with an affiliate of A Lorne Weil, the Company's Non-Executive Chairman of the board, for the sale of 95,693 ordinary shares at a price of approximately $10.45 per share in a private placement transaction, for proceeds to the company of $1.0 million.

In December 2014, the Company entered into two asset purchase agreements with Glasswall LLC, a South Florida based manufacturer of impact-resistant windows and door systems. Total consideration paid by the Company was $9,000, of which $4,000 were paid with the issuance of 388,199 ordinary shares issued to Glasswall at $10.30 per share.

In the year ended December 31, 2014, following the Notice of Effectiveness on June 16, 2014 of the Company's Registration Statement on Form S-1, the Company has issued 102,570 ordinary shares to former warrant holders who exercised their warrants. Total proceeds from the warrant exercises have been $821 at $8.00 per share.

**Note 20. Acquisitions**

In June 2014, we acquired selected assets of RC Aluminum Industries, Inc. ("RC Aluminum") for $1,900. RC Aluminum designs, manufactures and installs glass products for architects, designers, developers and general contractors. The primary assets acquired include approximately $70,000 in RC Aluminum backlog for high-rise projects in South Florida, the right to complete a number of RC Aluminum's contracted projects with an estimated value of approximately $12,000, and Miami-Dade Notices of Acceptance (NOA) for more than 50 products manufactured and sold by RC Aluminum.

In December 2014, we acquired assets of Glasswall, LLC, a Miami, South Florida based manufacturer of impact-resistant windows and door systems used in high-rise commercial and residential buildings. As part of the transaction, we acquired a 160,000 square foot warehouse/manufacturing/office facility in Miami for $5,167, and manufacturing and assembly equipment, and Miami-Dade NOAs for products manufactured and sold by Glasswall and other tangible and intangible assets for $4,134 accounted under other assets as of December 31, 2014, pending further assessment of the purchase price allocation. The Company did not acquire any equity interest or control of Glasswall and there was no goodwill related to this transaction. Total consideration consisted 388,199 ordinary shares for $4,000 in our stock and $5,301 in cash financed in part by a 15-year, $3,920 term loan that we secured to acquire the facilities.

Fair value considerations

| | | |
|---|---|---:|
| Assets Acquired | | |
| Land | $ | 1,952 |
| Buildings | | 3,215 |
| Other Assets | | 4,134 |
| Total | | 9,301 |
| Payment method | | |
| Financial Obligations | | 3,920 |
| Common Stock | | 4,000 |
| Cash | | 1,381 |
| Total | $ | 9,301 |

FS-29

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**

### Note 21. Segment and Geographic Information

The Company operates a single segment business for product sales which consists of geographical sales territories as follows:

|  | December 31, | |
|---|---|---|
|  | **2014** | **2013** |
| Colombia | 80,062 | 101,754 |
| United States | 101,612 | 66,723 |
| Panama | 11,351 | 10,210 |
| Other | 4,427 | 4,607 |
| Total Revenues | 197,452 | 183,294 |

### Note 22. Subsequent Events

Pursuant to the merger agreement and plan of reorganization and on filing of financial statements for the fiscal year ended December 31, 2014, Energy Holding Corporation will receive an aggregate of 500,000 ordinary shares based on its achievement of specified EBITDA targets set forth in such agreement.

On April 14, 2015, the Company's Board of Directors authorized the payment of regular quarterly dividends to holders of its ordinary shares at a quarterly rate of $0.125 per share (or $0.50 per share on an annual basis). The Board of Directors also approved an Exchange Offer to acquire all of the Company's outstanding warrants in exchange for ordinary shares of the Company at conversion ratio of 2.6 warrants in exchange for one ordinary share. The Exchange Offer will remain open for a period of 30 days once exchange documentation is sent to warrant holders and the first quarterly dividend payment will be made to shareholders of record 15 days after the end of the Exchange Offer.

FS-30

TABLE OF CONTENTS

TECNOGLASS INC.
Interim Financial Statements

TABLE OF CONTENTS

| | Page |
| --- | --- |
| Condensed Consolidated Balance Sheets at March 31, 2015 and December 31, 2014 | FS-32 |
| Condensed Consolidated Statements of Operations and Comprehensive Income for the quarters ending March 31, 2015 and 2014 | FS-33 |
| Condensed Consolidated Statements of Cash Flows for the quarters ending March 31, 2015 and 2014 | FS-34 |
| Notes to Condensed Consolidated Financial Statements | FS-35 |

FS-31

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Condensed Consolidated Balance Sheets**
**(In thousands, except share and per share data)**
**(Unaudited)**

|  | March 31, 2015 | December 31, 2014 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 17,132 | $ 15,930 |
| Trade accounts receivable, net | 47,504 | 44,955 |
| Due from related parties | 32,671 | 28,327 |
| Inventories, net | 31,473 | 28,965 |
| Other current assets | 25,653 | 23,319 |
| **Total current assets** | **154,433** | **141,496** |
| **Long term assets:** | | |
| Property, plant and equipment, net | 108,237 | 103,980 |
| Long term receivables from related parties | 3,392 | 4,220 |
| Other long term assets | 5,734 | 6,195 |
| **Total long term assets** | **117,363** | **114,395** |
| **Total assets** | **$ 271,796** | **$ 255,891** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable and accrued expenses | $ 35,780 | $ 33,493 |
| Due to related parties | 3,588 | 1,456 |
| Current portion of customer advances on uncompleted contracts | 12,048 | 5,782 |
| Short-term debt and current portion of long term debt | 59,886 | 54,925 |
| Note payable to shareholder | 80 | 80 |
| Other current liabilities | 21,712 | 17,300 |
| **Total current liabilities** | **133,094** | **113,036** |
| **Long term liabilities:** | | |
| Warrant liability | 14,913 | 19,991 |
| Customer advances on uncompleted contracts | 6,767 | 8,333 |
| Long term debt | 37,050 | 39,273 |
| **Total liabilities** | **191,824** | **180,633** |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **Shareholders' equity** | | |
| Preferred shares, $0.0001 par value, 1,000,000 shares authorized, 0 shares issued and outstanding at March 31, 2015 | — | — |
| Ordinary shares, $0.0001 par value, 100,000,000 shares authorized, 24,801,132 and 24,801,132 shares issued and outstanding at March 31, 2015 and December 31, 2014, respectively | 2 | 2 |
| Legal Reserves | 1,367 | 1,367 |
| Additional paid-in capital | 46,514 | 46,514 |
| Retained earnings | 48,687 | 38,806 |
| Accumulated other comprehensive income | (16,598) | (11,431) |
| **Total shareholders' equity** | **79,972** | **75,258** |
| **Total liabilities and shareholders' equity** | **$ 271,796** | **$ 255,891** |

The Accompanying Notes are an Integral Part of these Condensed Consolidated Financial Statements.

FS-32

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Condensed Statements of Operations and Comprehensive Income**
**(In thousands, except share and per share data)**
**(Unaudited)**

| | Three months ended March 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Operating revenues | $ 52,043 | $ 47,841 |
| Cost of sales | 34,861 | 33,245 |
| **Gross profit** | **17,182** | **14,596** |
| Operating expenses | 9,180 | 6,739 |
| **Operating income** | **8,002** | **7,857** |
| Gain (loss) on change in fair value of warrant liability | 5,078 | (8,880) |
| Non-operating revenues | 3,725 | 1,286 |
| Interest expense | 2,152 | 1,973 |
| **Income (Loss) before taxes** | **14,653** | **(1,710)** |
| Income tax provision | 4,772 | 2,971 |
| **Net income (loss)** | **$ 9,881** | **$ (4,681)** |
| **Comprehensive income:** | | |
| Net income (loss) | **9,881** | **(4,681)** |
| Foreign currency translation adjustments | (5,167) | (176) |
| **Total comprehensive income (loss)** | **$ 4,714** | **$ (4,857)** |
| Basic income (loss) per share | $ 0.40 | $ (0.20) |
| Diluted income (loss) per share | $ 0.35 | $ (0.20) |
| Basic weighted average common shares outstanding | 24,801,132 | 24,242,315 |
| Diluted weighted average common shares outstanding | 28,114,251 | 24,242,315 |

The Accompanying Notes are an Integral Part of these Condensed Consolidated Financial Statements.

FS-33

Case 1:16-cv-00420-ILG-MS Document 112-13 Filed 05/04/18 Page 117 of 140 PageID #: 3405

TABLE OF CONTENTS

### Tecnoglass Inc. and Subsidiaries

### Condensed Consolidated Statements of Cash Flows
### (Amounts in thousands)
### (Unaudited)

| | Three Months Ended March 31, | |
| --- | ---: | ---: |
| | 2015 | 2014 Restated |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income (loss) | $ 9,881 | $ (4,681) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | |
| Provision for bad debts | | 20 |
| Depreciation and amortization | 2,501 | 1,952 |
| Loss on disposition of assets | (9) | — |
| Loss on change in fair value of derivative liability | (18) | (67) |
| (Gain) loss on change in fair value of warrant liability | (5,078) | 8,880 |
| Deferred income taxes | (157) | 548 |
| Changes in operating assets and liabilities: | | |
| Trade accounts receivable | (6,008) | (4,436) |
| Inventories | (4,928) | 1,480 |
| Prepaid expenses and other current assets | 153 | (297) |
| Other assets | (3,325) | (6,123) |
| Accounts payable and accrued expenses | 4,871 | (7,400) |
| Customer advances on uncompleted contracts | 5,954 | 1,909 |
| Related parties | (3,961) | (5,541) |
| Other current liabilities | 5,463 | 2,375 |
| **CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES** | 5,339 | (11,381) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Proceeds from sale of investments | 49 | 59 |
| Purchase of investments | (197) | (409) |
| Acquisition of property and equipment | (4,769) | (1,185) |
| **CASH USED IN INVESTING ACTIVITIES** | (4,917) | (1,535) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from debt | 22,255 | 23,229 |
| Proceeds from the sale of common stock | — | 1,000 |
| Repayments of debt | (21,767) | (16,530) |
| Proceeds from merger | — | 22,519 |
| **CASH PROVIDED BY FINANCING ACTIVITIES** | 488 | 30,218 |
| Effect of exchange rate changes on cash and cash equivalents | 292 | 100 |
| **NET INCREASE IN CASH** | 1,202 | 17,402 |
| Cash – Beginning of period | 15,930 | 2,866 |
| Cash – End of period | $ 17,132 | $ 20,268 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | |
| Cash paid during the year for: | | |
| Interest | $ 1,385 | $ 1,469 |
| Taxes | $ — | $ — |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES:** | | |
| Assets acquired under capital lease | $ 9,100 | $ 55 |

The Accompanying Notes are an Integral Part of these Condensed Consolidated Financial Statements.

FS-34

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Condensed Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**

## Note 1. Organization, Plan of Business Operation

Tecnoglass Inc. ("TGI," the "Company," "we," "us" or "our") was incorporated in the Cayman Islands on September 21, 2011 under the name "Andina Acquisition Corporation" ("Andina") as a blank check company. Andina's objective was to acquire, through a merger, share exchange, asset acquisition, share purchase recapitalization, reorganization or other similar business combination, one or more operating businesses. On December 20, 2013, Andina consummated a merger transaction (the "Merger") with Tecno Corporation ("Tecnoglass Holding") as ultimate parent of Tecnoglass S.A. ("TG") and C.I. Energía Solar S.A. ES. Windows ("ES"). The surviving entity was renamed Tecnoglass Inc. The Merger transaction was accounted for as a reverse merger and recapitalization where Tecnoglass Holding was the acquirer and TGI was the acquired company. Accordingly, the business of Tecnoglass Holding and its subsidiaries became our business. We are now a holding company operating through our direct and indirect subsidiaries.

The Company manufactures hi-specification, architectural glass and windows for the global residential and commercial construction industries. Currently the Company offers design, production, marketing, and installation of architectural systems for buildings of high, medium and low elevation size. Products include windows and doors in glass and aluminum, office partitions and interior divisions, floating façades and commercial window showcases. The Company sells to customers in North, Central and South America, and exports about half of its production to foreign countries.

TG manufactures both glass and aluminum products. Its glass products include tempered glass, laminated glass, thermo-acoustic glass, curved glass, silk-screened glass, acoustic glass and digital print glass. Its Alutions plant produces mill finished, anodized, painted aluminum profiles and rods, tubes, bars and plates. Alutions' operations include extrusion, smelting, painting and anodizing processes, and exporting, importing and marketing aluminum products.

ES designs, manufactures, markets and installs architectural systems for high, medium and low rise construction, glass and aluminum windows and doors, office dividers and interiors, floating facades and commercial display windows.

In 2014, the Company established two Florida limited liability companies, Tecnoglass LLC ("Tecno LLC") and Tecnoglass RE LLC ("Tecno RE") to acquire manufacturing facilities, manufacturing machinery and equipment, customer lists and exclusive design permits.

## Note 2. Summary of significant accounting policies

### Restatement of Prior Period Financial Statements

The Company identified an error in the Condensed Consolidated Statement of Cash Flows for the three months ended March 31, 2014 resulting from the incorrect classification of proceeds received from the merger and equity issuance. In accordance with accounting guidance presented in ASC 250-10 and SEC Staff Accounting Bulletin No. 99, Materiality, management assessed the materiality of the error and concluded it was material to the Company's Condensed Consolidated Statement of Cash Flows for the three months ended March 31, 2014. The Company is restating the Condensed Consolidated Statement of Cash Flows for the three months ended March 31, 2014 to correct the error. The restatement results in a decrease in cash flows from operating activities of $22,519 from $11,138 to $(11,381) with a corresponding increase to cash flows from financing activities from $7,699 to $30,218. The restatement has no effect on our previously reported Condensed Consolidated Balance Sheets, Condensed Statements of Operations and Comprehensive Income.

### Basis of Presentation and Use of Estimates

These unaudited condensed consolidated financial statements include the consolidated results of TGI, its indirect wholly-owned subsidiaries TG and ES, and its direct subsidiaries Tecno LLC and Tecno RE. Material intercompany accounts, transactions and profits are eliminated in consolidation. The unaudited condensed

FS-35

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Condensed Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**

### Note 2. Summary of significant accounting policies – (continued)

consolidated financial statements are prepared in accordance with the rules of the Securities and Exchange Commission ("SEC") for interim reporting purposes.

The preparation of these unaudited, condensed consolidated financial statements requires the Company to make estimates and judgments that affect the reported amounts of assets and liabilities, revenues and expenses, and related disclosures of contingent assets and liabilities at the date of the Company's financial statements. Actual results may differ from these estimates under different assumptions or conditions. Estimates inherent in the preparation of these, consolidated financial statements relate to the collectability of account receivables, the valuation of inventories, estimated earnings on uncompleted contracts, useful lives and potential impairment of long-lived assets, and valuation of warrants and other derivative financial instruments. Based on information known before these unaudited, condensed consolidated financial statements were available to be issued, there are no estimates included in these statements for which it is reasonably possible that the estimate will change in the near term up to one year from the date of these financial statements and the effect of the change will be material, except for warrant liability further discussed below in this note and Note 10.

#### Foreign Currency Translation

The condensed consolidated financial statements are presented in United States Dollars, the reporting currency. The functional currency of the Company's operations in Colombia is the Colombian Peso. The condensed consolidated financial statements of the Company's foreign operations are prepared in the functional currency. The Statements of Operations and Comprehensive Income prepared in the functional currency are translated into the reporting currency using average exchange rates for the respective periods. Assets and liabilities on the condensed consolidated Balance Sheets are translated into the reporting currency using rates of exchange at the end of the period and the related translation adjustments are recorded as accumulated other comprehensive income, a component of equity in the condensed consolidated balance sheet.

#### Revenue Recognition

Our principal sources of revenue are derived from product sales of manufactured glass and aluminum products. Revenue is recognized when (i) persuasive evidence of an arrangement exists in the form of a signed purchase order or contract, (ii) delivery has occurred per contracted terms, (iii) fees and prices are fixed and determinable, and (iv) collectability of the sale is reasonably assured. All revenue is recognized net of discounts, returns and allowances. The Company recognizes revenue when goods are shipped, which is "FOB shipping point". Delivery to the customer is deemed to have occurred when the customer takes title to the product. Generally, title passes to the customer upon shipment, but title transfer may occur when the customer receives the product based on the terms of the agreement with the customer.

Revenues from fixed price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs incurred to date to total estimated costs for each contract. Revenues recognized in advance of amounts billable pursuant to contracts terms are recorded as unbilled receivables on uncompleted contracts based on work performed and costs to date. Unbilled receivables on uncompleted contracts are billable upon various events, including the attainment of performance milestones, delivery of product and/or services, or completion of the contract. Revisions to cost estimates as contracts progress have the effect of increasing or decreasing expected profits each period. Changes in contract estimates occur for a variety of reasons, including changes in contract scope, estimated revenue and estimated costs to complete.

#### Trade Accounts Receivable

Trade accounts receivable are recorded net of allowances for cash discounts for prompt payment, doubtful accounts and sales returns. Estimates for cash discounts and sales returns are based on contractual terms, historical trends and expectations regarding the utilization rates for these clients. The Company's policy is to reserve for uncollectible accounts based on its best estimate of the amount of probable credit losses in its

Case 1:16-cv-00420-ILG-VMS Document 127-2 Filed 05/11/18 Page 122 of 140 PageID #: 3410

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Condensed Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**

### Note 2. Summary of significant accounting policies – (continued)

existing accounts receivable. The Company periodically reviews its accounts receivable to determine whether an allowance for doubtful accounts is necessary based on an analysis of past due accounts and other factors that may indicate that the collectability of an account may be in doubt. Account balances deemed uncollectible are charged to the allowance for doubtful accounts after all means of collection have been exhausted and the potential for recovery is considered remote.

### Inventories

Inventories, which consist primarily of purchased and processed glass, aluminum, parts and supplies held for use in the ordinary course of business, are valued at the lower of cost or market. Cost is determined using a weighted-average method. Inventory consisting of certain job specific materials not yet installed are valued using the specific identification method. Reserves for excess or slow-moving inventories are updated based on historical experience of a variety of factors including sales volume and levels of inventories at the end of the period. The Company does not maintain allowances for the lower of cost or market for inventories of finished products as its products are manufactured based on firm orders rather than built-to-stock.

### Property, Plant and Equipment

Property, plant and equipment are recorded at cost. Significant improvements and renewals that extend the useful life of the asset are capitalized. Repairs and maintenance are charged to expense as incurred. When property is retired or otherwise disposed of, the cost and related accumulated depreciation are removed from the accounts and any related gains or losses are included in income as a reduction to, or increase in selling, general and administrative expenses. Depreciation is computed on a straight-line basis, based on the following estimated useful lives:

| | |
|---|---|
| Buildings | 20 years |
| Machinery and equipment | 10 years |
| Furniture and fixtures | 10 years |
| Office equipment and software | 5 years |
| Vehicles | 5 years |

### Warrant liability

The Company accounts for the warrants against its ordinary shares as a derivative liability. The Company classifies the warrant instrument as a liability at its fair value because the warrants do not meet the criteria for equity treatment under guidance contained in ASC 815-40-15-7D. This liability is subject to re-measurement at each balance sheet date and adjusted at each reporting period until exercised or expired, and any change in fair value is recognized in the Company's condensed consolidated statement of operations.

The Company determines the fair value of warrant liability using the Binomial Lattice options pricing model. In general, the inputs used are unobservable and the fair value measurement of the warrant liability is classified as a Level 3 measurement under guidance for fair value measurements hierarchy of categorization to reflect the level of judgment and observability of the inputs involved in estimating fair values. Refer to Note 10 for additional details about the Company's warrants.

### Income Taxes

The Company's operations in Colombia are subject to the taxing jurisdiction of the Republic of Colombia. Tecnoglass LLC and Tecnoglass RE LLC are subject to the taxing jurisdiction of the United States. TGI and Tecnoglass Holding are subject to the taxing jurisdiction of the Cayman Islands.

The Company recognizes deferred tax assets and liabilities for the expected impact of differences between the financial statements and tax bases of assets and liabilities and for the expected future tax benefit to be derived from tax losses and tax credit carry forwards if any.

FS-37

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Condensed Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**

**Note 2. Summary of significant accounting policies　– (continued)**

The Company believes that its income tax positions and deductions used in its tax filings would be sustained on audit and does not anticipate any adjustments that would result in a material changes to its financial position.

**Earnings per Share**

Basic earnings per share is computed by dividing net income by the weighted-average number of ordinary shares outstanding during the period, excluding the effects of any potentially dilutive securities. Income per share assuming dilution (diluted earnings per share) would give effect to dilutive options, warrants, and other potential ordinary shares outstanding during the period. Basic loss per share is computed by dividing loss available to common shareholders by the weighted-average number of common shares outstanding. Diluted loss per share is computed similar to basic loss per share except that the denominator is increased to include the number of additional common shares that would have been outstanding if the potential common shares had been issued and if the additional common shares are dilutive. The Company considered the dilutive effect of warrants to purchase ordinary shares in the calculation of diluted income per share, which resulted in 28,114,251 shares of dilutive securities for the three month period ended March 31, 2015. The computation of diluted earnings per share for the three months ended March 31, 2014 excludes the effects of dilutive options, warrants and other potentially dilutive securities because their inclusion, given a net loss for the period, would be anti-dilutive.

The following table sets forth the computation of the basic and diluted earnings per share for the three-month periods ended March 31, 2015 and 2014:

| | | |
|---|---|---|
| **Numerator for basic and diluted earnings per shares** | | |
| Net Income | $ 9,881 | $ (4,681) |
| **Denominator** | | |
| Denominator for basic earnings per ordinary share – weighted average shares outstanding | 24,801,132 | 24,242,315 |
| Effect of dilutive warrants and earnout shares | 3,313,119 | — |
| Denominator for diluted earnings per ordinary share – weighted average shares outstanding | 28,114,251 | 24,242,315 |
| Basic earnings per ordinary share | $ 0.40 | $ (0.20) |
| Diluted earnings per ordinary share | $ 0.35 | $ (0.20) |

**Product Warranties**

The Company offers product warranties in connection with the sale and installation of its products that are competitive in the markets in which the products are sold. Standard warranties depend upon the product and service, and are generally from five to ten years for architectural glass, curtain wall, laminated and tempered glass, window and door products. Warranties are not priced or sold separately and do not provide the customer with services or coverages in addition to the assurance that the product complies with original agreed-upon specifications. Claims are settled by replacement of the warrantied products.

**Non-Operating Revenues**

The Company recognizes non - operating revenues from foreign currency transaction gains and losses, interest income on receivables, proceeds from sales of scrap materials and other activities not related to the Company's operations. Foreign currency transaction gains and losses occur when monetary assets, liabilities, payments and receipts that are denominated in currencies other than the Company's functional currency are

FS-38

## Tecnoglass Inc. and Subsidiaries

## Notes to Condensed Consolidated Financial Statements
### (Amounts in thousands, except share and per share data)
### (Unaudited)

### Note 2. Summary of significant accounting policies – (continued)

recorded in the Colombian peso accounts of the Company in Columbia. During the quarters ended March 31, 2015 and 2014, the Company recorded net gains from foreign currency transactions of $3,361 and $602, respectively.

### Reclassifications

Certain accounts in the prior year's consolidated financial statements have been reclassified for comparative purposes to conform to the presentation in the current year consolidated financial statements. These reclassifications have no effect on the previously reported net income.

### Note 3 — Variable Interest Entities

The Company conducted an evaluation as a reporting entity of its involvement with certain significant related party business entities as of March 31, 2015 in order to determine whether these entities were variable interest entities requiring consolidation or disclosures in the financial statements of the Company. The Company evaluated two entities with whom it has maintained significant commercial relationships since 2004.

ES Windows LLC ("ESW LLC"), a Florida LLC, imports and resells the Company's products in the United States and acts as a freight forwarder for certain raw materials inventory purchased in the United States. The Company's CEO and COO, other family members, and other related parties own 100% of the equity in ESW LLC. The Company's sales to ESW LLC for the three month periods ended March 31, 2015 and 2014 were $11.9 million and $8.5 million, respectively. Outstanding receivables from ESW LLC at March 31, 2015 and December 31, 2014 were $18.9 million and $13.8 million, respectively.

Ventanas Solar S.A. ("VS"), a Panama sociedad anonima, is an importer and installer of the Company's products in Panama. Family members of the Company's CEO and COO and other related parties own 100% of the equity in VS. The Company's sales to VS for the three month periods ended March 31, 2015 and 2014 were $1 million and $3.7 million, respectively. Outstanding receivables from VS at March 31, 2015 and December 31, 2014 were $11 million and $12.2 million respectively, including a three-year payment agreement for trade receivables with a long term balance of $3.4 million and $4.2 million as of March 31, 2015 and December 31, 2014, respectively, related to a collection agreement between the Company and VS for trade receivables collection from customers in Panama.

As of the date of the evaluation, the Company concluded that (i) both entities are deemed variable interest entities because of the presence and effect of significant related parties; (ii) neither variable interest entity requires subordinated financial support for its operations as these operations are designed to provide residual returns to their equity investors, (iii) the Company's explicit variable interests are its arms-length commercial relationships which do not absorb the entities' risks and variability, (iv) that neither the Company nor its related parties had the controlling financial interests, and finally (v) the CEO, COO, family members and other equity investors are more closely related to the ESW LLC and VS and were therefore the primary beneficiaries of those entities' variable interests and residual returns or eventual losses, not the Company. The Company concluded that consolidation of these entities was not indicated.

No subordinated financial support has been provided to these entities as of March 31, 2015 or as of December 31, 2014.

FS-39

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Condensed Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**

### Note 4 — Inventories, net

Inventories are comprised of the following:

|  | March 31, 2015 | December 31, 2014 |
|---|---|---|
| Raw materials | $ 24,432 | $ 22,421 |
| Work in process | 2,270 | 2,136 |
| Finished goods | 2,589 | 2,158 |
| Stores and spares | 2,288 | 2,371 |
| Packing material | 165 | 171 |
|  | 31,744 | 29,257 |
| Less: inventory allowances | (271) | (292) |
|  | $ 31,473 | $ 28,965 |

### Note 5. Property, Plant and Equipment, Net

Property, plant and equipment consist of the following:

|  | March 31, 2015 | December 31, 2014 |
|---|---|---|
| Building | $ 34,677 | $ 36,228 |
| Machinery and equipment | 82,350 | 76,497 |
| Office equipment and software | 4,327 | 2,868 |
| Vehicles | 1,309 | 1,412 |
| Furniture and fixtures | 1,604 | 1,651 |
| Total property, plant and equipment | 124,267 | 118,656 |
| Accumulated depreciation and amortization | (31,339) | (31,646) |
| Net value of property and equipment | 92,928 | 87,010 |
| Land | 15,309 | 16,970 |
| Total property, plant and equipment, net | $ 108,237 | $ 103,980 |

Depreciation and amortization expense, inclusive of capital lease amortization, for the three-month periods ended March 31, 2015 and 2014 amounted to $2,501 and $1,952, respectively.

### Note 6. Long-Term Debt

At March 31, 2015, the Company owed approximately $96,936 under its various borrowing arrangements with several banks in Colombia, Panama, the United States and including obligations under various capital leases. The bank obligations have maturities ranging from six months to 15 years that bear interest at rates ranging from 2.9% to 12.03%. These loans are generally secured by substantially all of the Company's accounts receivable and/or inventory. Certain obligations include covenants and events of default including requirements that the Company maintain a minimum debt to EBITDA ratio, a minimum debt service ratio, total debt to total assets ratio and sales growth ratios.

|  | March 31, 2015 | December 31, 2014 |
|---|---|---|
| Obligations under borrowing arrangements | $ 96,936 | $ 94,198 |
| Less: Current portion of long-term debt and other current borrowings | 59,886 | 54,925 |
| Long-term debt | $ 37,050 | $ 39,273 |

FS-40

5/8/2018 https://www.sec.gov/Archives/edgar/data/1534675/000114420415041802/v412857_s4.htm

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Condensed Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**

**Note 6. Long-Term Debt – (continued)**

**Revolving Lines of Credit**

The Company has approximately $1.7 million available in two lines of credit under a revolving note arrangement as of March 31, 2015. The floating interest rates on the revolving notes are between DTF+6% and DTF+7%. DTF is the primary measure of interest rates in Colombia. At March 31, 2015 and December 31, 2014, $202 and $375 was outstanding under these lines, respectively.

Proceeds from debt and repayments of debt for the three months ended March 31, 2015 and 2014 are as follows:

|  | March 31, | | |
| --- | --- | --- | --- |
|  | **2015** | | **2014** |
| Proceeds from debt | $ 22,255 | $ | 23,229 |
| Repayments of debt | $ 21,767 | $ | 16,530 |

The Company acquired assets under capital leases for the three months ended March 31, 2015 and 2014 for $9,100 and $55, respectively.

Interest expense for the three month periods ended March 31, 2015 and 2014 was $2,152 and $1,973, respectively.

**Note 7. Income Taxes**

The Company files income tax returns for TG and ES in the Republic of Colombia. Colombia's Tax Statute was reformed in December 2014. A general corporate income Tax Rate applies at 25% and a CREE Tax based on taxable income also applies at a rate of 9% to certain taxpayers including the Company. Prior to the reform, the CREE Tax would only apply up to tax years 2015. The reform makes the CREE tax rate of 9% permanent and an additional CREE Surtax will also apply for the years 2015 through 2018 at varying rates.

The following table summarizes income tax rates under the tax reform law:

|  | **2015** | **2016** | **2017** | **2018** | **2019** |
| --- | --- | --- | --- | --- | --- |
| Income Tax | 25% | 25% | 25% | 25% | 25% |
| CREE Tax | 9% | 9% | 9% | 9% | 9% |
| CREE Surtax | 5% | 6% | 8% | 9% | — |
| Total Tax on Income | 39% | 40% | 42% | 43% | 34% |

The components of income tax expense (benefit) are as follows:

|  | **2015** | | **2014** |
| --- | --- | --- | --- |
| Current income tax |  | | |
|   Foreign | $ 4,929 | $ | 2,423 |
| Deferred income tax |  | | |
|   Foreign | $ (157) | $ | 548 |
| Total Provision for Income tax | 4,772 | | 2,971 |
| Effective income tax rate | 33.1% | | -173% |

The Company's lower effective tax rate for the three-month periods ended March 31, 2015 and 2014 reflect non-taxable revenues of $5,078 from the change in fair value of warrant liability as of March 31, 2015, compared with a non-deductible loss of $8,880 for the three month period ended March 31, 2014.

FS-41

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Condensed Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**

## Note 8. Fair Value Measurements

The Company accounts for financial assets and liabilities in accordance with accounting standards that define fair value and establish a framework for measuring fair value. The hierarchy prioritizes the inputs into three broad levels. Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities. Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration, for substantially the full term of the financial instrument. Level 3 inputs are unobservable inputs based on the Company's assumptions used to measure assets and liabilities at fair value. The classification of a financial asset or liability within the hierarchy is determined by the lowest level inputs that are significant to the fair value measurement.

Assets and Liabilities Measured at Fair Value on a Recurring Basis at March 31, 2015:

|  | Quotes Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|
| Warrant Liability | — | — | 14,913 |
| Interest Rate Swap Derivative Liability | — | 107 | — |
| Long term receivable from related parties |  | 3,392 | — |

Assets and Liabilities Measured at Fair Value on a Recurring Basis at December 31, 2014:

|  | Quotes Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|
| Warrant Liability | — | — | 19,991 |
| Interest Rate Swap Derivative Liability | — | 134 | — |
| Long term receivable from related parties |  | 4,220 |  |

## Note 9. Segment and Geographic Information

The Company operates a single segment business for product sales which consists of geographical sales territories as follows:

|  | Three months ended March 31, | |
|---|---|---|
|  | 2015 | 2014 |
| Colombia | $ 17,382 | $ 20,955 |
| United States | 31,678 | 21,867 |
| Panama | 1,468 | 4,415 |
| Other | 1,515 | 604 |
| Total Revenues | $ 52,043 | $ 47,841 |

FS-42

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Condensed Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**

**Note 10. Warrant Liability**

Prior to the Merger on December 20, 2013 the Company issued an aggregate of 9,200,000 warrants to purchase its ordinary shares as follows: 4,200,000 warrants issued in connection with Andina's Initial Public Offering, 4,800,000 warrants issued in connection with a Private Placement simultaneous with the Initial Public Offering and 200,000 working capital warrants issued upon conversion of a promissory note at the closing of the Merger. Following the Notice of Effectiveness of its Registration Statement on June 16, 2014, an aggregate of 102,570 warrants have been exercised by investors resulting in a net total of 9,097,430 warrants outstanding as of March 31, 2015. The fair value of the warrant liability was determined by the Company using the Binomial Lattice pricing model. This model is dependent upon several variables such as the instrument's expected term, expected strike price, expected risk-free interest rate over the expected instrument term, the expected dividend yield rate over the expected instrument term and the expected volatility of the Company's stock price over the expected term. The expected term represents the period of time that the instruments granted are expected to be outstanding. The expected strike price is based upon a weighted average probability analysis of the strike price changes expected during the term as a result of the down round protection. The risk-free rates are based on U.S. Treasury securities with similar maturities as the expected terms of the options at the date of valuation. Expected dividend yield is based on historical trends. The Company measures volatility using a blended weighted average of the volatility rates for a number of similar publicly-traded companies.

The inputs to the model were as follows:

|  | March 31, 2015 | December 31, 2014 |
|---|---|---|
| Stock Price | $ 9.30 | $ 10.15 |
| Dividend Yield | N/A | N/A |
| Risk-free rate | 0.56% | 0.67% |
| Expected Term | 1.72 | 1.97 |
| Expected Volatility | 32.77% | 33.62% |

The table below provides a reconciliation of the beginning and ending balances for the warrant liability measured using significant unobservable inputs (Level 3):

| | |
|---|---|
| Balance – December 31, 2014 | $ 19,991 |
| Fair value adjustment | (5,078) |
| Balance – March 31, 2015 | $ 14,913 |

**Note 11. Related Parties**

The Company's major related party entities are: ESW LLC, a Florida limited liability company partially owned by the Company's Chief Executive Officer and Chief Operating Officer, VS, an importer and installer based in Panama owned by related party family members, and Union Temporal ESW ("UT ESW"), a temporary contractual joint venture under Colombian law with Ventanar S. A. managed by related parties that expires at the end of its applicable contracts.

FS-43

5/8/2018 Case 1:16-cv-00420-ILG-VMS Document 121-2 https://www.sec.gov/Archives/edgar/data/1534675/000114420415041802/v412857_s4.htm Filed 05/14/18 Page 133 of 140 PageID #: 3421

**Tecnoglass Inc. and Subsidiaries**

**Notes to Condensed Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**

**Note 11. Related Parties  – (continued)**

The following is a summary of assets, liabilities, and income and expense transactions with all related parties, shareholders, directors and managers:

| | Three months ended March 31, | |
|---|---|---|
| | 2015 | 2014 |
| Revenues | | |
| Sales to ESW LLC | $ 11,871 | $ 8,513 |
| Sales to VS | 1,046 | 3,665 |
| Sales to UT ESW | 2 | 66 |
| Expenses | | |
| Fees paid to Directors and Officers | 389 | 117 |
| Paid to other related parties* | 443 | 89 |

| | March 31, 2015 | December 31, 2014 |
|---|---|---|
| Current Assets | | |
| Due from ESW LLC | $ 18,853 | $ 13,814 |
| Due from VS | 7,654 | 7,979 |
| Due from UT ESW | 2,103 | 2,000 |
| Due from other related parties | 4,061 | 4,534 |
| | $ 32,671 | $ 28,327 |
| Long term payment agreement from VS | $ 3,392 | $ 4,220 |
| Liabilities | | |
| Due to A Construir S.A. | $ (2,424) | $ (995) |
| Due to other related parties | (1,163) | (461) |

\*    Payments to other related parties in 2015 and 2014 consists of donations to Fundación Tecnoglass.

In December 2014, the Company and VS executed a three year payment agreement for recovery of trade receivables outstanding for $6.6 million with an interest rate of Libor + 4.7% paid semiannually. The payment agreement was accounted for at fair value.

In 2013, the Company guaranteed a loan for $163 used to develop a lot adjacent to the Alutions plant into a related party fuel service station Santa Maria del Mar S.A. At the March 31, 2015 the guarantee was in good standing and no liabilities have been recorded, and the Company was in the process of restructuring the guarantee to exclude the involvement of Tecnoglass, S.A., as required by the merger agreement.

In April 2014, the Company guaranteed approximately $300 of bank loans for the Company's Foundation. As of March 31, 2015, the loan balance was $300 and the guarantee is in good standing.

In December 2014, ESW LLC, a related party, guaranteed a mortgage loan for $3,920 for the acquisition of real properties in Miami-Dade County, Florida in favor of Tecnoglass RE, a wholly owned subsidiary of the Company.

**Note 12. Note Payable to Shareholder**

From September 5, 2013 to November 7, 2013 A. Lorne Weil loaned the Company $150 of which $70 was paid at closing of the Merger and $80 remained unpaid as of March 31, 2015 and December 31, 2014.

https://www.sec.gov/Archives/edgar/data/1534675/000114420415041802/v412857_s4.htm                                                                                         132/139

Case 1:16-cv-00420-ILG-VMS Document 127-2 Filed 05/14/28 Page 134 of 140 PageID #: 3422

TABLE OF CONTENTS

**Tecnoglass Inc. and Subsidiaries**

**Notes to Condensed Consolidated Financial Statements**
**(Amounts in thousands, except share and per share data)**
**(Unaudited)**

## Note 13. Derivative Financial Instruments

In 2012, the Company entered into two interest rate swap (IRS) contracts as economic hedges against interest rate risk through 2017, and two currency forward contracts as economic hedges against foreign currency rate risk on U.S. dollar loans. The currency forwards expired in January 2014. Hedge accounting treatment per guidance in ASC 815-10 and related Subsections was not pursued at inception of the contracts. The derivative contracts are recorded on the balance sheet as liabilities as of March 31, 2015 at an aggregate fair value of $107 Changes in the fair value of the derivatives are recorded in current earnings.

## Note 14. Commitments and Contingencies

### Guarantees

Guarantees on behalf of, or from related parties are disclosed in Note 11 — Related Parties

### Legal Matters

Tecnoglass S.A. is also a named defendant in the matter of Diplomat Properties, Limited Partnership as assignee of Shower Concepts, Inc. v. Tecnoglass Colombia, S.A. in the 17th Judicial Circuit in and for Broward County, Florida. Plaintiff Diplomat Properties, Limited ("Diplomat") has asserted a claim for indemnification against TG and Tecnoglass USA, Inc. The claim arises from the supplying of glass shower doors to a hotel/spa in Broward County, Florida. Specifically, in 2006, Diplomat commenced arbitration against Shower Concepts, Inc. seeking damages for breach of contract due to fractures in the installed glass shower doors. Diplomat initiated a complaint asserting various claims, which were dismissed with prejudice. The only remaining claim against the Tecnoglass entities is common law indemnification. TG denies liability and asserts that Shower Concepts was at fault and that as a joint tort feasor, it cannot sue for indemnity. A trial date has not yet been set for this case. Management and TG's counsel believes that a liability in this claim is remote and immaterial and there are no significant reasonably estimated amounts for a possible loss.

### General Legal Matters

From time to time, the Company is involved in legal matters arising in the ordinary course of business. While management believes that such matters are currently not material, there can be no assurance that matters arising in the ordinary course of business for which the Company is, or could be, involved in litigation, will not have a material adverse effect on its business, financial condition or results of operations.

## Note 15. Subsequent Events

The Company has evaluated events that occurred subsequent to March 31, 2015. Pursuant to the merger agreement and plan of reorganization and on filing of financial statements for the fiscal year ended December 31, 2014, Energy Holding Corporation received an aggregate of 500,000 ordinary shares based on the Company's achievement of specified EBITDA targets set forth in such agreement.

On April 14, 2015, the Company's Board of Directors authorized the payment of regular quarterly dividends to holders of its ordinary shares at a quarterly rate of $0.125 per share (or $0.50 per share on annual basis). The Board of Directors also approved an Exchange Offer to acquire all of the Company's outstanding warrants in exchange for ordinary shares of the Company at conversion ratio of 2.6 warrants in exchange for one ordinary share. The Exchange Offer will remain open for a period of 30 days once exchange documentation is sent to warrant holders and the first quarterly dividend payment will be made to shareholders of record 15 days after the end of the Exchange Offer. Management concluded that no additional subsequent events required disclosure other than those disclosed in these financial statements.

FS-45

## INFORMATION NOT REQUIRED IN PROSPECTUS

### Item 20. Indemnification of Directors and Officers

Cayman Islands law does not limit the extent to which a company's memorandum and articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the Islands courts to be contrary to public policy, such as to provide indemnification against willful fraud, willful default, civil fraud or the consequences of committing a crime. Our third amended and restated memorandum and articles of association provides for indemnification of our officers and directors to the maximum extent permitted by law, including for any liability incurred in their capacities as such, except through their own actual fraud or willful neglect or willful default.

We also have entered into indemnification agreements with each of our executive officers and members of our board of directors. The indemnification agreements supplement our third amended and restated memorandum and articles of association and Cayman Islands law in providing certain indemnification rights to these individuals. The indemnification agreements provide, among other things, that we will indemnify these individuals to the fullest extent permitted by Cayman Islands law and to any greater extent that Cayman Islands law may in the future permit, including the advancement of attorneys' fees and other expenses incurred by such individuals in connection with any threatened, pending or completed action, suit or other proceeding, whether of a civil, criminal, administrative, regulatory, legislative or investigative nature, relating to any occurrence or event before or after the date of the indemnification agreements, by reason of the fact that such individuals is or were our directors or executive officers, subject to certain exclusions and procedures set forth in the indemnification agreements, including the absence of fraud or willful default on the part of the indemnitee and, with respect to any criminal proceeding, that the indemnitee had no reasonable cause to believe his conduct was unlawful.

### Item 21. Exhibits and Financial Statement Schedules

Reference is hereby made to the attached Exhibit Index, which is incorporated herein by reference.

### Item 22. Undertakings

(a) The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(A) to include any prospectus required by Section 10(a)(3) of the Securities Act;

(B) to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20% change in the maximum aggregate offering price set forth in the "*Calculation of Registration Fee*" table in the effective registration statement; and

(C) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

II-1

TABLE OF CONTENTS

(4) That, for the purpose of determining liability under the Securities Act to any purchaser, each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. Provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(5) That, for the purpose of determining liability of the registrant under the Securities Act to any purchaser in the initial distribution of the securities, the undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(A) any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

(B) any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(C) the portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(D) any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

(b) The undersigned registrant hereby undertakes to supply by means of a post-effective amendment all information concerning a transaction, and the company being acquired involved therein, that was not the subject of and included in the registration statement when it became effective.

(c) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

II-2

TABLE OF CONTENTS

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Barranquilla, Colombia, on July 9, 2015.

### TECNOGLASS INC.

By:/s/ Joaquin Fernandez

Name: Joaquin Fernandez
Title: Chief Financial Officer,
(Principal Financial and Accounting Officer)

### POWER OF ATTORNEY

The undersigned directors and officers of Tecnoglass Inc. hereby constitute and appoint Jose Daes and Joaquin Fernandez with full power to act as our true and lawful attorney-in-fact with full power to execute in our name and behalf in the capacities indicated below, this registration statement on Form S-4 and any and all amendments thereto and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, and hereby ratify and confirm all that such attorneys-in-fact, or any of them, or their substitutes shall lawfully do or cause to be done by virtue hereof.

In accordance with the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Jose M. Daes<br>Jose M. Daes | Chief Executive Officer (Principal Executive Officer) | July 9, 2015 |
| /s/ Christian T. Daes<br>Christian T. Daes | Chief Operating Officer | July 9, 2015 |
| /s/ Joaquin Fernandez<br>Joaquin Fernandez | Chief Financial Officer (Principal Financial and Accounting Officer) | July 9, 2015 |
| /s/ A. Lorne Weil<br>A. Lorne Weil | Director (Non-Executive Chairman) | July 9, 2015 |
| /s/ Samuel R. Azout<br>Samuel R. Azout | Director | July 9, 2015 |
| /s/ Juan Carlos Vilariño<br>Juan Carlos Vilariño | Director | July 9, 2015 |
| /s/ Martha Byorum<br>Martha Byorum | Director | July 9, 2015 |
| /s/ Julio A. Torres<br>Julio A. Torres | Director | July 9, 2015 |

TABLE OF CONTENTS

# EXHIBIT INDEX

| Exhibit No. | Description | Included | Form | Filing Date |
|---|---|---|---|---|
| 2.1 | Agreement and Plan of Reorganization dated as of August 17, 2013 and as amended November 6, 2013, by and among the Company, Andina Merger Sub, Inc., Tecnoglass S.A., C.I. Energía Solar S.A. E.S. Windows and Tecno Corporation | By Reference | Schedule 14A | December 4, 2013 |
| 3.1 | Third Amended and Restated Memorandum and Articles of Association. | By Reference | Schedule 14A | December 4, 2013 |
| 4.1 | Specimen Ordinary Share Certificate. | By Reference | S-1/A | January 23, 2012 |
| 4.2 | Specimen Warrant Certificate. | By Reference | S-1/A | December 28, 2011 |
| 4.3 | Warrant Agreement between Continental Stock Transfer & Trust Company and the Company. | By Reference | 8-K | March 22, 2012 |
| 4.4 | Form of First Unit Purchase Option issued to EarlyBirdCapital, Inc. | By Reference | S-1/A | March 12, 2012 |
| 4.5 | Form of Second Unit Purchase Option issued to EarlyBirdCapital, Inc. | By Reference | S-1/A | March 7, 2012 |
| 5.1 | Opinion of Maples and Calder. | Herewith* | | |
| 10.1 | Amended and Restated Registration Rights Agreement among the Company, the Initial Shareholders and Energy Holding Corporation. | By Reference | 8-K | December 27, 2013 |
| 10.2 | Indemnity Escrow Agreement dated as of December 20, 2013, by and among the Company, Representative, Committee and Continental Stock Transfer and Trust Company. | By Reference | 8-K | December 27, 2013 |
| 10.3 | Additional Shares Escrow Agreement dated as of December 20, 2013, by and among the Company, Representative, Committee and Continental Stock Transfer and Trust Company. | By Reference | 8-K | December 27, 2013 |
| 10.4 | Form of Lock-Up Agreement between the Company and Energy Holding Corporation | By Reference | 8-K | August 22, 2013 |
| 10.5 | 2013 Long-Term Incentive Equity Plan | By Reference | Schedule 14A | December 4, 2013 |
| 10.6 | Form of Subscription Agreement | By Reference | 8-K | December 19, 2013 |
| 10.7 | Form of Indemnification Agreement | By Reference | 8-K | March 6, 2014 |
| 21 | List of subsidiaries. | By Reference | 10-K | April 15, 2015 |
| 23.1 | Consent of PricewaterhouseCoopers Ltda. | Herewith | | |
| 23.2 | Consent of Marcum LLP | Herewith | | |
| 24 | Power of Attorney (included on signature page of this Form S-4). | Herewith | | |
| 99.1 | Form of Letter of Transmittal. | Herewith | | |
| 99.2 | Form of Notice of Guaranteed Delivery. | Herewith | | |
| 99.3 | Form of Letter to Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees. | Herewith | | |
| 99.4 | Form of Letter to Clients of Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees. | Herewith | | |
| 101.INS | XBRL Instance Document | Herewith | | |

**TABLE OF CONTENTS**

| Exhibit No. | Description | Included | Form | Filing Date |
|---|---|---|---|---|
| 101.SCH | XBRL Taxonomy Extension Schema | Herewith | | |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase | Herewith | | |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase | Herewith | | |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase | Herewith | | |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase | Herewith | | |
| * | To be filed by Amendment. | | | |